**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **MAXUS METROPOLITAN, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No: 20-cv-00095-FJG** |
| | ) | |
| **TRAVELERS PROPERTY CASUALTY** | ) | |
| **COMPANY OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**SUGGESTIONS IN SUPPORT OF**
**TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA'S**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

i

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................... 1

II.  STATEMENT OF UNDISPUTED FACTS ................................................... 3

   A.   The Metropolitan ....................................................................................... 3

   B.   The Direct Fire Damage Claim (Phase 6 Fire Damage and Phase 5 Heat and Water Damage) ..................................................................................... 6

   C.   Maxus' Lost Rents Claims ......................................................................... 9

   D.   Maxus' Soot/Char Smoke Damage Claims .............................................. 9

      (1)   SELC Concealment ............................................................................. 9

      (2)   Concealment of May 30 Inspection. ................................................ 11

      (3)   Concealment of FBS data. ................................................................ 12

      (4)   Concealment of EAA report. ............................................................ 14

      (5)   Phase 5 Water Damage. .................................................................... 15

   E.   The Travelers Policy ............................................................................... 17

III. ARGUMENT ................................................................................................... 25

   A.   Standard of Review ................................................................................. 25

   B.   Maxus' Multiple Instances of Intentional Concealment Voids the Entire Policy ............ 25

      (1)   Phase 5 Water Damage ...................................................................... 27

      (2)   Soot and Char Sampling Results ...................................................... 29

   C.   Maxus Breached the Cooperation Provision of the Policy ..................... 33

      (1) Maxus' failure provide Travelers notice of the April 10, 2019 sprinkler rupture constitutes a material breach of the Policy's cooperation clause. ........................... 34

      (2) Maxus' refusal to cooperate with Travelers' requests with respect to FBS inspections and sampling constitutes a material breach of the cooperation clause. .............. 35

      (3) Maxus cannot recover damages incurred as a direct result of its failure to protect the covered property. ................................................ 36

      (4)   Maxus failed to comply with terms of the Policy prior to filing the present action. ...... 37

   D.   Maxus' Breach of Contract Claim Fails Because the Policy Does Not Provide Coverage for Maxus' Claim ......................... 39

   E.   Maxus Is Not Entitled to Soft Costs Coverage Under the Policy ........... 40

   F.   Maxus' Claimed Damages Were Caused by an Excluded Cause of Loss. ......................... 41

   G.   Maxus' vexatious refusal claim fails as a matter of law ......................... 42

      (1)   Maxus' vexatious refusal claim fails because there is no coverage under the Policy.... 42

      (2)   Travelers' refusal to pay was reasonable as a matter of law ........... 43

IV.  CONCLUSION .................................................................................................. 44

**TABLE OF AUTHORITIES**

*Adams v. Columbia Mut. Ins. Co.*, 978 S.W.2d 10 (Mo.App.1998)……..………………………26

*American States Ins. Co. v. Mathis*, 974 S.W.2d 647 (Mo. App. E.D. 1998)………..………….39

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)….………………………...……………..25

*Cedar Hill Hardware and Const. Supply, Inc. v. Ins. Corp. of Hannover*, 563 F.3d 329
(8th Cir. 2009)…..…………………………………………………………………………….….26

*Centermark Props. v. Home Indem. Co.*, 897 S.W.2d 98 (Mo. Ct. App. 1995)…………........…39

*Ceramo Co., Inc. v. Hartford Fire Ins. Co.*, No. 1:05-cv-0098-TCM, 2006 WL 2708626
(E.D. Mo. Sept. 20, 2006)………………………………………………………………….....43

*Childers v. State Farm Fire & Cas. Co.*, 799 S.W.2d 138 (Mo. App. 1990)..……………..…….26

*Church Mut. Ins. Co. v. Metro. Christian Worship Ctr. of St. Louis*, No. 4:19-CV-00903
-MTS, 2020 WL 6075638 (E.D. Mo. Oct. 15, 2020)……..……………………………..………..34

*Citizens Ins. Co. of America v. Leiendecker*, 962 S.W.2d 446 (Mo. App. E.D. 1998)…...……...39

*CM Vantage Specialty Ins. Co. v. Nephrite Fund 1, LLC*, No. 4:18-CV-1749-JMB, 2020
WL 805848 (E.D. Mo. 2020)…………………...………………….……..……………….26, 34

*Columbia Cas. Co. v. HIAR Holding, LLC*, 411 S.W.3d 258 (Mo. 2013) (en banc)…………….34

*Dhyne v. State Farm Fire & Cas. Co.,* 188 S.W.3d 454 (Mo.2006)……………………………..42

*Downtown Lofts LIHTC LLLP v. Travelers Prop. Cas. Co. of America*, No. 19-CV-3295-
WJM-SKC, 2020 WL 7828763 (D. Colo. Dec. 31, 2020)………………..……………….…40

*Federated Mut. Ins. Co. v. Peery's Auto Parts, L.L.C.*, No. 11-00172-CV-W-FJG, 2012 WL
828312 (W.D. Mo. Mar. 7, 2012)………………...………………….……..….………..26

*Grossman Iron and Steel Co. v. Bituminous Cas. Corp.*, 558 S.W.2d 255 (Mo. App. 1977)…...39

*Kauble v. MFA Mut. Ins. Co.*, 637 S.W.2d 831 (Mo. App. E.D. 1982)………...…...…………...39

*Liberty Mut. Fire Ins. Co. v. Scott*, 486 F.3d 418 (8th Cir. 2007)………………...………...26

iii

*Lower Brule Sioux Tribe v. South Dakota*, 104 F.3d 1017 (8th Cir.1997)……………....…….25

*Macheca Transp. v. Philadelphia Indem. Ins. Co*., 649 F.3d 661 (8th Cir. 2011).....……………42

*Neidenbach v. Amica Mut. Ins. Co*., 96 F.Supp.3d 925 (E.D. Mo. 2015)………...…….........26, 27

*Roller v. Am. Modern Home Ins. Co*., 484 S.W.3d 110 (Mo. Ct. App. 2015)……………..…...34

*Safeco Ins. Co. of Am. v. Schweitzer*, 372 F.Supp.3d 884 (W.D. Mo. 2019)………...……….....39

*SJP Props., Inc. v. Mt. Vernon Fire Ins. Co*., No. 4:14-cv-694-JAR, 2015 WL 4524337
(E.D. Mo. Jul. 27, 2015)……………………………………………...……...…………..43

*Truck Ins. Exchange v. Heman*, 800 S.W.2d 2 (Mo. App. W.D. 1990)……....……………….39

*Two Branch Marina, Inc. v. Western Heritage Ins. Co*., No. 4:07-cv-1017, 2008 WL
2952747, (E.D. Mo. Jul. 29, 2008)…………………………………………………..43, 44

*Wiles v. Capitol Indem. Corp*., 215 F. Supp. 2d 1029 (E.D. Mo. 2001)………….…………..35

*Wood v. Safeco Ins. Co. of Am*., 980 S.W.2d 43 (Mo.App.1998)…….…………………………42

**Rules**

Federal Rules of Civil Procedure Rule 56…..………………………………………...........25

Case 4:20-cv-00095-FJG   Document 84   Filed 04/16/21   Page 4 of 50

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Travelers Property Casualty Company of America ("Travelers") respectfully submits the following suggestions in support of its motion for summary judgment as follows:

## I. INTRODUCTION

Through the present lawsuit, Maxus Metropolitan, LLC ("Maxus" or "Plaintiff") alleges damages it claims arose from a September 27, 2018 fire that destroyed a stand-alone building known as "Phase 6," which is one of three buildings that make up the Metropolitan, an apartment complex located in Birmingham, Alabama.[1] The only physical connection between the Phase 6 building and other buildings in the complex was a single open-air walkway connecting the northern exposure of Phase 6 to the southern exposure of Phase 5. There were no other connections between the Phase 6 building that burned and the other buildings, and their interiors were not connected in any way.

At the time of the fire, Phase 6 was under construction and had largely reached a completed "rough-in" stage (i.e., sheetrock and flooring had not been installed and the interior consisted of framing, sub-flooring, and rough-in plumbing and electrical). The other buildings of the Metropolitan that were not involved in the fire were at various stages of completion – Phases 4 and 5 were at similar stages of construction as Phase 6, while Phases 1-3 were complete and had some occupants.

Travelers has already paid over $6,000,000 in insurance proceeds as a result of the fire, including:

- payment for the construction in place in Phase 6 at the time of the fire;

- damages to the Phase 5 building including, among other items, roof replacement for that building, replacement of sub-floor due to water damage, and some exterior cladding and window replacement on the façade closest the fire; and

---

[1] *See infra,* pg. 4.

- minor repairs to Phases 1-4.

Maxus now claims that soot and char from the fire infiltrated the interior spaces of all the other buildings (Phases 1-4 and Phase 5) that were not involved in the fire, and as a result, all the other buildings require demolition and rebuilding of all interior spaces. Maxus also claims that the other buildings suffered water damage as a result of the fire and require significant demolition of the exterior cladding and framing.

In response to Maxus' additional claims, Travelers retained the services of Chris Spicer, an AIHA-certified industrial hygienist, to evaluate the other buildings for the presence of soot and char from the fire and Kurt Mulder, a licensed structural engineer, to evaluate the water damage claims. Mr. Spicer inspected The Metropolitan on two occasions, collected samples, had them tested by an AIHA-certified laboratory (RJ Lee Group, Inc.), and concluded that no combustion materials (neither soot nor char) from the fire had infiltrated the other buildings of The Metropolitan as Maxus claimed. Mr. Mulder inspected The Metropolitan on three occasions, conducted testing on roof debris, and concluded that the water damage to the other buildings was not a result of the fire. As a result, Maxus and Travelers dispute whether there is coverage under the Travelers policy for Maxus' additional soot and char and water damage claims. However, based on the undisputed facts in the case, because Maxus breached the conditions of the Travelers policy, it has voided its coverage under Missouri law.

During the claims process, Maxus violated the "Concealment, Misrepresentation, or Fraud" condition of the Travelers policy in two ways. First, Maxus intentionally concealed material facts relating to soot and char sampling and testing performed on the Metropolitan. Second, Maxus made claims for water damages to the Phase 5 building that were not related to the fire, but rather, had been caused by a substantial sprinkler line rupture that occurred on April 10,

2

2019, more than six months after the fire and expiration of the Travelers policy. Moreover, Maxus breached its post-loss obligations and the cooperation condition of the Travelers policy. It is undisputed that Travelers requested information from Maxus throughout the course of its claim investigation, which Maxus never provided. Instead of providing requested information, Maxus commenced the present action in further breach of its obligations under the policy.

Furthermore, it is undisputed that Maxus stopped all repair and remediation work on Phase 5 by May 1, 2019 and did not resume construction activity in Phase 5 until February 2020. As a result, the water-soaked sub-floor from the April 10, 2019 sprinkler line rupture remained in place in Phase 5 for more than nine months until it was ultimately repaired and replaced. As a result, all of Maxus' claims for water and moisture damage to Phase 5 fail as a matter of law because Maxus failed to mitigate its losses in violation of the conditions of the policy obligating Maxus to protect property from further damage following a loss.

In addition, Maxus has not, and cannot, present evidence that Travelers breached the insurance contract or that Travelers vexatiously refused to pay Maxus' disputed claims. The undisputed facts show that Travelers has a valid, meritorious reason to refuse payment for disputed portions of Maxus' claim. Accordingly, Maxus' vexatious refusal claim fails as a matter of law.

In sum, no genuine issue of material fact exists for a jury's determination, and the Policy language at issue is clear. Thus, as a matter of law, Travelers is entitled to a judgment in its favor on a full and final basis as to all of Maxus' claims.

## II.    STATEMENT OF UNDISPUTED FACTS

### A.    The Metropolitan

3

1.      On or about September 19, 2014, Bomasada Birmingham, LLC purchased the property located at 2900 7th Ave South, Birmingham, AL 35223, to construct The Metropolitan apartment complex.[2] [Ex. 1, p. 3].

2.      On or about June 15, 2015, Bomasada Birmingham Metropolitan, LLC entered into a contract Bomasada BHM Construction, LLC commenced construction of the Metropolitan [Ex. 2, p. 14], which was divided into six phases as identified in the below rendering.



3.      On or about August 1, 2015, Travelers issued a Builders Risk – Construction PAK insurance policy number QT-660-7E077026-TIL-15 to "Bomasada Birmingham Metropolitan LLC; Bomasada BHM Construction LLC, and Bomasada Group Inc." (collectively, "Bomasada").

---

[2] On or about September 10, 2015, Bomasada Birmingham, LLC conveyed the subject property to Bomasada Birmingham Metropolitan, LLC. [Ex. 2, p. 61].

4

[Ex. 3, p. 2]. Over the course of construction, the project suffered from numerous delays, and the policy was renewed for various periods. [Ex. 3, p. 2].

4.      At the time of the loss, on September 27, 2018, policy number QT-660-7E077026-TIL-18, was in effect for the policy period of March 31, 2018 through September 30, 2018. [Ex 4, pp. 2-3]. The policy expired on September 30, 2018 and was not renewed. [Ex. 4, pp. 2-3].

5.      On or about August 31, 2018, Bomasada Birmingham Metropolitan, LLC (the Bomasada ownership entity) and Maxus entered into a real estate purchase and sale agreement for the purchase and sale of the Metropolitan. [Ex 5].

6.      At the time of the sale, Phases 1-3 of the Metropolitan were complete, temporary certificates of occupancy had been issued, and some of the top floor units were leased to tenants. [Ex. 6, p. 12, trp. 32:1-14].

7.      As part of the August 31, 2018 sale, Bomasada BHM Construction, LLC (the Bomasada construction entity) and Maxus entered into a Construction Completion Agreement in which Bomasada BHM Construction, LLC agreed to continue serving as the general contractor and oversee the remaining construction work on Phases 4-6 of the Project. [Ex. 7].

8.      The Construction Completion Agreement provided that "Contractor shall provide and maintain such types and amounts of insurance as set forth in Exhibit B." [Ex. 7, p. 6].

9.      Exhibit B of the Construction Completion Agreement provides as follows:

Property Insurance. The Contractor shall cause the current property insurance to be extended through the Competition Work. The Owner shall be a named insured. The Contractor shall maintain, in a company or companies lawfully authorized to do business in Alabama, property insurance written on a builder's risk "all-risk" or equivalent policy form in the amount of the Prior Construction Contract Sum, plus value of subsequent Completion Work and cost of materials supplied or installed by others, comprising total value for the entire Project at the site on a replacement cost basis without optional deductibles. The Owner shall pay Contractor the cost of the extension of the builder's risk "all-risk" property insurance, and such shall be a line item on Exhibit A to the Agreement. Such property insurance shall be

5

maintained, until Final Payment has been made as provided in Paragraph 6 of the Agreement.

Property insurance shall be a self-insurance program or on an "all-risk" or equivalent policy form and shall include, without limitation, insurance against the perils of fire (with extended coverage) and physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, collapse, earthquake, flood, windstorm, falsework, testing and startup, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation for Contractor's services and expenses required as a result of such insured loss.

If the Owner requests in writing that insurance for risks other than those described herein or other special causes of loss be included in the property insurance policy, the Contractor may, in its sole discretion, include such insurance, and the cost thereof shall be charged to the Owner by appropriate Change Order to the Agreement.

[Ex. 7, p. 14].

10. Travelers was not informed of the real estate sale or Construction Completion Agreement, or other agreements executed as part of the sale of the Metropolitan until after the September 27, 2018 fire. [Ex. 8, p. 3].

**B.     The Direct Fire Damage Claim (Phase 6 Fire Damage and Phase 5 Heat and Water Damage)**

11. On or about September 27, 2018, an intentionally set fire destroyed Phase 6, the stand-alone building, of the Metropolitan. Even though there was some indirect damage from the fire to Phase 5 (the building next to Phase 6) and very minor damage to a limited portion of the west-facing exterior of Phases 1-4, the fire itself was confined to Phase 6. [*See* Doc. 40-1].

12. On or about September 28, 2018, Bomasada provided Travelers with notice of its claim for property damage as a result of the fire. At that time, it was determined that those damages included damage to all of Phase 6, to the point it was built at the time, and roof and water damage to Phase 5 of the Project (hereinafter referred to collectively as "Fire Damage.").

6

13.     Following this notice, Travelers immediately began investigating the Fire Damage claim, which included meetings with Maxus and Bomasada, inspections of the Metropolitan, requests for documentation, and exchange of information. [Exs. 9 & 10].

14.     Upon receiving notice of the loss, Travelers became aware of Maxus' ownership interest and also of a Protective Safeguards endorsement on the Policy that potentially impacted coverage for the loss. [Ex. 11]. Although Maxus was not added as an additional insured on the Travelers policy, Maxus qualifies as an additional named insured "but only to the extent of [its] financial interest in the Covered Property." [*See* Exs. 4, p. 34; 11].

15.     On November 29, 2018, after evaluating the aforementioned coverage issues, Travelers issued a letter confirming its decision that the Protective Safeguards endorsement would not preclude coverage under the policy.[3] [Ex. 12, p. 3].

16.     Following meetings with Maxus and Bomasada, Travelers issued an advance payment in the amount of $1,000,000.00 to help cover any emergency services and initial repairs to Phases 1-5 and clean-up of Phase 6. [Ex. 13, p. 2; Ex. 14, p. 2].

17.     On December 12, 2018, Bomasada retained ATC Group Services, Inc. to perform, among other things, moisture mapping to determine the extent of water damage to the Phase 5 part of the building due to fire extinguishing efforts and roof damage as a result of the fire. [Ex. 15, p. 3, ¶ 1].

18.     On January 15, 2019, ATC issued its report identifying the areas of Phase 5 that had suffered water damage. [Ex. 15].

---

[3] Maxus was added to the policy as an insured; however, Maxus was not the original named insured, did not purchase the policy, was not involved in any renewals, and paid no premium at all for its coverage under the policy.

7

19. Thereafter, on January 29, 2019, Bomasada stated that the $1,000,000 advance payment was a sufficient amount for clean-up and repairs to "known damage attributed to the fire" to Phases 1-5, which included clean-up and restoration of Phase 5 of the Project. [Ex. 16, p. 2].

20. On March 13, 2019, Travelers issued a letter and statement of loss explaining that Travelers had been able to identify damages to the Metropolitan in the amount of $2,519,607.19 and was prepared to issue payment in that amount. [*See* Exs. 17, p. 2, ¶ 1; 51]. This estimate included costs to rebuild Phase 6 to its condition at the time of the loss; heat damage to the south façade and windows of Phase 5 that were closest to the flames; damage to the Phase 5 roof caused by embers that fell onto the TPO roof membrane; water damage to Phase 5, including replacement of approximately 3,000 square feet of subflooring in the specific areas identified in the ATC report; and mold remediation to the entire Phase 5 building. [*See* Exs. 17; Ex. 51].

21. In response, on March 20, 2019, Bomasada represented that the estimate for Phase 6 re-construction and repairs to Phases 1-5 did not represent a reasonable amount for the work but did not identify any specific areas of disagreement or provide an alternative estimate. [Ex. 17, p. 2].

22. Thereafter, on April 10, 2019, Travelers requested that Bomasada and Maxus provide documentation stating the basis for their disagreement. [Ex 18, p. 2, ¶ 2].

23. On April 18, 2019, without providing any of the previously requested information Bomasada and Maxus invoked the appraisal provision of the policy. [Ex. 19, p. 2, ¶ 2].

24. Travelers responded, explaining that appraisal was premature as Maxus and Bomasada had failed to provide an estimate of their claimed damage or identify specific areas of disagreement that could be subject to appraisal. [Ex. 20, p. 4, ¶ 1].

25.     The claim over the Phase 6 direct fire damage has been, and remains, in mediation. [*See* Doc. 52. ¶ 1].

**C.      Maxus' Lost Rents Claims**

26.     On or about April 12, 2019, through its consultant, Quantum Global, Maxus submitted an initial claimed amount of $415,569.04 in loss of rental income as a result of the September 27, 2018 fire. [Ex. 21, p. 4].

27.     On or about April 29, 2019, Maxus submitted an updated loss of rental income calculation, which claimed rental income losses to the entire Metropolitan property through the end of 2019, including claimed rental losses in Phases 1-4. [Ex. 21, p. 3].

28.     Travelers has paid $415,379.92 for lost rents for the appropriate period of restoration associated with the repairs to the various Phases of the Metropolitan relative to the damage. [Ex. 22]. Travelers has denied any additional claims for lost rental income beyond the associated periods of restoration as those lost rents are associated with rental income lost during Maxus' remediation of alleged soot and char contamination, which Travelers disputes is present.

**D.      Maxus' Soot/Char Smoke Damage Claims**

**(1)      SELC Concealment**

29.     On or about April 9, 2019, unbeknownst to Travelers, a representative of Maxus' construction consultant, BCCM Construction Group ("BCCM"), and Alex Stehl, Maxus' Vice-President of Construction were in direct communications with Safety Environmental Laboratories and Consulting, Inc. ("SELC"), an AIHA-certified testing laboratory located in Pelham, Alabama. The purpose of these communications was to request SELC to conduct soot and char testing in

specific areas identified by BCCM throughout the Metropolitan. [4] Maxus and BCCM requested SELC to collect samples, analyze them for the presence of soot and char and generate a report memorializing its findings to be completed by Friday, April 19, 2019. [Ex. 23, p. 3].

30.     On April 10 and April 11, 2019, SELC inspected the Metropolitan and collected 97 samples from the areas BCCM selected as having, in BCCM's estimation, the greatest suspicion of being contaminated. After collection, SELC started analyzing the 97 samples to determine the presence and concentration (if any) of soot and char from the September 27, 2018 fire in order to provide a report to Maxus by the requested deadline of April 19, 2019. [Ex. 24]

31.     However, before SELC was able to fully complete its analysis and issue a report, someone from Maxus or BCCM terminated SELC and told them not to issue a final report. [Ex. 25, p. 22, trp. 81, 82: 12-23, 1-9].

32.     The next week, on April 24, 2019, Forensic Building Science, Inc. ("FBS"), Maxus' current consultant, made its first visit to the Metropolitan and opined that it suspected soot and char contamination. [Ex. 26, pp. 2-3].

33.     On or about May 1, 2019, Maxus informed Travelers that it discovered evidence of what it believed was smoke and/or soot damage to Phases 1-4 and claimed additional smoke and/or soot damage to Phase 5 of the Metropolitan and that it had retained a company to perform testing and provide guidance. [Ex. 27, p. 2, ¶ 2].

34.     Maxus never identified SELC as one of its retained consultants, never advised Travelers that SELC had collected 97 samples from all parts of the Metropolitan, and never disclosed that SELC had conducted varying degrees of analysis on nearly all (85 out of 97) of the

---

[4] Travelers did not learn of SELC's involvement and Maxus' retention of SELC during the claim. Travelers only learned that SELC was involved during this litigation through the production of an e-mail from Maxus [Ex. 23]. Travelers only learned the degree of SELC's involvement when it received documents from SELC in February 2021, in response to a Rule 45 subpoena

samples addressing the very question to which Maxus sought an answer: whether combustion materials from the September 27, 2018 fire were present in the other areas of the Metropolitan. [*See* Ex. 52].

35.     In fact, Maxus never informed Travelers of its relationship with SELC, never told it about the work SELC had performed, and never provided any of SELC's test results. Travelers only obtained that information pursuant to a Rule 45 subpoena in the litigation. [*See* Doc. 51-2].

### (2)     Concealment of May 30 Inspection.

36.     On May 13, 2019, Travelers specifically requested that Maxus identify who had conducted smoke/soot damage testing at the Metropolitan. Travelers also requested Maxus provide it with sufficient notice of any future inspections for the specific purpose of affording Travelers an opportunity to have its representatives attend any inspections or sampling collection contemporaneously with Maxus' consultants. [Ex. 28 p. 4, ¶ 3].

37.     On May 28, 2019, Maxus acknowledged receipt of Travelers' May 13 letter. However, Maxus neither provided Travelers with the name of any testing firms nor informed Travelers about SELC's testing but, instead, stated that "an environmental hygienist" had been engaged and its work was underway. [Ex. 29].

38.     Moreover, Maxus did not advise Travelers of any upcoming environmental inspections by its environmental consultant as Travelers had requested. Rather, it offered to allow Travelers to inspect on its own at a reasonable time. [Ex. 29].

39.     Unbeknownst to Travelers, Maxus' claim consultants, Forensic Building Science ("FBS") were already scheduled to conduct additional environmental inspections of the property on May 30, 2019 "to compare the initial sampling result with the secondary sampling results." Ex. 30, pp. 3-4]. FBS conducted the inspection and collected 40 samples that it sent off for additional analysis [*See* Exs. 38 & 39].

40.     Maxus did not comply with Travelers' request to be advised of any inspections and afforded an opportunity to accompany Maxus' experts on said inspections.[5]

### (3)     Concealment of FBS data.

41.     On June 6, 2019, Travelers again reminded Maxus of the conditions under the policy and requested that Maxus permit Travelers' own experts to inspect the property on June 13, 2019. [Ex. 31].

42.     The following day, on June 7, 2019, Maxus provided Travelers with a Fire Damage Report issued by FBS, alleging that all remaining buildings (Phases 1-5) of the Metropolitan were impacted by the fire and sustained residual soot and/or char damage. [Ex. 32., p. 2]. However, no where in the report does FBS indicate that it had inspected and collected samples for a second time on May 30, 2019, or that it had sent those samples to laboratories for more advanced, confirmatory testing and was awaiting the results. [*See* Ex. 32].

43.     Despite not having received the results of the second round of sampling, the FBS Report stated that the entire project would need to be remediated, and residents and employees would need to be "vacat[ed]" from the Metropolitan premises. [Ex. 32, p. 63, ¶ 1].

44.     On June 13, 2019, Chris Spicer, an industrial hygienist retained by Travelers to inspect and evaluate Maxus' newly claimed smoke and/or soot damage, conducted an initial inspection of the Metropolitan to assess overall site conditions in order to evaluate the FBS report's conclusions. [Doc 40-2, p.3].

45.     The following day, on June 14, 2019, Maxus instructed all residents to vacate the Metropolitan property by June 24, 2019, which significantly expanded the claim. [Ex. 33].

---

[5] Travelers did not learn that a second inspection and that additional testing had been conducted until August 22, 2019, when it took the examination under oath of the **Bomasada** corporate representative on the Bomasada soft costs claims under the Policy and even then, was not made aware of the date of such inspection and testing until much later. [*See* Ex. 36]

46.     On August 22, 2019, Travelers took the examination under oath of Stuart Fred of Bomasada. [Ex. 6]. In that EUO, Travelers was made aware for the first time that FBS had taken the aforementioned second set of samples, had received additional test results, and had analyzed those results, but had not advised Travelers or provided Travelers with the test results. The documents and e-mails referencing those results were produced to Travelers by Bomasada and not Maxus – Maxus never notified Travelers of the second round of test results. [Ex. 6, p. 36, trp. 128:10-14].

47.     On September 12, 2019, Travelers made a specific request that Maxus provide it with copies of "any test results or reports related to this second round of environmental testing." Travelers also specifically requested any and all documents from FBS or any other retained experts regarding testing of the Metropolitan. [Ex. 34, p. 2].

48.     On September 23, 2019 and October 8, 2019, Travelers again requested the results of the second round of testing conducted at the Metropolitan. [Exs. 35, p. 2; 36, p. 2].

49.     Travelers followed those three requests with yet another request on October 17, 2019, which reiterated its need for documents and reports related to the FBS' second sampling inspection and more specifically requested "any and all test results from the second tests.' [Ex. 37, p. 5, ¶ 1].

50.     On or about November 13, 2019, Maxus finally provided Travelers with a copy of the FBS report relating to its second sampling inspection. [Ex. 38, p. 2]. Maxus also provided the test results from EMSL, Inc., an AIHA-certified laboratory. [Ex. 38, p. 8-66]. FBS' report dismissed EMSL's findings, stating this confirmatory testing as having been affected by ongoing construction. [Ex. 38, p. 7, ¶ 2].

51.     However, unbeknownst to Travelers, FBS had collected another set of samples during its May 30, 2019 inspection and sampling and sent those samples to another AIHA-certified environmental testing company, Microvision, for analysis. Maxus did not provide the results from Microvision and, in fact, never disclosed the fact that Microvision had even been involved in the analysis at any point during the claim. [*See* Ex. 39].

52.     Travelers did not discover that Microvision had conducted analysis on an additional set of samples until it discovered an invoice produced by Maxus in the current litigation. Travelers issued a subpoena to Microvision and finally obtained the Microvision results through that means on November 16, 2020. [*See* Doc. 35]. It is undisputed that Maxus never advised Travelers of Microvision's involvement or provide any results at any point during the claim, despite the fact that Microvision provided its results to FBS on June 21, 2019. [Ex. 39, p. 2].

**(4)     Concealment of EAA report.**

53.     Following Maxus evicting residents from the Metropolitan property, on or about September 30, 2019, Travelers' retained industrial hygienist, Mr. Spicer, visited the Metropolitan to conduct a second inspection and collect samples from specific locations for analysis by an AIHA-certified laboratory. [Ex. 40, p. 4, ¶ 1].

54.     During this inspection, FBS followed Mr. Spicer and collected concurrent samples. FBS observed Mr. Spicer's sample collection – the specific locations in the building where he sampled, the specific locations within the wall cavities where he took the samples, his methods for accessing the wall cavities, his sample collection techniques, his sampling medium, and his chain of custody protocols. FBS also collected samples from the same locations sampled by Spicer. [Ex. 40, p. 4, ¶ 1].

55.     Following the September 30, 2019 inspection, Travelers made repeated requests for Maxus to provide the test results for the samples FBS collected on September 30, 2019, which

14

were taken from the same locations where Mr. Spicer took his samples. However, Maxus did not provide them, and instead, on December 23, 2019, filed the current litigation without ever having provided the FBS test results.

56.     In fact, it was not until March 16, 2021, more than 14 months after it initiated litigation against Travelers that Maxus provided what appear to be partial test results from the samples FBS collected on September 30, 2019. The results were provided in response to a direct request for the specific results that had been identified for the first time in Tom Irmiter's January 15, 2021, rebuttal report as source material.[6]

57.     Based on his June 13, 2019 and September 30, 2019 inspections and subsequent testing, which included extensive electron microscopy and fractal analysis, Mr. Spicer concluded that there was no smoke, soot, or char damage to Phases 1-5 of the Metropolitan. [Doc 40-2, p. 10].

### (5)     Phase 5 Water Damage.

58.     As stated previously, Bomasada retained ATC Group Services, Inc. in December 2019, to identify areas of Phase 5 that were damaged by water from the fire-fighting efforts and leaks in the Phase 5 roof from holes caused by fire embers.[7] [Ex. 15].

59.     On January 15, 2019, ATC issued its report identifying the areas of the Phase 5 sub-floor that had been damaged by water intrusion, thereby establishing the scope of Phase 5 water damage caused by the fire from fire-fighting efforts and roof leaks. [See Ex. 15, pp. 6-7]. As a

---

[6] It appears that even the results Maxus provided on March 16, 2021, under the requirements and penalties of the Federal Rules of Civil Procedure, are incomplete, for there are test results from twenty additional samples that FBS collected on September 30, 2019, which remain unaccounted for.

[7] Phase 5 was not complete at the time of the fire. The exterior envelope was complete, however, the interior was still under construction. At the time of the fire, no finish items had been installed, i.e., sheetrock, flooring, and electrical and plumbing finishes had not been installed. Phase 5's interior contained OSB sub-floor, interior framing studs, rough plumbing and electrical and ductwork.

result, on March 13, 2019, Travelers included payment for the approximately 3,000 square feet of damaged sub-floor in Phase 5 that ATC had identified as having been damaged as a result of the fire [Exs. 28, p. 3, ¶ 3; 51].

60.     On May 1, 2019, Maxus' manager and CEO of Maxus Properties, David Johnson, wrote to Travelers and made a claim to Travelers for additional water damage to the sub-floor in Phase 5. [Exs. 21; 41, p. 13, ¶ 5]. Specifically, he claimed that the entire sub-floor had suffered water damage and would have to be replaced. [Ex. 27].

61.     The letter Mr. Johnson finally sent to Travelers went through multiple drafts, was reviewed by at least two other Maxus representative (Alex Stehl and Ryan Snyder) and ultimately Maxus' appraiser-come-public-adjuster, Chuck Howarth. [Ex. 41, pp. 2-10].

62.     However, unbeknownst to Travelers, on April 10, 2019, just three weeks prior to Mr. Johnson's May 1st letter, the same sub-floor in Phase 5 had been inundated with water on all floors as a result of a sprinkler line being cut during sub-floor construction activities. [Ex. 42]. The extent of the water damage was so significant that Maxus' own on-site property manager reported that the water caused "[e]xtensive damage to construction site in phase 5 on all floor levels." [Ex. 42, p. 6]. In fact, Alex Stehl, Maxus' Vice-President of Construction wrote to Bomasada to specifically address the damage from the sprinkler rupture and stated: "[t]he biggest area of concern is the water line break on 4/10/19 that caused a substantial amount of water flowing through all four floors." [Ex. 42, p. 2, ¶ 2].

63.     Moreover, records obtained from the Birmingham Water Works Board for the meter associated with the sprinkler system indicated that Maxus was billed for 2700 cubic feet of

water (a little over 20,000 gallons) used by the fire suppression system for that billing period.[8] [Ex. 43, p. 3].

64. The following day, on April 11, 2019, Bomasada (the contractor that cut the sprinkler line) placed an order for 12,288 square feet of 23/32" 4x8 OSB T&G identified as "Phase 5 Decking" [Ex. 44, p. 2].

65. Maxus concedes that the sprinkler line rupture was a "construction problem" and something that happens all the time in construction. [Ex. 45, p. 25, trp. 96:1-9]. Maxus also concedes that any damage from the sprinkler line rupture was not related to the fire. Despite the fact that the Travelers policy was no longer in effect and that Maxus knew this new damage was not related to the fire, it submitted the damage claim to Travelers, as opposed to the carrier who maintained the Builders Risk coverage at that time, never telling Travelers about the rupture [*See* Ex. 45, p. 33, trpp. 125-126]. Ultimately, knowing full well that there had been an intervening sprinkler rupture, Maxus accepted a supplemental payment from Travelers in February 2020 for the claimed additional water damage to the Phase 5 sub-floor, the scope of which included replacement of the entire Phase 5 sub-floor under the guise that it was fire related [Ex. 46].

66. Despite the fact that Phase 5 was inundated with thousands of gallons of water on April 10, 2019, and 12,000 square feet of sub-floor was unrepairable due to water damage, Maxus made no efforts to repair Phase 5 or remove the water-soaked materials until February 2020. [Ex. 47, p. 22, trp. 82:5-23].

### E. The Travelers Policy

---

[8] The records indicate that for the previous billing period, Maxus was billed for 100 cubic feet of water (approximately 740 gallons) and for 200 cubic feet (approximately 1480 gallons) of water for the period following the sprinkler line break. [Ex. 43, pp. 2, 4].

67. On March 31, 2018, Travelers issued a Construction PAK—Commercial Inland Marine Policy QT-660-7E077026-TIL-18, for policy period March 31, 2018 to September 30, 2018 (the "Policy") to Bomasada Birmingham Nationwide, LLC; Bomasada Birmingham Metropolitan, LLC; Bomasada BHM Construction, LLC; and Bomasada Group, Inc. (collectively, "Bomasada"). [Ex. 4].

68. The Policy contains Builders' Risk and property coverage parts related to the construction of the Metropolitan apartments located at 2900 7th Ave South, Birmingham, AL 35223 (the "Project"). [Ex. 4, pp. 11-14].

69. Subject to the Policy's definitions, terms, and conditions, the Policy includes a $35,000,000 Covered Property Limit of Insurance; a $5,000,000 limit under the Builders' Risk Special Time Element coverage; and additional coverages subject to the Limits of Insurance shown on the Policy's Declarations page(s), which are further discussed herein. [Ex. 4].

70. Specifically, Covered Property is described as "construction of three, 4-story frame residential buildings for 260 apartment units." [Ex. 4, p. 11].

71. The Policy's insuring agreement provides:

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations.

. . .

A.    COVERAGE

We will pay for direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss.

1.    Covered Property

Covered Property, as used in this Coverage Form, means the following types of property you own or for which you are legally liable, the value of which is included in the estimated "total project value" shown in the Declarations:

18

### a. Permanent Works

Materials, equipment, machinery, supplies and property of a similar nature that will become a permanent part of the project described in the Declarations during completion of such project or that will be used or expended in the completion of such project. Completion of the project includes site preparation (including demolition of existing buildings or structures), fabrication, assembly, installation, erection, alteration, renovation and similar construction activities.

### b. Temporary Works

Cofferdams, construction forms, cribbing, falsework, hoarding, scaffolds, fencing, signs, office trailers (and their "contents") and similar temporary buildings or structures incidental to completion of the project described in the Declarations.

. . .

### 3. Covered Causes of Loss

Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is excluded in Section B – EXCLUSIONS.

[Ex. 4, pp. 23-24]

72.     Section E of the Policy addresses Additional Named Insureds identified in contracts or written agreements executed prior to any loss:

### 1. Additional Named Insured

The following persons or organizations are included as Additional Named Insureds when you have agreed in a written contract or written agreement, executed prior to loss, to name such persons or organizations as an Additional Named Insured, but only to the extent of their financial interest in the Covered Property.

    a.    Owners of Covered Property;
    b.    Mortgagees or loss payees;
    c.    Contractors, sub constructors and sub-sub contractors; and
    d.    Lessors or lessees.

[Ex. 4, p. 34].

73.     The Policy includes exclusions to coverage, including the following:

**4.** We will not pay for loss or damage caused by or resulting from faulty, inadequate or defective:

    **a.** Planning, zoning, development, surveying, siting;

    **b.** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading or compaction;

    **c.** Materials used in repair, construction, renovation, remodeling, grading or compaction; or

    **d.** Maintenance;

of part or all of any property on or off the job site described in the Declarations.

[Ex. 4, p. 33].

74. The Builders' Risk Special Time Element Coverage Form addresses "Business Income," "Rental Value," and "Soft Costs" as follows:

**A. COVERAGE**

Covered Property as used throughout this Coverage Form means property that is Covered Property under the CONSTRUCTION PAK BUILDERS' RISK COVERAGE FORM.

The following Special Time Element Coverages apply when indicated by an 'X' in the Declarations for the applicable project.

**1. "Business Income"**

We will pay the actual loss of "business income" you sustain due to the partial or complete:

    **a.** Cessation of your business activities; or
    **b.** Delay in start up of your business activities;

during the "post-loss period of repair or construction". Such cessation or delay must be caused by or result from direct physical loss of or damage to Covered Property by a Covered Cause of Loss.

**2. "Rental Value"**

We will pay the actual loss of "rental value" you sustain due to the partial or complete:

**a.** Cessation of your business activities; or

**b.** Delay in start up of your business activities;

during the "post-loss period of repair or construction". Such cessation or delay must be caused by direct physical loss of or damage to Covered Property by a Covered Cause of Loss.

**3.** **"Soft Costs"**

We will pay your "soft costs" during the "period of delay in completion". Such "soft costs" must result from direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss which delays the completion of the applicable project described in the Declarations beyond the "planned completion date". The Soft Costs Limit of Insurance shown in the Declarations is the most we will pay in any one occurrence under this Coverage Extension.

[Ex. 4, p. 42]

75.     The Policy's Builders' Risk Special Time Element Coverage Form includes the following definitions pertinent to "Business Income," "Rental Value," and "Soft Costs" coverage:

**1.** **"Business Income"** means the sum of:

**a.** The net profit or loss (before income taxes) from the operation or use of the applicable project for its intended purpose; and

**b.** The continuing normal operating expenses, including payroll, of the operation or use of the applicable project for its intended purpose; less your "rental value".

**2.** **"Post-loss period of repair or construction"** means the period of time after direct physical loss of or damage to Covered Property by a Covered Cause of Loss that:

**a.** With respect to Covered Property not operating or in use for its intended purpose at the time of such loss or damage:

**(1)** Begins with the "planned completion date" or after any applicable Waiting Period shown in the Declarations from the "planned completion date", whichever is later; and

21

> **(2)** Ends on the date when Covered Property should be completed using reasonable speed and similar quality.
>
> **b.** With respect to Covered Property operating or in use for its intended purpose at the time of such loss or damage:
>
> > **(1)** Begins immediately or after any applicable Waiting Period shown in the Declarations whichever is later; and
> >
> > **(2)** Ends on the earlier of:
> >
> > > **(a)** The date when such property should be repaired, rebuilt or replaced with reasonable speed and similar quality; or
> > >
> > > **(b)** The date when business is resumed at a new permanent job
>
> . . .
>
> **3.** **"Rental value"** means the sum of:
>
> > **a.** The total rental income from the tenant occupancy of the applicable completed project, as furnished and equipped by you;
> >
> > **b.** The amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be your obligations; and
> >
> > **c.** The fair rental value of any portion of the applicable completed project which would have been occupied by you.

[Ex. 4, pp. 44-45].

76. The Policy provides the following "Duties In the Event Of Loss":

**C.** **Duties In The Event Of Loss Or Damage**

> You must see that the following are done in the event of loss or damage to Covered Property:
> . . .
>
> 2. Give us prompt notice of the loss or damage. Include a description of the property involved.
>
> 3. As soon as possible, give us a description of how, when and where the loss or damage occurred.
>
> 4. Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This

22

will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

5.   You will not, except at your own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent.

6.   As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

7.   We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

8.   Send us a signed, sworn proof of loss containing the information we request to settle the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

9.   Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or suit.

10.   Cooperate with us in the investigation or settlement of the claim.

. . .

**3.    Duties in the Event of Loss**

The following duties are added to the Duties in The Event of Loss CONDITION in the COMMERCIAL INLAND MARINE CONDITIONS

You must see that the following are done in the event of loss:

**a.**    You must make every effort to meet the applicable "planned completion date".

This includes:

23

**(1)** Resuming, as soon as possible, all or any part of the construction or repair; . . ..

. . .

If you do not resume the operation or use of Covered Property as quickly as possible or make every effort to meet the applicable "planned completion date", we will only pay the amount of loss we would have otherwise paid if you had complied with the above conditions.

[Ex. 4, pp. 19, 34-35].

77.   Coverage under the policy is subject to the following general conditions:

**GENERAL CONDITIONS**

**A.    Concealment, Misrepresentation Or Fraud**

This Coverage Part is void in any case of fraud, intentional concealment or misrepresentation of a material fact, by you or any other insured, at any time, concerning:

1. This Coverage Part;

2. The Covered Property;

3. Your interest in the Covered Property; or

4. A claim under this Coverage Part.

. . .

**C.    Legal Action Against Us**

No one may bring a legal action against us under this Coverage Part unless:

1.     There has been full compliance with all the terms of this Coverage Part; . . ..

[Ex. 4, pp. 19-20]

78.   To date, Travelers has made payments totaling $6,168,425.69 for the initial fire damages sustained to the Metropolitan as a direct result of the September 27, 2018 fire. [Ex. 53].

24

79.     To date, Travelers has also made payments of $780,600.67 under the Builders' Risk and/or Builders' Risk Special Time Element Coverages of the Policy for losses incurred as a direct result of the September 27, 2018 fire, which includes $415,379.92 in Phase 5 and Phase 6 "rental value" losses. [Ex. 53].

## III.     ARGUMENT

### A.     Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

If the moving party meets this requirement, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. 242, 248 (1986). The party opposing summary judgment may not rest on the allegations in the pleadings, but by affidavit or other evidence, must set forth facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(c); *Lower Brule Sioux Tribe v. South Dakota,* 104 F.3d 1017, 1021 (8th Cir.1997). To determine whether the disputed facts are material, courts analyze the evidence in the context of the legal issues involved. *Lower Brule,* 104 F.3d at 1021. Thus, the mere existence of factual disputes between the parties is insufficient to avoid summary judgment. *Id.* Rather, "the disputes must be outcome determinative under prevailing law." *Id.* (citations omitted).

### B.     Maxus' Multiple Instances of Intentional Concealment Voids the Entire Policy

The Travelers Policy provides that "[t]his Coverage Part is void in any case of fraud, intentional concealment or misrepresentation of a material fact, by you or any other insured, at any

25

time, concerning: . . . [a] claim under this Coverage Part." [Ex. 4, p. 19]. This condition has only one meaning – that an insured's breach of the condition ***immediately voids the entire policy***. *See Neidenbach v. Amica Mut. Ins. Co.,* 842 F.3d 560, 567 (8th Cir. 2016) (holding intentional material misrepresentations render entire policy void).

Under Missouri law, "a misrepresentation as to a portion of the loss may void coverage to the entire claim." *Liberty Mut. Fire Ins. Co. v. Scott*, 486 F.3d 418, 423 (8th Cir. 2007) (quoting *Childers v. State Farm Fire & Cas. Co.,* 799 S.W.2d 138, 141 (Mo.App.1990)). Provisions providing the policy is void if an insured misrepresents a material fact concerning a claim have been consistently enforced in Missouri and repeatedly upheld as a justification for voiding the entire policy and denying coverage for all claims being made when an insured commits a material misrepresentation in the claim as to a portion of the loss. *See Childers v. State Farm Fire & Cas. Co*., 799 S.W.2d 138, 141 (Mo. Ct. App. 1990); *CM Vantage Specialty Ins. Co. v. Nephrite Fund 1, LLC,* No. 4:18-CV-1749-JMB, 2020 WL 805848, at *12- 13 (E.D. Mo. 2020). To demonstrate materiality under Missouri law, "the standard is whether the alleged misrepresentation or concealment would have influenced a reasonably careful insurance company in deciding whether to accept the risk, and whether an insurer would have relied on such a representation." *Federated Mut. Ins. Co. v. Peery's Auto Parts, L.L.C.*, No. 11-00172-CV-W-FJG, 2012 WL 828312, at *7 (W.D. Mo. Mar. 7, 2012); *See, e.g., Adams v. Columbia Mut. Ins. Co.,* 978 S.W.2d 10, 11 (Mo.App.1998). A misrepresentation is material if an insurer, "acting reasonably and naturally in accord with [its] custom and practice, would have relied on the representation." *Peery's Auto*, 2012 WL 828312, at *7.

Moreover, the Eighth Circuit has rejected that an insurer must prove the elements of fraud, including intent to deceive and reliance, to void a policy where the policy provides it is rendered

void by a misrepresentation or concealment. *Cedar Hill Hardware and Const. Supply, Inc. v. Ins. Corp. of Hannover*, 563 F.3d 329, 346 (8th Cir. 2009). *See also Neidenbach v. Amica Mut. Ins. Co.*, 96 F. Supp. 3d 925, 930 (E.D. Mo. 2015) ("[D]espite the reference to the term "fraud" in most misrepresentation clauses, the insurer is not required to prove the elements of fraud to avoid coverage if the policy language also indicates, as here, that **the policy is rendered void for intentional concealment or misrepresentation of a material fact**.") (emphasis added).

### (1) Phase 5 Water Damage

The undisputed facts establish that Maxus' submission of the Phase 5 sub-floor claim violated the "Concealment, Misrepresentation, Or Fraud" condition of the Travelers policy. Maxus had an obligation to inform Travelers that the Phase 5 sub-floor had been significantly damaged (over 12,000 square feet) by the inundation of thousands of gallons of water on April 10, 2019, from a ruptured sprinkler line that (1) was not fire related and (2) did not occur during the Travelers policy period. Maxus' own Vice-President of Construction conceded that such damage would not have been related to the fire [Ex. 25, pp. 25-27], yet on May 1, 2019, Maxus submitted the Phase 5 sub-floor damage claim to Travelers under the guise that it had occurred before the Travelers policy expired on September 30, 2018 and was just more ensuing damage from the September 27, 2018 fire [*See* Ex 27]; otherwise, the claim would never have been made to Travelers and would have been submitted to Maxus' Builders Risk carrier instead whose policy was actually in place on April 10, 2019.

Any argument that this omission may have been a mistake or unintentional is belied by the fact that the letter from Mr. Johnson notifying Travelers of the claim went through several drafts, multiple edits, and was reviewed by at least four different people prior to it being submitted to Travelers. [*See* Ex. 41]. In fact, Maxus involved its appraiser in the drafting and ultimately settled on his draft of the letter. [Ex. 41, p. 1-10]. It is simply illogical to argue that Chuck Howarth, a

person Maxus has sought to identify as an expert on claims handling and insurance, mistakenly directed Maxus to submit this additional water damage claim to Travelers as opposed to the Builders Risk carrier that was on the risk when the April 10, 2019 sprinkler rupture occurred. The only reasonable inference to be drawn from these exchanges and the labor involved in drafting the letter is that every word was reviewed and every decision to include or omit language was made with intent and deliberation. [*See* Ex. 41]. Maxus specifically intended to submit this letter to Travelers in the hopes that Travelers would accept coverage for the water damage under the guise that it was fire-related.

This letter is the only notice Maxus gave of the additional claimed water damage in Phase 5 – a letter that contained no mention whatsoever that Phase 5 had been inundated with thousands of gallons of pressurized water that had nothing to do with the 2018 fire. The omission of this critical piece of information is telling. The undisputed facts establish that when Maxus decided to notify Travelers of the additional water damage to Phase 5, Maxus opted **not** to tell Travelers about the sprinkler line rupture and that this was new damage which occurred long after the Travelers policy expired on September 30, 2018.

As to the materiality of the concealment, it is hard to envision a fact more material than the one Maxus chose to conceal. Even David Johnson, Maxus' CEO, recognized the materiality of the information that Phase 5 had suffered a sprinkler line break:

> Q:    Do you know who at Maxus notified Travelers that there had been a sprinkler leak on April 10th, 2019?
>
> A:    I do not.
>
> Q.:    Who would have been responsible for providing that notice to Travelers?
>
> MR. ABRAMS: Object to the premise of the question. Object to the form. You can answer if you know.

28

A:  As I said, when we started this process, I told everybody to get Travelers everything we have, get Bomasada everything we have. So as soon as we should have known about that, I hope everybody knew about it told everybody. But I don't have any recollection of it.

[Ex. 48, p. 30, trp. 116:6-13].

David Johnson has conceded that the information was material, and he was the signatory of the letter notifying Travelers of the water damage, yet he (and the other contributors to the letter) opted not to mention the sprinkler line rupture. [*See Id.*]. Maxus knew that the direct cause of the new damage had nothing to do with the September 27, 2018 fire, yet it chose not to disclose the fact that it was the 20,000 plus gallons of water that caused "extensive damage to all floors" of Phase 5. [*See* Ex. 42]. Maxus deliberately remained silent about the sprinkler rupture and accepted payment from Travelers for replacement of the entire sub-floor in Phase 5 – all the while knowing that the reason it had to replace the sub-floor had nothing to do with the fire, but was, instead, related to the April 10, 2019, sprinkler line rupture. Maxus' concealment of these material facts was intentional and violates the "Concealment, Misrepresentation, Or Fraud" condition rendering the Travelers policy void.

### (2)    Soot and Char Sampling Results

The undisputed facts also establish multiple instances of Maxus' concealment of soot and char test results, which demonstrates an ongoing pattern of intentional conduct that likewise violates the concealment condition of the Travelers' policy. Four factors combine to affirmatively establish that Maxus' multiple concealments were intentional and in no way inadvertent:

**(1)**    On three different occasions, Maxus failed to disclose the identity of three different AIHA-certified testing consultants it employed to investigate whether the Metropolitan suffered soot and char contamination.

**(2)**    Maxus had access to testing results for 157 samples collected and analyzed by its own consultants. Travelers made multiple requests for these results, yet Maxus refused to provide them.

(3)     The concealment of the identities and the test results spanned nearly two years and continues to this very day as there are at least an additional twenty samples which remain unaccounted for; and

(4)     Not one of these samples that were concealed shows soot and char contamination beyond typical background levels.

Combining these factors, Maxus's motive for the concealment becomes clear. Maxus concealed the identities of at least three AIHA-certified laboratories that conducted soot and char analysis in April 2019 (SELC), June 2019 (Microvision), and March 2021 (Environmental Analysis Associates). All total, Maxus concealed a total of 157 samples collected by its own consultants and nearly an equal number of results based on these samples:

- 97 from SELC (April 2019 collection and analysis);

- 20 from Microvision; (May 29, 2019 collection; June 21, 2019 analysis);

- 20 from EAA (September 30, 2019 collection; and March 23, 2020 analysis), and

- 20 that remain entirely unaccounted for (September 30, 2019 collection: unknown analysis date)

The fact that Maxus did not disclose any of these results during the claim process that lasted more than seven months is sufficient to establish a material breach of this condition. Moreover, Maxus' pattern of concealment continued into the present litigation, for Maxus failed to produce the results during discovery. Instead, Travelers was only able to obtain what results it has via subpoenas or through repeated requested for documents referenced in expert disclosures.

In fact, the concealment of test results continues today. Even with the added requirements and penalties of the Federal Rules of Civil Procedure, Maxus has yet to provide Travelers with *any information* as to the whereabouts of the other twenty samples FBS took from the Metropolitan on September 30 – no identity of a testing laboratory, no explanation of where the samples went, or whether any testing results were obtained. The existence of these missing samples

30

is obvious from the enumeration of the twenty samples analyzed by EAA in March 2021 as there are twenty missing numbers. [*See* Doc. 72-2.]

The failure to disclose the identity of three AIHA-certified laboratories, the sheer number of test results concealed, coupled with the two-year long period in which these results were concealed (which continues to this date), and the conclusions in those results clearly establish that Maxus' concealment was intentional and violative of the conditions in the policy.

Maxus cannot argue that these results are immaterial because Maxus itself has submitted soot and char analysis in support of its soot and char claim – albeit only the ones which it determined fit its narrative. It cannot be disputed that these test results were precisely the type of information a reasonable insurer would rely upon to ascertain coverage – especially when the insured had submitted certain test results in support of its claim and where the issue of whether soot and char from a fire was present is central to the claim.

While it is not the substantive conclusions of the results that are determinative of whether Maxus violated the condition, the conclusions from these withheld results certainly shed light on why they were withheld. The fact that **none** of the concealed results support Maxus' narrative that soot and char from the fire infiltrated the interstitial spaces of the other areas of the Metropolitan and thus, caused damage is telling. Conversely, had the results supported the soot and char claim, Maxus would have provided the results to Travelers immediately along with a demand for payment of the claim. These multiple instances of concealment of test results, obtained through different inspections, conducted over a seven-month period, coupled with the fact that none of the concealed results support Maxus' claim makes any claim that Maxus' conduct was anything other than intentional untenable.

31

In fact, Maxus' Director and Maxus Properties CEO recognized the materiality of the results. For example, in response to a question of who at Maxus was responsible for providing Travelers with all of the environmental testing results, David Johnson testified as follows:

> It was a team effort. I think Ryan Snyder would have left it. I try to tell my people from day one give Travelers everything we have as soon as we have it. That was the mantra here and I hope we did that.
>
> . . .
>
> That was my direction to everybody. I don't get involved in the details. I've said to everybody give Bomasada, give Travelers everything we have as soon as we have it, is my mantra. That's my direction to the company. We want to be an open book.

[Ex. 48, p. 22, trp. 81:3-8, 11-17].

The following exchange then took place:

> Q:     I appreciate that. Along those same lines, Mr. Johnson, if there were environmental test results available to Maxus in April 2019 would it have been within your directive that that should have been provided to Travelers?
>
> MR. ABRAMS: Object to the form. You can answer.
>
> A:     Yes
>
> Q:     And if it was not that would not have been consistent with your directions?
>
> A:     Correct, I wanted Travelers to have everything.

[Ex. 48, p. 30-31, trp. 116-117].

Maxus cannot argue that these results were not material, for its own director recognized the importance of this information. In fact, these results go to the very heart of the main issue in this case – whether the other parts of the Metropolitan suffered soot and char contamination as a result of the fire. Maxus' intentional concealment of these results and the identities of these testing entities is violative of the conditions of the Travelers policy. As a result, Maxus' pattern of concealment has voided coverage under the policy.

Each of these misrepresentations standing alone would justify voiding the policy, but taken in their entirety, there can be no question this Court should void the Policy and grant summary judgment in favor of Travelers.

**C.  Maxus Breached the Cooperation Provision of the Policy**

As set forth above, Maxus' concealment of information related to the Phase 5 water damage claim and additional soot and char sampling results violates the "Concealment, Misrepresentation, or Fraud" condition in the policy. This same conduct is also violative of the cooperation clause of the policy.

The Travelers policy includes the following "Property Loss Conditions:"

**3.  Duties in the Event of Loss or Damage**

    **a.**    You must see that the following are done in the event of loss or damage to Covered Property:

        . . .

        **2.**    Give us prompt notice of the loss or damage. Include a description of the property involved.

        **3.**    As soon as possible, give us a description of how, when and where the loss or damage occurred.

        **4.**    Take all reasonable steps to protect the Covered Property from further damage and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

        . . .

        **6.**    As often as may be reasonably required, permit us to inspect the property providing the loss or damage and examine your books and records.

. . .

**9.** Cooperate with us in the investigation and settlement of the claim.

[Ex. 4, p. 18].

"Missouri courts have consistently acknowledged an insurer's right to a complete investigation of a claim . . . and have found that the insured's failure to assist in the investigation precludes any coverage. *CM Vantage Specialty Ins. Co. v. Nephrite Fund 1, LLC*, No. 4:18 CV 1749 JMB, 2020 WL 805848, at \*13 (E.D. Mo. Feb. 18, 2020) (citing *Roller v. Am. Modern Home Ins. Co.,* 484 S.W.3d 110, 116 (Mo. Ct. App. 2015)).

> Under Missouri law, "an insured's failure to comply with a cooperation clause supports an insurer's refusal to provide coverage when the insurer can show: (1) the insured materially breached the cooperation clause; (2) the insurer was substantially prejudiced as a result of the insured's breach; and (3) the insurer exercised reasonable diligence to secure the insured's cooperation."

*Church Mut. Ins. Co. v. Metro. Christian Worship Ctr. of St. Louis*, No. 4:19-CV-00903-MTS, 2020 WL 6075638, at \*4 (E.D. Mo. Oct. 15, 2020) quoting *Columbia Cas. Co. v. HIAR Holding, LLC*, 411 S.W.3d 258, 272 (Mo. 2013) (en banc).

**(1)    Maxus' failure provide Travelers notice of the April 10, 2019 sprinkler rupture constitutes a material breach of the Policy's cooperation clause.**

As stated, the only notice Maxus gave Travelers of the Phase 5 water damage claim was in its May 1, 2019 letter from David Johnson. Maxus never notified Travelers that the April 10, 2019 sprinkler rupture had caused extensive damage to the Phase 5 sub-floor, which was completely unrelated to the fire. "Cooperation clauses are designed to enable the [insurance] company to possess itself of all knowledge, and all information as to other sources of knowledge, in regard to facts, material to their rights, to enable them to decide upon their obligations, and to protect them against false claims." *Wiles v. Capitol Indem. Corp.*, 215 F. Supp. 2d 1029, 1032 (E.D. Mo. 2001)

34

(internal quotation marked omitted) (citations omitted). Maxus' conduct in failing to inform Travelers of the April 10, 2019 sprinkler rupture is exactly the type of conduct that the Policy conditions are designed to prevent. Due to Maxus' failure to provide material information with respect to this damage, Travelers was unable to observe the damage caused by the sprinkler rupture. Instead, Travelers was subjected to making payment on a false claim for damage to the property, which (a) undisputedly occurred after the Policy period and/or (b) was not the result of a Covered Cause of Loss.

In fact, the sprinkler rupture impacted the Phase 5 building so significantly Travelers' expert, Kurt Mulder, upon learning of the April 10th sprinkler rupture and the extent of the damage during this litigation, was compelled to supplement his Rule 26 expert report to reflect a material change in his opinion. [Doc. 56-2]. By hiding the sprinkler rupture from Travelers and not providing relevant documents during the claim including leak logs, letters, e-mails, photos, and videos – all of which existed – Maxus foreclosed any opportunity for Travelers to observe the damage caused by the sprinkler rupture and ascertain whether the damage was new damage or additional fire damage that had not previously been identified. As a result, Travelers ended up paying for replacement of the entire sub-floor as fire-related because Maxus did not disclose the sprinkler break. It cannot be disputed that Travelers suffered significant prejudice as a result of this failure to cooperate.

> **(2)** **Maxus' refusal to cooperate with Travelers' requests with respect to FBS inspections and sampling constitutes a material breach of the cooperation clause.**

In addition, Maxus conducted soot and char sample collection on May 30, 2019, without providing Travelers' notice of the inspection as Travelers had specifically requested. As a result, Travelers was forever deprived of the opportunity to observe FBS's collection methods, sampling

locations in the Metropolitan, specific sampling locations on the surfaces and in the interstitial wall cavities, sample collection techniques, and chain of custody protocols for these samples. Travelers was also deprived of the ability to collect samples in those same locations in order to compare the results. Maxus' refusal to allow Travelers to accompany FBS on May 30, 2019, forever foreclosed any opportunity Travelers had to collect samples contemporaneously with FBS at the precise locations FBS selected and compare the results – an opportunity that Travelers afforded Maxus on September 30, 2019.

Moreover, by refusing to allow Travelers to observe FBS and then to review the test results from the May 30 inspection, Travelers was forced to formulate a testing plan for the September 30 inspection and sample collection without a complete picture of what types of samples had been collected, the locations of said samples, and the results of the analysis – the very aspects of the Travelers' soot and char investigation that Maxus' experts have identified as inadequate. The prejudice Travelers suffered as a result was significant. One only need to look to Maxus' own expert's conduct to fully recognize the significance of the importance of a joint inspection. It is significant to point out that virtually all of Maxus' experts' criticisms of Mr. Spicer's analysis is based upon FBS's real-time observations of his protocols, sampling techniques, and location selection, which occurred only because FBS was permitted to personally observe Mr. Spicer's sampling. The prejudice resulting from Maxus' failure to cooperate was significant and irreparable. The facts establish that Maxus breached the conditions of the policy by refusing to cooperate with respect to the May 30 inspection. Maxus' breach substantially prejudiced Travelers. Accordingly, there is no coverage for Maxus' claims under the Travelers policy.

          **(3)**     **Maxus cannot recover damages incurred as a direct result of its failure to protect the covered property.**

The Policy imposes on Maxus the duty to protect Covered Property from further damage

and keep a record of expenses incurred to protect the Covered Property for consideration in the settlement of the claim ("the Preservation of Property Clause"). Specifically, the Policy states that Maxus must "take all reasonable steps to protect the Covered Property from further damage" because Travelers "will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss" In turn, this provision precludes coverage for damages that Maxus could have prevented.

The undisputed evidence shows that Maxus did not take reasonable steps to mitigate its losses, especially regarding continuous water damage occurring in Phase 5 due to faults in the EFIS, faulty installation of the replacement roof in January 2019, and following the April 10, 2019 sprinkler rupture. For example, Maxus did not begin removal of the water-soaked sub-floor from Phase 5 until February 2020. [Ex. 47, p. 22, trp. 82:5-23]. Throughout this period, Phase 5 was exposed to ongoing water intrusion from some or all of these sources, and the damages that resulted were due to Maxus' failure to protect the Covered Property – losses which through reasonable efforts Maxus could have avoided. Accordingly, Maxus is barred from recovering damages incurred as a result of its unreasonable failure to protect Phase 5 from continuous damages.

### (4) Maxus failed to comply with terms of the Policy prior to filing the present action.

The policy further provides that "[n]o one may bring a legal action against us . . . unless . . . [t]here has been full compliance with all of the terms of this Coverage Form." [Ex. 4, p. 20]. At the time this lawsuit was filed on December 23, 2019, in addition to having violated the "Concealment, Misrepresentation, or Fraud" condition of the policy, Maxus had also failed to satisfy the cooperation condition.

Specifically, Maxus failed to:

- provide Travelers the opportunity to attend the May 30 sampling inspection.

- provide Travelers with the test results from 40 samples collected by FBS on September 30, 2019;

- provide Travelers with the identity of Microvision and its report on the analysis it performed on the 20 samples FBS collected on May 30, 2019.

- provide Travelers with the identity of SELC as a consultant Maxus had retained to perform soot and char testing on the Metropolitan;

- provide Travelers with SELC's test results from the 97 samples it collected on April 11-12, 2019; and

- provide Travelers with notice that Phase 5 had suffered major water damage from the sprinkler break.

Having established that all this information withheld by Maxus was material to the claim, it cannot be disputed that Travelers made repeated requests for the information and tried to impress upon Maxus the materiality of the information.

Regarding the May 30 inspection, it cannot be disputed that Travelers made a very specific request on May 15, 2019, to be allowed to accompany Maxus' consultants at any future inspection. Maxus scheduled the May 30 inspection and did not advise Travelers. It cannot be disputed that Travelers' specific request included the very inspection that occurred two weeks later on May 30.

Moreover, as set forth in detail above, Travelers made repeated requests for the identity of environmental consultants utilized by Maxus and test results, and Travelers made multiple requests, both generally for all information and specifically regarding to specific test results – at least the ones that it knew about. Maxus failed to provide information about what testing it had done and the results themselves, choosing instead to piecemeal only that information to Travelers that furthered its narrative, and conceal other information that did not fit its story. All this was done in direct contradiction to its CEO's mantra to "give Travelers everything we have as soon as we have it." [Ex. 48, p. 22, trp. 81:14-15]. Maxus failed to cooperate thereby breaching the

38

conditions of the policy. Accordingly, there is no coverage for Maxus' claims under the Travelers policy.

### D. Maxus' Breach of Contract Claim Fails Because the Policy Does Not Provide Coverage for Maxus' Claim

"Disputes arising from interpretations and application of insurance contracts are matters of law for the court where there are no underlying facts in dispute." *Safeco Insurance Co. of Am. v. Schweitzer,* 372 F.Supp.3d 884, 889 (W.D. Mo. 2019) (citing *Centermark Props. v. Home Indem. Co.*, 897 S.W.2d 98, 100 (Mo. Ct. App. 1995)). In Missouri, the burden is on the insured to prove coverage; therefore, Maxus is required to show that its alleged damages are covered by the Policy. *Citizens Ins. Co. of America v. Leiendecker*, 962 S.W.2d 446, 451 (Mo. App. E.D. 1998); *Truck Ins. Exchange v. Heman*, 800 S.W.2d 2, 3-4 (Mo. App. W.D. 1990); *American States Ins. Co. v. Mathis*, 974 S.W.2d 647, 649 (Mo. App. E.D. 1998).

In order to make a prima facie case of coverage, an insured must establish issuance and delivery of the policy, payment of a premium, a loss caused by a peril insured against and notice of loss and proof of loss to the insurer as required by the terms of the policy. *Kauble v. MFA Mut. Ins. Co.*, 637 S.W.2d 831, 832 (Mo. App. E.D. 1982) (citing *Grossman Iron and Steel Co. v. Bituminous Cas. Corp.*, 558 S.W.2d 255, 259 (Mo. App. 1977)).

Maxus contends that it has suffered damages due the alleged presence of soot and char, which infiltrated all Phases of the Metropolitan as result of the Phase 6 fire. However, Maxus' experts' opinions regarding the alleged cause of damages to the Metropolitan are inadmissible. In turn, Maxus cannot prove that the disputed damages were caused by a covered cause of loss occurring within the policy period. Moreover, Travelers has proffered its own experts' opinions that soot or char was not present in the Metropolitan as a result of the fire. Instead, the damages caused by the fire and any alleged combustion by-products were limited to the damage for which

39

Travelers has already paid, and in fact, Maxus' alleged damages were caused by excluded causes of loss.

### E.        Maxus Is Not Entitled to Soft Costs Coverage Under the Policy

Notwithstanding the reasons discussed above, Maxus is not entitled to "soft costs" under the Policy, for the Policy only provides soft costs coverage to the Named Insured listed on the Declarations page. *See Downtown Lofts LIHTC LLLP v. Travelers Prop. Cas. Co. of America*, No. 19-CV-3295-WJM-SKC, 2020 WL 7828763 at *4 (D. Colo. Dec. 31, 2020). In *Downtown Lofts*, the court considered whether an Additional Named Insured was entitled to coverage for soft costs under a Construction PAK policy, similar to the policy at issue. *Id.* The court looked to the policy's plain language, which stated "We will pay your 'Soft Costs' during the 'period of delay in completion.'" The court then noted that the policy defined the term "your" to identify solely the "Named Insured shown in the Declarations page." *Id.* Thus, only the Named Insured listed on the Declarations page was entitled to soft costs coverage under the Coverage Extension, not the Additional Named Insured. *Id.* Moreover, the court noted that an Additional Named Insured could not have a reasonable expectation of soft costs coverage because the policy states that an Additional Named Insured is covered "*only* to the extent of their financial interest in the Covered Property," and soft costs are not included in Covered Property coverage. *Id.* at. *5–*6.

The operative policy language at issue in the case at hand is identical to the policy language construed in *Downtown Lofts*. The policy at issue in this case contains a Coverage Extension that provides coverage for "your 'Soft Costs' during the 'period of delay in completion.'" [Ex. 4, p. 25]. This policy also defines "your" as identifying the "Named Insured as shown in the Declaration pages." [Ex. 4, p. 24]. Thus, the soft costs coverage provided in the Coverage Extension is limited to the Named Insured listed in the Declarations page, which does not list Maxus. This policy, like

40

the policy in *Downtown* Lofts, states that the owner of Covered Property is an Additional Named Insured "but only to the extent of their financial interest in the Covered Property." [Ex. 4, p. 35]. Maxus, as owner of the Covered Property (the Metropolitan), is an Additional Named Insured. However, Maxus is not a Named Insured shown on the Declarations page. As Additional Named Insureds, Maxus obtained coverage for their financial interest in the Permanent Works and Temporary Works, *i.e.* the Covered Property at the project site. Therefore, the soft cost provision of the policy's Coverage Extension does not cover Maxus' claimed soft costs. Accordingly, applying the plain language of the Policy, Maxus is not entitled to soft costs coverage under, and Travelers is entitled summary judgment as to Maxus' soft costs claim.

**F.      Maxus' Claimed Damages Were Caused by an Excluded Cause of Loss.**

The Policy includes the following exclusion:

4.  We will not pay for loss or damage caused by or resulting from faulty, inadequate or defective:

   a.  Planning, zoning, development, surveying, siting;

   b.  Design, specifications, workmanship, repair, construction, renovation, remodeling, grading or compaction;

   c.  Materials used in repair, construction, renovation, remodeling, grading or compaction; or

   d.  Maintenance;

   of part or all of any property on or off the job site described in the Declarations.

Reports obtained from the architect of record evidence a pattern of faulty, inadequate, and defective workmanship and construction, which resulted in damage to the Metropolitan prior to the fire. [Ex. 49]. In fact, Maxus, itself, has documented a number of "defects in the quality of craftsmanship" or "construction quality" issues with the Metropolitan. [Ex. 50]. Because Maxus' claimed damages occurred as a result of faulty, inadequate, and defective workmanship and

41

construction, some of which pre-date the September 2018 fire, Maxus' damages are excluded from coverage under the Policy.

### G. Maxus' vexatious refusal claim fails as a matter of law

Maxus has also asserted a claim for vexatious refusal to pay under Missouri Statutes 375.420 and 375.296. Contrary to the overwhelming evidence cited above, Maxus alleges that Travelers did not have reasonable cause to deny its claim. Incredibly, Maxus claims that Travelers failed to properly or timely investigate Maxus' claim; failed to properly make payments for undisputed damages; caused unreasonable delays; and failed to timely and appropriately respond to Maxus' correspondence. The undisputed facts completely refute Maxus' allegations.

"To establish a claim for vexatious refusal to pay, [Maxus has] to prove: (1) it had an insurance policy with the insurer; (2) the insured refused to pay; and (3) the insurer's refusal to pay was without reasonable cause or excuse." *See Macheca Transp. v. Philadelphia Indem. Ins. Co.*, 649 F.3d 661, 674 (8th Cir. 2011) (*Dhyne v. State Farm Fire & Cas. Co.,* 188 S.W.3d 454, 457 (Mo.2006)). "There may be no vexatious refusal where the insurer has reasonable cause to believe and does believe there is no liability under its policy, and it has a meritorious defense." *Macheca*, 649 F.3d at 674 (citing *Wood v. Safeco Ins. Co. of Am*., 980 S.W.2d 43,55 (Mo.App.1998)). Maxus has not and cannot meet this burden. First, as shown above, the Policy does not provide coverage for Maxus' claim. Second, as the undisputed facts demonstrate, Travelers' refusal to pay Maxus' additional claimed damages was reasonable and justified. For both of these reasons, Maxus' vexatious refusal claim fails as a matter of law.

### (1) Maxus' vexatious refusal claim fails because there is no coverage under the Policy.

Under Missouri law, an insured cannot maintain a vexatious refusal claim unless it is established that the claimed loss was covered under the policy. *See SJP Props., Inc. v. Mt. Vernon*

*Fire Ins. Co*., No. 4:14-cv-694-JAR, 2015 WL 4524337, *9 (E.D. Mo. Jul. 27, 2015). As set forth above, there is no coverage for Maxus' loss and no breach of the Policy. For this reason alone, Travelers is entitled to summary judgment on Maxus' vexatious refusal claim.

### (2) Travelers' refusal to pay was reasonable as a matter of law

Denial of a claim in reliance on the opinion of a qualified expert is not vexatious as a matter of law unless the expert's opinion was clearly unfounded. *See Macheca Transp. v. Philadelphia Indem. Ins. Co*., 649 F.3d 661, 674-75 (8th Cir. 2011) (affirming summary judgment in favor of insurer on vexatious refusal claim where insurer relied, in part, on expert reports); *Two Branch Marina, Inc. v. Western Heritage Ins. Co*., No. 4:07-cv-1017, 2008 WL 2952747, *6-7 (E.D. Mo. Jul. 29, 2008) (summary judgment granted to insurer that relied on qualified experts where there was no evidence that their opinions were unfounded); *Ceramo Co., Inc. v. Hartford Fire Ins. Co.*, No. 1:05-cv-0098-TCM, 2006 WL 2708626, *4 (E.D. Mo. Sept. 20, 2006) ("The undisputed evidence is that conflicting expert reports by experts retained by Ceramo and Hartford have resulted in a legitimate dispute over the extent of Ceramo's damage on its business interruption claim.").

In this case, the evidence is undisputed that once Maxus represented to Travelers that it discovered evidence of what it believed was smoke and/or soot damage to the Metropolitan, for the first time on May 1, 2019, Travelers undertook a series investigative acts to determine if there was any factual basis for Maxus' claims. [Ex. 28. p.4, ¶ 3]. On May 13, 2019, Travelers requested to inspect the Metropolitan in order for its retained industrial hygienist evaluate whether Phases 1-5 had been damaged by smoke, soot, and/or char as a result of the Phase 6 fire. [Ex. 28, p. 4, ¶ 3]. Travelers requested that it be provided adequate notice of any inspections by Maxus' retained

43

consultants and allowed to attend such inspections. [Ex. 28, p. 4, ¶ 3]. In addition, Travelers requested documents and noticed Maxus' EUO for July 9, 2019.[9]

In this case, the evidence is undisputed that Travelers acted promptly and conducted a full investigation of Maxus' soot and char claim, which was reported to Travelers seven months after the September 2018 fire. [Ex. 27]. Travelers reasonably relied on the reports of Mr. Chris Spicer. There is absolutely no evidence whatsoever that Travelers' experts were unqualified or that their opinions were unfounded.[10] *See Two Branch Marina,* 2008 WL 2952747, at *6.

This additional reason entitles Travelers to summary judgment on Maxus' vexatious refusal claim. Maxus can point to no evidence to support its argument that Travelers failed to adequately investigate the loss. As a result, the undisputed facts fall far short of Maxus' burden to show that Travelers' refusal to pay was without reasonable cause or excuse. This is a coverage dispute regarding, among other issues, Maxus' compliance with terms and conditions of the policy with respect its disputed cause of loss claim and does not rise to the level of conduct required to demonstrate a vexatious refusal claim. As a result, Maxus' vexatious refusal claim fails as a matter of law.

## IV.     CONCLUSION

The undisputed facts show that the Maxus' breach of contract claim fails as a matter of law. First, Maxus materially concealed and misrepresented information with respect to the claim. Second, Maxus failed to comply with the conditions precedent to coverage, specifically its "Duties In the Event of a Loss." Third, Maxus's breach of contract claim is based on inadmissible expert

---

[9] Despite Travelers specific requests, Maxus did not inform Travelers of FBS's additional inspection, which took place on May 8, 2019. Instead, Maxus informed Travelers on May 28, 2019 that its "environmental hygienist" and retained appraiser "have already inspected the property." In addition, Maxus requested alternative dates for its examination under oath. Ex. 29, p. 2. ¶ 3].

[10] Notably, Maxus did not file a *Daubert* challenge as to Mr. Spicer's or any of Travelers' designated experts.

44

testimony. Finally, notwithstanding the above-mentioned reasons, Maxus' claim is not covered under the policy or is otherwise excluded by the exclusions detailed herein. In turn, Maxus has not, and cannot, present evidence proving that Travelers breached the insurance contract or that Travelers vexatiously refused to pay additional soot and water damage claim. With no genuine issue of material fact in dispute, Travelers is entitled to, and respectfully requests, the entry of summary judgment in its favor as a matter of law on all claims alleged in the Maxus' Petition.

WHEREFORE, PREMISES CONSIDERED, Travelers respectfully requests that this Honorable Court enter an Order granting this Motion for Summary Judgment and entering a full and final judgment in Travelers' favor as to all claims asserted against it and for such other and further relief to which it may be entitled.

Respectfully submitted,

s/Brenen G. Ely
Brenen G. Ely (*pro hac vice*)
Kenneth W. Boyles, Jr. (*pro hac vice*)
ELY & ISENBERG, LLC
3500 Blue Lake Drive, Suite 345
Birmingham, Alabama 35243
Telephone: (205) 313-1200
Facsimile: (205) 313-1201
bely@elylawllc.com
kboyles@elylawllc.com

Dale L. Beckerman, MO Bar #26937
Daniel E. Hamann, MO Bar #28164
DEACY & DEACY, LLP
920 Main Street, Suite 1000
Kansas City, Missouri 64105
Telephone: (816) 421-4000
Facsimile: (816) 421-7880
dlb@deacylaw.com
deh@deacylaw.com

*Attorneys for Defendant Travelers Property Casualty Company of America*

## CERTIFICATE OF SERVICE

I do hereby certify that on April 16, 2021, I electronically submitted the foregoing with the Clerk of the Court for the United State District Court for the Western District of Missouri using the CM/ECF system, which will send a Notice of Electronic Filing to the following counsel of record:

Michael J. Abrams
Kimberly K. Winter
Brian W. Fields
Noah H. Nash
Lathrop GPM, LLP
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108-2618
Telephone: (816) 292-2000
Facsimile: (816) 216-2001
michael.abrams@lathropgpm.com
kim.winter@lathropgpm.com
brian.fields@lathropgpm.com
noah.nash@lathropgpm.com

                                        s/Brenen G. Ely
                                        **OF COUNSEL**