# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | | |
|---|---|---|
| MAXUS METROPOLITAN, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No: 20-cv-00095-FJG |
| | ) | |
| TRAVELERS PROPERTY CASUALTY | ) | |
| COMPANY OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**REPLY SUGGESTIONS IN SUPPORT OF TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA'S MOTION TO EXCLUDE EXPERT TESTIMONY OF THOMAS IRMITER AND NEIL CARLSON**

# TABLE OF CONTENTS

I.      INTRODUCTION……………………………………………...……………4

II.     ARGUMENT……………………………………………………………...4

    A.      Irmiter is Unqualified to Offer Opinions Outside of His Area of Expertise………4

        1.      Internal and external infiltration and fire behavior opinions……………..5

        2.      Opinions as to other qualified experts' methodologies or opinions………8

        3.      Interpretation of data and sampling results………………………………..8

        4.      Health risks of combustion by-products…………………………………..9

    B.      Irmiter's "Mechanism for Combustion Byproduct Cross Contamination" Opinions Are Unreliable and Inadmissible……………………………………10

    C.      Carlson's Data was Not Produced Pursuant to Any Recognized Standard………14

        1.      Carlson failure to utilize Polarized Light Microscopy (PLM) renders his data and any opinions based on his data unreliable…………..15

        2.      Opinions based on Carlson's data are due to be excluded because they are based on work performed by an unaccredited laboratory and are misinterpreted……………………………………………………18

    D.      Irmiter's Opinions Based on EMSL or Microvision Data Are Inadmissible…….20

        1.      Irmiter's Opinions Regarding EMSL's, Microvision's, or Any Other Data Are Untimely……………………………………………………21

        2.      Any opinions regarding EMSL's or Microvision's Data is Unreliable….21

    E.      Irmiter's opinions regarding carcinogenic effects and need for remediation…...22

III.    CONCLUSION……………………………………………………………22

1

# TABLE OF AUTHORITIES

## Cases

*Am. Auto. Ins. Co. v. Omega Flex, Inc*., No. 4:11CV00305 AGF, 2014 WL 859760, at *3 (E.D. Mo. Mar. 5, 2014), *aff'd*, 783 F.3d 720 (8th Cir. 2015)…………….…...………………..…5

*Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 597 (1993)…..……………………….4, 13

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, (1997)……………….……………………..…...11

*Hill v. Fikes Truck Line, LLC*., No. 4:11-CV-816 CAS, 2012 WL 5258753, at *3 (E.D. Mo. Oct. 24, 2012)……………...……….……………….……………………...………...8, 9

*Houser v. Norfolk S. Ry. Co*., No. 4:16-CV-01517, 2019 WL 2868933 *2 (M.D. Pa. July 3, 2019)………………….………………………….……………………………………....10

*In re Paoli R.R. Yard PCB Litig*., 35 F.3d 717, 754 (3d Cir. 1994)…………………………..18

*Jones v. Beelman Truck Co*., No. 4:13-CV-252 CAS, 2015 WL 3620651, at *7 (E.D. Mo. June 9, 2015)…………………………………………..……………….……………..…...7

*Larson v. Kempker*, 414 F.3d 936, 941 (8th Cir. 2005)……………….……..……...……..…9

*Looney v. Zimmer, Inc*., No. 03-0647-CV-W-FJG, 2004 WL 1918720 *4 (W.D. Mo. Aug. 19, 2004)…........................................................................................................................21

*In re James Wilson Assocs*., 965 F.2d 160, 173 (7th Cir. 1992)…………………………...…..9

*Norman v. State Farm Fire & Cas. Co*., No. 13-CV-01643-PAB-CBS, 2014 WL 6477889, at *3 (D. Colo. Nov. 19, 2014)…………………………………..……………………...8

*Ruston v. Off. Depot, Inc*., No. 3:10-CV-05057-DGK, 2011 WL 4916622, at *2 (W.D. Mo. Oct. 17, 2011)……………...……………………….……………….…………13

*Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009) ……………..…………….6

*Sylla–Sawdon v. Uniroyal Goodrich Tire Co*., 47 F.3d 277, 283–84 (8th Cir. 1995)...………..6

*Trost v. Trek Bicycle Corp.,* 162 F.3d 1004, 1008 (8th Cir. 1998)………………………….21

*United States v. Medina–Copete*, 57 F.3d 1092, 1104 (10th Cir. 2014)…………………..…8

*Weisgram v. Marley Co*., 169 F.3d 514, 520–21 (8th Cir. 1999)……………….…..……...….5

*Z.J. by & through Jones v. Kansas City*, No. 4:15-CV-00621-FJG, 2017 WL 4390274,

Case 4:20-cv-00095-FJG   Document 104   Filed 07/12/21   Page 3 of 26

at *14 (W.D. Mo. Sept. 29, 2017)...……………………………………………….…………..10

**<u>Rules</u>**

Federal Rule of Evidence 702…………………………….......................................4, 8, 10

Federal Rule of Evidence 703……………………………………………………….8, 9

Federal Rule of Civil Procedure 37(c)(1)……………………………………...……....21

Defendant Travelers Property Casualty Company of America ("Travelers") submits the following Reply Suggestions in Support of its Motion to Exclude Expert Testimony of Thomas Irmiter ("Irmiter") and Neil Carlson ("Carlson"):

## I.    INTRODUCTION

Plaintiff bears the burden to establish that Irmiter's and Carlson's opinions are both reliable and admissible. FED. R. EVID. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). Instead of meeting that burden, in an attempt to distract the Court from the true evidentiary issues, Plaintiff makes substantive arguments about the case, insurance coverage, Travelers' positions, and the substantive merit of its expert's opinions citing objectionable, irrelevant, and – in some ways – completely inaccurate information. While Travelers disputes Plaintiff's statements on these various topics, it will not provide a point-by-point response to those which have no merit under a Rule 702 analysis. Instead, Travelers reiterates its focus on the true issues before this Court:

(1)    Plaintiff's purported experts exceed the bounds of their qualifications;

(2)    Plaintiff's purported experts' opinions are not based on sufficient (and in some cases, any) facts or data;

(3)    Plaintiff's purported experts' opinions are fundamentally flawed as they are not the product of any reliable methodology; and

(4)    Plaintiff's experts have not applied any such methodology to the facts of this case.

Therefore, Irmiter's and Carlson's opinions are due to be excluded as detailed in Travelers' Motion and further explained herein.

## II.    ARGUMENT

### A.    Irmiter is Unqualified to Offer Opinions Outside of His Area of Expertise.

4

Purporting to be a "jack of all trades," Irmiter opines on several fields of study ranging from fire dynamics and weather to causation and engineering. However, "the Eighth Circuit has long held that an expert is only permitted to offer testimony within the bounds of his qualifications, and may not offer opinions outside of his area of expertise." *Am. Auto. Ins. Co. v. Omega Flex, Inc.*, No. 4:11CV00305 AGF, 2014 WL 859760, at *3 (E.D. Mo. Mar. 5, 2014), *aff'd,* 783 F.3d 720 (8th Cir. 2015) (citing *Weisgram v. Marley Co.,* 169 F.3d 514, 520–21 (8th Cir.1999)).

### 1. Internal and external infiltration and fire behavior opinions.

Irmiter's certifications are as a "building official – limited"[1] in the State of Minnesota and International Code Council ("ICC") licensure as a residential building inspector and property maintenance/housing inspector. Per Irmiter's "building official-limited" certification, he is permitted to perform code administration for one- and two- family dwellings and exempt classifications of buildings, which includes apartments with three units or less,[2] and may only conduct code inspections for other structures under the direction of a certified building official.[3] As Irmiter states in his report, the property at issue is a "[s]ix Phase wood-framed, four-story, slab-on grade, luxury apartment complex . . . consist[ing] of 19 different floorplans." (Doc. 93-2, p. 7 of 74). Thus, Irmiter's "building official – limited" certification does not include The Metropolitan, and he would only be permitted to conduct code inspections of the property under the direction of

---

[1] "An individual with this certification may perform code administration for one- and two-family dwellings, their accessory structures, and 'exempt classes of buildings'. . ... A certified building official-limited may conduct inspections for other structures regulated by the State Building Code under the direction of a designated certified building official or the state building official." Minn. Stat. Ann. § 326B.133 (West).

[2] "Apartment houses/condominiums (three units or less), dwellings, lodging houses, attached single-family dwellings/townhomes, and congregate residences (each accommodating ten persons or less)" are exempt residential classes of buildings. Minn. R. 1800.5900.

[3] *Supra*, note 1.

a designated certified building official or the state building official, and such inspection would be limited to code administration.

Under well-established Eighth Circuit precedent, Irmiter's testimony must remain within the bounds of his expertise – testimony related to applicable building codes, whether those codes were followed, and to some extent, the impact any such code deficiencies might have on the quality of the construction of the Metropolitan. However, Irmiter offers no opinions within those areas, but instead, he ventures into the scientific fields of fire dynamics, meteorology, industrial hygiene, and engineering; a practice that is strictly prohibited. Irmiter's experience is in building codes; therefore, his testimony must stay within the bounds of this scope. *See Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009) ("[F]or an expert witness to be qualified based on experience, that experience must bear a close relationship to the expert's opinion." (citing *Sylla–Sawdon v. Uniroyal Goodrich Tire Co.,* 47 F.3d 277, 283–84 (8th Cir.1995)).

Maxus attempts to artificially broaden Irmiter's qualifications by pointing out that he operates his own business and has been involved with any number of properties that have been impacted by fire, but its response is devoid of any reference as to how this experience relates to his "Mechanism for Combustion Cross Contamination" opinions. Rather, Maxus offers the Court a broad, ill-defined standard that, taken to its logical conclusion, would allow a person with any type of experience on a fire claim, regardless of the role, to testify as to virtually every scientific topic implicated by a structure fire. This is not the rule and Irmiter's testimony has gone so far afield of his limited area of expertise. Because Irmiter's building code certifications bear no relation to his preferred opinions, and Irmiter has failed to explain how his experience in cost estimating and the construction industry qualify him to offer his "Mechanism for Combustion

6

Cross Contamination" opinions, such opinions are inadmissible and due to be excluded. *See B.P.S., LLC v. Covington Specialty Ins. Co.*, No. 5:19-CV-06154-FJG, 2020 WL 9218532, at *3 (W.D. Mo. Aug. 26, 2020) (allowing expert to testify as to scope, costs and amount of repairs, but excluding testimony as to causation where "[d]espite [proffered expert's] expertise as a general contractor and in structural framing, plaintiff ha[d] not demonstrated that [preferred expert] ha[d] the requisite expertise to as opine as an expert as to the cause of the damage.")

Moreover, Irmiter's training as a weather spotter does not qualify him to opine as to the "dynamics of wind and wind forces," which he states is a basis for his "Mechanism for Combustion Cross Contamination" opinions. (*See* Doc. 93-2, p. 15 (14 of 73)). In an effort to cure defects in Irmiter's expert disclosures, Plaintiff has submitted Irmiter's affidavit, which states: "To gain certification as a SKYWARN weather spotter, [Irmiter] participated in an eight-hour in-person education course as well as a one-hour-test." (Doc. 93-3 ¶ 4). Tellingly, Plaintiff and Irmiter omit details regarding the subjects covered by the course or test. Instead, Plaintiff argues that "Irmiter's training as [a] weather spotter also permits him to provide an educated review of what the photos and videos from the fire depict." (Doc. 93, p. 13 of 30). However, the jury is as capable as Irmiter in viewing photographs and videos and noting what they depict. *See Jones v. Beelman Truck Co.*, No. 4:13-CV-252 CAS, 2015 WL 3620651, at *7 (E.D. Mo. June 9, 2015). Because Irmiter's training as weather spotter bears no relationship to his proffered opinions, Irmiter's testimony related to "wind dynamics," "wind forces," "wind patterns," or otherwise associated with weather conditions during the time of the fire is inadmissible. In turn, Irmiter's is unqualified to offer his "Mechanism for Combustion Cross Contamination" opinions, which are based on his "training as a weather spotter." Therefore, such opinions are due to be excluded in their entirety.

### 2. Opinions as to other qualified experts' methodologies or opinions.

Second, Irmiter is unqualified to opine as to Travelers' experts' methodology or opinions. It is undisputed that Irmiter is not an industrial hygienist, and he does not meet any of the American Board of Industrial Hygiene Association's requirements to become a certified industrial hygienist. (Doc. 78-3, p. 5 of 8, tpp. 65:16-24). While Irmiter claims that he has "worked closely with Industrial Hygienists and Environmental Scientists," working with such experts does not qualify him as an expert in the technical matters on which he seeks to opine. (Doc. 93-2, p. 5 of 74). "Where, as here, an expert witness relies on experience, the expert 'must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *Norman v. State Farm Fire & Cas. Co.*, No. 13-CV-01643-PAB-CBS, 2014 WL 6477889, at *3 (D. Colo. Nov. 19, 2014) (citing *United States v. Medina–Copete,* 57 F.3d 1092, 1104 (10th Cir.2014) (quoting Fed. R. Evid. 702, advisory committee notes)). Irmiter's failure to explain how working alongside qualified professionals qualifies him to opine as to Travelers' experts' methodology or opinions – areas in which he is clearly unqualified – is fatal. Therefore, any such opinions are inadmissible.

### 3. Interpretation of data and sampling results.

With respect to his purported interpretation of data and lab results, Irmiter is far out of his field of expertise. In an attempt to compensate, Irmiter relies on analysis and reports conducted by third parties, and Plaintiff glosses over Irmiter's improper reliance by citing to Federal Rule of Evidence 703. However, Rule 703 only allows an expert to base an opinion on inadmissible facts or data if a qualified expert in that particular field would reasonably rely on these kinds of facts or data. *See Hill v. Fikes Truck Line, LLC*, No. 4:11-CV-816 CAS, 2012 WL 5258753, at *3 (E.D.

Mo. Oct. 24, 2012) ("An expert's opinion must be based upon his or her own application of principles within his [or] her expertise to the facts of the case.").[4]

While "an expert may extrapolate from data supplied by other experts, . . . a person does not become an expert simply by reviewing an expert's reports or research." *Larson v. Kempker*, 414 F.3d 936, 941 (8th Cir. 2005) (internal citation omitted). This is precisely what Irmiter has done with respect to his opinion interpreting environmental testing data. While Irmiter could read the lab reports and data like any other person, absent qualifications and training as an industrial hygienist or other qualified environmental professional, he is not qualified to provide analysis or interpretation of the data. *See Hill*, 2012 WL 5258753, at *4. It is undisputed that Irmiter has no training in any scientific field, and Plaintiff concedes that "Irmiter does not claim to be a microscopist." (Doc. 93, p. 14). While lab results are the type of information a qualified expert (*i.e.*, an industrial hygienist) might use to opine on the presence of soot, char, and ash from the fire, Irmiter is not qualified to tell the jury what he thinks these results mean, and any such opinions are inadmissible.

### 4. Health risks of combustion by-products

Finally, Irmiter is not qualified to render opinions regarding carcinogenic properties or health risks associated with soot, char, and/or ash. As stated, Irmiter does not possess any scientific training. He is not a toxicologist, medical doctor, chemist, industrial hygienist, or trained in any similar field. In fact, Irmiter has stated that he is not qualified to opine as to health risks associated with combustion by-products. (Doc. 78-13, p. 2, trp. 123-24 ("I'm not qualified to give that

---

[4] Moreover, opinions that are entirely that of another expert are inadmissible under Rule 703. *See Matter of James Wilson Assocs.*, 965 F.2d 160, 173 (7th Cir. 1992) (excluding architect's proposed expert testimony about condition of building because architect was acting as "the engineer's spokesman" and could not "vouch[] for the truth" of the engineer's opinions); *Hill*, 2012 WL 5258753, at *3 (holding proffered expert's opinion not admissible where proffered expert not qualified to make opinion, which was entirely based on opinion of another expert).

9

opinion. . . . I typically don't disqualify myself, but I'm not a medical doctor.")). Therefore, Irmiter is unqualified to opine that soot, char, and/or ash must be removed due the alleged carcinogenic properties of soot and/or other health risks associated with fire combustion by-products. *See Z.J. by & through Jones v. Kansas City*, No. 4:15-CV-00621-FJG, 2017 WL 4390274, at \*14 (W.D. Mo. Sept. 29, 2017), *aff'd in part, rev'd in part, dismissed in part sub nom on other grounds,* 931 F.3d 672 (8th Cir. 2019) (excluding expert opinion as to potential health effects "when his testimony strayed into these fields . . . outside the scope of his expertise"); *Houser v. Norfolk S. Ry. Co.*, No. 4:16-CV-01517, 2019 WL 2868933 \*2 (M.D. Pa. July 3, 2019) (excluding ergonomics expert from testifying regarding risk factors to health because the expert was not medically trained).

Plaintiff has failed to establish that Irmiter possesses the requisite knowledge, skill, experience, training, or education sufficient to qualify him to testify in this case. To the extent Irmiter has based his qualifications on working alongside qualified experts or other experience, Irmiter's failure to explain why that experience is a sufficient basis for his opinions, how that experience is reliably applied to the facts, and how his experience led to his conclusions is fatal. *See* FED. R. EVID. 702, advisory committee notes. Because the Court's gatekeeping function requires more than simply taking the expert's word for it, this Court should preclude Irmiter from testifying as an expert in this case.

### B. Irmiter's "Mechanism for Combustion Byproduct Cross Contamination" Opinions Are Unreliable and Inadmissible.

Irmiter's opinions fail not only because he is unqualified, but also because they fall well short of the reliability requirements of Rule 702. Irmiter's Opinion 3.1.1 amounts to a series of unsubstantiated statements, which are not backed by applying applicable principles or methodologies to the facts of the case. Plaintiff claims that Irmiter's report is supported by "clear

citations and statements," but a close review of these "citations and statements" reveals that they are inapplicable to the facts of the case and/or Irmiter is unqualified to render opinions utilizing these standards. While Plaintiff states that Irmiter "opines that infiltration will occur at open failure points in the structure which permit smoke into the building and that The Metropolitan contained various such points,"[5] this opinion is "connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

First, in reliance on a "How Stuff Works" article, Irmiter opines that the effects of the Phase 6 fire "were similar" to that of a wildfire, and states it is his opinion that the "fire was large enough to effectively create its own weather pattern in the form of circulating high winds forcing Phases 1-4 to pressurize and become engulfed in smoke." (Doc. 93-2, p. 16 of 75). However, this opinion is nothing more than Irmiter's *ipse dixit*. Plaintiff argues that this "article simplifies a complex fire dynamics topic." (Doc. 93, p. 15 (18 of 30)). As Plaintiff has conceded the complexity of the topic, it becomes even more incumbent on Irmiter to explain how he is qualified to simplify and condense down a topic unique to the science of fire dynamics – a field in which scientists spend years of their lives researching. Irmiter does nothing more than any other lay person could do, which is to read an overly simplified article and arrive at a fundamentally unsupported conclusion.[6] Notwithstanding Irmiter's lack of qualifications, it is undisputed that Irmiter's opinion is based on quotations from an article published "**for entertainment purposes only**" by a website that "**make[s] no warranty as to the reliability, accuracy, timeliness, usefulness or completeness of the information**." "Visitor Agreement". HowStuffWorks.com. <https://www.howstuffworks.com/terms-and-conditions.htm> (last accessed 6 July 2021).

---

[5] (Doc. 93, p. 15 of 30)

[6] Plaintiff and Irmiter's lack of any explanation as to how Irmiter is remotely qualified to speak in this complex area of science belies the obvious conclusion that Irmiter is unqualified to offer any fire dynamics opinions.

(emphasis added). Because Irmiter's initial opinion regarding the effects and winds created by the fire is inadmissible, Irmiter's "Mechanism for Combustion Cross Contamination," which is premised on this fundamentally unreliable opinion, is due to be excluded in its entirety.

Second, citing material by A. Bhatia, which "discusses the smoke control systems and examines the design considerations associated with stairwell pressurization systems" in high-rise buildings,[7] Irmiter states that stack effect, natural convection, thermal expansion, wind forces, buoyancy of combustion gases, and HVAC operation are the six "primary factors that affect the movement of smoke **within** a building." (Doc. 93-2, p. 19 (p. 18 of 73) (emphasis added)). Based on his initial faulty opinion regarding the external wind forces at the time of the fire, without explanation as to each of these "factors," he opines that "all six factors which affect the movement of smoke within a building . . . were in play during the fire." (Doc. 93-2, p. 19 (p. 18 of 73)).

While Irmiter is clearly unqualified to opine as to the winds or other forces created by the fire (*i.e.*, fire dynamics), as explained in Travelers' motion, Irmiter's reliance on this material is misplaced. (Doc. 78, pp. 19-21 of 39). Plaintiff argues that the crux of Irmiter's "internal airflow" opinion is "that the common atmosphere of the complex and the continuously operating mechanical systems [(HVAC systems)] caused cross-contamination and the spread of particulate throughout the complex." (Doc. 93, p. 15 (p. 18 of 30)). However, once again, Irmiter's opinion fails to apply the principles upon which he relies to the facts of the case. As explained in Travelers' Motion, the material on which Irmiter relies deals with an interior fire. (Doc. 78, p. 20 of 39). It is undisputed that the only fire occurred on Phase 6 of the property, and it is undisputed that the fire was not present inside the other structures of the Metropolitan.

---

[7] "Stairwell Pressurization Systems", A. Bhatia, Continuing Education and Development, Inc. https://www.cedengineering.com/userfiles/Stairwell%20Pressurization%20Systems.pdf (last accessed July 12, 2021).

Moreover, Plaintiff and Irmiter are aware that operation of the HVAC system could not be a component in the spread of the alleged particulate, for it is undisputed that power was cut off for all portions of the Metropolitan. *See* Ex. 1. While the validity of an expert's opinion is usually the subject of cross-examination, Irmiter's opinions are based on underpinnings, which are "contrary to the evidence of the case and would confuse or mislead the jury;" therefore, they are further due to be excluded. *See Ruston v. Off. Depot, Inc.*, No. 3:10-CV-05057-DGK, 2011 WL 4916622, at *2 (W.D. Mo. Oct. 17, 2011). Furthermore, Irmiter's opinion is premised on blatant speculation. (Doc. 93-2, p. 21 (p. 20 of 73) ("We understand from maintenance that some doors and windows **may** have been left open when tenants evacuated." (emphasis added)). Irmiter's speculation and failure to provide any meaningful explanation as to how the six "primary factors … were in play during the fire" deem this portion of his opinion inadmissible.

Finally, based on these faulty premises, Irmiter reaches the ultimate unreliable opinion of Section 3.1.1 of his report and states:

> In my opinion, winds generated by this fire, not winds in the surrounding area, created the perfect condition for distribution of microscopic fire particulate and combustion byproducts that are harmful. These winds and the heat from the fire created the mechanism for the building pressurization to occur. Once the fire was contained and residents went back in and opened their windows and sliding doors to address the interior smoke smell, the interior of the building was depressurized (imagine letting air out of a balloon). This caused exfiltration to occur which contributed to cross contamination.

(Doc. 93-2, p. 22 (p. 21 of 27)).

Irmiter's proffered theory has not been tested; subjected to peer review or publication; does not have a known or potential rate of error; certainly, has not gained general acceptance in the scientific community; and fails to meet any other *Daubert* factors. Instead, his opinions are fundamentally unreliable, and in many respects, based on subjective belief and unsupported

speculation. Therefore, Irmiter's "Mechanism for Combustion Byproduct Cross Contamination" opinions are due to be excluded in their entirety.

###  C. Carlson's Data Was Not Produced Pursuant to Any Recognized Standard

As explained in Travelers' motion, the data produced by Carlson was not produced in compliance with ASTM 6602-13 or any other relevant standard. Therefore, any opinions based on this data must be excluded.

Maxus does not argue that Carlson failed to comply with ASTM 6602-13, rather it argues that "allegiance to all aspects of ASTM 6602-13 was not warranted" and seeks to re-characterize his role in the process preliminary and non-conclusive. (Doc. 93, p. 24). While the facts belie that argument as Carlson's data was the only data in Irmiter's possession when he wrote his initial June 5, 2019, report concluding widespread soot and char contamination **from the September 27, 2018 fire**, Maxus' characterization of Carlson's role as purely preliminary and non-conclusive, it begs the question of how his testimony is at all helpful to the trier of fact. If Carlson's tests were inconclusive and non-compliant with ASTM 6602-13, then they are not sufficiently reliable to assist the trier of fact with resolving the question before it.

Carlson and Irmiter were aware that ASTM 6602-13 was the standard by which Carlson's laboratory results were to be analyzed. Maxus cannot now excuse Carlson's failure to comply with ASTM 6602-13 by diminishing Carlson's role in the process when it was Carlson's data alone, that Irmiter relied upon for his opinion that complete remediation was required. (Doc. 93-2, pp. 68-70 of 74). In fact, Irmiter makes no mention of any other data upon which he relied in Opinion 3 of his report. *Id.* Either Carlson's failure to comply with ASTM 6602-13 makes his data unreliable and inadmissible, or Carlson's role was so minimal and his data and opinions so

14

inconclusive that they cannot assist the trier of fact in determining whether soot and char from the September 27, 2018 fire were present in the other unaffected buildings of the Metropolitan.

In addition, Plaintiff states that Irmiter's report "cites ASTM E2268-04, ANSI-IICRS S500, [and] ASTM E1216-11." (Doc. 93, p. 22 (p. 25 of 30)). In fact, Irmiter's report cites a litany of standards (most of which are inapplicable to the facts of this case); however, there is no indication that Irmiter or Carlson complied with these standards. Instead, it is readily apparent that Irmiter and Carlson chose certain aspects of standards in order to formulate a self-serving "methodology," which has not been tested or subjected to peer review, has no known potential rate of error, and was developed solely to advance a "presumptive" finding of soot, char, and/or ash in collected samples. Accordingly, opinions based on Carlson's data are inadmissible.

### 1. Carlson failure to utilize Polarized Light Microscopy (PLM) renders his data and any opinions based on his data unreliable.

"Carlson did not utilize PLM. He reviewed samples from The Metropolitan via bright field microscopy." (Doc. 93, p. 17 (20 of 30)). While Plaintiff states that "the fact that Carlson did not in fact perform PLM" somehow lessens Travelers' arguments as to the reliability of Carlson's data, this reasoning is entirely misplaced, for Carlson's use of bright field microscopy further demonstrates his deviation from accepted methodologies and standards including those specifically cited by Plaintiff, Irmiter, and Carlson.

For example, the procedure for inspection of tape-lifts under ASTM 6602-13 is through the use of a stereo binocular microscope followed by PLM or transmission electron microscopy (TEM). First, ASTM 6602-13 calls for "inspect[ion of] the tape-life with a stereo binocular microscope. Note regions of interest where either jet black or dark particles are visible." From there, ASTM 6602-13 calls for the inspection of the tape-lift with PLM using both transmitted and reflected light. During this second PLM step, ASTM 6602-13 states that "[a]cinoform soot will

Case 4:20-cv-00095-FJG   Document 104   Filed 07/12/21   Page 16 of 26

appear as opaque, jet black aggregates of particles displaying a dull reflection in top light."
Because Carlson failed to utilize PLM, he would never be able to reach this second step of
presumptively identifying aciniform soot. Carlson's failure to employ PLM in his analysis
demonstrates his complete deviation from the "screening test method" under ASTM 6602-13.
Accordingly, unlike Plaintiff's suggestion, Carlson's analysis was not a proper first-step review as
called for in ASTM 6602-13.

While Plaintiff argues **without citation** that "[b]right field microscopy is an accepted
preliminary, presumptive initial investigation," this argument is simply not true. While it is true
that there is no one universally accepted methodology for analysis of soot and char, all accepted
"preliminary, presumptive" analysis include the use of PLM. In fact, each of the source on which
Plaintiff cites include PLM analysis.

For example, the Council-certified Fire and Smoke Damage (CFSx) Certification Program
Guide, on which Plaintiff relies, make no reference to "bright-field transmitted" microscopy.
Instead, it states:

> Carbonized material (char and ash) may be analyzed using **optical microscopy
> (epi-reflected and polarized light microcopy).** Initial examination by low power
> reflected light microscopy is first performed to help define and report the
> macroscopic texture and color of the dust sample and determine the absence or
> presence of large fire residue particles in the sample (char or suspect ash). The
> samples are analyzed for traits such as color, size, morphology and evidence of
> cellular morphology. PLM analysis can be used to characterize settled particles.
> Under PLM scrutiny, some char particles may appear the same as other opaque
> particles and may lead to false negatives or positives.
>
> . . .
>
> Because the electrons of the conductive layer of metals interact strongly with
> photons, which make the sample not transparent enough to be observed with a
> transmitted light microscope, the reflected light microscope was created.

(Doc. 93-18, p. 43 (p. 44 of 60)).

16

Plaintiff next argues that "Carlson's methods are consistent with recognized laboratory practices followed by Microvision, EMSL, EAA, and the AIHA Technical Guide [for Wildfire Impact Assessment]. However, a review of these standards reveals that this statement is not true.

Microvision's "comprehensive soot analysis allows for the detection of soot particulate via a combination of microscopy techniques including light microscopy, Scanning Electron Microscopy (SEM), and Energy Dispersive Spectroscopy (EDS)." While MicroVision uses the blanket term light microscopy, it, in fact, utilized PLM in its analysis of the samples Irmiter submitted. (*See* Doc. 93-13, p. 2 of 62).

EMSL applies ASTM 6602-13, and as explained above, it does not involve the use of bright field microscopy. (Doc. 93-20, p. 17 of 55). With respect to the use of light microscopy, EMSL states that "**reflected light microscopy** is primary used to examine opaque particles: metals, coal/coke, wood, slag, rock, plastics, alloys, composites, [and] char," and indicates that the use of reflective light microscopy and PLM are recommended in order to obtain a presumptive finding of soot. (Doc. 93-20, pp. 18, 28 of 55). EMSL further stats that "[l]ight microscopy alone can be MISLEADING" (Doc. 93-20, p. 29 of 55 (emphasis in original). EMSL also cites Indoor Environmental Standard Organization/Restoration Industry Association (IESO/RIA) Standard 6001 – Evaluation of HVAC Interior Surfaces to Determine the Impact from Fire-related Particulate, which includes no mention of bright field microscopy. Instead, [t]his analysis is a screening technique using light microscopy (polarized light microscopy and steromicroscopy) to determine the presence of char and soot (presumptive[1])." IESO/RIA Standard 6001, "EMSL Fire Related Testing Program," https://tinyurl.com/4r7m2xv7. Similarly, EAA analysis for fire combustion residue makes no mention of the use of bright field microscopy. Instead, the EAA report on which Plaintiff relies states: "EAA Quantifying airborne and surface fire combustion

contamination is a multi-step process requiring Optical Microscopy (Polarized Light & Reflected Light), and Scanning Eclectron Microscopy / X-ray analysis." (Doc. 93-19, p. 21 of 45).

Finally, the AIHA Technical Guide states that "[i]nitial examination by low power reflected light microscopy is first performed to help define and report the macroscopic texture and color of the dust sample and determine the absence or presence of large fire residue particles in the sample (char, suspect ash, or soot clusters)." (Doc. 93-17, p. 11 (p. 19 of 32)). Because bright field microscopy must be used in conjunction with PLM in order to obtain a presumptive identification of soot and confirmatory identification of char or ash, Carlson's failure to use PLM further demonstrates that his methodology is unreliable. In fact, Maxus's own expert, Daniel Baxter, opines that "[a]n accurate analysis specifically requires the use of bright field, polarized light, and <u>reflected light dark field</u> imaging.[8] (Doc. 92-9, p. 16 of 37 (emphasis in original)).

> ### 2. Opinions based on Carlson's data are due to be excluded because they are based on work performed by an unaccredited laboratory and are misinterpreted.

Notwithstanding Carlson's failure to apply any reliable or accepted methodology and Irmiter's lack of qualifications to render opinions as to such data, Irmiter's opinions based on Carlson's data must be excluded because (1) they are based on work performed by an unaccredited laboratory; and (2) they misinterpret the data. *See In re Paoli*, 35 F.3d 717, 754 (3d Cir. 1994) (upholding a lower court's decision to exclude testimony that was based upon lab work that was performed by an unaccredited laboratory and misinterpreted).

It is undisputed that Carlson's home laboratory is unaccredited, and as evidenced by Carlson's affidavit, his data was produced without a clear protocol and unbiased procedure for analyzing samples. In fact, it is undisputed that Carlson's methodology for analysis of soot and

---

[8] While Travelers' disputes the opinions and methodology utilized by Maxus' expert, Daniel Baxter, Travelers cites Baxter solely to illustrate that no reliable or accepted methodology was utilized with respect to Carlson's data.

char was developed for the sole purpose of advancing Irmiter's and/or his company's opinions. (Doc. 93-16, ¶ 8).

Moreover, a comparison of Carlson's and Irmiter's reports reveals that Irmiter misinterpreted Carlson's data, for Carlson report makes it abundantly clear that his data does not conclusively establish the presence of soot and/or char at the Metropolitan. For example, Carlson's report states, in part, as follows:

> Additionally, microscopic examination revealed **Char-like** particles on both the air and tease tape samples at several locations. The microscopic analysis of **soot-like particles is presumptive** using this method of optical microscopy. Several samples had structures resembling **soot-like** particles and these were noted in the report.

(Doc., 93-5, p. 5 of 7 (emphasis added)).

> Similar structures such as **spray paint particles can give false positives for soot**. . . .The soot sample analysis is listed as **soot-like** since no chemical analysis has been completed on the particles. This method is therefore a screening method and can be **used to suggest the need for further sampling or note areas where it is relatively clean and additional, more costly sampling would not be warranted**.

(Doc., 93-5, p. 6 of 7 (emphasis added)).

> The phase 1 soot and char analysis is an accepted screening method to identify **potential areas** for elevated interior levels for soot and char. It is offered as part of EMSL's four stage protocol.

(Doc., 93-5, p. 7 of 7 (emphasis added)).

While Carlson, a certified industrial hygienist, explained the presumptive nature of his findings and sampling techniques, Irmiter, in reliance on Carlson's analysis of samples taken on May 8, 2019 and May 9, 2019, states:

> The results from by N.G. Carlson were consistent with distribution of combustion byproducts from the fire that occurred on September 27, 2018.
>
> . . .

19

> Combustion byproducts from the fire including; **soot, char and ash were found in all of the locations I anticipated** based on the design of the building, the size and duration of the fire and the type of products consumed in the fire.

(Doc. 93-2 p. 68 of 74).

> A total of 72 air, tape and bulk grab samples were submitted to N.G. Carlson. Of the 72 air, tape and bulk grab samples taken and submitted for analysis, **some level of combustion byproducts consistent with the fire were found in all the samples, including soot, char, and ash (100%).**

(Doc. 93-2 pp. 69 of 74).

Therefore, Irmiter may not opine that soot, char, and/or ash were found in the samples analyzed by Carlson because such opinions are unreliable. Plaintiff concedes as much stating that Carlson's "reports state no chemical identification was conducted and that a 'presumptive identification' was made. . . . If presumptive identification of soot or char is made then additional confirmatory analysis may be conducted." (Doc. 93, p. 21 of 30).

Carlson's failure to apply any reliable or accepted methodology to analyze samples renders his data and any opinion based on that data unreliable. Therefore, Carlson's data and opinions based on that data must be excluded. Moreover, Irmiter's opinions regarding Carlson's data must be excluded as Irmiter is unqualified to opine as to the data, which is readily apparently by his misinterpretation of the data.

### D. Irmiter's Opinions Based on EMSL or Microvision Data Are Inadmissible

As detailed in Travelers' motion and above, Irmiter's opinion regarding the presence of combustion by-products were based solely on his reliance on Carlson's data from the May 8, 2019 and May 9, 2019 sampling. (Doc. 93-2, pp. 68-71 of 74). However, once Plaintiff realized the deficiencies in Carlson's data, Plaintiff now argues without citation that Irmiter's opinions are based on EMSL Analytical, Inc. ("EMSL") and Microvision Laboratories, Inc. ("Microvision") analysis.

### 1. Irmiter's Opinions Regarding EMSL's, Microvision's, or Any Other Data Are Untimely

As a preliminary matter, any opinion as to the EMSL or Microvision data is inadmissible as such opinions were not included in Irmiter's Rule 26 reports. A review of Irmiter's Rule 26 report indicates that EMSL is only referenced with respect to Irmiter's critiques of Travelers' experts and is devoid of any mention to Microvision. (Doc. 93-2, p. 58 of 74). In fact, Irmiter specifically states that: "All samples were collected and entered a chain of custody. **After the sampling was completed, the samples were delivered to Neil Carlson, CIH, of NG Carlson Analytical.** The analysis of the results is included in the report." (Doc. 93-2, p. 69 of 74 (emphasis added)). Therefore, Irmiter may not offer opinions as to the EMSL, Microvision, or any other sampling due to his failure to disclose such opinions in Rule 26 expert report. Fed. R. Civ. P. 37(c)(1); *See, e.g., Trost v. Trek Bicycle Corp.,* 162 F.3d 1004, 1008 (8th Cir.1998) (affirming district court's decision to exclude the opinion of plaintiff's expert witness where his affidavit and report were produced late). Allowing expert testimony regarding opinions disclosed after an opposing party's deadline to file a motion for summary judgment results in prejudice to the opposing party. *Looney v. Zimmer, Inc.*, No. 03-0647-CV-W-FJG, 2004 WL 1918720 *4 (W.D. Mo. Aug. 19, 2004). Plaintiff has offered no justification or explanation as to why any opinions regarding the EMSL and Microvision analysis (or analysis of any other samples besides those collected May 8 and May 9, 2019) were not included in Irmiter's initial Rule 26 or supplemental reports. Therefore, both Fed. R. Civ. P. 37 and the Court's Amended Scheduling Order prohibit Irmiter from opining as to this data.

### 2. Any Opinions Regarding EMSL's or Microvision's Data Is Unreliable

While Irmiter failed to disclose any opinions with respect to EMSL or Microvision's data, based on Plaintiff's response, it appears that Irmiter may seek to opine that "[t]he results from

these labs confirmed the presence of soot and char at The Metropolitan." (Doc. 93, p. 26 of 30). To the extent that Plaintiff seeks to proffer this statement under the guise of expert testimony, the Court should preclude such opinions as they would not be the product of reliable principles and were not applied reliably to the facts of the case, for it is undisputed that the data shows that no soot was found in these samples.

### E. Irmiter's opinions regarding carcinogenic effects and need for remediation.

Plaintiff inaccurately states that "[t]he need for remediation is not in question and the Policy covers removal of soot and char caused by or resulting from the September 27, 2018 fire." However, Irmiter's opinions that the alleged presence of soot and char require remediation is the central matter at issue in this litigation.[9] Irmiter opines "there is not an acceptable level for exposure[; therefore] the combustion byproducts from the fire found in this building should be removed." While Irmiter's opinion must be excluded because he is unqualified, it also fails because it is based on carcinogenic properties of gas-phase soot. Maxus has made no effort to demonstrate by a preponderance of the evidence that Irmiter is qualified to offer opinions regarding the carcinogenic effects of fire particulates; that any such opinions are based on sufficient facts or data; that such opinions are the product of any reliable methodology or were applied to the facts of this case. Accordingly, any opinions regarding the health effects of combustion by-products or any opinions regarding the need and/or scope of remediation are inadmissible.

## III. CONCLUSION

For the reasons explained in Travelers' motion and as detailed above, this Court should preclude Irmiter and Carlson from testifying as experts in this case. First, Irmiter's experience

---

[9] Plaintiff incorrectly states that it "does not carry a burden to prove any need" for remediation. (Doc. 93, p. 29 of 30).

does not establish that he is an expert in the areas on which he intends to testify. Second, Irmiter relies on speculation, conjecture, and unreliable methodologies. With respect to Carlson, his data was not produced pursuant to any applicable or reliable standard. Instead, Carlson chose certain aspects of standards in order to formulate a self-serving "methodology," which has not been tested or subjected to peer review, has no known potential rate of error, and was developed solely to advance a "presumptive" finding of soot, char, and/or ash in collected samples. Accordingly, Carlson's data any opinions based on that data are due to be excluded.

Finally, Plaintiff's response indicates that Irmiter may seek to offer undisclosed opinions based on results from EMSL, Microvision, and/or other data. However, such opinions were not included in Irmiter's Rule 26 reports. Therefore, both the Federal Rules of Civil Procedure and this Court's Amended Scheduling Order prohibit Irmiter from opining as to this data.

WHEREFORE, PREMISES CONSIDERED, Travelers respectfully requests that this Honorable Court enter an Order excluding Thomas Irmiter's and Neil Carlson's proffered expert opinions and testimony under Rule 702 and *Daubert*.

Respectfully submitted,

s/Brenen G. Ely
Brenen G. Ely (*pro hac vice*)
Kenneth W. Boyles, Jr. (*pro hac vice*)
ELY & ISENBERG, LLC
3500 Blue Lake Drive, Suite 345
Birmingham, Alabama 35243
Telephone: (205) 313-1200
Facsimile: (205) 313-1201
bely@elylawllc.com
kboyles@elylawllc.com

Dale L. Beckerman, MO Bar #26937
Daniel E. Hamann, MO Bar #28164
DEACY & DEACY, LLP
920 Main Street, Suite 1000
Kansas City, Missouri 64105

23

Telephone: (816) 421-4000
Facsimile: (816) 421-7880
dlb@deacylaw.com
deh@deacylaw.com

*Attorneys for Defendant Travelers Property*
*Casualty Company of America*

## CERTIFICATE OF SERVICE

I do hereby certify that on July 12, 2021, I electronically submitted the foregoing with the Clerk of the Court for the United State District Court for the Western District of Missouri using the CM/ECF system, which will send a Notice of Electronic Filing to the following counsel of record:

Michael J. Abrams
Kimberly K. Winter
Brian W. Fields
Noah H. Nash
Lathrop GPM, LLP
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108-2618
Telephone: (816) 292-2000
Facsimile: (816) 216-2001
michael.abrams@lathropgpm.com
kim.winter@lathropgage.com
brian.fields@lathropgpm.com
noah.nash@lathropgpm.com

s/Brenen G. Ely
OF COUNSEL