## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| MAXUS METROPOLITAN, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 20-cv-0095-FJG |
| | ) | |
| TRAVELERS PROPERTY CASUALTY | ) | |
| COMPANY OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Michael J. Abrams, MO Bar #42196
Kimberly K. Winter, MO Bar #45029
Noah H. Nash, MO Bar #72048
LATHROP GPM LLP
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108-2618
Telephone: 816.292.2000
Facsimile: 816.292.2001
michael.abrams@lathropgpm.com
kim.winter@lathropgpm.com
noah.nash@lathropgpm.com

*Attorneys for Plaintiff*
*Maxus Metropolitan, LLC*

# TABLE OF CONTENTS

Pages(s)

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES ..................................................................................................... ii

I.      Introduction .................................................................................................................. 1

II.     Legal Standards ............................................................................................................ 1

        A.     Summary Judgment ....................................................................................... 1

        B.     Materiality and Prejudice Are Necessary to Void Insurance Policy............ 2

III.    Response to Travelers' Statement of Undisputed Facts ............................................. 3

IV.     Maxus' Additional Statement of Undisputed Facts .................................................. 12

V.      Background ................................................................................................................. 29

VI.     Policy Does Provide Coverage .................................................................................. 30

VII.    Maxus Did Not Breach the Policy Due To Phase 5 Water Damage ......................... 33

VIII.   Maxus Did Not Breach the Policy Due To Soot and Char Sampling ....................... 37

        A.     May 30, 2019 Sampling Visit ..................................................................... 37

        B.     Sampling Results Were Not Concealed ...................................................... 38

IX.     Maxus Did Not Fail to Protect the Property ............................................................. 41

X.      Extraneous Points Raised by Travelers In Statement of Facts ................................ 42

XI.     Neither Materiality Nor Prejudice Are Shown ......................................................... 43

XII.    Maxus is Entitled to Soft Costs ................................................................................. 45

        A.     Travelers Waived or Should be Estopped from Seeking to Deny
               Coverage Under the Time Element Coverage ............................................. 46

        B.     Maxus May Recover Soft Costs Under the Coverage Extension .............. 47

XIII.   Maxus' Damages are Not Excluded by the Policy .................................................... 49

XIV.    Vexatious Refusal Claim Does Not Fail .................................................................... 50

XV.     Conclusion .................................................................................................................. 53

CERTIFICATE OF SERVICE ............................................................................................... 54

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Acceptance Ins. Co. v. Brown*,
    832 So. 2d 1 (Ala. 2001) ................................................................50

*Blumer v. Automobile Club Inter-Ins*,
    340 S.W.3d 214 (Mo. Ct. App. 2011) ..............................................49

*BP Air Conditioning Corp. v. One Beacon Ins. Grp.*,
    33 A.D.3d 116 (NY 2006) ................................................................47

*Centermark Props. v. Home Indem. Co.*,
    897 S.W.2d 98 (Mo. Ct. App. 1995) .................................................49

*Century Fire Sprinklers, Inc. v. CNA/Transp. Ins. Co.*,
    23 S.W.3d 874 (Mo. Ct. App. 2000) .................................................46

*Childers v. State Farm Fire & Cas. Co.*,
    799 S.W.2d 138 (Mo. Ct. App. 1990) ...............................................44

*CM Vantage Specialty Ins. Co. v. Nephrite Fund 1, LLC*,
    No. 4:18 CV 1749 JMB, 2020 WL 805848 (E.D. Mo. Feb. 18, 2020) ...................................44

*Forest Oil Corp. v. Strata Energy, Inc.*,
    929 F.2d 1039 (5th Cir. 1991) .........................................................47

*Gohagan. v. Cincinnati Ins. Co.*,
    809 F.3d 1012 (8th Cir. 2016) .........................................................48

*Hampton v. Standard Ins. Co.*,
    400 F. Supp. 3d 805 (W.D. Mo. 2019), *aff'd* 815 F. App'x 100 (8th Cir. 2020) .................1, 2

*Heringer v. Am Family Mut. Ins. Co.*,
    140 S.W.3d 100 (Mo. Ct. App. 2004) ...............................................49

*Higgins v. Union Pac. R.R. Co.*,
    931 F.3d 664 (8th Cir. 2019) ...........................................................2

*Interstate Cleaning Corp. v. Comm. Underwriters Ins. Co.*,
    325 F.3d 1024 (8th Cir. 2003) .........................................................46

*Liberty Mut. Fire Ins. Co. v. Scott*,
    486 F.3d 418 (8th Cir. 2007) ...........................................................44

*Madison Cty. v. Evanston Ins. Co.*,
    340 F.Supp.3d 1232 (N.D. Ala. 2018) .............................................48

*Maher Bros., Inc. v. Quinn Pork, LLC*,
  512 S.W.3d 851 (Mo. Ct. App. 2017)..................................................................50

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)........................................................................................2

*Mendota Ins. Co. v. Lawson*,
  456 S.W.3d 898 (Mo. Ct. App. 2015)..............................................................49

*Monroe v. Freight All Kinds Inc.*,
  No. 18-CV-03238-SRB, 2020 WL 6589000 (W.D. Mo. Nov. 10, 2020).................2

*Myers v. Farm Bureau Town & Country Ins. Co. of Mo.*,
  345 S.W.3d 341 (Mo. Ct. App. 2011)........................................................2, 3, 43

*Neidenbach v. Amica Mut. Ins. Co.*,
  842 F.3d 560 (8th Cir. 2016) ..........................................................2, 43, 44

*Powell v. State Farm Mut. Auto Ins. Co.*,
  173 S.W.3d 685 (W.D. Mo. 2005).................................................................50

*Qureshi v. Am. Family Mut. Ins. Co.*,
  604 S.W.3d 721 (Mo. App. E.D. 2020) ..........................................................52

*Ritchie v. Allied Prop. & Cas. Ins. Co.*,
  307 S.W.3d 132 (Mo. banc 2009)..................................................................49

*Russell v. Farmers & Merchs. Ins. Co.*,
  834 S.W.2d 209 (Mo. App. S.D. 1992) ..........................................................52

*Seeck v. Geico Gen. Ins. Co.*,
  212 S.W.3d 129 (Mo. banc 2007)..................................................................49

*In re State Farm Fire & Cas. Co.*,
  872 F.3d 567 (8th Cir. 2017) ......................................................................48

*Sullivan v. State Farm Mut. Auto. Ins. Co.*,
  513 So.2d 992 (Ala. 1987)............................................................................50

*Welsh v. Nationwide Affinity Ins. Co. of Am.*,
  No. 17-CV-00090, 2017 WL 7037744 (W.D. Mo. Dec. 6, 2017)............................52

*Westview Drive Investments, LLC v. Landmark Am. Ins. Co.*,
  522 S.W.3d 583 (Tex. Ct. App. 2017) ............................................................47

*Willis v. State Farm Fire & Cas. Co.*,
  219 F.3d 715 (8th Cir. 2000) .........................................................................2

iii

**Statutes**

R.S.Mo. § 375.420 ...........................................................................................................51

**Other Authorities**

Fed. R. Civ. P. 56............................................................................................. *passim*

Mark Pomerantz, *Recognizing the Unique Status of Additional Named Insured*, 53
    Fordham L. Rev. 117 (Oct. 1984)...........................................................................47

iv

# I.     Introduction

Defendant Travelers Property Casualty Company of America's ("Travelers") Motion for Summary Judgment fails to present any undisputed issue of material fact upon which the Court can enter judgment. The Motion raises nothing but minor, immaterial issues in a thinly veiled attempt to deflect from Travelers' inappropriate handling of a claim that requires an enormous repair and reconstruction effort after a massive fire at The Metropolitan apartment complex in Birmingham, Alabama on September 27, 2018. Travelers' biggest complaint is that it did not timely receive (irrelevant and inconsequential) details of a multifaceted and extremely complex repair project from Plaintiff Maxus Metropolitan, LLC's ("Maxus"). Travelers also alleges that Maxus misrepresented details about water damage in a portion of the project, and that this should negate the coverage entirely. This accusation is not only false, but offensive. Travelers' arguments are wholly insufficient. The record proves Maxus complied with the Policy and has cooperated with Travelers. Contrary to Travelers' assertion, Travelers has in its possession all of the information it purports to be missing. More importantly, Travelers has not and cannot articulate how it supposedly relied on allegedly false information, or why it needed any of the information it claims it did not timely receive to adjust the claim. Nor has Travelers articulated how it has allegedly experienced any prejudice here. Because Travelers cannot meet its burden, the pending Motion must be denied.

# II.     Legal Standards

## A.     Summary Judgment

A federal court may only grant summary judgment under Federal Rule of Civil Procedure 56(a) "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When reviewing the record, the court must view all facts and inferences "in the light most favorable to the nonmoving party." *Hampton v. Standard*

*Ins. Co.*, 400 F. Supp. 3d 805, 808 (W.D. Mo. 2019), *aff'd* 815 F. App'x 100 (8th Cir. 2020) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–90 (1986)). The moving party bears the burden "of establishing both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law." *Hampton*, 400 F. Supp. 3d at 808. This burden includes the responsibility of specifically identifying both the "basis for its motion, and . . . those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Monroe v. Freight All Kinds Inc.*, No. 18-CV-03238-SRB, 2020 WL 6589000, at *2 (W.D. Mo. Nov. 10, 2020) (internal citations omitted). Thus, summary judgment is only proper "if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Higgins v. Union Pac. R.R. Co.*, 931 F.3d 664, 669 (8th Cir. 2019).

## B.    Materiality and Prejudice Are Necessary to Void Insurance Policy

In order to void an insurance policy based on an insured's alleged material misrepresentations or fraud in connection with the claims process, the misrepresentation must be (1) material and (2) must prejudice the insurer – causing the insurer to change position in reliance on the fraud or misrepresentation. *Neidenbach v. Amica Mut. Ins. Co.*, 842 F.3d 560, 565 (8th Cir. 2016); *Myers v. Farm Bureau Town & Country Ins. Co. of Mo.*, 345 S.W.3d 341 (Mo. Ct. App. 2011).

The Eighth Circuit has held that "a fact or circumstance is material if it pertains to facts that are relevant to the insurer's rights . . . to decide upon its obligations and protect itself against false claims." *Willis v. State Farm Fire & Cas. Co.*, 219 F.3d 715, 718 (8th Cir. 2000) (quotation omitted). To be prejudiced, the insurer must show some change in position (e.g., partial payment,

2

increased investigation costs, etc.). *Myers*, 345 S.W.3d at 349.  Absent a showing of materiality and prejudice, the insurer cannot seek to void the policy.

### III.  <u>Response to Travelers' Statement of Undisputed Facts</u>

Maxus objects to Travelers' Statement of Facts as it violates Local Rule 56.1(a) because each fact is not "set forth in a separately numbered paragraph and supported in accordance with Fed. R. Civ. P. 56(c)."

1.  Admitted.

2.  Admitted Exhibit 2 is a contract between Bomasada Birmingham Metropolitan, LLC and Bomasada BHM Construction, LLC dated June 15, 2015.  Admitted The Metropolitan complex contains six phases depicted in the rendering listed.  The remainder of the statements at Paragraph 2 are incomplete sentences to which Maxus cannot respond.

3.  Denied that the cited exhibit establishes the statement at this paragraph as the information is not found in the exhibit.  Admitted that policy QT-660-7E077026-TIL15 was in place at the time of the September 27, 2018 fire.

4.  Denied that the cited exhibit establishes the statement at this paragraph as the information is not found in the exhibit.  Admitted that policy QT-660-7E077026-TIL15 was in place at the time of the September 27, 2018 fire.

5.  Admitted.

6.  Admitted.

7.  Admitted.

8.  Admitted.

9.  Admitted.

3

10.     Denied that the cited exhibit establishes when Travelers was "informed" of sale of The Metropolitan.

11.     Denied.  Extensive damage throughout The Metropolitan is established in Maxus' expert reports. **Exhibits 1-6** *passim* (Maxus' Rule 26 Reports T. Irmiter, N. Carlson, D. Baxter; Maxus' Rule 26 Reply Reports A. Farnham, D. Baxter, T. Irmiter).

12.     This paragraph is in violation of Federal Rule of Civil Procedure 56(c) and Local Rule 56.1(a) as it fails to cite to any record evidence.  Nonetheless, Maxus admits that Travelers' own claim notes and deposition establish that Travelers was provided notice of a property damage claim for the fire on September 27, 2018 (not September 28, 2018). **Exhibit 7** at TRAV000017994 (Claim notes); **Exhibit 8** at 39:24-40:20 (Travelers 30(b)(6) deposition). Maxus denies the remainder of this paragraph as it lacks a proper record cite to identify the references in the paragraph (including who "determined" "those damages")

13.     This paragraph is in violation of Federal Rule of Civil Procedure 56(c) and Local Rule 56.1(a) as it contains characterization and argument inappropriate in a statement of fact. Denied that the cited exhibit establishes the statement at this paragraph as the information is not found in the exhibit.

14.     This paragraph is in violation of Federal Rule of Civil Procedure 56(c) and Local Rule 56.1(a) as it contains characterization and argument inappropriate in a statement of fact. Denied that the cited exhibit establishes the statement at this paragraph (that Travelers became aware of its own endorsement based on an insured making a claim) as the information is not found in the exhibit.  Admitted that Maxus is covered by the Policy for the September 27, 2018 loss.

15.     Denied that the cited exhibit establishes the statement in this paragraph as the information is not found in the exhibit.  Admitted that the cited exhibit states coverage is being

provided in full: "This letter is in follow up to a conversation you had with Claim Manager Stephen Bryan on Wednesday, November 28 confirming Travelers investigation has been completed and coverage is being provided for this loss. This letter is to confirm coverage is being provided in full for this loss per the applicable policy conditions." Doc. 84-12 at 3.

16. Admitted Travelers issued an advance payment in the amount of $1,000,000.00 which it stated was for emergency services and initial repairs to Phases 1-5 and cleanup of Phase 6. Denied that the cited exhibit supports that this payment was made "[f]ollowing meetings with Maxus and Bomasada[.]"

17. Admitted.

18. Admitted.

19. Denied that this is a material fact. The $1,000,000 payment was an advance payment, as evidenced by Travelers statements at paragraph 20. *See also,* **Ex. 8** at 82:20-83:9.

20. Denied that the cited exhibits establish the statement at this paragraph as the information is not found in the exhibits. The paragraph refers to a letter allegedly issued by Travelers but the exhibits are not said letter and none of the statements regarding what the estimate covered are found in the cited exhibits. Admitted Travelers did issue a check for approximately $2.5 million during the course of the claim.

21. Admitted.

22. Admitted.

23. Admitted.

24. Admitted that Travelers' counsel so claimed. Denied that such information was required. **Exhibit 9** at 43 § D ¶ 1 (Insurance Policy).

25.     Maxus neither admits nor denies this paragraph as it is inappropriate to disclose information regarding any mediation and the allegation is irrelevant to this litigation.

26.     Admitted.

27.     Denied that the cited exhibits establish the statement at this paragraph as the information is not found in the exhibits.

28.     Denied that the cited exhibits establish the statement at this paragraph as the information is not found in the exhibits; the cited exhibit reflects only $372,155.99 in payment. Admitted Travelers has denied claims for lost rental income.

29.     Admitted the cited exhibit contains communications between BCCM, Maxus, and SELC. Denied Maxus requested specific collection or analysis by SELC and denied Maxus initiated conversations with SELC or engaged SELC. **Exhibit 10** at 67:1-10; 70:20-71:10; 74:2-5 (Alex Stehl deposition).

30.     Denied that the cited exhibit establishes the statement at this paragraph (that testing was done only at areas BCCM selected as having, in BCCM's estimation, the greatest suspicion of being contaminated) as the information is not found in the exhibit. Admitted SELC analyzed some samples, per Doc. No. 84-52 (not the cited 84-24). Denied Maxus was ever in possession of SELC's report. **Ex. 10** at 79:20-22.

31.     Denied that the cited exhibits establish the statement at this paragraph (that SELC was terminated and told not to issue a final report) as the information is not found in the exhibit. Admitted Maxus has not been in possession of any SELC report. *Id.* at 79:20-22.

32.     Admitted that on April 24, 2019 FBS made its first visit to The Metropolitan.

33.     Admitted.

6

34.     This paragraph is in violation of Federal Rule of Civil Procedure 56(c) and Local Rule 56.1(a) as it contains characterization and argument inappropriate in a statement of fact. Denied that the cited exhibit establishes the statement at this paragraph as the information is not found in the exhibit. Admitted Maxus has not been in possession of any SELC report. *Id.* at 79:20-22.

35.     Denied that the cited exhibit establishes the statement at this paragraph as the information is not found in the exhibit. Admitted Maxus did not initiate conversations with SELC or engage SELC. *Id.* at 67:1-10; 70:20-71:10; 74:2-5. Admitted Maxus has not been in possession of any SELC report. *Id.* at 79:20-22.

36.     Admitted the requests from Travelers are in the cited exhibit.

37.     Admitted. Further admitted Maxus has not been in possession of any SELC report. *Id.* at 79:20-22.

38.     Admitted.

39.     Denied as Maxus does not know Travelers' state of mind and cannot determine what was "unbeknownst to Travelers[.]"

40.     This paragraph is in violation of Federal Rule of Civil Procedure 56(c) and Local Rule 56.1(a) as it fails to cite to any record evidence and contains characterization and argument inappropriate in a statement of fact.

41.     Admitted that the cited exhibit contains quotations from the Policy and a request to inspect the property on June 13, 2019.

42.     Admitted that on June 7, 2019, Maxus provided FBS' "Field Report for Initial Fire Loss Investigation" regarding FBS' findings from its visits to the site on April 24, 2019 and May 8, 2019.

7

43.     Admitted that FBS concluded The Metropolitan needed to be remediated and residents and employees would need to be vacated.

44.     This paragraph is in violation of Federal Rule of Civil Procedure 56(c) and Local Rule 56.1(a) as it contains characterization and argument inappropriate in a statement of fact. Admitted Spicer did visit the site on or about June 13, 2019.

45.     This paragraph is in violation of Federal Rule of Civil Procedure 56(c) and Local Rule 56.1(a) as it contains characterization and argument inappropriate in a statement of fact. Admitted residents were instructed via letter dated June 14, 2019 to vacate The Metropolitan by June 24, 2019.

46.     Admitted Travelers took the examination under oath ("EUO") of Stuart Fred on August 22, 2019.  Denied any of the statements in this paragraph are found in the cited transcript. Denied Travelers "was made aware for the first time" of the claimed information at the EUO; in the cited transcript Travelers itself is providing exhibits containing the alleged new information. Doc No. 84-6 at 128:10-14.

47.     Admitted the requests from Travelers are in the cited exhibit.

48.     Admitted the requests from Travelers are in the cited exhibit.

49.     Admitted the requests from Travelers are in the cited exhibit.

50.     This paragraph is in violation of Federal Rule of Civil Procedure 56(c) and Local Rule 56.1(a) as it contains characterization and argument inappropriate in a statement of fact. Admitted Maxus provided FBS' report dated November 13, 2019 with EMSL data on November 13, 2019.  Denied FBS "dismissed" EMSL's findings; FBS noted construction would affect the samples, drawing from EMSL's own statement in its report. **Exhibit 11** at report p. 4 (FBS 11/13/19 report).

8

51. Denied. MicroVision data was listed in Addendum B to FBS' October 2020 Rule 26 report. **Exhibit 12** at report p. 5.

52. Denied. MicroVision data was listed in Addendum B to FBS' October 2020 Rule 26 report. *Id*.

53. Admitted Spicer was on site on or about September 30, 2019. Denied that the cited exhibit states Spicer's intention.

54. Admitted.

55. This paragraph is in violation of Federal Rule of Civil Procedure 56(c) and Local Rule 56.1(a) as it fails to cite to any record evidence and contains characterization and argument inappropriate in a statement of fact. Denied; the data from samples collected on September 30, 2019 which were analyzed by EAA is listed in Thomas Irmiter's October 5, 2020 Rule 26 report and was later provided to Travelers. **Exhibit 13** at report p. 2 (Irmiter R 26 Addendum A).

56. This paragraph is in violation of Federal Rule of Civil Procedure 56(c) and Local Rule 56.1(a) as it fails to cite to any record evidence and contains characterization and argument inappropriate in a statement of fact. Denied; the data from samples collected on September 30, 2019 which were analyzed by EAA is listed in Thomas Irmiter's October 5, 2020 Rule 26 report and was later provided to Travelers. *Id*.

57. Denied as Travelers misstates the opinion of its own expert. Spicer concludes "combustion related particulates detected in wall cavities represent background conditions," not that there was no smoke, soot, or char damage to Phases 1-5. Exhibit 14 at report p. 9.

58. Admitted.

59. This paragraph is in violation of Federal Rule of Civil Procedure 56(c) and Local Rule 56.1(a) as it contains characterization and argument inappropriate in a statement of fact.

9

Denied that the ATC report "established the scope of Phase 5 water damage[.]" Admitted the ATC report establishes that ATC found "Extensive water intrusion and microbial growth on floors one (1) through four (4)." **Exhibit 15** at report p. 8 (ATC Report). Denied as payment by Travelers for 3,000 square feet of flooring cannot be determined from the cited exhibits. Admitted that the cited Doc. No. 84-28 at 3 ¶ 3 shows Maxus disputed the payment provided as insufficient.

60. This paragraph is in violation of Federal Rule of Civil Procedure 56(c) and Local Rule 56.1(a) as it contains characterization and argument inappropriate in a statement of fact. Admitted the May 1, 2019 letter stated, "There is also extensive water damage to the flooring in the Phase-5 building that we believe will require replacement of most of the flooring in place at the time of the fire."

61. Admitted the named individuals reviewed versions of the May 1, 2019 letter.

62. This paragraph is in violation of Federal Rule of Civil Procedure 56(c) and Local Rule 56.1(a) as it contains characterization and argument inappropriate in a statement of fact. Denied as Maxus does not know Travelers' state of mind and cannot determine what was "unbeknownst to Travelers[.]" Denied that the cited exhibit supports the numerous statements in this paragraph, as the information is not found in the exhibit. Admitted the subfloor had already been damaged prior to the sprinkler line cut on April 10, 2019 and that the sprinkler cut did not cause any additional damage. Ex. 15 at report p. 8; **Exhibit 16** ¶¶ 3-5 (T. Irmiter 7/14/21 Affidavit).

63. Admitted.

64. Admitted.

65. This paragraph is in violation of Federal Rule of Civil Procedure 56(c) and Local Rule 56.1(a) as it contains characterization and argument inappropriate in a statement of fact. Denied. Ex. 10 at 96:19-97:3; 97:11-12, 100:8-20; 102:3-16; 126:1-3; 129:10-14.

10

66. This paragraph is in violation of Federal Rule of Civil Procedure 56(c) and Local Rule 56.1(a) as it contains characterization and argument inappropriate in a statement of fact. Denied. **Exhibits 17-19** *passim* (Norton & Schmidt report + addendum; Innovative Structural Consultants report); **Exhibit 20** at 10:2-3; 24:15-25:7, 26:19-27:4; 21:3-12 (Sean Fee Deposition).

67. The Policy speaks for itself and is the best evidence of its terms and Travelers has agreed Maxus is covered by the Policy. Travelers SOF ¶ 14.

68. Admitted. Further stated the Policy is the best evidence of its terms.

69. The Policy speaks for itself and is the best evidence of its terms and Travelers has agreed Maxus is covered by the Policy. Travelers SOF ¶ 14. Further, Travelers stated the Policy contains a coverage extension for $100,000 of additional soft costs, which is outside of the other limits. Ex. 8 at 20:14-22:19.

70. The Policy speaks for itself and is the best evidence of its terms.

71. The Policy speaks for itself and is the best evidence of its terms and Travelers has agreed Maxus is covered by the Policy. Travelers SOF ¶ 14

72. The Policy speaks for itself and is the best evidence of its terms and Travelers has agreed Maxus is covered by the Policy. Travelers SOF ¶ 14

73. The Policy speaks for itself and is the best evidence of its terms.

74. The Policy speaks for itself and is the best evidence of its terms and Travelers has already paid a portion of Maxus' claim owed under the Special Time Element Coverage form.

75. The Policy speaks for itself and is the best evidence of its terms and Travelers has already paid a portion of Maxus' claim owed under the Special Time Element Coverage form.

76. The Policy speaks for itself and is the best evidence of its terms.

77. The Policy speaks for itself and is the best evidence of its terms.

11

78.     Admitted.

79.     Admitted that the unredacted portions of the cited exhibit total the claimed figure; denied that the cited exhibit refers to Phases 5 and 6.

## IV.     **Maxus' Additional Statement of Undisputed Facts**

### Entities

1.      Bomasada BHM Construction ("Bomasada") was the original builder on the project. Exhibit 21 ¶ 4 (John Alexander Stehl Affidavit).

2.      In 2018 prior to full construction of the complex, Maxus purchased the property. *Id.* ¶ 5.

3.      The sale provided for Bomasada to complete the project. *Id.*

4.      After the September 27, 2018 fire, Bomasada remained involved, for a time, as the contractor in charge of the rebuild of the complex. *Id.* ¶ 6.

5.      BCCM Construction Group ("BCCM") is a third-party entity hired by Maxus that has also been involved in reconstruction. *Id.* ¶ 7.

### Fire

6.      The fire at The Metropolitan apartment complex in Birmingham, Alabama on September 27, 2018 was a two-alarm fire involving approximately 40-50 firefighters which destroyed two complete buildings, impacted numerous others, and took multiple fire crews hours to control. (https://www.al.com/news/birmingham/2018/09/massive_2-alarm_blaze_destroys.html).

7.      An onlooker described the fire as resembling a volcano due to "all the ash raining down." *Id.*

12

8.     Birmingham Fire and Rescue Service Captain Harold Watson stated the fire was one of the largest in recent city history. *Id.*

9.     Photos depict the fire:



1:

2:



3: Birmingham Fire Dept_NPS 164 [3]

4: [4]

[3] Produced by Birmingham Fire and Rescue Service.

[4] Source: News footage in file of Travelers' expert R. Schroeder.

14



5:                                                   [5]

10.     The blaze could be seen from some distance away:



Birmingham Fire Dept_NPS 131 [6]

11.     Phase 6 of The Metropolitan was destroyed, as was the adjacent building seen in the first photo above and demarked with a blue box in the following figure.

---

[5] Source: Video footage produced by Travelers.

[6] Produced by Birmingham Fire and Rescue Service.



*Figure 1: Map of Building. (Black Arrow showing Phase Six)*

Ex. 1 at report p. 6; Ex. 16 at ¶ 2.

12.    There was also extensive thermal damage to the south-side of Phase 5 with broken windows and damaged siding. Ex. 6 at report p. 5.

13.    Phase 5 suffered charred paint, melted window frames, and broken glass. *Id.*

14.    The roofs of Phases 4 and 5 showed fire impact, included warped and damaged air conditioning units, melted PVC pipes, and damage to the roof. Ex. 1 at report p. 25-29.

15.    Smoke staining was visible on the roofs of Phases 2-4. *Id.* at report p. 43.

16.    The fire department flooded parts of the structures, including roof assemblies, decks, and exterior walls. *Id.* at report p. 10.

17.    High pressure hoses and water cannons were used to extinguish the fire. *Id.*

18.    The water cannons have 3-inch lines that typically shoot water at between 300-600 PSI and are designed to blow through high impact glass. *Id.* at report p. 21.

19.    Building materials are not designed to withstand this amount of force or volume of water. *Id.*

16

20.	The assemblies where water entered during the extinguishing efforts were not designed for the water load sprayed directly at them during the firefighting efforts. *Id.* at report p. 22.

**Policy**

21.	Travelers issued an insurance policy which covers remediation of soot and char from the fire found at The Metropolitan. Ex. 9.

22.	The Policy covers "direct physical loss of or damage to covered property caused by or resulting from" a covered cause of loss. *Id.* at policy p. 22.

23.	A "covered cause of loss" is any risk of direct physical loss, unless specifically excluded by the Policy. *Id*. at policy p. 23.

24.	The Policy provides certain additional coverages for "Debris Removal" and "Pollutant Clean Up and Removal" from specified causes of loss, which include fire, smoke, soot, and leakage from fire extinguishing equipment. *Id*. at 25, 28, 51-52.

25.	"Pollutant" is also defined to include "smoke" and "soot." *Id*. at 40.

26.	The CONSTRUCTION PAK – BUILDERS' RISK SPECIAL TIME ELEMENT COVERAGE provides Business Income, Rental Value, and Soft Costs up to a $5 million limit. *Id*. at 12.

27.	There is a Coverage Extension for Soft Costs up to an additional $100,000. *Id.* at 13.

28.	The Policy allows the parties to request an appraisal if there is a disagreement on the amount of loss, stating:

17

D. **ADDITIONAL CONDITIONS**

The following conditions apply in addition to the COMMERCIAL INLAND MARINE CONDITIONS, the COMMON POLICY CONDITIONS and the ADDITIONAL CONDITIONS of the CONSTRUCTION PAK – BUILDERS' RISK COVERAGE FORM.

1. **Appraisal**

If we and you disagree on the amount of net income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.

The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

*Id.* at 43.

### Scope of the Remediation Project

29.     The repair and reconstruction of The Metropolitan after the fire has been a massive undertaking. Ex. 21. ¶ 8.

30.     Building inspectors and engineers were needed to assess safety of the building. *Id.*

31.     Numerous trades have been involved, including cleaners, carpenters, drywall repairmen, and painters. *Id.*

32.     Work on the site has been ongoing continuously since the fire. *Id.*

33.     Repair and reconstruction has lasted over 34 months. *Id.*

### Chronology

34.     ATC Group Services LLC ("ATC") was engaged to conduct infrared imaging, moisture assessment, and combustion by-product sampling at Phase 5. Ex. 15 at report p. 3.

35.     They visited the site on December 18, 2018. *Id.*

36.     ATC's report is dated January 15, 2019 evaluating water damage at Phase 5. *Id.* at report p. 1.

18

37. The ATC report stated

- "Based on our assessment, ATC Group Services LLC (ATC") identified extensive water intrusion and fire affected areas in the Phase 5 Building." *Id.* at report p. 2.

- "Floors One (1) through Four (4) had extensive water intrusion and suspect VMG." *Id.* at report p. 5.[7]

- "Extensive water intrusion and microbial growth on floors one (1) through four (4)." *Id.* at report p. 8.

38. Travelers' proffered expert Kurt Mulder's Rule 26 report states:

According to the adjuster, water did intrude through holes burnt in the roofing. It stands to reason, that Building 5 was inundated with water from hoses by the fire department during the firefighting activities to prevent Building 5 from catching fire. The exterior claddings of a structure are not designed to shed water that is applied in such a manner. Therefore, the inundation of the structure of Building 5 with water, in combination with the reported holes burned in the roofing by embers, that a large amount of water would be expected to have intruded into the interior of Building 5.

**Exhibit 22** at report p. 8 ¶ 2.

39. On or about March 13, 2019 Travelers provided a payment of $3,519,607.19, $58,460.93 of which was itemized as for repairs to Phases 1 through 5. Doc. 84-51 at 3.

40. Travelers alleges the payment included approximately 3,000 square feet of flooring in Phase 5. Doc 84 at ¶ 59.

41. Maxus and Bomasada disputed the overall sufficiency of the payment. **Exhibit 23** (Jason Johns March 20, 2019 letter).

42. On April 10, 2019, a sprinkler line was cut at Phase 5. Ex. 10 at 87:14-18.

---

[7] VMG is not defined, but the report frequently refers to "visible mold growth." *See* Ex. 15 at p. 4 Table 1.

47178733v.3

43. The sprinkler that was cut on April 10, 2019, in Phase 5 did not create new damage to the subfloor, framing members, trusses or exterior sheathing of the building. Ex. 16 ¶ 3.

44. Any damage was collateral in nature and did not affect the cost of repair. *Id.*

45. The flooring in Phase 5 is an oriented strand board (OSB) with an Exposure 1 rating. *Id. ¶ 4.*

46. This rating is stamped on the flooring and can be seen in photos in Thomas Irmiter's report dated June 5, 2019, for example at pages 24-28. *Id.*

47. Exposure 1-rated sheathings, either OSB or Plywood, have a fully waterproof bond and are designed for applications where construction delays may be expected prior to providing protection. *Id.*

48. Travelers' proffered expert Kurt Mulder's Rule 26 report notes "OSB sheathing is designed with some water resistance." Ex. 22 at report p. 8 ¶ 3.

49. If Exposure 1-rated panels and sheathing do get to wet, edge swelling may be experienced. Ex. 16 ¶ 4.

50. Given the condition of the OSB subflooring in Phase 5 that Irmiter observed on April 24, 2019, the damage to the subflooring, trusses, all framing and wall sheathing occurred as a direct result of the water used to protect Phase 5 from catching fire during the fire. *Id. ¶ 5.*

51. Firefighting efforts caused large amounts of water to wet the OSB. *Id.*

52. The water remained on the flooring for some time after the fire. *Id.*

53. This water caused the damage to Phase 5 flooring. *Id.*

54. Based on Irmiter's education, training and experience, he concluded that the condition of the flooring he observed on April 24, 2019 could not have been caused by the sprinkler cut two weeks prior to due to the extent of the damage on the Exposure 1-rated OSB. *Id.*

20

55. Travelers' proffered expert Dr. Robert Schroder's November 6, 2020 Rule 26 report referred to the April 10, 2019 sprinkler cut. **Exhibit 24** at report p. 30-31.

56. Maxus' Vice President Alex Stehl testified that whether Phase 5 subfloor was damaged as a result of the sprinkler leak was something that would be determined by experts only. Ex. 10 at 96:19-97:3; 100:8-20; 102:3-16

57. On May 1, 2019, Maxus notified Travelers, "there is evidence of smoke/soot damage in The Metropolitan buildings that survived the fire[.]" **Exhibit 25** (May 1, 2019 letter)

58. Travelers did not respond to Maxus' May 1, 2019 letter. Ex. 21 ¶ 9.

59. On May 28, 2019, Maxus informed Travelers, "Travelers is welcome to send its own experts to reinspect the property at a reasonable time.  Please let us know if you would like to schedule this inspection, and we will do our best to accommodate you." **Exhibit 26** letter p. 1 (May 28, 2019 letter).

60. In the same correspondence, Maxus reiterated that it disagreed with Travelers' determination on the amount of loss and that Maxus was invoking the Policy's appraisal provision. *Id*.

61. On May 30, 2019, Irmiter visited the property again. Ex. 11 at report p. 2.

62. Irmiter did not find it odd for an insurer to not be present at his May 30, 2019 visit. Ex. 16 ¶ 6.

63. In a report dated June 5, 2019, Maxus' expert Thomas Irmiter of Forensic Building Science (FBS) provided conclusions from FBS' visits to the property in early May. **Exhibit 27**.

64. FBS had collected samples from the building and provided them to Neil Carlson of NG Carlson Analytical for analysis. *Id.* at report p. 35.

21

65. Carlson's analysis suggested fire-related contamination in the complex. *Id.* at report p. 54.

66. FBS found damage in the interior and exterior of each of the buildings in the complex. *Id.* at report p. 17-32.

67. FBS noted that the soot is a known carcinogen. *Id*. at report p. 34, 37.

68. FBS concluded that Phase 5 should be razed to the slab and rebuild as cleanup and repair costs would exceed treat down and rebuild. *Id.* at report p. 60.

69. FBS also concluded cleaning and remediation was needed in the remaining buildings. *Id.* at report p. 60.

70. FBS recommended the complex be vacated for repairs. *Id.* at report p 60.

71. FBS found that ongoing contamination would occur from structures adjacent to The Metropolitan and concluded they should be razed prior to repair and cleaning of The Metropolitan. *Id.* at report p. 10.

72. On June 7, 2019, Maxus provided FBS' June 5, 2019 report to Travelers. *Id.* at letter p. 1.

73. Maxus notified Travelers of significant issues identified in Irmiter's report and asked for consultation regarding Maxus' consideration of evacuation of residents and cleanup efforts. *Id.* at letter pp. 1, 2.

74. Travelers did not respond to Maxus' June 7, 2019 letter. Ex. 21 ¶ 10.

75. Maxus reached out to Travelers via telephone multiple times without success. **Exhibit 28** at 1 (June 11, 2019 letter).

76.     On June 11, 2019, Maxus informed Travelers that it needed to remediate the property, would need to evacuate residents, and needed a response by close of business on June 12, 2019. *Id.*

77.     On June 12, 2019, Travelers responded that it was unable to provide its position on the matter. **Exhibit 29** at letter 1 (June 12, 2019 letter).

78.     On June 13, 2019, Travelers' proffered expert Christopher Spicer went to The Metropolitan. Ex. 14 at 3.

79.     For months, Maxus requested Travelers to provide its evaluation from Spicer's visit without response. Ex. 21 ¶ 13.

80.     On June 14, 2019, residents were instructed to vacate the complex by June 24, 2019. **Exhibit 30** (June 14, 2019 Notice of Vacate).

81.     Throughout the Summer of 2019, Maxus explored its options regarding what to do regarding Phase 5 and the complex overall. Ex. 21 ¶ 11.

82.     Maxus invited Travelers' participation in conversations regarding how to address the complex. *Id.* ¶ 12.

83.     Maxus obtained two engineering reports regarding Phase 5. One report and addendum were provided by Norton & Schmidt Consulting Engineers, LLC.  A second report was provided by Innovative Structural Consultants, LLC. *Id.* ¶ 14; Exs. 17-19.

84.     After receiving and reviewing these reports, Maxus believed Phase 5 could be repaired. Ex. 21 ¶ 14.

85.     Thereafter, Maxus obtained bids for the repair work on Phase 5. *Id.*

86.     In late 2019, Resource Construction, LLC became involved in the project to repair Ph 5 subfloor. Ex. 20 at 10:2-3; 24:15-25:7; 26:19-27:4; 21:3-12.

87. Resource entered into a contract for the work on phase 5 around January 2020. *Id.* at 21:13-15.

88. Resource worked at The Metropolitan from late January or early February through April 2020, three to seven days per week. *Id.* at 66:12-20.

89. On September 30, 2019, Travelers' expert Spicer returned to the site and collected samples at locations of his choosing. Ex. 14 at 7; Ex. 16 ¶ 7; **Exhibit 31** at report p. 3 (April 22, 2020 Report).

90. On September 30, 2019, FBS gathered duplicate samples at each location selected by Spicer. Ex. 16 ¶ 8.

91. The samples were collected side-by-side to each other (within 1 inch of each other). *Id.*

92. One set of samples from each location were sent for further analysis. *Id.*

93. The other samples from the same locations were held as a failsafe should further analysis later be required. *Id.*

94. That need never arose. *Id.*

95. Accordingly, approximately half of the samples collected by FBS on September 30, 2019 were not analyzed. *Id.*

96. The samples that were never analyzed were duplicative because they were collected from the same locations as the samples which were analyzed. *Id.* ¶ 9.

97. Thus, the samples that were not analyzed are of no consequence. *Id.*

98. Because the samples were not evaluated, no report has ever been issued for those samples. *Id.* ¶ 8.

99. FBS retains those samples today. *Id.* ¶ 9.

24

100. The data from samples collected on September 30, 2019 which were analyzed by EAA is listed in Thomas Irmiter's October 5, 2020 Rule 26 report and was later provided to Travelers. Ex. 13 at report p. 2.

101. Travelers had admitted that the EAA data is in its possession. Doc. No. 72 at 5.

102. On November 13, 2019, FBS issued a report detailing the May 30, 2019 visit, including the data from EMSL. **Exhibit 11**.

103. The report was provided to Travelers on the same day, November 13, 2019. *Id*. at e-mail p. 1.

104. The report provided information regarding the visit and sample collection. *Id*. at report p. 3-4.

105. EMSL's report analyzing the data states where each sample was collected and maps with locations where samples were collected is provided. *Id*. at PDF p. 9-28, 67-72

106. EMSL's data showed, "out of the 20 surface samples submitted 17 showed signs of particulates consistent with the fire." *Id.* at report p. 3.

107. On December 16, 2019, Travelers provided to Maxus its proffered expert Spicer's preliminary report dated August 2, 2019 and his final report dated December 11, 2019. **Exhibits 32-34** (Travelers e-mail December 16, 2019; Spicer August 2, 2019 Report; Spicer December 11, 2019 Report).

108. Travelers testified that it had refused to provide Spicer's preliminary report because it is the company's policy to not provide preliminary reports until the investigation is final. Ex. 8 at 78:12-81:16.

109. Travelers provided the final and preliminary report to Maxus at the same time. *Id.* at 77:21:78-11.

25

**Experts**

110.     On October 6, 2020, Maxus produced its Federal Rule of Civil Procedure 26 reports. Doc. No. 34.

111.     Extensive damage throughout The Metropolitan is established in Maxus' expert reports. Exs. 1-6 *passim*.

112.     The addendum to the Rule 26 report of expert Thomas Irmiter from Forensic Building Science, Inc. ("FBS") notes that FBS relied on data from NG Carlson Analytical, Inc.; a MicroVision Lab Report dated January 10, 2017; and an EMSL report dated November 13, 2019.[8] Ex. 12.

113.     Microscopist Neil Carlson provided initial analysis of samples from The Metropolitan to determine if there was any indication soot and char from the fire were present. Ex. 2 at report p. 4; **Exhibit 35** (Carlson data).

114.     The results from Carlson's investigation suggested char and soot were present at The Metropolitan. Ex. 35; **Exhibit 36** ¶ 6.

115.     Further analysis was performed by two additional laboratories, EMSL and MicroVision. Ex. 36 ¶ 6.

116.     The results from these labs confirmed the presence of soot and char at The Metropolitan. *Id*.

117.     EMSL's data showed, "out of the 20 surface samples submitted 17 showed signs of particulates consistent with the fire." Ex. 11 at report p. 3.

---

[8] The MicroVision report date in FBS' report is a typo, which Maxus later clarified to Travelers. The EMSL report is identified as "Forensic Building Science Supplemental Sampling Report Dated November 13, 2019."

47178733v.3

118.     MicroVision found char (called "wood ash" in the lab's report) in areas of the complex that had not been surfaced cleaned prior to the sampling. **Exhibit 37** at 59 (MVL0000004); Ex. 36 ¶ 6.

119.     The cleaning activity removed any possible additional evidence of contamination that may have existed. Ex. 36 ¶ 6.

120.     Irmiter found that infiltration will occur at open failure points in the structure which permit smoke into the building and that The Metropolitan contained various such points. Ex. 1 at report p. 7, 12, 19.

121.     Specifically, Irmiter relies on:

- As-built conditions and design of the structure, including incomplete construction of Phases 3, 4, and 5 (Ex. 1 at report p. 12-13, 20, 52-53; Ex. 4 at report p. 6-25, 44, 59).

- Operation of internal mechanical systems, including HVAC (Ex. 1 at report p. 12-13, 67; Ex. 4 at report p. 7, 44).

- Doors and windows left open as individuals left and then returned to the units (Ex. 1 at report p. 20-21; Ex. 4 at report p. 44, 59).

- Building codes and standards (Ex. 1 at report p. 12-13, 65).

- Videos and photos showing the smoke patterns changing (Ex. 1 at report p. 11, 14-17; Ex. 4 at report p. 34-44).

- Data from sampling (Exs. 11, 12, 35, 37).

122.     Travelers' proffered expert Stuart Batterman stated:

Outdoor smoke from a structure fire or other source can enter a building if two conditions are present: (1) the building exterior must be exposed to smoke and high concentrations of fire-related pollutants, particularly at air entry locations and for prolonged periods; and (2) air infiltration and particle penetration of smoke and fire related pollutants enter through the building envelope and into the building.

27

**Exhibit 38** at report p. 11.

123. Exposure of the building to smoke with high concentrations of pollutants can be seen by photos and videos of the fire. Photos 4 and 5 above; Ex. 1 at report p. 11, 14-17; Ex. 4 at report p. 34-44.

124. Wind speed and direction can be judged by the videos of the fire. Ex. 1 at report p. 11, 14-17; Ex. 4 at report p. 34-44.

125. Entrance of the fire particulate can be determined by the conditions in place at the time of the fire (open windows, doors, bypasses, operating HVAC systems). Ex. 1 at report p. 20.

126. Continued particulate impact through cross-contamination within the interiors was determined by the as-built conditions of the building, including an HVAC system which continued to operate during the fire. Ex. 1 at report p. 2, 12-13,52-53, 67; Ex. 4 at report p. 6-25, 44, 59.

127. The fact that The Metropolitan had openings without draft stops or insulation created opportunities for the smoke to infiltrate. Ex. 1 at report p. 7, 10.

**SELC**

128. BCCM engaged Safety Environmental Laboratories and Consulting, Inc. ("SELC") to evaluate The Metropolitan complex. Ex. 10 at 67:1-10.

129. Maxus was not involved in the conversation between BCCM and SELC. *Id.* at 74:2-5.

130. Maxus never received a report from SELC. *Id.* at 79:20-22; 79:20-80:1; 80:14-20; 81:20-82:1; 82:18-82:1.

**Disclosures to Travelers**

131. Maxus did not intentionally conceal any information from Travelers. Ex. 21 ¶ 15.

**Travelers' Corporate Representative Deposition**

132.    Travelers stated that rather than shadow any expert hired by the insured, the standard practice is for it to simply send its own experts to do the sampling.  Ex. 8 at 61:22-62:21.

133.    When asked how Travelers was prejudiced by any alleged failure to cooperate, Travelers recited policy language without explaining how the alleged failure actually caused Travelers harm. *Id.* at 30:24-31:10.

134.    When specifically asked how any information Travelers claims to be missing would have impacted Travelers' coverage determination, Travelers stated such information might have "assisted" in the investigation. *Id.* at 118:7-24.

135.    Travelers' corporate representative, who has been involved with adjusting this claim from its inception, stated he did not know if anything had been submitted recently on Phases 1 through 5 for consideration of payment. *Id.* at 107:15-108:12.

136.    Travelers testified that Maxus is an additional insured on the Policy. *Id.* at 24:17-19.

137.    Travelers testified additional named insureds are treated the same as the original named insureds for purposes of coverage. *Id.* at 25:7-20.

138.    Travelers testified a named insured has coverage up to the policy limits and its financial interest in the covered property. *Id.* at 26:9-18.

## V.    <u>Background</u>

The fire at The Metropolitan apartment complex in Birmingham, Alabama on September 27, 2018 was extensive.  Photos depict the breadth of its reach. SOF ¶¶ 9, 10.  It was a two-alarm fire involving approximately 40-50 firefighters which destroyed two complete

47178733v.3

buildings, impacted numerous others, and took multiple fire crews hours to control. *Id.* ¶ 6.[9]  An onlooker described the fire as resembling a volcano due to "all the ash raining down." *Id.* ¶ 7. Birmingham Fire and Rescue Service Captain Harold Watson stated it was one of the largest fires in recent city history. *Id.* ¶ 8.  Phase 6 of The Metropolitan and an adjacent building were destroyed. *Id.* ¶ 11.  There was also extensive thermal damage to the south-side of Phase 5 of the complex, with broken windows and damaged siding. *Id.* ¶ 12.  Phase 5 also suffered charred paint, melted window frames, and broken glass. *Id.* ¶ 13.  The roofs of Phases 4 and 5 showed fire impact, including warped and damaged air conditioning units, melted PVC pipes, and other damage to the roofs. *Id.* ¶ 14.  Smoke staining was visible on the roofs of Phases 2-4. *Id.* ¶ 15.

This large blaze, of course, necessitated an enormous response. The repair and reconstruction of The Metropolitan after the fire has been a massive undertaking. *Id.* ¶ 29.  Building inspectors and engineers were needed to assess safety of the building. *Id.* ¶ 30.  Numerous trades have been involved, including cleaners, carpenters, drywall repairmen, and painters. *Id.* ¶ 31. Work on the site has been ongoing continuously since the fire. *Id.* ¶ 32.  Repair and reconstruction has lasted over 34 months. *Id.* ¶ 33.

## VI.     **Policy Does Provide Coverage**

The undisputed material facts prove that the Policy does provide coverage.  Travelers mistakenly claims that Maxus' breach of contract claim fails because the Policy does not provide coverage. Mot. at 39-40.  Travelers' argument relies exclusively on its motions to exclude Maxus' experts. Mot. at 39.  These motions are baseless and must be denied.  Maxus incorporates by reference its response to the motions to exclude Maxus' experts. Doc. Nos. 90, 91, 92, 93.

---

[9] "SOF" refers to Maxus' Additional Statement of Undisputed Facts.

Both the facts and the science prove the Policy does provide coverage. Travelers issued an insurance policy which covers remediation of soot and char from the fire that occurred at The Metropolitan. SOF ¶ 21. The Policy covers "direct physical loss of or damage to covered property caused by or resulting from" a covered cause of loss. *Id.* ¶ 22. A "covered cause of loss" is any risk of direct physical loss, unless specifically excluded by the Policy. *Id.* ¶ 23. The Policy provides certain additional coverages for "Debris Removal" and "Pollutant Clean Up and Removal" from specified causes of loss, which include fire, smoke, soot, and leakage from fire extinguishing equipment. *Id.* ¶ 24. "Pollutant" is also defined to include "smoke" and "soot." *Id.* ¶ 25.

Logically, soot and char from the massive blaze impacted the nearby structures in the same complex. The fire's large plume containing soot and char is visible in nearly every photo of the fire. The impacted parts of The Metropolitan complex at issue here are in the immediate vicinity of the two buildings which were destroyed.

Scientifically, it is clear that soot and char from the fire have been deposited at The Metropolitan. Maxus' Rule 26 Reports in this litigation establish the data and scientific conclusions finding soot and char at the complex. SOF ¶ 111. The addendum to the Rule 26 report of expert Thomas Irmiter from Forensic Building Science, Inc. ("FBS") notes that FBS relied on data from NG Carlson Analytical, Inc., MicroVision, and EMSL. *Id.* ¶ 112.

Microscopist Neil Carlson provided initial analysis of samples from The Metropolitan to determine if there was any indication soot and char from the fire were present. *Id.* ¶ 113. The results from Carlson's investigation suggested char and soot were present at The Metropolitan. *Id.* ¶ 114.

47178733v.3

Further analysis was performed by two additional laboratories, EMSL and MicroVision. *Id.* ¶ 115. The results from these labs confirmed the presence of soot and char at The Metropolitan. *Id.* ¶ 116. EMSL's data showed, "out of the 20 surface samples submitted 17 showed signs of particulates consistent with the fire." *Id.* ¶ 117. Micro Vision found char (called "wood ash" in the lab's report) in areas of the complex that had not been surfaced cleaned prior to the sampling. *Id.* ¶ 118. The cleaning activity had removed any possible additional evidence of contamination that may have existed. *Id.* ¶ 119.

Irmiter also analyzed smoke infiltration through considering fire dynamics against the buildings as they existed on the date of the fire and how the structures were used in the days immediately thereafter. He found that infiltration will occur at open failure points in the structure which permit smoke into the building and that The Metropolitan contained various such points. *Id.* ¶ 120. This logical opinion is supported by numerous facts and data regarding The Metropolitan. Specifically, Irmiter relies on:

- o As-built conditions and design of the structure, including incomplete construction of Phases 3, 4, and 5. *Id.* ¶ 121.

- o Operation of internal mechanical systems, including HVAC. *Id.*

- o Doors and windows left open as individuals left and then returned to the units. *Id.*

- o Building codes and standards. *Id.*

- o Videos and photos showing the smoke patterns changing. *Id.*

- o Data from sampling. *Id.*

Travelers' own expert Stuart Batterman concedes two conditions can cause smoke to enter a building:

Outdoor smoke from a structure fire or other source can enter a building if two conditions are present: (1) the building exterior must be exposed to smoke and high

32

concentrations of fire-related pollutants, particularly at air entry locations and for prolonged periods; and (2) air infiltration and particle penetration of smoke and fire related pollutants enter through the building envelope and into the building.

*Id.* ¶ 122. Both of these conditions occurred at The Metropolitan and are determinable from the facts presented in Irmiter's report. Exposure of the building to smoke with high concentrations of pollutants can be shown by photos and videos of the fire; wind speed and direction, causing prolonged exposure of the building can also be judged by the videos of the fire. *Id.* ¶¶ 123, 124. Entrance of the fire particulate can be determined by the conditions in place at the time of the fire (open windows, doors, bypasses, operating HVAC systems). *Id.* ¶ 125. Continued particulate impact through cross-contamination within the interiors was determined by the as-built conditions of the building, including an HVAC system which continued to operate during the fire. *Id.* ¶ 126. The fact that The Metropolitan had openings without draft stops or insulation created opportunities for the smoke to infiltrate. *Id.* ¶ 127. Irmiter's opinions on infiltration are further supported by the fact that the sampling at the complex *found precisely that* – fire byproducts in the building cavities, as detailed above. Accordingly, Travelers cannot meet its burden on summary judgment as the undisputed material facts do not establish that the Policy does not apply.

**VII.    Maxus Did Not Breach the Policy Due To Phase 5 Water Damage**

Travelers' arguments regarding Phase 5 water damage are an attempt at misdirection. It claims that an April 10, 2019 sprinkler cut invalidates clearly-established fire-related water damage. Mot. at 27-29, 34-35. Maxus neither intentionally concealed any information regarding Phase 5 water damage nor breached the cooperation provision of the Policy.

It is undisputed that the fire-fighting efforts caused water damage. The fire department flooded parts of the structures, including roof assemblies, decks, and exterior walls. SOF ¶ 16. High pressure hoses and water cannons were used to extinguish the fire. *Id.* ¶ 17. The water

cannons utilized have 3-inch lines that typically shoot water at between 300-600 PSI. *Id.* ¶ 18. Building materials are not designed to withstand this amount of force or volume of water. *Id.* ¶ 19. In fact, the cannons are designed to blow through high impact glass. SOF ¶ 18. The assemblies where water entered during the extinguishing efforts were not designed for the water load sprayed directly at them during the firefighting efforts. *Id.* ¶ 20. Travelers' own proffered expert Kurt Mulder's Rule 26 report states:

> According to the adjuster, water did intrude through holes burnt in the roofing. It stands to reason, that Building 5 was inundated with water from hoses by the fire department during the firefighting activities to prevent Building 5 from catching fire. The exterior claddings of a structure are not designed to shed water that is applied in such a manner. Therefore, the inundation of the structure of Building 5 with water, in combination with the reported holes burned in the roofing by embers, that a large amount of water would be expected to have intruded into the interior of Building 5.

*Id.* ¶ 38.

ATC Group Services LLC ("ATC") was engaged to conduct infrared imaging, moisture assessment, and combustion by-product sampling at Phase 5. *Id.* ¶ 34. It visited the site on December 18, 2018 and its report is dated January 15, 2019. *Id.* ¶¶ 35, 36. The report identified "extensive water intrusion and fire affected areas in the Phase 5 Building." *Id.* ¶ 37. Travelers actually admits that ATC found extensive water damage. Travelers *Id.* ¶¶ 18, 59.

On April 10, 2019, a sprinkler line was damaged, but, contrary to Travelers' claim, the sprinkler did not cause any additional damage beyond that previously caused by the massive fire-fighting efforts detailed above. *Id.* ¶¶ 42-54. Any damage was collateral in nature and did not affect the cost of repair. *Id.* ¶ 44. Maxus' expert Thomas Irmiter of FBS viewed the Phase 5 flooring on April 24, 2019 and observed damage which was too extensive to have been caused by a sprinkler cut just two weeks prior. *Id.* ¶ 50.

34

This is evidenced by the extensive damage to the building's flooring. The flooring in Phase 5 is an oriented strand board (OSB) with an Exposure 1 rating. SOF ¶¶ 45, 46. Exposure 1-rated sheathings, either OSB or Plywood, have a fully waterproof bond and are designed for applications where construction delays may be expected prior to providing protection. *Id.* ¶ 47. Travelers' proffered expert Mulder acknowledges "OSB sheathing is designed with some water resistance." *Id.* ¶ 48. If Exposure 1-rated panels and sheathing do get to wet, edge swelling may be experienced. *Id.* ¶ 49. The large amount of water that wetted the OSB during the firefighting efforts and then remained on the flooring for some time caused damage to the flooring. *Id.* ¶¶ 51-53. Given the condition of the OSB subflooring in Phase 5 that Irmiter observed on April 24, 2019, the damage to the subflooring, trusses, all framing and wall sheathing occurred as a direct result of the water used to protect Phase 5 from catching fire during the fire. *Id.* ¶¶ 50, 54.

Travelers misrepresents the testimony of Maxus' Vice Present Alex Stehl. Travelers incorrectly claims that Stehl conceded the damage was not fire related. Mot. at 27. In fact, Stehl repeatedly and clearly testified that the determination was up to expert determination. *Id.* ¶ 56. This mischaracterization should not be tolerated and cannot form the basis of summary judgment.

Travelers' alleged payment for some Phase 5 flooring does not establish the scope of fire-related damage. On or about March 13, 2019 Travelers provided a payment of $3,519,607.19, $58,460.93 of which was itemized as for repairs to Phases 1 through 5. *Id.* ¶ 39. Travelers alleges the payment included approximately 3,000 square feet of flooring in Phase 5. *Id.* ¶ 40. Maxus disagreed with the sufficiency of the overall payment and, along with Bomasada, disputed the total. *Id.* ¶ 41.

ATC's finding of "extensive" damage and Maxus' dispute of Travelers' payment proves that Travelers' attempt to claim that 3,000 square feet of flooring as the extent of the fire-related

47178733v.3

damage to the subflooring in Phase 5 is not based on the facts. There is clearly a genuine dispute of material fact between the parties as to what amount of flooring was damaged by the fire. Travelers cannot obtain summary judgment on this record.

Travelers' argument regarding Maxus' May 1, 2019 notice to Travelers regarding subfloor damage is a red herring. Travelers claims that the notice could not have been a "mistake" because it went through several drafts. Mot. at 27. Maxus does not, and has never, claimed that the May 1, 2019 letter was sent in error. The letter was properly sent to Travelers because the damage identified in the letter was fire-related, as established above. The fact that the letter went through drafts is irrelevant. The letter was properly directed to Travelers because Maxus provided details regarding fire-related damage to the carrier on the risk at the time of the fire, i.e., Travelers.

Travelers' suggestion that Maxus improperly delayed repairs also misrepresents the facts. Mot. at 37. Throughout the Summer of 2019, Maxus explored its options regarding what it should do to repair and rebuild Phase 5 and the complex overall. SOF ¶ 81. Maxus invited Travelers' participation in conversations regarding how to address the complex. *Id.* ¶ 82. Maxus hired two engineering firms to evaluate Phase 5. *Id.* ¶ 83. After analyzing the engineers' reports, Maxus believed Phase 5 could be repaired. *Id.* ¶ 84. Thereafter, Maxus obtained bids for the repair work. *Id.* ¶ 85. In late 2019, Resource Construction, LLC ("Resource") became involved in the project to repair the Phase 5 subfloor. *Id.* ¶ 86. Resource entered into a contract for the work on Phase 5 around January 2020. *Id.* ¶ 87. Resource worked at The Metropolitan from late January or early February through April 2020, three to seven days per week. *Id.* ¶ 88. There is no evidence in the record that the time taken to carefully consider the options caused any additional damage.

Travelers misleadingly claims that its expert, Mulder, was "compelled" to issue a supplemental report on March 5, 2021 due to alleged new information regarding the sprinkler.

36

Mot. at 35. This declaration ignores that Travelers *was already aware* of the sprinkler cut by November 6, 2020 when its experts issued their Rule 26 reports. Travelers' expert Dr. Robert Schroder acknowledged the sprinkler cut in his original report dated November 6, 2020. SOF ¶ 55. In other words, Travelers' own expert was aware of the sprinkler cut four months before the alleged "compelled" supplementation. There is no reason Mulder should not have been aware of the sprinkler when Travelers issued its original expert reports. Travelers cannot claim prejudice related to its experts when it already knew of the sprinkler when the expert reports were issued.

**VIII.** **Maxus Did Not Breach the Policy Due To Soot and Char Sampling**

Travelers' position regarding soot and char sampling is hyperbole without factual support. Maxus did not, as Travelers claims, intentionally conceal any sampling results and did not breach the cooperation provision of the Policy. Mot. at 29-32, 35-39.

**A.** **May 30, 2019 Sampling Visit**

Travelers bangs its chest regarding Travelers' expert Irmiter and his team from FBS visiting the property on May 30, 2019, claiming Maxus concealed information and did not cooperate. Mot. at 35-38. In truth, Maxus did not intentionally conceal any information from Travelers. SOF ¶ 131. Irmiter did not find it odd for an insurer to not be present at his May 30, 2019 visit. *Id.* ¶ 62. More importantly, Travelers admitted in its deposition that the lack of attendance was inconsequential. In fact, Travelers stated that rather than shadow any expert hired by the insured, the standard practice is for it to simply send its own experts to do the sampling. *Id.* ¶ 132.

Travelers' argument regarding prejudice is unsupportable. Mot. at 36. On May 28, 2019, Maxus informed Travelers that it was free to have its own expert on site to inspect the property. SOF ¶ 59. In fact, Spicer did visit the property on June 13, 2019, well prior to his September 30, 2019 sampling. *Id.* ¶ 78. The September 30, 2019 sampling event was led by Spicer and he selected

37

the sampling locations. *Id.* ¶ 89. Travelers had the opportunity to make its own independent observations of the site, its own decisions about the fire's impact, and its own choices regarding where samples should be collected. The Motion's implication that Travelers' sampling decisions were not the sole responsibility of its expert is insincere.

Irmiter provided a report which documented his May 30, 2019 visit and the results thereof. *Id.* ¶ 102. This report was provided to Travelers on the very day Maxus received it, November 13, 2019. *Id.* ¶ 103. The report provided information regarding the visit, sample collection, and results. *Id.* ¶ 104. EMSL's report analyzing the data states where each sample was collected and maps with locations where samples were collected is provided. *Id.* ¶ 105. Travelers remained welcome to come back to the property should it feel that the information received in the report warranted further visits. It is also notable that litigation was not filed until December 19, 2019. Travelers had sufficient opportunities to conduct any inspection it wished before and after it received Irmiter's report. Travelers cannot allege it was prejudiced in not being present at the May 30, 2019 visit given it has a report which fully documents the visit and sampling.

There was no concealment or material breach of the cooperation clause because Maxus never intentionally failed to inform Travelers of FBS' May 30, 2019 and Travelers was not prejudiced by not attending. Maxus has numerous disputes with Travelers' assertions and each dispute is supported in the record, as detailed above. On these facts, summary judgment cannot be entered.

## B.     Sampling Results Were Not Concealed

Travelers argues that Maxus "concealed" results in an "ongoing pattern of intentional conduct" and failed to comply with terms of the Policy by not supplying sampling results. Mot. at 29-32, 38. The facts do not support Travelers' position. On May 1, 2019, Maxus informed

38

Travelers that soot and char were identified. SOF ¶ 57. Travelers did not respond to this letter. *Id.* ¶ 58. On June 7, 2019, Maxus provided Travelers with a report from FBS which found fire-related contamination in the complex. *Id.* ¶¶ 63-72.

### i. SELC

Travelers is upset that Maxus did not inform Travelers about an entity which was never Maxus' consultant, Safety Environmental Laboratories and Consulting, Inc. ("SELC"). Mot. at 30, 38. BCCM, not Maxus, engaged Safety Environmental Laboratories and Consulting, Inc. ("SELC") to evaluate The Metropolitan complex. SOF ¶ 128. Maxus was not involved in conversations between BCCM and SELC to set up the investigation. *Id.* ¶ 129. Maxus never received a report from SELC. *Id.* ¶ 130. Thus, Travelers' claims that Maxus somehow concealed SELC's identify or data is simply untrue; SELC was not Maxus' consultant and Maxus never had a report from SELC to provide to Travelers.

### ii. MicroVision

Travelers alleges Maxus did not identify MicroVision and did not provide a report for MicroVision's analysis. Mot. at 30, 38. In fact, the data is listed in the addendum to Irmiter's Rule 26 report provided in October 2020. SOF ¶ 112. Contrary to Travelers' claims, the MicroVision data does evidence that soot and char from the fire was found at The Metropolitan. Mot. at 31. MicroVision found char (called "wood ash" in the lab's report) in areas of the complex that had not been surfaced cleaned prior to the sampling. SOF ¶ 118. The cleaning activity removed any possible additional evidence of contamination that may have existed. *Id.* ¶ 119. Travelers cries wolf given it has been in possession of this data and the data does show fire contamination at The Metropolitan.

47178733v.3

### iii.     September 30, 2019 Data

Travelers also takes issue with data from September 30, 2019. Mot. at 30, 38.  First, Travelers argues 20 samples from September 30, 2019 are "entirely unaccounted for[.]" Mot. at 38.  There is no reason for Travelers' claims as Maxus has not hidden any data.  On September 30, 2019, FBS gathered duplicate samples at each location selected by Travelers' proffered expert Spicer. SOF ¶ 90.  The samples were collected side-by-side to each other and were within 1 inch of each other.  *Id.* ¶ 91.  One set of samples from each location were sent for further analysis. *Id.* ¶ 92.  The other samples from the same locations were held as a failsafe should further analysis later be required. *Id.* ¶ 93.  That need never arose. *Id.* ¶ 94.  Accordingly, approximately half of the samples collected by FBS on September 30, 2019 were not analyzed. *Id.* ¶ 95.  The samples that were never analyzed were duplicative because they were collected from the same locations as the samples which were analyzed. *Id.* ¶ 96.  Thus, the samples that were not analyzed are of no consequence. *Id.* ¶ 97.  Because the samples were not evaluated, no report has ever been issued for those samples. *Id.* ¶ 98.  FBS retains those samples today. *Id.* ¶ 99.

Incredibly, Travelers somehow argues Maxus failed to provide the data from samples analyzed by Environmental Analysis Associates, Inc. (EAA). Mot. at 30.  The EAA data is listed in Thomas Irmiter's October 5, 2020 Rule 26 report and was later provided to Travelers. SOF ¶ 100.  Travelers acknowledged this disclosure in its Motion to Exclude Daniel Baxter. *Id.* ¶ 101. The data listed in Irmiter's report and disclosed to Travelers are the only samples that were evaluated from the September 30, 2019 sampling event.  There is utterly no basis for Travelers' claim that Maxus has hidden data.

47178733v.3

#### iv.    EMSL

Not mentioned in the Motion is Maxus' provision of EMSL data clearly finding soot and char at The Metropolitan.  On November 13, 2019, FBS issued a report detailing sampling results from EMSL. SOF ¶ 102.  The report was provided to Travelers on the same day, November 13, 2019. *Id.* ¶ 103.  EMSL's data showed, "out of the 20 surface samples submitted 17 showed signs of particulates consistent with the fire." *Id.* ¶ 106.  Travelers wholly ignores this in its Motion.

#### v.    Intent

There is no evidence to support Travelers' argument that there was any concealment, much less that any such actions were "intentional." Mot. at 25, 29, 31.  Maxus did not intentionally conceal any information from Travelers. SOF ¶ 131.  Travelers' citations to testimony of Maxus' Director and Maxus Properties CEO David Johnson at page 32 of the Motion are not an admission of any intentional concealment or materiality of data.  Mr. Johnson's quoted testimony merely says that his direction to the company is to provide information. As detailed in this section, Maxus did just that.  Travelers' argument regarding provision of data require a willful suspension of the facts.

## IX.    <u>Maxus Did Not Fail to Protect the Property</u>

Travelers' argument that Maxus failed to protect the property are unsupported and untrue.  Mot. at 36-37.  For the first time at page 37 of its Motion, Travelers raises the "EFIS" and a January 2019 roof replacement.  Travelers neither defines "EFIS" nor elaborates on its claims regarding EFIS or the roof.  As this argument is not supported in any fashion, it should not be considered at summary judgment.

In response to Travelers' claims regarding the sprinkler cut and Phase 5 water damage, Maxus incorporates its argument above at Section VII.  The sprinkler did not cause additional damage to the structure. SOF ¶¶ 43-54.  Maxus properly remediated the subfloor after careful

41

consideration of all options while inviting Travelers to participate in discussions regarding how to address remediation. *Id.* ¶¶ 81-88.

## X.     **Extraneous Points Raised by Travelers In Statement of Facts**

Travelers raises various issues in its Statement of Facts upon which it never elaborates in its argument.  They merit clarification as they do not actually show any malfeasance by Maxus.

In its Statement of Facts, Travelers refers to Maxus' decision to remove residents to allow for remediating and suggests this was somehow inappropriate. Travelers SOF ¶¶ 43-45.  In fact, the record establishes that residents needed to be removed from the complex.  In FBS' June 5, 2019 report, Maxus' expert found fire-related contamination in each of the buildings in the complex and recommended Phase 5 be razed to the slab. *Id.* ¶¶ 65-69. The report noted that the soot found at the complex is a known carcinogen. *Id.* ¶ 67.  FBS found that adjacent structures should be razed because ongoing contamination would occur due to repair and cleaning at The Metropolitan. *Id.* ¶ 71.  FBS recommended the complex be vacated for repairs. *Id.* ¶ 70.

Thus, in early June 2019 Maxus had in hand a report from an expert that residents were subject to potential danger.  Maxus provided FBS' June 5, 2019 report to Travelers on June 7, 2019 and requested Travelers' consultation regarding the need to evacuate residents and conduct extensive cleanup efforts. *Id.* ¶¶ 72, 73.  Travelers did not respond to this letter and Maxus' phone calls. *Id.* ¶¶ 74, 75.  On June 11, 2019, Maxus informed Travelers that it needed to remediate and remove residents and requested a response by close of business. *Id.* ¶ 76. On June 12, 2019 Travelers responded that it cannot advise Maxus on the issue. *Id.* ¶ 77.  Travelers' proffered expert Spicer inspected the property the next day, prior to notice to the residents to vacate the property. *Id.* ¶ 78.

47178733v.3

In the interest of health and safety, Maxus acted based on the information it had. After inviting Travelers to its decision-making process, a decision was made in the best interests of the residents and the property. On June 14, 2019, Maxus instructed residents to vacate by June 24, 2019. *Id.* ¶ 80. FBS' initial conclusion regarding the extent of contamination was confirmed by MicroVision and EMSL. *Id.* ¶¶ 116-118; *supra* Section VIII(B).

Travelers also suggests invocation of the Policy's straightforward appraisal provision was somehow inappropriate. Travelers SOF ¶¶ 21-24. What is inappropriate is Travelers' denial of that procedure after Maxus invoked it. The appraisal provision in the Policy requires only that the parties "disagree on…the amount of the loss." SOF ¶ 28. There is no requirement that the party invoking appraisal must justify the request for an appraisal or provide supporting documentation. Here, Maxus disputed Travelers' ascertainment of damages and, accordingly, properly invoked the appraisal provision. *Id.* ¶ 60. This process is set forth in the Policy, Maxus invoked it, and Travelers denied it at the time and now continues to assert that Maxus was somehow in the wrong for invoking the process. In fact, Travelers' actions are evidence of its vexatious refusal, as detailed in Section XIV below.

## XI.  <u>Neither Materiality Nor Prejudice Are Shown</u>

Travelers has not, and cannot, make the required legal showing to void the entire Policy based on these minor disputes regarding Phase 5 water damage, sampling, protection of the property, and appraisal. Travelers would have to show both materiality and prejudice in the alleged misrepresentations (which is impossible because there was no misrepresentation) in order to void the Policy. *Neidenbach*, 842 F.3d at 565; *Myers*, 345 S.W.3d at 349.

Travelers cannot satisfy either element. First, there was no misrepresentation, and even the purported misrepresentation is immaterial; Maxus is not asserting a false claim. Travelers does

47178733v.3

not dispute that The Metropolitan suffered a significant fire loss that is covered by the Policy. Maxus is not seeking costs from Travelers for water damage which was not caused by the fire. Second, Travelers cannot show it has been prejudiced by any alleged misrepresentation. During its corporate representative deposition, Travelers could not articulate a single decision which was changed because of Maxus' alleged misrepresentation. When asked how Travelers was prejudiced by any alleged failure to cooperate, Travelers merely recited policy language without explaining how the alleged failure actually caused Travelers harm. SOF ¶ 133. Moreover, when specifically asked how any information Travelers claims to be missing would have impacted Travelers' coverage determination, Travelers could not provide anything in support, and merely complained that such information might have "assisted" in their investigation. *Id.* ¶ 134.

The cases relied upon by Travelers merely underscore that *egregious, fraudulent* conduct is necessary for courts to void an insurance policy based on intentional material misrepresentations. Mot. at 26-27. For example, in *Liberty Mut. Fire Ins. Co. v. Scott*, 486 F.3d 418, 420 (8th Cir. 2007) and *Neidenbach*, 842 F.3d 560, the insureds provided sworn proofs of loss claiming hundreds of thousands of dollars of personal property items as part of insurance losses. In both cases, the insureds had claimed less than $10,000 in total personal property assets less than a year earlier in connection with a bankruptcy petition. The courts found it impossible to reconcile these extreme discrepancies, concluding the only reasonable inference being that the insureds were fraudulently exploiting their insurance policies. Similarly, in *Childers v. State Farm Fire & Cas. Co.*, 799 S.W.2d 138 (Mo. Ct. App. 1990), the insureds, former spouses, deliberately lied under oath about the amount of personal property items destroyed in a fire, thereby voiding any potential insurance coverage. The insured in *CM Vantage Specialty Ins. Co. v. Nephrite Fund 1, LLC*, No. 4:18 CV 1749 JMB, 2020 WL 805848 (E.D. Mo. Feb. 18, 2020) went so far as to

44

have its contractors make fraudulent statements to seek tens of thousands of dollars in insurance coverage. Common to all these cases is an intent to deceive which is equivocally absent from this case.

Unlike the cases cited by Travelers, Maxus has not submitted a fraudulent proof of loss or made any other fraudulent statement. Accordingly, the cases relied upon by Travelers are factually dissimilar and do not support Travelers' contention that Maxus made a material misrepresentation which justifies voiding the policy.

Moreover, Travelers' arguments regarding alleged delay in providing information is immaterial, not to mention hypocritical. Travelers' proffered expert Spicer went to The Metropolitan on June 13, 2019. SOF ¶ 78. For months, Maxus requested Travelers provide its assessment of the damage. *Id*. ¶ 79. No such information was provided until approximately *six months* after Spicer went to the property. Finally, on December 16, 2019, Travelers provided Spicer's preliminary report, dated August 2, 2019, and his final report, dated December 11, 2019. *Id*. ¶ 107. Travelers testified that it had refused to provide Spicer's preliminary report because it is the company's policy to not provide preliminary reports until the investigation is final. SOF ¶ 108. Notably Travelers did, in fact, eventually provide Spicer's preliminary report, albeit four months after it was written. Travelers provided the final and preliminary report to Maxus at the same time. *Id*. ¶ 109. Travelers sat on its hands for months. Its boldface arguments here alleging Maxus delayed in providing information ignore Travelers' own actions and ignore the law's requirements that Travelers show materiality and prejudice.

## XII.    Maxus is Entitled to Soft Costs

Travelers broadly states that "*the Policy* only provides soft costs coverage to the Named Insured listed on the Declarations page." Mot. at 40 (emphasis added). However, later in

47178733v.3

Travelers' brief, it appears to be referring only to the $100,000 of soft costs provided in the "Coverage Extension." It is difficult to tell what Travelers is actually asserting, but the Coverage Extension is not the only section of the Policy that provides for soft costs. Travelers fails to explain that there are two separate and distinct sections of the Policy which insure Maxus' soft costs. *First*, the CONSTRUCTION PAK – BUILDERS' RISK SPECIAL TIME ELEMENT COVERAGE provides Business Income, Rental Value, and Soft Costs up to a $5 million limit. SOF ¶ 26. *Second*, there is a Coverage Extension for Soft Costs up to an additional $100,000. *Id.* ¶ 27. Although Travelers does not clearly delineate between the two provisions, Travelers presumably is only referencing the $100,000 "Coverage Extension" and not the $5 million Time Element Coverage section which includes soft costs. In any event, Travelers' argument fails under both provisions for the reasons set forth below.

### A. Travelers Waived or Should be Estopped from Seeking to Deny Coverage Under the Time Element Coverage

In the event Travelers is arguing that the Time Element Coverage Section does not afford Maxus coverage for soft costs (which does not appear to be the case, but it is unclear), it has failed to preserve its right to do so. It is well established that an insurer must plead exclusions as affirmative defenses. *Century Fire Sprinklers, Inc. v. CNA/Transp. Ins. Co.*, 23 S.W.3d 874, 877 (Mo. Ct. App. 2000). Failure to do so may waive or prohibit an insurer from asserting defenses which may otherwise be available under the policy. *Id.* An insurer can also waive or be estopped from denying coverage based on positions taken during its handling of the insurance claim at issue. *See, e.g.*, *Interstate Cleaning Corp. v. Comm. Underwriters Ins. Co.*, 325 F.3d 1024, 1028 (8th Cir. 2003) (an insurer may be estopped from denying coverage if based on "inconsistent ground[s]" and can waive a coverage defense by "intentionally, either expressly or impliedly, relinquish[ing] a known right").

46

In this case, Travelers never raised an affirmative defense that Maxus was not entitled to soft costs (under any portion of the Policy). *See* Travelers' Answer, Doc. No. 2. For this reason alone, Travelers' has waived this defense. Additionally, Travelers acknowledges that it has paid Maxus $415,379.92 for lost rents under the Time Element Coverage. Travelers SOF ¶ 28. Travelers' decision to pay Maxus for lost rental income is contrary to its current position that Maxus, as an Additional Named Insured, only has an insurable financial interest in the physical covered property at the project site. This is an explicit waiver of any such defense which Travelers might have otherwise been able to raise regarding this issue. Accordingly, Maxus is entitled to the $5 million in coverage afforded under the Special Time Element Coverage, which includes soft costs.

## B. Maxus May Recover Soft Costs Under the Coverage Extension

Similarly, Travelers' position that Maxus cannot seek softs costs under the Coverage Extension conflicts with fundamental insurance principals. Absent unambiguous policy language to the contrary, an additional named insured enjoys the *same coverage* as any other named insured listed in the policy. *E.g.*, *BP Air Conditioning Corp. v. One Beacon Ins. Grp.*, 33 A.D.3d 116, 126 (NY 2006); *Forest Oil Corp. v. Strata Energy, Inc.*, 929 F.2d 1039, 1044-45 (5th Cir. 1991); *see also* SOF ¶ 137 (Travelers' admission that additional named insureds are treated the same as the original named insureds for purposes of coverage). The term "additional named insured" is unique and has technical meaning in insurance policies. *See, e.g.*, *Westview Drive Investments, LLC v. Landmark Am. Ins. Co.*, 522 S.W.3d 583, 594-595 (Tex. Ct. App. 2017). By choosing to specifically designate a party as an additional *named* insured (rather than an additional insured), parties to the contract intend for that added party to be treated analogously to the other named insureds. Mark Pomerantz, *Recognizing the Unique Status of Additional Named Insured*, 53

47

Fordham L. Rev. 117 (Oct. 1984); *see also Madison Cty. v. Evanston Ins. Co.*, 340 F.Supp.3d 1232, 1273-75 (N.D. Ala. 2018) (finding the policy at issue ambiguous because it failed to construe the meaning of "additional named insured").

Under the terms of the Construction Completion Agreement, Maxus was added as a "named insured" to the Policy. Travelers SOF ¶ 28; SOF ¶¶ 136, 137. Based on the parties' clear intent, the Policy was procured by Bomasada for the mutual benefit of Maxus, including all coverages and privileges afforded therein. Travelers mistakenly focuses on the Additional Conditions provision which states Maxus—as an additional named insured—is covered "only to the extent of their financial interest in the Covered Property." Policy at 33; SOF ¶ 138. But this provision is nothing more than a reiteration of the "basic premise" of the "concept of indemnity" that entitles Maxus to "full, but not more than full, value for the loss suffered" and "to be made whole but not be put in a better position than before the loss." *In re State Farm Fire & Cas. Co.*, 872 F.3d 567, 573 (8th Cir. 2017). It is not, as Travelers' asserts, a limitation on available coverage. Maxus, as any reasonable insured, rightfully understood that being designated as an additional named insured on the Policy ensured it equal protection in the event of a loss like the fire at issue in this cause. This is not a situation where two different insureds are trying to collect the same amounts or "double-dipping," there is one limit for both Bomasada and Maxus and Maxus merely seeks to recover.

Even assuming *arguendo* that Maxus' coverage is somehow less robust than that afforded the other named insureds listed in the Policy (which it is not), the Policy is, at best, ambiguous regarding Maxus' entitlement to soft costs. In disputes concerning the meaning of contract language, "the key is whether the contract language is ambiguous or unambiguous." *Gohagan. v. Cincinnati Ins. Co.*, 809 F.3d 1012, 1015 (8th Cir. 2016). Where there is any ambiguity, the policy

language is construed against the insurer in favor of coverage. *Mendota Ins. Co. v. Lawson*, 456 S.W.3d 898, 903 (Mo. Ct. App. 2015). A policy is ambiguous where there is "duplicity, indistinctness, or uncertainty in the meaning of the language in the policy." *Seeck v. Geico Gen. Ins. Co.*, 212 S.W.3d 129, 132 (Mo. banc 2007). "To test whether the language used in the policy is ambiguous, the language is considered in the light in which it would normally be understood by the lay person who bought and paid for the policy." *Blumer v. Automobile Club Inter-Ins*, 340 S.W.3d 214, 219 (Mo. Ct. App. 2011) (quoting *Heringer v. Am Family Mut. Ins. Co.*, 140 S.W.3d 100, 102 (Mo. Ct. App. 2004). Policy provisions should not be interpreted in isolation but rather the policy as a whole should be evaluated. *Ritchie v. Allied Prop. & Cas. Ins. Co.*, 307 S.W.3d 132, 135 (Mo. banc 2009).

Viewed in its entirety, the Policy is arguably ambiguous with regard to Maxus' right to soft costs. Using Travelers' logic, under the Special Time Element Coverage of the Policy, Maxus has a right to certain coverages, including soft costs. However, pursuant to another provision, Maxus is allegedly precluded from soft costs due to its status as additional named insured. Stated differently, Travelers appears to assert that Maxus has soft cost coverage up to $5 million under one section of the policy, and yet has "no reasonable expectation of soft costs coverage" (in the amount of $100,000) under a separate coverage extension. This is nonsensical. Maxus (nor any reasonable insured) would expect such conflicting coverage positions as that now proffered by Travelers. Due to this arguable ambiguity, the Policy must be construed in Maxus' favor.

## XIII.   <u>Maxus' Damages are Not Excluded by the Policy</u>

An insurance contract is designed to protect the insured and must be interpreted to grant coverage rather than defeat it. *Centermark Props. v. Home Indem. Co.*, 897 S.W.2d 98, 101 (Mo. Ct. App. 1995). Accordingly, policy exclusions are construed strictly against the insurer in favor

49

of providing coverage. *Maher Bros., Inc. v. Quinn Pork, LLC*, 512 S.W.3d 851, 857 (Mo. Ct. App. 2017); *Sullivan v. State Farm Mut. Auto. Ins. Co.*, 513 So.2d 992, 994 (Ala. 1987) ("exceptions to coverage must be interpreted as narrowly as possible to provide the maximum coverage available"). Unless the language of the exclusion at issue unequivocally applies to the facts of the case, summary judgment is improper and must be denied. *Id.* Where, as here, an insurer "seeks to escape coverage based on a policy exclusion, it has the burden of proving facts that make the exclusion applicable." *Powell v. State Farm Mut. Auto Ins. Co.*, 173 S.W.3d 685, 689 (W.D. Mo. 2005) (citation omitted); *Acceptance Ins. Co. v. Brown*, 832 So. 2d 1, 12 (Ala. 2001).

Travelers erroneously contends that Maxus' damages are excluded under the Policy without providing an indicium of factual support. Instead, Travelers relies entirely on conclusory allegations that there is evidence of damages resulting from faulty, inadequate, or defective workmanship which are excluded under the Policy. Travelers has not—and cannot—meet its burden of proving an exclusion precludes or otherwise limits coverage.

Notably, Maxus has not sought coverage for any damage resulting from faulty, inadequate, or defective workmanship. Indeed, Maxus has made clear that it believes such issues exist, but that the damages arguably caused by these issues are *not* part of Maxus' insurance claim against Travelers. These unrelated (and unclaimed) damages have no impact on Travelers' indemnity obligation for the tens of millions of dollars in covered damages Travelers owes but has wrongfully refused to pay Maxus. Because Travelers has not shown any exclusion applies to this loss, summary judgment on this point must be denied.

## XIV. <u>Vexatious Refusal Claim Does Not Fail</u>

Travelers asserts that it could not possibly have wrongfully refused to pay *the soot and char portion* of Maxus' claim, because it denied coverage for that portion of the claim based on

expert testimony. Travelers also asserts that it conducted a timely and adequate investigation of the claim, and therefore, there can be no vexatious refusal. Maxus disagrees with Travelers' contention that because it hired experts to opine about the soot and char portion of the claim that a vexatious refusal claim is impossible. Notably, a jury could find that Travelers' decision not to pay the soot and char portion of the claim on the basis that the soot and char was not the result of the massive two-alarm fire, but merely environmental background levels in Birmingham was unreasonable regardless of any expert testimony.

More importantly, Travelers has neglected other portions of the claim (other than the soot and char issues) that are owed and that Travelers has failed and refused to pay for months or even years. For example, Maxus has provided Travelers evidence of lost rental value, as well as additional property damage costs, and yet nothing has been paid on even those portions of the claim for months without reasonable excuse. Astonishingly, Travelers' corporate representative, who has been involved with adjusting this claim from its inception, stated he did not know if anything had been submitted recently on Phases 1 through 5 for consideration of payment. SOF ¶ 135. The fact that Maxus has had to come out of its own pocket to pay for repairs and rebuilding of Phases 5 and 6, despite Travelers acknowledging coverage is due for the work is egregious behavior and certainly unreasonable in support of a vexatious refusal claim.

Similarly, Travelers' refusal to participate in the appraisal process after Maxus invoked it under the clear language of the Policy is further evidence of vexatious behavior. Travelers had no legitimate justification for denying Maxus the right to an appraisal here and Travelers' refusal to permit the appraisal process to go forward caused unnecessary delays in payment.

Under Missouri law, an insured may recover damages and attorney's fees when an insurance company refuses to pay for loss "without reasonable cause or excuse." R.S.Mo.

§ 375.420. The elements of vexatious refusal an insured must prove are as follows: (1) the existence of an insurance policy with the insurer; (2) that the insurer refused to pay the insured's losses; and (3) the insurer's refusal was without reasonable cause or excuse. *Qureshi v. Am. Family Mut. Ins. Co.*, 604 S.W.3d 721, 727 (Mo. App. E.D. 2020).

"[W]hether an insurer's refusal to pay is vexatious or not must be determined by the situation as presented to the insurer at the time it was called on to pay." *Russell v. Farmers & Merchs. Ins. Co.*, 834 S.W.2d 209, 221 (Mo. App. S.D. 1992). "Generally, whether an insurer acted reasonably is a question of fact for the jury, and thus is improper for a court to determine in granting a summary judgment." *Welsh v. Nationwide Affinity Ins. Co. of Am.,* No. 17-CV-00090, 2017 WL 7037744, (W.D. Mo. Dec. 6, 2017).

Given the extensive delay in payment, among other things, it is certainly possible that a jury would find Travelers' behavior to be vexatious. Moreover, with regard to the soot and char portion of the claim, vexatious refusal claims have been upheld where the insured's "refusal is based upon a suspicion, rather than a reasonable inference of established facts." *Id.* Notably, under Missouri law "direct and specific evidence to show vexatious refusal is not required," and a jury "may find vexatious delay upon a general survey and a consideration of the whole testimony and all the facts and circumstances in connection with the case." *Id.*

Appropriate claims adjusting requires insurance company representatives to make decisions based on facts, rather than speculation, following a full investigation. Travelers has chosen to deny the soot and char portion of the claim based on its expert's determination that the soot and char did not result from the major fire event on the property, instead claiming it is merely typical environmental background levels of soot typical for Birmingham, Alabama. Travelers has refused to consider and instead ignored the competing (and more logical) view here, which is that

47178733v.3

the soot and char at The Metropolitan directly resulted from the massive two-alarm fire that burned for hours and required 40 to 50 firefighters. SOF ¶ 6. Travelers wants to bury its head in the sand and blindly rely on its own hired experts, because this is a multi-million-dollar issue. Travelers does not want to consider the full facts here that demonstrate coverage, and that is vexatious refusal.

## XV.   Conclusion

The record evidences numerous genuine issues of material fact which preclude entry of summary judgment. Travelers' claims are based on minuscule issues that arose during a massive repair and reconstruction of a large apartment complex. Its arguments regarding alleged concealment do not rise to the requisite level of materiality and prejudice required to eviscerate the entire Policy. Maxus did not intentionally conceal any information from Travelers and Travelers is currently in possession of each piece of evidence that exists upon which it bases its Motion. Accordingly, the Motion must be denied.

Dated:  July 16, 2021                          Respectfully submitted,

                                               /s/ *Michael J. Abrams*
                                               Michael J. Abrams, MO Bar #42196
                                               Kimberly K. Winter, MO Bar #45029
                                               Noah H. Nash, MO Bar #72048
                                               LATHROP GPM LLP
                                               2345 Grand Boulevard, Suite 2200
                                               Kansas City, Missouri 64108-2618
                                               Telephone:  816.292.2000
                                               Facsimile:  816.292.2001
                                               michael.abrams@lathropgpm.com
                                               kim.winter@lathropgpm.com
                                               noah.nash@lathropgpm.com

                                               *Attorneys for Plaintiff*
                                               *Maxus Metropolitan, LLC*

47178733v.3

## CERTIFICATE OF SERVICE

I do hereby certify that on July 16, 2021, I electronically submitted the foregoing with the

Clerk of the Court for the United State District Court for the Western District of Missouri using

the CM/ECF system, which will send a Notice of Electronic Filing to the following counsel of

record:

Dale L. Beckerman, MO Bar #26937
Daniel E. Hamann, MO Bar #28164
DEACY & DEACY, LLP
920 Main Street, Suite 1000
Kansas City, Missouri 64105
Telephone: (816) 421-4000
Facsimile: (816) 421-7880
dlb@deacylaw.com
deh@deacylaw.com

Brenen G. Ely (*pro hac vice*)
Kenneth W. Boyles, Jr. (*pro hac vice*)
ELY & ISENBERG, LLC
3500 Blue Lake Drive, Suite 345
Birmingham, Alabama 35243
Telephone: (205) 313-1200
Facsimile: (205) 313-1201
bely@elylawllc.com
kboyles@elylawllc.com

*Attorneys for Defendant Travelers*
*Property Casualty Company of America.*

/s/ *Michael J. Abrams*
An Attorney for Plaintiff