# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | |
|---|---|
| MAXUS METROPOLITAN, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )    Case No. 20-cv-0095-FJG |
| | ) |
| TRAVELERS PROPERTY CASUALTY | ) |
| COMPANY OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

## ORDER

Currently pending before the Court is Travelers' Motion for Summary Judgment (Doc. # 83).

## I. BACKGROUND

### A. Construction of The Metropolitan

On September 19, 2014, Bomasada Birmingham, LLC purchased the property located at 2900 7th Ave. South, Birmingham, Alabama to construct The Metropolitan apartment complex. Construction of the apartment complex began on June 15, 2015 and was divided into six phases. On or about August 1, 2015, Travelers issued a Builders Risk – Construction PAK insurance policy number QT-660-7E077026-TIL-15 to "Bomasada Birmingham Metropolitan LLC; Bomasada BHM Construction LLC, and Bomasada Group Inc." (collectively, "Bomasada"). On or about September 10, 2015, Bomasada Birmingham, LLC conveyed the subject property to Bomasada Birmingham Metropolitan, LLC. Over the course of construction, the policy was renewed for various periods.  At the time of the loss, on September 27, 2018, policy number QT-

660-7E077026-TIL-18, was in effect for the policy period of March 31, 2018 through September 30, 2018. The policy expired on September 30, 2018 and was not renewed. On August 31, 2018, Bomasada Birmingham Metropolitan, LLC (the Bomasada ownership entity) and Maxus entered into a real estate purchase and sale agreement for the purchase and sale of The Metropolitan. At the time of the sale, Phases 1-3 of The Metropolitan were complete, temporary certificates of occupancy had been issued, and some of the top floor units were leased to tenants. As part of the August 31, 2018 sale, Bomasada BHM Construction, LLC (the Bomasada construction entity) and Maxus entered into a Construction Completion Agreement in which Bomasada BHM Construction, LLC agreed to continue serving as the general contractor and to oversee the remaining construction work on Phases 4-6 of the Project. The Construction Completion Agreement provided that the Contractor shall provide and maintain such types and amounts of insurance as set forth in Exhibit B.

Exhibit B of the Construction Completion Agreement provides as follows:

> Property Insurance. The Contractor shall cause the current property insurance to be extended through the Competition Work. The Owner shall be a named insured. The Contractor shall maintain, in a company or companies lawfully authorized to do business in Alabama, property insurance written on a builder's risk "all-risk" or equivalent policy form in the amount of the Prior Construction Contract Sum, plus value of subsequent Completion Work and cost of materials supplied or installed by others, comprising total value for the entire Project at the site on a replacement cost basis without optional deductibles. The Owner shall pay Contractor the cost of the extension of the builder's risk "all-risk" property insurance, and such shall be a line item on Exhibit A to the Agreement. Such property insurance shall be maintained, until Final Payment has been made as provided in Paragraph 6 of the Agreement.
>
> Property insurance shall be a self-insurance program or on an "all-risk" or equivalent policy form and shall include, without limitation, insurance against the perils of fire (with extended coverage) and physical loss or damage including, without duplication of coverage, theft, vandalism,

2

malicious mischief, collapse, earthquake, flood, windstorm, falsework, testing and startup, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation for Contractor's services and expenses required as a result of such insured loss.

If the Owner requests in writing that insurance for risks other than those described herein or other special causes of loss be included in the property insurance policy, the Contractor may, in its sole discretion, include such insurance, and the cost thereof shall be charged to the Owner by appropriate Change Order to the Agreement.

Travelers was not informed of the real estate sale or the Construction Completion Agreement or other agreements executed as part of the sale until after the fire.

**B. The Fire Damage Claim (Phase 6 Fire Damage and Phase 6 Heat and Water Damage).**

On September 27, 2018, an intentionally set fire destroyed a stand-alone building known as "Phase 6" which is one of three buildings that make up The Metropolitan. The Phase 6 building was connected to one of the other buildings (known as Phase 5) of The Metropolitan by an open-air walkway. The south side of the Phase 5 building suffered extensive thermal damage including broken windows, charred paint, melted window frames, damaged siding and broken glass. The roofs of Phases 4 and 5 showed fire impact, including warped and damaged air conditioning units, melted PVC pipes and damage to the roof. Smoke staining was also visible on the roofs of Phases 2 – 4.  Building inspectors and engineers were needed to assess safety of the buildings. Numerous trades were involved, including cleaners, carpenters, drywall repairmen, and painters. Remediation work on the apartment complex stated the first week of October 2019. Repair and remediation lasted over 34 months.

Bomasada provided Travelers with notice of its claim for property damage as a result of the fire. At that time, it was determined that those damages included damage to all of Phase 6, to the point it was built at the time, and roof and water damage to Phase 5 of the Project. Upon receiving notice of the loss, Travelers became aware of Maxus' ownership interest and also of a Protective Safeguards endorsement on the Policy that potentially impacted coverage for the loss. Although Maxus was not added as an additional insured on the Travelers policy, Maxus qualified as an additional named insured. On November 29, 2018, Travelers sent a letter to Bomasada stating, "[t]his letter is in follow up to a conversation you had with Claim Manager Stephen Bryan on Wednesday, November 28 confirming Travelers investigation has been completed and coverage is being provided for this loss. This letter is to confirm coverage is being provided in full for this loss per the applicable policy conditions." (Doc. 84-12). Following meetings with Maxus and Bomasada, Travelers issued an advance payment in the amount of $1,000,000.00 to help cover any emergency services and initial repairs to Phases 1-5 and clean-up of Phase 6.

On December 12, 2018, Bomasada retained ATC Group Services, Inc. to perform moisture mapping to determine the extent of water damage to Phase 5 due to fire extinguishing efforts and roof damage as a result of the fire. ATC also conducted combustion by-product sampling. On January 15, 2019, ATC issued its report identifying the areas of Phase 5 that had suffered water damage. Their report showed "extensive water intrusion and fire affected areas in the Phase 5 Building." "Floors One (1) through Four (4) had extensive water intrusion and suspect VMG." "Extensive water intrusion and microbial growth on floors one (1) through four (4)." On March 13, 2019, Travelers

4

issued a letter and statement of loss explaining that Travelers had been able to identify damages to The Metropolitan in the amount of $2,519,607.19 and was prepared to issue payment in that amount. This estimate included costs to rebuild Phase 6 to its condition at the time of the loss; heat damage to the south façade and windows of Phase 5 that were closest to the flames; damage to the Phase 5 roof caused by embers that fell onto the TPO roof membrane; water damage to Phase 5, including replacement of approximately 3,000 square feet of subflooring in the specific areas identified in the ATC report; and mold remediation to the entire Phase 5 building. In response, on March 20, 2019, Bomasada represented that the estimate for Phase 6 re-construction and repairs to Phases 1-5 did not represent a reasonable amount for the work but did not identify any specific areas of disagreement or provide an alternative estimate. Thereafter, on April 10, 2019, Travelers requested that Bomasada and Maxus provide documentation stating the basis for their disagreement. On April 18, 2019, without providing any of the previously requested information Bomasada and Maxus invoked the appraisal provision of the policy. Travelers responded, explaining that appraisal was premature as Maxus and

Bomasada had failed to provide an estimate of their claimed damage or identify specific areas of disagreement that could be subject to appraisal.

### C. Maxus' Lost Rents Claims

On or about April 12, 2019, through its consultant, Quantum Global, Maxus submitted an initial claimed amount of $415,569.04 in loss of rental income as a result of the fire. Travelers has paid $415,379.92 for lost rents for the period of restoration associated with the repairs to the various Phases of The Metropolitan relative to the

damage. Travelers has denied any additional claims for lost rental income beyond the associated periods of restoration as those lost rents are associated with rental income lost during Maxus' remediation of alleged soot and char contamination, which Travelers disputes is present.

**D. Maxus' Soot/Char Smoke Damage Claims**

**(1) Safety Environmental Laboratories and Consulting, Inc. ("SELC")**

On or about April 9, 2019, unbeknownst to Travelers, a representative of Maxus' construction consultant, BCCM Construction Group ("BCCM"), and Alex Stehl, Maxus' Vice-President of Construction communicated with Safety Environmental Laboratories and Consulting, Inc. ("SELC"), an AIHA-certified testing laboratory. The purpose of these communications was to request that SELC conduct soot and char testing in specific areas identified by BCCM throughout The Metropolitan. SELC collected samples, analyzed them for the presence of soot and char and generated a report memorializing its findings. On April 10 and April 11, 2019, SELC inspected The Metropolitan and collected 97 samples. After collection, SELC started analyzing the 97 samples to determine the presence and concentration (if any) of soot and char from the fire. However, before SELC was able to fully complete its analysis and issue a report, someone from Maxus or BCCM terminated SELC and told them not to issue a final report.

The next week, on April 24, 2019, Forensic Building Science, Inc. ("FBS"), Maxus' current consultant, made its first visit to The Metropolitan and opined that it suspected soot and char contamination. On May 1, 2019 Maxus informed Travelers that it discovered evidence of what it believed was smoke and/or soot damage to Phases 1-

6

4 and claimed additional smoke and/or soot damage to Phase 5 of The Metropolitan. Maxus also notified Travelers it had retained a company to perform testing and provide guidance. Travelers states that Maxus never informed Travelers of its relationship with SELC, the work SELC had performed or provided SELC's test results. However, Maxus states it was never in possession of the SELC report. Travelers obtained that information pursuant to a Rule 45 subpoena in the litigation.

**(2) May 30, 2019 Inspection by Forensic Building Science ("FBS")**

On May 13, 2019, Travelers specifically requested that Maxus identify who had conducted smoke/soot damage testing at The Metropolitan. Travelers also requested Maxus provide it with sufficient notice of any future inspections for the specific purpose of affording Travelers an opportunity to have its representatives attend any inspections or sampling collection contemporaneously with Maxus' consultants. On May 28, 2019, Maxus responded to Travelers and advised that it had hired an environmental hygienist to determine the nature and extent of any environmental issues that potentially exist on the property due to the significant amount of soot and smoke from the fire. Maxus informed Travelers that the hygienist had already inspected the property and their work was underway, but Travelers was welcome to send its own experts to reinspect the property at a reasonable time. Maxus reiterated that it disagreed with Travelers' regarding the amount of loss and that it was invoking the appraisal provision of the Policy. Travelers disagrees that Maxus invoked the appraisal process.

Maxus' claim consultants, Forensic Building Science ("FBS") were already scheduled to conduct additional environmental inspections of the property on May 30, 2019 "to compare the initial sampling result with the secondary sampling results." On

May 30, 2019, Maxus' expert, Thomas Irmiter visited the property again. Travelers was not informed of the May 30, 2019 inspection. Mr. Irmiter's company – Forensic Building Science ("FBS") collected samples from the building and provided them to Neil Carlson of NG Carlson Analytical for analysis. Carlson's analysis suggested fire related contamination in the complex. FBS found damage in the interior and exterior of each of the buildings in the complex. FBS concluded that Phase 5 should be razed to the slab and rebuilt as the cleanup and repair costs would exceed the costs to tear down and rebuild. FBS also concluded that cleaning and remediation was needed in the remaining buildings and that ongoing contamination would occur from structures adjacent to The Metropolitan. FBS recommended that they should be razed prior to repair and cleaning of the other buildings. FBS also recommended that the apartment complex be vacated for repairs.

**(3) FBS Data**

On June 6, 2019, Travelers again reminded Maxus of the conditions under the policy and requested that Maxus permit Travelers' own experts to inspect the property on June 13, 2019. The following day, on June 7, 2019, Maxus provided Travelers with a Fire Damage Report issued by FBS, alleging that all remaining buildings (Phases 1-5) of The Metropolitan were impacted by the fire and sustained residual soot and/or char damage. The report does not indicate that FBS had inspected and collected samples for a second time on May 30, 2019, or that it had sent those samples to laboratories for more advanced, confirmatory testing and was awaiting the results. On June 11, 2019, Maxus informed Travelers that it needed to remediate the property and would need to

evacuate the residents and needed a response by the close of business on June 12, 2019. On June 12, 2019, Travelers responded to Maxus and stated:

> Travelers' investigation into the claim is ongoing, and it has scheduled an inspection of the premises by an industrial hygienist tomorrow, June 13, 2019. Once the industrial hygienist has inspected the premises, he will need an opportunity to analyze the information he obtains in the inspection, review and analyze Mr. Irmiter's report and recommendations, and perform his own evaluation.

On June 13, 2019, Chris Spicer, an industrial hygienist retained by Travelers to inspect and evaluate Maxus' smoke and/or soot damage, conducted an initial inspection of The Metropolitan to assess overall site conditions in order to evaluate the FBS report's conclusions. The following day, on June 14, 2019, Maxus instructed all residents to vacate The Metropolitan property by June 24, 2019. On August 22, 2019, Travelers took the examination under oath of Stuart Fred of Bomasada. In that examination, Travelers learned that FBS had taken a second set of samples, had received additional test results, and had analyzed those results, but had not advised Travelers or provided Travelers with the test results. The documents and e-mails referencing those results were produced to Travelers by Bomasada and not Maxus – Maxus never notified Travelers of the second round of test results. On September 12, 2019, Travelers made a specific request that Maxus provide it with copies of "any test results or reports related to this second round of environmental testing." Travelers also specifically requested any and all documents from FBS or any other retained experts regarding testing of The Metropolitan. On September 23, 2019 and October 8, 2019, Travelers again requested the results of the second round of testing conducted at The Metropolitan. Travelers followed those three requests with another request on October 17, 2019, which reiterated its need for documents and reports related to the FBS'

9

second sampling inspection and more specifically requested "any and all test results from the second tests."  On or about November 13, 2019, Maxus provided Travelers with a copy of the FBS report detailing the May 30, 2019 visit, including the data from EMSL. Maxus also provided the test results from EMSL, Inc., an AIHA-certified laboratory. Maxus states that the EMSL data showed, "out of the 20 surface samples submitted 17 showed signs of particulates consistent with the fire." Travelers disputes this data. FBS' report noted that construction would affect the samples. FBS had collected another set of samples during its May 30, 2019 inspection and sampling and sent those samples to another AIHA-certified environmental testing company - MicroVision, for analysis. Maxus did not immediately provide the results from MicroVision. Travelers states that it did not discover that MicroVision had conducted analysis on an additional set of samples until it discovered an invoice produced by Maxus in the current litigation. Travelers issued a subpoena to Microvision and obtained the results through that means on November 16, 2020. Maxus disputes this, stating that the MicroVision data was listed in an Addendum to FBS' October 2020 Rule 26 Report. The EMSL and MicroVision labs confirmed the presence of soot and char. MicroVision found char in areas of the complex that had not been surface cleaned prior to sampling. Travelers states that the report stated: "Wood ash particles were detected in two of the twenty submitted samples and estimated at 20% of the sample particle volume for sample 1B, and trace amount for sample 7B." (Doc. 106-37, p. 60 of 62). "No particles consistent with soot or combustion related particles were detected in the remaining sixteen (16) submitted samples." Id. Maxus alleges that the cleaning activity removed any possible additional evidence of contamination that may have existed.

10

Travelers' expert, Stuart Batterman stated:

> Outdoor smoke from a structure fire or other source can enter a building if
> two conditions are present: (1) the building exterior must be exposed to
> smoke and high concentrations of fire-related pollutants, particularly at air
> entry locations and for prolonged periods; and (2) air infiltration and
> particle penetration of smoke and fire related pollutants enter through the
> building envelope and into the building. These conditions - the *exposure*
> and *completed pathway* - depend on the fire and building configuration,
> local and prevailing meteorology, pressure differences, pollutant type, and
> other factors.

(Stuart Batterman Expert Report, p. 11).

**(4) EAA Report**

On September 30, 2019, Travelers' retained industrial hygienist, Chris Spicer,

visited The Metropolitan to conduct a second inspection and collect samples from

specific locations for analysis by an AIHA-certified laboratory. During this inspection,

FBS followed Mr. Spicer and collected concurrent samples. FBS observed Mr. Spicer's

sample collection – the specific locations in the building where he sampled, the specific

locations within the wall cavities where he took the samples, his methods for accessing

the wall cavities, his sample collection techniques, his sampling medium, and his chain

of custody protocols. FBS also collected samples from the same locations sampled by

Spicer. One set of samples from each location was sent for further analysis and the

other samples were held as a failsafe should further analysis later be required.

Accordingly, approximately half of the samples collected by FBS on September 30,

2019 were never analyzed. The samples that were not analyzed were duplicative

because they were collected from the same locations as the samples which were

analyzed. Because these samples were not analyzed, no report was issued for those

samples and FBS has retained those samples. Maxus states that data from the samples

collected on September 30, 2019 which were analyzed by EAA is listed in Mr. Irmiter's October 5, 2020 report. Travelers disputes that the October 5, 2020 report references the EAA data. Travelers received the March 2020 EAA report on March 16, 2021.

Following the September 30, 2019 inspection, Travelers requested Maxus to provide the test results for the samples FBS collected which were taken from the same locations where Mr. Spicer took his samples. However, Maxus did not provide them at that time. The results were eventually provided to Travelers, but there is disagreement on when these results were provided. Based on his June 13, 2019 and September 30, 2019 inspections and subsequent testing, which included extensive electron microscopy and fractal analysis, Mr. Spicer concluded that the "combustion related particulates detected in wall cavities represent background conditions."

**(5) Phase 5 Water Damage**

In December 2019, Bomasada retained ATC Group Services, Inc. to identify areas of Phase 5 that were damaged by water from the fire-fighting efforts and leaks in the Phase 5 roof from holes caused by fire embers. The Phase 5 building was not complete at the time of the fire. The exterior envelope was complete, but the interior was still under construction and no finish items (i.e., sheetrock, flooring, electrical or plumbing) had been installed. The interior of Phase 5 included oriented strand board sub-floor, interior framing studs, rough plumbing, electrical and ductwork. On January 15, 2019, ATC issued its report identifying the areas of the Phase 5 subfloor that had been damaged by water intrusion. As a result, on March 13, 2019, Travelers included payment for the approximately 3,000 square feet of damaged sub-floor in Phase 5 that

ATC had identified as having been damaged as a result of the fire. Maxus disputed that this payment was sufficient.

On May 1, 2019, Maxus' manager and CEO of Maxus Properties, David Johnson, wrote to Travelers and stated, "[t]here is also extensive water damage to the flooring in the Phase-5 building that we believe will require replacement of most of the flooring in place at the time of the fire." Travelers claims that three weeks before, on April 10, 2019, a sprinkler line was cut during construction which caused extensive damage to the construction site. Maxus claims that the subfloor was already damaged by the fire and the water damage caused by the sprinkler line did not cause any additional damage. In support of this statement, Maxus relies on its expert Thomas Irmiter, who concluded that the condition of the flooring he observed on April 24, 2019 could not have been caused by the sprinkler cut two weeks earlier, due to the extent of the damage on the OSB. However, Travelers states that Mr. Irmiter provided two written reports, neither of which address the April 10, 2019 water rupture's effect on subfloor, framing members, trusses, or exterior sheathing of Phase 5. Travelers' argues that Mr. Irmiter's statement should be excluded because he offered no explanation for his late disclosure by affidavit such an opinion. Additionally, Maxus' own records indicate that the April 10, 2019 sprinkler break caused "extensive damage to construction site in Phase 5 on all floor levels." (Doc. 84-29, p. 2). Records obtained from the Birmingham Water Works Board for the meter associated with the sprinkler system indicated that Maxus was billed for 2700 cubic feet of water (a little over 20,000 gallons) used by the fire suppression system for that billing period. The previous billing period showed that Maxus was billed for approximately 740 gallons. Maxus asserts that any damage from

13

the sprinkler line cut was collateral and did not affect the cost of repair. However, Travelers states that Maxus has not provided experts who can testify to this, as Mr. Howarth has been excluded and they did not designate another expert to testify as to the costs associated with this repair. On April 11, 2019, the day after the sprinkler line was cut, Bomasada (the contractor that cut the sprinkler line) placed an order for 12,288 square feet of 23/32" 4x8 OSB T&G identified as "Phase 5 Decking." Travelers states that despite the fact that the Travelers policy was no longer in effect and that Maxus knew that this new damage was unrelated to the fire, Maxus submitted the damage claim to Travelers who issued payment for the damage in February 2020. Maxus denies this fact.

Maxus obtained two engineering reports regarding Phase 5. One report was provided by Norton & Schmidt Consulting Engineers, LLC. A second report was provided by Innovative Structural Consultants, LLC. After reviewing the reports, Maxus believed that Phase 5 could be repaired. Maxus then obtained bids for the repair work. In late 2019, Resource Construction, LLC became involved in the project to repair the Phase 5 subfloor. Resource worked at The Metropolitan from late January 2020 or early February through April 2020, three to seven days a week.

**E. The Travelers Policy**

On March 31, 2018, Travelers issued a Construction PAK—Commercial Inland Marine Policy QT-660-7E077026-TIL-18, for policy period March 31, 2018 to September 30, 2018 (the "Policy") to Bomasada Birmingham Nationwide, LLC; Bomasada Birmingham Metropolitan, LLC; Bomasada BHM Construction, LLC; and Bomasada Group, Inc. (collectively,"Bomasada").

14

The Policy contains Builders' Risk and property coverage parts related to the construction of The Metropolitan apartments located at 2900 7th Ave South, Birmingham, AL 35223 (the "Project"). Subject to the Policy's definitions, terms, and conditions, the Policy includes a $35,000,000 Covered Property Limit of Insurance; a $5,000,000 limit under the Builders' Risk Special Time Element coverage; and a coverage extension of $100,000 of additional soft costs.

The Policy's insuring agreement provides:

Throughout this policy, the words "you" and "your" refer to the Named Insured shown in the Declarations.
. . .

**A. COVERAGE**
We will pay for direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss.

**1. Covered Property**
Covered Property, as used in this Coverage Form, means the following types of property you own or for which you are legally liable, the value of which is included in the estimated "total project value" shown in the Declarations:

**a. Permanent Works**
Materials, equipment, machinery, supplies and property of a similar nature that will become a permanent part of the project described in the Declarations during completion of such project or that will be used or expended in the completion of such project. Completion of the project includes site preparation (including demolition of existing buildings or structures), fabrication, assembly, installation, erection, alteration, renovation and similar construction activities.

**b. Temporary Works**

Cofferdams, construction forms, cribbing, falsework, hoarding, scaffolds, fencing, signs, office trailers (and their "contents") and similar temporary buildings or structures incidental to completion of the project described in the Declarations.
. . .
**3. Covered Causes of Loss**

15

Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is excluded in Section B – EXCLUSIONS.
Section E of the Policy addresses Additional Named Insureds identified in contracts or written agreements executed prior to any loss:

**1. Additional Named Insured**
The following persons or organizations are included as Additional Named Insureds
when you have agreed in a written contract or written agreement, executed prior to
loss, to name such persons or organizations as an Additional Named Insured, but only to the extent of their financial interest in the Covered Property.

**a.** Owners of Covered Property;
**b.** Mortgagees or loss payees;
**c.** Contractors, sub constructors and sub-sub contractors; and
**d.** Lessors or lessees.

 The Policy includes exclusions to coverage, including the following:

**4**. We will not pay for loss or damage caused by or resulting from faulty, inadequate or defective:

**a.** Planning, zoning, development, surveying, siting;

**b.** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading or compaction;

**c.** Materials used in repair, construction, renovation, remodeling, grading or compaction; or

**d.** Maintenance; of part or all of any property on or off the job site described in the Declarations.

The Builders' Risk Special Time Element Coverage Form addresses "Business Income," "Rental Value," and "Soft Costs" as follows:

**A. COVERAGE**

Covered Property as used throughout this Coverage Form means property that is Covered Property under the CONSTRUCTION PAK BUILDERS' RISK COVERAGE FORM.

The following Special Time Element Coverages apply when indicated by an 'X' in the Declarations for the applicable project.

16

**1. "Business Income"**

We will pay the actual loss of "business income" you sustain due to the partial or complete:

**a.** Cessation of your business activities; or
**b.** Delay in start up of your business activities;

during the "post-loss period of repair or construction". Such cessation or delay must be caused by or result from direct physical loss of or damage to Covered Property by a Covered Cause of Loss.

**2. "Rental Value"**

We will pay the actual loss of "rental value" you sustain due to the partial or complete:

**a.** Cessation of your business activities; or
**b.** Delay in start up of your business activities;

during the "post-loss period of repair or construction". Such cessation or delay must be caused by direct physical loss of or damage to Covered Property by a Covered Cause of Loss.

**3. "Soft Costs"**

We will pay your "soft costs" during the "period of delay in completion". Such "soft costs" must result from direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss which delays the completion of the applicable project described in the Declarations beyond the "planned completion date". The Soft Costs Limit of Insurance shown in the Declarations is the most we will pay in any one occurrence under this Coverage Extension.

The Policy's Builders' Risk Special Time Element Coverage Form includes the

following definitions pertinent to "Business Income," "Rental Value," and "Soft Costs"

coverage:

1. "Business Income" means the sum of:

**a.** The net profit or loss (before income taxes) from the operation or use of the applicable project for its intended purpose; and

17

**b.** The continuing normal operating expenses, including payroll, of the operation or use of the applicable project for its intended purpose; less your "rental value".

2. **"Post-loss period of repair or construction"** means the period of time after direct physical loss of or damage to Covered Property by a Covered Cause of Loss that:

**a.** With respect to Covered Property not operating or in use for its intended purpose at the time of such loss or damage:

(1) Begins with the "planned completion date" or after any applicable Waiting Period shown in the Declarations from the "planned completion date", whichever is later; and

(2) Ends on the date when Covered Property should be completed using reasonable speed and similar quality.

**b.** With respect to Covered Property operating or in use for its intended purpose at the time of such loss or damage:

(1) Begins immediately or after any applicable Waiting Period shown in the Declarations whichever is later; and

(2) Ends on the earlier of:

(a) The date when such property should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

(b) The date when business is resumed at a new permanent job . . .

**3.** "Rental value" means the sum of:

**a.** The total rental income from the tenant occupancy of the applicable completed project, as furnished and equipped by you;

**b.** The amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be your obligations; and

**c.** The fair rental value of any portion of the applicable completed project which would have been occupied by you.

The Policy provides the following "Duties In the Event Of Loss":

**C. Duties In The Event Of Loss Or Damage**

18

You must see that the following are done in the event of loss or damage to Covered Property:
. . .
**2.** Give us prompt notice of the loss or damage. Include a description of the property involved.

**3.** As soon as possible, give us a description of how, when and where the loss or damage occurred.

**4.** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

**5.** You will not, except at your own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent.

**6.** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

  Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**7.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**8.** Send us a signed, sworn proof of loss containing the information we request to settle the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**9.** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or suit.

**10.** Cooperate with us in the investigation or settlement of the claim.
. . .

**3. Duties in the Event of Loss**

19

The following duties are added to the Duties in The Event of Loss CONDITION in the COMMERCIAL INLAND MARINE CONDITIONS

You must see that the following are done in the event of loss:

**a.** You must make every effort to meet the applicable "planned completion date".

This includes:

**(1)** Resuming, as soon as possible, all or any part of the construction or repair; . . ..
. . .
If you do not resume the operation or use of Covered Property as quickly as possible or make every effort to meet the applicable "planned completion date", we will only pay the amount of loss we would have otherwise paid if you had complied with the above conditions.


Coverage under the policy is subject to the following general conditions:

**GENERAL CONDITIONS**

**A. Concealment, Misrepresentation Or Fraud**

This Coverage Part is void in any case of fraud, intentional concealment or misrepresentation of a material fact, by you or any other insured, at any time, concerning:

1. This Coverage Part;

2. The Covered Property;

3. Your interest in the Covered Property; or

4. A claim under this Coverage Part.
. . .
**C. Legal Action Against Us**

No one may bring a legal action against us under this Coverage Part unless:

1. There has been full compliance with all the terms of this Coverage Part; . . ..

20

(Insurance Policy, Ex. 4).

The Policy provides certain additional coverages for "Debris Removal" and "Pollutant Clean Up and Removal" from specified causes of loss, which include fire, smoke, soot, and leakage from fire extinguishing equipment. However, Travelers states that Maxus has not made a claim in this lawsuit for Additional Coverage. The CONSTRUCTION PAK – BUILDERS' RISK SPECIAL TIME ELEMENT COVERAGE provides Business Income, Rental Value, and Soft Costs up to a $5 million limit. There is a Coverage Extension for Soft Costs up to an additional $100,000.

To date, Travelers has made payments totaling $6,168,425.69 for the initial fire damages sustained to The Metropolitan as a direct result of the September 27, 2018 fire. To date, Travelers has also made payments of $780,600.67 under the Builders' Risk and/or Builders' Risk Special Time Element Coverages of the Policy for losses incurred as a direct result of the September 27, 2018 fire, which includes $415,379.92 in Phase 5 and Phase 6 "rental value" losses. The Policy allows the parties to request an appraisal if there is a disagreement on the amount of loss. Travelers denies that Maxus made a demand for appraisal under the contract. The other three buildings did not burn, but Maxus claims that the buildings have been contaminated by char and soot residue produced by the fire. Maxus claims that Travelers' policy which remediation of soot and char from the fire. Maxus seeks coverage under the suit for remediation costs and has sued for Breach of Contract and Vexatious Refusal to Pay. Travelers has denied payment because it argues that soot and char did not reach the other buildings. The disagreement is whether soot and char are present at the apartment complex and their

source. Maxus submits that soot and char have been found, Travelers claims that any soot and char at the complex resulted from background contamination from the neighborhood and not from the fire.

## II. STANDARDS

### A. Summary Judgment Standard

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the moving party meets this requirement, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. 242, 248 (1986). In Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Court emphasized that the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts" in order to establish a genuine issue of fact sufficient to warrant trial. In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. Matsushia, 475 U.S. 574, 588; Tyler v. Harper, 744 F.2d 653, 655 (8th Cir. 1984).

22

## III. DISCUSSION

### A. Did Maxus' Alleged Concealment Void the Policy or Breach the Cooperation Provision of the Policy?

#### 1. Phase 5 Water Damage

Travelers states that Maxus had an obligation to inform them that the Phase 5 sub-floor had suffered significant damage when a sprinkler line was cut on April 10, 2019 and that this damage was not related to the September 27, 2018 fire and it did not occur during Travelers' policy period. Instead on May 1, 2019, Travelers states that Maxus submitted the Phase 5 sub-floor claim to Travelers and omitted any mention of the water damage caused by the sprinkler line cut. The May 1, 2019 letter reads in part: "[t]here is also extensive water damage to the flooring in the Phase - 5 building that we believe will require replacement of most of the flooring in place at the time of the fire. This is a frustrating move backwards for us, but one that cannot be prevented unfortunately." (Ex. 84-27, p. 2). Travelers states that Maxus cannot argue that this was a mistake or unintentional because the May 1, 2019 letter went through several drafts, multiple edits and was reviewed by at least four different people before it was submitted to Travelers. Travelers argues that Maxus' conduct in failing to inform them of the sprinkler line rupture is exactly the type of the conduct that the policy conditions were designed to prevent. Travelers states that due to Maxus' failure to provide information about the rupture, Travelers was unable to observe the damage and perform its own inspection and determination as to whether the damage was new or additional fire damage.

In opposition, Maxus states that large amounts of water were sprayed on the Phase 5 building to prevent it from catching fire. Traveler's own expert, Kurt Mulder

stated in his report: "It stands to reason, that Building 5 was inundated with water from hoses by the fire department during the firefighting activities to prevent Building 5 from catching fire. . . .Therefore, the inundation of the structure of Building 5 with water, in combination with the reported holes burned in the roofing by embers, that a large amount of water should be expected to have intruded into the interior of Building 5." (Mulder Report, ¶ 38). Additionally, the ATC Group Services LLC visited the site on December 18, 2018 and in its report identified "extensive water intrusion and fire affected areas in the Phase 5 Building." Maxus states that the sprinkler line did not cause any additional damage beyond that previously caused by the fire-fighting efforts and any damage was collateral and did not affect the cost of repair. Maxus' expert, Thomas Irmiter viewed the Phase 5 flooring on April 24, 2019, and observed that there was pre-existing damage that was too extensive to have been caused by the sprinkler line being cut two weeks earlier.

In reply, Travelers states that Maxus intentionally concealed the sprinkler rupture even though it had an obligation to inform Travelers of the rupture. Travelers states that Maxus remained silent and accepted a supplemental payment from Travelers which included replacement of the entire Phase 5 subfloor under the guise that it was related to the fire.

Travelers states that under Missouri law, "a misrepresentation as to a portion of the loss may void coverage to the entire claim." Liberty Mut. Fire Ins. Co. v. Scott, 486 F.3d 418, 423 (8th Cir. 2007)(quoting Childers v. State Farm Fire & Cas. Co., 799 S.W.2d 138, 141 (Mo.App. 1990)). To demonstrate materiality, "the standard is whether the alleged misrepresentation or concealment would have influenced a reasonably

careful insurance company in deciding whether to accept the risk, and whether an insurer would have relied on such a representation." Federated Mut. Ins. Co. v. Peery's Auto Parts, L.L.C., No. 11-00172-CV-W-FJG, 2012 WL 828312 at *7 (W.D.Mo. Mar. 7, 2012). Additionally, Travelers argues that an insured's failure to comply with a cooperation clause supports an insurer's refusal to provide coverage when the insurer can show "(1) the insured materially breached the cooperation clause; (2) the insurer was substantially prejudiced as a result of the insured's breach; and (3) the insurer exercised reasonable diligence to secure the insured's cooperation." Church Mut. Ins. Co. v. Metro. Christian Worship Ctr. of St. Louis, No. 4:19-CV-00903-MTS, 2020 WL 6075638 at *4 (E.D.Mo. Oct. 15, 2020) quoting Columbia Cas. Co. v. HIAR Holding, LLC, 411 S.W.3d 258, 272 (Mo. 2013)(en banc).

The Court finds that there are disputed factual issues related to the Phase 5 water damage claim. Travelers was aware that there had been extensive water damage to subflooring of Phase 5 as a result of the copious amounts of water directed at the building during the efforts to prevent the building from catching fire. But what is not clear is whether a determination had been made that all of the subflooring would have to have been replaced as a result of the damage from the firefighting efforts before the sprinkler line ruptured. Travelers states that it should have been informed of the sprinkler line cut. Maxus states that the sprinkler line cut did not cause any additional damage and did not have any effect upon the claim. Because there are disputed issues of fact regarding this issue, the Court finds that summary judgment in not appropriate on this claim.

### 2. Soot and Char Testing

Travelers states that Maxus conducted soot and chart sampling on May 30, 2019 and did not provide Travelers notice of the inspection, despite being requested to do so. Travelers states that it was forever deprived of the opportunity to observe FBS's collection methods, sampling locations on the surfaces and interstitial wall cavities, collection techniques and chain of custody protocols. Travelers states that it was also deprived of the ability to collect samples in those same locations in order to compare results. Travelers alleges that Maxus also concealed soot and char testing results and that this demonstrates an ongoing pattern of intentional conduct. Travelers alleges Maxus concealed the identities of three laboratories that conducted testing at The Metropolitan: 1) the SELC Lab in April 2019; 2) MicroVision Lab in June 2019 and 3) Environmental Analysis Associates in March 2021. Additionally, Travelers states that there were twenty samples that FBS took from The Metropolitan on September 30 and Maxus has provided no information on the whereabouts of those twenty samples or whether any testing results were obtained. Travelers argues that the intentional concealment of these results and the identities of the testing entities is violative of the policy.

In opposition, Maxus argues that on May 1, 2019, it informed Travelers that soot and char had been identified, but Travelers did not respond to this letter. On May 28, 2019, Maxus informed Travelers:

> We understand that you now know we have engaged The Howarth Group, Inc. to assist with this claim and that an environmental hygienist also has been engaged to determine the nature and extent of any environmental issues that potentially exist on the property due to the significant amount of soot and smoke arising from the fire. They have already inspected the property and their work is underway, but Travelers is welcome to send its

26

own experts to reinspect the property at a reasonable time. Please let us know if you would like to schedule this inspection, and we will do our best to accommodate you.

(Doc. 106-26). Maxus states that Travelers' expert, Chris Spicer visited the property on June 13, 2019 and Travelers had the opportunity to make its own observations, its own decisions about the fire's impact and choices regarding where samples should be collected. Thus, Maxus states that it cooperated with Travelers.

On June 7, 2019, Maxus provided Travelers with a report from FBS which found fire related contamination in the complex. Maxus states that with regard to the other labs that conducted testing, BCCM, not Maxus engaged Safety Environmental Laboratories and Consulting, Inc. ("SELC"). Maxus states that it was not involved in this investigation, SELC was not hired by Maxus and never provided a report to Maxus. With regard to the MicroVision report, Maxus states that the data is listed in the addendum to Irmiter's Rule 26 report that was provided to Travelers in October 2020. Maxus states that the MicroVision data shows that soot and char from the fire was found at The Metropolitan. With regard to the supposedly missing samples, Maxus states that on September 30, 2019, FBS gathered duplicate samples at each location selected by Travelers' expert – Chris Spicer. The samples were collected side-by-side and were within 1 inch of each other. One set from each location was sent for further analysis. The other samples from the same locations were held in case further analysis would later be required. However, there was never any reason to perform additional testing, so Maxus states that these samples were never analyzed. FBS states that it currently has possession of these samples. With regard to the to the data from Environmental Analysis Associates, Inc., Maxus states that the data is listed in Irmiter's October 5,

2020 Rule 26 report and was later provided to Travelers. Maxus states that this data analyzes the only samples that were evaluated from the September 30, 2019 sampling event and there is no basis for Travelers' claim that Maxus has hidden data. Additionally, Maxus states that there is no evidence to support Travelers' argument that there was any concealment or that its actions were intentional. Maxus states that the citations to the testimony of David Johnson are not an admission of concealment or materiality of data, but rather show that his direction to the company was to share and provide information with Travelers.

Similar to the Phase 5 water damage claim, the Court finds that there are disputed facts which preclude the granting of summary judgment on the lack of cooperation and concealment of the Soot and Char testing results. Travelers argues that on May 13, 2019, it requested permission to inspect the buildings at the same time as Maxus' soot damage inspector. (Doc. . 84-28, p.4). Travelers also requested the name of the company conducting the testing. On May 28, 2019, Maxus informed Travelers that it was free to have its own expert on site to inspect the property, but it is unclear whether Maxus communicated that its expert would be visiting the property on May 30, 2019 and whether Maxus offered Travelers the opportunity to participate or follow along on that date. Travelers expert – Chris Spicer visited the property on June 13, 2019 and also on September 30, 2019 when he conducted his own sampling. Additionally, Maxus expert – Irmiter provided a report from his May 30, 2019 visit.  The report was provided to Travelers on the same day that Maxus received it – November 13, 2019. Travelers claims that it was not given a report of testing conducted by MicroVision on June 21, 2019. Maxus states that this data was listed in an addendum to

Irmiter's Rule 26 Report. But Maxus does not explain why this report was not provided to Travelers earlier. Travelers however acknowledges in its reply suggestions that on November 13, 2019, Maxus did provide EMSL Analytical Inc.'s June 17, 2019 sampling report and FBS's November 13, 2019 supplemental sampling report. It is clear from the parties' briefing that there were several soot and char samples taken of the buildings at The Metropolitan at different times by different companies and which yielded results about which the experts disagree. Some results were shared with Travelers shortly after they were prepared and some results were provided at a later time, but the Court finds that there the facts do not show that Maxus either failed to cooperate in scheduling the FBS soot/char testing nor did Maxus intentionally conceal the soot/char testing results. Accordingly, Travelers' Motion for Summary Judgment based on Maxus alleged concealment and failure to cooperate is hereby **DENIED**.

**B. Breach of Contract Claim**

Travelers argues that Maxus is claiming that it has suffered damages under the policy due to the presence of soot and char which infiltrated all Phases of The Metropolitan as a result of the fire. However, Travelers states that Maxus' experts' opinions regarding the cause of the damages are inadmissible. Thus, Travelers argues that Maxus cannot prove that the disputed damages were caused by a covered cause of loss occurring within the policy period. Travelers argues that it has proffered its own experts' opinions showing that soot and char were not present in the other phases of The Metropolitan as a result of the fire, but rather were caused by excluded causes of loss. In opposition, Maxus states that the policy provides coverage. Maxus states that Travelers issued a policy which covers remediation of soot and char from the fire that

occurred. The policy covers "direct physical loss of or damage to covered property caused by or resulting from a covered cause of loss." A "covered cause of loss" is any risk of direct physical loss, unless specifically excluded by the Policy. The Policy provides certain additional coverages for "Debris Removal" and "Pollutant Clean Up and Removal" from specified causes of loss, which include fire, smoke, soot, and leakage from fire extinguishing equipment.  "Pollutant" is also defined to include "smoke" and "soot." Maxus states that its expert reports establish the data and scientific conclusions that show there is soot and char at the complex. Irmiter's addendum to his report shows that FBS relied on data from NG Carlson Analytical, Inc. MicroVision and EMSL.

Travelers moves for summary judgment on the Breach of Contract claim, arguing that Maxus cannot show soot and char damages in the other phases of the apartment complex because all of its experts opinions are inadmissible. The Court has issued a separate ruling on the Motion to Exclude Maxus' experts. As detailed in that Order, the Court has excluded some of Irmiter's opinions, but has denied the remainder of Travelers' Motions to Exclude Maxus' experts.  Accordingly, because there are disputed issues of fact related to whether soot and char were found in the other phases of The Metropolitan, the Court hereby **DENIES** Travelers' Motion for Summary Judgment on the Breach of Contract claim.

## C. Entitlement to Soft Costs

Travelers states that only the named insured listed on the policy is entitled to recover soft costs. Travelers states that the owner of the Covered Property is an Additional Named Insured "but only to the extent of their financial interest in the

Covered Property." Travelers states that Maxus is the owner of The Metropolitan, and is an Additional Named Insured, but was not a Named Insured on the Declarations page.

In opposition, Maxus states that Travelers appears to be referring to the $100,000 of softs costs provided in the "Coverage Extension." However, Maxus states that this is not the only section of the Policy that provides for soft costs. Maxus states that the CONSTRUCTION PAK – BUILDERS' RISK SPECIAL TIME ELEMENT COVERAGE provides Business Income, Rental Value, and Soft Cots up to a $5 million limit. There is also a "Coverage Extension" that provides for Soft Costs up to an additional $100,000. Maxus states that Travelers has failed to preserve it right to argue that this section of the policy does not provide coverage. Maxus states that an insurer must plead exclusions as affirmative defenses and failure to do so may waive or prohibit an insurer from asserting defenses which may otherwise be available. Maxus states that an insurer can waive or be estopped from denying coverage based on positions taken during its handling of the insurance claim. Maxus states that Travelers never raised an affirmative defense that it was not entitled to soft costs (under any portion of the Policy). Thus, Maxus states Travelers has waived this defense. Additionally, Maxus states that Travelers has already paid $415,379.92 for lost rents under the Time Element Coverage. Maxus states that this decision to pay for lost rental income is contrary to its current position that Maxus, as an Additional Named Insured, only has an insurable financial interest in the physical covered property. Thus, Maxus states that it is entitled to the $5 million in coverage afforded under the Special Time Element Coverage, which includes soft costs. Additionally, Maxus argues that it may recover soft costs under the coverage extension. Maxus states the under the terms of the Construction Completion

31

Agreement, it was added as a "named insured" to the Policy. Based on the parties' clear intent, the Policy was procured by Bomasada for the mutual benefit of Maxus, including all coverages and privileges afforded by the policy. Maxus states that Travelers focuses on the Additional Conditions provision which states that Maxus, as an additional named insured, is covered "only to the extent of their financial interest in the Covered Property." But Maxus states that this provision is nothing more than a restatement of the basic premise of indemnity that entitles Maxus to "full, but not more than full, value for the loss suffered" and "to be made whole but not be put in a better position than before the loss." In re State Fire & Cas. Co., 872 F.3d 567, 573 (8th Cir. 2017). Maxus states that this is not a limitation on coverage. Additionally, Maxus states that the policy is, at best, ambiguous regarding its entitlement to soft costs. If the contract is ambiguous, Maxus states that the policy language is construed against the insurer in favor of coverage. Travelers failed to respond to any of Maxus' arguments regarding soft costs or questions about ambiguity regarding the different provisions of the policy. Therefore, the court finds that Travelers is not entitled to summary judgment on Maxus' claim for Soft Costs.

**D. Whether Maxus' Damages Were Caused by an Excluded Cause of Loss**

Travelers states that reports obtained from the architect for The Metropolitan evidence a pattern of faulty, inadequate and defective workmanship and construction which resulted in damage to The Metropolitan prior to the fire. Travelers states that because Maxus' damages occurred as a result of the defective and inadequate workmanship, Maxus' damages are excluded. In opposition, Maxus states that Travelers contends that Maxus' damages are excluded under the policy without any

factual support. Maxus states that policy exclusions are strictly construed against the insurer in favor of coverage. Maher Bros., Inc. v. Quinn Pork, LLC, 512 S.W.3d 851,857 (Mo.App. 2017).  Where an insurer "seeks to escape coverage based on a policy exclusion, it has the burden of proving facts that make the exclusion applicable." Powell v. State Farm Mut. Auto Ins. Co., 173 S.W.3d 685, 689 (Mo. 2005). Maxus states that it has not sought coverage for any damage arising from faulty, inadequate or defective workmanship. Maxus states that any damages caused by these issues are *not* part of Maxus' insurance claim against Travelers. Maxus states that because Travelers has not shown that any exclusion applies, summary judgment on this point must be denied. The Court notes that Travelers did not file any response to Maxus' arguments in opposition. Accordingly, because Travelers has failed to carry its burden to show that this exclusion applies, the Court hereby **DENIES** Travelers' Motion for Summary Judgment on this point.

## E. Vexatious Refusal Claim

Travelers argues that it is entitled to summary judgment on Maxus' claim for vexatious refusal to pay.  In order to establish a claim for vexatious refusal to pay, Travelers states that Maxus has to prove: "(1) it had an insurance policy with the insurer; (2) the insured refused to pay; and (3) the insurer's refusal to pay was without reasonable cause or excuse." Macheca Transp. v.  Philadelphia Indem. Ins. Co., 649 F.3d 661, 674 (8th Cir. 2011).  Travelers argues first, the policy does not provide coverage and second, Travelers' refusal to pay Maxus' additional claimed damages was reasonable and justified.  Travelers states that the evidence is undisputed that once Maxus notified Travelers that it had discovered evidence of soot and char damage,

33

Travelers undertook a series of investigative actions to determine if there was any basis for this claim. Travelers states that it reasonably relied on the report of its expert Chris Spicer.  In opposition Maxus states that a jury could find that Travelers' decision not to pay the soot and char portion of the claim on the basis that the soot and char was not the result of the fire was unreasonable, regardless of any expert testimony. Additionally, Maxus states that Travelers has neglected other portions of the claim (other than the soot and char issues) that are owed and Travelers has failed and refused to pay for months or even years. Maxus states that it provided Travelers evidence of lost rental value, as well as additional property damage costs, but nothing was ever paid on those portions of the claim.  Additionally, Travelers' refusal to participate in the appraisal process after Maxus invoked it under the language of the Policy is further evidence of vexatious behavior.  Maxus states that Travelers had no legitimate justification for denying Maxus the right to an appraisal and its refusal to permit the appraisal caused unnecessary delays in payment. Maxus states "[g]enerally, whether an insurer acted reasonably is a question of fact for the jury, and thus is improper for a court to determine in granting summary judgment." Welsh v. Nationwide Affinity Ins. Co. of Am., No. 17-CV-00090-CV-W-GAF, 2017 WL 7037744 (W.D.Mo. Dec. 6, 2017) (quoting May & May Trucking, L.L.C. v. Progressive N.W. Ins. Co., 429 S.W.3d 511, 516 (Mo.Ct. App. 2014). Maxus states that Travelers has chosen to deny the soot and char portion of the claim based on its experts' determination that the soot and char did not result from the fire event, but instead came from the environmental background levels of soot typical for Birmingham, Alabama. Maxus states that Travelers has refused to consider and ignored the competing and more logical view that the soot

34

and char at The Metropolitan resulted from the massive fire that burned for hours and required 40 to 50 firefighters to put out. Maxus argues that Travelers failure to consider all of the facts supports its claim of vexatious refusal. In reply, Travelers states that the dispute in this case regarding the clause of claimed additional damages to Maxus' property creates an open question of fact, which Travelers is entitled to a judicial determination of without exposure to penalty for vexatious refusal.  However, the Court finds, just as there are disputed issues of fact regarding the claims for the soot and char damages, there are also disputed facts surrounding Travelers refusal to pay for these damages and whether that refusal was reasonable. These facts prevent the entry of summary judgment for Travelers on the vexatious refusal claim.  Accordingly, the Court hereby **DENIES** Travelers Motion for Summary Judgment on the vexatious refusal to pay claim.

## IV. CONCLUSION

Accordingly, for the reasons stated above, the Court hereby **DENIES** Travelers' Motion for Summary Judgment (Doc. #  83).

Date: March 28, 2022                                   **S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri                                  Fernando J. Gaitan, Jr.
                                                        United States District Judge

35