```
 1            IN THE UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF MISSOURI
 2                   WESTERN DIVISION

 3  MAXUS METROPOLITAN, LLC,        )
                                    )
 4                   Plaintiff,     ) No. 20-cv-00095-FJG
             vs.                    )
 5                                  )
    TRAVELERS PROPERTY CASUALTY     ) July 27, 2023
 6  COMPANY OF AMERICA,             )
                     Defendant.     )
 7

 8            ............................
          TRANSCRIPT OF JURY TRIAL - VOLUME 3 OF 8
 9     BEFORE THE HONORABLE FERNANDO J. GAITAN, JR.
           UNITED STATES DISTRICT COURT JUDGE
10

11     Proceedings recorded by electronic stenography
              Transcript produced by computer
12

13                   APPEARANCES

14  For the Plaintiff:      MR. MICHAEL J. ABRAMS
                            MS. ALANA McMULLIN
15                          MS. KIMBERLY K. WINTER
                            Lathrop GPM LLP
16                          2345 Grand Avenue, Suite 2200
                            Kansas City, Missouri 64108
17
    For the Defendant:      MR. BRENEN G. ELY
18                          MS. LAUREN A. WIGGINS
                            Ely & Isenberg, LLC
19                          3500 Blue Lake Drive, Suite 345
                            Birmingham, Alabama 35243
20
                            MR. DANIEL EDWARD HAMANN
21                          Deacy & Deacy, LLP
                            9233 Ward Parkway, Suite 370
22                          Kansas City, Missouri 64114

23          Gayle M. Wambolt, RMR, CRR
           U.S. Court Reporter, Room 7552
24      Charles Evans Whittaker Courthouse
            400 East Ninth Street
25      Kansas City, MO 64106 (816) 512-5641
                        350
```

```
1                          INDEX
                        JURY TRIAL
2                      JULY 27, 2023

3   EVENT                                        PAGE

4   Proceedings in Courtroom                      352

5                   CHRONOLOGICAL INDEX

6   PLAINTIFF'S WITNESSES:

7                          DIR  CROSS  RDIR  RCRS

8   THOMAS IRMITER          353   431

9   DAVID JOHNSON           441   467   489

10  MICHELLE PIENTA         491   509   515   516

11  JOHN ALEXANDER STEHL    517   534   565

12

13

14

15

16

17

18

19

20

21

22

23

24

25                         351
```

THURSDAY, JULY 27, 2023

2      (The following proceedings were had out of the presence of the

3      jury:)

4                  THE COURT:  Christy's talked to you about Friday,

5      correct?

6                  MR. ELY:  Yes, sir.

7                  THE COURT:  Any problems with that?

8                  MR. ELY:  No.

9                  MR. ABRAMS:  Your Honor, counsel, we spoke.

10     Plaintiffs have -- well, with -- including Mr. Irmiter, a

11     total of five witnesses between now and Friday.  We're taking

12     one out of turn.  So we think that probably takes us to around

13     when you want to stop tomorrow.  Maybe it's a little early,

14     and then --

15                 THE COURT:  Early is good.

16                 MR. ABRAMS:  Well, we didn't want you to be upset

17     and think we're wasting the court's time.  Then defendant will

18     be ready to go Monday.  So we think the timing is working out

19     about right.  And given who we think is coming, we think --

20     what did we say?  We do think we can end it around Wednesday.

21                 MR. ELY:  You had asked for eight days, and we're

22     trying to stay on that.

23                 THE COURT:  I appreciate that.

24                 MR. ELY:  It looks like we can get our rebuttal

25     finished in that time and get it to the jury.

                                      352

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

```
 1              THE COURT:  All right.  The instruction that I
 2    haven't been reading religiously, I won't read, but I'm going
 3    to have it posted in the jury room also.  And I'm going to
 4    tell the jurors if there's any question about what that
 5    instruction says, you'll have a chance to read it on your own
 6    as well.  Just wanted to let you know about that too.
 7              Any questions?
 8              MR. ABRAMS:  Your Honor, you're -- we intend to have
 9    some kind of conference with you regarding the instructions.
10              THE COURT:  Oh, I'm not talking about -- I'm just
11    talking about the instruction on not talking about the case.
12              MR. ELY:  The one he reads every day.
13              THE COURT:  I don't want to read it at every break.
14    I want them if somebody says, Well, did he say this, to have
15    the ability to see what it says.
16              MR. ELY:  That's great.
17              MR. ABRAMS:  Very good.  Thank you, Your Honor.
18              MR. ELY:  Thank you.
19              (The following proceedings were had in the presence
20    of the jury:)
21    THOMAS IRMITER, previously being sworn, resumed the stand:
22    CROSS-EXAMINATION (continued) BY MR. ELY:
23    Q    Morning, Mr. Irmiter.
24    A    Good morning.
25    Q    Good to see you back.
```

353

```
 1              I'm going to touch on a couple of things that --
 2   from yesterday, and I'm going to try very, very hard to go off
 3   memory so that I don't be repetitive.  So forgive me if I do.
 4              MR. ELY:  The first thing I want to do -- can we
 5   pull up the Defendant's 33, RES377417 underscore 001774.
 6   Q    (BY MR. ELY) While we're waiting, yesterday I believe we
 7   had a discussion -- we ended our day yesterday talking about
 8   the two theories of -- your two opinions with regard to the
 9   water damage in the doughnut building from the fire.  I think
10   we were talking about the water cannon theory that has been in
11   your expert reports, and we also talked about the -- touched
12   on the fire ember issues.
13              So you mentioned in response to that about the fire
14   hoses, you said that there was a photograph that you had
15   referred to showing the -- showing the fire -- the fire
16   streams from the firetrucks on phase 1 through 4.
17              And I'm going to direct you to your video screen.
18   Is that the photograph you're referring to?
19   A    That's one of them, yes, that shows the top of the roof
20   here.  What I was commenting on yesterday is that the top of
21   where the hose is, was generally about 10 feet above the
22   roofs.  That's what I was commenting on.
23   Q    Okay.  And so with regard to this photograph, what does
24   it depict in terms of the firefighting efforts?  Do you know?
25   A    Yeah.  What's happening right now, there's no active
```

                                  354

1    spray.  There's water just cascading down here.  So at this
2    point in this video, the four-hour video, it's basically just
3    showing it in inactive position.
4    Q    For all of our purposes, this is not the streams you're
5    talking about, what's depicted here?  This is -- it looks like
6    a pressurized stream; is that right?
7    A    Exactly.
8    Q    While I've got this photograph up, I believe early in
9    your testimony yesterday, you explained to the jury that there
10   were buildings in between phase 6 and phases 1 through -- or
11   the doughnut building, correct?
12   A    Yes.
13   Q    My recollection is, is that you said that the building
14   burned -- the building that burned down between the phase 6
15   and the doughnut building was -- I think you said it was 10
16   feet from the doughnut building?
17   A    No, I did not.
18   Q    You didn't?
19   A    No.  I said there's a building here that's 10 feet, but
20   the one -- this did not burn down.  I said there was a
21   building within 10 feet.  Again, I may -- I didn't --
22   certainly don't want to mislead anybody.  The building that
23   burned down is here.
24   Q    Right.  I wanted to make sure I was clear, and that
25   makes perfect sense to me.
                              355

Case 4:20-cv-00095-FJG   Document 243   Filed 09/05/23   Page 6 of 221

```
 1              Just so we can orient everyone, the -- this picture
 2    depicts that that -- I'll call it a residential building.
 3    A     Yeah.
 4    Q     There were three residential buildings in between,
 5    correct?
 6    A     Yes.
 7    Q     And this shows the residential building closest to phase
 8    6 involved in the fire?
 9    A     Yes.
10    Q     And this other residential building on the left, that
11    building did not burn down?
12    A     Correct.
13    Q     Okay.  Thank you.
14              So let's move on to Exhibit 257.  Let's go to page
15    4,109, please, Defendant's Exhibit 257.
16              While we're waiting, to kind of sum up what we
17    touched on yesterday was, you were -- you were also
18    functioning as evaluating the construction defect aspect of
19    the Metropolitan?
20    A     Yes.
21    Q     Okay.  And you, along with Mr. Hixson and Mr. Garrels,
22    issued an expert report?
23    A     Yes.
24    Q     Did you all quantify the damages?
25    A     Yes.
```

356

```
 1   Q    Is this on the screen, which is -- is this a summary of
 2   the damages that -- on pages -- Exhibit 257, page 4,109, is
 3   that a summary of the damages you provided Maxus associated
 4   with construction defect?
 5   A    Yes.  So this number here added to the number that we
 6   talked about yesterday of $28 million, would be the total
 7   amount invested or had -- that Maxus paid out to get this
 8   property up and running.
 9   Q    So we've got the 28 million you and Mr. Abrams talked
10   about yesterday?
11   A    Yep.
12   Q    I've got 17.4 here.
13   A    Yep.
14   Q    In excess of 45 million?
15   A    Yes, absolutely.
16   Q    Okay.  Mr. Irmiter, do you know how much the building --
17   how much Bomasada anticipated -- it anticipated would cost
18   them to build this from a vacant lot?
19   A    Probably less than that, but new construction is always
20   less than reconstruction.  New construction, you're starting
21   up.  Reconstruction, you have to deconstruct and then
22   reconstruct.  So it's always more expensive.
23   Q    Okay.  Just so I'm clear, it's your testimony that there
24   were $45 million in damages between the construction defect
25   and the fire damage to the doughnut building and phase 5?
```
                                357

```
 1    A    And phase 6.

 2    Q    And phase 6?

 3    A    And phase 6, yes.

 4    Q    And phase 6 was the one that burned to the ground; the

 5    rest of them were left standing in various conditions?

 6    A    Yes.

 7    Q    Okay.  So I want to touch on the water damage issues

 8    that you and Mr. Abrams talked about yesterday.

 9              MR. ELY:  So can you pull up Plaintiff's Exhibit 11,

10    page 34.  If you could zoom in on figure 32.

11    Q    (BY MR. ELY) Okay.  Can you tell us what this depicts?

12    And this is from -- just for frame of reference, this is from

13    your expert report?

14    A    Yes.

15    Q    Okay.

16    A    So what you're seeing here is material that's painted

17    white, and so this was part of that remediation on the

18    interior where we're spraying.  So there was insulation in

19    these areas that would have hidden all of this.  That

20    insulation was removed, and we showed representations of what

21    we were showing underneath the roof deck showing signs of

22    water damage.  This is later on.  So this remediation work had

23    already been done in these areas.

24              Now we're replacing the roof if you look at the

25    dates.  So in this location over the top of all of this was
```

                                   358

1  the OSB roof deck material that was damaged out to about here.

2  That has been removed, and we're basically looking at the

3  underlying damage to the framing.  And all of this was dry at

4  the time we opened it.

5  Q    Okay.  And that's a good point.  I appreciate you

6  bringing that up.  I want to touch back on that issue from

7  yesterday.

8         So I understand, your opinion is in differentiating

9  between the construction defect and the fire damage, your

10 opinion is that the fire damage is dry and friable.  I think

11 you said friable; you can grab it and it disintegrates?

12 A    That's the technical term, yes, for it.

13 Q    And anything that was related to construction defect,

14 that you equated to construction defect, would have been wet

15 at the time of your discovery?

16 A    Yes, and isolated.  That's the other key point is that

17 once we got all of the cladding off the entire building and we

18 could really look at the damaged map, the wet areas were

19 isolated below the corners of windows consistent with window

20 failure and at the intersections of the decks starting at the

21 very first deck on down.  So the floor of phase -- of the

22 fourth floor, third floor, second floor, those intersections.

23        Anything -- this area right up in here when we later

24 opened up this stucco, there was damage to that, but it was

25 dry at the time.  So, again, we easily differentiated between

                              359

```
 1   those two.
 2   Q    Okay.  And tell me about this photograph.  It's got a
 3   date of 3/24/20.  Do you know where it originated?
 4   A    We took it, FBS.
 5   Q    FBS took this photograph?
 6   A    Absolutely.
 7         MR. ELY:  Can you split screen for me, Chris, with
 8   Defendant's Exhibit 257, page 14.  Need to zoom out.  Next
 9   page, please.
10   Q    (BY MR. ELY) So, Mr. Irmiter, the image on the right, my
11   right, is taken from Defendant's Exhibit 257, which is the
12   expert report you all issued in the construction defect case.
13         Are these identical photographs between figure 32 on
14   the left from the fire damage opinion and figure 7 on the
15   right from the construction defect?
16   A    Yes.
17   Q    And can you read that last line on the right on figure 7
18   from your construction defect report?
19   A    The wood blocking, framing, and roof deck were wet at
20   the time of discovery, yes, in the location where this is
21   circled.
22   Q    Okay.
23   A    Right near the deficient flashing.
24   Q    Okay.
25   A    The area away from the flashing was dry.  So we have two
                               360
```

```
 1    types of damage occurring at the same location.

 2    Q    So you have dry -- what kind of -- you can see the spans

 3    here.  How -- what kind of distance are we looking at?

 4    A    In terms of this, the dry area?

 5    Q    Yes.  I'm just trying to get a sense of how -- is it 2

 6    feet, 3 feet?  What am I looking at?

 7    A    Yeah.  The wet area was probably less than 10 inches

 8    right at the flashing point, right at the flashing point.  The

 9    dry area started beyond that.  Two completely different causes

10    of loss in the same location.  We saw this all over the

11    building.

12    Q    So how do you -- it looks like it's the same material.

13    This is all connected, right?

14    A    No.  It's in the same location, but it's not connected

15    because this -- once the water -- once the holes in the roof

16    were patched and the source of the water affecting this

17    location stopped, this damage was still there underneath the

18    membrane.  It wasn't discovered until later, and it was dry.

19    It's related to the fire.

20         When we're opening this area here, very isolated

21    areas, it's wet.  It means it's actively leaking at the

22    flashing point.

23    Q    Okay.  What was causing the leak on the left?

24    A    On the left, defective construction.

25    Q    What specific defect was it?
```

361

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

1    A    Flashing.  The flashing was not installed correctly.

2    Q    Okay.  So it's your testimony that the water stopped at

3    that circle and then moved -- and to the right is all dry and

4    friable, so that would be related to the fire?

5    A    Yes.  Because if you take a look right here, there's --

6    on the edge of the flashing, there's what's called a kickout.

7    So it kicks out and diverts.  So it basically, like a dam,

8    keeps the water from running this direction and directed it

9    down the wall.

10   Q    Okay.  Let's go to Plaintiff's Exhibit 11, page 37,

11   please.

12         So I'm looking at figure 37 right now.

13   A    Yes.

14   Q    Can you tell me what I'm looking at here?  This is,

15   again -- and I don't want to move back and forth, but

16   Plaintiff's Exhibit 11 is your expert report in this case.

17   A    Yes.  This is an upper floor unit.  So what -- this is

18   an outside wall.  So some of that damage came down from the

19   roof leak, came down into some of the units and was not

20   discovered until we actually removed the carpeting, removed

21   the Sheetrock, and removed the trim materials.

22         So this whole area here was covered with carpeting.

23   Sheetrock came all the way down to here, and then over the top

24   of that Sheetrock was a piece of wood trim or baseboard

25   basically.  So all of that is concealed.

                                362

```
 1            There are a number of locations where we opened up

 2   similar types of damage, but it was wet.  And there were

 3   locations where it was dry.  So when we were finding it was

 4   dry, we then were going up to the roof in the same locations

 5   looking for patches and drawing that conclusion that this was

 6   more than likely associated with the fire damage, holes that

 7   were put into the membrane and water that ensued through those

 8   holes either during or after the fire before they were

 9   patched.

10   Q    Okay.  Let's take a look at Defendant's Exhibit 257,

11   page 47 on the split screen, please.

12            Again, Mr. Irmiter, this is your photo taken on

13   3/25?

14   A    Yes.

15   Q    Who actually took this photo; do you know?

16   A    It would have been Caleb or Frank.  Might have been

17   Kevin Steinke.

18   Q    Who is Caleb?

19   A    Caleb Garrels.

20   Q    Kevin Steinke?

21   A    Steinke, yes.

22   Q    Was Kevin an FBS employee?

23   A    He is, yes.

24   Q    What did he do for you?

25   A    He does field inspections.
```

363

1   Q   Okay.  So with respect to figure 37 on the left from the

2   firefighting -- or from the fire report, figure 79 on the

3   right, can you tell us what we're looking at and how those

4   compare?

5   A   So the one on the left on damage sheathing, removed

6   water damaged materials and the one on the right, typical

7   concealed water damage, that is the same photo on 36.  And 78

8   is -- I do not believe is in the same location.

9   Q   Okay.  So let's just -- let's talk about the bottom

10  first with the figure 37 and figure 79, the pictures of the

11  gypcrete.

12  A   Yes.

13  Q   Can you tell me what -- you've already explained what

14  we're looking at on the fire damage report.  On the right, can

15  you tell us what we're looking at in the construction defect

16  report in the same area?  Assuming it's the same photograph.

17  A   Right.  Typical concealed damage to wall plates under

18  gypcrete.  It's the same location.

19  Q   And on the left, there's damage you're associating with

20  fire -- with the fire, and on the right is damage in the same

21  location you're associating with the construction defect?

22  A   To the gypcrete.  This is the gypcrete material.  Over

23  here is a door, and water coming under this door literally

24  took this gypcrete material, which it's a cement plaster

25  material that's installed over the wood floor as a fire rating

                            364

```
 1   on every one of these units, and then the carpet is glued down
 2   to that.  If water gets into that, it turns it into mush
 3   basically.
 4           So this area, that gypcrete is what we're referring
 5   to.  So, again, I suppose we could have drawn arrows and
 6   bifurcated out in the description the differences.  We didn't
 7   do that.  We have two causes of water.
 8   Q    That's what I'm having to ask and have you clarify for
 9   me.
10   A    Yeah.
11   Q    You mentioned that the photographs on the top, and I --
12   they look to be the same photograph on figure 36 from the fire
13   report and figure 77 from the construction defect.
14   A    Yes, they are.  So 36 and 77 are the same locations.
15   Q    Can you tell me why -- what -- why that's in the fire
16   report on the left and why it's in the construction defect
17   report on the right?
18   A    Because we believe in the location, there were two
19   causes of loss at this location.
20   Q    Okay.  And my question to you is on the left, you're
21   saying that this was dry at the time of discovery.  On the
22   left, what areas were wet and what areas were dry to make it a
23   construction defect?
24   A    The stud itself up higher and closer to the corner of
25   the window was wet.  The lower part was dry.  I will testify
                                365
```

that this particular location that you're focusing on, all of

these --

Q    Yes, sir.

A    -- are not included in the cost analysis for the repairs

for the fire.

Q    Okay.

A    They are all allocated to construction defect because,

again, both causes of loss, I have to make a decision where am

I going to apply this?  And the more likely cause, even though

there is evidence that it came from the fire, it also is

evidence of construction defect.  So we assigned all of these

to the defect values of that $17 million.

Q    And I thought this yesterday as you were going through

it and you raised another issue today that -- can you walk me

through the process of how you were able to differentiate

within literally damages sitting next to each other, one fire,

one construction defect, between the 17 million that you all

allocated for construction defect and the 17 million we're

talking about here for the fire damage?  How did you go

through that process, and how did you arrive at that

allocation?

A    Well, number one, working with the general contractor

initially, we set up two forms of monitoring for their

timecards, and our job was to be there.  We were there each

week to kind of oversee and monitor this.

```
 1            And very clearly, we did a class with them on this
 2    is what we're looking for that would typically be related to
 3    defect.  This is what we're typically looking for that would
 4    be related to fire damage.
 5            And obvious issues of materials being wet below
 6    windows on first and second floors was kind of a no brainer.
 7    When we got to areas like this, that's where you'll see a lot
 8    of our photos because they're bringing us in to say, Hey, we
 9    can't differentiate.  We need your help to do that.  That was
10    one of our roles.
11            So, again, the timecards were split as well on the
12    work that they were doing.  So if opening this whole area took
13    them -- and repairing this area, the timecards might have had
14    an allocation for part of it for fire work and part of it for
15    construction defect.
16            When we sat down and did the final analysis and
17    reviewed all of these documents, when we got to these areas of
18    questions, we put it all to construction defect --
19    Q    So --
20    A    -- to eliminate this argument today that we might be
21    having.
22    Q    I understand.  I don't think we're having an argument.
23    A    No, a discussion.
24    Q    I don't consider it an argument.  I consider you're
25    clarifying some things for me.
                                  367
```

```
 1   A    Yes.

 2   Q    So with respect to the $17 million in construction

 3   defect you identified, you testified yesterday that you are a

 4   code official?

 5   A    I am.

 6   Q    And as a code official, would $17 million in defects in

 7   one of the ten worst buildings you've seen in how many?

 8   A    45 years.

 9   Q    How many buildings have you inspected?

10   A    Over 10,000.

11   Q    Wasn't this a process that Maxus was going to have to

12   undertake regardless of the fire damage?  Once you found these

13   defects, didn't they have to repair them?

14   A    Well, it's serendipitous, quite frankly.  We were

15   shocked.  Nobody expected to find this.  They were shocked at

16   what they had purchased, okay, quite frankly.

17   Q    Right.

18   A    So, yeah, this was -- removing the drywall to access the

19   cleaning that I still believe today was necessary as a result

20   of the fire particulate opened up Pandora's box.  Had we not

21   done that, as I sit here today, I will tell you that if we

22   were here today with none of this work being done, I'm

23   guessing you would have a number of residents there that would

24   be sick from the water damage and the mold, and I think that

25   more than likely some of those decks would have collapsed by
```

368

```
 1   now.

 2   Q    You mentioned sick from the mold?

 3   A    Yep.

 4   Q    Let's talk about mold for a minute, if you would.  And

 5   this is one of the things I wanted to touch on, so I

 6   appreciate that.

 7          Tell me what you found with regard to the mold and

 8   the water damage once you opened up -- we talked about the

 9   water damage.  We don't have to go back through that.

10          What you found with regard to the mold that was

11   present at the Metropolitan once you started opening up the

12   cavities.

13   A    It's interesting.  We found primarily two types of mold.

14   One was stachybotrys and the other was Aspergillus

15   Penicillium, which are molds that are typically water

16   activated.  To keep them generating, molds are a hypha.  It's

17   a plant essentially.  So to keep it active, you have to have a

18   continuous water source.

19          What's interesting is that in the areas where we

20   found the dry and friable material, we found the white rot.

21   That is a dominant mold that actually takes over the other two

22   molds.  So once the water source is gone, those other molds

23   don't go away.  They go dormant.  And when they're in the

24   dormant position, they're taken over by the white rot.  That

25   was another way that we could distinguish between what we call
```

369

```
 1   fire damage and what we called water damage.  And those are in
 2   Carlson's samples.
 3   Q    Great.  That was my next question.  Thank you for
 4   answering that.
 5   A    Yes.
 6   Q    Mr. Carlson was the one who took -- on the mold aspect
 7   of this, he was taking the mold -- or the samples and looking
 8   at the mold to identify the species?
 9   A    We were taking the samples obviously.  He was
10   identifying.
11   Q    I'm sorry.
12   A    Yeah.
13   Q    So you said -- used the word "serendipitous."  Can you
14   explain what you mean by that?
15   A    Well, we didn't expect to find all of this stuff.  It
16   was -- I guess it was -- I look at it as being fortunate,
17   quite frankly.  I mean, we're here -- I'm here today
18   representing this building.  I'm not representing the tenants.
19   I'm not representing Maxus.  I'm representing the building.
20   The building had a story to tell.  We were just able to tell
21   the whole story by opening it.
22   Q    Sure.  You mentioned that you believed that had you --
23   had the stuff not been repaired, the tenants would have been
24   sick from mold exposure.  Am I right about that?  I want to
25   make sure I didn't mishear you.
```

370

1    A    Yes.  I -- based on the work that I have done in

2    analyzing buildings that are damaged by water that are

3    affected by mold and the number of incidents that I have seen

4    of health-related issues with tenants and with owners of

5    buildings, this would have been in line with some of those,

6    yes, three to four years later.

7    Q    Just so I can clarify, you're not offering an opinion on

8    the health risk of mold?  You're not getting into that?

9    A    No.

10    Q    Okay.  Fair enough.

11        So with respect to the -- so we've got two things

12    you're dealing with on the construction defect side as well as

13    the fire side, which is damage to these framing members that

14    we've seen, and you've got a mold issue.  So you're having to

15    separate out construction defect; mold and water damage

16    related to construction defect; mold and water damage related

17    to fire?

18    A    Well, we didn't separate out any mold related to fire.

19    We didn't allocate any mold to fire.  We didn't separate out

20    necessarily in the numbers an allocation for mold in any of

21    these cases.

22        The work to remediate the soot, as I testified

23    yesterday, would be done under the same standards that you

24    would do for any mold remediation.  So we don't have separate

25    costing for any of that.

                                  371

```
 1   Q    So there was no expansion of the remediation efforts,

 2   the change orders, or anything once the mold and the water

 3   damages were discovered?

 4   A    There was expansion for removal of some of the

 5   water-damaged materials that was allocated typically to the --

 6   other than in phase 5, it was allocated to the construction

 7   defect.  That was our goal.

 8   Q    Okay.

 9   A    Yeah.

10   Q    Okay.  So let's talk about the framing damage that we

11   just looked at.

12          I believe you said yesterday -- you said -- we all

13   know this was a new complex.  I think you said something to

14   the effect that the extent of the damage you saw was like

15   almost a 20-year-old building with water issues.  Am I

16   remembering that correctly?

17   A    In some locations, absolutely.  But that was primarily

18   in phase 5 in the courtyard where we removed and found the

19   dry, friable materials.

20   Q    Okay.

21   A    Yeah.

22   Q    And so with respect to the construction defect, the $17

23   million worth of construction defect damages, how long had

24   that been going on before the fire?

25   A    In my opinion, the day that -- the first day that
```

372

```
1   windows were set into the framing and were not flashed and
2   taped.  The next rain, that window could have leaked.
3   Q    Let's take the doughnut building for example.  You used
4   the term "dried-in" yesterday.
5   A    Yes.
6   Q    Just so I can go back over and make sure we're talking
7   about the same things, dried-in to me means I've got an
8   exterior, I've got windows, and I've got a roof.
9   A    Yes.  That is functioning for its intended purpose.
10  Q    So if I understand what you're telling me is as soon as
11  the doughnut building was dried in, damage from the
12  construction defects started?
13  A    Yes.  It's intermittent with each rain.
14  Q    Right.  And repeats itself over and over?
15  A    Doesn't stop and it does not self-correct.
16  Q    Okay.  So with respect to the mold damage -- well, let
17  me back up.
18       And by the same token, additional damage coming from
19  the construction defect, every time it rains before the fire,
20  we've got damage, correct?
21  A    We've got the start of the damage, yes.  What happens to
22  this OSB material is, again, even the OSB sheathing on the
23  outside behind the stucco and the cladding, it also has that
24  type 1 exposure with the wax on it.  So those initial first
25  rains, it's not really going to affect it; but at the window,
```

373

1    when you're installing it, you have an edge just like on the

2    floor that's cut.

3            So as that -- as that edge gets hit, the first few

4    times it gets a little bit of water in there and it's fine.

5    But as it continues, it's like a sponge.  It begins to hold

6    water, and then it begins to expand.  And that process,

7    depending on how bad the opening is, can happen -- begin to

8    happen within months or within a year or so.

9    Q    And am I correct in my timeline that the discovery of

10   these construction defects, these damages about -- started in

11   about November of '19?

12   A    Yes.  Well, actually we knew about them in March of --

13   we knew about them in -- yeah, you're right.  I'm sorry.

14   Q    So the specific inside the walls was November of 2019?

15   A    Yes, correct.

16   Q    And so in between the September the 27th of 2018 and

17   September 30th of 2018, every time it rained, there was

18   additional damage caused by the construction defect?

19   A    Yes.

20   Q    And so with respect to the construction defects we've

21   been talking about, you learned a lot -- you said it was

22   serendipitous when you started opening up the wall cavities.

23   I want to back up for a minute to your first visit to the site

24   on April the 24th, 2019, right?

25   A    Yes.

                                  374

```
1    Q    You and big Franklin?

2    A    Yes.

3    Q    Okay.  What is Mr. Franklin's role at your company?

4    A    Well, Frank is also a certified building code official.

5    Frank is one of our -- he's no longer with us -- was one of

6    our field inspectors, did this kind of work.

7         I think the issue at that point was we're going to

8    go down and take a look at this thing if it is something that

9    we deem that we are going to take as a project.  That's really

10   what this was, a scoping visit.  Is this something that we

11   think we want to do?

12        Then based on my schedule, Frank was going to end up

13   being the point on this in terms of managing this particular

14   project.

15   Q    When you flew down on April the 24th, 2019, you were

16   assessing the project; is that right?

17   A    Yes.

18   Q    Okay.  And were you looking for -- we've talked -- I

19   think you talked yesterday about the fire issues, the soot and

20   char issues.  Were you also looking for construction issues?

21   A    No.  We didn't go down there to look at construction

22   issues, but when you have two building code officials, who

23   inspect buildings for code proficiency and you walk in, you

24   can't help but not do that.  I mean, I do it in every building

25   I go into.
```
375

1    Q    So from that standpoint, I want to focus on what you

2    noticed -- that you and Franklin noticed as code issues or

3    construction issues.  Walk me through what you all noticed on

4    April the 24th.

5    A    On April the 24th, we noticed in phase 5, for example,

6    they had subfloor that had been removed.  I think we showed

7    you some pictures of that.

8              Like an isometric drawing, when the subfloors are

9    removed, you can look through the floor, all the trusses to

10   the walls below, and there's something called point load.  So

11   what has to happen in this type of construction is starting at

12   the bottom, you have your floor.  You have to have a

13   continuous load path supported all the way through at various

14   locations.

15             We were finding that load paths were cantilevered,

16   were not built with continuous framing.  That would -- not so

17   much that the building would collapse, but what happens later

18   is once it's sheetrocked and finished, that's when cracks will

19   start happening all over the building.  All right.  So we knew

20   that that condition was there.

21             We had headers above windows and above doors that

22   were undersized.  We had framing clearly that wasn't complete.

23   But the evidence that we were seeing is that they were not

24   installing fire blocking in appropriate places.  There were

25   plumbing issues that we were seeing.  They had -- there were

                                  376

1    electrical issues that we were seeing.  This is all in phase 5

2    and part of phase 4.

3    Q    So is it -- is it safe to summarize all that to say that

4    you saw a number of defects the first day you went down there?

5    A    Absolutely.  In those two phases, yeah.

6    Q    In just the places you looked.  I'm not suggesting that

7    you should --

8    A    And I've been doing this long enough.  So you start -- I

9    think one of the questions that we asked after that is who did

10   the framing on phase 4 and phase 5?  And we found out from

11   Woody that the people that are doing -- were doing the framing

12   on that were the same ones that had done the framing on phases

13   1, 2, and 3, which is already enclosed in Sheetrock.

14        So I learned over the years that people do things

15   pretty much the same.  So you can speculate at that point that

16   more than likely, if it's the same people doing the job, they

17   probably made the same screwups in the other areas.  That's at

18   least what was in my mind at that point in time.

19   Q    So you had concerns for the whole property at that

20   point?

21   A    The possibility existed, yes.

22   Q    Did you communicate that to anyone at Maxus?

23   A    Yes.

24   Q    Who did you communicate?

25   A    Talked with Alex about it.

                              377

```
 1    Q    Do you know when you --

 2    A    Actually I don't know if we -- because we were not -- I

 3   think we communicated it to Howarth, because we did not have

 4   direct contact with Maxus.  So the Howarth Group who brought

 5   us down there, we sat down and brought that up with

 6   Mr. Howarth, that there was -- there are other issues at this

 7   building that are of concern.

 8    Q    The person you're referring to is Chuck Howarth?

 9    A    Yes.

10    Q    He is with the Howarth Group in Franklin, Tennessee, I

11   believe?

12    A    Yes.  He is a public adjustor.

13    Q    And you've worked with Mr. Howarth over the years?

14    A    Yes.

15    Q    How many times did you work with Mr. Howarth over the

16   last five years?

17    A    Oh, probably a hundred times.

18    Q    Typically does Mr. Howarth bring you into these

19   projects?

20    A    Yes.

21    Q    How many projects had you worked on with Mr. Howarth

22   prior to the Metropolitan?

23    A    Again, probably when I say a hundred, it's probably 90.

24    Q    Okay.

25    A    60 of those were fires done in Gatlinburg from the
```

378

```
 1   wildfires.  So that's a big number right there.

 2   Q    Okay.

 3   A    Kind of inspected that whole town.

 4   Q    So you knew Mr. Howarth before you got involved at the

 5   Metropolitan?

 6   A    Yes.

 7   Q    And you have worked with him since then?

 8   A    Yes.

 9   Q    Okay.

10   A    I think we have one active project with him right now.

11   He's about to retire.

12   Q    So, Mr. Irmiter, I want to talk now -- I want to shift

13   gears a little bit with you, and I want to talk about the

14   water damage in phase 1 through 4 from the fire and make sure

15   that I'm clear on what your opinion is here today.

16   A    Yes.

17   Q    Am I correct that you are attributing the water damage

18   that you've allocated to the fire from fire ember damage to

19   the TPO membrane?

20   A    Yes.

21   Q    And not from firefighting efforts?  We've moved off of

22   that?

23   A    Yes.

24   Q    So let's talk about the ember damages or the damages

25   from the ember.
```

                              379

```
 1            MR. ELY:  If we can pull up Plaintiff's 785, pages

 2   35, I believe.

 3   Q    (BY MR. ELY) Mr. Irmiter, for just ease of reference,

 4   Plaintiff's 785, I believe, is your supplemental report that

 5   you filed in this case?

 6   A    Okay.

 7            MR. ELY:  Let's go to figure 42, which should be

 8   towards the end.  Sorry.  I wrote my pages wrong.

 9            Keep going.  That's not the right one.  I'm sorry.

10   Q    (BY MR. ELY) Mr. Irmiter, at some point you identified

11   in a supplemental report where you believed the ember damage

12   occurred on the rest of the building?

13   A    Yes.

14   Q    And you -- I believe it's your testimony it occurred all

15   over?

16   A    Yes, based on the patches that we saw and some of the

17   fire particle that was still there when we got there.

18   Q    Okay.  Let's take a look at Plaintiff's Exhibits 11, 27,

19   28, and 29.

20            Okay.  I think we went over some of this yesterday.

21   A    Yes.

22   Q    This is an example that you're pointing to as an example

23   of damage from fire embers.  Do you know if this is on the

24   phase 4 roof?

25   A    Yes.
```

                         380

```
 1   Q    So if we can --

 2   A    No.  The one on -- figure 25 is mislabeled.  I testified

 3   yesterday that's phase 5.

 4   Q    Yeah.

 5   A    And that is phase 5.

 6   Q    That's phase 5.

 7        MR. ELY:  Can we split screen with 186, site plan,

 8   Defendant's 186, so we can have some understanding of where

 9   we're talking about here.

10   Q    (BY MR. ELY) So, Mr. Irmiter, could you telestrate for

11   me on the doughnut building where you believe the fire embers

12   hit the night of the fire or even on -- in phase 4 too.

13   A    Sure.  So the long -- we showed a photo of a long spread

14   of embers, okay.  That was over in this location here.  So

15   this is where our fire is.

16        As far as this right here, as I sit here today, I

17   can't tell you on phase 4 if it was there or there or there.

18   Q    That's fair enough.

19   A    Yeah.  I don't have that mapped specifically.  So all of

20   the other ones that you're going to show me on phases 1

21   through 3, which are later after this, I'm not going to be

22   able to tell you specifically where they are.  All right?

23   Q    Sure.  Mr. Irmiter -- strike that.

24        MR. ELY:  Let's go to the next page on the left, the

25   left document, please.
```

381

```
 1    Q    (BY MR. ELY) And this is what we looked at yesterday,
 2   right?
 3    A    Yes.
 4    Q    Again, I know figure 27 is a closeup shot.  Do you
 5   know -- happen to know where that would have been taken?
 6    A    No.
 7    Q    And this 28, can you tell me where that would have been
 8   taken?  I know you said it's phase 4.
 9    A    Yes.
10    Q    Okay.  Now, the date on the photograph is February 25th
11   of 2020?
12    A    Yes.
13    Q    Fire occurred September the 27th, 2018; so we're 17
14   months from the fire?
15    A    Yep.
16    Q    So who took these photographs?
17    A    These would have been taken -- I may have taken them.
18   Let's see, when did COVID shut down -- the airports shut down
19   in March of 2020, I believe.  I had a trial in Georgia that
20   weekend and stopped by the site on my way down to a trial.
21   These may have been taken by me.  I would have been there that
22   week.
23    Q    So with respect to the material we see in figure 28, can
24   you tell me what you did to investigate what it's made of?
25    A    Just got down and rubbed some of it.  We showed examples
```

                                    382

```
 1    of cleaning some of this stuff.  It was consistent with fire

 2    particulate in my mind.

 3    Q    How so?

 4    A    It was charry, I guess.

 5    Q    It was charry?

 6    A    Yeah, for lack of a better word.

 7    Q    Were you able to pull some of it off the TPO membrane?

 8    A    Yes.  You certainly could have.  We didn't sample any of

 9    it.

10    Q    But you didn't -- you didn't have a materials engineer

11    look at it?

12    A    No.

13    Q    You just got down on your hands and knees and touched it

14    and determined it was charry?

15    A    Yes.

16    Q    Okay.  So let's go to Plaintiff's Exhibit 116.  I'm

17    sorry.  Yeah, Plaintiff's Exhibit 116.

18              And, Mr. Irmiter, you took a lot of photos.  I've

19    tried looking at them the best I can.  But you took a lot.

20              How many do you think FBS took out there?

21    A    I think there's 25,000 or 30,000.  Again, understand we

22    were there monitoring the reconstruction; so a lot of those

23    photos are to help document the reconstruction of the

24    building.

25              MR. ELY:  Let's try page 164, if I've got it right.
```

383

```
 1   I'm sorry.  Actually this is Plaintiff's 16.
 2   Q    (BY MR. ELY) I believe you have a photo log.  I'm going
 3   to kind of walk through the photo log.  I know you and
 4   Mr. Abrams did this yesterday.
 5            So let's go to the next page.  So this is the
 6   courtyard.  We started on this yesterday.  Next page, please.
 7   Next page.  Next page, please.  Next.  Okay.
 8            So this is -- did you take these photographs on
 9   April the 24th?
10   A    I did.
11   Q    Okay.  Tell me what I'm looking at in figures 11 and 12.
12   A    You're looking at two of the air exchangers in two
13   different hallway locations that I took.
14   Q    So I think we saw -- I call these diffusers.  Are they
15   diffusers?
16   A    Yes.
17   Q    We looked at a picture of a diffuser yesterday that had
18   some discoloration on it, and I believe your testimony was
19   that's -- that was smoke.  That was an indication of smoke
20   that had gotten into the HVAC unit?
21   A    Yes.
22   Q    And so my question to you is on April the 24th -- and
23   let me back up.
24            Whose photograph was that?
25   A    Those are -- and that was mislabeled yesterday by
```
384

Case 4:20-cv-00095-FJG   Document 243   Filed 09/05/23   Page 35 of 221

```
 1   counsel indicating that those were taken on 4/24/2019.  They
 2   were not.  Those were not my photos.  Those were taken by
 3   Mr. Howarth prior to our inspection.
 4   Q    Would that have been around April 5th?
 5   A    My understanding.
 6   Q    Okay.  So the photo we saw yesterday was taken on April
 7   5th by Mr. Howarth, not by FBS?
 8   A    Yes.  These are the same locations, and the staff had
 9   painted over that area.  They had repainted it by the time we
10   got there.
11   Q    Okay.  Did you test this area?
12   A    I believe we did test that area, yeah.
13   Q    Let's go to the next page, please.
14        These are just photographs of the interior?  What's
15   the purpose of these?  What am I looking at?
16   A    I'm just capturing -- again, understand that we had --
17   we walked the entire structure first, okay, and then we
18   started again and walked the structure to begin taking photos.
19   You just get a sense of what's the whole thing look like.  So
20   we had already walked through 5, and we had already seen what
21   you're going to later see in these photos of this diffuser in
22   the installation phase.  All right.
23        So now we're going back and we're starting to
24   document what it looks like as it's completed and work our way
25   to phase 5.  That's how we did it.
```

385

```
1    Q    And the diffuser installation, I think we looked at

2  yesterday?

3    A    Right.  That shows up later in this photo log.

4    Q    And there's 1,144.  We're not going to go through all of

5  them.

6    A    That's why we're taking this photo because we're going

7  to later potentially use this.  Depending on the sampling,

8  depending on what happens, we may use this as a reference to

9  show what it looks like when it's completed side by side to

10  the one that we saw the day of inspection.

11    Q    Mr. Irmiter, with regard to Chuck Howarth's photo

12  yesterday and these photos you took on April the 24th of 2019,

13  I believe you testified yesterday that it's your opinion that

14  soot and char from the fire got into the HVAC system and

15  circulated throughout the property; is that right?

16    A    Got into the building, and then it got into the HVAC

17  system.

18    Q    And if -- you pointed to that diffuser, the

19  discoloration on that diffuser as -- and I believe you said

20  that was an indication to me that that entry had taken place

21  -- infiltration had taken place in the building?

22    A    At that date, it's an indication with the Howarth photos

23  that that could have happened.  That's all it is.  We don't

24  know what that black stuff is until we test it.

25    Q    Okay.
```

                              386

1   A    Or we test the surrounding area.

    2   Q    And so the black stuff that was on the April 5th

    3   photo --

    4        MR. ELY:  Back up one page, please, Chris, if you

    5   would.

    6   Q    (BY MR. ELY) -- was gone on April the 24th of 2019?

    7   A    Well, it's gone on -- it's gone on the surfaces -- or,

    8   I'm sorry, it's gone on the grilles.

    9   Q    Sure.  That's what I mean.

   10   A    We're concerned about what's behind all that.

   11   Q    That's what I mean.  So to your point that what you saw

   12   on the Howarth photo, until you get up there and test it, you

   13   don't know what it is?

   14   A    Right.  All you can do is visually look at it and say,

   15   Yeah, there's some dark stuff coming out of a vent.  Now,

   16   understand that I've been doing this for 45 years.  Typically

   17   in a building this new, brand new, I don't see dark stuff

   18   coming out of vents.

   19   Q    Was construction ongoing to some degree in the doughnut

   20   building in April?

   21   A    Only in a little bit of phase 3.  This is the first

   22   floor.  That's all completed, and there are people living

   23   there.

   24   Q    Okay.  So with respect to what was in that photograph on

   25   April the 5th, you can't definitively say what it was?

                              387

1    A    I cannot.

2    Q    And you were -- when you came back on April the 24th,

3    you -- it was not there for you to test?

4    A    It had been cleaned off the surface, just that surface.

5    Q    All right.  I understand.  So as you walked through the

6    doughnut building on April the 24th of 2019, did you have

7    Chuck Howarth's photo from April 5th?

8    A    We had it, yes.  He had already sent us photos.

9    Q    Were you looking for similar places like that where

10   there was a discoloration from the diffusers?

11   A    Yes.  Didn't find any.  It had all been cleaned.

12   Q    Okay.  If you had found any, there would be photos of

13   that?

14   A    Yes, absolutely.

15   Q    Did you find any soot deposition on the walls other than

16   the photo we saw yesterday?

17   A    That was the only location.

18   Q    Okay.  And just so I'm clear, with respect to what you

19   saw -- what Mr. Howarth photographed on April the 5th, that

20   was six months after the fire or more?

21   A    Yes.

22   Q    So let's shift back to the ember issue.  I'm sorry I

23   kind of got off track here.  I want to take a look at

24   Defendant's Exhibit 107, please.

25            I want to ask you, Mr. Irmiter, when you -- let me
                                388

```
 1   ask you this question.  When FBS showed up at the site to take

 2   its second samples on May 8th and 9th, who was there?

 3   A    Frank was there, Kevin Steinke was there, and I believe

 4   Jeremy Lansdown from our company.

 5   Q    Do you know where they went on the property?

 6   A    In terms of the entire time they were there or where

 7   they sampled?

 8   Q    Where they went.  I just want to know where they walked.

 9   A    The entire property.

10   Q    So they were on the doughnut building roof in May of

11   2019?

12   A    Yes, I believe they were.  Yes, in fact I know they were

13   because I know Jeremy Lansdown in his photo log has pictures

14   of the roofs, yeah.

15   Q    Did anyone in your group come back to you and tell you

16   that they observed ember damage on May 8th and 9th of 2019?

17   A    No.

18   Q    So FBS was on the roof, didn't observe any ember damage

19   in May of 2019?

20   A    I'm not going to say that they didn't observe any ember

21   damage.  I'm not sure that we were looking for ember damage at

22   that point in time.  We were just -- the photos that Jeremy

23   took are just overviews.  It was just get up on the roof and

24   take an overview of the roof.  That was really all those were.

25   We were not doing a roofing inspection.
```

389

```
 1              Our understanding at that point was that 5 had been
 2     replaced, all the other roofs had been repaired, and they were
 3     functioning for their intended purpose.  So it really wasn't
 4     in our assignment to do a roof inspection.
 5     Q     Okay.
 6     A     Because there was no causal link to roof failure at that
 7     point in time.
 8     Q     Okay.  But you were -- FBS was assessing fire damage
 9     also; is that a fair statement?
10     A     Yeah.  It's a fair statement that we were looking at
11     fire damage.
12     Q     I mean, if you saw fire damage on the roof, that's
13     something that FBS would have mentioned?
14     A     We did see some fire damage.  On 5 we saw the melted --
15     you know, we would have mentioned that if we had seen it.
16     But, again, it wasn't something that we were looking at.
17     Q     Okay.  Great.  So have you ever seen this GAF Field
18     Services report dated 2/25/19?
19     A     I don't believe we have.
20     Q     Okay.  Who is GAF?
21     A     Well, GAF is a large manufacturer of roofing products.
22     We work with GAF.  I'm familiar with them.
23     Q     Over the years, you've run into GAF a lot?
24     A     I've had training from GAF, yes.
25     Q     Okay.  Great.  So -- and you've also worked with a lot
```

                                390

1    of roofing manufacturers over the years?

2    A    Yes, I have.

3    Q    Tell us what a field services report is generally in the

4    industry.

5    A    You can -- you can have the manufacturer come out after

6    the inspection or after the roof is installed.  And, again, I

7    don't know if this is tied to this, but it most likely is tied

8    to the warranty on the roof.  The manufacturer will then do an

9    inspection of the roof, make sure that it is installed

10   correctly, address any issues that need to be corrected so

11   that it meets their installation instructions and thereby

12   giving you the warranty.

13          Another reason that they can come out is, for

14   example, if we have a roof that is damaged in a storm and we

15   think that it is uplifted, sometimes they'll get called out by

16   the insurance company to do an inspection to say, No, the roof

17   is fine, or the roof was defectively installed.

18          So lots of reasons why they come out.  I can't

19   recall why this was.

20   Q    Well, yeah, I'm not expecting you to do that because I

21   know you haven't seen this before.  But the date of this is

22   2/25/19.  This predates FBS's first trip to the property by

23   two months.

24   A    Yes.

25   Q    So this field services report was generated between the

                              391

```
1    time of the fire and the time FBS got to the site?

2    A    Yes.

3    Q    Okay.  So it says, "Immediate punch list action

4    required."  What does that mean generally in the industry?

5    A    That means that there's probably some problems with the

6    roof.

7    Q    Okay.

8         MR. ELY:  Chris, if you could go to the next page,

9    please.  Next.  Next page, please.  Next page.  Sorry.

10   Q    (BY MR. ELY) So let's take a look.

11        MR. ELY:  So go to -- if you could enlarge.  Go to

12   the next page, please.  Enlarge image 6, please.

13   Q    (BY MR. ELY) Can you tell us where that is, Mr. Irmiter?

14   A    No.  I can't tell which building that is.  It looks

15   like -- this is 3, I believe.  I think this is the -- I think

16   it is.  I think this is the corner of the parking garage.

17   Q    Okay.

18   A    And then I think this is 3.

19   Q    Okay.  Can you point to any ember damage you see in that

20   photograph?

21   A    No, I cannot.  I can see some patches that have been

22   done.

23   Q    Sure.

24   A    But, yeah.

25   Q    Okay.
                              392
```

```
 1              MR. ELY:  Chris, can you go to the next photograph,
 2   please.  Or, I'm sorry, the next -- yeah, that one.  You had
 3   it.  Sorry.
 4   Q     (BY MR. ELY) Again, same location?
 5   A     Yes.
 6   Q     That wall in the corner, the right corner?
 7   A     Yeah, same location.  This would be an area of interest
 8   right here for me.  This would be an area of interest here.
 9   These would be areas of interest.  I would want to see why
10   those pockmarks are showing up on this roof.
11   Q     Okay.
12              MR. ELY:  Chris, if you could go back to page 1.
13   Q     (BY MR. ELY) So we've got the manufacturer on the roof
14   February 25th of 2019.
15              Mr. Irmiter, if the manufacturer is on the roof in
16   February 25th of 2019, how is it even possible they missed
17   ember damage from the fire?
18   A     I don't know.
19   Q     I mean, in your experience with GAF -- I mean, you've
20   had training with GAF.  GAF a good company?
21   A     Yeah, they are.  It depends on what they were asked to
22   do, quite frankly.  You have to understand there's a
23   proprietary relationship that the contractors have with the
24   manufacturers, and oftentimes what I see is even though it is
25   the manufacturer, they're being directed by the contractor,
```
                                393

1  This is what we want you to look at.  All right.  So, again, I

2  don't know what their instructions were.

3  Q    And I'm not asking you --

4  A    GAF wants this roofing contractor to keep buying their

5  product.  That's the main emphasis.

6  Q    Let me ask you this question:  With respect to -- based

7  on your experience in the industry, if a manufacturer gets on

8  the roof and determines that there's been fire damage, what

9  happens to the warranty?

10  A    Warranty is voided.

11  Q    And if a warranty is voided, GAF or any other

12  manufacturer doesn't have any more responsibility for that

13  roof, do they?

14  A    Typically.  Unless -- well, again, GAF could deem that

15  it could be repaired.  They could say all of these areas where

16  there's fire damage, repair them, and, again, I just don't

17  know.  There's no other information here that I can glean.

18  Q    I'm not trying to get you to answer questions about the

19  specifics.  I'm asking generally speaking in your -- based on

20  your experience.

21         So if the manufacturer is out there after a fire and

22  fire damage voids their warranty and relieves them of any

23  obligation, is it a reasonable assumption, based on -- in the

24  industry, that they're going to discover -- they're going to

25  identify any potential fire damage?

                              394

```
 1    A    If that's what they were asked to do and that's -- and

 2   that's a key.  I think a better way to answer this question is

 3   have we gone on roofs that GAF or other manufacturers have

 4   inspected where they have issued a report where they said

 5   there are no problems; and then when we get involved, we bring

 6   GAF back out there and we specifically take them to a number

 7   of locations where we believe the roof has been damaged by

 8   wind, and their opinion changes.  It happens all the time,

 9   absolutely.

10    Q    Did you do that in this case when you found fire

11   damages?

12    A    No, we did not.

13    Q    If that was going to void Maxus' warranty on the roof,

14   don't you want GAF back out there looking at it?

15    A    No, because the roof is being replaced.  I don't care at

16   that point in time.  The roof is -- understand, we're removing

17   the roof to get to the damage underneath.  So -- and I'll

18   just -- you opened this door, so I have to go here.  It's just

19   going to take a minute.  Excuse me, jury.

20         But this building was an existing building at the

21   time of the loss.  So it falls under the 2009 existing

22   building code.

23         In the existing building code -- in new

24   construction, you follow the building code.  Okay.  It's

25   pretty simple.  It's ground up.  It's all there.  You know
                                  395
```

1    what you're going to do.

     2            In the existing building code, as a code official,

     3    you learn that you -- the very first thing you have to do is

     4    you have to go to the definition section of the code.

     5            The definition gives you three options, okay?  It's

     6    an existing building.  What are we going to do?  So number

     7    one, are we going to repair it?  There's a definition for

     8    repairing, and you know what it says?  It says, Repair is only

     9    applicable for the purposes of maintenance.  They want you to

    10    maintain your building.

    11            Are we doing all this work for maintenance?  No.  So

    12    this doesn't fit a repair under the code definition.

    13            Second, is it an addition?  Are we adding additional

    14    space to the building?  No.

    15            So there's only one option, the third option, which

    16    is alteration.  There's a level four alteration that states if

    17    more than 50 percent of the aggregate area of the building is

    18    being worked on, more than 50 percent, clearly more than 50

    19    percent of this building is being worked on, then you must

    20    bring the entire building up to current code.

    21            This building went under construction in 2009 under

    22    that code.  After the fire, the code in Alabama changed to the

    23    2018 code.  The 2018 code requires specifically the roof deck

    24    insulation above the roof.  So as soon as we opened that roof

    25    to repair that damage, the entire roof had to come out under
                                         396

```
 1   the code.

 2   Q    Okay.

 3   A    Very simple.

 4   Q    That's another question I wanted to ask you because I've

 5   seen it in your report.  You agree that the lack of insulation

 6   underneath that TPO membrane on the doughnut building was a

 7   code violation?

 8   A    It had to be --

 9   Q    Had to be replaced?

10   A    Yes.

11   Q    So that was an insulation issue?

12   A    Yes.  But it had no effect on this loss.  That lack of

13   insulation had no effect on the fire loss.

14   Q    Okay.  Let's pull up Defendant's Exhibit 111, please.

15        So to sum up with regard to the ember holes, we've

16   got GAF on the roof on February 25th, 2019, and for whatever

17   their scope is, they're inspecting the roof?

18   A    Yes.

19   Q    We've got FBS on the roof May 8th and 9th of 2019, and

20   for whatever scope FBS had, they were on that doughnut

21   building roof as well?

22   A    Yes.

23   Q    And it wasn't until February of 2020, in those

24   photographs that we looked at that ember holes from the

25   phase -- the phase 6 fire were discovered on the doughnut
```

1   building roof?

2    A    Well, we didn't discover ember holes on the doughnut

3   roof.  We discovered patching up slope of the doughnut roof

4   consistent with patching that we knew had been done to those

5   buildings after the fire.  5 was replaced.  Patching was done

6   on the other roofs.  As I said, once that patch was put in

7   place, it stopped the source of water from coming in from the

8   rains.

9    Q    Okay.

10   A    So we did not open up any of those patches to examine

11  them.

12   Q    So as you're sitting here today, you can't testify as to

13  what those patches were for?  They could have been mechanical

14  damage, they could have been anything?

15   A    Yes, they certainly could have been anything, but the

16  distribution of them appeared to be more consistent with

17  random char and fire particulate hitting the building.

18  Mechanical damage is typically located around HVAC units where

19  you're working, where you have tools and things like that.

20  It's usually centralized.

21   Q    But, again, you never laid eyes on what was underneath

22  the patch?

23   A    We did not.

24   Q    So are you able to testify to any reasonable degree of

25  certainty that those patches were from ember holes?

                            398

```
 1   A    I'm sorry.  Let me back up.  When the roof came off, we
 2   were able to see water staining.  I think even your expert
 3   Mulder mentions that.  He's there when the membrane is coming
 4   off, and there is water staining underneath these patches.
 5   Q    Okay.  So let's go to -- I want to shift gears a little
 6   bit on something you talked about yesterday.  Let's go to
 7   Plaintiff's Exhibit 6, pages 11 through 14.
 8           Mr. Irmiter, you mentioned something yesterday, and
 9   I was doing my best to take accurate notes.  You mentioned the
10   ASTM.
11   A    Yes.
12   Q    Tell us what ASTM is.
13   A    American standard -- American Society of Testing and
14   Measures.
15           Essentially, every product that is utilized in the
16   building code, most every single product for code compliance
17   is tested by ASTM.  ASTM tests car seats.  They test cribs.
18   They effectively test almost everything for compliance.
19           ASTM also provides a number of inspection and
20   testing standards, methodologies for how you inspect.  The
21   primary one that we use is ASTM E2128, which is a field guide
22   for inspecting buildings for water damage.  And it provides
23   and utilizes the scientific method for determining what is
24   called the proximate cause of damage by eliminating other
25   causes.
```
                              399

```
 1    Q    And included in those ASTM --

 2              MR. ELY:  Let's go to page 11 through 14, please.

 3    Go down.  Keep going.  I'm sorry.  It's 11 of the document.

 4              It's 11 of 64.  I've got my numbers wrong.  It's

 5    actually No. 14, page 14 of the document.  There we go.  Sorry

 6    about that.

 7    Q    (BY MR. ELY) So this is -- Mr. Irmiter, this is your

 8    report from June the 5th, 2019, first report you issued I

 9    believe in this case.

10    A    Yes.  Very early in the inspection process.

11    Q    Okay.  And in this you list a lot of documents that you

12    reviewed.

13    A    If we can, I think you're mischaracterizing what it

14    says.  If you could go up to the section right above this.

15    Q    Sure.  I'm sorry.  I don't mean to do that.  If there's

16    an area of the document you want me to go, please let me know,

17    because I do not want to do that.

18    A    Yes.  Go up a page, please.  Thank you.  2.6.

19              2.6 are the actual documents that we received and

20    reviewed.

21    Q    Okay.  I'm sorry.  Thank you for that clarification.

22    A    2.7 are the documents that we would rely on to support

23    our position, if asked.

24    Q    Great.  Thank you for that.

25              I see right there at the bottom, we start with some
```

400

```
 1   ASTM guides.

 2   A     Yes.

 3   Q     And I counted at least a dozen references to the ASTM.

 4   A     Yes.

 5   Q     And this is a pretty -- this is a guide that you go by?

 6   A     Yes.

 7   Q     Okay.

 8         MR. ELY:  Go to the next, please, if you would,

 9   Chris, please.  Next one.

10   Q     (BY MR. ELY) So I want to go to the fourth bullet from

11   the bottom.

12         Anyway, ASTM 660213?

13   A     Yes.

14   Q     You know what that is?

15   A     Yes, I do.

16   Q     Tell the jury, if you would, what that is and how you

17   utilize it.

18   A     It's a sampling guideline for looking for carbon black

19   particulate as a result of fires.  It is right now, as we sit

20   here today and back then, the only standard that essentially

21   lays out a methodology for sampling.  It does -- it talks

22   about tape lifts.  It talks about the use of air-o-cells.  It

23   talks about the use of wipes.  It kind of lays out the process

24   and the procedure.  It lays out some laboratory criteria for

25   how you analyze using standard microscopy, standard light
```

401

1  microscopy, using polarized light microscopy, those kinds of

2  things which the hygienists have already talked about and are

3  going to talk probably more about.

4  Q    Sure.  This is the -- when you started this process in

5  June of 2019, that was the standard you were looking at?

6  A    It's one of the standards, absolutely.  We also were

7  looking at an ASTM standard particularly for tape lifts.

8           MR. ELY:  If we could pull up Defendant's Exhibit

9  165, please, and go to page 2.

10 Q    (BY MR. ELY) So it's got these -- this is -- this is

11 ASTM 660213, correct?

12 A    Yes.

13 Q    Okay.  And it's got these bullet points on the left

14 side?

15 A    Yes.

16 Q    And it talks about -- it defines all these different

17 terms?

18 A    The things you might see under a microscope, yes.

19 Q    In Section 6, it's got sampling.  Let's go to the next

20 page, please.

21          And it lists standard -- under standard glass

22 microscope slides, it identifies two techniques.  I only see

23 two techniques under 6.2.4.  Let's go to technique 1 and 2.

24          Okay.

25 A    Yep.

                               402

1    Q    6.3.1, it talks about Technique No. 1.  Technique No. 1

2    under 66023 is wipe sampling?

3    A    Yes.

4    Q    That's an accepted method of sampling; it not?

5    A    If it's done correctly, yes.

6    Q    And it says -- it identifies a polyester wipe to remove

7    surface particulates and solids.  That's the point of the

8    wipe, right, is to remove the particulate on the surface?

9    A    If that's the wipe that you submit for the -- for

10   examination.

11   Q    Okay.  So if you -- I don't understand the answer to

12   that question.

13        Is -- go ahead.

14   A    Well, I testified yesterday that the Spicer Group that

15   did the sampling for Travelers used a large wipe to clean

16   everything and then used the smaller wipe to take their

17   sample, which is what they submitted.  In looking at the chain

18   of custody, there's no indication that they submitted the wipe

19   that they cleaned with.  That's the problem I have.

20   Q    So your testimony is based on your review of the Spicer

21   report, the wipes that were done were not sampling?

22   A    Based on my review of the lab results, yes.

23   Q    What do you use wipes for?  What kind of analysis do you

24   use them for?

25   A    What's that?

                              403

1   Q    What's the purpose of a wipe?  What type of analysis do

2   you use with a wipe?

3   A    PLM, polarized light microscopy, typically.  You could

4   also use it for light microscopy.

5   Q    What is the appropriate medium for TEM analysis?

6   A    TEM analysis would be -- depends on the lab.  I mean,

7   there's different -- this complete issue right now is being

8   dealt with in the D Committee, the committee that put this

9   together.  All these standards are in the process of being

10  changed.  That's how much the science has evolved in three

11  years or four years since this occurred.

12          And Mr. Baxter can talk more to that since he's on

13  that committee.  I think this is a better question for

14  Mr. Baxter.

15  Q    All right.  Fair enough.  But your criticism is of

16  Mr. Spicer.  So I'm understanding it, with regard to the

17  wiping that went on, your criticism is that those wipe samples

18  were never examined?

19  A    Yes.  And that the ones that were examined were examined

20  in a cleaned condition.

21  Q    Okay.  So you're saying they were cleaning the spot,

22  then taking the tape sample?

23  A    Yes.  That's what we observed.

24  Q    Okay.  So the second technique is tape sampling, you

25  mentioned.  So we've got wipe sampling as an appropriate

                                    404

```
 1   method; we've got tape sampling as an appropriate method?
 2   A    Yes.
 3             MR. ELY:  Okay.  Zoom back out, Chris, if you would.
 4   Q    (BY MR. ELY) So can you point to me in Section 6.2.4
 5   where it says that air-o-cell sampling, which is what you did
 6   at the Metropolitan, where it says air-o-cell sampling is an
 7   appropriate method of sampling under 660213?
 8   A    I do not believe it states that in this particular
 9   document.  I'd have to look at the entire document.  I believe
10   one of the methods that it talks about is air-o-cell somewhere
11   else in the document.  I just can't remember.
12   Q    If I give you a hard copy of the document, would that
13   help you?  Because I want to make sure I'm not missing
14   something.
15   A    It's not necessary.  If it's not in there, it's not in
16   there.  The air-o-cell sample is simply a tape lift inside the
17   cassette.
18   Q    I understand.
19   A    You can talk to Mr. Baxter about this.  He developed
20   this process.  He's the one that has the patent on that
21   particular medium.
22   Q    I'm happy to talk to Mr. Baxter.
23   A    Absolutely.
24   Q    I'm talking to you right now.  I need to understand.
25             I understood when I mentioned 660213, that you said
```
                                405

```
1    it talked about wipe sampling, tape sampling, and air-o-cell
2    sampling as appropriate methods of collection?
3    A    I believe it did, yes.
4    Q    But under these -- under the standard glass microscope
5    slides, which is PLM, right?  That's what's viewed under the
6    microscope?
7    A    Well, no.  Standard light microscopy is the first step.
8    The second step would be PLM.  PLM is looked at for char.  The
9    problem with PLM, which Mr. Baxter will discuss, is that PLM
10   heats up the char and destroys it; so it basically diminishes
11   the sampling results.  That's why the standard is changing to
12   light -- standard light microscopy, which is what Carlson did.
13   The new standard is going to state that that is the correct
14   method for determining soot and char damage.
15   Q    Okay.  And --
16   A    So we're ahead of the standard being changed.
17   Q    Okay.
18   A    We're doing it the right way.
19   Q    Okay.  But under 660213, air-o-cell sampling is not
20   identified in 6.2.4 as an appropriate sampling?
21   A    In this section, you're correct, it is not.
22   Q    So if you are trying to -- strike that.
23        So let's talk a little bit about the shadowing of
24   Mr. Spicer on September the 30th of 2019, I believe.  Yeah.
25   A    I think it was, yeah.
                              406
```

```
 1    Q    Who was there for FBS?

 2    A    Kevin Steinke and Adam Piero.  Frank may have been there

 3    as well.  I don't know.  He may have been on site.

 4    Q    So as I understood your testimony yesterday, when the

 5    wall cavities were opened up, it's your testimony that they

 6    cleaned it with some kind of wipe and just stuck a tape sample

 7    on there and sent it off to the lab?

 8    A    No.  They stuck a tape sample.  They used an SEM plug,

 9    and then they also took a wipe.  So they did three things.

10    Q    And if the wipe samples that they took were actually

11    sent to RJ Lee and analyzed, that's not consistent with your

12    understanding that they cleaned the wipe and didn't have it

13    analyzed?

14    A    Well, then they have a fourth sample that they took

15    because they used a small wipe that then didn't -- one of the

16    wipes didn't get sampled but was bagged and sent.

17    Q    Okay.  As you sit here today, you don't know whether the

18    first wipe that was done on the surface was sent to RJ Lee and

19    sampled?

20    A    No, you're right.  I cannot tell you whether that was.

21    It's my understanding in talking to my people that those wipes

22    were not bagged.

23    Q    Okay.

24    A    And those wipes were curled up and thrown on the floor

25    and were not bagged.
```
                                   407

```
 1    Q    Okay.  So with regard to what FBS did that day, do you
 2   know where in the wall cavities FBS sampled -- took its
 3   samples?
 4    A    Same exact location that they sampled.
 5    Q    So you --
 6    A    After they sampled.
 7    Q    So if -- after the wipe, after the tape, and after the
 8   SEM tap, FBS went back and took samples from the exact same
 9   location that had already been opened?
10    A    Yes, using a small wipe and using a tape lift.  Not in
11   exactly the same location.  Again, we have a 12 inch -- or 14
12   inch by 14 inch opening; so if they're sampling over here, we
13   went over here.  We're in the same opening, but not the exact
14   same location.
15    Q    Your testimony yesterday was they cleaned the surface?
16    A    Yes.
17    Q    So FBS didn't come back and test the cleaned surface?
18    A    Well, sure.  I mean, if their -- you saw on one of the
19   photos where they had a large area that's wet, and then later
20   he's sampling in this location, okay?  He samples there.
21   We're sampling there as well.
22         Why wouldn't we sample in the same location?  If
23   he's sampling a clean location, we're going to sample a clean
24   location as well, fully expecting what we're going to get back
25   from the lab is zero, which we did.
```

408

```
 1    Q    Okay.  So would you expect -- and you've used wipe

 2    sampling before, haven't you?

 3    A    Yes.

 4    Q    In fact, you did -- you sent wipe samples to EMSL,

 5    correct?

 6    A    Yes.

 7    Q    So would you expect there to be -- would you expect the

 8    wipe sample that you -- the first wipe sample that you run

 9    across the surface, that's going to pick up whatever's there,

10    correct?

11    A    Yes.

12    Q    I mean, that's the whole point.

13    A    Yes.  But the tape lift should be done first.

14    Q    But if it's not, if it's not, the wipe sample can pick

15    up the same material, right?  It's an approved sampling

16    method?

17    A    It is an approved sampling method, provided that it's

18    not balled up and put on the floor and then another sample is

19    taken.

20    Q    Sure.  I will agree with you.  If the wipe sample was

21    taken and it was discarded, that's not going to do anybody any

22    good?

23    A    No.

24    Q    Okay.  So one of the issues I believe you had with

25    Mr. Spicer's sampling was that he was cutting into Sheetrock?
```
409

```
 1   A    Yes.

 2   Q    So that's thing one.

 3        Thing two, did you -- do you have an issue with

 4   where he sampled in the cavity?

 5   A    Yes.

 6   Q    Tell me about that again, please.

 7   A    As I just explained to the jury, wipes and tape lifts

 8   are designed to pick up what's called settled dust, the dust

 9   that has settled.  Typically dust does not settle 4 feet up in

10   a wall.  It settles at the base of a wall.

11        And then the other issue that I had is he's sampling

12   in exterior walls where dew point issues are going to occur,

13   where insulation is going to act as a filter.  So the

14   insulation should have been sampled to see what's in the

15   insulation.  He didn't do that.

16        Our sampling was done in partitions, in open

17   partitions that had connected bypasses.  That's where we're

18   going to find the soot accumulating, which is where we found

19   it.

20   Q    So is the soot accumulating in areas with insulation?

21   A    Sure, absolutely.  Could be, but nobody sampled it.

22   Q    You just said he sampled in wall cavities where there

23   was insulation is what I understood you said?

24   A    Yes.  But the insulation, much like a furnace filter,

25   it's a filter, is going to pick up that particulate and hold
```

                                410

```
 1   that particulate.  So where he is sampling behind the
 2   insulation may, in fact, have very little, if any, fire
 3   particulate which is embedded within the insulation itself.
 4            We showed you the pictures of the insulation and the
 5   dirty nature of that insulation.  That was never sampled by
 6   them.
 7   Q    So in walls with insulation, is it your testimony that
 8   the soot and char from the phase 6 fire is not going to get on
 9   the OSB?
10   A    Some of it could have, but it's certainly going to be in
11   the insulation.
12   Q    Why do you have to seal the entire building with paint?
13   Why can't you just pull the insulation out?
14   A    You do pull the insulation out, but in pulling the
15   insulation out, guess what happens?  You air-o-cellize the
16   soot and the char, and it grabs onto the wood.  Why wouldn't
17   you clean it at that point in time?
18   Q    Okay.  So my understanding is that you're critical of
19   the wall cavity techniques using a saw, correct?
20   A    Yes.
21   Q    You're critical of the locations inside the wall cavity?
22   A    Yes.
23   Q    So do you know if he took any samples from areas that
24   were not fully finished; meaning, wall cavities?
25   A    Yes.  He took some samples in phase 5.
```
411

```
 1   Q    So didn't have to cut Sheetrock in phase 5, did he?

 2   A    No.  But he still did the same cleaning technique.

 3   Q    Okay.  So your criticism of phase 5 is that he did a

 4   cleaning technique, threw the wipes on the ground, and then

 5   ran a tape sample?

 6   A    Yes.

 7   Q    So the dust issues, the dust issues from the Sheetrock,

 8   they don't apply in phase 5?

 9   A    No.

10   Q    Okay.  And the location in the cavity, there's no

11   insulation in phase 5, was there?

12   A    No.

13   Q    And would you agree with me that phase 5 was the closest

14   in proximity to the phase 6 fire?

15   A    Yes.

16   Q    So if Mr. Spicer is trying to skew the results to avoid

17   fire -- combustion byproducts in the phase 6 fire, why is he

18   sampling open wall cavities in phase 5?

19   A    To look at closeness to the cause of origin.  Makes

20   sense.  Why wouldn't he do that?

21        What I'm talking about is phase 5 is not in dispute.

22   Travelers has already agreed that they're going to clean phase

23   5.  So I'm guessing the reason he's sampling phase 5 is to do

24   some comparisons of those results to what he's finding in the

25   other areas.
```
412

```
 1          My criticism is not with what he did in phase 5.
 2    Phase 5 is moot in my mind.  That's already covered.
 3          It's these other areas where he samples and the
 4    sampling methodology basically destroyed the results for the
 5    laboratory.  I'm sure the laboratory was never informed or saw
 6    photos of where these were taken based on the results.
 7    They're full of Sheetrock dust.
 8  Q    Okay.
 9          MR. ELY:  Judge, we've been going for an hour and a
10    half.  I can take a break.  I'm about to shift.  I don't want
11    everybody to have to sit here for -- it's not a marathon.  I
12    don't have a lot longer, but I have a little bit.  I just want
13    to make sure.  I'm trying to be considerate to everybody.
14          THE COURT:  I'm ready for a break.
15          MR. ELY:  Enough said.
16          THE COURT:  We'll take a break about 15, 20 minutes
17    or so.  Again, I won't read the instruction.  I've asked that
18    it be posted in the jury room.  If anybody has a question in
19    their mind about what the instruction says, they can read it
20    themselves.  Again, just don't discuss the case with each
21    other yet.  It's not that time.
22          We'll take a recess at this time.  Thank you.
23               (A recess was taken.)
24          (The following proceedings were had in the presence
25    of the jury:)
                        413
```

```
 1   CROSS-EXAMINATION (continued) BY MR. ELY:

 2   Q    Mr. Irmiter, going back to the September the 30th of

 3   2019, shadowing of Mr. Spicer.  I believe yesterday you used

 4   the term "babysitting," that's what you all were there to do.

 5   Can you tell me exactly what your role was there?

 6   A    Yes.  We knew that Travelers had requested to do their

 7   own sampling.  We suggested to counsel that typically when

 8   available, we should be there and observe, and they asked us

 9   to do that.  So that was really our duty.  And to gather

10   concurrent samples.

11   Q    Along those lines, if Travelers had requested to be

12   present when you conducted your samples in May, May 29th and

13   30th, would you have had a problem with that?

14   A    No.

15   Q    Okay.  Was that ever a possibility proposed to you by

16   anyone at Maxus?

17   A    No.

18   Q    Okay.  And had it been asked, you would have allowed

19   that to happen?

20   A    I'm always in favor of concurrent sampling.

21   Q    Sure.  So with respect to --

22   A    Particularly when we go to the same areas.

23   Q    Yeah, I understand.

24        So with respect to the role of FBS on that day, did

25   you ask your employees to make sure to document everything?
                              414
```

1    A    As best they could, yes.

2    Q    And I believe you just testified that your issue is that

3    there was a cleaning wipe that was done on every location and

4    tossed on the floor?

5    A    Yes.

6    Q    Okay.  Is that something you all would have documented?

7    A    Yes.

8    Q    So let's look at Plaintiff's Exhibit 16, please.  Go to

9    page 262.

10         So if Chris Spicer had taken a wipe, thrown it on

11   the floor, would it have been your advice to your employees to

12   take photos every single time he did that?

13   A    No, not necessarily.  Just to note that that was being

14   done.

15   Q    Okay.  Is it your testimony that he did it on every

16   sample?

17   A    No, not necessarily.

18   Q    Okay.  Well, so let's look at the figure 1 and 2.  Is

19   this a photograph of what Mr. Spicer did?  Let's go to the

20   next figure, please.

21         This is on the day of the sampling.  These are

22   photographs FBS took?

23   A    Yes.

24   Q    Okay.  Is there any wipe on the floor that you can see?

25   A    Well, no, because the wiping process hadn't started yet.

                                415

```
 1   Q    Okay.  Let's go to the next one.  Let's go to the next

 2   page.

 3           Let's look here.  Are we seeing any discarded wipes

 4   on the floor here?

 5   A    No.  This is phase 5.

 6   Q    Okay.  Is it your testimony that Spicer did that in

 7   phase 5 as well as the other phases?

 8   A    I don't recall.  No, I don't -- I don't know.  As I sit

 9   here right now, based on these photos, I can't remember.

10   Q    Okay.  Well, did your employees tell you he was doing

11   that at the time?  You were on video phone, right?

12   A    Off and on.  Not constantly.

13   Q    Okay.  Did they tell you early in the process he was

14   doing that?

15   A    No.  Later in the process when he got to the opening of

16   the Sheetrock is when a lot of the wiping occurred.

17   Q    Let me back up.  And I asked a bad question.  Sorry.

18           Did he do -- did he begin doing that in the first --

19   with the first samples?

20   A    I'd have to look at the photos to recall.  I just don't

21   remember.

22   Q    Okay.  So don't see them here.  Let's go to the next

23   page, please.

24           Wipes on the floor here?

25   A    No.
```
                                416

```
1    Q    Next page, please.

2         Wipes on the floor here?

3    A    No.  But this is very consistent with how a wipe should

4    be done.  If you look at figure 10, notice the size of that

5    wipe.  That's what I talked about.  That is a wipe.  That is a

6    wipe sample that would typically be used in these.

7    Q    Okay.

8    A    Which is different than what we see later.  That was the

9    concern.  They changed their process --

10   Q    Okay.  What --

11   A    -- for some reason.

12   Q    -- do you mean "they changed their process"?  I don't

13   understand that.

14   A    They got these big wipes and started wiping large areas

15   and then sampling.

16   Q    Changed their process from what?

17   A    This is where they started.  This would follow -- in my

18   mind, this would follow the ASTM standard and what I was

19   trained in terms of how you take a wipe sample.  This is the

20   medium that you use.  This is the size that you use.  So this

21   would be textbook sampling based on the ASTM standard.

22   Q    Okay.  So with respect to the wipes on the floor, the

23   discarded wipe testimony you gave earlier, when your employees

24   told you that was going on, did you give them instructions to

25   take photographs of that?
```

417

```
 1    A    No, not necessarily.

 2    Q    Did you tell them to document that?

 3    A    No.

 4    Q    Okay.  All right.

 5    A    The photos document themselves, and those don't --

 6  again, please understand that what you're seeing right here

 7  early on is what in my mind should have occurred all the way

 8  through.  All a sudden these larger wipes are entered into the

 9  picture, and those wipes are not going into a bag and going

10  presumably to a lab for sampling.  That's the concern we have.

11    Q    Okay.  Are you familiar with Mr. Spicer's credentials?

12  You know what he is by profession?

13    A    Yeah.  He's an industrial hygienist.  Sure.

14    Q    Okay.  We'll have him later in the trial and he'll

15  explain.

16         So let's move on to the next thing, which is -- if

17  we could pull up Plaintiff's Exhibit 6, page 29 and 30.

18         This is something you mentioned yesterday I just

19  wanted to touch on briefly.

20         MR. ELY:  Keep going down.  It's 29 and 64.

21    Q    (BY MR. ELY) This is with respect to this first

22  photograph in the bottom right corner.  So you mentioned

23  yesterday that with respect to the sprinkler line, correct --

24  and you were out there April 24th.  The sprinkler line had

25  been ruptured before you showed up?
```

418

```
1    A    Ten days earlier, yes.

2    Q    Okay.  So -- and you mentioned yesterday that it had

3    been dried out in 24 hours?

4    A    24 to 48 is what I was told, yes.

5    Q    Who told you that?

6    A    Alex Stehl, director of construction, and also Woody

7    from Bomasada, who was the field superintendent on the job for

8    Bomasada.

9    Q    Do you know what specific steps Bomasada took to dry out

10   the building?

11   A    No.

12   Q    Did you see -- let's go to the next page.  This is a

13   hole in the subfloor in phase 5, right?

14   A    Where we stepped through it when we were inspecting.

15   Q    Did you observe other holes in the subfloor other than

16   those?

17   A    Yes.

18   Q    Do you know why they were there?

19   A    Well, they were consistent with holes that we created

20   stepping through the floor.  So they looked like areas where

21   people had stepped through the floor.  As I indicated, work

22   was ongoing.  They were removing subfloor.  So as you're

23   moving out, just take a piece of subfloor, it's not

24   unreasonable that a workman would step through to get there.

25   Q    And if, in fact, Bomasada had -- let me back up.
```

419

1           Phase 5 at this time was, as we talked about,

2    dried-in, April of 2019?

3    A    April 2019.  After the fire?

4    Q    Yes, sir.  Your first visit out there.  It had a roof on

5    it, it had windows?

6    A    In a manner of speaking, it was dried-in, yes.

7    Q    Fair enough.  Fair enough.

8           So if you have a sprinkler line break in there,

9    would you agree that the appropriate method is to punch holes

10   in the subfloor and let the water drain?

11   A    No.  The appropriate method is to drill holes in the

12   subfloor.  You don't punch holes.

13   Q    Okay.

14   A    Drilling holes is done all the time in everyday

15   construction when the project is delayed over that 90-day

16   period, which is the exposure rating for the OSB.  So if

17   you're coming up on that exposure rating, the manufacturer

18   recommends that you drill pilot holes to allow it to drain.

19   We saw no pilot holes drilled anywhere.

20   Q    I think you testified yesterday that you observed some

21   new subfloor that had been put in.  They were in the middle of

22   replacing it, right?

23   A    Yes.

24   Q    Is it -- just so I'm clear and I don't make an

25   assumption, at the time you inspected on April 24th, 2019,

                         420

1  that new subfloor was not damaged?

2  A    No, it was not.  And it's not in our damage model for

3  replacement.  We didn't replace it.

4  Q    Sure, sure.  So at that point in time, the subfloor in

5  phase 5 didn't need to be completely replaced?  There were

6  areas that were okay?

7  A    Yes.  I think there was select areas that were okay.

8  Yeah.

9  Q    All right.  Shifting gears, you mentioned yesterday that

10  you started working on -- FBS started working on the

11  Metropolitan in April -- around April of 2019.  You stayed on

12  the job until sometime in 2020 -- or '22?

13  A    '22.

14  Q    Sorry.  For almost three years.  And I believe

15  Mr. Abrams talked to you yesterday about you don't have a --

16  you don't have an interest in the value of the claim, any of

17  those kinds of things.

18         So my question to you is this:  How much has FBS

19  billed Maxus for its work out there since April -- between

20  April of 2019 and when you walked off the job in 2022?

21  A    Boy, I don't know.  Offhand, I'm guessing it's probably

22  $400,000, something like that, over a three-year period.

23  Q    Okay.  Mr. Irmiter, I want to go through a couple of

24  dates with you.  Do you recall the date that the tenants were

25  evicted from the Metropolitan?

                                421

```
 1   A     Not the specific date, no.

 2   Q     Does June 14th ring a bell?

 3   A     Yes.

 4   Q     2019?

 5   A     Rings a bell, yes.

 6   Q     We can agree on that?

 7   A     Yep, sure.

 8   Q     Okay.  And so I just want to walk through the steps

 9  leading up to that.  April 24th is the first day you're on the

10  site?

11   A     Yes.

12   Q     In 2019.  And at that point in time, you identified for

13  Maxus potential combustion byproduct problems as well as

14  construction defect problems?

15   A     Yes.

16   Q     I'm assuming between that week of April the 24th, you

17  communicated that to Maxus?

18   A     Yes.

19   Q     Okay.  You came back on May the 8th and May 9th?

20   A     We scheduled -- I want to be clear.  We scheduled the

21  May 8th and May 9th prior to leaving on the 24th.

22   Q     Okay.  So you came back to take samples on May 8th and

23  May 9th?

24   A     Correct.

25   Q     And that was -- those were the samples that we heard
```

422

```
 1   from Mr. Carlson about, 72 samples?
 2   A    Yes.
 3   Q    And I understood your testimony yesterday to be that
 4   when you finished sampling then, you were already planning to
 5   come back?
 6   A    Yes.
 7   Q    And so -- and I believe you also testified that you gave
 8   instructions to Bomasada to stop work?
 9   A    Yes.
10   Q    And I believe you testified yesterday when you came back
11   on the 29th and the 30th, unfortunately, some of the sites you
12   wanted to test, they were occupied?
13   A    Yes.  Work had been completed.  So work continued, yeah.
14   Q    But there were tenants in the apartments you wanted to
15   test?
16   A    Yes.
17   Q    Who leased those apartments?
18   A    Who leased them?
19   Q    Yeah.  Was it Maxus, or was it Bomasada?
20   A    Bomasada, I'm guessing.  I don't know who leased them.
21   I'm not familiar with the leasing arrangements or any of those
22   things, yeah.
23   Q    So did you advise Maxus at any point before May 28th and
24   29th to stop leasing apartments because there may be a
25   problem?
                               423
```

```
 1   A    Not specifically.  I mean, they knew the overall issues.
 2   We were doing more testing.  We wanted to continue the work.
 3   But, no, I don't know that we sat down and said stop leasing.
 4   Q    Do you think you had adequately expressed your concerns
 5   to either Mr. Howarth or Maxus by May 1st of 2019, such as
 6   they were, based on the information you had?
 7   A    No.  We probably began initial discussions in -- a week
 8   or so after Carlson's report came, but I can't remember the
 9   sequencing of when that was.  So not by May 1st because May
10   1st we hadn't sampled yet.  We sampled May 8th and 9th.
11   Q    But you had expressed your concerns after your initial
12   visit on April 24th as to combustion byproducts and to
13   construction defect?
14   A    No, I did not.  I expressed that the conditions were in
15   place that if, in fact, smoke reached phases 1 through 4,
16   conditions were in place that we were seeing in 5 that if they
17   existed in 1 through 4 and smoke got to that location, there
18   could be contamination.  How would I know until we sampled?
19   That's all I'm saying.
20   Q    Sure.  Got it.
21        So you issued your first report on June 5th, 2019?
22   A    Yes.
23   Q    And what was the status of the sampling that you had
24   conducted on May 28th and 29th?  Had the analysis been
25   completed?
```
424

```
 1   A    No.  It was at the laboratories.  It actually came in --
 2   I believe it came in right around the 10th of June, was the
 3   first one from EMSL.  So after the report was issued and right
 4   at about the time people moved out.
 5   Q    Okay.
 6   A    Yeah, or began moving out.
 7        MR. ELY:  Let's pull up Plaintiff's Exhibit 141, if
 8   you would.  Let's just go to the first page, please.  No.
 9   Sorry, 17.
10   Q    (BY MR. ELY) So this email is dated Tuesday, June the
11   11th, 2019.  Who is Stefan Wiersgallia?  Do you know him?
12   A    I have no idea.
13   Q    Do you know who you spoke with at EMSL?
14   A    No, I don't recall.
15   Q    So the email says:  I just confirmed with Tom they are
16   looking to do CBP level 4 on all samples submitted.
17        You communicated with EMSL at some point, correct?
18   A    Oh, yes.
19   Q    This is on June 11th.  By this email, it looks like the
20   sampling of the analysis had not been done.
21   A    Their analysis had not been done.
22   Q    Okay.  Who -- so let me ask you this:  With respect
23   to --
24   A    Well, I don't -- let me back up.  We had sent them the
25   samples from the inspection that predated June 11th.
```
425

1  Q    Sure, yes.

2  A    And I can't tell you at this point in time if the

3  samples had been done yet or if they were getting ready to be

4  done and that's what triggered this.  I just don't know in

5  their process how long they sat at their lab.

6  Q    That's fair enough.

7  A    But they had them prior to this.

8  Q    You sent them June 5th?

9  A    Yeah.  So they had them for six days when this email

10  came out.

11  Q    I'm not asking you to speak what EMSL's process is.

12  A    Yeah.

13  Q    The second sentence:  This is for an apartment fire in

14  Birmingham that had a $25 million loss.

15       Did you tell Stefan Wiersgallia that the loss at the

16  Metropolitan was $25 million?

17  A    No, I never would have ever said that to anybody in a

18  communication.  I've never done that in my career.  So I don't

19  know if this was a subsequent conversation that he had with

20  Chuck Howarth or where that came from.  And at that point in

21  time, the only person that would have had any idea on a

22  ballpark number would have been Mr. Howarth, the public

23  adjustor.

24  Q    Was Mr. Howarth also talking with EMSL, or were you the

25  point of contact?

426

```
 1   A    I don't know if he talked to them, but I would never
 2   have said this.
 3   Q    Okay.  Is anybody -- was anybody at FBS in contact with
 4   EMSL other than you?
 5   A    Not that I'm aware of, but I don't know.
 6   Q    Okay.  Let's go up to -- just so we can get a date.
 7   Let's go up to the previous page.
 8           The -- on this internal chain of custody, you see
 9   the due date, 6/17/2019?
10   A    Yes.
11   Q    Do you recall whether you had EMSL results back before
12   June the 13th?
13   A    Before June 13th?
14   Q    Yes, or June 14th.
15   A    No, they came back after that.
16   Q    What about the MicroVision results?
17   A    I think they came back after as well.
18   Q    Okay.  With respect to the decision to evict the
19   tenants, were you involved in those conversations with Maxus?
20   A    Yes.
21   Q    Tell me about those conversations and what your position
22   was.
23   A    My discussions with them were based on the initial 72
24   samples, based on the conditions that we saw in phase 5 and
25   part of phase 4 that was not complete on our initial
```

427

```
 1    inspection; that the conditions existed for
 2    cross-contamination throughout the other phases that were
 3    occupied; that two issues were -- two additional issues were
 4    discussed.  One, that those areas in 1 through 4 are going to
 5    have to be cleaned, as demonstrated by Travelers' decision to
 6    agree to clean 5.  So now we just need to clean the rest.
 7              How are we going to do that?  Is it possible to do
 8    that with tenants living there?  Is it possible to keep
 9    renting the space?  Those are all their decisions.  I'm just
10    giving them options.  That's all I'm doing is saying here are
11    the various options that we can deal with.
12    Q    So was there ever any discussion that the decision to
13    evict might want to wait on the MicroVision and EMSL results?
14    A    No.
15    Q    You didn't recommend that they wait on that?
16    A    Not that I recall.
17    Q    So the decision to evict the tenants was based solely
18    on -- at the time, all the information you had was your
19    inspections and the Carlson analysis?
20    A    The timing on their decision was based on the
21    information that they had at that time, which did not include
22    the MicroVision and the EMSL report.
23    Q    Okay.  And that would be only your inspections and the
24    Carlson report?
25    A    Well, and whatever information they had to make that
```
428

1    financial decision.  I can't speak to their internal policies.

2    Q    Okay.  So the EMSL and MicroVision reports came after

3    June 14?

4    A    Yes.

5    Q    When did you issue a report, any report on either one of

6    those reports from EMSL and MicroVision?

7    A    I don't recall in the reports when we issued that.  We

8    may have touched on it on the October 5th, 2020, report -- or

9    2019.  I just don't recall.

10   Q    Do you recall if Mr. Spicer was provided the EMSL or

11   MicroVision reports before he came out on September the 30th?

12   A    I have no idea what he was given.  We do not give

13   experts on the other side our file when it is in litigation.

14   That is up to the attorneys to do that.  We don't talk to each

15   other.  That's common practice.  I'm not on the phone with

16   Spicer, and he's not on the phone with me talking.

17   Q    I understand.

18   A    It's an arm's length.

19   Q    The period of time I'm talking about is June of 2019,

20   when you got the reports, to when Mr. Spicer came out

21   September the 30th of 2019, which was all prelitigation.  Did

22   you provide any reports to the attorneys or anyone and suggest

23   that Mr. Spicer be provided those reports?

24   A    I provided the attorneys with all of our files as they

25   came in.  What they do with them is their decision.  I do not

                              429

```
 1   direct the attorneys, and I do not suggest to the attorneys

 2   how to manage their caseload.

 3   Q    Fair enough.  Fair enough.

 4        Mr. Irmiter, with respect to the ember damage on the

 5   doughnut building, would that water damage have occurred,

 6   continue to occur up until the time that those embers, if they

 7   were there, were repaired?

 8   A    Removed and repaired, yes.  It would have continued

 9   until those patches happened.

10   Q    Every time it rained.

11   A    Every time it rained.

12   Q    And you don't know when those repairs took place?

13   A    I do not know specifically, but I know that -- and we

14   have pictures of this in the ACT report that show phase 5 roof

15   prior to it being replaced with hundreds and hundreds of

16   patches on it.  So presumably when they patched phase 5 after

17   the fire, when they finally had access.  Remember, they

18   couldn't get to the site for -- because it was closed down.

19        Once they got to the site and did the temporary

20   repairs on 5, that's more than likely when they would have

21   done the other ones.

22   Q    So at the -- if the ATF released the site the first week

23   of October, the repairs couldn't have taken place before then?

24   A    Well, the photo that ATC is showing is of the repairs

25   that are already done.  So they were done before ATC got there
```

430

```
 1   and after Bomasada was given access back when the site was
 2   reopened.  I don't know that time slot.
 3   Q    Okay.  And just so I'm clear, you're referring to phase
 4   5?
 5   A    Well, phase 5, yes.  That's what they have photos of.
 6   But presumably that's when they walked the rest of the roof
 7   and did the other repairs.
 8   Q    But you don't know that?
 9   A    I do not know that, no.
10   Q    The water damage would have continued to occur up until
11   the time those roof repairs were made on the doughnut?
12   A    Yes.
13   Q    So if it rained after September the 30th of 2018, that
14   damage would have occurred during that period of time?
15   A    With each rainstorm, there would have been water that
16   would have entered, yes.
17            MR. ELY:  Thank you, Mr. Irmiter.
18            THE WITNESS:  Thank you.
19            MR. ABRAMS:  Redirect, Your Honor?
20            THE COURT:  Yes.
21   REDIRECT EXAMINATION BY MR. ABRAMS:
22   Q    Mr. Irmiter, I want to cover some of the topics that you
23   were asked about by Mr. Ely.
24            First, let's talk about the sampling methods that
25   you did.  You did more than one type of sampling method,
                              431
```

```
 1    correct?

 2     A    Yes.  We did four types.

 3     Q    You did a tape lift?

 4     A    Yes.

 5     Q    Did wipe?

 6     A    Yes.

 7     Q    You did bulk sample?

 8     A    Yes.

 9     Q    And you did air-o-cell, correct?

10     A    Yes.

11     Q    Now, there's some talk about air-o-cell, and air-o-cell

12    wasn't in the standard that Mr. Ely put up.  Would you explain

13    what air-o-cell is?

14     A    It's tape in a can.  That's what we call it in the

15    industry.  So we showed you the little vial, the picture of

16    the plastic vial that's sealed on each side, and we open up

17    and we hook it to the machine.  And we run air through that.

18    Embedded in there is a tape lift.

19     Q    Okay.  So it's a tape inside an air sample?

20     A    Yeah.  It's a more convenient way to do a broad spectrum

21    sample of a large area.

22     Q    Okay.  By the way, you were asked -- you were shown

23    pictures of discoloration coming out of the vents.  We saw

24    those yesterday.  Mr. Ely showed you these again today.

25              When you went first to the Metropolitan April 24,
                             432
```

1  2019, did you smell smoke?

2  A    A little bit in 5 because 5 wasn't conditioned.  But,

3  no, in the rest of the building, as we walked through, it

4  smelled like paint and brand new construction.

5  Q    Okay.  And I should have been more clear.  1 through 4,

6  you didn't smell any smoke?

7  A    No.

8  Q    Did you ever smell any smoke at 1 through 4 at the

9  Metropolitan?

10  A    Absolutely.

11  Q    When did that occur?

12  A    So once the building was unoccupied and the people moved

13  out, during the remediation process when you're remediating,

14  you have to turn off all the HVAC systems.  So as soon as we

15  decommissioned the building and the ambient temperature in the

16  building got within 5 degrees of the outside temperature -- so

17  the working conditions were hot inside -- all a sudden you

18  could smell the smoke.

19        That is typical of what we hear.  One of the

20  complaints we hear from consumers after fire losses, even

21  after the remediation work is done when it's not done

22  correctly, is six months later:  Why does my house smell like

23  smoke still?

24        All right.  It typically is connected, directly

25  connected to rise of dew point and humidity.

433

1    Q    So when you -- so when you were first there on April

2    24th, 2019, and you're looking around 1 through 4, you don't

3    smell smoke, was the air conditioning on?

4    A    Yes.  And it was also on when Spicer did his

5    inspections.

6    Q    Let's switch to the roof, and I want to make sure that

7    we have this clear.  And I'm talking about the roof on phases

8    1 through 4.  Mr. Ely just asked you a little bit about this.

9         By the way, just to give us -- we saw some pictures

10   from GAF.  Give us a magnitude.  How big is this roof?

11   A    It's basically 4 acres.

12   Q    4 acres?

13   A    Yeah.

14   Q    Okay.

15   A    A big roof.

16   Q    So when GAF took those pictures, they did their

17   inspection, had the patching already been done?

18   A    I'd have to look at the date, but I believe so, yes.

19   Q    Okay.

20   A    Yeah, they had.

21   Q    It's February, right?

22   A    Yeah.

23   Q    Tell us how much -- of this 4-acre roof, were there 1 or

24   2 patches?  How many patches were on this 4-acre roof, 1

25   through 4?

                                434

```
1    A    Multiples of hundreds.

2    Q    Multiples of hundreds?

3    A    Yes.

4    Q    Okay.  And when you looked under the roof, under the

5    patching, did you see signs that was consistent with embers

6    that had gotten on the roof?

7    A    Well, holes that had been created, yes.  And I want to

8    be clear that we show in our report four or five or six

9    pictures of residual ember damage, okay, that is on phases 1

10   through 4.  The reason we're showing that is because when

11   we -- and you have to look at when we show those photos, when

12   we publish those photos in our reports.

13        When you look at the videos that are showing embers

14   being shot into the air, when you look at the videos that show

15   the shifting of the smoke towards the buildings, all we were

16   doing three years later is seeing if there were any signs of

17   that left on the roof anywhere, and we found like five.

18   Q    Okay.

19   A    Yeah.

20   Q    That's where I was going to get to.  I think it's

21   important to understand the dates here and the sequence.

22   A    Yeah.

23   Q    So fire occurs at the end of September.  ATF is doing

24   their investigation.  Mr. Ely just talked about it.  Can't get

25   into the building for a while.  And on this roof, 1 through 4,
                               435
```

```
 1    there are hundreds of patches that are done, correct?

 2    A    Yes.  Multiples of hundreds, yes.

 3    Q    Multiples of hundreds that are done.

 4            And then months later, GAF comes back, and there's

 5    some pictures where it's after the patching, correct?

 6    A    Yes.  And they're looking at at least -- he showed me a

 7    limited part of the report.

 8    Q    That's okay.  My point is that happens afterwards?

 9    A    Yes.

10    Q    You come back.  And when you get back on the roof later,

11    you don't see hundreds of ember holes because they'd been

12    already patched?

13    A    Right.

14    Q    You see how many on this 4 acre?

15    A    1,500, 2,000.

16    Q    No, no, not patches.  How many parts were not patched on

17    that roof by the time --

18    A    We found maybe five small locations.

19    Q    Out of 4 acres?

20    A    All we were doing was looking for the possibility that

21    embers had gone onto the roof, which would have required the

22    patching.  Those are signatures of that.  That's all that is.

23    Q    And when you opened up the roof and you got under the

24    patching, what did you find?

25    A    Typically at the locations where the patches had been
                                 436
```

1    done, there were areas of water.  You could see where water

2    had come in and had dried out.

3    Q    Okay.  But it wasn't wet?

4    A    No.  And interestingly enough, those areas were not

5    rotted because understand, here's my low part of the roof

6    where the rot occurs.  Here's my holes.  Water comes through

7    that hole, but it doesn't sit there.  It goes down to the end,

8    and that's where it sits.

9         It's kind of like when you take a towel and you hang

10   it on the line.  What dries first?  The upper part.  All the

11   water goes down to the bottom.  That's exactly what happens on

12   this roof until it's patched.

13   Q    And I want to switch a little bit on the roof to talk

14   about the lack of insulation.  You got some questions about,

15   okay, there was a lack of insulation on a portion of the roof.

16   Had the insulation been there, would that -- would that have

17   eliminated the damage that needed to be corrected?

18   A    No.  It would not have eliminated the damage.  It simply

19   would have lowered their heating and air conditioning costs,

20   as I testified before.  And I think what's important to know

21   is that there was, in fact, insulation in the roof.  We call

22   the roof the roof assembly.  In the building code, the roof

23   assembly starts at the interior ceiling, the back side of that

24   ceiling all the way up through the roof membrane.  That's the

25   assembly.

                         437

```
 1              So within that assembly, underneath within the
 2    trusses, there was actual insulation.  That's an important
 3    piece.
 4    Q    All right.  I want to switch next.
 5              MR. ABRAMS:  Melissa, sorry about this.  Would you
 6    put up slide 53 from yesterday?
 7    Q    (BY MR. ABRAMS) So, Mr. Irmiter, we talked about damage
 8    to the roof on 1 through 4, and then you've got -- in your
 9    damage calculation, you've got 7 percent, the amount above the
10    window line that you say is fire related.
11    A    Yes.
12    Q    Okay.  And that equals about $250,000?
13    A    Yeah.
14    Q    Okay.
15    A    That's how much.
16    Q    So what are we seeing here in 53?
17    A    We're seeing damage that is caused by two things in this
18    location.  We're seeing damage that is dry here, and it
19    continues this direction.  And we're seeing damage right here
20    that was actually wet out about this far and traveled down the
21    wall.
22    Q    Okay.
23    A    This is a defect.  This is fire related.
24    Q    Okay.
25    A    So what we did in this case is we allocated to replace
```
                                  438

1    the OSB roof deck.  But all of this, because this is water

2    damage, required replacing all that framing, 10 feet of it.

3    That went into the construction defect bucket.

4    Q    Okay.  Are we seeking any money from Travelers for that?

5    A    No, just for the OSB.

6    Q    Okay.

7    A    Just the roof damage.

8    Q    Which was damaged as a result of the embers and the

9    water coming underneath?

10   A    Yes.  But because we couldn't draw -- if this had all

11   been dry right here next to the flashing, we would have

12   eliminated construction defect.  But because we had some

13   contribution here, okay, all we're asking to do is repair,

14   replace the OSB.  This would be related because part of it's

15   here to defect.

16           In other words, if this entire -- these three boards

17   all the way across here, if they cost -- to set up the

18   scaffold in that one location, to just do that little bit of

19   work there, it's complicated, if that would have cost, you

20   know, $2,000, what we didn't do is we didn't say, okay, we're

21   going to allocate -- based on the square footage, we're going

22   to allocate 3 percent to construction defect and -- or 3

23   percent to construction defect, 97 percent to fire.  With this

24   framing, we said, No, we'll just take all of this and put it

25   in construction defect so we don't have to pick this fight.

                                439

```
1    Q    Okay.

2         MR. ABRAMS:  Will you put up slide 43, please.

3    Q    (BY MR. ABRAMS) Okay.  This is -- switching gears.  This

4    is taken from the subfloor in phase 5, correct?

5    A    Yes.  Upper floor, fourth floor.

6    Q    And this is parts -- well, we talked about this

7    yesterday.  What does this reflect?

8    A    This is the subfloor that was in the process of being

9    removed.  When we got there and we talked about the condition

10   of this and how I eliminated this as being from the pipe burst

11   that occurred ten days before as opposed to water that sat on

12   this for a much, much longer period of time.

13   Q    Okay.

14        MR. ABRAMS:  All right.  You can remove that.

15   Q    (BY MR. ABRAMS) One last thing.  You were asked about

16   other water damage at the Metropolitan and that you found mold

17   and so forth relating to that.

18        Is Maxus seeking any of that -- those monies from

19   Travelers?

20   A    No.

21        MR. ABRAMS:  Thank you.  No further questions.

22        MR. ELY:  Nothing further, Your Honor.

23        THE COURT:  Thank you.

24        THE WITNESS:  Thank you, jury.

25        MR. ABRAMS:  Your Honor, we have to find our next
                                440
```

```
 1   witness.
 2              THE COURT:  What are we waiting on?
 3              MR. ABRAMS:  Dave Johnson, Your Honor, who I believe
 4   is here.
 5              Your Honor, he's parking the car.  Can we take five?
 6              THE COURT:  We can take five minutes and just sit
 7   here.  By the time they get up and get here -- you need to
 8   have your people ready to go.
 9              If you need to stand and stretch, feel free to do
10   that.
11   DAVID JOHNSON, being duly sworn by the courtroom deputy,
12   testified:
13   DIRECT EXAMINATION BY MR. ABRAMS:
14   Q    Would you please state your name for the record.
15   A    David Johnson.
16   Q    You think you'll need these?
17   A    I do.
18   Q    Mr. Johnson, where do you reside?
19   A    I live at 4217 Normandy Lane, Kansas City, Missouri.
20   Q    And tell the jury, what do you do for a living?
21   A    I spend most of my time in a real estate company called
22   Maxus Properties, but I also am the control shareholder of a
23   bank called Verimore.  And excuse my breath.  I sprinted up
24   the hill, so I'll calm down here in a minute.  I'm sorry I'm a
25   minute late.
```

441

```
 1            Then I also am the founder of Chicken N Pickle, an
 2   indoor/outdoor restaurant concept with two in Kansas City
 3   headquartered here.
 4   Q    Well, we're here to talk about Maxus, tell us briefly --
 5   and the jury's heard a little bit about Maxus, but tell the
 6   jury about what Maxus does.
 7   A    Maxus Properties -- there's a Maxus Properties REIT that
 8   owns apartment complexes, and there's a Maxus property
 9   management company owned by the REIT that manages all these
10   apartment complexes and a few for third parties.  They manage
11   about 8,000 units today.
12            One of the units they managed was the Metropolitan
13   subject to this lawsuit that was actually owned by MOF Fund 1.
14   The REIT owns part of that.  So there's different ownership
15   there.  But Maxus, as I use that today, is a management
16   company of about 200 people that manages apartment complexes
17   and a few shopping centers day to day.
18   Q    Where is Maxus located, its headquarters?
19   A    Just where I ran from, 104 Armour, North Kansas City,
20   Missouri.
21   Q    I'm impressed that you did that.
22            And tell us, what's your role at Maxus?
23   A    I'm the chairman of the company and am involved in
24   day-to-day activities with the property management company.
25   Q    Let's talk about the Metropolitan Apartment complex in
                                442
```

1   Birmingham.  How did Maxus come to purchase that apartment

2   complex?

3    A    About six or seven years ago, there was a tax bill

4   passed that created opportunity zones.  And I'm an old tax

5   CPA.  And I think the opportunity zones are an attractive way

6   to invest money, especially if you have capital gains.

7            So we set up a team of people to go look for

8   apartment complexes and opportunity zones across the United

9   States.  We identified Metropolitan as one of those.  You need

10  to buy them before they're placed in service.

11   Q    All right.  So let me pause you right there.

12           So I think I talked about this a little in opening,

13  but can you give a brief description?  What's an opportunity

14  zone?  Where are they located?

15   A    In this litigation six, seven years ago, the government

16  identified distressed areas.

17   Q    You said "litigation."  You meant legislation?

18   A    Sorry.

19   Q    You've got litigation on your mind.

20   A    I do.  I'll slow down.

21           Six, seven years ago, legislation was passed that

22  identified distressed areas in the United States by census

23  tract.  There's some here in Kansas City, some in every state.

24  So we looked at all those census tracts in the United States

25  and looked for apartment complexes under construction there.

                          443

```
 1          Opportunity zones were created by the government to
 2    create -- to encourage investments in distressed areas for the
 3    purpose of job growth and economic growth.  So they highlight
 4    trying to build new apartments, new businesses, and things.
 5          And we, being a real estate company, concentrated on
 6    trying to find new apartments in opportunity zones.
 7    Q    So before you purchased the Metropolitan, did you go
 8    down to Birmingham and look at the property?
 9    A    I did go see it a couple of times before we closed on
10    the purchase, yes.
11    Q    And what state of construction was it in?
12    A    When I first went down there, I believe there was no
13    units leased at all, and construction was probably about 80,
14    85 percent done.  I remember one of my first meetings sitting
15    in the welcome center, the offices of it.  They were done.
16    The offices were done, but I don't believe they'd gotten a TCO
17    by that time to move tenants in.
18    Q    And was there anything unusual about the way the
19    property, the condition of the property when you observed it?
20    A    Actually I've told many people, your first view of this
21    property is it's really beautiful.  It's in an area much like
22    our Crossroads area, little outside downtown with some good
23    bars and restaurants across from a hot chicken place they
24    called Hattie B's, redeveloping, nice area.  We were very
25    excited to purchase the complex and thought that it had a good
```

444

```
 1   future.
 2   Q    You said it's in a nice area, but I thought you just
 3   told us it was in an opportunity zone?
 4   A    Much like parts of The Crossroads here, I love The
 5   Crossroads in Kansas City.  To frame it up, a little part of
 6   The Crossroads is an opportunity zone, and they do that by
 7   economic factors and the people who live there and wages and
 8   so forth.
 9        So even though it's an up-and-coming area, I think
10   we'd all say Crossroads is in a city in the United -- and the
11   government are encouraging development in these areas.
12   Q    And so we've all heard about the fire that occurred.
13   Well, let's step back.
14        When -- do you remember when you purchased, when
15   Maxus purchased the Metropolitan?
16   A    My memory is -- I'm not great at dates -- June of 2018.
17   Q    I don't think you are good at dates, because I think it
18   was actually August 31, 2018.  Does that sound right?
19   A    Yes.  I knew it was 2018.
20   Q    Do you remember the fire occurring shortly after you
21   purchased --
22   A    About 30 days later.  I believe that was in September.
23   Q    The fire occurs.  And does Maxus put Travelers on notice
24   of the loss?
25   A    The -- when the fire occurred, it was still under
```
                                445

```
 1    construction.  We had a general contractor on the property.
 2    So my memory is from day one, we worked with Bomasada, who was
 3    building it and I believe whose name the insurance was in, and
 4    we were an additional insured.  We worked with them day one to
 5    go contact Travelers.  So Bomasada may have done it, we may
 6    have done it, but we were involved with them as a team day one
 7    to get Travelers involved.
 8    Q    So right after the fire occurs, were you able to go in
 9    and look at the condition of the Metropolitan?
10    A    Soon thereafter, I took a trip down to see it, yes.
11    Q    Was there -- was there a hold on being able to look at
12    the property because of an ATF investigation?
13    A    My memory is it was virtually on shutdown.  I've had one
14    other apartment complex in my life that was subject to this
15    type of thing by ATF.  It was an arson in Little Rock.  Very
16    impressive that they shut down the site, and we were hardly
17    able to tour it, and you could do no remediation.  You could
18    not get started on fixing it until the site was released back
19    to us from the ATF.
20    Q    Okay.  I'd like you to look at -- we have hard copies,
21    but we're also going to put some things on the board.
22           I'm going to direct you to look at Exhibit --
23    Plaintiff's Exhibit 268.  You have a screen in front of you,
24    Mr. Johnson, if that's helpful.
25    A    Okay.  I've got it.
```
                            446

```
1   Q    This is a document, an Alabama Department of Insurance
2   Consumer Request for Assistance document; is that right?
3   A    Yes.
4   Q    What is this?
5   A    My memory is right after the fire and even as we started
6   getting to release the property, we started to believe
7   Travelers was not acting very promptly.
8   Q    Let's get some dates out there.  So the fire occurs on
9   September 27th, 2018.  What's the date of this document?
10  A    Where is it at?  I'm sorry.
11  Q    There's a highlighting.
12  A    It's dated November 20th, 2018.
13  Q    November 20th, 2018.  So almost two months after the
14  fire?
15  A    Correct.
16          MR. ABRAMS:  If we go to the next slide, this is
17  part of the -- one more.
18  Q    (BY MR. ABRAMS) So, Mr. Johnson, you were telling us
19  about this document.  What prompted you to make a complaint to
20  the Alabama Department of Insurance?
21  A    In my view, Travelers was being very slow, and in my 30
22  or 40 years in real estate, it's absolutely critical up front
23  to get the insurer to agree that they have coverage on you.
24          There's a lender on this who's very concerned that
25  there's going to be enough funds to rebuild it and to finish
```
447

it.  So each time you try to immediately get the insurer to
agree that they'll cover a loss.

Q    Are the parts that are called out here on the screen, is
that part of -- are those portions of your complaint to the
Alabama Department of Insurance?

A    They are.

Q    And will you read those, please?

A    Above-mentioned policy.  Since that notification,
Travelers has continuously delayed processing the claim; and
after a month and a half, has still not reached a coverage
determination.

Q    And the next one?

A    Alabama Department of Insurance Administrative Code
482-1-125.07 states that the first-party claimant shall be
advised of the status of acceptance or denial of the claim by
the insurer within 30 days or the number of days specified in
the policy after receipt by the insurer of properly executed
proofs of loss.  After 53 days, Travelers has still not given
Bomasada any legitimate reason why more than a month was
needed to simply determine coverage in this matter.

Q    When you're writing this with Bomasada in November,
almost two months after the fire, had Travelers told you yet
that you have coverage under this policy?

A    No.  We were on pins and needles to get the
determination.

                              448

```
1    Q    Can you tell us what this document is?

2    A    It's a letter from Travelers to Jason Johns, who was the

3    attorney for Bomasada.

4    Q    Okay.  This is Plaintiff's Exhibit 259.  What's the date

5    of this letter?

6    A    November 29th, 2018.

7    Q    Okay.  So nine days after you made your complaint to the

8    Alabama Department of Insurance?

9    A    Yes.

10   Q    So -- and what does this letter reflect?

11   A    This letter is very important that Travelers agrees that

12   coverage is going to be provided for the full loss per the

13   policy.

14   Q    So this was the letter you were looking for?

15   A    This is a critical letter, yes.

16   Q    60 days after the fire?

17   A    Yes.

18   Q    All right.  When -- let's talk about the problems at 1

19   through 4 and the combustion byproducts; smoke, char, and ash.

20        So at this point, did Maxus have an idea that there

21   was a problem with combustion byproducts in phases 1 through 4

22   of the property?

23   A    No.  I'd been to the property.  1 through 4 appeared to

24   me to be unharmed, untouched, were still a very, very nice

25   apartment complex.  It was at the time very well-occupied.
                              449
```

1    Q    So tell us how did you come to hear about an issue

2    related to combustion byproducts in 1 through 4?

3    A    We were encouraged by our outside advisers to get an

4    environmental impact of what the fire had done to the whole

5    complex, not just buildings 6 and 5.

6    Q    Okay.  And that didn't -- but you don't do that until

7    the spring of 2019, months after the fire; is that correct?

8    A    Yes.

9    Q    And so what is it that prompted them to give you this

10   advice, or what was happening?  Why did it take so long to

11   say, Hey, we may have a problem in 1 through 4?

12   A    The entire process was slow.  It started with the ATF.

13   It started with we weren't the frontline at the time with

14   Bomasada to get them to rebuild it.  So this whole process

15   took longer than we would have liked.

16             But at some point early in that year, we got advice

17   that everywhere we looked in 6 and 5, there's all kinds of

18   soot and fire damage.  You better go look at buildings 1

19   through 4.

20   Q    Okay.  So let's go to Plaintiff's Exhibit 301, the May

21   1st, 2019, letter.

22             So tell us what this letter is, Mr. Johnson.

23   A    It's a letter from Maxus Metropolitan, LLC signed by me

24   as the manager, and I was trying to push and lay out to

25   Travelers the breadth of the problem we had here; and, again,

                              450

```
 1   encourage them to try to move quicker to help us.
 2   Q    Okay.  And you say here, Hey, we may have an issue
 3   relating to combustion byproducts in 1 through 4?
 4   A    Yes, we did.
 5   Q    All right.
 6        MR. ABRAMS:  Let's go to the next slide, Plaintiff's
 7   Exhibit 6.
 8   Q    (BY MR. ABRAMS) All right.  This is a fire damage report
 9   dated June 5, 2019, correct?
10   A    Yes, it is.
11   Q    All right.  This is a report that you got from FBS and
12   Mr. Irmiter, correct?
13   A    Yes, it is.
14   Q    And what was your understanding of the results of this
15   initial test from Mr. Irmiter?
16   A    Well --
17   Q    This report from Mr. Irmiter.
18   A    It was a very lengthy report, but I remember to this day
19   focusing on the part where it was -- first time it became
20   fully aware to me that we had real problems with environmental
21   conditions in buildings 1 through 4.
22   Q    And what was your reaction to receiving that report?
23   A    I've got to tell you when I read it, it took my breath
24   away because I had no idea that we had serious problems there.
25   Again, I had seen the property.  If you would have seen the
```

451

```
 1   property, you would think it's fine.
 2            Yeah, next door to it was a burned-down building.
 3   Apartment 6 was devastated, burned to the ground, but this was
 4   a normal looking apartment complex with people living in it.
 5   I'd been in it.  I didn't smell anything.  I didn't have any
 6   concerns before this report about leasing units to people in
 7   there.
 8            And then you get this report, and it says you have
 9   real problems in there, and our tenants, our families, our
10   customers are at risk.
11            MR. ABRAMS:  Can we go to the next slide, please,
12   Melissa.
13   Q    (BY MR. ABRAMS) All right.  This is Exhibit 309.  It is
14   a -- can you tell us what this is?
15   A    Almost immediately after getting the report, we talked
16   with our attorneys.  We talked internally with them.  We said,
17   We have to do something right away.
18            So Lathrop & Gage, our attorneys, they're
19   representing us today, write a letter, it appears to me to be
20   the day after, alerting Travelers we've got real problems
21   here.  We have real concerns here.  We have life safety issues
22   of our customers.  And we wanted Travelers fully in the loop
23   day one.  We were hoping they would treat us as a partner and
24   work together to fix a big problem.
25   Q    And are you seeking Travelers' input on the issue?
                                 452
```

```
 1    A    Yes.  At that time and for all over I don't know how
 2  many letters and phone calls, I reached out to Travelers'
 3  adjustor.  I tried to get ahold of the chairman of the
 4  company.  This was a real problem, a life safety problem,
 5  multimillion dollars that I was trying to get Travelers to
 6  focus on.
 7    Q    Why was it important for Maxus and you to get Travelers'
 8  input on these issues?
 9    A    It is apparent to me, and we did, that the only option
10  we had was to move those people out as soon as we could.  And
11  we wanted Travelers involved in that because I believe that we
12  had insurance on them.  So I believe I had a moral obligation
13  to move them out, but I believed the economics of it would
14  fall on Travelers.  And we wanted them to know day one that we
15  didn't have a choice, that we knew we had business income, but
16  I -- I didn't do this because I wanted to.  This was an
17  absolute need to move those people out.
18    Q    So this letter written by a very handsome attorney in
19  Kansas City dated June 7th, did you get a response to that by
20  June 11?
21         MR. ABRAMS:  And if you put the next slide up.
22    Q    (BY MR. ABRAMS) This is Plaintiff's Exhibit 310.  What
23  is this?
24    A    They had not read the report yet, the best we could
25  tell.  We had not got a response from Travelers four days
                              453
```

1    later.  I got the report and read it in an hour and knew it
2    was all hands on deck.  Here we are five days later with life
3    safety issues, and we -- Travelers is not engaged that I can
4    tell.
5    Q    Okay.  So let's go to the next exhibit, Exhibit 311.
6    Did Travelers respond to your previous letter on June 12th?
7    A    Their attorneys responded on June 12th.
8    Q    Okay.  Will you read -- well, will you read to the jury
9    what's stated by Travelers' lawyer, another handsome lawyer
10   from Birmingham, Alabama, who wrote this one.  Will you read
11   what Mr. Ely responded?
12   A    I will.  Travelers has not undertaken and will not
13   undertake any technical, feasibility, safety, or other review
14   of the report or opinions of Mr. Irmiter.  Therefore,
15   Travelers cannot and does not take a position regarding the
16   alleged necessity of instructing the residents to vacate the
17   premises.
18   Q    So what did you do?
19   A    We had no -- we had no choice.  Travelers -- we get the
20   money from them or not, those people had to be moved out.  I
21   could not live, my company.  We had a meeting with Cheryl
22   Marshall, our CFO, and others.  It was not a close decision.
23   This is life safety.  This is people's lives.  This is our
24   customers.  We had to move them out as soon as possible,
25   whatever the short-term cost and the short-term damage to us.

454

```
 1    Q    Did you -- did tenants express any upset with you
 2    when -- well, let's put up the next slide first, and then
 3    we'll ask you the question.  Plaintiff's Exhibit 313.
 4              This is dated June 14, two days later after
 5    Mr. Ely's letter.  What is this?
 6    A    This is a letter.  I remember drafting it with Cheryl
 7    and Ryan Snyder, our CFO.  We spent great time on this to
 8    alert as soon as we could, to notify all the tenants currently
 9    living in buildings 1 through 4 that we were going to require
10    that they move out, no matter the short-term cost to us.
11    Q    What kind of accommodations did you make to your
12    tenants?
13    A    We -- I think we did rent reduction.  We tried to help
14    them with moving.  I don't remember if we said it in here.  I
15    remember clearly we set up a call-in center for a Saturday
16    right after that.  I don't know what day of the week that was.
17    I think it was during the week.
18              I remember sitting in the conference room with
19    Cheryl Marshall and the team fielding 30 or 40 calls from very
20    upset residents that they were having to move out, and they
21    ran the gamut of reasons.  Some were upset because -- I
22    remember I talked to several of them myself.  Several were
23    like, I live here and there's nothing wrong with it.  Why are
24    you making me move out?  I moved in 30 days ago.
25              We just said, We believe it's a life safety issue.
```

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

```
 1   We are going to require you to go.  Then there was some that

 2   thought we hadn't moved quick enough.  Why did you not get

 3   this report to us months ago?  My memory is we gave them the

 4   report very soon after that.  We didn't make them file a

 5   lawsuit or do anything.  We gave people this report.  We

 6   wanted them to know what was going on.

 7           So there was some people who didn't want to move

 8   out.  Some people thought we should have moved them out

 9   sooner, but they were all mad and upset.  And I get it.  Who

10   wants a letter that says you get to move out of a brand new,

11   nice apartment in a couple days?

12   Q    And did you make any monetary accommodation, aside from

13   you -- you said there was a reduction of rent.  Was there also

14   a monetary accommodation to the Metropolitan residents that's

15   in this letter?

16   A    Yes.  We -- without knowing if Travelers would help us

17   or do anything, we said we'll pay you $2,000 moving allowance

18   to help you.  We had staff there.  We called around and tried

19   to find other apartments in the area.  We tried to do

20   everything we could; because, again, these are your customers.

21           We were hopeful that they would move back in in 6 to

22   12 months.  We knew we were going to stay in the thing.  We

23   should have done the right irrespective that we were in

24   business there.  We reduced the rent.  We offered them a cash

25   bonus and tried to do anything we could.
```
                                   456

```
 1   Q    Mr. Johnson, if you had to do it all over again, knowing
 2   what you know now, would you have made a different decision?
 3   A    You know, you look back at a lot of decisions, and this
 4   is one of those I didn't lose one second of sleep on.  We did
 5   the right thing without any help, without any assistance from
 6   Travelers.  You've got to do the right thing, whether you're
 7   going to get paid for it or not.
 8          I believe our company -- I'm proud of them.  Some of
 9   them are here.  We did the right thing, took all the brain
10   damage, took all the economic risk, and I would do it again
11   tomorrow.
12   Q    So what did you do next?  You moved tenants out.  What
13   was the next thing that you did?
14   A    Well, just to finish on that.  I mean, they were very
15   upset.  And over the next month or two, we got sued by a
16   majority of them.  Not all of them.  I believe there was two
17   large class action lawsuits that we hadn't done things right.
18          So we continued to try to mitigate and work with
19   that.  90 percent of them were involved in that.  I believe
20   those lawsuits have been settled.  So we tried to take the
21   best care we could of them.  We got them out.  We helped them
22   move.  We had people there.  But we got everybody out of there
23   pretty quickly.
24          So we let the -- we thought the tenant portion of
25   this was we had done all we could do.
```
457

```
 1   Q    And then did you start focusing on a remediation plan
 2   for the Metropolitan?
 3   A    We had been and continued to at that time a remediation
 4   plan.  So it kind of shifted.  We always knew we had to
 5   rebuild building 6.
 6             Building 5 became kind of a world of its own.  We
 7   spent months.  Should it get torn down?  Can it be rebuilt as
 8   is?  So forth.  So a complete rebuild 6.  What are you going
 9   to do to fix 5 that's been under construction?
10             And then with this shift right then, we immediately
11   dove into how do we environmentally remediate this building so
12   it would be 100 percent safe for anybody to live in it?
13   Q    Did you receive a remediation plan from your
14   consultants, from FBS?
15   A    We had several people, FBS involved in it, several
16   outside consultants, and people in our office working on a
17   remediation plan within days after getting the report.
18   Q    And did you ultimately sign a contract with a contractor
19   to remediate phases 1 through 4?
20   A    We did.
21   Q    Okay.
22             MR. ABRAMS:  Melissa, will you put up the next
23   slide.
24   Q    (BY MR. ABRAMS) Can you tell us what this document is?
25   A    This is an AIA, pretty much form document to remediate
```
                                  458

```
1    the Metropolitan phases 1 through 4 dated October 9th, 2019,

2    with BCCM Construction.

3    Q    So by October 9th, 2019, you had a remediation plan, you

4    settled on a contractor to do the remediation, and you signed

5    a contract?

6    A    Yes.  But let's not forget that we notified Travelers

7    all the time of what we were doing, and I believe we sent this

8    contract to Travelers before we signed it.

9    Q    Okay.  And let's go to the next slide to get our timing

10   here.

11            This is Exhibit 369.  This is an email, correct,

12   dated what date?

13   A    December 16, 2019.

14   Q    And what does this email provide?  What does it send?

15   A    It's from Travelers' attorney providing for the first

16   time to us initial site visit and combustion reporting that

17   they had obtained.

18   Q    And were you forwarded this email from your lawyer?

19   A    Yes.

20   Q    Did you receive it on December 16, 2019?

21   A    Yes.

22   Q    And when you reviewed this email -- well, did you review

23   the enclosed documents from Mr. Spicer?

24   A    I did.

25   Q    And what did you understand them to mean in general
```

459

```
 1   terms?
 2   A    I'm a CPA by training, so not great at this
 3   environmental stuff and so forth.  What I took out of that was
 4   the Travelers' expert was going to dispute our science; was
 5   disputing what was done in buildings 1 through 4.
 6   Q    And what was the date of Mr. Spicer's report that
 7   Travelers had?
 8   A    The first one is August 2nd, 2019.
 9   Q    Okay.  So just to put some context here, we know that
10   the fire occurs on September 27th.  We know -- well, of 2018.
11   We know that tenants are moved out in June of 2019, correct?
12   A    (Witness nodded head.)
13   Q    And we know that you signed a contract with a remediator
14   in October.  Were -- in October and November of 2019, what's
15   happening at the Metropolitan?
16   A    We're spending millions of dollars doing destructive
17   work to get behind the walls.  If you just looked at it, you
18   didn't see it.  I saw it after they took down the walls.  None
19   of us would have looked at it.  It was nasty underneath those
20   walls, the soot, the discoloration, and so forth.
21          So we were spending millions of dollars on doing
22   what we thought was the best thing to do, which we had told
23   Travelers we were going to do.  We were spending millions of
24   dollars that we believe you should be paying us for.  Do you
25   have any input on this?
```

460

```
 1              I'll never forget in December to find out all of a
 2   sudden that they were going to dispute our science and we'd be
 3   here today; that they don't want to pay us on it when they
 4   fully knew that we had signed a multimillion dollar contract?
 5   They had information in their files at that time when we told
 6   them that they were going to not do that.
 7              Why didn't they call me and say, Hey, Dave, you
 8   don't need to do that.  You can do it much cheaper.  You can
 9   spend $2 million and everybody will be fine.  Why did they
10   think I would take life safety risk of our customers and they
11   wouldn't ever pay us for it or tell us about it until it was
12   after it was done?
13   Q    So in August of -- no lawsuit is filed yet, correct?
14   A    Correct.
15   Q    In August of 2019, does anyone from Travelers pick up
16   the phone and say, Hey, wait, wait, wait, don't spend this
17   money; don't enter into a contract; don't do this; we think
18   there's a cheaper way to do it, or it may not be necessary?
19   Does anyone pick up the phone and call you and tell you that
20   in August?
21   A    We never heard from Travelers.
22   Q    Did they tell you that in September?
23   A    No.
24   Q    Did they tell you that in October?
25   A    No.
```

461

```
1    Q    At the time you signed the contract.  In November, when
2    you're ripping out walls, does anyone from Travelers pick up
3    the phone and say, Wait, don't do this?
4    A    No.
5    Q    It's not until when do you get this report?
6    A    December.  And, remember -- I don't know if we're going
7    to pull it up.  Remember, we notified them.  We sent it to
8    them and sent the contract.  We are going to sign this
9    contract, and they had that in their files.  They let their
10   customer -- we're their customer -- sign a multimillion dollar
11   contract that they knew they were going to fight at the time?
12   That's just untenable.
13   Q    So what would you have done if someone -- if someone at
14   Travelers had picked up the phone in August or September or
15   October and said, Mr. Johnson, we understand, we've seen the
16   reports and here's Mr. Spicer's report from August, what would
17   you have done?
18   A    I would have called them immediately and said, You know,
19   the tenants are already out.  So our hair's not on fire.
20   Let's get your smart guys -- I'm sure they hire smart guys --
21   with our smart guys on environmental things that I don't
22   understand, and let's figure out a path together.  We didn't
23   want to spend the money.
24             Spending $17 million took extra months and years.
25   We're past getting any lost rents.  It's past the time.  So it
                              462
```

1  was costing us money to do this.  We didn't want to do it.  We
2  didn't profit on it.

3          So we -- I would have immediately called them and
4  said, Get Irmiter with your gentleman, Mr. Spicer.  Let's have
5  these guys get together, and if we can come up with a plan
6  that's 100-percent safe, we would have done it in a minute.  I
7  would not have signed that contract if they would have sent
8  this to us and said, We have a problem with your science.

9          I would have put the experts together.  I would have
10 put the attorneys together and said, Please, give us a path
11 here to work together to go forward, instead of just getting
12 blindsided in December after we'd spent millions of dollars.
13 Q   After you get this letter, what do you direct your
14 lawyers to do?
15 A   I said we have no choice.  They are completely out of
16 bounds here.  We have to litigate.  I wrote several letters.
17 I again tried to call the chairman of Travelers.  I wrote
18 letters to the chairman of Travelers.  I talked to them.  I
19 said, You guys are completely out of bounds here.  This makes
20 no sense.  How can you argue after the fact that you didn't
21 tell us?  We shouldn't be here.

22          And I did all I could, but all I could -- all I've
23 been able to do is pay attorneys a lot of money; and three
24 years later, here we are taking up your great time to
25 hopefully resolve this.
                        463

```
 1    Q    So let's quickly go through a couple more letters.

 2              MR. ABRAMS:  If you would put up Exhibit 339.

 3    Q    (BY MR. ABRAMS) This is a letter, September 18, 2019,

 4    and this is obviously before you see the Spicer report.  What

 5    is your lawyer -- what is your lawyer saying here?

 6    A    This is what I was alluding to.  This is why I was so

 7    upset in December.  In September, we said, Accordingly, we

 8    request that Travelers inform us as soon as possible whether

 9    it objects to the insured's remediation of phases 1 to 4 of

10    the property beginning on October 7th, 2019.

11    Q    Did you get a call saying they've got a report from

12    Spicer in August?

13    A    No.

14    Q    Let's look at exhibit -- well, I don't know.

15              Yeah.  Let's look at Exhibit 344.  This is a little

16    bit later.  This is an October 4, 2019, letter.  What's

17    happening here?

18    A    There's some back and forth with the attorneys about

19    what was going on.

20    Q    And this is addressing lost rental income.  Tell us

21    what's happening at the Metropolitan in October of 2018.

22    A    Obviously we had vacated buildings 1 through 4.  So we

23    were losing tens of thousands of dollars in rental income we

24    were counting on.

25              When you have a fire, you guys probably understand,
                                   464
```

we still had a mortgage at the bank, and the bank wants to get

paid every month.  Interest expenses.  We had utility expenses

and other expenses.  So we work very closely usually with our

insurance companies to try to get lost rents.  We try to

insure that.  This letter was out there informing them and

trying to get them to step up and pay us some lost rents.

Q    Are you receiving payments for the reconstruction of

phase 6?  You've received some payments, but are you receiving

all the payments that you need to reconstruct phase 6?

A    I believe that we were getting ten cents on the dollar

we were owed.

Q    If you go to the next line.

         And what does this relate to?

A    About the building 6, rebuilding that we were trying to

get funds on.

Q    And what is your -- and what's your urgency here with

respect to getting paid for phase 6?  Is phase 6 getting

rebuilt at this point?

A    It is getting rebuilt.  It's to our interest to get it

rebuilt as soon as possible because these lost rents that I

know we do have is for a certain time period.  And, again,

we've gone through all that, the delays here.  So we're not

getting lost rents anymore.

         So this job took forever, but we, as a company,

every week tried to do all we could to get it rebuilt as

```
 1   quickly as we could facing all the challenges we had.  So
 2   phase 6 was getting rebuilt.  We were spending millions of
 3   dollars paying the general contractor and subs to rebuild it
 4   and trying to get it done as soon as possible.
 5   Q    And during the remediation process, it was discovered
 6   that there were other problems with the building, building
 7   defects, correct?
 8   A    Yes.
 9   Q    And we've heard from that from Mr. Irmiter.  Mr. Irmiter
10   said this is one of the worst things that he's seen in terms
11   of building defects in the property.  And you know that?
12   A    We were very disappointed in the quality of construction
13   by the general contractor.
14   Q    Okay.  And did you give instructions to your litigation
15   team about seeking any of those construction defects from
16   Travelers?
17   A    I don't believe Travelers should pay us one penny for
18   the defective work that the GC did.  We have pursued the GC
19   and the subcontractors there to try to get a -- I had a
20   contract with the GC to build a class A building.  And we to
21   this day are trying to get them to build us a class A
22   building.  Travelers shouldn't pay us a penny for the problems
23   Bomasada caused.
24         MR. ABRAMS:  Mr. Johnson, no further questions.
25   I'll pass the witness.
                         466
```

```
1    CROSS-EXAMINATION BY MR. HAMANN:

2    Q    Morning, Mr. Johnson.

3    A    Good morning.

4    Q    I just have a few questions for you.  Just getting some

5    things confirmed here.

6            You don't claim to have any construction experience,

7    do you?

8    A    I'm a CPA by training.  Whatever experience I have is

9    just day to day over 30 or 40 years of being in the real

10   estate business, but I would not consider myself an expert at

11   all.

12   Q    Understood.  Your college experience was in accounting,

13   correct?

14   A    Yes.

15   Q    Okay.  And after you got out of college, you became a

16   tax accountant before you started Maxus?

17   A    Actually started in the audit department of Arthur

18   Andersen & Company, a big eight firm, for several years, and

19   then I transferred to the tax division.  And I made manager

20   after four years and was there nine and a half years.

21   Q    Okay.  At Maxus, you basically started the company; is

22   that fair?

23   A    Yes.

24   Q    The principal interest in Maxus or of Maxus was in

25   owning and managing apartments, correct?
```

467

Case 4:20-cv-00095-FJG   Document 243   Filed 09/05/23   Page 118 of 221

```
 1    A     Yeah.  There's two Maxuses.  I tried to lay it out.  I
 2   don't think it's important.  There's Maxus Realty, Maxus REIT
 3   that owns the properties, and it owns 100 percent of a
 4   management company calmed Maxus Property, Inc., that manages
 5   properties.  So Maxus REIT owns them.  Maxus Properties Inc.
 6   manages them.  We can use Maxus together if you would like.
 7    Q     Let's go about it in a different way.  There's Maxus
 8   Metropolitan?
 9    A     Yes.
10    Q     Do you have a position at Maxus Metropolitan?
11    A     Effectively I do.  Maxus Metropolitan is owned partially
12   by the REIT, partially by individuals, partially by one that
13   has seven or eight owners.  I have an ownership interest in
14   many of those.
15    Q     Maxus Metropolitan was created for the purpose of owning
16   the Metropolitan in Birmingham, Alabama, correct?
17    A     Yes.
18    Q     Okay.  And at Maxus Metropolitan, wouldn't it be fair to
19   say that you occupied a role as the manager?
20    A     Yes.
21    Q     The decision maker?
22    A     Yes.  Day-to-day decision maker.  Anything large, I
23   would take to the board -- a board.
24    Q     Let's go back to when you acquired an interest in buying
25   the Metropolitan.  First of all, your interest stemmed in
```
468

1    large part from a significant change in the tax law, correct?

2    A    Yes.  This rose to the top of our like-to-acquire

3    because it was in an opportunity zone, which is a tax benefit.

4    Q    Okay.

5         MR. HAMANN:  Show Defendant's Exhibit 244, please.

6    344.  Yes, thank you.

7    Q    (BY MR. HAMANN) I'm going to show you Exhibit --

8    Defendant's Exhibit 344 and ask whether that exhibit is a memo

9    from you to the REIT board dated August 22 on the acquisition

10   of the Metropolitan Apartments?

11   A    Yes, it is.

12   Q    And as of the date of this memo on August 22, 2018, the

13   apartments hadn't been purchased yet?

14   A    As I sit here, I don't remember the exact dates, but

15   I'll take your word for it.

16   Q    Okay.  The -- am I correct that the tax benefits and

17   advantages presented by the recent tax law changes before then

18   require that you be the owner before the first tenant moves

19   in?

20   A    To get the maximum benefits, yes, we wanted to buy it

21   before tenants moved in.

22   Q    And you knew, didn't you, that from the previous owner,

23   the people you were purchasing the Metropolitan from, that

24   tenants were set to move in, some, as of the beginning of

25   September 2018?

                              469

```
 1   A    I believe that's correct.

 2   Q    So if the deal didn't go through and the apartment

 3   didn't become purchased by that time, Maxus would not be

 4   eligible for the tax benefits that they were seeking?

 5   A    That's not correct.

 6   Q    How so?

 7   A    To get the maximum benefits, to get every penny of

 8   benefit, you need to own it before the first tenant moves in.

 9   If five tenants move in or something, I don't remember the

10   exact math -- I believe it's by building, you might lose some

11   of the tax benefits but not all of them.  It's almost a pro

12   rata thing.

13        We bought some buildings where four or five people

14   had moved in.  It's not an all-or-nothing thing.

15   Q    Okay.  And Maxus Metropolitan, the plaintiff in this

16   case, was created in August for the purpose of being the

17   purchaser of the Metropolitan?

18   A    That's my memory.

19   Q    Now, before Maxus became the owner, who had been the

20   owner?

21   A    I don't know the exact entities.  I know that Bomasada

22   was the GC, and I believe they had a special purpose entity

23   that owned it, had some outside investors, and Jason Johns and

24   his partner owned part of it.

25   Q    Well, there was a Bomasada Birmingham Metropolitan that
```
470

Gayle M. Wambolt, CCR No. 462

```
 1   was an entity that you bought it from; is that true?

 2   A    That sounds right.

 3   Q    And then there was also a Bomasada BHM Construction that

 4   was the construction company that was building the

 5   Metropolitan at the time; is that correct?

 6   A    I think those are the right entities we dealt with.

 7   Q    Okay.  Now, did you have a man named Cary Case go down

 8   to Birmingham before the sale?

 9   A    Do I have a man?

10   Q    Did you ask a man named Cary Case to go down to

11   Birmingham to look over the Metropolitan before the sale?

12   A    Adam Fletcher, who wrote this memo, was in charge of

13   acquisitions, and he would have arranged for all that.  I

14   wouldn't have been involved day to day on having an inspection

15   done, but I remember one was done.  And I believe that was the

16   gentleman that I did not interact directly with him.

17   Q    I see.  Did you know that Mr. Case worked for a company

18   named BCCM?

19   A    I believe that's correct.  I don't know if it's BCCM.

20   We do two things with them.  It's a good friend of mine named

21   Ed Taylor, and he and Jason own a company called BCCM.

22   There's another company called UES that often does our phase 1

23   environmentals and inspections.  So I don't know what

24   entity -- what company Cary Case was with.  I believe he was

25   with one of Ed Taylor's companies.
```

471

1    Q    But in any event, Cary Case was dispatched to go down

2    and look at the Metropolitan?

3    A    That's my memory.

4    Q    Now, you said a minute ago, I think, that you are unsure

5    in your memory as to when the actual purchase of the Maxus

6    Metropolitan took place?

7    A    I'm not great at dates, so I threw out June.  I believe

8    the paperwork here shows that it was -- we closed in August.

9    Q    I was going to say, if you take a look at Travelers

10   Exhibit 2.  Now, this document has multiple pages, as I'm sure

11   you know.  But when you look at the first page of Exhibit 2,

12   does it refresh your recollection that the purchase and sale

13   agreement was dated August 31, 2018?

14   A    Yes.

15   Q    And that's when the -- that's when the deal closed,

16   correct?

17   A    Again, without looking at documents, there would have

18   been a closing statement.  To give you the exact date, I hate

19   to be wrong again, but I know it closed right around in

20   August.  I believe it closed in August 2018.

21   Q    All right.  Do you have that up there?  The agreement?

22   A    I do.

23             MR. HAMANN:  Do you mind if I approach?  May I?

24             MR. ABRAMS:  It's not physically --

25             MR. HAMANN:  It's not physically there?

                              472

```
 1              MR. ABRAMS:  No.  I only put our exhibits there.

 2    Q    (BY MR. HAMANN) Let me hand you a paper copy,

 3   Mr. Johnson, of Defendant's Exhibit 2.  Does this refresh your

 4   recollection?

 5    A    Yes.  I have it in front of me.  It's a purchase

 6   contract dated August 31st.  My hesitation is over 34 years of

 7   real estate, we seldom sign a contract one day and close that

 8   day.  It's typically afterwards.  So the August, September, I

 9   don't know the exact date it closed.

10    Q    In fairness to you, Mr. Johnson, the contract was signed

11   on behalf of Maxus by Ryan Snyder, wasn't it?

12    A    It was.  That's our CFO.

13    Q    Okay.  That's page 23 of this exhibit?

14    A    It is.

15    Q    Okay.  You said something a minute ago about the

16   inspection.  I wanted to ask you a couple of questions about

17   the involvement of Mr. Case before August 31, 2018.

18              Now, did Mr. Taylor, the man you were acquainted

19   with and friends with, did he propose that you have a property

20   condition assessment report performed on the Metropolitan

21   before going forward with the purchase?

22    A    I don't recall.  I've been involved with 80 buys and

23   sells of apartments in the last five years.

24    Q    Okay.  Did -- do you recall that you declined a property

25   condition assessment report?
                                      473
```

```
 1   A    I don't recall.  I'd have to look at the files.

 2   Q    Okay.  When I call it a "property condition assessment

 3   report," is that kind of a term of art?  Do you know what that

 4   means?

 5   A    Yeah.  We typically -- we don't often buy new or under

 6   construction.  We typically buy existing apartments, and if

 7   you do that, you go get a property condition -- what I

 8   typically call a PCR, property condition report, and you

 9   typically get a phase 1 environmental.

10        So you get two separate reports usually required by

11   the lender, and UES has done 90 percent of that work for us in

12   the last ten years.  UES is a company owned by Ed Taylor, and

13   Ed Taylor is also involved with BCCM.

14   Q    Okay.  Do you recall sending an email indicating that

15   Mr. Case was to do a one-day detailed inspection of the

16   Metropolitan?

17   A    I don't recall that email as I sit here, but I'm sure

18   it's a -- if you've read it, that's correct.  That sounds

19   fine.

20   Q    All right.  Did you get an email from Mr. Cary Case days

21   later saying he spent several hours on site reviewing the

22   property and performing a brief walk of the entire property?

23   The timeframe is August, late August.

24   A    Sure.  I don't recall the specifics.  I'm familiar with

25   it.  I don't recall getting that email and so forth.  I know
```

474

```
 1    we had an -- some inspection done before we bought it.
 2    Q    Okay.  Now, you decided to go ahead and go forward with
 3    the purchase, correct?
 4    A    We did.
 5    Q    "We," you and the board?
 6    A    Correct.
 7    Q    Okay.  Now, let me show you again on Exhibit 2, if you'd
 8    turn to page 18.  Do you have it in front of you, Mr. Johnson?
 9    A    I have 14 in front of me.  I have 18 in front of me now.
10    Q    Okay.  And I direct your attention on page 18 to
11    section -- paragraph 21A.  It's a long paragraph.  But if you
12    go down about, say, seven or eight lines from the top of that
13    paragraph, it provides, doesn't it, that Maxus will be
14    purchasing the property based solely on its inspections and
15    investigation of the property; and that purchaser, which is
16    Maxus, will be purchasing the property as is, where is, and
17    with all faults as of the date of the agreement?
18              Have I read that correctly?
19    A    You have.
20    Q    Okay.  Now, I want to -- after that, I want to fast
21    forward to the time of the fire.  The fire is September 27th,
22    2018.
23              First thing, you were not down in Birmingham that
24    day, were you?
25    A    I was not.
                                475
```

```
 1   Q    Okay.  At the time -- as of the time of the fire, the

 2   day of the fire, the phase 6 building was still under

 3   construction, wasn't it?

 4   A    Yes.

 5   Q    Okay.  Phase 6 building didn't have any tenants in it?

 6   A    It did not.

 7   Q    Okay.  Phase 6 building burned to the ground.

 8   A    It did.

 9   Q    Okay.  Now, it was connected, that is to say the phase 6

10   building, by a walkway to another building in the

11   Metropolitan, phase 5?

12   A    Yes.  I believe there's one skywalk between them.

13   There's also some integrated parking there.

14   Q    Okay.  Exactly.  At the time of the fire, phase 5 was

15   still under construction, wasn't it?

16   A    Yes.

17   Q    And at the same time, phase 5 didn't have any tenants in

18   it?

19   A    That is correct.

20   Q    Okay.  Another Metropolitan building complex was phase

21   4?

22   A    Yes.

23   Q    Okay.  And as of the time of the fire, it was still

24   under construction, wasn't it?

25   A    That's my memory, yes.
```
                                    476

```
1    Q    Phase 4 didn't have any tenants in it?

2    A    That's my memory.

3    Q    Then there was a -- we've heard about the doughnut

4    building, which is the combination of phases 1, 2, and 3?

5    A    Yes.

6    Q    It has kind of an interior courtyard, a hole, if you

7    will; therefore, it's called the doughnut building?

8    A    Yes.

9    Q    Now, as of the time of the fire, some work was still

10   being done at the doughnut building, but some units were ready

11   for tenants; and in fact some had moved in by the time of the

12   fire; is that right?

13   A    That's my memory at 10,000 feet.  I don't know that

14   there was six tenants in or three or whatever.  Yes, there was

15   a few tenants in there.

16   Q    I appreciate that.  Whether it's six, ten, I'm not

17   holding you to a specific number by any means, but is it fair

18   to say it was just really a fraction of the overall number of

19   units that were occupied?

20   A    Yes.

21   Q    Small number, frankly, true?

22   A    That's my memory.

23   Q    Now, at the time you were considering buying the

24   Metropolitan, that is to say Maxus, you became aware that

25   Bomasada had an insurance policy with Travelers Property
```

477

```
 1    Casualty Company of America; is that right?
 2     A    It would have been part of our normal due diligence
 3    probably handled by our CFO, Ryan Snyder.
 4     Q    Okay.  And the policy period on that Travelers' policy
 5    ended on September 30, 2018, correct?
 6     A    I don't remember specific dates.
 7     Q    Okay.  So a few days after the fire?
 8     A    Again, we had the documents.  I'm sure you have the
 9    right date.
10     Q    Okay.  You'll take my word for it then?
11     A    I will.
12     Q    Okay.  Now, after the fire, the fire site was
13    investigated by law enforcement, correct?
14     A    Yes.
15     Q    And law enforcement required that all the tenants that
16    you had at the time had to move out?
17     A    They were not allowed access to the building for some
18    period of time.
19     Q    Several weeks anyway; fair to say?
20     A    I don't recall the exact -- I know that they couldn't go
21    right back in.  It was completely shut down.
22     Q    Okay.  But after that period passed, the tenants were
23    allowed to return to their units at the Metropolitan?
24     A    At some point in the future, the tenants that were in
25    building 1 to 3 got access back, as did our employees.
```
                                478

1  Q    And going forward, realizing, of course, that phase 6 is
2  destroyed, that is to save phases 1 through 3, Maxus continued
3  its efforts to attract more tenants, true?
4  A    Yes.  We restarted our leasing efforts after the
5  building was released back to us.
6  Q    Okay.  And you were talking earlier about your conflict
7  with Travelers.  Is it true that Travelers was in contact with
8  Bomasada within a day of the fire?
9  A    I don't recall.
10  Q    Would it surprise you to learn that?
11  A    I know Bomasada reached out to them immediately.
12  Q    And at the time, were you content to let Bomasada take
13  the lead in dealing with Travelers?
14  A    At the beginning Bomasada took the lead because it was
15  builders risk insurance, and we were an additional insured.
16  Q    Okay.  We've heard in this trial the name of Alex Stehl.
17  Just want to ask a little bit of you about his background.
18          Mr. Stehl was not -- did not have a position at
19  Maxus at the time of this fire, correct?
20  A    I'd have to look at a timeline, but Alex has been with
21  us three or four years, but I don't recall the start date.
22  Q    Would it refresh your recollection if you were to hear
23  that his first day of employment at Maxus was in January of
24  2019; that is to say, after the fire?
25  A    As before, I'm being very trusting of the good-looking
                              479

1  attorney from the Travelers' side.  I think that's the right

2  date.

3  Q    Okay.  So the title he was given when he was hired was

4  vice president of construction and development?

5  A    Yes.

6  Q    And what were his duties and responsibilities in that

7  position?

8  A    He has a myriad of duties.  We don't do a lot of

9  construction.  Metropolitan is really kind of out of the norm

10 for us, and we weren't the general contractor of that.  So he

11 was in charge of overseeing that.

12        He's worked with us on major renovation projects.

13 He also spends a part of his time looking at the new Chicken N

14 Pickles we have been constructing in other cities.

15 Q    So his role or his responsibility isn't confined to

16 Maxus; it spans into other business endeavors such as Chicken

17 N Pickle, which is not connected with Maxus except it has some

18 common ownership, such as you?

19 A    That is correct.

20 Q    Now, you've known Mr. Stehl, Alex Stehl, since he was a

21 child?

22 A    Since he was born.  His father --

23 Q    Since he was born, exactly.  His father, Doug Stehl, was

24 a friend and a fraternity brother of yours?

25 A    He's one of my best friends and a fraternity brother.

                              480

```
1   Q    Okay.  Back in your days at Mizzou?

2   A    Yes.

3   Q    Maxus did not have anyone with the title of vice

4   president of construction and development before Maxus hired

5   Alex Stehl, correct?

6   A    I don't know all the titles there.  We had a

7   construction department.  We've had some excellent employees

8   for ten years, Mike May and others.  I don't know all their

9   titles exactly.

10  Q    Was hiring Alex Stehl basically your decision,

11  Mr. Johnson?

12  A    No.  For big things like that, I have an outstanding

13  executive team.  Ryan Snyder, Cheryl, we work together as a

14  group.  They would have been part of the interview process and

15  probably requesting that we get more expertise in it.  So, no,

16  I don't make decisions alone.

17  Q    I understand that, but would it be fair to say you

18  recommended his hiring?

19  A    I'm a big fan of Alex Stehl.  I've known him since he

20  was born.  He built an apartment complex down the street from

21  Maxus for another company called Centric.  I went and visited

22  him several times at that site, and he basically built an

23  apartment complex from the ground up.  So he had great

24  knowledge.

25  Q    Okay.  So that was in January of 2019.  In the beginning
```

481

```
 1    of 2019, isn't it fair to say that Maxus continued to sign new

 2    tenants to the Metropolitan?

 3    A    I believed that once we got the building back up until

 4    we got a report that there was environmental problems in

 5    there, that we were in full leasing mode, yes.

 6    Q    And new tenants were signed in April and in May of 2019,

 7    correct?

 8    A    I think we signed up tenants every month.

 9    Q    Okay.  Signed up tenants in June 2019 too?

10    A    I believe up to the date of the report.  I would be

11    shocked if we did -- I'm pretty confident we did no leasing

12    after we got that report.

13    Q    I'm sorry?

14    A    I'm highly confident we did no leasing after we saw the

15    report that said that there was problems in the building.

16    Q    The report to which you're speaking is the one dated

17    what, June 6th?

18    A    The FBS report.

19    Q    The FBS report?

20    A    Yes, sir.

21    Q    So your testimony is you didn't continue to sign tenants

22    from that day forward?

23    A    Correct.

24    Q    All right.  Going back to April, you were shown earlier

25    a letter dated May 20 -- excuse me.  May 1, 2019, to Greg
```
                                   482

```
 1   Bynum.  You authored a letter dated May 1, 2019, to Mr. Bynum,

 2   didn't you?

 3   A    I remember that exhibit we saw about 30 minutes ago.

 4   Q    Let me just go ahead and put up Defendant's Exhibit 14.

 5        Okay.  Now, do you recognize that letter?

 6   A    I do.

 7   Q    Exhibit 14?

 8   A    I do.

 9   Q    And that is the letter that you sent to Greg Bynum at

10   Travelers, correct?

11   A    Correct.

12   Q    Okay.

13        MR. HAMANN:  Excuse me, Your Honor.  We're at a

14   little bit after noon, and I didn't -- I'm going to go a bit

15   longer for sure.  I didn't know whether this is the time to

16   break or not.

17        THE COURT:  I think so.  I think so.

18        How much longer are you going to be with this

19   witness?

20        MR. HAMANN:  Maybe between 20 and 40 minutes.

21        THE COURT:  Okay.  Let's break.  Once again, I'll

22   ask you not to discuss the case among yourselves.  Enjoy your

23   lunch.  Thank you.

24             (A recess was taken.)

25             (The following proceedings were had in the presence
                              483
```

of the jury:)

CROSS-EXAMINATION (continued) BY MR. HAMANN:

Q   Mr. Johnson, a few more questions to ask you.  One is you talked about the Alabama insurance complaint.  I want to talk to you about that.

        MR. HAMANN:  Can we see Plaintiff's Exhibit 268, please?

Q   (BY MR. HAMANN) The insurance complaint that you were talking about Maxus submitting, if we look at page 4 of your complaint, it looks like it's signed by Jason Johns.  Do you see that?

A   I do.

Q   Now, Jason Johns was not an employee of Maxus, was he?

A   He is not.

Q   He's not an attorney for Maxus either?

A   He is not.

Q   Jason Johns was an attorney in the employment of Bomasada?

A   He is.

Q   So did you read the complaint before it even went out?

A   I don't recall.  I believe I was involved, but I don't recall the specifics.

Q   Okay.  Now, I want to ask you about the inspection that was undertaken before the Metropolitan was purchased.  Let's take a look at Defendant's Exhibit 78.  Take a look at page 2.

                                484

```
 1              Do you see this, that on August 17, you got a report
 2    from Cary Case on his inspection of the Metropolitan?
 3    A    I did.
 4    Q    Okay.  And he was communicating directly to you,
 5    correct?
 6    A    To me and Mike McRoberts.
 7    Q    Okay.  Does he say in there that Mr. McRoberts and he
 8    were able to spend several hours on site the day before?
 9    A    Yes.
10    Q    Reviewing the property and performing a brief walk of
11    the entire property?
12    A    Yes.
13    Q    Was that consistent with the inspection you wanted him
14    to make?
15    A    Yes.
16    Q    Do you think his inspection was sufficient for
17    purchasing an as-is property?
18    A    In retrospect, knowing what I know today, not, but at
19    the time, I did the best I could.  We were buying a brand new
20    property.  Buy a brand new car, you don't usually go get it
21    inspected.  It was getting built.  It was under construction
22    with a company called Bomasada, who had a warranty on it.
23              So in retrospect, sitting here today, I wish I'd
24    have done a hell of a lot more.  I didn't.  But I felt
25    comfortable at the time putting friends and family, millions
```
                                   485

1  of dollars of our business money in it at the time.

2  Q    I understand.  Now, let's take a look at Defendant's

3  Exhibit 98.

4       Now, you were talking earlier about your criticisms

5  of Travelers, and I want to direct your attention to this

6  Exhibit 98, which is a -- an email that you authored and sent

7  to Stuart Fred on April 9, 2019.  I want to direct your

8  attention down to the last paragraph.

9       Now, in this email, it's true, isn't it, that you

10  tell Stuart Fred, We are not going to get paid for our added

11  time here, as the owner and both of us are incurring legal

12  fees that will not be repaid, as Travelers has not acted in

13  bad faith to date?

14  A    That's what I believed at the time I wrote that, yes.

15  Q    That is what you believed at the time?

16  A    Yes.

17  Q    Now, let's go back to your May 1, 2019, letter to Greg

18  Bynum, which is Defendant's Exhibit 14.

19       Now, in that letter, you touch on several topics,

20  don't you, sir?

21  A    I do.

22  Q    Okay.  Second paragraph, you say, There's evidence of

23  smoke/soot damage in the Metropolitan buildings that survived

24  the fire and employed a company to perform testing and provide

25  guidance.  Do you identify the company in the letter?

                              486

```
 1   A    I'd have to read the whole thing, but I don't recall.

 2   Q    Don't recall, okay.

 3            Now, at the bottom of that page, there is the last

 4   paragraph.  You identify, There is also extensive water damage

 5   to the flooring in the phase 5 building that we believe will

 6   require replacement of most of the flooring in place at the

 7   time of the fire.  This is frustrating to move backwards for

 8   us, but one that cannot be prevented unfortunately.

 9            And your purpose here was to inform Travelers that

10   you were expecting to be paid for the water damage to the

11   flooring in phase 5, correct?

12   A    Yes.

13   Q    Now, anywhere in this letter, and I'd like you to take a

14   look at it, did you ever advise Travelers that there had been

15   a sprinkler line rupture just a few weeks earlier in phase 5?

16   A    I don't believe it's discussed in this letter.

17   Q    Okay.  Why not?

18   A    I don't know.

19   Q    Okay.  Let's take a look at Defendant's Exhibit 102.

20            Now, in Exhibit 102 on the first page near the

21   bottom, you're writing to a man named Harry Heimsoth, aren't

22   you?

23   A    What part?  From Henry --

24   Q    Right.

25   A    Below August 6th that we're --
                              487
```

```
1    Q    Yeah.

2    A    Yes.  I believe that's -- yes.

3    Q    And you were talking about the Metropolitan?

4    A    Yes.

5    Q    And you were urging him, weren't you, to -- for his bank

6    to assume the loan?

7    A    I was sweet talking my lender, trying to get a loan.

8    Q    In your letter to Mr. Heimsoth -- what was the date on

9    that letter?  August 6th, 2019, you see that?

10   A    Yes, sir.

11   Q    Okay.  You make the statement, don't you, to

12   Mr. Heimsoth, I have always made money on insurance is the

13   history?

14   A    That's what it says.

15   Q    And that's what it says and that's what you wrote,

16   correct?

17   A    That's what I wrote.  But it needs to be known that you

18   need to define profit here.  I've never made -- it's never

19   been a profit center.  We've never made a penny on insurance.

20   We've been lucky to recover a percentage of what we are owed.

21        So when I said make money, it's over -- I've been

22   doing this 30 years.  It's over the bid ask.  So I lost an

23   apartment complex to Katrina.  It was 30 million bucks I was

24   owed.  The insurance company comes in and offers 3 million.

25   We ended up getting 28 million walking in to pick the jury.
                            488
```

```
 1    To me, we made money from 3 million to 28 million.

 2              I have never gotten a penny more than we were owed,

 3    and that's all we're asking for here.  I'm not trying to

 4    profit on Travelers.  I just want paid back the money that we

 5    paid years ago to correct life safety items.  I'm not here to

 6    profit on Travelers.

 7    Q    Nevertheless, I'm just pointing out in this letter what

 8    you are doing is telling Mr. Heimsoth your history is I have

 9    always made money on insurance?

10    A    I've always gotten more -- what I was telling Henry

11    Heimsoth here, you can bring him on, is that we've always

12    gotten more than the insurance company has offered.  I've

13    never made a penny on any insurance claim.  I've lost money on

14    every one.

15    Q    I see.

16              MR. HAMANN:  That's all I have.  Thank you.

17              MR. ABRAMS:  Brief redirect, Your Honor?

18    REDIRECT EXAMINATION BY MR. ABRAMS:

19    Q    We'll go to the next one, and we'll circle back.

20              You were asked about the sales contract when you

21    purchased the Metropolitan as an as-is sales contract with the

22    buyer, correct?

23    A    That's what was in the contract.

24    Q    Does that mean that you don't have any insurance for the

25    property?
```

489

```
 1   A    Has nothing to do with insurance.  That's a standard

 2   provision in 99 percent of the contracts when I'm buying or

 3   selling.  Everybody wants "as is."

 4   Q    Okay.  All right.  We have Exhibit 268, which is the

 5   Alabama Department of Insurance complaint.

 6        You were asked a question about who signed the

 7   complaint.  I want to draw your attention to the first page

 8   where it says who the insured and the claimant name, the

 9   claimant's names.  What does it say underneath that?

10   A    Above it?

11   Q    The first page, do you see that?

12   A    Insured or claimant's name above it?

13   Q    Yes.

14   A    It says Bomasada BHM Construction slash Maxus

15   Metropolitan.

16   Q    Maxus Metropolitan is you?

17   A    That's our entity that bought the complex.

18        MR. ABRAMS:  No further questions, Your Honor.

19        MR. HAMANN:  No questions.

20        THE WITNESS:  Apologize for being late on your time

21   of day, Your Honor.

22        THE COURT:  You made it in just the nick of time.

23        THE WITNESS:  Thank you.

24   MICHELLE PIENTA, being duly sworn by the courtroom deputy,

25   testified:
                            490
```

```
 1   DIRECT EXAMINATION BY MS WINTER:

 2   Q     Good afternoon.

 3   A     Good afternoon.

 4   Q     Would you please introduce yourself to the jury.

 5   A     I am Michelle Pienta.

 6   Q     And where do you live?

 7   A     Chicago, Illinois.

 8   Q     And what do you do for a living?

 9   A     I am a CPA currently working independently.

10   Q     Can you please tell us a little bit about your education

11   and relevant prior work experience?

12   A     So I graduated from Bradley University in Illinois, with

13   a degree in accounting in 1995.  Following that, I spent five

14   years working as an auditor for the federal government and

15   then worked as a CPA for various accounting firms, Meaden &

16   Moore, then Quantum Global Advisers and then BDO, who

17   ultimately acquired Quantum Global.  And at the time I left

18   BDO, I was a director there; and, again, have been working

19   independently since then.

20           THE COURT:  Can everybody hear her okay?

21           MS. WINTER:  Maybe speak up a little bit.

22   Q     (BY MS. WINTER) So you have over 20 years of experience

23   measuring property and economic damages related to various

24   causes of loss?

25   A     That's correct.
                           491
```

1    Q     Have you dealt with other losses at multi-family

         2   commercial properties like the Metropolitan?

         3    A     I would say in the last 10 to 15 years, I've probably

         4   handled close to 150 losses at multi-family complexes, yes.

         5    Q     And what did do you for Maxus in this particular case?

         6    A     So my prior firm, Quantum Global, was engaged by Maxus

         7   in February 2019 to assist with assessing the business income

         8   loss or impact from the fire on Maxus' overall financial

         9   operations at the facility due to the fact that they were

        10   unable to lease the units at the complex.

        11    Q     Okay.  What materials did you review to determine the

        12   impact on the potential revenue and operations due to the

        13   fire?

        14    A     So I had discussions with Maxus personnel and received

        15   data from them, which primarily included financial statements,

        16   rent rolls, rent ledgers, concession reports, and other

        17   supplier materials.

        18    Q     Did you also look at the insurance policy?

        19    A     Yes, I did review the policy as well.

        20    Q     So can you explain generally what a business

        21   interruption loss is?

        22    A     So generally what the coverage is, is to -- say it in

        23   the most simplistic terms, is to make the property owner whole

        24   following a loss such as the fire that occurred at the

        25   Metropolitan.  So to put them back in the financial position

                                       492

1    they would have been in had the fire not occurred.

2            So in this case, because as it being an apartment

3    complex, that would apply to the rents that they were unable

4    to charge the tenants because they couldn't have tenants

5    occupying those units.

6            MS. WINTER:  Melissa, do you want to pull up Exhibit

7    255, first slide.

8    Q    (BY MS. WINTER) So can you tell us what this Plaintiff's

9    Exhibit 255 is?

10   A    This is the policy that we reviewed and it was in place

11   that covered the property at the time of the fire.

12   Q    And this is just the first page in front of you.  If you

13   want to look at it, you have the full policy.

14   A    Yes.

15   Q    So this is the policy that you reviewed when you were

16   preparing your calculation of the lost rents claim?

17   A    That's correct.

18   Q    Does the Travelers' policy provide for lost business

19   revenue when there's a loss like the September 27th, 2018,

20   fire here?

21   A    Yes, it does.

22           MS. WINTER:  Melissa, can you go forward one slide?

23   Q    (BY MS. WINTER) So can you just walk us through the

24   coverage on -- can you just walk us briefly through the

25   business interruption coverage?

                                493

1    A    Yes.  So on this declarations page, it outlines the
2    coverage for loss for the business income, lost rental value,
3    and other soft costs that may be incurred to the limit of $5
4    million.  Again, there's the BI, the business income.  I'm
5    sorry, the lost rental value, the soft costs, which could
6    include things like architectural fees, additional insurance
7    premiums, increased -- or additional costs for contract
8    negotiations, those things that are listed out there, again,
9    to the limit of $5 million.
10             There's also a 30-day waiting period that's
11   applicable, which essentially means that Maxus could not start
12   collecting any part of that $5 million of that lost rental
13   value or other costs until 30 days after the fire occurred or
14   30 days after the date on which the project, in this case the
15   apartments, were supposed to be completed, whichever date is
16   later.  So you start at that date, add 30 days, and then
17   that's when you can start calculating these kinds of losses.
18   Q    And just to be clear, you've mentioned the $5 million
19   limit.  That is separate from and in addition to the $35
20   million limit for the other property damage, correct?
21   A    That's correct.  Those are separate coverages.  So, yes,
22   the 5 million would be on top of the $35 million for the
23   property itself.
24   Q    Does the policy give specifics as to how you're supposed
25   to calculate the lost rents?
                        494

```
 1   A     Not specifically or not in a like mechanical type

 2   manner.  It, you know, provides kind of a general definition

 3   for what the rental value is; meaning the loss of the -- the

 4   rents that you would collect for the time that those

 5   apartments are down; again, considering that 30-day waiting

 6   period, but then extending through the full period of

 7   restoration until those units are complete.

 8             It also, again, just generally says that it's your

 9   lost net income plus continuing expenses, but, again, doesn't

10   kind of mechanically or give you a formula for doing that

11   calculation.

12             MS. WINTER:  Melissa, will you go forward a slide

13   and one more.

14   Q     (BY MS. WINTER) So here I believe is the definition of

15   rental value that explains what you were talking about.

16   A     That's correct.  So, again, it just -- it says that it's

17   the loss of the rental value or the loss -- the rents that

18   you're unable to collect because your business is either

19   stopped or, you know, has been delayed because of, again, in

20   this case, the fire.  So from -- once you apply the 30-day

21   waiting period, from that time until the end of the period of

22   restoration, you would collect, again, that loss of rent for

23   that time period.

24   Q     So you mention the post-loss period of restoration.

25             MS. WINTER:  Melissa, can you go forward another
                              495
```

```
 1   slide and go forward one more.
 2   Q    (BY MS. WINTER) So can you explain to us what the
 3   post-loss period of repair or construction is?
 4   A    So essentially, again, considering the -- first, that
 5   30-day waiting period, once, you know -- once you get past
 6   that 30 days, it's the period during which the property and in
 7   this case, the units, these apartments are unable to be leased
 8   as you're going through the remediation, repair, and
 9   reconstruction phases.  So it ends once those repairs are
10   completed, you know, using kind of a reasonable time and using
11   the same types of materials that had been in place or had been
12   planned to be in place prior to the fire.
13   Q    And there's no specific cutoff date on this period,
14   correct?
15   A    That's correct.  It's just the reasonable time period,
16   again, using a reasonable speed and, again, using the same
17   types of materials that were planned to be used prior to the
18   loss, but there was not an end date or a specific number of
19   days, no.
20   Q    Okay.  So I want to talk a little bit -- you prepared a
21   report in this matter.  This is just the first page again, but
22   did you prepare this report showing your calculation of Maxus'
23   lost rental income due to the fire?
24   A    Yes, I did.
25   Q    And I'm just going to walk through some of your
```

                               496

```
 1   calculations, and if you could summarize your findings for me.

 2              First of all, when was this report prepared?

 3   A    October 6th of 2020.

 4   Q    And how many units were ultimately going to be rented at

 5   the Metropolitan when it was complete?

 6   A    So the full complex was to have 262 units total, and it

 7   was anticipated that the full capacity would be 260 of those

 8   units, with the understanding that you typically have a couple

 9   of units that, you know, may be held for -- as a model unit.

10   So as potential tenants are coming to look at the property,

11   they could go through that model unit or just in kind of a

12   regular turnover.

13              As you've got tenants moving out, new tenants moving

14   in, that you would have a couple of units that would not be

15   occupied.  So that 260 units would be considered full

16   capacity.

17   Q    Okay.  Next slide.

18              So this is a demonstrative that summarizes your

19   report that was done in October of 2020.  What was the total

20   amount of business interruption loss that you calculated at

21   the time of your report?

22   A    So it's -- the total is the $7,857,609 that you see at

23   the bottom, and that's comprised of a few different categories

24   or amounts that are also shown here.

25   Q    So it includes lost rental value and then some other
```
                                 497

```
 1   expenses and lost business income?
 2    A    That's correct.  So the lost rental value of $7,510,619.
 3   In addition to that, there were some prorated rents, other
 4   concessions and credits that were given to tenants who either
 5   could not occupy their units for a time after the fire,
 6   tenants who had to move out mid month in later -- a few months
 7   down the road in 2019 as those units had to be evacuated to
 8   prepare for the cleanup and remediation that had to occur.
 9   And, again, other fees that tenants had initially paid that
10   were ultimately credited back to those tenants who were
11   impacted in that manner.
12            Finally, there was a -- an additional payment that
13   was made to tenants.  There were 96 tenants that ultimately
14   had to vacate the property, and Maxus paid them $2,000 each to
15   assist with their relocation and move-out expenses, especially
16   since it had to happen in a pretty quick manner.  So for those
17   96 tenants, $2,000 each, that was another $192,000.
18    Q    And when you prepared your report in October of 2020,
19   can you tell me what you used for the end date for the period
20   of restoration?
21    A    The end date that was used for the calculation that was
22   the basis of the report is January 31st of 2021.
23    Q    And can you explain why you used an end date of January
24   31st, 2021, when you prepared this report?
25    A    At the time we agreed to use that end date with the
                                498
```

1    understanding that repairs and reconstruction were still

2    ongoing, that they would likely extend beyond that January

3    2021 time period, but also knowing that at that time we had

4    already exceeded the $5 million limit.

5    Q     So at this point in October of 2020, using the

6    anticipated end date of January 31st, 2021, you were at $7.8

7    million, and you previously said the limit was $5 million,

8    correct?

9    A     That's correct.

10   Q     So let's just walk through quickly a calculation of one

11   of the units just so the jury can understand what you did to

12   calculate lost rents.  I've taken this information from your

13   report.  It's Exhibit B4A.  We've broken it up here just to

14   show the rent calculation.  Can you just walk us through what

15   this shows us?

16   A     Yes.  So, again, this is just for one unit, and we

17   basically or essentially used this same calculation, the same

18   methodology for all 262 of the units in the property, but we

19   went on a unit-by-unit basis.

20         So for this one in this example, you see the Unit

21   No. 1-101.  We started with the initial average monthly rent,

22   which is that $1,552 figure you see down at the bottom in that

23   second column.  And that was based on -- it's an actual

24   average monthly rent amount based on the actual rents for

25   tenants for units that were occupied at the time of the fire.

                              499

```
 1   So we looked at all those actual rents, took an average to

 2   come up with the $1,500 a month.  That was applied for -- from

 3   our start date through the end of August 2019.

 4            Then considered the fact that since we were looking

 5   at a pretty extended period in the calculation, over a couple

 6   of years, that in the normal course of business, there would

 7   be a -- likely an annual rent increase.  So we applied a

 8   5-percent increase 12 months later or starting in September of

 9   2019, which brings us up to the $1,600 a month in rent.  And,

10   again, the same thing 12 months later, another 5 percent gets

11   us to $1,700 a month.  So we used those monthly rent amounts

12   to carry forward and through the end of the period in the

13   calculation.

14            So next we had to determine when do we start

15   calculating that amount for each unit.  And in this example,

16   we first looked at what the original move-in date was, which

17   that move-in date is the term from the construction schedule,

18   which indicated when the unit would be available to be leased,

19   when construction would be completed and you could have the

20   tenant move in.

21            So in this case for this unit 101, the move-in date

22   was September 1st of 2018.  Because that was prior to the

23   fire, which did not occur until September 27th, we had to use

24   that date or the actual date of the loss, September 27th, to

25   consider that our initial starting point for when we could
```

500

```
 1   potentially start losing rent on that unit.

 2           We then had to apply the 30-day waiting period.  So

 3   we are starting September 27th, the date of the loss, and the

 4   30-day waiting period gets us to October 27th.  So it's the

 5   first date on which we can start calculating or considering

 6   potential lost rent for this particular unit.

 7   Q    And you did this for every single unit, correct?

 8   A    For each of the 262 units, yes.

 9   Q    So just to summarize how you calculated the lost rental

10   value, can you walk me through this demonstrative that

11   summarizes your report?

12           First of all, is this an accurate summary of the

13   amounts in your report?

14   A    Yes, it is.

15   Q    So can you walk us through what each of these numbers

16   are and what this means?

17   A    Yes.  So then the first amount, the first row entitled

18   "potential rental income" essentially is the grand total of

19   after having completed the exercise that I just outlined for

20   that one unit.  So we complete that exercise for all 262

21   units, determining when we can start considering lost rent,

22   running that through month by month by month through January

23   31st of 2021, incorporating those 5-percent annual rent

24   increases again.

25           So for all 262 units as of January 31st, 2021, we
                                501
```

1  calculated a total potential rental income of the $10,544,000
2  you see in that first row.

3        Following that, we had to consider the fact that,
4  you know, from the time of the fire as each month progressed,
5  there were different levels of occupancy that would have been
6  occurring.  Because the construction would have been ongoing,
7  units would have been becoming available at different times,
8  so there would have been varying levels of occupancy and
9  increasing levels of occupancy as the months went by if the
10 fire had not occurred.

11       So early in the time period, we applied a lower
12 percentage factor or occupancy factor, starting, you know, as
13 low as maybe 13 percent in October, ramping up again month by
14 month by month until we progressed to what was considered full
15 occupancy, which would have been obtained around -- we
16 projected around September of 2019 fully leased putting in --
17 applying that percentage of occupancy to account for the fact
18 that not every unit was going to be occupied from the day we
19 started calculating the loss.

20       So once we applied that percentage, reduced that
21 potential rental income to the $9,267,000 figure for a
22 projected amount.

23       And the next row is the actual rents received.
24 Because, you know, at the time of the fire and in the months
25 after that, there were some tenants that were occupying

                              502

```
 1    apartments at the complex.  So there were some rents that were

 2    being earned.  So we need to take that into account and reduce

 3    the projected rental income by the actual rents that were

 4    earned during that time period.

 5             Once we backed that out, we come up with a total

 6    lost rental income of the $8,715,000 figure you see and then

 7    to account for the fact that the above amounts reflect just

 8    your standard rent amounts.  So whenever you would -- your

 9    normal rent that you would pay for your apartment.

10             On top of that, there are certain other income items

11    that would have been earned at the property.  You know, if

12    there were laundry facilities or you collect cable fees from

13    tenants, oftentimes you get utility reimbursements from

14    tenants or the tenants pay for -- if they incur -- you know,

15    have any damages in their units or locks have to be changed,

16    new keys, things of that nature, those are additional fees or

17    additional revenues that would have been earned by Maxus if

18    the Metropolitan had -- the property been occupied or the

19    units been occupied.  So we added another 5 percent to account

20    for all those various other potential revenue sources, which

21    is the $435,000 figure you see there.

22    Q    And just to cut you off for a second, is that industry

23    standard, 5 percent?

24    A    5 percent is pretty standard across the board.  And I've

25    handled probably over 150 business interruption losses at

                                   503
```

1    multi-family complexes, but it also is based on the financial

2    information that we received from Maxus, their actual

3    information, as well as the projections they had for the

4    properties.  The other income would be about 5 percent of your

5    rental income.

6    Q     Then last you have noncontinuing expenses, and that's

7    another deduction.  Can you explain what that is?

8    A     So that deduction is to account for the fact that

9    because the business is not operating, because the

10   Metropolitan is not, you know, fully leasing units, there

11   aren't tenants on the property, there are certain expenses

12   that you're not incurring, that you don't have to incur,

13   whether that's costs to turn over a unit.  Say as a tenant

14   moves out before another one moves in, you'll paint, maybe

15   replace the carpet or cleaning the carpets.

16           If you have HVAC repairs or other expenses of those

17   type that you're simply not incurring because the tenants

18   aren't there.  So you calculate that and back that out as

19   well.

20           In this instance, we calculated the noncontinuing

21   expenses initially at 10 percent because the property was

22   operating to some extent.  There were tenants living there

23   with some kind of normal activity and expenses being incurred.

24   And then we increased that expense to 20 percent later on in

25   the calculation after the entirety of the property was

                                504

1    vacated.

 2              So in July of 2019, we upped that percentage to 20

 3    percent.  So it varies depending on the -- which time in the

 4    calculation, but ultimately for the duration.  Then after July

 5    of 2019, we used the 20-percent factor to calculate those

 6    noncontinuing expenses that have to be backed out of the total

 7    lost rental income.

 8              Considering then both the addition of the other lost

 9    income of 5 percent but then backing out those saved or

10    noncontinuing expenses, we ultimately arrive at the $7,510,000

11    of lost rental value.

12    Q    And that was as of -- or through January 31st of 2021,

13    because that was just the date that we were picking in October

14    of 2020, because we didn't really know when it was going to

15    end, but that was just the projection that you're using,

16    correct?

17    A    That's correct.  Through January of 2021, yes.

18    Q    So at that point, we were already at seven and a half

19    million dollars.  And what was the limit in the policy?

20    A    The limit was $5 million.  So we were well in excess of

21    that limit at the time that I prepared my report and

22    through -- in this calculation through January of 2021.

23    Q    So at what point would Maxus have hit the $5 million

24    limit by your calculation?

25    A    In June of 2020.

                               505

1    Q    And are you aware of when the various phases of the

2    Metropolitan were actually beginning to be rented again after

3    the fire?

4    A    It was not until significantly after that.  Not until --

5    let's see.  I'm trying to recall.  The -- until 2022, I

6    believe.

7    Q    It was after June of 2020, correct?

8    A    Yes.  It was well after that.

9    Q    So by the time Maxus was actually able to rent

10   apartments at the Metropolitan after the fire, based on your

11   calculations, the actual lost rent was more than the $5

12   million limit at that point, correct?

13   A    Yes.  It would have been more than double.

14   Q    Can you think of any reason why an insured owner would

15   purposely delay construction, remediation at a property that

16   they're trying to rent?

17   A    No, I can't.  In my experience, property owners have

18   done everything in their power to complete the repairs and

19   reconstruction as quickly as possible and even more so in an

20   instance such as this where their $5 million limit had been

21   exceeded, you know, pretty early on in terms of the period of

22   restoration.  So they had every incentive to complete the

23   reconstruction as quickly as possible.

24   Q    Are you familiar with delays that were happening in the

25   construction industry in general between 2019 and December of

                                 506

1  2021 when the work was being done at Metropolitan?

2  A    Absolutely.  Based on my experience with other losses,

3  other claims that I have handled, there were significant

4  issues affecting reconstruction and construction at the time.

5  There were major supply chain issues.  There were significant

6  issues with labor and labor shortages, and there were lockdown

7  orders in place so people couldn't go to work.  Or you had

8  entire crews that were getting sick and being in quarantine,

9  which stopped work all together, and just issues and delays in

10 obtaining the required construction materials and supplies as

11 well.

12 Q    Have you handled other claims like this one where one or

13 more buildings may be completely destroyed by some sort of

14 incident, hurricane, fire, whatever it is, that there are

15 other buildings in the complex that are left standing

16 afterwards?

17 A    Yes, I have, several.

18 Q    When that happens, do you think it's common for the

19 buildings that remain standing to be impacted by the loss even

20 if there's no like obvious damage to the other buildings?

21 A    It is quite common in my experience, to the extent that

22 you've got construction vehicles on site, you've got all the

23 workers coming in and out, the noise of construction, and

24 those things.  So you have potential new tenants coming to

25 view a property, and they see that kind of activity, they hear

507

1    the noise.  It's quite often a deterrent for them to want to
2    lease a unit because of those factors.
3              So when we look at these types of losses or the
4    impact of these types of losses, we look at the property
5    overall, not just if it's one of ten buildings impacted or a
6    couple of buildings impacted.  We look at the overall
7    property, and typically what we see is a reduction in
8    occupancy.  And it's attributable to the fact that there's the
9    ongoing construction.
10   Q    And you previously mentioned that in addition to the
11   lost rental value, a portion of your calculation was for extra
12   expense and soft costs.  Can you explain briefly what you
13   understand the policy covers as far as these types of losses
14   go, what that means?
15   A    So that means that there's coverage for, for example,
16   for the extra expense, that the policy includes coverage for
17   an additional $250,000 for costs or expenses that you incur
18   that are beyond your normal operating expenses but that you
19   are incurring in order to push forward the -- your
20   remediation, repairs, or reconstruction.
21             And the soft costs that we looked at or talked about
22   earlier could include -- they are costs that are in excess of
23   what you budgeted for your project; so in this case, the
24   construction of the apartment complex.  You had a budget for
25   that project; and now because of the loss, you are incurring
                                   508

```
 1   additional costs beyond that.

 2           So if you have additional architectural fees or you

 3   have to get new additional permits and there are fees

 4   associated with that.  You have to renegotiate contracts.

 5   You've got additional insurance premiums, financing costs, et

 6   cetera.

 7   Q    So here if we look at these amounts that -- the

 8   $346,990, that's soft costs, extra expense, that sort of

 9   thing; is that correct?

10   A    That's correct.

11   Q    And then Maxus' expenses for lost rents alone exceeded

12   the $5 million limit way before this time of your calculation,

13   correct?

14   A    Yes, it did.

15           MS. WINTER:  No further questions.

16   CROSS-EXAMINATION BY MR. ELY:

17   Q    Ms. Pienta, how are you?

18   A    I'm doing well.

19   Q    You may not remember, I saw you a couple years ago.

20   A    It's been a few years.

21   Q    Yes, it has.

22           First off, I wanted to ask you with respect to

23   phases 5 and 6, you're familiar with the Metropolitan and the

24   different buildings, correct?

25   A    Yes.
```

                                509

```
 1   Q    Obviously you've been through an extensive calculation

 2   based on every apartment.  So you understand phase 6 burned to

 3   the ground?

 4   A    Yes.

 5   Q    And you understand phase 5 was impacted by the fire?

 6   A    Yes.

 7   Q    And neither of those buildings were occupied at the

 8   time.

 9   A    That's correct.

10   Q    And I believe when you and I talked back in maybe 2019,

11   there was -- you had worked with Travelers in terms -- in

12   phase 5 and 6, business interruption loss, and some payment

13   had been made by Travelers; is that correct?

14   A    Yes.  We hadn't worked with Travelers in doing a

15   calculation.  We had -- at the time I was with Quantum Global,

16   I prepared an initial calculation for all phases, all units.

17   Yes, we had discussion with Travelers about the calculation

18   that Travelers had completed for just 5 and 6.  And, yes, I

19   understood there were -- there was an initial payment made

20   based on that, that measurement.

21   Q    Okay.  And that -- so there was a payment made for 5 and

22   6 even though they weren't occupied at the time; came up with

23   future occupancy rates and figured it that way, correct, for

24   those two buildings?

25   A    Correct.
```

510

```
 1   Q    So moving to phases 1 through 4, I believe at the time
 2   you and I talked previously in 2019, you had done a
 3   calculation based upon the understanding that phase 1 through
 4   4 had been -- would have to be completely vacated; is that
 5   correct?
 6   A    That's correct.
 7   Q    Now, just so I make sure I understand the parameters of
 8   what you're here to testify about today, you're not testifying
 9   about the necessity of the remediation or the evacuation of
10   the tenants, any of those things, correct?
11   A    That's correct.
12   Q    What you're here to testify about today is the numbers
13   based upon the expectation in Maxus' claim that those losses
14   are covered under the policy?
15   A    That's correct.
16   Q    That a fair statement?
17   A    Yes.
18   Q    That was a lot of words.  I'm sorry.
19        So I wanted to point you to -- I think you looked --
20   you looked at this particular provision with Kim, and if we
21   could pull up Section A1, zoom.  Yeah, right there.  Great.
22        So you talked about the business income.  The
23   business income, the last sentence there says, Such cessation
24   or delay must be caused by or result from direct physical loss
25   of or damage to covered property by covered cause of loss.
```
511

```
 1    Correct?

 2    A    Correct.

 3    Q    You've got to have a covered event triggering the

 4    business interruption loss?

 5    A    Correct.

 6    Q    And as far as that is concerned, every calculation you

 7    made was based upon the assumption that all of the rental loss

 8    is related to a direct physical loss from a covered cause of

 9    loss?

10    A    That's correct.

11    Q    Okay.  So with respect to -- I believe you talked about

12    the period of restoration.  Go to page 42, please.

13          Period of restoration, the post-loss period for

14    repair or construction.  I believe you said that that period

15    of restoration, it doesn't specify a specific period, right?

16    A    Correct.

17    Q    Because, of course, it depends upon the extent of the

18    construction necessary to repair the loss?

19    A    And the time that it takes to complete that

20    construction.

21    Q    Right, right.  That's the next step.

22          And that has to be reasonable.  That period of time

23    related to the nature of the repairs has to be reasonable?

24    A    Based on the definition in the policy, yes.

25    Q    Okay.  And that was the case here at the Metropolitan?
                              512
```

```
 1    A    Yes.

 2    Q    Okay.  So the fact that the policy requires direct

 3  physical loss of damage from a covered cause of loss, number

 4  one, and a reasonable period of restoration, number two, based

 5  upon the extent of that loss, how did you figure the

 6  reasonable period of restoration here?  I know you said

 7  January 31st, 2021.  How did you figure that?

 8    A    We didn't calculate a -- what the period would have been

 9  or what the period was.  Again, we were kind of -- we started

10  initially doing the calculation on a month-by-month basis or

11  every few months we were updating.  And at the time I was

12  asked to prepare my report, we established the -- a date by --

13  through which to run a calculation, which was January 31st,

14  2021, but, again, I'm assuming work was still ongoing and

15  likely would still continue even beyond the January 2021 date.

16    Q    Were you made aware at any time that there was other

17  work going on at the property that was not related to fire

18  remediation?

19    A    No, I was not.

20    Q    So no one told you that there was a construction defect

21  issue out there during the period of time that you calculated

22  your period of restoration?

23    A    No, they did not.

24    Q    Would that have been important information for you to

25  know?
```
                                   513

1    A      Potentially, yes.

2    Q      Why so?

3    A      If there was a difference or if it would somehow have

4    affected the time period.  However, with the limit that was in

5    place and what we understood to be the impact of the loss, our

6    calculations had exceeded that $5 million limit.

7    Q      You just said what you understood to be the impact of

8    that loss.  That was information you got from Maxus, correct?

9    A      That's correct.

10   Q      And the fact that -- if there was construction defect

11   work going on out there, investigation, removal of the

12   cladding and damages identified in the millions, wouldn't you

13   think that that would impact how long the construction work

14   would take to repair all that damage?

15   A      It could potentially, but it could also be done in the

16   same timeline or same manner which the remediation, repairs,

17   and reconstruction due to the fire were done.

18   Q      Sure.  And -- but you wouldn't know that as you sit here

19   today?

20   A      I do not.

21   Q      And so your number that you've put on the board today

22   does not take into consideration one single day of

23   construction defect, remediation, or investigation, does it?

24   A      I was not aware of that type of work or -- so,

25   therefore, the calculation, the report that I prepared is

                                514

1  based on my understanding of what the impact and period of
2  restoration was due to the fire.
3  Q    So that would be no?
4  A    That would be no.
5  Q    Okay.
6         MR. ELY:  No further questions.
7         MS. WINTER:  Brief redirect.
8  REDIRECT EXAMINATION BY MS. WINTER:
9  Q    So Mr. Ely discussed the fact that there were payments
10 made on phases 5 and 6.  Phase 6 is the one that burned to the
11 ground.  5 is next door that was also under construction.  And
12 Travelers has agreed that there is business interruption
13 coverage that they have owed for those phases, correct?
14 A    Correct.
15 Q    So if we're just assuming that we're talking about
16 phases 5 and 6, would we have exceeded the $5 million limit
17 based upon your calculation of lost rents alone?
18 A    Yes.
19 Q    What time or what date had you estimated that we would
20 have exceeded the $5 million limit just on phases 5 and 6
21 alone?
22 A    Just for those two phases, the $5 million limit would
23 have been exceeded by April of 2022.
24 Q    Do you know whether phases 5 and 6 were actually being
25 leased by April of 2022?
                          515

```
 1    A    They were not.

 2    Q    So even if we exclude phases 1 through 4 of the business

 3  interruption calculation, we only look at lost rent and other

 4  expenses from phases 5 and 6, Maxus is still owed the full $5

 5  million limits for this coverage, correct?

 6    A    That's correct.

 7         MS. WINTER:  No further questions.

 8         MR. ELY:  Briefly, Your Honor, if I may.

 9  RECROSS-EXAMINATION BY MR. ELY:

10    Q    Ms. Pienta, if the insured decides to delay initiating

11  repair work for, say, 15 months after a loss, would that

12  factor into your calculations at all?

13    A    It would, but I've never been in a situation where an

14  insured has delayed repairs for any reason, especially where

15  they know they've got limits on their coverage.

16    Q    If it were shown in this case that remediation on phase

17  5 didn't start until 15 months after the fire, would that be

18  an important fact for you to know in calculating your phase 5

19  analysis?

20    A    Potentially, yes.

21    Q    Okay.  And if it was shown that in the reconstruction of

22  phase 6, the contractor was fired and substantial remediation

23  work had to be done to repair what the contractor had done

24  wrong, would those be important facts that you would want to

25  consider in your phase 6 analysis?
                         516
```

```
 1   A    Yes, we would consider them.  I can't say how that would

 2   impact --

 3   Q    Sure.  Not asking you to.  Were you provided any of

 4   those facts?

 5   A    No, I was not.

 6          MR. ELY:  Thank you.  I don't have anything else.

 7          MS. WINTER:  No further questions.

 8          THE COURT:  Thank you, ma'am.

 9          MR. ABRAMS:  Your Honor, ready for the next witness,

10   or you need a break?

11          THE COURT:  Let's do this.

12   JOHN ALEXANDER STEHL, being duly sworn by the courtroom

13   deputy, testified:

14   DIRECT EXAMINATION BY MR. ABRAMS:

15   Q    Please state your name for the record.

16   A    John Alexander Stehl.

17   Q    Mr. Stehl, what do you do for a living?

18   A    I work for Maxus Properties.  I'm the VP of construction

19   and development for them.

20   Q    And tell us a little bit about your background.  What's

21   your educational background?

22   A    So I graduated Kansas State University in 2012, and then

23   started in on the general contracting for Straub Construction

24   in 2013; was an assistant superintendent there.  And then

25   moved to Centric about a year and a half later, and was at
                              517
```

```
 1    Centric as a -- it was a super manager role.  So it was a
 2    superintendent project manager.  Then morphed into a project
 3    manager role for them for four and a half years, and then in
 4    2019, went to Maxus Properties and been there ever since.
 5    Q    Okay.  So tell us a little bit about what does Straub
 6    do?
 7    A    Straub is a local general contractor here in town that
 8    primarily focused on multi-family construction projects when I
 9    was there.  And then Centric did similar stuff, but they've
10    done health care.  I worked on health care, did community
11    centers, and they've done industrial as well.  So --
12    Q    When you say you did health care and community centers,
13    were you involved in the construction of them?
14    A    Yeah.  I was a project manager slash super manager for
15    some of those projects, but primarily a lot of multi-family
16    jobs for them as well.
17    Q    And you said you are a vice president of construction at
18    Maxus now?
19    A    Correct.
20    Q    And what do you do as vice president of construction?
21    A    There's various roles, but oversee various construction
22    projects that we may have, kind of an owner's rep role.
23    Q    Do you have any affiliation with the Chicken N Pickle
24    part of the business?
25    A    Correct, I do.  So I also work on the Chicken N Pickle
```
518

1  development side and lead that development team and do

2  ground-up construction for Chicken N Pickles.

3  Q    Okay.  When you say do the construction, you're not

4  hammering nails?

5  A    I am not physically doing the construction.  It's more

6  of an owner's role, owner rep role.

7  Q    All right.  So let's talk about the Metropolitan in

8  Alabama.  Just so we have a timeframe, you started at Maxus

9  when?

10  A    Right after the -- January 2nd or whatever date after

11  the holiday of 2019.

12  Q    So the fire had occurred at the Metropolitan already; is

13  that right?

14  A    Correct.

15  Q    Okay.  And what was -- so you didn't get a chance to see

16  the Metropolitan before the fire; is that right?

17  A    Correct.

18  Q    So when did you first see the Metropolitan in person?

19  A    It would have been in January or February of 2019.

20  Q    And what was your role at that point with respect to the

21  Metropolitan?

22  A    To go down there to oversee progress and see

23  construction happening and try to finish the project.

24  Q    And not only what was the reason for your visit, but

25  what was your responsibility with respect to the Metropolitan

519

```
 1   when you began at Maxus?

 2    A    We had a general contractor on site that was supposed to

 3   complete the project for us.  So just updating my team back in

 4   the home office to make sure that they were completing what

 5   they said they were and continued to do -- be on time and on

 6   budget.

 7    Q    And who was the general contractor that you're referring

 8   to?

 9    A    Bomasada.

10    Q    Okay.  Was that also the company that sold the building

11   to Maxus?

12    A    Correct.

13    Q    All right.  So describe just the state of the

14   Metropolitan the first time you saw it.  I forgot what you

15   said.  When did you see it in person first?

16    A    January or February -- I don't recall the exact time --

17   but of 2019.

18    Q    So within a month or two of you starting?

19    A    Yes.

20    Q    What was the status of the Metropolitan at that time?

21    A    Phases 1 through 3 were primarily finished.  There was

22   people living there.  Phase 5 was basically at the framing

23   stage.  Phase 6 was completely down to the ground, and they

24   were doing some miscellaneous cleanup.  And phase 5, they were

25   doing miscellaneous cleanup as well.
```
520

```
 1    Q    All right.  I want to fast forward to April of 2019.
 2              MR. ABRAMS:  Melissa, if I could have you put up
 3    Travelers Exhibit 86.
 4    Q    (BY MR. ABRAMS) Mr. Stehl, you have it on the screen in
 5    front of you.  It's the same screen the jury is seeing there.
 6              Okay.  So this is an email from Cary Case, and
 7    you're -- it's to a man named Brad Stiles at SELC, and you're
 8    copied on the email, correct?
 9    A    Correct.
10    Q    Tell us just for reference, who is Mr. Case?
11    A    Mr. Case worked at BCCM.  It's another general
12    contractor in Kansas City that we used a lot prior to myself
13    being employed there to help and assist on construction
14    projects.
15    Q    And what was BCCM's role at the Metropolitan on April --
16    as of April 9, 2019?
17    A    Like I said, they were assisting Maxus and seeing
18    construction through as well since I had just on boarded.
19    Q    Okay.  And does this reflect the -- what you had known
20    about the Metropolitan as of this time in April of 2019?
21    A    Does this reflect?
22    Q    And can you elaborate on what prompted this email from
23    Mr. Case?
24    A    Site visits that we had seen evidence of soot or char
25    potentially in the buildings.
```
521

```
1    Q    Okay.  Were you there on that site visit?

2    A    I was there early April.

3    Q    Okay.  And let's first talk about there's been some

4    reference to subfloor, correct?

5    A    Correct.

6    Q    All right.  So when you visited this site in April of

7    2019, did you notice any issues relating to the phase 5

8    subfloor?

9    A    Yeah.  It was already saturated and deteriorated from

10   water damage.

11   Q    Okay.  And when you say "saturated," it had -- there was

12   crumbles?

13   A    It had already been dried out, but there was evidence

14   that it had been saturated for some time previous.

15   Q    That's my -- that's really my question.  When you were

16   there beginning of April of 2019, was the floor wet?

17   A    No.

18   Q    Okay.  Was there a determination made that the subfloor

19   had to come out?

20   A    Yeah.

21   Q    Okay.  Yes?

22   A    Yes.

23   Q    Now, you are aware that there was a sprinkler leak?

24   A    Correct.

25   Q    Okay.  Did that sprinkler leak happen before or after
```

522

```
 1   your visit?

 2    A    After my visit.

 3    Q    Okay.  Did it happen before or after you sent this

 4   email?

 5    A    It happened after this email.

 6    Q    Okay.  So by the time you sent this email before the

 7   sprinkler leak, you had determined that the subfloor in 5 had

 8   to come out?

 9    A    Yes.

10    Q    And were there pieces of the subfloor that could -- that

11   could remain?

12    A    There were.  There was potentially some.  I don't know

13   if they remained or not.  I didn't determine that.  That's why

14   we had experts there.

15    Q    Okay.  But do you remember was there parts of the

16   subfloor that had already been replaced on 5?

17    A    Yes.

18    Q    Okay.  And was it extensive amounts of the subfloor or

19   just small pieces?

20    A    Small pieces.

21    Q    Okay.  And when you say "small pieces," what are we

22   talking about?

23    A    Square footage wise.

24    Q    Yeah.  And just an approximation.  When you say "small

25   pieces," what are we talking about?
```

523

```
 1    A    I don't know.  Couple thousand square feet.

 2    Q    Okay.  To give us an idea like for all of phase 5, how

 3   many square feet of subfloor is there?

 4    A    About 35,000.

 5    Q    All right.  So on this -- well, let's go -- before we go

 6   to this exhibit, I want to cover one other thing.  So Brad

 7   Stiles, you recognize that name at SELC?

 8    A    Yes.

 9    Q    Do you remember who SELC is?

10    A    I don't know exactly what they -- I know they can test

11   environmental items.

12    Q    Environmental what?

13    A    Environmental, like soot and char, determine that.

14    Q    Okay.  Do you know why Cary Case is communicating with

15   SELC?

16    A    Based on previous site visits of our concern with having

17   soot and char, potentially contaminants in the building.

18    Q    Do you know if SELC was engaged to do some testing for

19   soot and char?

20    A    This email suggests we did engage them.

21    Q    Okay.  And did there come a time when they were removed

22   from the project?

23    A    Yes.

24    Q    And why was that?

25    A    Because we decided to hire somebody else, the Howarth
                            524
```

```
1    Group, and they had their own testing agency, which was FBS,

2    and we didn't need two different tests.

3    Q    Is there any other reason why SELC was removed?

4    A    No.

5    Q    Okay.  Did you want to remove them because you didn't

6    think that you liked the results that they were going to find?

7    A    No.  I don't even recall the results.

8    Q    Okay.  And do you even know if you received --

9    A    I don't even recall the results.

10   Q    Do you even know if SELC completed the test results and

11   sent them to you?

12   A    I don't.

13   Q    So the only reason that you're aware of that SELC was

14   removed from the project is you didn't want two companies

15   doing the same thing?

16   A    Correct.

17   Q    Who recommended going with a different company other

18   than SELC?

19   A    The Howarth Group after we decided do hire them.

20   Q    And they recommended who?

21   A    FBS.

22   Q    Okay.  Let's go to the next slide, please.

23         All right.  Do you recognize this document?

24   A    Yeah.

25   Q    Okay.  What is this?
```

525

```
 1   A    Basically an outline to an email saying where we thought

 2   there was potential damage within the complex.

 3   Q    Okay.  And when was this email -- this is the email

 4   that's in connection on April 9th?

 5   A    Yes.

 6   Q    Okay.  Can you read what it says, and I don't know if

 7   you've become adept to circling.

 8        Do you see where -- do you see where it mentions

 9   anything about the condition in phase 5?

10   A    Phase 5 has soot and water damage.

11   Q    Okay.

12   A    Test whole building -- or this building, all four floors

13   for soot.

14   Q    Okay.  And so when it says phase 5 has soot and water

15   damage, is the water damage that you're talking about what you

16   saw to the subflooring where it had dried out and -- had water

17   damage and it dried out and was failing?

18   A    Correct.

19   Q    Okay.  Was this written before the sprinkler break?

20   A    Yes.

21   Q    Okay.  All right.

22        MR. ABRAMS:  Let's go to the next, if you would.

23   Q    (BY MR. ABRAMS) This is Defendant's Exhibit 82,

24   Travelers' Exhibit 82, and can you tell us what this is?

25   A    This is an email from Cary Case to an engineer, a local
```
                                      526

```
 1   engineer here explaining what we basically found from our site

 2   visit that week.

 3   Q    Are you copied here?

 4   A    Yes.

 5   Q    And what's the date of Mr. Case's email?

 6   A    April 5th, 2019.

 7   Q    And can you read the highlighted portion from that email

 8   from April 5th, 2019?

 9   A    So preface it, it's phase 5.  The flooring is showing

10   significant exposure to water and associated deterioration.

11   Q    Okay.  Was that email sent, written and sent before the

12   sprinkler break?

13   A    Yes.

14   Q    All right.  Let's transition.  Let's transition topics

15   to FBS and their role in the project.  I think you mentioned

16   already.  How did Maxus become acquainted with FBS?

17   A    We hired the Howarth Group, which they suggested to hire

18   FBS to do testing and oversee the remediation process for us.

19   Q    And were you at the initial meeting when FBS went to

20   inspect the property in April of 2019?

21   A    Yes.

22   Q    Okay.  Do you recall what they did on that visit?

23   A    We observed all phases of the project and could see that

24   there are byproducts or contamination we should investigate

25   further.
```

                                527

```
 1    Q    And did they note that they -- that they thought that

 2  there may be some evidence of combustion byproducts in phases

 3  1 through 4?

 4    A    Yes.

 5    Q    And did Maxus authorize the conducting additional

 6  testing?

 7    A    Yes.

 8    Q    All right.  And do you remember receiving the results of

 9  those tests?

10    A    From FBS?

11    Q    Yes.

12    A    Yes.

13    Q    Now, were you involved in -- we heard from Mr. Johnson

14  earlier about Maxus' decision after it received the report

15  from FBS about moving tenants out of property.  Were you

16  involved in that decision, or was that outside of your

17  involvement?

18    A    I was in the meeting.

19    Q    Okay.  You remember that?

20    A    Yep.

21    Q    Okay.  And do you remember what you heard from FBS

22  regarding what their recommendation was to Maxus?

23    A    Yes.

24    Q    And what was that?

25    A    To move the tenants out.
```
528

Gayle M. Wambolt, CCR No. 462<br>Registered Merit Reporter

Case 4:20-cv-00095-FJG   Document 243   Filed 09/05/23   Page 179 of 221

```
 1   Q    Okay.  And why was that?  Why did FBS recommend that?

 2   A    Because there was --

 3   Q    What did they tell you about that?

 4   A    -- soot and contaminants in the building.

 5   Q    And so why is it that they recommended that tenants be

 6   moved out?

 7   A    Because we needed to remediate to make it safe.

 8   Q    Okay.  I want to transition now to talk about your role

 9   in the construction process and the oversight and how it

10   worked.  So can you describe your role in the oversight of the

11   rebuild of 6 and the finishing of 5 and remediation of 1

12   through 4, your personal role?

13   A    So my role, we hired two general contractors, Bomasada

14   and BCCM, to complete phase -- Bomasada to do phase 6,

15   rebuild, and BCCM to do the remediation work.  We also hired

16   FBS to oversee all of that, and then they all fed up to me and

17   reported back to me.  And then I maintained and reviewed pay

18   apps, change orders, and all sorts of that stuff to

19   complete -- make sure the project was completed in a timely

20   fashion and within the budget.

21   Q    Did FBS also provide any assistance in reviewing pay

22   applications?

23   A    Yes.  They also assisted in --

24   Q    And -- I'm sorry.  I interrupted you.

25   A    Just reviewing with me.
```
                                                    529

```
 1    Q    Would FBS review it first and then make a recommendation
 2   to you about whether the pay application was reasonable or
 3   not?
 4    A    Yeah.
 5    Q    And were there times where FBS said, We don't think that
 6   this is a reasonable amount; don't pay it?
 7    A    Correct.
 8    Q    Okay.  And -- but it would come to you and the Maxus
 9   team from those recommendations to make the final decision?
10    A    Yes.
11    Q    So it's sort of a belt-and-suspenders approach?
12    A    Absolutely.
13    Q    So -- but you actually reviewed all the pay
14   applications?
15    A    Yes.
16    Q    Okay.  For the entire project?
17    A    Yes.
18    Q    And any change orders?
19    A    Correct.
20    Q    And how did you -- what process did you use to -- you
21   got a recommendation from FBS, but what process did you use to
22   conclude that what you were paying, what Maxus was paying was
23   a fair and reasonable price for what was being submitted to
24   you on the construction project?
25    A    There was two different avenues.  There's an Xactimate
```

```
 1   process that was used and then competitive bids also used on
 2   this project to ensure that we were getting the most
 3   competitive pricing.
 4   Q    Let's talk about competitive bids and then come back to
 5   it.
 6            Well, let's finish on the -- on when you got pay
 7   applications and change orders.  Other than getting advice
 8   from FBS, did you do anything else to make sure that what you
 9   were paying on those pay applications and on change orders was
10   fair and reasonable?
11   A    We leaned on FBS to ensure that we were appropriate in
12   those.
13   Q    Okay.  And you have your own experience in managing
14   construction.  You would look at it also to make sure that you
15   thought that the price was fair and reasonable?
16   A    Correct.
17   Q    Okay.  And do you believe that there was anything that
18   Maxus paid on this project to rebuild that you wrote checks
19   for that you didn't believe was fair and reasonable?
20   A    Absolutely not.
21   Q    Okay.  Let's -- now, you talked about competitive
22   bidding.
23            MR. ABRAMS:  If we go to slide 6.
24   Q    (BY MR. ABRAMS) Tell us what this is.
25   A    These are two local Kansas City contractors that went
```

531

```
 1    out and bid the remaining work of the Metropolitan project,
 2    and we put them side by side.  This is part of the competitive
 3    bidding process, and we selected the most qualified low-bid
 4    quote.
 5    Q     Okay.  So -- and just to orient us, what scope of work
 6    are they -- is this competitive bid for?
 7    A     The exteriors of phases 1 through 4, the finishing
 8    building -- or phase 4, the first and second floor interiors.
 9    Building 5, interior and exterior and phase 6, completing
10    that.
11    Q     All right.  So you had two competitive bids.  Who was
12    more expensive; who was cheaper?
13    A     BCCM was cheaper.  Centric was more expensive.
14    Q     Who did you choose?
15    A     BCCM.
16    Q     Who was your former -- was Centric a former employer of
17    yours?
18    A     Yes.
19    Q     And you rejected them?
20    A     Yes.
21    Q     And you rejected them because?
22    A     They were too high.
23    Q     Okay.  Let's also -- let's look -- so we just -- let's
24    pull up a few examples of some pay applications.
25              MR. ABRAMS:  If you go to the next one.  This is
```
                              532

```
 1   Plaintiff's Exhibit 456.
 2   Q    (BY MR. ABRAMS) What are we looking at here?
 3   A    We are looking at a fire pay application for phases 1
 4   through 4 from BCCM.
 5   Q    All right.  And tell us -- and, again, we've heard a
 6   little bit about this.  Explain what's a pay application?
 7   A    Pay application is how basically the contractor is paid
 8   each month from the owner.
 9   Q    So, in other words -- and I'll back up for a second.
10        Maxus signs a contract with a contractor to do work
11   on the project, right?
12   A    Yes.
13   Q    And -- but it takes many months to complete the project,
14   correct?
15   A    Correct.
16   Q    And so the contractor doesn't get paid at the end of the
17   project, right, because it has to pay its people and so on,
18   right?
19   A    Correct.
20   Q    And it gets -- so it gets paid every month, correct?
21   A    Yes.
22   Q    And how is it that you know how much to pay the
23   contractor every month?
24   A    Looking at the work that they have actually completed on
25   site.
```
                              533

```
 1   Q    Okay.  So depending on how much work they've completed
 2   versus the contract, that's how you decide.
 3            And so does the contractor make an application to
 4   you for how much money they should receive every month?
 5   A    Yes.
 6   Q    Okay.  Is this an example of one of those applications
 7   to get paid?
 8   A    Correct.
 9   Q    All right.  And so what -- when you got an application
10   like this, what did you do?
11   A    I would review it and go through line by line and see
12   what percentage they were billing and see if it makes sense
13   compared to what work they had completed.
14   Q    Is there backup that's submitted with these pay
15   applications?
16   A    Yes.
17   Q    And would you also receive the opinion of FBS before you
18   would pay any of those pay applications?
19   A    Yes.
20            MR. ABRAMS:  Mr. Stehl, I'll pass the witness.
21   Thank you.
22   CROSS-EXAMINATION BY MR. HAMANN:
23   Q    Good afternoon.
24   A    How are you?
25   Q    I'm fine.  Just have a few questions for you.
```

534

```
 1              In the spring of 2019, you were getting down to the
 2   Birmingham Metropolitan about once a month?
 3   A    Correct.
 4   Q    Okay.  And you were down there on April 4, 2019, and
 5   while you were there, you met with Cary Case?
 6   A    Yes.
 7   Q    Who worked for BCCM, correct?
 8   A    Correct.
 9   Q    Okay.  And weren't you and Mr. Case inspecting the
10   quality of the construction among other things?
11   A    Among other things, yes.
12   Q    Okay.  And when you were inspecting the quality of the
13   construction among other things, did you find problems such as
14   water leaks?
15   A    Yes.
16   Q    All right.  And did you write Stuart Fred of Bomasada a
17   letter regarding what you saw on April 4, 2019?
18   A    Which letter?
19   Q    I'll show you Travelers' Exhibit 24.
20   A    Yep.
21   Q    You recognize the letter?
22   A    Yes.
23   Q    Okay.  Now, your objective in writing Mr. Fred this
24   letter was to get his attention to the issues you were
25   identifying and to remedy those issues, correct?
```
535

```
 1    A    Correct.

 2    Q    Okay.  And, in fact, the -- at the top you label your

 3   letter "Construction Quality Report No. 1."  Do you see that?

 4    A    Yes.

 5    Q    Okay.  Now, isn't it fair to say that water infiltration

 6   was a major concern to you?

 7    A    Throughout the project.

 8    Q    Including at the time of this letter too?

 9    A    Correct.

10    Q    Okay.  Some of the concerns that you found with water

11   infiltration, some of them were in the doughnut building,

12   weren't they?

13    A    Yes.

14    Q    In your letter here, you see in the third paragraph

15   Maxus' management team found three additional water leaks in

16   finished units.  You see that?

17    A    Yes.

18    Q    Does that mean you saw water leaks in finished units,

19   meaning some were in phases 1 through 4?

20    A    Correct.

21    Q    Okay.  Now, did you find as you were reviewing pay

22   applications for Bomasada when Bomasada was the contractor

23   that the documentation that they were providing was sometimes

24   lacking?

25    A    Yes.
```
                                536

```
 1   Q    Documentation wouldn't support the application in some

 2   cases?

 3   A    In some cases.

 4   Q    All right.

 5            MR. HAMANN:  Now, let's have Exhibit 25.

 6   Q    (BY MR. HAMANN) Mr. Stehl, I'm showing you a letter

 7   dated April 12, 2019, to Mr. Fred.  You see that?

 8   A    Yes.

 9   Q    You recognize that as a letter you wrote?

10   A    Correct.

11   Q    It's labeled at the top "Construction Quality Report No.

12   2"?

13   A    Yep.

14   Q    Now, in that letter, you inform Mr. Fred that there was

15   a water leak on April 10, 2019, correct?

16   A    Correct.

17   Q    And you further tell him that it caused a substantial

18   amount of water flowing through all four floors?

19   A    Correct.

20   Q    Okay.  And you're talking about the phase 5 building,

21   aren't you?

22   A    Yes.

23   Q    And the source of your information about this water leak

24   came from the people on site.  Didn't you get reports?

25   A    Yes.
```

                              537

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

```
1    Q    Okay.  And this wasn't the only place there were water
2    leaks, but that was one of the places, correct?
3    A    That was one of them.
4    Q    Okay.  Now, did you inspect the flooring of phase 5
5    after learning of this waterline break?
6    A    I don't recall.
7    Q    Okay.  Did you tell Travelers about the waterline break,
8    that they saw it?
9    A    I know they know about it or knew about it.
10   Q    Well, I'm just asking whether you told them.  Thank you.
11   A    I don't recall if I personally told them about it.
12   Q    Okay.  And in this letter, didn't you have Mr. Fred ask
13   them to tell you how Bomasada planned to remedy these
14   problems?
15   A    Yes.
16   Q    And was that because you viewed these water problems to
17   be Bomasada's responsibility?
18   A    To fix the fire sprinkler break, yes.
19   Q    Now, fire sprinkler break, as you -- your understanding
20   was that it was cut by either Bomasada or one of its
21   subcontractors?
22   A    Correct.
23   Q    What efforts did Bomasada take to get the water out and
24   dry out the building following this event?
25   A    They were on site, so they would have had the ability to
                              538
```

```
 1    clean it up in a timely manner because subflooring has the
 2    ability to dry out if there is any water on it.  Just like
 3    building a house, you don't have a roof day one and it rains,
 4    there is some timelines that you have that it will not destroy
 5    the subfloor just from one water incident.
 6    Q    Okay.  But -- let me ask you, Mr. Stehl, do you know
 7    what measures Bomasada took?
 8    A    They cleaned it up as quickly as they could.
 9    Q    Do you know how they cleaned up?
10    A    I don't recall how they cleaned it up.
11    Q    All right.  Now, let's take a look at Travelers' Exhibit
12    201.  Let's direct your attention to Stehl 0029 to 0033.
13         Okay.  Now, if you look at 0029, this is an incident
14    report on Maxus Properties' letterhead?
15    A    Yes.
16    Q    Okay.  And was -- does it say that this report was
17    created on April 10, 2019?
18    A    Yes.
19    Q    And it's called an incident report?
20    A    Yes.
21    Q    Okay.  Let's turn to the next page.
22         On this page it identifies the date -- the time of
23    the incident to be 5:45 p.m.?
24    A    Correct.
25    Q    And the date of the incident to be April 10?
```

                                 539

```
 1    A    Yes.

 2    Q    Okay.

 3         MR. HAMANN:  Let's go to the next page.

 4    Q    (BY MR. HAMANN) Now, under -- at the very top where the

 5    writer is describing the incident in detail, does it identify

 6    that approximately 5:45 p.m., fire alarms sounded throughout

 7    the entire complex due to a fire waterline in building 2,

 8    phase 5, under construction building, that was hit and broke?

 9    A    Yes.

10    Q    Okay.  The fire department responded, correct?

11    A    Yes.

12    Q    Let's move further down on that page.  Do you see the

13    section that says "describe damage done"?

14    A    Yes.

15    Q    Okay.  And the reporter providing this report said what

16    in the notes as to damage that was done?

17    A    Extensive damage to construction site in phase 5 on all

18    four levels.

19    Q    Okay.  And then let's go further to the next page.

20         Okay.  Do you see pictures there, photographs?

21    A    Yep.

22    Q    And are those photographs that were -- that accompanied

23    this report?

24    A    Yes.

25    Q    And those are the photographs that are -- you understand
```

540

1   depict the waterline break?

2   A     Correct.

3   Q     Okay.  Now, you also saw a video too of it, didn't you?

4   A     Yes.

5   Q     Okay.  Let's take a look at Defendant's Exhibit 114.

6              It's going to be a video.  I'm going to ask you

7   whether you can identify this as being a video corresponding

8   to these photographs showing the waterline break in progress.

9              MR. HAMANN:  Does that come with audio?

10  A     Does it have a date?

11  Q     (BY MR. HAMANN) Let's see.

12             MR. HAMANN:  Play it again, please.

13  Q     (BY MR. HAMANN) I don't see a date.  Do you have a

14  question about whether that's the same thing as --

15  A     You just asked if it corresponded directly to that

16  report.

17  Q     Uh-huh.  But I'm talking about the photographs on that

18  report.

19  A     Yeah.  That's what I'm saying.  You said does this

20  correspond with those photographs.

21  Q     And your answer is?

22  A     If there's a date, I could confirm.

23  Q     If it doesn't have a date, can you tell me, from just

24  comparing what you're seeing here?

25  A     It appears to be the same.

                              541

```
 1    Q     Okay.  Thank you.

 2          Let's go back again to the report.  Was this report

 3    authored by a Maxus Property employee at the site named Keisha

 4    Martin?

 5    A     Yes.

 6    Q     Okay.  Now, was there a separate document also authored

 7    in relation to this waterline break?

 8    A     Was there an additional letter?

 9    Q     Yes.  Called a water leak log?

10    A     Yes.

11    Q     Okay.  Let's -- same exhibit at Stehl 0034 to 0036.

12          Do you see in front of you a water leak log?

13    A     Yes.

14    Q     Okay.  And do you recall that you received this?

15    A     Yes.

16    Q     And it speaks to the same waterline break that

17    Ms. Martin was reporting?

18    A     Correct.

19    Q     And to the waterline break that was depicted in her

20    pictures?

21    A     Yes.

22    Q     Okay.  It says here construction busted -- I'm going in

23    the overview section.  Do you see that?

24    A     Yes.

25    Q     Construction busted a sprinkler pipe in phase 5 causing
                              542
```

```
 1    the fire alarm to sound.  The water has been stopped.  Phase 5

 2    was put on test for the night by Woody, and he is calling for

 3    fire watch.

 4              Let me ask you, Mr. Stehl, who is Woody?

 5    A    He was the superintendent for Bomasada.

 6    Q    Okay.  Let's go to the next page.

 7              Under the heading near the top, it says "Source of

 8    water intrusion."  Do you see that?

 9    A    Yes.

10    Q    And does the author say the source of the water

11    intrusion was the pipes?

12    A    Yes.

13    Q    Okay.  And then does he also -- does this writer also

14    attach photos?

15    A    Yes.

16    Q    Okay.  And was -- who prepared the water leak log?

17    A    If you go back to the first page, but I think it was

18    Jeff Norris of this -- yeah, Jeff Norris.

19    Q    Okay.  And he was Maxus' maintenance man?

20    A    Correct.

21    Q    Let's take a look at Travelers Exhibit 23.  This is a

22    letter dated May 1, 2019.  Is it by Mr. Johnson?  Let's look

23    at the second page.

24    A    Yes.

25    Q    To Greg Bynum at the Travelers, correct?
```

543

1    A    Yeah.  If you go back to the first page, I think it said

2    Greg.  Yeah.

3    Q    Did you have any role in the preparation of this letter?

4    A    I was aware of it, yes.

5    Q    Okay.  The letter here, bottom of the first page,

6    identifies that there is extensive water damage to the

7    flooring in the phase 5 building.  Do you see that?

8    A    Yes.

9    Q    Okay.  And this is prepared about, what, almost three

10   weeks after the sprinkler line break?

11   A    Correct.

12   Q    Now, in this letter, do you see any reference made about

13   the fact that SELC, Brad Stiles' company, had already gone out

14   to the Metropolitan to do testing for combustion byproduct?

15   A    No.

16   Q    Okay.  Now, were you the individual who terminated

17   SELC's work on that job?

18   A    I don't know if I was the sole person from Maxus that

19   terminated that.  We just -- we decided to hire the Howarth

20   Group, like I said earlier, and we didn't need two reports.

21   Q    Well, did you get a call from Mr. Stiles that he told

22   you preliminarily what he was finding or not finding as a

23   result of the testing and analysis that he performed?

24   A    I don't recall.

25   Q    Don't recall?

                                    544

```
 1    A    (The witness shook head.)

 2    Q    Do you recall after that, you told him to stop work?

 3    A    I don't recall.

 4    Q    Did you tell Mr. Stiles not to do a written report?

 5    A    I still don't recall.  All I know is we chose the

 6  Howarth Group to do our testing.

 7    Q    My question is really pertaining to a conversation you

 8  would have had with Brad Stiles.

 9          In your conversation with Mr. Stiles, did you

10  indicate any criticism of his work?

11    A    There was no reason for me to criticize any of his work.

12  We selected one person to test so there wasn't multiple tests.

13    Q    Did you ever hear of a reason why the decision was made

14  to go with FBS and quit using SELC?

15    A    Because Howarth recommended FBS.

16    Q    Is that the only reason?

17    A    That's the reason I recall.

18    Q    Do you recall that Mr. Stiles was relaying to you what

19  his -- what his testing and sampling was producing in the way

20  of findings?

21    A    I don't recall any of his results.

22          THE COURT:  Mr. Hamann, how much more do you have,

23  because we're getting close to break time.

24          MR. HAMANN:  I can stop here.  I won't be that much

25  longer, but I'm happy to stop.
```

545

```
 1              THE COURT:  Yeah.  Let's do that.  We'll break until
 2  about 20 till.
 3              Again, don't talk about the case among yourselves or
 4  with others, and the rest of the language of the instruction
 5  is posted for your viewing.  We'll stand in recess at this
 6  time.
 7                    (A recess was taken.)
 8              (The following proceedings were had in the presence
 9  of the jury:)
10  CROSS-EXAMINATION (continued) BY MR. HAMANN:
11  Q    Mr. Stehl, let me ask you:  You said something earlier
12  about meeting with Mr. Howarth?
13  A    Yes.
14  Q    Did you meet with him on April 4, 2019?
15  A    I don't believe so.
16  Q    You don't think you did?
17  A    I don't recall the exact date.  I think we met with him
18  in April sometime.  I don't know the exact date.
19  Q    Okay.  On April 5, isn't it true that you offered an
20  email to Norton & Schmidt?
21  A    Yes.
22  Q    Okay.  Let me pull up Defendant's Exhibit 82.
23              If you look at the second half of the page, it goes
24  farther down.  Let's go to the next page.
25              And in that email, you see it's from Cary Case and
                              546
```

```
1    from you?

2    A    Correct.

3    Q    Okay.  Do you outline your inspection needs?

4    A    Yes.

5    Q    Okay.  And in that email, which is on April 5, 2019, you

6    ask for exterior envelope inspection.  Do you see that?

7    A    Yes.

8    Q    There you're saying about halfway down, that first

9    Paragraph No. 1, Our fear is the envelope is lacking proper

10   construction details.  Do you see that?

11   A    Yes.

12   Q    Then we move to paragraph 2 of your email, and it's in

13   relation to phase 5, isn't it?

14   A    Correct.

15   Q    Okay.  This is -- you indicate, This section has

16   significant damage caused by water infiltration.  Do you see

17   that?

18   A    Yes.

19   Q    And was this based upon your visit to the Metropolitan?

20   A    Yes.

21   Q    Okay.  Flooring is showing significant exposure to water

22   and associated deterioration, correct?

23   A    Yes.

24   Q    Let's move on farther down.

25              And for phase 2, you said you would like a full
```
547

```
 1   structural and MEP review for code compliance.  What is MEP?
 2    A    Mechanical, electrical, and plumbing.
 3    Q    For code compliance as well as evaluation of the
 4   structural components?
 5    A    Correct.
 6    Q    Then in your third paragraph, it relates to phases 1
 7   through 4, doesn't it?
 8    A    Yes.
 9    Q    And in it, you point out in your concluding sentence,
10   your opinion is the plumbing is a major point of concern due
11   to the massive amounts of leaking evident by repairs, correct?
12    A    Correct.
13    Q    You also indicate in that paragraph you are seeing many
14   drywall repairs from what appear to be faulty plumbing as well
15   as many areas of -- that are obvious roof leaks?
16    A    Correct.
17    Q    Okay.  And you ask there that these buildings need
18   evaluation of current building processes for code compliance
19   and proper manufacturer installation techniques?
20    A    Correct.
21    Q    You were directing this request to Norton & Schmidt?
22    A    Can I clarify?  Because in that email, that -- this
23   email actually from Cary Case originally.
24    Q    Okay.  The email, though, is April 5, isn't it?
25    A    I believe so.
                              548
```

```
1    Q    And it's going to Norton & Schmidt?

2    A    If you show me, yeah.  I can't --

3    Q    Let's back up a page.

4    A    Because it originally is April 5 from Cary to Norton &

5    Schmidt, correct.

6    Q    And you're CC'd on it?

7    A    Yes.

8    Q    Now, the next day, April 6th -- let's look at

9    Defendant's Exhibit 83, turning to page 2.

10        Do you see there you've gotten -- there's an email

11   dated April 6th from Keisha Martin again?

12   A    Correct.

13   Q    Okay.  This is actually before the earlier reference.

14   And in that email, did she identify two apartments with water

15   damage?

16   A    Correct.

17   Q    And these were 127 and 123?

18   A    Yes.

19   Q    Okay.  Water in 127, 123.  127, she reports damage was

20   extremely visible; is that right?

21   A    In 123, yes.  Well, both visible.

22   Q    Okay.  Now, let's turn to page 1 of this exhibit, and at

23   the top, you're writing an email on April 7, 2019, aren't you?

24   A    Yes.

25   Q    And it's going to Cary Case and Leah Thibault?
```
                                549

```
 1    A    Correct.

 2    Q    And it starts out, Cary, Leah, can we massage this

 3  paragraph below?  Was this what you were thinking of?

 4          Let me ask you, Mr. Stehl, are you in this email

 5  drafting some language to put in correspondence?

 6    A    Correct.

 7    Q    Okay.  Then what follows below is what you would say in

 8  that draft correspondence in the real correspondence?  You're

 9  putting together what you would like to have put in

10  correspondence?

11    A    Sure.

12    Q    And that would go to Bomasada?

13    A    In some -- in some form or fashion, yes.

14    Q    Right.  But that was the intent?

15    A    That's the intent.

16    Q    Okay.  And the second paragraph of that email indicates

17  that the Maxus ownership team and construction consultant

18  walked the Metropolitan building located at 2900 7th Avenue

19  South, Birmingham, Alabama, on April 4, 2019.

20          Now, was the construction consultant Mr. Howarth?

21    A    No.  I believe that was Cary.

22    Q    Okay.  And the Maxus ownership team, was that you?

23    A    Yes.

24    Q    Who else?

25    A    I believe it was just me.
```

                                   550

1    Q    Now, you identify in this that during your walk, two

2    major concerns were discovered.  One was the envelope

3    construction quality and the CPVC water piping; is that right?

4    A    Yes.

5    Q    Okay.  And what you put in this proposed communication

6    to Bomasada, quote, The building envelope construction showed

7    many defects in the quality of craftsmanship and attention to

8    detail; is that right?

9    A    Yes.

10   Q    Okay.  And you propose including that in communications

11   to Bomasada because that is, in fact, your view?

12   A    Yes.

13   Q    And in this draft correspondence, you go further and

14   say, We are concerned once this project is 100 percent turned

15   over to Maxus management team, we are going to have to fix

16   EIFS.  And what is that?

17   A    EIFS or stucco.

18   Q    Okay.  Hardie siding.  What is that?

19   A    The siding material.

20   Q    And TPO?

21   A    Roof membrane.

22   Q    Okay.  To name a few in the very near future.

23        You go on to say, don't you, there appears to be

24   water leaks throughout the exterior that needs to be addressed

25   immediately prior to Maxus' procession?

                                551

```
 1    A    (Witness nodded head.)

 2    Q    So you were finding water leaks throughout the exterior,

 3    correct?

 4    A    Yes.

 5    Q    Okay.  The next paragraph after that talks about water

 6    leaks that you found, correct?

 7    A    Yes.

 8    Q    Found two water leaks and additional water leaks in

 9    finished units, right?

10    A    Correct.

11    Q    And you voiced the concern in your draft:  Maxus is

12    concerned the plumbing contractor was not diligent in glueing

13    the joints or properly performing an adequate air test to

14    eliminate these issues prior to live water being introduced to

15    finished spaces, right?

16    A    Yes.

17    Q    And you conclude in your draft by saying, Please provide

18    a plan of action that Bomasada plans to address and remedy

19    these concerns prior to full takeover.

20    A    Correct.

21    Q    Okay.  So that is what you had drafted in the way of

22    communication to Bomasada?

23    A    Yes.

24    Q    Concerning those subjects?

25    A    Yes.
```

552

```
 1   Q    Let's take a look at Defendant's Exhibit 86.

 2        Now, this is an email, isn't it, from Cary Case to

 3   Brad Stiles, CC'ing you?

 4   A    Yes.

 5   Q    So you're on the email?

 6   A    Correct.

 7   Q    Okay.  And in this it says at the top, Brad, it was a

 8   pleasure meeting with you today.  Per our phone conversation,

 9   we would like soot testing in the areas noted on the map

10   below.  We would like to set a limit of not to exceed $6,500

11   and have findings to us by Friday, April 19, 2019.  Correct?

12   A    Correct.

13   Q    And this email was on -- it says 12:31 p.m. on April 9.

14   A    Yes.

15   Q    Okay.  Now, in this, Cary Case is communicating not only

16   to Mr. Stiles, but also to you, correct?

17   A    Correct.

18   Q    At the bottom it says, Alex, please respond to this

19   email with approval to bill Maxus Properties, 104 North Armour

20   Road, North Kansas City, Missouri, in an amount not to exceed

21   $6,500.  And did you approve that?

22   A    I believe so.

23   Q    And, in fact, Maxus paid SELC the $6,500, correct?

24   A    I do not know that.

25   Q    You don't know that?
                              553
```

```
 1   A    I don't know that.

 2   Q    Were you a party to any conversation within Maxus where

 3   the question of whether or not to pay SELC was discussed?

 4   A    I just don't remember ever seeing a bill, but I don't --

 5   we wouldn't -- I don't remember any conversations of why we

 6   wouldn't have paid them if they submitted a bill.

 7   Q    Okay.  And the date of that email is April 9, 2019,

 8   correct?

 9   A    Yes.

10   Q    And the letter or, excuse me, the email starts out by,

11   It was a pleasure chatting with you today.

12        So that puts the date when this communication took

13   place of April 9?

14   A    Yes.

15   Q    Now, also on April 9, this time it's at 12 -- 2:30 p.m.

16   Did you get in contact with Terracon?

17   A    (No response.)

18   Q    Let's turn to Defendant's Exhibit 85.

19        If you look, you see at the bottom of page 2, don't

20   you, Mr. Stehl, it says, On Tuesday, April 9, 2019, at 2:36

21   p.m., Alex Stehl wrote -- do you see that?

22   A    Yes.

23   Q    And isn't what you're doing in this writing is making a

24   request to Terracon?

25   A    Correct.
                            554
```

```
 1    Q    What is Terracon?

 2    A    They're a consultant that does various building envelope

 3    inspections or third-party inspections for cities like steel

 4    inspections, foundation, concrete inspections.  So they're a

 5    versed contractor consultant around the country.

 6    Q    Now, in this email, turning to paragraph numbered three,

 7    you're pointing out, aren't you, to Terracon in relation to

 8    your request, this being at phases 1 through 4, these

 9    buildings are in various stages of completion from carpet all

10    the way down to framing?

11    A    Correct.  This is just the -- a forwarded email from the

12    Cary Case email.

13    Q    Upon inspection, we are finding many drywall repairs

14    from what appears to be faulty plumbing, correct?

15    A    Yep.

16    Q    As well as many areas with obvious roof leaks?

17    A    Yes.

18    Q    These buildings will need evaluation of current building

19    processes for code compliance and proper manufacturer

20    installation techniques; is that right?

21    A    Yes.

22    Q    Then you conclude, The plumbing is a major point of

23    concern due to the massive amount of leaking evident by the

24    repairs?

25    A    Yes.
```
                              555

```
 1   Q    The next day, April 10, is the day the sprinkler line
 2  ruptured?
 3   A    Correct.
 4   Q    Now, let's look at Defendant's Exhibit 25.
 5        Mr. Stehl, is Exhibit 25, Defendant's Exhibit 25 a
 6  letter that you wrote to Stuart Fred?
 7   A    Yes.
 8   Q    Okay.  This is a Construction Quality Report No. 2?
 9   A    Yes.
10   Q    I think we touched on it before the break.
11   A    Correct.
12   Q    Okay.  And this is dated April 12 --
13   A    Correct.
14   Q    -- 2019.
15        The subject of this letter is "water intrusion"?
16   A    For the most part, yes.
17   Q    Okay.  That's where you were talking in the second
18  paragraph several leaks in finished units and unfinished
19  units?
20   A    Correct.
21   Q    And you identified the biggest concern was the waterline
22  break on April 10, 2019, that caused a substantial amount of
23  water flowing through all four floors, correct?
24   A    Correct.
25   Q    Okay.  But that wasn't the only incident of water
                             556
```

1    intrusion in your paragraph, correct?

2    A    Right.

3    Q    Okay.  And your letter concludes, Please provide a plan

4    of action that Bomasada plans to address and remedy these

5    concerns prior to full takeover?

6    A    Yes.

7    Q    Okay.  Now, did you find problems in the form of delays

8    when dealing with Bomasada?

9    A    What form of delays?

10   Q    Just delays in getting things done.

11   A    I don't know if there was unnecessary delays.  We were

12   trying to complete the project with the facts that we had at

13   the time and move as quickly as we could with every fact that

14   we had.

15   Q    Were there times that it was not moving as fast as you

16   were wanting it to move?

17   A    Sure.  But I think that's with every single project.

18   Q    Now, was -- speaking of Bomasada, Bomasada was the

19   contractor on which phase?

20   A    They were the original developer and contractor on the

21   entire project, phases 1 through 6.

22   Q    Okay.  And then when you came onto the scene in

23   beginning of 2019, what work was Bomasada working on at that

24   point?

25   A    They were working on phases 1 through 4 and trying to

                              557

finish those units; working in phase 4 itself, trying to
complete and do punch work and finish work.  And then the
first two floors were at the studs.

       And then phase 5, they were doing some remediation
and cleanup work.  And phase 6, they were -- the building had
been torn down or was on the ground, and they were trying to
start some of that work as well.

Q    Okay.  Now, about when did Bomasada exit the scene when
there was a parting of the ways between Maxus and Bomasada?

A    I believe it was in June of 2020.  I don't know the
exact date.

Q    Do you know the reason why Bomasada and Maxus parted
ways on this project?

A    We had issues with their quality and had tried to get
them to fix it, and they had refuted to fix it.

Q    Okay.  Did BCCM come to succeed Bomasada as the
contractor?

A    Yes.

Q    And BCCM was contracted as of about when; do you
remember?

A    For which phase?

Q    Say for phases 1 through 4.

A    1 through 4, I believe it was in the fall of 2019.

Q    About a year after the fire?

A    Correct.

                           558

```
 1   Q    Okay.  What about for phase 5?

 2   A    I don't know the exact contract date, but I know there's

 3   a document that states that date.

 4   Q    The -- once BCCM got on board, were you the point of

 5   contact between BCCM and Maxus, or was Mr. Irmiter, or how did

 6   that work out?

 7   A    We hired FBS to oversee to try to create the

 8   belt-and-suspenders approach that we hit on earlier, and they

 9   would all funnel up to myself, and then I would report back to

10   Maxus.

11   Q    So if I understand correctly, let's say BCCM, if they

12   submitted a pay app, it would be reviewed by Mr. Irmiter or

13   his company?

14   A    Correct.

15   Q    And then would it pass on to you?

16   A    We would collectively review it; so, yes.

17   Q    Do you mean at the same time or when he gave you his

18   recommendation --

19   A    They would submit it to me, I would submit it to FBS,

20   and then we would discuss once both parties had time to

21   review.

22   Q    And then after both FBS and you had had time to review,

23   what happened next?  Would you be submitting it to management

24   at Maxus?

25   A    Correct.  Or the bank.
```

559

```
 1   Q    Or the bank.  Who at Maxus?

 2   A    We'd send it to our accountants, and Ryan Snyder would

 3   review it.

 4   Q    So who had the ultimate authority to pay or not pay the

 5   pay app?

 6   A    Maxus.

 7   Q    Who within Maxus would make that ultimate decision?

 8   A    Dave Johnson could make that ultimate decision.

 9   Q    Could Mr. Snyder?

10   A    He could.

11   Q    He's the chief financial officer?

12   A    Yes.

13   Q    Okay.  Leaving aside who could do what, in your

14   experience, who, in fact, made those decisions at Maxus?

15   A    Typically Dave Johnson would make those decisions.

16   Q    Now, would Mr. Johnson review pay apps and

17   documentation?

18   A    Not typically.

19   Q    So what would be provided to Mr. Johnson in order for

20   him to decide whether or not to pay a certain pay app?

21   A    Our recommendation to pay.

22   Q    Okay.  Let me ask you with respect to BCCM, did you

23   encounter instances of what you thought was slow work or delay

24   in their progress?

25   A    Sure.  Like I said before, we always, as the owner, want
                              560
```

```
 1    it to be done quicker and faster.
 2    Q    At some point in May of 2021, did you express in an
 3    email that you were disgusted at the quality of progress since
 4    your last visit?
 5    A    Perhaps because you're reading it, but I don't know if
 6    you have that in front of me.
 7    Q    It's not an exhibit, but let me give this to you and see
 8    if it refreshes your recollection.
 9    A    Thank you.  Sure.
10    Q    Okay.  Having looked at that, does that refresh your
11    recollection?
12    A    Yeah.  I don't know who this went to.
13    Q    But it's an accurate reflection of your views?
14    A    Yes.
15    Q    Okay.  And in -- at that time on May 11, 2021, you were
16    expressing you wanted to get a realistic update from your
17    visit to the Metropolitan, correct?
18    A    Correct.
19    Q    Okay.  And were you utterly disgusted in the quality and
20    progress since your last visit?
21    A    That's what it says.
22    Q    That had been about 60 days earlier?
23    A    Yes.
24    Q    And in this communication, you say, Jason Young assured
25    Maxus we would have units in June and ready to lease starting
```

561

```
 1   July 5th?

 2    A     Correct.

 3    Q     Okay.  And then you say based on what you've seen, we

 4   would be lucky to get units in August/September because most

 5   of the siding and site work has to be completed?

 6    A     Correct.

 7    Q     Okay.  And then you say you noticed -- you saw only four

 8   people working at this site?

 9    A     Yes.

10    Q     Okay.  And you go on to -- in your communication,

11   Continue to chase water leaks after we have replaced the

12   entire exterior?

13    A     Correct.

14    Q     Okay.  And so you were reporting that you had seen water

15   leaks in advance of sending -- preparing this document on

16   April 11 -- excuse me -- May 11, 2021?

17    A     Yes.

18    Q     Okay.  You said superintendents come and go on this site

19   as they please and have no leadership steering the project.

20   That was your opinion?

21    A     Yep.

22    Q     Okay.  And you go further down.  Your view was that he

23   needs to be on site -- you're talking about Jason Young --

24   every week watching his guys because they are not trustworthy?

25    A     Correct.
```

562

```
1   Q    Okay.  And then you say you're sorry that this is harsh?

2   A    Yes.

3   Q    Okay.  You recognize that BCCM is a trusted partner for

4   us, and for the project to look in this shape is extremely

5   frustrating?

6   A    Yes.

7   Q    So you were -- you had seen the project, and you were

8   giving voice to your frustrations at what you had seen or not

9   seen?

10  A    That's correct.

11  Q    Now, after this time, we're talking about May 11, 2021,

12  did Maxus encounter additional frustrations from BCCM on this

13  project?

14  A    Sure.

15  Q    And what were they?  What was the nature of those?

16  A    We were just trying to get finished, but obviously

17  there's a little more to the story.  I mean, the sub market

18  had been beaten and battered from the previous general

19  contractor and didn't have the greatest reputation with the

20  subs, or that project didn't.  So it was hard to get certain

21  contractors to want to participate or the correct contractors.

22  So we did the best we could in the most timely manner.

23          Obviously I wasn't -- I didn't appreciate -- or I

24  didn't think that we were moving quick enough.  But there was

25  also some other issues behind the scenes of what was causing
```
                                563

```
 1   delays.

 2   Q     But it all added up to delay?

 3   A     Sure.

 4   Q     Who had been the BCCM superintendent on site?

 5   A     There was several.

 6   Q     Ron McRae?

 7   A     He was one of the first, if not the first.

 8   Q     Was Mr. McRae removed?

 9   A     He was.

10   Q     Do you know why?

11   A     I don't know the exact extent.  You'd have to ask BCCM.

12   Q     Do you know whether it was in response to complaints

13   coming from Maxus?

14   A     I don't recall that.

15   Q     After Mr. McRae was removed, did you tell Jason Young

16   that the quality and manpower must pick up by real soon?

17   A     I know I said that throughout the project.

18   Q     Isn't it true that BCCM missed a number of deadlines for

19   turning units over to be leased?

20   A     Yes.

21   Q     We were talking earlier about Mr. Howarth.  Am I correct

22   that he was retained by Maxus to be an appraiser?

23   A     I believe Maxus and Bomasada jointly.

24   Q     Okay.  Going back to the April 4, 2019, meeting, who was

25   in attendance?
                                 564
```

```
 1   A    April 4, 2019?

 2   Q    Yes.

 3   A    I don't recall off the top of my head.  I know Cary Case

 4   was because I was with him.  I mean, we had several meetings

 5   on site; so I don't know if this was with Chuck at that time

 6   or if that was a later date or with Bomasada, unless you can

 7   help me out.

 8   Q    Let me ask you this:  We showed an email earlier where

 9   you contacted Norton & Schmidt.  Did Norton & Schmidt

10   eventually conduct an inspection at this site?

11   A    I don't recall if they did or not.  It might have been

12   on phase 5, but I'm not 100 percent sure.

13            MR. HAMANN:  That's all I have.  Thank you.

14            MR. ABRAMS:  Brief redirect.

15   REDIRECT EXAMINATION BY MR. ABRAMS:

16   Q    Mr. Stehl, three areas.  First, you were recently just

17   asked some questions about leaks in the siding, in the EIFS,

18   in the stucco and the construction defect.  Is Maxus claiming

19   any damages from Travelers for those amounts?

20   A    No.

21   Q    Second, you were asked earlier about times in which you

22   perceived insufficient documentation to pay a pay app.

23   Remember that?

24   A    Yes.

25   Q    From Bomasada or from BCCM?
```

565

```
 1   A    Yes.

 2   Q    I think that one example was Bomasada.  That happened,

 3   correct?

 4   A    Correct.

 5   Q    What did you do when that happened?

 6   A    We would oftentimes send it back and ask for additional

 7   information, and then get it back.  And then if it was

 8   appropriate, we would pay it.

 9   Q    Okay.  Would you pay it before you received the correct

10   documentation?

11   A    No.

12   Q    Okay.  Finally, on this water leak, we saw photographs

13   of the water leak and a video.  What's on the floor is OSB

14   board.  You talked about this, right?

15   A    Correct.

16   Q    Is the OSB board ruined if it gets wet?

17   A    Not if it's cleaned up.

18   Q    Okay.  And is it designed with some kind of protection

19   on it that it can withstand some water?

20   A    Correct.  For a certain duration as well.

21   Q    Okay.  So have you seen water leaks like -- of the

22   magnitude that you saw in those pictures before in your work

23   or at home?

24   A    Yes, I have.  But if you clean it up in a timely manner,

25   you can save that OSB.
```
566

```
 1    Q    Okay.  Is there any reason that you have that that OSB
 2   was not cleaned up in a timely fashion?
 3    A    No.
 4    Q    Okay.  Oh, in -- finally, you said, okay, well, on the
 5   report it says damaged because of the leak -- of the water
 6   main break.  Does it say lasting damage to the OSB as a result
 7   of the water main break?
 8    A    No.
 9    Q    Okay.  Is it fairly routine that you get a leakage like
10   that, and OSB boards can get wet and cleaned up?
11    A    Correct.
12    Q    Is that unusual?  Is that some kind of just wild, crazy
13   scenario that can happen?
14    A    Correct.
15    Q    Is it, or does this happen routinely?
16    A    No, it can happen.  But if it's cleaned up properly,
17   it's fine to keep.
18          MR. ABRAMS:  Okay.  No further questions, Your
19   Honor.
20          MR. HAMANN:  No questions.
21          THE COURT:  You may step down.
22          MR. ABRAMS:  You want us to keep going to the next
23   witness or --
24          THE COURT:  Or what?
25          MR. ABRAMS:  Or take a break, Your Honor.  Or I
                              567
```

1   don't know what other options we have.

2          THE COURT:  We just took a break, so let's keep

3   moving.

4          MR. ABRAMS:  Okay.  Very good.

5   RYAN SNYDER, sworn by the courtroom deputy.

6          (Counsel approached the bench and the following

7   proceedings were had:)

8          THE COURT:  How long are you going to be with this

9   witness?

10         MR. ABRAMS:  I'm thinking it's an hourish, maybe a

11  little longer, but did you want to bring up --

12         MR. ELY:  We're moving fast, so we were trying to

13  coordinate.  We understand that the court has some scheduling

14  issues tomorrow.

15         THE COURT:  Right.

16         MR. ELY:  It looks like if we take Ryan tomorrow, we

17  can finish with him.  We wouldn't have to start at 8:00 unless

18  the court wants to do it.  We could finish early tomorrow with

19  him, and we can start our case on Monday.  My issue is I have

20  an expert who's coming on Monday.  When we had talked

21  previously, we were looking at Maxus resting at the end of

22  Friday.  So we wanted to discuss that with you.  I don't know

23  what the court wants us to do.

24         Now, next week, as I said this morning, Mike and I

25  think we're moving pretty fast.  I think we get to Wednesday,

                              568

```
 1   our last witness is on Wednesday.  So --

 2              THE COURT:  I don't know if that's moving fast for

 3   you.

 4              MR. ELY:  I understand.  I understand, Your Honor.

 5   I understand.  But I don't know what scheduling issues the

 6   court has.  I wanted to address it with you and just let you

 7   know where we are.  But this is --

 8              THE COURT:  I just need to leave by 4:00 tomorrow.

 9   I was trying to make sure we got as much in tomorrow as

10   possible.

11              MR. ELY:  Okay.

12              MR. ABRAMS:  The issue is if Mr. Snyder goes

13   tomorrow, it's probably just one witness tomorrow based on --

14   because your witnesses aren't coming until Monday.

15              THE COURT:  You want to save him for tomorrow?

16              MR. ELY:  If it's fine with you, it would be a short

17   day.  We have some depositions that can be maybe read.

18              THE COURT:  Okay.

19              MR. ELY:  Begin tomorrow?

20              THE COURT:  Yes.

21              MR. ELY:  Thank you, Your Honor.  I appreciate it.

22         (The proceedings returned to open court.)

23              THE COURT:  They twisted my arm.  We're going to

24   stop today and resume tomorrow.  We're on a time schedule

25   that's going to have us where I said we would be.  So we're
```
569

```
1   not losing anything.  We can leave a little early today.

2              Again, I thank you for your patience, and we'll --

3   that's right.  I forgot.  Our schedule is going to be such

4   that we don't need to come in at 8:00 tomorrow.  Let's start

5   at 8:30 like we did.  We're still going to finish on time to

6   get you out of here because I have a conflict in the

7   afternoon, late afternoon myself.

8              So we're moving right along.  We're not losing

9   anything.  We're on schedule.  Okay.

10             MR. ABRAMS:  And, Your Honor, just -- based upon our

11  expectation, if there is just one witness tomorrow, we'll

12  probably be done before lunch.

13             THE COURT:  We have some exhibits and things we need

14  to talk about, the lawyers and myself.  So you may get out

15  early.

16                  (Court adjourned.)

17                  REPORTER'S CERTIFICATE

18

19             I certify that the foregoing pages are a correct

20  transcript from the record of proceedings in the

21  above-entitled matter.

22

23  _____        _____
         Date                 /s/Gayle M. Wambolt
24                        GAYLE M. WAMBOLT, CRR, RMR
                          United States Court Reporter
25                             570
```