<pre>
 1            IN THE UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF MISSOURI
 2                   WESTERN DIVISION

 3   MAXUS METROPOLITAN, LLC,          )
                                       )
 4                   Plaintiff,        ) No. 20-cv-00095-FJG
             vs.                       )
 5                                     )
     TRAVELERS PROPERTY CASUALTY       ) July 28, 2023
 6   COMPANY OF AMERICA,               )
                     Defendant.        )
 7

 8            ..............................
          TRANSCRIPT OF JURY TRIAL - VOLUME 4 OF 8
 9     BEFORE THE HONORABLE FERNANDO J. GAITAN, JR.
           UNITED STATES DISTRICT COURT JUDGE
10

11     Proceedings recorded by electronic stenography
              Transcript produced by computer
12

13                   APPEARANCES

14   For the Plaintiff:      MR. MICHAEL J. ABRAMS
                             MS. ALANA McMULLIN
15                           MS. KIMBERLY K. WINTER
                             Lathrop GPM LLP
16                           2345 Grand Avenue, Suite 2200
                             Kansas City, Missouri 64108
17
     For the Defendant:      MR. BRENEN G. ELY
18                           MS. LAUREN A. WIGGINS
                             Ely & Isenberg, LLC
19                           3500 Blue Lake Drive, Suite 345
                             Birmingham, Alabama 35243
20
                             MR. DANIEL EDWARD HAMANN
21                           Deacy & Deacy, LLP
                             9233 Ward Parkway, Suite 370
22                           Kansas City, Missouri 64114

23            Gayle M. Wambolt, RMR, CRR
            U.S. Court Reporter, Room 7552
24        Charles Evans Whittaker Courthouse
              400 East Ninth Street
25        Kansas City, MO 64106 (816) 512-5641
                        571
</pre>

```
 1                        INDEX
                        JURY TRIAL
 2                    JULY 28, 2023

 3                 CHRONOLOGICAL INDEX

 4   PLAINTIFF'S WITNESSES:

 5                          DIR   CROSS   RDIR   RCRS

 6   RYAN SNYDER            573    589    605    607

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                           572
```

```
 1                      FRIDAY, JULY 28, 2023
 2   (The following proceedings were had in the presence of the
 3   jury:)
 4   RYAN SNYDER, being duly sworn by the courtroom deputy,
 5   testified:
 6   DIRECT EXAMINATION BY MR. ABRAMS:
 7    Q    Please state your name.
 8    A    Ryan Snyder.
 9    Q    Mr. Snyder, where do you reside?
10    A    Lee's Summit, Missouri.
11    Q    What do you do for a living?
12    A    I'm the chief financial officer at Maxus.
13    Q    We'll come back to that in a second.  Tell us about your
14   educational background.
15    A    Got a degree in accounting from the Harvard of the
16   Midwest, the University of Missouri, and went to work.  Yep.
17   That's the extent of it.
18    Q    Then your work experience, tell us what you have done
19   professionally.
20    A    I'm a CPA and worked in two large public accounting
21   firms for about 12 years, Arthur Andersen and KPMG.  Left
22   there to be the controller at Hostess Brands.  They make
23   Twinkies and DingDongs and CupCakes and HoHos.
24         I was there a couple years, and then became the
25   chief financial officer at a nursing college and then left --
```
573

1    was there two or three years and left there to become the CFO

2    of Maxus.

3    Q    And CPA means?

4    A    Certified public accountant.

5    Q    Okay.  And CFO?

6    A    Chief financial officer.

7    Q    All right.  So tell us briefly what you do as the chief

8    financial officer at Maxus.

9    A    I'm responsible basically for the finance function

10   generally at Maxus.  So I'm responsible for the preparation of

11   financial statements.  I deal with our lenders, our banks, our

12   risk management, our insurance companies, handle our treasury

13   management, all that kind of finance stuff.

14   Q    Okay.  Let's talk about the Metropolitan.  I'm not going

15   to go back through the history because I think we've all heard

16   it before.  We understand phase 6 burned to the ground.  There

17   was no question you had to rebuild that, correct?

18   A    That's correct.

19   Q    What about phase 5?  Was there any discussion about

20   whether should you just tear phase 5 down and rebuild it or

21   fix the fire damage?  What happened there?

22   A    There was.  The phase 5 repair was a bit of a

23   complicated process.  The damage to the subfloor, we

24   ultimately had to hire a structural engineer to help us figure

25   out how to repair the subfloor.  And in that process, there

                              574

1    was a lot of discussion -- you remember Mr. Irmiter talked

     2    about the possibility of having to lift the building up and

     3    put the subfloor underneath it?  The structural engineer

     4    helped us design a fix that -- so that we didn't have to do

     5    that.

     6           But before we were able to get that -- the fix in

     7    place, we did evaluate for quite a while whether it would be

     8    better to just knock the building down and build it from the

     9    ground up again.  That whole process took several months.

    10    Q    And what was involved in that process?  Did it take

    11    awhile?  Did you have to work with engineers?

    12    A    Engineers.  We hired a structural engineer, and between

    13    Bomasada -- Bomasada was involved in the process and a

    14    structural engineer and others.  BCCM may have been involved

    15    as well.  I'm not certain.

    16    Q    And so the final decision was not to tear it down but to

    17    fix the fire damage and go forward?

    18    A    That's correct.

    19    Q    All right.  And so did you have to -- was there any kind

    20    of communication with the city in order for that to happen,

    21    city of Birmingham?

    22    A    Yeah.  What made it complicated was if we -- it may have

    23    been more efficient -- it may have been more cost effective to

    24    actually knock the building down and build it back again; but

    25    what made it complicated was -- I believe it was Mr. Irmiter

                                      575

```
 1   that mentioned the city building code had changed.

 2           So the building was originally constructed under the

 3   2008 building code.  If we knocked the building down and

 4   rebuilt it, we had to rebuild it under the 2018 building code.

 5   So if we had done that, we would have had to get new

 6   architectural drawings, new city approvals and probably some

 7   other process-related things that would have taken months.

 8   Q    Okay.  Was that part of the decision to --

 9   A    It was.

10   Q    -- rehabilitate and repair instead of knocking it down?

11   A    Yes, it was.

12   Q    All right.  Let's talk -- let's go to numbers, which is

13   your specialty.

14           As the chief financial officer at Maxus, did you

15   track the costs that Maxus incurred for damages related to the

16   fire?

17   A    I did.

18   Q    Okay.  And did you track these expenses as they were

19   being incurred?

20   A    Yes.

21   Q    Okay.  And to the best of your knowledge, are the

22   expenses and damages related information that's been provided,

23   are those accurate?

24   A    Yes.

25           MR. ABRAMS:  Can you put up the first line, Melissa?
                               576
```

1    Q    (BY MR. ABRAMS) Okay.  We've seen this before.  Tell us
2    what this slide represents.
3    A    This represents the total fire-related damages separated
4    between the remediation that we had to do, mostly the smoke
5    and soot remediation and the fire repairs, the rebuilding of
6    building 6, and the repairing -- some related to repairing
7    building 5.
8    Q    Okay.
9         MR. ABRAMS:  Go to the next slide.
10   Q    (BY MR. ABRAMS) All right.  Tell us what we're looking
11   at here.
12   A    This is -- shows the total cost that we incurred between
13   remediation and repairs, and it deducts the amount that
14   Travelers has paid to date.
15   Q    Okay.  So just to go through this briefly, Maxus spent
16   on fire remediation, that's to fix the -- clean the soot and
17   char, $17.1 million and -- correct?
18   A    Yes.
19   Q    The repairs to rebuild 6, rebuild 5, fix all the fire
20   damages not related to soot and char is $11.5 million?
21   A    That's correct.
22   Q    And then you have received some payments from Travelers,
23   correct?
24   A    We've received a little over $6.1 million.
25   Q    So the total amounts that you're claiming for property

577

Case 4:20-cv-00095-FJG   Document 244   Filed 09/05/23   Page 7 of 42

1   damage are?

     2   A    $22,595,865.

     3   Q    Okay.  And does that take into account any deductibles

     4   that you have to pay?

     5   A    Yes.

     6        MR. ABRAMS:  Okay.  All right.  Let's go to the next

     7   slide, please.  And by the way -- can you go back one?

     8   Q    (BY MR. ABRAMS) So, by the way, we heard yesterday from

     9   Ms. Pienta about business interruption damages.  Does this

    10   slide reflect any business interruption damages?

    11   A    No, it does not.

    12   Q    Business interruption damages are on top of this amount?

    13   A    That's correct.

    14   Q    All right.  So how is it that you -- how is it that

    15   these numbers have been calculated?

    16   A    Well, we track all of these costs as we receive pay

    17   apps.  So once we receive a pay app and once we're satisfied

    18   that we're okay to pay the pay app, then we track them.  We

    19   just track that cost between, you know, all the different

    20   categories.

    21   Q    Okay.  And in order to come up with these numbers, did

    22   you go through all the invoices and change orders that were

    23   paid?

    24   A    Every one.

    25   Q    Okay.

                                578

```
 1              MR. ABRAMS:  Let's go to the next slide.
 2     Q     (BY MR. ABRAMS) Tell us what this is, Mr. Snyder.
 3     A     This is our check register.
 4     Q     Okay.  And what's the significance of that?  There's --
 5     it's -- there's a lot of numbers here.  Hard to see.  Tell us
 6     what a check register is.
 7     A     This just lists all of the checks that we paid -- all
 8     the checks that were used to pay the construction-related
 9     costs.
10     Q     Okay.  At the Metropolitan?
11     A     At the Metropolitan.
12     Q     Okay.  And so this one totals -- what's the total on the
13     bottom?
14     A     Well, those are separate checks.
15     Q     Okay.  So each one, each one of these checks -- why do
16     you have these subtotals?
17     A     Because we often paid multiple pay apps on one check.
18     Q     Okay.  All right.  So what you have here is the check
19     that was written with which pay apps were -- let's just take
20     us through one.  There's a lot of check registers, but just so
21     they understand.
22              So the first one that's listed there, this February
23     6th, 2020.
24     A     Yeah.  So that was, it looks like, six different pay
25     apps that we paid on one check, and the total check amount was
                                    579
```

```
1    $1,907,000.

2    Q    Okay.  And you list the payment date, correct?

3    A    Correct.

4    Q    The invoice date?

5    A    Correct.

6    Q    The invoice number?

7    A    Correct.

8    Q    The vendor is what?  Is that the person -- that's the

9    company that did the work?

10   A    That's correct.

11   Q    The amount of the bill?

12   A    That's correct.

13   Q    Okay.  And then what's the difference between amount and

14   amount applied?  They look like they're the same numbers.

15   A    They generally are.  Sometimes we paid less than the pay

16   app.  So we may have in our accounts payable system, for

17   example, $100; but for one reason or another, either we didn't

18   receive the appropriate support or we were waiting on some

19   other information, we may have paid less on the pay app.  That

20   happened on a couple of occasions.

21   Q    And then the last column, the insurance loss amount,

22   what is that?

23   A    That's the amount that -- I believe that's the amount

24   that applies to the insurance claim.

25   Q    Okay.  And the numbers are close to the same?
```
                                   580

```
 1    A    Yes, yes.

 2    Q    So there's some -- so an instance, though, let's take on

 3   the second group of column from that December 31 payment date.

 4   You have amount applied, $229,579.  Do you see that?

 5    A    I'm sorry?

 6    Q    So in the second grouping of checks.

 7    A    Yes, I see that.

 8    Q    Okay.  But then the insurance loss is less, right?

 9    A    That's correct.

10    Q    Okay.  And why is that?

11    A    That's because some of it related to either -- other

12   construction costs, not related to the insurance claim.

13    Q    So, for instance, if it was construction defect, it

14   wouldn't be in that column?

15    A    That's correct.

16    Q    Okay.

17         MR. ABRAMS:  Can we go to the next slide, please?

18    A    Can I correct something real quick?

19    Q    (BY MR. ABRAMS) Yes.

20    A    I think we have this in another format as well.  This

21   looks like it is not separated by check.  This is separated a

22   different way.  So you can see that the payment date on the

23   top line, 2/6/2020, those were all different payment dates.  I

24   misspoke when I said these were all individual payments.

25    Q    Okay.  But nevertheless, all these payments -- these all
                                581
```

1   represent checks that were actually written by Maxus to pay

 2   for these damages?

 3   A    Yes, they do.

 4   Q    Okay.

 5        MR. ABRAMS:  Can you go to the next slide, please?

 6   Q    (BY MR. ABRAMS) And, again, another check register or

 7   portion of the check register, what is this representing?

 8   A    The same thing.  Payments made to various vendors

 9   related to the reconstruction effort.

10   Q    Let's walk through the very first one.  You've got a

11   payment date of August 20, 2020.  That's when you made it.

12   Almost three years ago, correct?

13   A    That's correct.  We made the payment on August 20th

14   to -- in this case, we paid it directly to one of Bomasada's

15   subs, Essayon.  We paid them directly.

16   Q    And when we say "subs," you mean a subcontractor?

17   A    That's correct.

18   Q    And it has the amount?

19   A    Yes, it does.  $295,603.

20   Q    And this is that amount, the full amount of that was --

21   is being sought from Maxus, correct -- I'm sorry.  Being

22   sought from Travelers, correct?

23   A    Yes.

24   Q    We have -- let's take an example on this check register.

25   If you can see the one for May 20, 2020, the H2K Construction,

                              582

```
 1   do you see that?  It's about more than halfway down the page.
 2   A    I do.  Yes, I see it.
 3   Q    Okay.  So that one, that was a payment that Maxus made
 4   to a subcontractor for $84,132, correct?
 5   A    That's correct.
 6   Q    All right.  And how much is being sought from Travelers
 7   for that check?
 8   A    Zero.
 9   Q    Okay.  Why is that?
10   A    Because it wasn't related to the fire claim.
11   Q    Okay.  So it could be, for instance, a construction
12   defect?
13   A    Correct.
14            MR. ABRAMS:  Can we go to the next page.
15   Q    (BY MR. ABRAMS) All right.  What are we seeing here?
16   A    It's just a continuation of the check registry.
17   Q    So these are more checks that Maxus paid to remediate
18   the claim to repair?
19   A    That's correct.
20   Q    All right.  Let's just look at the first one that -- to
21   BCCM Construction.  It's a -- tell us what that is.  Tell us
22   the payment date.
23   A    That one was paid on November 9th, 2019.
24   Q    Okay.
25   A    It was Pay App No. 1.
```

                              583

```
 1   Q    Okay.  So Maxus came out of pocket for that.  How much
 2  was that?
 3   A    $600,000.
 4   Q    Okay.  And that was paid way back in November of 2019?
 5   A    That's correct.
 6   Q    Okay.
 7           MR. ABRAMS:  Let's go to the next slide.
 8   Q    (BY MR. ABRAMS) What are we seeing here?
 9   A    Just a continuation of the check registry.
10   Q    Okay.  And, again, the next one, what are we seeing
11  here?
12   A    Same thing; continuation of the check registry.
13   Q    Okay.  The next one?
14   A    Just another continuation of the check registry.
15   Q    Okay.  These are all checks written by Maxus for repair
16  or remediation of the Metropolitan.  Some are construction
17  defects, some are not?
18   A    Correct.
19   Q    All right.  Next page.
20   A    Again, just another page of the check registry.
21   Q    All right.  And again?
22   A    Another page from the check registry.
23   Q    Okay.  And the final one.  All right.  What do we see
24  here?
25   A    This is the -- what looks to me to be the final page of
```

584

1   the check register totaling -- that shows the total amount
        2   paid and the total amount that we're claiming in the -- for
        3   insurance damages.
        4   Q    Okay.  And so the total checks, if you go down there,
        5   it's actually forty-five million thirty -- more than $45
        6   million, correct?
        7   A    That's correct.
        8   Q    You're not seeking all those amounts from Travelers,
        9   correct?
       10   A    No, we are not.
       11   Q    Okay.  So it has the amounts that you're seeking from
       12   Travelers totals up all the checks that were written down at
       13   the bottom southeast corner of this page?
       14   A    Yes, it does.
       15   Q    All right.
       16        MR. ABRAMS:  Let's go to the next slide, please.
       17   Q    (BY MR. ABRAMS) And what are we looking at here?
       18   A    This is one of the checks that was listed on the check
       19   registry.
       20   Q    This is just an example of what it looks like?
       21   A    Yes.
       22   Q    And so when you send a check -- this check went to BCCM,
       23   correct?
       24   A    Yes, it did.
       25   Q    And this is one that was sent in March of 2022, correct?
                                      585

```
 1    A    Yes.

 2    Q    And so when you -- on the check stub -- what's on top?

 3    A    That's a stub that is printed out that shows exactly

 4  which pay apps were paid.

 5    Q    Okay.  So when Maxus writes a check to its payees, does

 6  it always explain what the check's for?

 7    A    It does, yes.

 8    Q    And in this one, it explains like, for instance, on the

 9  check stub, it says BCCM.  Tell us what this -- that first

10  one, what does that reference?

11    A    That represents, appears to me, Pay App No. 27 on BCCM's

12  contract for the remediation in phases 1 through 4.

13    Q    And then it gives the amount in this example of $73,000?

14    A    Yes.

15    Q    Okay.  Why is it important -- or is it important as the

16  Maxus CFO, when you write a check to a vendor, why is it

17  important or is it important that you explain what you're

18  paying for?

19    A    Yeah.  I mean, the -- it is important.

20    Q    And why is it important?

21    A    Well, so we don't -- it's important to us to know what

22  we're paying for, and it's important for our vendor to know

23  what they're receiving so we can make sure that everything

24  that's due is paid and everything that they are due is

25  received.
```

586

```
 1    Q    Okay.

 2         MR. ABRAMS:  Let's go to the next one, please.

 3    Q    (BY MR. ABRAMS) All right.  We talked about business

 4  interruption, and Ms. Pienta talked about this yesterday.  Can

 5  you tell us what this slide represents?

 6    A    Yeah.  This is the amount of total business interruption

 7  through, I believe, January of 2021.

 8    Q    Okay.  And let's -- walk it through with us.  So it says

 9  "lost rental income," and there's an asterisk there.  Do you

10  see that?

11    A    I do.

12    Q    Tell us what that means.

13    A    The asterisk indicates that the lost rental income was

14  calculated from October 6th, 2020, through the restoration

15  period, which we ended on January -- in January 2021.

16    Q    Okay.  And then what's the next piece of that?

17    A    That's additional expenses that we incurred related

18  to -- primarily related to moving tenants out and certain

19  other costs that we incurred related to the fire damage.

20    Q    Are those things that you believe are covered under the

21  business interruption portion of the policy?

22    A    Yes.

23    Q    So we've got a total incurred?

24    A    Yes.

25    Q    And then there was some payments from Travelers?
```
                                587

```
 1   A    There were.  Travelers paid a total of about $865,000
 2   under this portion of the policy.  Bomasada received directly
 3   approximately $450,000 for certain costs that they'd incurred
 4   relating to reworking contracts and so on after the fire
 5   happened.  We received a little over $415,000.
 6   Q    So I want to make sure that we understand this.  So if
 7   you -- on the business interruption, if you had continued to
 8   calculate the business interruption, would the number be --
 9   for lost rental income be even more than the $7.5 million?
10   A    Millions more, yes.
11   Q    But you cut it off.  Why did you cut it off?
12   A    Because we exceeded the limit.
13   Q    And the limit was 5.1 million?
14   A    That's correct.
15   Q    So was the point why keep counting if you've exceeded
16   the limit?
17   A    That's correct.
18   Q    So the amount that you -- that Maxus is claiming from
19   Travelers for business interruption damages is how much?
20   A    $4,234,399.
21   Q    If there wasn't a limit under the policy, would the
22   claim be for more?
23   A    It would be, yes.
24   Q    Okay.  Significantly more?
25   A    Millions more.
```

588

```
 1   Q    Okay.

 2          MR. ABRAMS:  We'll pass the witness, Your Honor.

 3   Thank you, Mr. Snyder.

 4   CROSS-EXAMINATION BY MR. HAMANN:

 5   Q    Morning.

 6   A    Good morning.

 7   Q    I have a few questions to ask you, Mr. Snyder.

 8          I see these tabulations calculating what's been

 9   spent.  Did you prepare those tabulations yourself?

10   A    I did not personally, no.

11   Q    Okay.  Thank you.

12          I wanted to ask you about rent rolls.  I take it in

13   your position as CFO, you have occasion to analyze rent rolls?

14   A    I do.

15          MR. HAMANN:  Let's show Defendant's Exhibit 435,

16   please.

17   Q    (BY MR. HAMANN) Mr. Snyder, can you identify that as the

18   rent roll for the Maxus property the Metropolitan as of

19   September 30, 2018?

20   A    Yes.

21   Q    Okay.  Now, does the rent roll just show the status of

22   all the units of the Metropolitan; for example, whether

23   they're occupied or not, by whom, and what kind of amount is

24   being received in the way of rent?

25   A    Yes, it does.
```

589

```
 1   Q   Okay.  Now, if we look at Exhibit 435, the rent roll for

 2   the end of September 2018, am I correct that of all the units

 3   in the Metropolitan, 18 of them, were occupied?

 4   A   I can't tell from this sheet, but that -- my

 5   recollection is at the time of the fire, there were 17 units

 6   occupied, but it could have been 18.

 7   Q   Okay.  And as we see here, this is as of September 30,

 8   2018.  The fire took place on September 27th?

 9   A   That's correct.

10   Q   Okay.  So whether it's 17 or 18, we've got at least a

11   very close ballpark?

12   A   That's correct.

13   Q   Okay.  Now, there was a period, of course, after the

14   fire when the tenants had to be moved out?

15   A   Correct.

16   Q   Okay.  And then they -- they returned, and Maxus

17   continued its effort to lease the units in the Metropolitan,

18   those that were ready?

19   A   That's correct.

20   Q   Okay.  Let me show you what is marked Defendant's

21   Exhibit 438.

22        Now, this is a rent roll detail similar to the

23   earlier one for Exhibit 435.  This time it's for June 27,

24   2019, correct?

25   A   That's correct.
```
                            590

```
 1   Q    Okay.  Now, this will also show, won't it, the status of
 2   occupancy at the Metropolitan as of the 27th of June?
 3   A    Yes, it will.
 4   Q    Okay.  So if we look at this first page here, we see
 5   that we have the very first one, unit 101, that the tenant was
 6   moved in, correct, at May 20, 2019?
 7   A    Yes, that's correct.
 8   Q    So as of May 20, 2019, this individual moved into the
 9   Metropolitan?
10   A    It appears to be, yes.
11   Q    Okay.  And then if we move down this page to unit 117,
12   we see, don't we, that this unit had a tenant with a move-in
13   date of June 13, 2019?
14   A    That's correct.
15   Q    Okay.  If we move farther down the page, we see at the
16   bottom a tenant whose move-in date was May 2, 2019?
17   A    That's correct.
18   Q    Okay.  And these dates correspond within the -- with
19   when the leases started?
20   A    They should, yes.
21   Q    Okay.  So we move on to the next page.  We see, don't
22   we, near the top of unit 123, Maxus has leased it and its
23   move-in date for that unit is June 1, 2019, correct?
24   A    That's correct.
25   Q    Okay.  Then unit 124, just moving down the list, Maxus
                              591
```

```
 1    has got that leased and its -- the move-in date is May 31?

 2    A    Correct.

 3    Q    Okay.  Moving farther down, Maxus has leased unit 127.

 4    The move-in date for the tenant is May 6, 2019?

 5    A    That's correct.

 6    Q    Then farther down, unit 130, similarly, the tenant's

 7    move-in date is May 16, 2019?

 8    A    That's correct.

 9    Q    Okay.  If we go further on the next page, unit 204, you

10    have it becoming occupied and the move-in date, the lease

11    start, is May 31, 2019?

12    A    Yes.

13    Q    Okay.  And then for unit 205, the lease begins and the

14    move-in date is May 25, 2019?

15    A    Yes, it is.

16    Q    For unit 208, the move-in date and the lease started May

17    27th, 2019?

18    A    Yes, it did.

19    Q    All right.  Unit 209, lease started, tenant moved in May

20    10, 2019?

21    A    Yes.

22    Q    And you go down to unit 210, move-in date, lease started

23    May 31, 2019?

24    A    Correct.

25    Q    And then moving down, you look at unit 212, you see the
```
                                   592

1  lease started, the tenant moved in on May 31, 2019?

    2   A    Correct.

    3   Q    All right.  Unit 213, the tenant moved in and the lease

    4  was started on May 20, 2019?

    5   A    Correct.

    6   Q    Okay.  Turning to the next page, you see a tenant moving

    7  into unit 306, moving in on May 28, 2019?

    8   A    I'm sorry.  Which one?

    9   Q    This unit 306.

   10   A    Yeah.  I see it now.

   11   Q    Okay.  And the move-in date on that -- for that unit was

   12  May 28, 2019?

   13   A    Correct.

   14   Q    This means this is the date when these tenants are --

   15  who have leased the apartment are actually moving in?

   16   A    Well, it's the date that they can move in.  Sometimes it

   17  happens after that date; but, yes.

   18   Q    Maxus is permitting these tenants to move in at least as

   19  of that date?

   20   A    That's correct.

   21   Q    We move further down on this page to unit 313, and we

   22  see, don't we, that on May 31, 2019, the move-in date for that

   23  unit, that being 313, was May 31, 2019?

   24   A    I do.  I see that, yes.

   25   Q    Okay.  Let's go to the next page.  We're still on the
                                593

1  rent roll for this date of June 27, 2019, correct?

2   A   Correct.

3   Q   And we see for unit 315, the tenant move-in date was May

4  24, 2019?

5   A   That's correct.

6   Q   And then for unit 316 -- excuse me -- 317, the move-in

7  date for the tenant was May 31, 2019?

8   A   That's correct.

9   Q   Going down near the bottom of the page, we see for the

10  unit 328, the move-in date for the tenant for that unit was

11  May 23, 2019?

12   A   That looks to be the case.  I'm not sure what the second

13  date is below that.

14   Q   Okay.

15   A   But it appears to be -- the lease start date appears to

16  be May 23rd.  I don't know what the significance of June 27th

17  is.

18   Q   I understand.  Turning to the next page, let's look at

19  unit 330.  Does your rent roll, the Maxus rent roll show that

20  the move-in date for the tenant leasing 330 was May 21, 2019?

21   A   It does.

22   Q   And then moving down the page for unit 402, does the

23  rent roll of Maxus show that the tenant was allowed to move in

24  May 22, 2019?

25   A   It does.

594

```
 1   Q    Let's go to the next page.  The rent roll for unit 412,

 2   does it show a move-in date of May 8, 2019?

 3   A    Yes, it does.

 4   Q    And then moving down to unit 413, does your rent roll --

 5   I should say the rent roll of Maxus show the tenant was

 6   allowed to move in on June 6th, 2019?

 7   A    Yes, it does.

 8   Q    Moving farther down the page to unit 422, does that show

 9   that the tenant from 422 was permitted to move in as of June

10   12, 2019?

11   A    Yes.

12   Q    So the rent rolls shown in Exhibit 438 show Maxus was

13   permitting tenants to move into the Metropolitan?

14   A    Yes, that's correct.

15   Q    Now, I want to ask you a couple of questions relating to

16   some dates here.

17        Do I understand -- at some point I understand

18   Bomasada was the contractor on the job?

19   A    That's correct.

20   Q    It later became replaced?

21   A    Bomasada was the general contractor that built the

22   complex.  We ultimately -- they were -- we signed a contract

23   with them to rebuild phase 6.  We signed a contract with BCCM

24   to do the remediation work.  And then we, a few months, later

25   replaced Bomasada with BCCM to do the rebuild of phase 6.  So
                              595
```

```
 1   ultimately BCCM finished the project.
 2   Q    Now, there were discussions, weren't there, we've talked
 3   about them some in this case, surrounding the decision of
 4   Maxus to evict the tenants?
 5   A    Yes.
 6   Q    Okay.  Now, am I right in understanding that June 24,
 7   2019, Maxus advised Bomasada to stop work on the project?
 8   A    I don't know the date, but we did advise Bomasada to
 9   stop at some point.
10   Q    Okay.  Let me see if this refreshes your recollection.
11   This is an email.  It says from Alex Stehl to Stuart Fred.
12            Now, Stuart Fred was kind of the head guy at
13   Bomasada?
14   A    He was one of the principals there, yes.
15   Q    And I'm going to ask you to take a look at this email
16   and see whether it refreshes your recollection as to the fact
17   that Maxus told Bomasada to stop work and when that was.
18   A    Well, this is dated June 14th.
19   Q    Right.  Having looked at that, does that refresh your
20   recollection as to when Maxus told Bomasada to stop work on
21   the project?
22   A    It does.
23   Q    And what date was that?
24   A    June 14th, 2019.
25   Q    Okay.  Thank you.
                              596
```

```
 1              And pursuant to that instruction, is it your

 2   understanding that Bomasada indeed stopped work on the project

 3   at that time?

 4   A    I believe they did, yes.

 5   Q    Okay.  Now, at a later date, did the contract

 6   relationship between Bomasada and Maxus terminate?

 7   A    Yes, it did.

 8   Q    Okay.  And did Maxus indicate June 5, 2020, that --

 9   strike that.

10              Had Maxus received a letter in early June of 2020

11   from Bomasada advising that Bomasada was stopping work on the

12   contract?

13   A    There were a lot of letters flying around, but we did

14   receive a letter from Bomasada of that nature, yes.

15   Q    Okay.

16              MR. ABRAMS:  Your Honor, can we approach?

17              (Counsel approached the bench and the following

18   proceedings were had:)

19              MR. ABRAMS:  Your Honor, my only concern is, is that

20   you ruled on a motion in limine that we're not going to get

21   into the disputes between Maxus and Bomasada.  You know --

22              THE COURT:  I don't know.  What is it that he wants

23   to offer?

24              MR. ABRAMS:  What's that?

25              THE COURT:  What is it he wants to offer?
```
                                597

```
 1            MR. ABRAMS:  Well, that's a good point.  I'm not
 2    sure.
 3            MR. HAMANN:  What I need to do is just refresh his
 4    recollection that as of early June of 2020, Bomasada stopped
 5    work.
 6            MR. ABRAMS:  That's fine.  We don't have an
 7    objection to that.
 8            What I don't want to do is get into the whole
 9    dispute with Bomasada.  Clearly they were fired.  Clearly we
10    told them to stop work because we were in remediation.  That's
11    fine.  Beyond that I think it's --
12            THE COURT:  Right.
13            MR. ELY:  We agree.
14            MR. HAMANN:  Yes.
15        (The proceedings returned to open court.)
16    Q    (BY MR. HAMANN) Mr. Snyder, let me hand you this
17    document.  It looks to be a letter from an attorney at Lathrop
18    GPM to Jason Johns and -- would you take a look at that and
19    see if it refreshes your recollection as to when Bomasada
20    determined it was going to stop work on the project?
21    A    It appears to be June 4th, 2020.
22    Q    Okay.  Does that correspond with your recollection now
23    that you're refreshed?
24    A    Yes.
25    Q    Okay.  Thank you.
```
                              598

```
 1            Now, there's something I'm unclear about with
 2  respect to Maxus, the plaintiff; that is to say, Maxus
 3  Metropolitan.
 4            Am I right that the plaintiff Maxus Metropolitan is
 5  comprised of what; that is to say, are there entities and
 6  individuals that comprise that entity?
 7  A    There are entities and individuals that own that entity,
 8  yes.
 9  Q    Okay.  So with respect to Maxus Metropolitan, is it
10  owned by an entity called Maxus Opportunity Fund?
11  A    That's more precise.  The owner of Maxus Metropolitan is
12  actually Maxus Opportunity Fund 1.  There are individual and
13  entities that own Maxus Opportunity Fund 1, but Maxus
14  Metropolitan also has two additional owners that are not in
15  Maxus Opportunity Fund 1 that are separate entities.
16            So Maxus Metropolitan is owned approximately 36
17  percent by Maxus Realty Trust, Inc., two separate entities
18  with Maxus Realty Trust, Inc., and 64 percent by Maxus
19  Opportunity Fund 1.
20  Q    You said Maxus Realty Trust?
21  A    Correct.
22  Q    And what is Maxus Realty Trust?
23  A    That's our real estate investment trust.  That's the
24  vehicle that -- through which most of our apartments are
25  owned.
```
599

1  Q    And can you just educate me on what a real estate

2  investment trust is here?  That is to say, do they have

3  different characteristics in different circumstances?

4  A    It's more a tax designation.  It -- it's a -- it

5  primarily determines how we're treated under the tax law, and

6  it's specific to real estate.  It's designed to be an entity

7  that holds entities that earn passive income like rent.

8  Q    So it's supposed to have attractive investment features?

9  A    Yes.

10  Q    That form?

11  A    Yes.  It has certain tax features, yes.

12  Q    That are hopefully attractive to potential investors?

13  A    They can be, yes.

14  Q    I see.  I was going to ask you also, were you involved

15  in the process of separating out the fire damage costs that

16  Maxus claims and the construction defect costs Maxus claims?

17  A    I was.

18  Q    How was -- what did you do?

19  A    Well, I directed the effort.  We had a forensic

20  accountant outside of Maxus that prepared -- those schedules

21  that we looked at earlier, I believe they were prepared by a

22  forensic accountant, and then our -- all of the information

23  was provided by our staff to him and his staff.  We reviewed

24  those schedules many times.

25  Q    Who was the forensic accountant?

600

```
 1   A    His name was Kris Zeid from RubinBrown.  Z-i-e-d, I
 2   think.  Not sure of the I before E.
 3   Q    Now, let me ask you:  Speaking of your own background
 4   and experience, would you agree that you don't have any
 5   expertise in determining cause of damage to buildings?
 6   A    That's correct.
 7   Q    In this case, did Maxus rely on Mr. Irmiter for that?
 8   A    Yes.
 9   Q    Now, a similar question, Mr. Snyder, were you involved
10   in any allocation of business income losses that are claimed
11   between fire damage and construction defect?
12   A    No.
13   Q    Do you know of anyone who was asked to make that
14   differentiation?
15   A    No.
16   Q    In your capacity as chief financial officer, would you
17   have close oversight over the checks that went out from Maxus
18   to pay various entities?
19   A    Yes.
20   Q    So let me ask you with respect -- you've been here to
21   hear something about Safety Environmental, SELC?
22   A    I'm sorry.  Can you repeat?
23   Q    My question, sir, is this:  Did Maxus pay Brad Stiles'
24   environmental company, Safety Environmental, for its work in
25   April of 2019?
                                601
```

```
 1   A    I don't know.  If he invoiced us and did the work, we
 2   likely paid it, but I don't know for sure if we paid that or
 3   not.
 4   Q    Okay.  I wanted to also ask you, we heard something from
 5   Mr. Irmiter the past several days, a lot of things actually.
 6            Is it fair to say Mr. Irmiter wore different hats
 7   during his activity at the Metropolitan?
 8   A    Yes, he did.
 9   Q    And speaking as the chief financial officer of Maxus,
10   can you tell us in a ballpark manner the total amount of money
11   that Maxus paid Mr. Irmiter for the various hats he wore at
12   the Metropolitan?
13   A    I'd have to look.  Off the top of my head, I don't know.
14   It was a sizeable amount, though.
15   Q    I understand that.  Sizeable means different things to
16   different people.  So let me ask you, was it -- do you think
17   it was more than $500,000?
18   A    I don't think so.  Mr. Irmiter said $400,000.  I believe
19   it was slightly less than that the last time I looked.
20   Q    And that was from all of his activity?
21   A    Yes.
22   Q    Let me show you Defendant's Exhibit 225.
23            Mr. Snyder, can you identify that as a subcontract
24   agreement that was dated January 2020 between Bomasada and an
25   entity called Resource Construction?
                                   602
```

```
 1   A    It appears to be, yes.

 2   Q    Okay.  So would that date, January 2020, if you look at

 3   the last page, page 14, you see signatures and dates.  And one

 4   signature for Bomasada is January 21, 2020.  The signature for

 5   Resource Construction is January 17, 2020.

 6              But in any event, we can agree, can't we, that

 7   period would mark the time when Resource Construction

 8   commenced work at the Metropolitan?

 9   A    It appears to be, yes.

10   Q    Now, did Maxus enter into a contract with BCCM?

11   A    Yes.

12   Q    And was that contract entered in, what, September,

13   October of 2019?

14   A    Which contract?

15   Q    I think probably the first one.  Does that ring a bell?

16   A    We have multiple contracts with BCCM on this.  We --

17   it's possible we entered a contract with BCCM in October of

18   2019.

19   Q    Okay.  Let me show you Defendant's Exhibit 403, and if

20   you'll turn to the next page.

21              Can you identify that page as being the first page

22   of a pay application?

23   A    That appears to be the first page of a BCCM pay

24   application, yes.

25   Q    And this is a Pay Application No. 1?
```

603

```
 1   A    Yes.

 2   Q    And the date on it is for a period to September 30,

 3   2020?

 4   A    Correct.

 5   Q    So can we infer from that that BCCM was probably on the

 6   job working just prior to the date of that pay application?

 7   A    I'd have to -- I don't know what the details are, but it

 8   appeared -- I don't know what the details of the $88,000 are

 9   without seeing the underlying support, but it appears that

10   they were on site either then or right around that time, yes.

11   Q    Right.  And this is the first pay application too?

12   A    That's correct.  So it could have been that we were

13   advancing money to get -- for staging and things like that.

14   Q    And as you point out, the -- on Line No. 4, it says the

15   total completed and stored to date was $88,988.33, correct?

16   A    Yes.

17   Q    Does that suggest that this first pay app for an amount

18   of $89,000 on this project shows this is the beginning of the

19   project?

20   A    This is the beginning of BCCM's involvement in the

21   project, yes.

22   Q    Exactly.  That's what I mean.

23        I take it in your position as chief financial

24   officer, you work closely with Mr. Johnson?

25   A    I do.
```

604

```
 1    Q    On a daily basis?

 2    A    Every day.

 3    Q    Had Mr. Johnson instructed Maxus' people to be

 4    transparent with Travelers?

 5    A    Absolutely.

 6              MR. HAMANN:  That's all I have.  Thank you.

 7              MR. ABRAMS:  Your Honor, brief redirect?  Thank you.

 8    REDIRECT EXAMINATION BY MR. ABRAMS:

 9    Q    Mr. Snyder, let's talk about dates here.  There's a lot

10    of dates you were asked about.  Let's talk about some dates.

11              MR. ABRAMS:  Melissa, will you put up Plaintiff's

12    Exhibit 311.

13    Q    (BY MR. ABRAMS) This is a letter from Travelers' lawyer

14    to me, June 12th, 2019, correct?

15    A    Yes.

16    Q    And this is the letter in which Travelers says it has

17    not undertaken and will not undertake any technical,

18    feasibility, safety, or other review of the reports of

19    Mr. Irmiter.  Therefore, Travelers does not take a position

20    regarding the alleged necessity of instructing residents to

21    vacate the premises, correct?

22    A    Yes.

23    Q    June 12th, 2019, correct?

24    A    Yes.

25              MR. ABRAMS:  All right.  Melissa, will you put up
                              605
```

```
 1   the Plaintiff's Exhibit 313.

 2   Q    (BY MR. ABRAMS) What is this, Mr. Snyder?

 3   A    This is a letter we sent to our residents notifying them

 4   that we needed to get the building cleared.

 5   Q    And what -- and to vacate, correct?

 6   A    Yes.

 7   Q    And what's the date of that one?

 8   A    June 14th, 2019.

 9   Q    Two days later?

10   A    Yes.

11   Q    Okay.  Now, you saw -- counsel went through with you

12   when people moved in and so on.  It's true that one resident

13   actually moved in the day before he got this letter, right?

14   A    Possibly.  His lease -- his or her lease started that

15   day, yes.

16   Q    Lease started that day, and the very next day, he gets a

17   letter saying you've got to vacate?

18   A    That's correct.

19   Q    And you told all of the tenants -- did you tell all the

20   tenants that they had to vacate at the same time, or did you

21   tell people at different times?

22   A    We told them all at the same time.

23   Q    Okay.  You told them through this letter?

24   A    Correct.

25              MR. ABRAMS:  Will you put back up the check stub we
                             606
```

1  were looking at.

2  Q    (BY MR. ABRAMS) Got some questions about checks.  This

3  is -- this was an example of a check -- we went through this

4  in direct -- that you wrote to BCCM in March of 2022, correct?

5  A    That's correct.

6  Q    And we talked about the paystub, and you explained why

7  it was important to put on the paystub, not only for your own

8  records, but as a courtesy to who you're writing a check to,

9  of what you're paying for, correct?

10 A    That's correct.

11 Q    When you got checks from Travelers, did it indicate what

12 they were paying for?

13 A    No.

14 Q    Was there anything on the paystub of what they were

15 paying for?

16 A    To my recollection, no.

17       MR. ABRAMS:  No further questions.

18       MR. HAMANN:  Just a couple questions, please, Your

19 Honor.

20 RECROSS-EXAMINATION BY MR. HAMANN:

21 Q    Who is Resource Construction?

22 A    I believe it was one of the subcontractors used in the

23 rebuild or remediation.  I'm not sure.

24 Q    Was that at phase 5?

25 A    I don't know.

                         607

```
 1   Q    The phase 5 remediation contract --

 2            MR. ABRAMS:  Your Honor, what does this have to do

 3   with redirect?

 4            MR. HAMANN:  I've got one question to go.

 5            THE COURT:  No questions?

 6            MR. HAMANN:  Just this one, that's all.

 7            THE COURT:  I'll hear it.

 8   Q    (BY MR. HAMANN) If the phase 5 remediation contract was

 9   January 17th, 2021, is that the date that Maxus began

10   remediation of phase 5?

11   A    Repeat the question, please.

12   Q    If the phase 5 -- if the contract for phase 5

13   remediation was January 17, 2021, was that the date when Maxus

14   began remediation of phase 5?

15   A    If that's the date of the contract and that contract was

16   for the remediation of phase 5, that would make sense.  But I

17   don't know that to be certain.

18            MR. HAMANN:  That's all I have.  Thank you.

19            MR. ABRAMS:  No questions, Your Honor.

20            THE COURT:  Thank you.

21            (Counsel approached the bench and the following

22   proceedings were had:)

23            MR. ABRAMS:  So, Your Honor, that's what we had for

24   the day.

25            THE COURT:  We could have taken the day off.
                              608
```

```
 1              MR. ELY:  We didn't know that was going to go that

 2    quick, Your Honor.  I apologize.

 3              THE COURT:  That's all you've got for the day?

 4              MR. ELY:  Yes, sir.

 5              MR. ABRAMS:  So defendant starts -- we have one

 6    witness we are taking out of order, and then defendants starts

 7    on Monday.

 8              THE COURT:  What witness are you going to have

 9    Monday?

10              MR. ELY:  On Monday, Dr. Robert Schroeder, Chris

11    Spicer we anticipated calling and perhaps the Travelers'

12    witness, depending on how that goes.  That's what I'm

13    anticipating, Your Honor.

14              THE COURT:  Before you leave, get with -- Patricia?

15              I'm asking that they meet with you about the

16    witnesses that we're going to have next week.  Quite frankly,

17    I don't want to waste the jury's time to have them waiting

18    here.

19              MR. ELY:  No, sir.  I looked at it last night and

20    tried to do some time allocations, Your Honor.  I think we

21    will be done by Wednesday or with our part by Wednesday

22    midday.  That's my hope.

23              MR. ABRAMS:  And then we have -- there are three

24    rebuttal witnesses.  They should be --

25              MR. ELY:  We can handle those that day.
```

609

```
 1              MR. ABRAMS:  You think so?

 2              MR. ELY:  I think so.

 3              THE COURT:  Why don't you guys continue to decide

 4    this.  I'd like to know everything today and be done by

 5    Wednesday.

 6              MR. ABRAMS:  We'll try to go fast.

 7              MR. ELY:  We'll get together and see what we can do,

 8    Your Honor.  Thank you.

 9          (The proceedings returned to open court.)

10              THE COURT:  Thank you.  We're done.  I feel maybe we

11    could have done this yesterday and had the day off today, but

12    we and they still have some things they need to do.  We just

13    don't need you to be here for that.  For the inconvenience to

14    you, I apologize, but trials are like potholes in the road.

15    You see one, you hit it; and you don't see one, and you hit it

16    anyway.

17              So, again, it's important because you're going to be

18    gone over the weekend.  Ask that you report back on Monday at

19    8:30.  We'll get started.  And I've been promised we'll have

20    continuous witnesses through Wednesday, and we're looking

21    forward to submitting the case on Thursday.

22              So we're still ahead of the curve here, if you will.

23              Any questions?

24              All right.  Please read that instruction on your way

25    out of the jury room.  It's very important since we're going
```

                                      610

Case 4:20-cv-00095-FJG   Document 244   Filed 09/05/23   Page 40 of 42

```
 1   to have this big gap in here and people coming up to you and
 2   saying what you been doing in court and yada, yada, yada, and
 3   you've got to say mum is the word, all right?
 4              Have a good weekend.  Thank you.
 5              (The following proceedings were had out of the
 6   presence of the jury:)
 7              THE COURT:  Anything else we need to discuss?
 8              MR. ELY:  No, sir.
 9              THE COURT:  Get it tight.
10              MR. ELY:  I understand, yes, sir.
11              Your Honor, I do have one question.  I'm sorry.
12   Mike is -- you're calling Jason next week?
13              MR. ABRAMS:  Maybe.  Depending on the time.
14   Possibly, although if we think we've got -- covered it in
15   other ways and we're trying to get it done, maybe we don't
16   call him.
17              MR. ELY:  All I want to make sure is since they
18   haven't rested today, that I have an opportunity for a Rule 50
19   motion because the case is not closed at this point.  If it
20   becomes closed, then we'll have a Rule 50 motion at that time.
21   I just wanted to advise the court that's what we plan on doing
22   next week.
23              THE COURT:  We'll take it up.
24              MR. ABRAMS:  No objections.
25              (Court adjourned.)
                       611
```

```
 1                  REPORTER'S CERTIFICATE

 2

 3          I certify that the foregoing pages are a correct

 4   transcript from the record of proceedings in the

 5   above-entitled matter.

 6

 7   _____        _____

        Date                   /s/Gayle M. Wambolt
 8                             GAYLE M. WAMBOLT, CRR, RMR
                               United States Court Reporter
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```