<pre>
 1            IN THE UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF MISSOURI
 2                    WESTERN DIVISION

 3   MAXUS METROPOLITAN, LLC,        )
                                     )
 4                  Plaintiff,       ) No. 20-cv-00095-FJG
              vs.                    )
 5                                   )
     TRAVELERS PROPERTY CASUALTY     ) July 31, 2023
 6   COMPANY OF AMERICA,             )
                    Defendant.       )
 7

 8            ..............................
           TRANSCRIPT OF JURY TRIAL - VOLUME 5 OF 8
 9      BEFORE THE HONORABLE FERNANDO J. GAITAN, JR.
           UNITED STATES DISTRICT COURT JUDGE
10

11      Proceedings recorded by electronic stenography
                Transcript produced by computer
12

13                      APPEARANCES

14   For the Plaintiff:        MR. MICHAEL J. ABRAMS
                               MS. ALANA McMULLIN
15                             MS. KIMBERLY K. WINTER
                               Lathrop GPM LLP
16                             2345 Grand Avenue, Suite 2200
                               Kansas City, Missouri 64108
17
     For the Defendant:        MR. BRENEN G. ELY
18                             MS. LAUREN A. WIGGINS
                               Ely & Isenberg, LLC
19                             3500 Blue Lake Drive, Suite 345
                               Birmingham, Alabama 35243
20
                               MR. DANIEL EDWARD HAMANN
21                             Deacy & Deacy, LLP
                               9233 Ward Parkway, Suite 370
22                             Kansas City, Missouri 64114

23           Gayle M. Wambolt, RMR, CRR
            U.S. Court Reporter, Room 7552
24       Charles Evans Whittaker Courthouse
              400 East Ninth Street
25       Kansas City, MO 64106 (816) 512-5641
                         612
</pre>

```
 1                          INDEX
                          JURY TRIAL
 2                       JULY 31, 2023

 3                    CHRONOLOGICAL INDEX

 4   DEFENDANT'S WITNESSES:

 5                                DIR   CROSS   RDIR   RCRS

 6   ROBERT SCHROEDER            614    684    715

 7   RUSSELL CHRISTOPHER SPICER  717    757    783

 8   STEPHEN BRYAN               785

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                           613
```

```
 1              MONDAY, JULY 31, 2023

 2              (The following proceedings were had in the presence

 3   of the jury:)

 4              MR. ELY:  Morning, Your Honor.

 5              THE COURT:  Good morning.

 6              MR. ELY:  Ready for our first witness?

 7              THE COURT:  I am.

 8              MR. ELY:  We call Dr. Robert Schroeder.

 9   ROBERT SCHROEDER, being duly sworn by the courtroom deputy,

10   testified:

11   DIRECT EXAMINATION BY MR. ELY:

12   Q    Good morning.

13   A    Good morning.

14   Q    Can you please state your name for the record.

15   A    Sure.  My name is Robert Alan Schroeder.

16   Q    Dr. Schroeder, where do you reside?

17   A    Minneapolis.

18   Q    Okay.  And what is your present occupation?

19   A    Well, I'm a fire material scientist as well as a fire

20   investigator.

21   Q    And do you have a business; you have an employer?  Who

22   do you work for?

23   A    Myself.  Sole practitioner.

24   Q    Okay.  And just for -- generally speaking, can you tell

25   us with regard to -- what do you do in that field that you --
```
<center>614</center>

1  the materials and fire science?

2  A    I analyze buildings, ships, aircraft, large commercial

3  structures, industrial structures after they've experienced an

4  explosion or a fire, and I look at the construction.  I look

5  at the maintenance.  I look at the history.  I basically do a

6  building autopsy.

7           I look at the historical records of the building.  I

8  look at data.  I understand the materials.  I understand all

9  the elements of it, and then I do the total analysis.

10           So I like to say it's a coroner versus a medical

11  examiner.  A coroner does not have to be a doctor.  A medical

12  examiner does.  There's various similarities.  I'm the medical

13  examiner.

14  Q    And how long have you been investigating fires?

15  A    Full time since 1979.

16  Q    Okay.  And did you do any fire investigations prior to

17  that?

18  A    Well, for the military, I was a certified fire

19  investigator by the Air Force in 1975, but we don't like to

20  have fires in the military.  So I did spend some time with a

21  local fire department.  But otherwise, no.

22  Q    And have you also been a firefighter?

23  A    Oh, yes.  That's how I started out.

24  Q    Okay.  Can you tell us about your experience as a

25  firefighter, where you were active as a firefighter and when?

615

```
 1    A    Sure.  In 1972, I went in the military, went in the Air
 2   Force, the Air Guard.  I was trained as a firefighter and
 3   crash rescue firefighter, and I had that role until '79.
 4           In the interim, I also went to college at Oklahoma
 5   State University and was a firefighter on the Stillwater Fire
 6   Department.  So I literally lived in the fire station and
 7   responded when the bells rang.  Ultimately I finished riding
 8   the big red trucks in 1986 and '87 for a suburban department
 9   in Minneapolis, the Minnetonka Fire Department.
10           So I quit riding the big red trucks in the end of
11   1986.
12    Q    And you mentioned your time at Oklahoma State.  So
13   the -- go ahead and tell us about your educational background
14   starting with Oklahoma State, if you would.
15    A    Sure.  At Oklahoma State, I was in a program, a fire
16   protection -- fire protection and safety program.  In '77, I
17   received an Associate of Science degree in fire protection.
18   In '78, I received a Bachelor of Science degree in fire
19   protection and safety engineering technology while I was at
20   OSU.
21    Q    Okay.  And after you came out of Oklahoma State, what
22   were your career choices that you had, and what did you take?
23    A    Sure.  I could have been an industrial hygienist.  I
24   could have been a safety professional.  I could have been a
25   fire chief or a fire command officer, and I chose to go into
```
<div align="center">616</div>

Case 4:20-cv-00095-FJG   Document 245   Filed 09/05/23   Page 5 of 224

```
 1   fire investigation.

 2   Q    Okay.  What year was that?

 3   A    '79.

 4   Q    Okay.  And at some point, you went back to school to get

 5   a master's degree; is that correct?

 6   A    I did.  I like to call it my midlife crisis.  At age 37,

 7   I decided that it was time to get retooled, and I went and got

 8   a master's degree, Master's of Science degree at University of

 9   California-Berkeley in mechanical engineering.

10   Q    Did you study in any other schools at Berkeley while you

11   were getting your mechanical engineering degree?

12   A    Oh, I did.  I spent an awful lot of time in the

13   Department of Natural Resources dealing with wild land fires,

14   not only taking courses and participating in prescribed

15   burning, but ultimately I had the honor to be the TA for

16   Dr. Martin, who was one of the really early innovators on wild

17   land fires.

18        I also studied in the School of Information Sciences

19   looking at data and how to understand data and in civil

20   engineering looking at materials.

21   Q    And after you received your master's degree from

22   Berkeley, did you pursue a Ph.D. at Berkeley?

23   A    I did.  I ultimately got a doctor of engineering from

24   Berkeley, and that department was -- I moved from mechanical

25   now to civil environmental.  And my work there dealt with
```

<div align="center">617</div>

1  materials:  Construction materials, concrete, plastics, wood,

2  the whole array.  Ultimately my doctoral dissertation was

3  post-fire analysis of construction materials.  So the fire

4  element of my life has never left me.

5  Q    Okay.  And are you still active as a fire investigator?

6  A    Well, on April 21st, I decided that it was -- 51 years

7  in the business is enough.  So I'm on approach -- I'm on final

8  approach, if you will.

9  Q    So in your 51 years in the business, how many -- you

10 have an estimation of how many fires you've investigated?

11 A    The number is between 2,500 and 3,000.

12 Q    And can you tell me, just so we can understand the scope

13 of your investigation, as between cause and origin and other

14 aspects of a fire, what do you focus on?

15 A    Well, the cause and origin is always a critical element

16 of this, but then why did the fire spread, what was being

17 given off by the fire, why did the building suffer so much

18 damage, the fire dynamics, what's happening, what's happening

19 to adjacent structures.

20 Q    So tell us when you were hired in this case and what you

21 were charged with doing.

22 A    I was hired, I believe it was, the 11th of July 2020.

23 And I was asked by you to assist in the investigation and the

24 analysis of this fire, what took place, the fire dynamics, how

25 everything was impacted.

618

```
 1   Q    And in that capacity, can you give us a general idea of

 2   the kinds and amount of information you've reviewed in

 3   arriving at your opinions in this case?

 4   A    Oh, my gosh.  Hundreds of thousands of pages of

 5   documents, complete building plans, thousands of photographs;

 6   some taken by me at the scene, thousands taken by others.  The

 7   fire department records, and there were videotapes made both

 8   by security cameras as well as individuals.  Weather records,

 9   historical records; as they were building the building, the

10   communiques between the architects and the people on the

11   ground, the squawks, the comminques between the city of

12   Birmingham building inspectors and the people constructing it.

13   It just goes on forever and ever.

14   Q    Okay.  And as part of that, you mentioned videos.  Were

15   you able to obtain a security video and review that with --

16   that shows the fire?

17   A    Yes, I did.

18   Q    Okay.  How long is that video?

19   A    Well, if you include the time before the fire, I think

20   we start rolling the video at about 9:30 that night prior to

21   the fire the next morning at 0037.  So there are, I think, up

22   to nine hours of security video that I've seen.

23   Q    Okay.  And can you tell us how you examined that video

24   and broke it down?

25   A    Sure.  Once I got into the timeframe of the discovery of
```
                                    619

1    the fire, I then took the video and had it dissected down

2    frame by frame by frame.  So that's 30 frames per second, and

3    you can go through and really get a feel for what's going on.

4    By moving through those frame by frames, you're not going one

5    second and then another second, but moving quickly through

6    them, but much slower than the video's rolling, and it gives

7    you great detail.  You learn a lot about things that you would

8    never see just watching the video roll.

9    Q    And in preparation for your testimony today, did you go

10   through and capture segments of the video as opposed to

11   playing the entire four hours?

12   A    Yeah.  We're not going to be playing nine hours of video

13   today, folks, no.

14             MR. ELY:  Pull up Defendant's Exhibit 152.

15   Q    (BY MR. ELY) And tell us -- this is security 12:23:08 to

16   12:31.  So can you tell us what we are looking at here?

17   A    Sure.  We're at the Sandbar across the street, across

18   7th Avenue.

19             MR. ELY:  Can you split out with Defendant's Exhibit

20   185 so we can have some reference of where this is.

21   A    While you're doing that, we're looking at the south end

22   of building 6 and the two adjoining structures.  The one

23   immediately to its left from this perspective burned, and the

24   second to the left did not.

25   Q    (BY MR. ELY) So can you point to us, Dr. Schroeder,

                              620

```
 1   where the video generally is set up?

 2   A     Sure.  Can I --

 3   Q     Yeah.

 4   A     Where do you want me to point?

 5   Q     Yes.

 6   A     Oh, does that do it?  Oh, wow.  Let me pull -- sorry

 7   about the artwork.

 8          So that's kind of the perspective we're looking at.

 9   We're looking towards the end of building 6.

10   Q     Okay.  And so can you orient us with the other areas of

11   the Metropolitan to where they would be located with the

12   security camera shot?  What's that to the left?

13   A     To the left?  I'm not tracking with you.  I'm sorry.

14   Q     Point us to the doughnut building, if you would.

15   A     The doughnut building is here.

16   Q     And can you point us to phase 5?

17   A     (Witness complied.)

18   Q     And then phase 4?

19   A     (Witness complied.)

20   Q     And then the parking garage?

21   A     (Witness complied.)

22   Q     Okay.  So what we were looking at with the vantage point

23   of the security video is the doughnut building will be to the

24   left?

25   A     Yes.
```

<div align="center">621</div>

```
 1    Q    And phase 5 will be behind phase 6?

 2    A    Correct.

 3    Q    And phase 4 and the parking deck will be up in the left

 4    corner?

 5    A    Yes.

 6    Q    Okay.  So let's go back to the video, please.  We've got

 7    to clear that.

 8    A    Do I do that?  Do I clear it, or does somebody else do

 9    it?

10    Q    I got it.  Thank you.

11    A    Thanks.

12    Q    Okay.  So in an effort to speed this along a little bit,

13    we're not going to watch all these videos in realtime.  I'm

14    going to ask Chris to move it through.  And when you want to

15    stop, please let us know to stop, but, otherwise, we're going

16    to kind of track through the video.

17            And describe for us, if you will, as we're going

18    through, what we're looking at right now, the timestamp in

19    relation to the beginning of the fire.

20    A    Okay.  So we're before the beginning of the fire.

21    And -- can I mark on this?

22    Q    Yes, you can.

23    A    Oh.  Just something to see.  Those are the lights in the

24    garage.  You can see it from this perspective, and we'll see

25    them again.  They'll be in a different state.
```

622

Case 4:20-cv-00095-FJG   Document 245   Filed 09/05/23   Page 11 of 224

1          This is a doorway into building 6, and it's all
2  quiet.  You've got the container boxes back here, which we'll
3  see when we're looking at the fire from the 30th Street side.
4          Let's roll tape.
5  Q    What are in the container boxes?
6  A    That's further construction.
7  Q    Okay.
8          MR. ELY:  Can we grab the play and move it along a
9  little faster?
10 A    Hold it right there.  Just a second ago, we saw wisps of
11 smoking coming up from this doorway.
12         And we should clear my markings off, please.
13         So watch -- you can just kind of see it right now,
14 and it's 26:44.  Watch there.  See the coloration changes?
15 You get a clear vision, and then it's obscured a little bit.
16 That's smoke starting to find its way out of the building.
17         Keep rolling.
18         More smoke coming out.  We're at 27 -- 0027.  So
19 this time clock is off by an hour.  You see more smoke coming
20 out.
21         Let's pick it up a little bit, please.
22         Okay.  Stop right there.  We've got smoke here.  And
23 this illumination, that's from the fire.  The fire is burning
24 in this -- the building is constructed like an E, with the
25 middle part of the E kind of cut back short.  So in between

                              623

```
 1   two legs of the E, you're getting fire in that alcove area

 2   that is now burning with such intensity that it's illuminating

 3   the trees across the street.

 4           Clear and roll.  Thank you.

 5           More smoke.

 6           Now stop.

 7           If you watch up here, you're going to see

 8   illumination.  The fire is moving its way up towards the roof.

 9           Clear.

10           This is the -- no.  Stop.

11           Watch the smoke here.  You'll see a consistency of

12   the smoke moving out of the building and towards the

13   northeast.  We're not seeing -- if we draw a line here, we're

14   not seeing any smoke moving in the direction of phase 3.  It's

15   moving to the east and to the north.

16           Clear and roll, please.

17           More fire coming, shooting up in the back.  You can

18   see it just boiling up here.

19           Clear.  Roll.

20           And you can speed it up a little bit more.

21           Oh, here.  Again, I want to point out to you where

22   this smoke is going.  It's actually going -- hooking around

23   the corner now and heading to the northeast.  Still clear --

24   on the phase 3 side, still clear to see the lights in the

25   parking garage.  That is not obscured by the smoke.  There's
```

624

1    no smoke over there.

2            Roll tape.  You can pick up the speed a little bit.

3            PD is on the scene.

4    Q    PD, you mean police department?

5    A    Police department.

6            And even up here, you see the smoke being pulled

7    across the front and south side and then moving to the

8    northeast.  This is all heading in that direction.

9            Clear my mark off.

10           There's a police officer down there running around

11   going, What a mess.

12           And you can speed that up a little bit more.

13   Q    All right.  So let's go to the second section of video,

14   security 12:31 to 12:40.

15           Dr. Schroeder, does this pick up where the other one

16   left off?

17   A    It does.  It does.  We don't have any gaps.

18           Look at the smoke rolling around, going to the

19   north, going to the east, coming out of this southeastern

20   corner of building 6.

21   Q    Dr. Schroeder, we see -- now see smoke coming out of

22   the -- on the left side of the building next to these

23   residential structures.  Can you explain what's happening

24   there?

25   A    Sure.  We are getting some smoke from building 6, but it

                                625

```
 1   is being drawn into the body of the fire.

 2            And then think of a campfire and -- a big campfire.

 3   The air for the reaction -- because to have fire, you need

 4   fuel, you need heat, and you need oxygen.

 5            And so we've got plenty of fuel.  This is like a --

 6   almost like a forest inside with all of the studs and framing.

 7   So we've got plenty of fuel.

 8            We've got fire.  Now what we need is oxygen.  And so

 9   this fire is just drawing oxygen in from all around it.  And

10   the plume, the body of fire, literally the heat and the fire

11   rising up from around and above building 6 is part of that

12   draw; part of drawing the air into that area from all around.

13            So you see some smoke coming out of the western side

14   of building 6.  And, by the way, that side does not have any

15   windows; so it is kind of a barrier wall.  There are some

16   openings, some vent openings in there; but for the most part,

17   it's a barrier wall.

18            Now we're getting activity through the front end, if

19   you will, the south end of building 6.  We should see the

20   firetrucks roll up pretty quick.

21   Q    So at this point --

22   A    So you are getting some smoke over here, but you can

23   still see the lights in the parking garage.  They're not

24   obscured.  The smoke isn't being drawn there.

25   Q    So at this point in the fire, the airflow around the
```
                              626

1  other areas of the Metropolitan, is the fire pulling air away

2  from those areas?

3  A    Yes.

4  Q    Okay.

5  A    You just saw the first engine come in.  And by the way,

6  you'll hear me talk about engines and trucks.  Trucks are the

7  ladder trucks, the elevated platforms.  The engines -- here's

8  a truck rolling here, and that's a quint 22.  So they're on

9  the scene.

10  Q    Can you tell for the rest of us what a quint is and what

11  it does?

12  A    Sure.  And here comes ladder 2.

13        A quint is a truck that has both a big fire pump in

14  it as well as the ladder, an aerial platform.  So it can do

15  both jobs.

16        The ladder truck only does one job, and that's the

17  aerial platform.  And so if they want to put a hose up there

18  to discharge water, they have to have an engine, another fire

19  truck supporting that effort.

20        The quint, no.  The quint can both pump its own

21  water as well as extend the boom and discharge water down from

22  the elevated platform.

23        So, again, your --

24  Q    Let's move to video 3.  I think this is security at

25  12:48 to 12:56.

627

```
 1   A     All right.  So stop right here for just a second.

 2               This is quint 22 setting up.  That's the end of the

 3   ladder, the end of the platform setting up to start spraying

 4   water onto building 6.

 5               The other ladder truck is back here, ladder 2, and

 6   they're setting up to spray water on building 6 as well.

 7               This is in the early stages.  They've just got on

 8   scene.  They're trying to get into an attack mode.  And you'll

 9   see that things change very rapidly, and all of a sudden the

10   chief is saying, Move the trucks, move the trucks.  And you --

11   I'm not hearing that, but you can see the action on the video.

12               So if you'll clear that and roll tape.

13               You see the firefighter coming down.  Now they've

14   moved it.  You just saw the ladder swing out of the way.

15   That's because they're thinking, Oh, my God, this is going to

16   be -- we'll be at risk.  Let's reposition the equipment.

17   Q     At this point --

18   A     If you look here, you'll see the smoke being drawn.  The

19   fire's intensity, that wall has lost its integrity, and the

20   illumination is coming out.

21               If you'll clear that screen for a second.

22               You can still see the outline of the doughnut

23   building as well as the parking lot.

24               Clear screen.

25               Okay.  The other ladder truck's here.  They're
```
                                    628

1    setting up.  You can see the top of the platform.  Quint 22 is

2    now spraying water, trying to spray water.  It's not a very

3    impressive stream at this point.

4            You see the fire hoses?  This firefighter now is

5    using a hand line.  There's a firefighter up in the basket of

6    ladder 2, and now they're pulling that down.  You see ladder 2

7    going down, and you see a firefighter moving up in the basket.

8            The fire was so intense on this eastern side along

9    30th Avenue that the firefighter that was in the basket

10   actually was injured.  He bailed out of the basket, and you

11   see them trying to hose him down right now.  It's so intense.

12   He bailed out of the basket and injured himself.  He didn't

13   wait to walk down it.

14           Clear screen, please.  Clear screen.

15           Watch on this side, you're going to see the building

16   start to -- as you're seeing, there's quint 2 now getting a

17   fog stream going.

18           They'll be moving the ladder truck out of the way.

19   You can see people scrambling over here on the right,

20   firefighters scrambling, and this is a completely-out-of-

21   control-it's-going-down-to-the-ground-soon fire.

22   Q    And at this point in the fire, is the airflow -- is the

23   airflow still the same, away from the other areas of the

24   Metropolitan?

25   A    That's right.  If you look over here, you can see the

629

1    doughnut building, phase 3.  No obscurations to speak of.  You

2    can see the top of the parking garage, and everything is being

3    drawn in.  You've got a clear line here.  The smoke isn't

4    rolling out there.  It is literally being drawn into this

5    massive plume that from a distance it looks like a volcano.

6    It's just dramatic.  It's huge.  A big column of fire into the

7    sky.

8              Clear screen, please.

9              You can speed it up.

10             You see the firefighters moving hose lines.

11             MR. ELY:  Let's queue up the next one, which is

12    security 100 to 105.

13    A    We can -- oh, here, this -- you see steam and the early

14    stages of smoke on this adjoining building.  That's because of

15    radiant -- the heat from the fire.  The radiant heat from the

16    fire is so intense that it's causing things at a distant to

17    light up, to auto ignite; meaning, you don't need to put a

18    flame there.  The radiation, like the sun's radiation, is so

19    intense, it will literally burst into flames, and we're

20    getting the early signs of that with that house.

21             Before things burst into flames as they're being

22    slowly heated, you'll see the change in the material.  You'll

23    see it start to off gas.  You'll see it give off moisture.

24    You'll see it literally smoke before boom, it bursts into

25    flames when you've got a fire that is -- when that building is

                              630

1  being subjected to radiant heat, not flame.

 2  Q    Okay.

 3  A    Okay.  You can see the smoke just -- it's here.  It's

 4  being drawn into the building.  Collapse.  The first sign of

 5  collapsing.  Hope you all saw that.  That was the south wall.

 6  Q    And when the wall collapsed, at that collapse stage, did

 7  the airflow change and the smoke change directions?

 8  A    No, no.  In fact, you can see how even from the

 9  adjoining house, how it's all getting drawn in.  That's being

10  drawn in by this massive column of fire, which is the

11  footprint of building 6.

12  Q    Okay.

13  A    Continues to be drawn in.

14        MR. ELY:  Chris, you can probably speed it up a

15  little bit.

16  A    Yeah.

17        MR. ELY:  Let's go to the next security video.  I

18  believe it's 2:04 to 2:12.  Yeah.

19  A    Okay.  Now -- clear screen, please.

20        The building has collapsed and is now burning what

21  we call in the business rubble.  It's burning rubble.

22  Building is pancaked.  It's no longer the structure we knew it

23  to be.  And the ladder trucks are setting up to now start the

24  final extinguishment, and that takes time.

25        But as you can see, the smoke is still being drawn

                             631

1  up and things are moving towards the northeast.  It is not

2  going backwards.  It's not going in this direction towards the

3  doughnut building.  It's not going in this direction towards

4  phase 4 and the parking lot.  It is going in this direction

5  and up.

6  Q    Okay.

7       MR. ELY:  Chris, you can probably speed a little

8  through this now.

9  A    You can see a ladder truck spraying water.

10 Q    (BY MR. ELY) And still no change in the airflow at this

11 stage?

12 A    No.

13      MR. ELY:  Let's go to 2:38 to 2:46.

14 A    There was -- they hit a hot spot.  That's actually steam

15 coming out.

16 Q    (BY MR. ELY) Okay.

17 A    You can see quint 22.  You can still see the smoke being

18 drawn towards the body of where building 6 was.

19 Q    Dr. Schroeder, in the back, there's some lights in the

20 parking garage.  Can you tell us what you're seeing right at

21 this point in the fire with regards to the lights back there?

22 A    Sure.  They're emergency lighting.  So if you lose power

23 to a building, in order to get out safely for the occupants,

24 there's emergency lighting set up.  We've got it in this

25 building.  You go anywhere and you'll see it.

632

1          The parking garage was equipped with emergency

          2     lighting.  And I will tell you that we see three lights here.

          3     When we're looking at the video early on before the fire, you

          4     saw that the parking garage was well lit up inside.  Now it's

          5     not.

          6     Q    What does that tell you?

          7     A    Tells me the power's out.

          8     Q    Okay.

          9          MR. ELY:  Chris, we can probably speed through this

         10     as well.

         11     Q    (BY MR. ELY) Now, at this stage of the fire, we see

         12     smoke down at the lower levels.  Can you describe for us

         13     what's happening at this time in relation to the other parts

         14     of the Metropolitan?

         15     A    Sure.  At this point in the firefighting effort, we

         16     really are in the -- I'll call it the final extinguishing

         17     stages.  So we no longer have that massive plume, that big

         18     rising column of fire occurring, and it's more akin to when

         19     you're trying to put out a campfire.  So the smoke is going to

         20     be drifting and moving out in all directions versus what we

         21     have been seeing in the main course of the fire.

         22          So we are starting to get drifting on a lateral

         23     lower-to-the-ground basis here.

         24     Q    When you say "drifting," can you describe for us what --

         25     how that's any different than what was happening when the fire

                                        633

1     was active?

2      A     I think I did, but I'll do it again.

3      Q     Okay.

4      A     So when the fire is active, we've got this big column of

5     fire going up in the sky.  Heat is rising, and that's pulling

6     in air from all around.  So that's the driving force, a column

7     of hot air pulling everything in from around it.

8            In this case, it's really tamped down, if you will.

9     The fire's no longer generating that kind of massive column.

10    And as the firefighters are putting water on the fire, they're

11    getting steam.  They're getting some smoke, and it's not just

12    rising straight up.  It is now able to move out laterally in

13    all directions.

14     Q     All right.  Let's look at some photographs just from the

15    end stage of the fire really quickly.

16            MR. ELY:  Can we go to RAS109613.  Can you split

17    screen with Defendant's Exhibit 185?

18     Q     (BY MR. ELY) So, Dr. Schroeder, can you tell us where

19    this photograph was taken in relation to the Metropolitan and

20    phase 6?

21     A     This photograph is taken -- that's the view and the

22    angle.

23     Q     Okay.  So for orientation purposes, to the right of

24    where phase 6 was and to the left is -- that's the doughnut

25    building in the upper left corner?

                              634

```
 1    A    It's up here.

 2    Q    Okay.

 3         MR. ELY:  Can we go to RAS009117 with the left

 4    screen, please.

 5    Q    (BY MR. ELY) Can you show us where this photograph --

 6    generally where this photograph would have been taken?

 7    A    Looks like a view of the angle from here looking in that

 8    direction.

 9    Q    Okay.  And is the -- this taken in front of the doughnut

10    building there?

11    A    Yes.  This is on 7th Avenue.

12    Q    Okay.

13    A    That's quint 22 right there.

14    Q    And is -- can you describe for us what you gleaned from

15    this photograph in terms of the activity of the plume and the

16    smoke at this stage of the fire?

17    A    It's fairly clear the plume is still going up, and there

18    is clear space between the building and the fire plume.  So

19    there's no smoke moving out laterally attacking building --

20    the doughnut building.  It's all being drawn into the massive

21    column created by the fire.

22         MR. ELY:  Can we go to RAS009109, please, on the

23    left side.

24    Q    (BY MR. ELY) Okay.  Dr. Schroeder, can you tell us where

25    this photograph was taken in relation to the Metropolitan?
```

635

1    A    It's taken from across from right about here looking.

2    Here's the southeastern corner of the Metropolitan.

3    Q    Okay.

4    A    You can see the nextdoor building and obviously the

5    fire.  And, again, you get a clear space between where the

6    smoke is and the building.

7         MR. ELY:  Can we go to RAS105980 on the left,

8    please.

9    Q    (BY MR. ELY) Okay.  Dr. Schroeder, can you point to us

10   on the map where this would have been taken?

11   A    I believe it's in this area right here.

12   Q    Okay.  And same thing with the smoke which you've

13   already said?

14   A    Yeah.

15   Q    Okay.  One last photograph, RAS009120 on the left,

16   please.

17   A    Oh, that's looking towards building 6.  Here you see

18   building 5.  You see the tower, the elevator tower for

19   building 6, and you see the adjoining building, and back here

20   is phase 3, the doughnut building.

21   Q    Okay.  So now we've seen the video, the photographs of

22   the fire.  So let's talk a little bit, if we can, about the --

23   what you were able to determine about the airflow.

24         MR. ELY:  Can we go to RAS334783, please, on the

25   left.

                           636

```
 1    Q     (BY MR. ELY) Dr. Schroeder, tell us what we're looking

 2    at, and also give us a vantage point from where this diagram

 3    is looking.

 4    A     Sure.  Let me create an arrow pointing in that

 5    direction.  I'm just not getting this done very well today.

 6              So we're looking from the east to the space between

 7    building 5 on the right and building 6 on the left, and the

 8    big tell for this is the bridge between 5 and 6.  You can see

 9    that here too.

10              And back into the drawing, back into the diagram is

11    the doughnut building, phase 3.

12    Q     So is this phase 5 on the right?

13    A     It is.

14    Q     Phase 6 on the left?

15    A     Yes.

16    Q     Can you describe for us -- with respect to phase 5, can

17    you describe for us the airflow patterns with regard to phase

18    5?

19    A     Well, the airflow is going to be coming around phase 5.

20    Q     Okay.

21    A     The windows were intact, at least during the early

22    stages of the fire, and the -- so that's not really a

23    contributor because there's no -- there's no supply air.

24    You've got a closed volume.  So it's really the air moving

25    around phase 5 and being drawn in.
```
                                637

1  Q    Okay.  What happens when the windows are out?  Does

2  air -- is air pulled out of phase 5 in the fire?

3  A    If you don't have anything on the other side to supply

4  air that's being pulled out, it will probably be pretty

5  stagnant in there.

6  Q    Okay.  Let's go to RAS106001 on the left, please.

7  A    There we are watching the firefighters.  And, again,

8  you've got a clear view down the alleyway towards phase 3

9  building.  And there's the parking garage.

10  Q    So at this stage, is air being driven into phase 5 or

11  the opposite direction?

12  A    No.  Air is being drawn into 6.  It is not being driven

13  into phase 5 or any of the other Metropolitan buildings.

14         MR. ELY:  So let's go to RAS105689.  I want to move

15  to the parking deck.

16  Q    (BY MR. ELY) So tell us what this is, please, this photo

17  is.

18  A    So on the right side here is phase 4, and that's -- that

19  is the southern wall of phase 4 that runs parallel to the

20  parking ramp.

21  Q    Can you show us on the map where that is?

22  A    Sure.  Right here, right in that area.

23  Q    Okay.

24         MR. ELY:  So can you go to RAS376694.

25  A    So this is the fire.  Air is being -- as I said, this

                                638

massive column of fire wants air, and so it will be pulling it

from anywhere.

     The 10-foot space between the parking garage and

phase 4 provides a nice avenue of air to get moved in because

the -- you've got openings in the parking garages.  It's

not -- the walls are not continuous.

     So you can see in the parking garage, and that

allowed for the fire, the body of the fire to be pulling air

from between building 4 and the parking garage through the

parking garage and feeding the fire.

     And that's what this diagram shows, the airflow that

I would expect that plume would be drawing through.

Q    Okay.

     MR. ELY:  Can we go to RAS105534.

Q    (BY MR. ELY) Can you tell us, first of all, do you know

when this photograph was taken and by whom?

A    Yeah.  It was taken on the 2nd of October by a fire

investigator for Veritas.

Q    Okay.  And can you show us on the map where this

location is?

A    Sure.  Where that red dot is.

Q    Okay.  And is there anything -- tell us what you're

seeing with regard to the parking deck or any impacts of the

fire that you can see.  Is there anything you can take from

this photograph?

639

```
 1   A    I'm seeing soot accumulation on the face of the parking

 2   wall.  There's certainly not soot accumulation on the window.

 3   This is the window in the elevator lobby when you're looking

 4   out.  Nothing's going on there.

 5          You can see building 6 back here and its remains.

 6   Nothing remarkable is happening here.

 7   Q    Is this photograph consistent with your opinion that the

 8   airflow on the night of the fire was flowing actually away

 9   from the other areas of the Metropolitan into the fire?

10   A    Yes.

11          MR. ELY:  Can we go to RAS105472, please.

12   Q    (BY MR. ELY) So tell us the vantage point of this.

13   There's the bridge again?

14   A    Sure.  We kind of saw this during the fire photographs

15   where the firefighters had the lines out and were spraying the

16   hose streams out.  So we are looking again through the alley

17   towards phase 3.  The phase 3 exterior wall is back here.

18   Right behind that green box is the entryway into phase 3.

19   It's a double steel door entryway.  And there's a canopy on

20   top of it.

21          And directly above that are windows in the elevator

22   lobby.  The photograph we previously saw I believe came out of

23   the third floor elevator lobby looking through that window.

24   Q    And that -- the green thing where you have that dot on

25   the right side, what is that?
```
                              640

```
 1    A    Oh, that's an electrical transformer.

 2    Q    Was -- based on the information you saw, was that

 3    damaged in any way by the fire?

 4    A    No.  No, it was not.

 5    Q    And with respect to the visual of the eastern face of

 6    phase 3 -- and, again, the doughnut building, this would have

 7    been the wall of the doughnut building closest to the fire,

 8    correct?

 9    A    Yes.

10    Q    Can you draw on the map where that wall was?

11    A    (Witness complied.)

12    Q    Okay.  And based on this photograph and your review of

13    the documents, were you able to find any visual evidence of

14    smoke impact on that exterior wall?

15    A    No.  There's a couple other things I've seen in the

16    photograph, if I may.

17    Q    Sure.

18    A    Building 5, these are windows into building 5 on its

19    east side.  They're intact.  They're not broken out.  They're

20    not busted by hose streams.  They're intact.  They're not

21    broken by fire.

22         And then the dumpster, that's not impacted by fire

23    either.  That's not -- you don't see the discoloration of the

24    paint.  You don't see it oxidized.  It was fine.  It was

25    happy.
```

641

```
 1   Q    Okay.  Let's go to -- so based upon this photograph and

 2   what we can see from the doughnut building and the other

 3   areas, is this consistent with your understanding -- your

 4   opinion that the airflow during the time of the fire was away

 5   from the buildings into the fire?

 6   A    Yes.

 7         MR. ELY:  Let's go to RAS109560.

 8   Q    (BY MR. ELY) Tell us what we're looking at here.  Is

 9   this a photograph you took?

10   A    We're on the fourth floor of phase 5 looking at the

11   bridge going to phase 6.  We've seen a lot of shots from the

12   outside looking in.  The bridge is going across.  Now we're in

13   5 looking into 6, looking towards 6.

14   Q    Can you show us on the map where this photograph was

15   taken?

16   A    Right there.

17   Q    Okay.  And tell us what your observations are of this

18   photograph.

19   A    Sure.  If we look at the wood and the steels.  We have

20   oriented strand board here, 2 x 4 studs and 2 x 6 studs.  We

21   have steel truss plates here and trusses, and none of it's

22   charred.  None of it's sooted.  None of it's showing any signs

23   of heating.

24         And if hot air, hot gasses would find their way into

25   that area, you would see that.  You would see the wood start
```
                              642

```
 1   to discolor.  You would see, depending on the duration of
 2   heating, char start to form.
 3          And with the steel, this light steel also starts to
 4   lose its strength if it's being subjected to heating.
 5          We don't see any of that.
 6   Q    Again, is this photograph consistent with what you
 7   found, that air was being pulled away from the other
 8   structures into the fire?
 9   A    Yes.  It was not -- fire was not being -- finding its
10   way into the space.
11   Q    Okay.
12          MR. ELY:  So let's look at RAS376696.  Full screen,
13   please.
14   Q    (BY MR. ELY) So tell us what we're looking at here,
15   Dr. Schroeder.
16   A    This is kind of a viewing angle if we were in a drone
17   looking down from 7th Avenue on the complex.  So you've got
18   the two buildings in between.  You have the doughnut building
19   here, 6, 5, and the garage.
20   Q    Can you show us the directional airflow from each of
21   those other areas of the Metropolitan during the fire?
22   A    Sure.  Drawn in, drawn in, drawn this way, drawn that
23   way.  Obviously this way and this way, all being drawn into
24   this column.
25   Q    So based upon your review of the video, your review of
```
                                 643

Case 4:20-cv-00095-FJG   Document 245   Filed 09/05/23   Page 32 of 224

1    the documents and the many photographs and your experience

2    over 50 years of investigating fires, were you able to arrive

3    at an opinion to a reasonable degree of scientific certainty

4    as to whether the smoke from the phase 6 fire impacted the

5    other areas of the Metropolitan?

6    A    I have.

7    Q    What is that opinion?

8    A    It did not.

9    Q    Okay.  Now, I want to shift gears with you quickly to

10   the -- there have been claims here for water damage to the

11   doughnut building and other areas of the Metropolitan.  So I

12   want to shift gears to that for a minute, and I want to go to

13   RAS376725, please.

14        So can you tell us, Dr. Schroeder, what we're

15   looking at here?

16   A    Sure.  This is a setup of where the engines and the

17   ladder trucks were positioned as they were fighting the fire.

18   There's quint 22, which I've talked about quite a bit.  Truck

19   2 or ladder 2 back here.

20        And I noted here, I'm circling, video.  The position

21   the video was shot from was actually a little further north,

22   but this is a witness to the fire, a civilian, if you will,

23   that has come upon it and is now doing a YouTube video.

24   Q    Before I leave this, I want to -- I do want to ask you

25   this question.

                              644

```
 1              With respect to this diagram, did you review the

 2     Birmingham fire records, the videos, and the photographs to

 3     determine where the Birmingham Fire Department directed its

 4     water streams?

 5      A    I sure did.

 6      Q    Did you find any indication anywhere that the Birmingham

 7     Fire Department directed water streams to any part of the

 8     doughnut building or phase 4?

 9      A    No, they did not.

10      Q    Other than the photograph we saw of phase 5 in between

11     phase 6 with the bridge, were there any information or

12     photographs or records that you saw that indicated that fire

13     streams had been directed to any other part of the

14     Metropolitan other than that south phase of phase 5?

15      A    No, no.

16      Q    So let's go to RAS009127.  I believe it's the video that

17     the jury has seen before.  It's the YouTube video of the fire.

18              The purposes of this I want to talk about

19     specifically as we go through this, I'd like to -- I'd like

20     for you to describe for us what you're seeing in terms of the

21     embers.

22              Can you, first of all, tell us what -- you call it

23     something different.

24      A    Brands.

25      Q    Tell us what that is.
                                  645
```

```
 1   A    So as the wood is burning, it's breaking down, and

 2   chunks of it will start to fall apart.  Some of those chunks

 3   may still have unburned wood and have a fuel value left in

 4   them.  And those burning brands will be lofted up by the plume

 5   and ultimately drop out.

 6          So brand burning is a big deal in wild land fire

 7   right now.  It's a massive deal in California, huge, because

 8   the fires are occurring.  They're picking up houses.  The

 9   houses have this additional fuel package and start to break

10   up, and brands are now spreading the fire away from and

11   forward from the frontline.

12          So it's jumping because of brand burning.  You'll

13   get brand burning in -- primarily where you've got a structure

14   that's fully evolved and now you've got -- there's no roof.

15   It's just burning like a big campfire, which we had here.

16   Q    So as part of your work on this project, you made an

17   analysis of where the fire brands impacted the Metropolitan?

18   A    Yes.

19          MR. ELY:  So let's roll this video.  We can do it

20   the same way, Chris.

21   A    So can we stop for just a second, please?

22          Just -- I'd like you to know more details.

23          This is building 5, and the ladder truck is back in

24   here, ladder 2.  We have an intersection.  We have a

25   firefighter there.  And, in fact, you can see the hose that
```
                                  646

```
1    the firefighter is dragging over to hit the hydrant there.

2    You look closely, you'll see the hydrant, you see the fire

3    helmet down.  He's bending down to make that connection.

4           The building is not yet collapsed.  So this is the

5    plume.  This is the massive column of fire.  And even as the

6    plume is going up, it's still drawing in air.

7           Okay.  Sorry about that.

8    Q    (BY MR. ELY) That's all right.

9    A    Clear.  Okay, stop.

10          These are brands.  These are burning brands you see

11   coming to -- towards the photographer.  And the photographer

12   is north and east of the building; north and east of building

13   6.

14          You don't see any of that -- of those glowing embers

15   over in this region.

16   Q    Okay.  So what we were looking at -- so, Dr. Schroeder,

17   can you draw where the video is being taken from?  Just put a

18   dot.

19   A    Back here.

20   Q    Okay.  And where are we -- with the video still, we have

21   the right corner.  Can you tell us where those brands are in

22   relation to the Metropolitan?

23   A    They're over in here.

24   Q    Okay.  And the area you pointed to over the doughnut

25   building, that's the area that's clear?
```
647

```
 1    A    Yes.

 2    Q    Okay.

 3         MR. ELY:  Can you pull 185 out, please?

 4    A    I don't want that to suggest there were no brands

 5    hitting on the doughnut building because this area closest to

 6    the fire sure got brands.  It did get brands from the fire.

 7    So I don't want to leave you with the impression that there

 8    was no brand dispersal on building 5.  There was.

 9    Q    (BY MR. ELY) Right.  Okay.  So let's keep rolling with

10    it.

11    A    See the point down.  All that falling down are burning

12    brands.  The glowing little -- not so small.  The glowing

13    things coming down are brands.  You see the air being drawn

14    here, brands falling out of the column.  Just hit over there.

15         Can we back up for just a second, please?

16         Watch the brand that comes down and hits the ground

17    and kind of bursts.  Here it comes.  Boom.  That was a

18    good-sized brand.  So you -- but this is all moving to the

19    northeast.

20         Ladder 2 is moving.  You see the truck backing up

21    there?

22    Q    And just for reference, when you say it's moving to the

23    north and east, north and east is the directions away from the

24    other areas --

25    A    Oh, yes.  Yeah, yeah, yeah.  Yes, it is.  And here's
```

```
 1   where -- there's a brand that flew and hit right next to the

 2   videographer.

 3             MR. ELY:  Okay.  We can stop that.

 4             Let's go to RAS376670, please.

 5   Q    (BY MR. ELY) So, Doctor, tell us what we're looking at

 6   here.

 7   A    The remains of building 6 is there.  Obviously this is

 8   the doughnut building here.  Building 5 is here.

 9             The coloration, the darker gray, the lighter gray

10   represents where there was the darker, more brand markings

11   found in the roof material.  Lighter is fewer.

12             What I will tell you is as I'm preparing for court,

13   I did see some lesser dispersal of brands in this white area

14   of 5.

15             So building 5 definitely got nailed by fire brands.

16             MR. ELY:  Okay.  Let's take a look at RAS357.  If we

17   could split the screen out with this, 376670.

18   Q    (BY MR. ELY) So, Dr. Schroeder, tell us, do you

19   recognize this photograph?

20   A    I do.

21   Q    Do you know who took this photograph?

22   A    It was at J.S. Held, I believe, on the 18th of October.

23   Q    So this was taken October 18, 2018?

24   A    Yes.  Just days after the fire.

25   Q    Okay.  So tell me what I'm looking at here.
```
                                649

1   A     Sure.  This is the roof of building 5, and somebody has
          2   obviously gone up there and said, Oh, we've got holes.  We
          3   need to patch.
          4           So they're using this black zip system tape.  When
          5   they're constructing the building and putting up walls, they
          6   put this black barrier tape that won't allow moisture to go
          7   through between the exterior oriented strand board walls.
          8           So they're -- somebody is on the site, gone up and
          9   said, Okay, these holes will let water in; let us quick patch
         10   it in the interim until we get a new roof up here.
         11           They were also up there doing larger patches because
         12   I can see this -- that wool or partially looking wool
         13   material, that's roofing material.  That's thermal polyolefin,
         14   TPO.  And so somebody was up there with the pieces of TPO
         15   covering larger holes that had been created by the fire.
         16   Q     Can you show us on the diagram on the right where this
         17   location is, please?
         18   A     I think it's right in this area here.
         19   Q     Okay.
         20           MR. ELY:  On the left, can we go to RAS357257?
         21   Okay.
         22   A     Yeah.  There you see -- you're seeing more brand holes
         23   that did not get covered.
         24   Q     (BY MR. ELY) Do -- so with respect to -- and I've seen
         25   some of -- we can see some of the brands here.  Again, can you

                                    650

                          Gayle M. Wambolt, CCR No. 462
                            Registered Merit Reporter

```
 1   show me a location, if you're able to, as to where this

 2   photograph's taken?

 3   A    I think this is over in this area.

 4   Q    Okay.  So with respect to these brands we're seeing on

 5   the left, they're not covered with that zip tape?

 6   A    Right.

 7   Q    Can you explain why some of these might have been

 8   covered, some of these wouldn't be covered?

 9   A    Sure.  So if I may talk a little bit about the roofing

10   material, the TPO, the thermal polyolefin.  That's plastic,

11   and it's a plastic that can be --

12            MR. ABRAMS:  Your Honor, can I approach?

13            (Counsel approached the bench and the following

14   proceedings were had:)

15            MR. ABRAMS:  Your Honor, this is not in his report.

16            MR. ELY:  It's fine.  That's fine.  I'll move on.

17        (The proceedings returned to open court.)

18            MR. ELY:  So let's go to RAS357275.

19   Q    (BY MR. ELY) Tell me what I'm looking at here, please.

20   A    So we're on building 5 up in this area.

21   Q    What direction am I looking?

22   A    We're looking to the west.  The parking garage is here.

23   Building 4 is here.

24   Q    Again, these -- was this photo taken in October 2018?

25   A    Yes.
```

651

Case 4:20-cv-00095-FJG   Document 245   Filed 09/05/23   Page 40 of 224

```
 1   Q    Okay.

 2   A    As I was saying to you all earlier, in preparing, I did

 3   see some other spots on building 5 where brands had hit, but

 4   the dispersal was far less than what we saw in the shaded

 5   areas.

 6   Q    Okay.  And is this -- what's depicted in this

 7   photograph, is this also depicted in the diagram on the right

 8   in that white area?

 9   A    Yes.

10   Q    And the white area is -- based on your opinion, there

11   was no impact from the fire brands in those areas?

12   A    Correct.  In fact, you don't even see any tape.  No

13   black tape.

14        MR. ELY:  Can we go to RAS357284 on the left.

15   Q    (BY MR. ELY) Okay.  And is this in the same location

16   looking at the phase 4 roof?

17   A    Correct.  You're looking in that direction, parking

18   garage on the left, phase 4 roof in the center.

19   Q    That's consistent with your determination in this

20   diagram that there are no brands in that area?

21   A    Correct.

22   Q    Okay.

23        MR. ELY:  Go to 357296.

24   A    Just -- again, to be precise, there's no brands showing

25   on phase 4 in the foreground of that photograph.  As I pointed
```

<div align="center">652</div>

```
 1   out before, there's a few spots.

 2    Q    Right.

 3          MR. ELY:  So let's go on to 357307.

 4    Q    (BY MR. ELY) Tell me what I'm seeing here, please.

 5    A    Sure.  We're in this region of building 5, and there's

 6   patches and there's no patches.  And then I talked to you

 7   earlier about something was up there.  I pointed out -- in

 8   fact, here's the roll of TPO right back there that someone had

 9   gone up and made a big patch.  And that's the big patch right

10   there.  That was after the fire.

11    Q    Okay.

12          MR. ELY:  Let's show 357309, please.

13    A    Now, in fact, when the photograph was taken, here's the

14   adhesive and the applicator used.  You can see the adhesive

15   here and here.

16          By the way, this is the bridge to building 6.

17    Q    (BY MR. ELY) Can you show us on the map where this is

18   located?

19    A    Sure.  Right about there.

20    Q    Okay.  So with respect to phase 5, these photographs are

21   indicative of the damage that occurred from the embers to that

22   section of the TPO membrane; is that correct?

23    A    Yes.

24    Q    That's reflected in your diagram of the dark shaded

25   area, the grayer shaded area in RAS376670?
```

<div align="center">653</div>

```
 1   A    Yes.

 2   Q    Okay.  Now, let's take a look at RAS116295 on the left

 3   screen, please.

 4             Dr. Schroeder, do you recognize this photograph?

 5   A    Sure.  It's the doughnut building.

 6   Q    Do you know when this was taken?

 7   A    I think this photograph was taken in December.

 8   Q    Of what year?

 9   A    Of -- December of 2018.

10   Q    Do you know the source of this photograph?

11   A    ATC.  They did a survey of the property.

12   Q    Okay.  Can you show us on the right diagram what area of

13   the doughnut building roof this picture depicts?

14   A    That area.

15   Q    And based on -- is it your opinion that there's no ember

16   or brand damage in that section of the roof as of December of

17   2018?

18   A    That's correct.  I see nothing, no signs of it.

19             MR. ELY:  Let's go to RAS116297 on the left, please.

20   Q    (BY MR. ELY) Again, do you recognize this photo?

21   A    I do.

22   Q    Do you know when this photograph was taken?

23   A    Same group, December 18th of 2018.

24   Q    Can you show us on the diagram to the -- on the right

25   where -- what this is depicting?
```

654

```
 1    A    They're moving across the doughnut building on the north

 2   end.

 3    Q    Okay.  What section is in the -- on that left side?  Is

 4   there a section of the doughnut building we can see from there

 5   as well to some degree?

 6    A    I just marked on the diagram.

 7    Q    Okay.  So, again, this photograph you reviewed, is this

 8   consistent with your opinion that there was no ember or fire

 9   brand damage from the phase 6 fire on the doughnut building

10   roof?

11    A    It is.

12         MR. ELY:  Can we go to RAS116303.

13    Q    (BY MR. ELY) Can you show me where this is located on

14   the Metropolitan, this photograph?

15    A    Back in this area.

16    Q    Again, is this a photograph from December of 2018 from

17   ATC?

18    A    Yes.

19         MR. ABRAMS:  Counsel, what date did you say?

20         MR. ELY:  December of 2018.

21    A    Yes.  I'm sorry.  I'm trying to get precise location for

22   you.

23    Q    (BY MR. ELY) Okay.  That's fine.  So this is the back

24   corner of the phase 4 roof in December of 2018?

25    A    Yes.
```

655

```
 1    Q    Again, was this consistent with your conclusion that the
 2    ember -- there was no ember or brand damage from the phase 6
 3    fire on the phase 4 roof?
 4    A    It is.  It is consistent with that.
 5    Q    So based upon your review of the photographs, the
 6    information you were provided and your experience -- and the
 7    video and your experience as a fire investigator, were you
 8    able to come to an opinion within a reasonable degree of
 9    certainty, scientific certainty, as to whether embers or
10    brands from the phase 6 fire impacted the doughnut building
11    roof or the phase 4 roof?
12    A    I do have an opinion.
13    Q    What is that opinion?
14    A    Brands did not impact -- fire brands did not impact
15    those roof areas of phases 3 and 4.
16              MR. ELY:  Your Honor, we've been going a little
17    while.  I'm at a breaking point if you would like.  I can keep
18    going.
19              THE COURT:  Let's go for another 15 minutes.
20              MR. ELY:  Yes, sir.
21    Q    (BY MR. ELY) So I want to shift gears a little bit with
22    you, and I want to --
23              MR. ELY:  If we could pull up RAS335050 on the left
24    side and Defendant's 185 on the right, please.
25    Q    (BY MR. ELY) Okay.  Dr. Schroeder, can you tell us,
                              656
```

```
 1   first of all, where did this photograph come from?

 2    A    I took it.

 3    Q    Can you show us on the -- what does it depict on the

 4   left?

 5    A    Well, this is the eastern wall, eastern exterior wall of

 6   the doughnut building.  The wall closest to the fire.

 7    Q    Can you draw for us on that diagram where this wall is?

 8    A    Sure.

 9    Q    Where this wall is, are we -- we're looking back towards

10   the parking garage, correct?

11    A    We are.

12    Q    Okay.  So tell me what we see in terms of air vents and

13   airflow or air vents on this particular wall.

14    A    Sure.  I will do my best.

15             And there's more down here.

16             These are -- what I've circled are intake vents for

17   the corridor HVAC system.  The corridor has its own heating

18   and air conditioning systems, and these vents bring in makeup

19   air.  So it's dedicated just to feed air, fresh air to the

20   corridors.

21    Q    Okay.  And so as part of your analysis, you reviewed the

22   systems within the doughnut building and the complex as a

23   whole; systems meaning the HVAC systems, correct?

24    A    Yes.

25    Q    And so is -- and you mentioned that these intake vents
```

<div align="center">657</div>

1    service the corridor HVAC system?

2    A    That's correct.

3    Q    Is there another -- are there other HVAC systems within

4    the Metropolitan, the doughnut building?

5    A    Oh, absolutely.

6    Q    So setting aside the corridor system, what other HVAC

7    systems are there in the Metropolitan?

8    A    The lobby space, the common area, the workout space,

9    they have their own HVAC systems, their own heating and

10   cooling systems.  Each apartment has its own individual

11   heating and cooling system as well.  So we've got however many

12   apartments with their own individual heating and cooling

13   systems, and then the common space and then the corridors.

14   Q    So with respect to the individual systems -- and each

15   unit has its own self-contained HVAC system, correct?

16   A    Yes, it does.

17   Q    Is there any airflow from the outside into those

18   individual apartment HVAC systems?

19   A    There are no intake ducts like this to serve the

20   individual HVAC system.  There's --

21   Q    It doesn't --

22   A    There's no outside makeup air that is being dedicated to

23   each unit.

24   Q    So let's go to -- Dr. Schroeder, down on the bottom of

25   the wall, can you identify those for me, what those things

658

```
 1   are?

 2    A    You mean down here?

 3    Q    Yes, sir.

 4    A    I'm kind of doing a box around them.

 5         There are three pass-through ducts.  A pass-through

 6   duct is -- there's no blower.  There's no -- it's just like a

 7   tunnel.

 8         And pass-through ducts are to get fresh air into the

 9   courtyard of the center of the doughnut, and that's their only

10   purpose.  Another avenue is so you don't get stagnant air

11   within that courtyard doughnut area.

12    Q    Okay.  So I want to take the individual systems first.

13         MR. ELY:  Can we pull up RAS007443?  Okay.  So we

14   can take the right side down, please, Chris.

15    Q    (BY MR. ELY) So let's talk about the individual

16   apartment HVAC systems.  Is this -- as I understand your

17   testimony, the -- there's no external inflow from the outside

18   in?

19    A    That's correct.

20    Q    It's simply a recirculation of the interior air?

21    A    Yes.  And it expects that there will be some leakage

22   around the windows and movement in and out of the apartment to

23   refreshen it, but there's no dedicated fresh air.

24    Q    So if we're talking about smoke infiltration then, where

25   is -- where are pathways into the individual units of -- smoke
                              659
```

1    from an external fire?

2    A    It would either have to come through an open window or

3    through the door opening to the corridor.

4    Q    Okay.  Can you tell us what, based on the blueprints and

5    plans, you were able to determine about the doors to the

6    corridors from the individual units?  That would just be the

7    front door of the apartment?

8    A    Yes.

9    Q    Okay.

10   A    So the corridors have got to be safe.  They've got to be

11   fire safe.  If you've got a fire in one unit, you don't want

12   that spreading into the corridor and around.  Or if you've got

13   a fire elsewhere, you don't want the people in the adjoining

14   spaces to be at risk.

15          So the fire code, the building code requires what's

16   called a fire-rated door to be used from the corridor into the

17   individual apartment.  And that fire-rated door has been

18   tested, and it's there to create a barrier from fire moving in

19   and smoke moving in.

20   Q    Okay.

21          MR. ELY:  Can we go to RAS024942, please.

22   Q    (BY MR. ELY) Is that an example of a door you're talking

23   about?

24   A    It is.  I'll just point out a couple of things.

25          There's the threshold.  There is a sweep on the
                                 660

1  lower, and if we look close, there are -- appears to be a seal

2  around the inside of the frame, so you get the sides of the

3  door and the bottom sealed up.  And that's a barrier from

4  smoke moving into that space.

5  Q    Is that part of the design of the apartment to prevent

6  that infiltration?

7  A    Oh, yes.

8  Q    Okay.

9  A    That's part of the fire door assembly.

10 Q    Okay.  So -- and with respect to the interior

11 apartments, the apartments themselves, this was a fire that

12 was external; meaning, away from the other parts of the

13 Metropolitan, outside the four walls, correct?

14 A    Right.  It was not in front of the building, that's

15 correct.

16 Q    Is there a difference in terms of the movement of smoke

17 into rooms from a fire inside the building versus an external

18 fire outside the building?

19 A    Oh, absolutely.

20 Q    Can you tell us how an internal fire acts in terms of

21 pushing smoke around inside a building when the fire is in the

22 building?

23 A    Sure.  If the fire is on the outside, campfire, all the

24 pressure, all the heat that's being generated is lost to

25 atmosphere.  So there's no containment of it.  And so there's
                          661

```
 1   no pressure being built up by the fire because it's just being

 2   released in the atmosphere.

 3           We take the same fire and we put it inside of a

 4   building.  We put it inside this courtroom.  We've got walls

 5   and ceilings and doors creating what -- technically we call

 6   that a control volume.  Well, for today, it's a room.

 7           If we have a fire in this room, the smoke and hot

 8   gasses will rise up and start to change the temperature of the

 9   room.  But because the volume, the space itself doesn't

10   change, with the change in temperature, creates a change in

11   pressure.  So we're actually pressurizing this room if we had

12   a fire in it, and that pressurization wants to find avenues of

13   release.  So it will go through doors.  It will go through

14   ductwork.  Like water, it will find its way out, and that's

15   the dramatic difference.

16           We don't have the pressurization occurring within a

17   building when the fire is external.  No heating of the

18   interior, no pressure change.

19   Q    Okay.  And so is it your opinion that -- strike that.

20           With respect to these individual apartment

21   complexes, if there was infiltration from the common spaces

22   into the apartment or from the external windows into the

23   apartment, would that leave a trail?

24   A    Yes.  Smoke does leave a trail from where it's the

25   densest, and it diminishes as it's moving into a space, out of
```
                                    662

```
 1   a space.

 2   Q     Where would you see those trails in -- if it comes from

 3   the -- let's start with the interior space.  From a hallway

 4   into an apartment, where are you going to find those trails?

 5   A     With the greatest density -- the greatest smoke

 6   concentration should be right around the openings where the

 7   smoke is being pressurized and pushed into that space.

 8   Q     Okay.  And if it's coming from the outside, where would

 9   you find that?

10   A     When you say "outside," are you talking external?

11   Q     External to the building.

12   A     You're not going to find that.

13   Q     Okay.  So with respect to a smoke infiltration event,

14   why is there a smoke infiltration event into the apartments?

15   What would you expect to see throughout the building?

16   A     I would expect to see a lot of signs of soot and smoke

17   accumulation, darkening, especially where it's being -- coming

18   into the space around the doorframe if the doorframe is not

19   sealed.  If it's coming in through windows, smoke will

20   condense out, literally cause a film on the window on the

21   inside.  And if it's in the HVAC system -- and, again, these

22   are individual units.

23          So if you've got smoke coming into one individual

24   unit, I would expect it to show up on the diffusers or even in

25   the corridor.  I would expect smoke staining, discoloration,
                                663
```

1    blackening to be shown in the diffusers.

2    Q    Okay.  And based on your review of, I guess, tens of

3    thousands of photographs in this case, did you see any

4    evidence of those signs of a widespread smoke infiltration

5    event in the interior spaces?

6    A    No, I did not.

7    Q    And is that something -- based on your experience over

8    2,500 to 3,000 fires, is that something you would expect to be

9    fairly obvious when tenants move back in after the fire?

10   A    Oh, yes.

11   Q    Okay.

12            THE COURT:  This will probably be a good time for a

13   break.

14            MR. ELY:  Absolutely.  Thank you, Your Honor.

15            THE COURT:  We'll take a break at this point in

16   time.  Again, I'll ask you not to discuss the case among

17   yourselves or with others in any form or fashion as outlined

18   in my instruction.  We'll take about 15 minutes and break at

19   this time.

20                 (A recess was taken.)

21            (The following proceedings were had in the presence

22   of the jury:)

23   DIRECT EXAMINATION (continued) BY MR. ELY:

24   Q    Dr. Schroeder, when we left off, we had talked about

25   individual HVAC systems.  I want to move off of that, and I
                                  664

1    want to, if I could, take a look at still 514.

2            Okay.  Can you tell us what that is?

3    A    Sure.  That's the courtyard side of the pass-through,

4    that passive duct with no blower that brings fresh air into

5    the -- inside of the doughnut area.

6            MR. ELY:  Can you split screen with Defendant's

7    Exhibit 185, please.

8    Q    (BY MR. ELY) Can you show us an arrow where -- or lines

9    to explain where that -- the pass-through delivers air back

10   and forth?

11   A    There are three of them.  One goes through 26, one goes

12   through 25, one goes through 24.

13   Q    Okay.  Now, I believe earlier in your testimony we were

14   talking about the stage of the fire where it was essentially

15   being put out and the smoke was low to the ground.  I think

16   you mentioned drift.

17   A    Yes.

18   Q    Okay.  Is it possible that at that low stage that you

19   get some drift into these pass-throughs?

20   A    Sure.

21   Q    And is it also possible that at this drift stage, if

22   there's openings, you may have some smoke from the phase 6

23   fire drifting in?

24   A    Yes.

25   Q    As an example, at the end of the fire during the drift

                              665

```
 1  phase, I'll call it, phase 5 had been opened up because of the

 2  windows?

 3   A    Correct.

 4   Q    And would you expect to see some -- potentially some

 5  drift of the smoke into phase 5?

 6   A    Yes.

 7   Q    And by virtue of that, if combustion byproducts were

 8  found, some in phase 5, that wouldn't -- that was consistent

 9  with your opinion; that wouldn't surprise you?

10   A    No.  I would expect that.

11   Q    Now, with respect to these pass-throughs, can you

12  describe how they're put together like --

13   A    Sure.  I'm the grandson of a sheet metal worker.  So

14  they would have a mechanical -- either an interlocking between

15  the duct system.  So this is sheet metal ducts that are put

16  together.  You're not going to have one that's 30 feet long.

17  So you have to put it together in sections, but that is going

18  to be a mechanical-fastened section.  It just doesn't -- they

19  just don't butt them up.  And so the sections can flop around.

20   Q    Okay.  And so is it -- I mean, is it theoretically

21  possible that if smoke in the drift phase got into those

22  ducts, that they could infiltrate some area of the doughnut

23  building?

24   A    I really doubt that under no pressure, I wouldn't expect

25  to see smoke finding its way through that mechanical joint.
                             666
```

```
 1   Q    Okay.  And so -- you mentioned pressure.  Is that an
 2   element that you're looking for in terms of determining where
 3   the smoke is going?
 4   A    Yes.
 5   Q    Kind of the driving force?
 6   A    Yes.
 7   Q    So at this drift phase with either the pass-throughs or
 8   into phase 5, there's no driving force?
 9   A    No.
10   Q    And so is it your opinion that any infiltration into
11   either phase 5 or through the pass-throughs would have been
12   minimal?
13   A    Yes.
14   Q    Okay.  So the last thing I want to talk about with
15   regard to air systems in the doughnut building.
16        MR. ELY:  If we could go to RS010843 on full screen,
17   please.
18   A    Before you leave the photograph --
19   Q    (BY MR. ELY) Yes.
20   A    -- may I point something out?
21   Q    Sure.
22   A    So if we had smoke passing through, volumes of smoke
23   coming out the pass-through, I would expect to see patterns of
24   smoke, condensed smoke both on the ceiling above it as well as
25   the louvers itself.  These are clean.
```

667

```
 1              Now, this was captured off of Mr. Irmiter's video
 2    that he took when he was out at the site looking at things.
 3    Q     Okay.  When was that?
 4    A     No other photographs really captured -- and none of the
 5    4,000, 5,000 photographs taken in October of 2018 looked at
 6    any of that.  Didn't -- it didn't document a condition where
 7    we had smoke issuing out of there.
 8              MR. ELY:  Let's go to RS010843, please.
 9    Q     (BY MR. ELY) So as part of your analysis, you also took
10    a look at the internal construction specifications, correct?
11    A     Yes.
12    Q     And one of the issues that's been raised that you looked
13    at was the existence of fire separation walls in the doughnut
14    building, correct?
15    A     Yes.
16    Q     And did you form an opinion as to whether the fire
17    separation walls had been installed into the doughnut
18    building?
19    A     I have.
20    Q     Okay.  And can you tell me what we're looking at on the
21    screen presently?
22    A     So this is the document that came through the
23    discovery -- it was produced by I believe in this case, it
24    could have been the architect -- where they're getting
25    pressure from the building inspector saying he's both -- the
```
<div align="center">668</div>

building inspector is enforcing a one-hour assembly at both

the interior floor ceiling assembly as well as the ceiling

assembly to the unusable space.

I would use the term interstitial space, but

unusable space is what's above the ceiling, between the

ceiling and the next floor.  And this was constructed with

trusses, so it's an open cavity.

So they want -- the building inspector is going in

and giving a critical eye as early as '17.  And by the way,

there are other documents dating into -- I think it's as late

as June of '18 where the building inspector is still on them

to do a complete job with fire caulking.  So the city of

Birmingham is watching this, looking for flaws.

Q    And in the first paragraph of the problem identification

or question -- let me back up.

What is this document?  It's got Bomasada's name at

the top.  It's got originator, Douglas Altenbern.  What are we

looking at here?

A    Distribution to the architect.  That's an internal

document.

Q    What is Bomasada asking of the architect?

A    Well, it's saying that it's got an RFI number of 90.

But the most important thing is the second sentence that says,

However, this is holding up inspections and a significant

amount of work to proceed.

669

```
 1    Q    When you say RFI, what's that stand for?

 2    A    I don't know what that means.

 3    Q    Okay.  So is this part of what you reviewed to determine

 4   whether the fire separation walls had been installed in the

 5   doughnut building?

 6    A    It is, yes.

 7    Q    And as of the request of September 13th, 2017, at least

 8   what this document says, is that the fire separation wall

 9   issue is holding up inspections and a significant amount of

10   work to proceed?

11    A    Yeah.  It's like a stop work.  The city has said, Hey,

12   you're not going to proceed.

13    Q    Okay.  And in determining whether the fire separation

14   walls had been installed, did you also look at photographs?

15    A    I did.  A lot of photographs.

16         MR. ELY:  Can we go to RS010844.

17    Q    (BY MR. ELY) Can you tell me what we're looking at here?

18    A    Sure.  My recollection is that came out of a group of

19   photographs and communication from the building people to the

20   architect or the architect to the building people saying, This

21   is what we need.  The city is requiring this level of

22   completion.

23         So you see that the orange tube going through,

24   around its space.  You see a foam-like material where it's

25   passing through, that's fire caulking.  They want it taped so
```

<center>670</center>

1    there's no gap where the gypsum wallboard comes up to the

2    underside of the next floor.

3            This is kind of a "This is what we expect"

4    photograph.

5            MR. ELY:  Can we pull up RAS334782?

6    A    By the way, this is not after the fire.

7    Q    (BY MR. ELY) Okay.  This was during construction before

8    the fire?

9    A    Yes.

10   Q    Tell us what we're looking at here.

11   A    So I created or micro created a graphic to better

12   explain to you what these different construction features

13   should look like when completed, and this is based upon the

14   plans that were submitted to the city of Birmingham.

15   Q    Explain to us the significance of the existence of fire

16   separation walls in terms of your analysis of the impact of

17   this fire.

18   A    Well, the fire separation walls compartmentalize spaces,

19   don't allow for commonality between spaces.

20           I was talking about the fire door earlier, the door

21   between your unit and the corridor.  Well, this takes on the

22   same approach, only more stringent.  This has rated

23   assemblies, which have been tested by UL and other

24   organizations and published.  And the architect looks, Okay,

25   we need in this case L546, and that is prescribed on how

                                671

1     you're going to do that.

2            So if we're in the corridor here and we look up, we

3     see the ceiling, and that's part -- that's a fire barrier.

4     Gypsum wallboard is a fire barrier to keep fire from getting

5     into the truss space above.  In this case they also filled the

6     truss spaces with fiberglass insulation, probably so they

7     wouldn't have to sprinkler them, put fire sprinklers in those

8     spaces.

9            Between the corridor interstitial space and the

10    living unit space, the gypsum wallboard has to go all the way

11    up to the underside of the next floor.  So you have an

12    effective barrier from floor to floor, and that's both in the

13    corridor as well as about the perimeter walls of the unit.

14    Not every wall has to go all the way up within the unit; but

15    around the perimeter, it does.

16           So that's all I'm trying to show here.

17    Q    Okay.  So with respect to the fire separation walls,

18    does the presence or absence of the fire separation walls in

19    this building have any impact on whether combustion byproducts

20    can migrate into the living spaces of the apartments?

21    A    Sure.

22    Q    Okay.  Tell me about that.

23    A    I think we were talking earlier about how can you get

24    smoke into spaces.  If you've got a fire in one -- we'll talk

25    about internal fire for a second.

                                 672

```
 1              If you've got a fire in one unit, that fire is not

 2    going to spread to the adjoining units rapidly because this

 3    Sheetrock, gypsum wallboard-rated barrier goes all the way up

 4    to the underside of the ceiling.  So even if we lose some of

 5    the Sheetrock, the gypsum ceiling, because of the fire, it's

 6    still not getting a chance to laterally spread up in this

 7    space.

 8              The same thing holds true with smoke.  It is as much

 9    of a fire containment as it is a smoke containment.  And,

10    again, this is all compartmentalization.  We've learned over a

11    hundred years the importance of compartmentalization in

12    keeping property and people safe.

13    Q    Does the presence or absence of the fire separation

14    walls, based on your investigation in this particular fire,

15    impact your opinion as to whether soot and char from the phase

16    6 fire infiltrated the individual apartment spaces?

17    A    The presence of it tells me by design we're not getting

18    common migration between, let's say, the corridor and the

19    inhabited space, both above in the interstitial space as well

20    as in what's called the inhabited area where we live.

21    Q    And in your review of the materials, it is your opinion

22    that the fire separation walls, there was evidence that the

23    fire separation walls were in place?

24    A    Yes.  I even saw them in building 5 up in the

25    interstitial space while building 5 was still in kind of a raw
```

673

```
 1  state.
 2  Q    I want to shift gears to the last HVAC air system.  I
 3  want to talk about the common area HVAC.  And I want to go
 4  back, if I could to -- real quickly, RAS335050.
 5          My question here is, I think you had circled all
 6  these vents on the side of the east wall of the doughnut
 7  building.  These -- you identified these as exterior -- tell
 8  me what --
 9  A    Makeup air, fresh air.
10  Q    And those service the corridor HVAC systems which are
11  different than the individual apartment systems?
12  A    That is correct.
13  Q    So based on your experience in the number of fires you
14  investigated over the years, if there was a significant or
15  major infiltration of soot and char into an HVAC system,
16  what's the -- what evidence of that would you be seeing?
17  A    I would be looking at the filters, and I would be
18  looking at the diffusers, the vents.
19          MR. ELY:  Can we pull up RAS381865.
20  Q    (BY MR. ELY) So tell me what this photograph is and when
21  it was taken?
22  A    So this photograph was taken in -- I think it was April
23  24th of 2019.  So about six months after the fire.
24          And we're seeing some kind of deposit on the
25  diffusers, and these are the outlets.  This is not where air
```
674

```
 1   is coming in.  This is the discharge from the H -- corridor
 2   HVAC system along the east side of building 3, the doughnut
 3   building, and I'm only on the first floor.  So we've got two
 4   of them.
 5          If you look down in the lower section, it says
 6   hallway 127, 127.  That's the room that it's right behind.
 7   The other one, which we'll see, is probably hallway 123.
 8   Q    RAS381869.
 9          MR. ELY:  Can you split the screen, please.
10   A    That's the other one, 123.
11   Q    (BY MR. ELY) Are these on the same hallway?
12   A    Yes.
13   Q    Okay.  And besides these two photographs, the four I
14   think you called them diffuser vents, have you seen any -- in
15   your review of all the documents and all the photographs in
16   this case, have you seen any other photographs of diffuser
17   vents with discharge of some sort of particulate?
18   A    No, I have not.
19   Q    Did you make a calculation -- did you count the number
20   of diffuser vents in the doughnut building?
21   A    I counted the number of diffuser vents in phases 1
22   through 4.
23   Q    Okay.  How many did you come up with?
24   A    1,077 vents and grilles.
25   Q    So besides these four vents that were taken April 2019,
```

<center>675</center>

```
 1   six months after the fire, did you see any other photographs

 2   of any of the 1,077 vents that had particulate?

 3   A    No.

 4   Q    Based on your experience, over 50 years of investigating

 5   fires, if there was an infiltration, smoke infiltration issue

 6   into an HVAC system, would you be seeing more than four out of

 7   1,077?

 8   A    Yes.

 9   Q    Okay.  Dr. Schroeder, I want to go to -- finally, want

10   to go to what you reviewed to determine the actual state of

11   the interior spaces both the night of the fire and shortly

12   thereafter.

13         MR. ELY:  Let's go to RAS501626.003168, please.

14   Q    (BY MR. ELY) So while he's pulling that up, were you

15   able to review video from the Birmingham Police Department

16   body cam video?

17   A    I did, yes.

18   Q    From the night of the fire?

19   A    Night of the fire.

20   Q    So based on your review of that video, can you describe

21   for us what -- what was Birmingham Police Department doing?

22   A    Going in and notifying the occupants of the phase 3

23   building that there was a fire next door and they needed to

24   leave the building.

25   Q    So did you do the same thing with that video that you
```

<div align="center">676</div>

1  did with the other videos and break it down frame by frame?

2   A    Yes.

3   Q    Okay.  So tell me generally what your observations were

4  of the video footage that you saw.

5   A    So the officers make entry on the 7th Street side.  They

6  go up to the fourth floor first.  And as they're moving around

7  the doughnut building, the fourth floor, they're knocking on

8  doors and getting people alerted that there's a problem next

9  door.

10         There are no alarms going off.  You're not seeing

11  the strobes going off at this point.  My impression is people

12  are answering the door going, Why are you bothering me?  Why

13  are you knocking on my door?

14   Q    Is the -- is your review of that Birmingham Police

15  Department video, what value is it to you in terms of your

16  analysis?

17   A    The corridors are clear.  There's no smoke making entry

18  into the building.  Everybody's walking around.  Nobody is

19  coughing.  Nobody's covering their mouths.  They're -- it's

20  just another day on the fourth floor.

21   Q    And so based on your experience, again, if there was

22  a -- there was smoke infiltration from the phase 6 fire into

23  the doughnut building, what would you expect to be seeing?

24   A    Well, the clear entry points into the doughnut building

25  are these 6-inch or 8-inch -- I think actually 6-inch fresh

677

1  air intakes going to individual HVAC units in the corridor.  I

2  would expect to see the corridor being the first charge, the

3  first place that you would detect smoke if it was being drawn

4  into the building.  And at this point, it's not the case.

5  Q    And what do you mean by charged?

6  A    Oh, when smoke starts filling a space, it charges the

7  space.  The smoke layer builds down, and your obscuration

8  rate, the distance that you can see, reduces, and it just

9  keeps getting worse and worse.

10  Q    And you weren't able to see any of that in the video?

11  A    No, no.

12  Q    How long was the video, Dr. Schroeder?

13  A    15, 20 minutes.  They were more than on four.  They were

14  on three and two.  They were going through the building.

15  Q    Before I get -- before I pull the video up, I do want to

16  go back to something with respect to the HVAC systems in the

17  doughnut building but particularly, the corridor HVAC systems.

18        Did you -- did the blueprints call for smoke alarms

19  to be in that system?

20  A    I believe it did, yes.

21  Q    Okay.  And have you since determined that those smoke

22  alarms were never in the system?

23  A    They were not installed.

24  Q    Okay.  So there was no mechanism in there to shut down

25  the HVAC system due to smoke?

678

```
 1   A    That's correct.  There was no -- in large HVAC systems,
 2   you have a smoke detector.  It detects a problem.  It shuts
 3   that unit off.
 4   Q    Okay.  So with respect to the power to the HVAC system,
 5   I believe you testified earlier the power went off at some
 6   point.  You're not able to pinpoint in time when that
 7   happened, are you?
 8   A    I am not.
 9   Q    But if the HVAC system shut down and the power shut
10   down, there's no additional circulation of anything?
11   A    That's correct.
12   Q    Okay.  So I'm going to ask you to take a look at this
13   first photograph.  Tell me -- I think you've already kind of
14   described what the Birmingham Police Department was doing.
15   Tell me what's happening here.
16   A    Sure.  This is a video grab of a still image where the
17   officer is about to enter the fourth floor.  He's come up the
18   stairs from the ground level and is about to open the door.
19   Q    Okay.  And there's a timestamp up in the top right
20   corner.  Can you tell us what that means?
21   A    Sure.  The police department, they're using -- can I --
22   Zulu time, Greenwich Mean Time, and there's a five-hour
23   difference between Greenwich Mean Time in London and in
24   Birmingham.
25            So Zulu time is 5:45:57; Z, for Zulu.  The actual
```
<div align="center">679</div>

```
 1    time that most of us civilians would say is, Oh, it's 45
 2    minutes after midnight or 0045, as I like to use.
 3    Q    So it's 12:45?
 4    A    12:45.
 5        Q    (By Mr. Ely)
 6            MR. ELY:  All right.  Let's go to the next one,
 7    RAS510626.003591.
 8    Q    (BY MR. ELY) Okay.  This is what we were talking about
 9    earlier.  This is the hallway?
10    A    Yeah.  This is one of the corridors on the fourth floor.
11    Q    Okay.  So at 12:46, what's going on outside with the
12    fire?
13    A    It's burning quite intensely, but it's not close to
14    collapse yet.
15    Q    Okay.  And, again, based on what you said earlier, this
16    is -- in terms of looking for a smoke-filled building, this is
17    not what you would expect?
18    A    Correct.
19            MR. ELY:  Can we go to RAS501626.006999.
20    Q    (BY MR. ELY) Another hall photo shot?
21    A    Right.  This actually is on the west side of the fourth
22    floor.  The reason why I can tell is that this -- the riser,
23    the sprinkler supply pipe here for a hand line for firefighter
24    is only on the west side.
25            MR. ELY:  Okay.  Can we go to RAS501626.007922.
```

680

```
 1   Q    (BY MR. ELY) You had mentioned the tenants.

 2   A    Yeah.

 3   Q    And I think you had -- is this -- this is an indication,

 4   shows the hallway, kind of what's going on in the building

 5   evacuation, correct?

 6   A    Yeah.  There's more than one, than just this man.

 7        MR. ELY:  All right.  So let's go to

 8   RAS501626.008233.

 9   Q    (BY MR. ELY) Another tenant?

10   A    Another tenant.

11   Q    Another hallway?

12   A    Yep.

13        MR. ELY:  RAS501626.008128.

14   Q    (BY MR. ELY) Another hallway?

15   A    Yep.  Fourth floor.

16   Q    RAS501626.008906.

17   A    Police officer walking down a corridor in four.

18   Q    (BY MR. ELY) And the last photo, RAS501626.026997.

19   A    Same thing.

20   Q    Okay.  So what time is indicated on this body cam?

21   A    0059.  So it's 12:59, just before 1:00.

22   Q    So this all took place between 12:45 and one o'clock in

23   the morning, correct?

24   A    On the fourth floor.

25   Q    On the --
                              681
```

```
1   A    They're still in the building after one o'clock.  They
2  move down to the third and then to the second.
3   Q    In terms of the fourth floor evacuating the tenants,
4  this took place 12:45 to one o'clock?
5   A    Yes.
6   Q    What's going on with the fire during that period of
7  time?
8   A    We're moving toward collapse, and I think collapse
9  starts, as we saw earlier this morning, about 1:02, 0102.
10  Q    Okay.  Let's go to -- I want to move to additional
11 photos that talk about the condition of the building shortly
12 after the fire.
13          MR. ELY:  Can we go to RAS105436.
14  Q    (BY MR. ELY) Okay.  This -- you recognize this
15 photograph?
16  A    I do.
17  Q    Do you know who took this photograph?
18  A    It was taken by the Veritas fire investigator on the 2nd
19 of October.
20  Q    So this is within five days of the fire; five, six days?
21  A    Yes.
22          MR. ELY:  Can we go to RAS105513 and place
23 Defendant's 185 to the right, split it.
24  Q    (BY MR. ELY) Do you know the source of this photograph
25 on the left?
```

682

```
 1    A    I think it's Veritas as well.

 2    Q    Okay.  Same date, October --

 3    A    Yes.

 4    Q    Within five days of the fire?

 5    A    Yeah.

 6    Q    Can you show us on the map where this hallway is?

 7    A    Sure.  In that direction.  And by the way, this corner,

 8  the elevator is right here, and this is a service room.

 9    Q    Okay.  So --

10    A    This is the east wall.

11    Q    Okay.  And that is an interior wall.  Can you tell what

12  floor that's on?

13    A    I'm sorry?

14    Q    Can you tell what floor that's on?

15    A    Two through four.  Right now I can't tell you.

16    Q    That's fair enough.

17         So this, on the left where you've written east wall,

18  this is the interior wall closest to the fire?

19    A    Yes.

20    Q    Okay.

21         MR. ELY:  Can we take a look at RAS105550 on the

22  left, please.

23    Q    (BY MR. ELY) Can you tell us where that is?

24    A    Continuing down that corridor.

25    Q    That same east side closest to the fire?
```

<center>683</center>

```
 1   A    East side closest to the fire.  Now we're down at this
 2   end.
 3              MR. ELY:  Can we go to RAS105551.
 4   Q    (BY MR. ELY) Can you locate this for me, please?
 5   A    I can.  This is the first floor east wall.  Here's
 6   double doors that go out into the alleyway.  Here's the
 7   elevator.  Photograph is looking south.
 8   Q    Okay.  Can you show us on the map where this is?
 9   A    I tried to clear that.  It's right here.
10   Q    I believe we saw a photograph earlier, the double doors
11   with the canopy?
12   A    Yes.
13   Q    Is that the inside of the double doors with the canopy?
14   A    It is.  The canopy is right outside here.
15   Q    Okay.  And based on your review of these photographs,
16   were you able to see any signs of smoke infiltration into
17   these areas of the doughnut building as a result of the phase
18   6 fire?
19   A    No.  I would be looking for it around here and up here.
20              MR. ELY:  I'll pass the witness, Your Honor.
21              MR. ABRAMS:  May I, Your Honor?
22              THE COURT:  Yes.
23   CROSS-EXAMINATION BY MR. ABRAMS:
24   Q    Dr. Schroeder, my name is Mike Abrams.  I'm a lawyer in
25   Kansas City.  Nice to meet you.
                              684
```

```
 1   A      Nice to meet you.

 2   Q      Let's start where Mr. Ely ended.  Let's look at --

 3          MR. ABRAMS:  Pull up slide 18, Melissa.

 4   Q      (BY MR. ABRAMS) When you said, Dr. Schroeder, while

 5   we're pulling that up, that when you saw police body cam

 6   videos, there were no alarms going off, correct?

 7   A      On -- they were on the fourth floor.  Eventually

 8   somebody did pull the alarm in the building.

 9   Q      Okay.

10   A      The cops were -- they didn't know whether they'd gotten

11   everybody out, and then they pulled the alarm.

12   Q      But there's fire alarms going off during the police body

13   cam video, correct?

14   A      Towards the end of it, yes.

15   Q      I thought you said you didn't see any alarms going off.

16   A      Not on the fourth floor.

17   Q      Okay.  But you did see on the body cam image -- and

18   we'll get it up there just so we have it absolutely clear.

19   A      Yeah.

20   Q      Again, this body cam footage happens before phase 6

21   falls to the ground, correct?

22   A      What we've just been looking at, yes.

23   Q      What's that?

24   A      On the fourth floor, that is correct.

25   Q      Well, for the entire body cam footage that you saw,
```

<div align="center">685</div>

```
 1  correct?

 2  A    No.  I think we have them still in the building when the

 3  collapse is occurring.

 4  Q    At the very end maybe?

 5  A    Towards the end, yes.

 6  Q    Okay.

 7       MR. ABRAMS:  Can you play that?  Is it having

 8  problems loading?  Maybe go to the next.

 9  Q    (BY MR. ABRAMS) I don't think we're in any disagreement.

10  I heard you say in your testimony no alarms going off, but you

11  recognize that during the police body cam footage, alarms are

12  going off, correct?

13  A    Eventually they do go off.

14  Q    Let's switch gears.

15       I want to show you -- let's just start with the

16  security footage of the fire, and parts of it for some reason

17  Mr. Ely didn't show you.

18       MR. ABRAMS:  Can we pull that up?

19  Q    (BY MR. ABRAMS) So let's orient ourselves here,

20  Dr. Schroeder.  The time here is -- it says 2:04 on the top,

21  correct?

22  A    Correct.

23  Q    And that's about 30 minutes after the last part of the

24  video that you were shown during direct examination, correct?

25  A    I'm sorry.  I --
```
                    686

```
 1   Q    I think it was about 1:20, maybe a little longer.  Let's

 2   see if this one will play.

 3              MR. ABRAMS:  All right.  Wait.  Can you pause there

 4   for one second and roll it back?

 5   Q    (BY MR. ABRAMS) So what's happening at the fire here is

 6   we've got -- 6 has collapsed, correct?

 7   A    Yes.

 8   Q    Structure next to it caught on fire, correct?  And you

 9   showed us pictures of that, right?

10   A    I did.

11   Q    That's what's happening here.  Still working on the

12   fire.  You can see the flames, right, still going, right?

13   A    It's in a pretty extinguished state; but, yeah, there's

14   still burning going on.

15   Q    There's still burning going on.  All right.

16              MR. ABRAMS:  Play this.  Thank you, Melissa.

17   Q    (BY MR. ABRAMS) And we see here that the smoke is

18   drifting towards the left of the screen towards phases 1

19   through 3, correct?

20   A    We're seeing some of that, yes.

21   Q    Okay.

22   A    From the right of the screen, it is moving towards the

23   body of 6, yes.

24   Q    Towards the left of the screen which is --

25   A    Yes.
```
<center>687</center>

```
1    Q    Which is towards 1 through 3, correct?

2    A    Right.

3    Q    And you said something during your testimony.  I just

4    want to make sure that we've got it right.

5         Your report -- and you do not state with scientific

6    certainty that smoke or char or soot could not have gotten

7    into 1 through 4 from this fire, correct?  You said it's

8    possible, but you don't think it did.

9         But you're not saying from a degree of scientific

10   certainty that the soot, char, and smoke from the fire got

11   into 1 through 4, correct?

12   A    No.  I'll say that now from point of scientific

13   certainty, no, it's not getting in there.

14   Q    So -- all right.  Let's talk about your role here.

15        You were hired on July 14th, 2020, correct?

16   A    Seems right, yes.

17   Q    22 months after the fire, correct?

18   A    Yes.

19   Q    You didn't personally get to inspect the Metropolitan

20   until October of 2020, correct?

21   A    September and October.

22   Q    Well, your report says October.  Do you want to read it?

23   It's on page 7.

24   A    Then October it is.

25   Q    Okay.  And that was over two years, 25 months after the
                              688
```

```
1   fire, correct?

2    A    Correct.

3    Q    And as part of your analysis, you reviewed the

4   Birmingham Fire and Rescue Service incident report as part of

5   your analysis, correct?

6    A    I did.

7    Q    All right.

8           MR. ABRAMS:  If we could put up -- Melissa, if you

9   could put up slide 3.

10   Q    (BY MR. ABRAMS) This is the report from the Birmingham

11  Fire Department that you reviewed as part of your work,

12  correct?

13   A    Yes.

14          MR. ABRAMS:  If you go to the next slide.

15   Q    (BY MR. ABRAMS) And this says -- I know it's a little

16  bit blurry to read.  But in part it says that the fire --

17  appeared that two apartments were involved in the fire with

18  extension to the breezeway, correct?

19   A    I'm sorry.  Where's the extension to the breezeway?

20  Yes, I see that.

21   Q    Okay.  And also it says that several apparatus were

22  damaged as a result of the radiant heat from the fire,

23  correct?

24   A    Yes.

25          MR. ABRAMS:  If you'd go to the next slide.
```
689

Case 4:20-cv-00095-FJG   Document 245   Filed 09/05/23   Page 78 of 224

```
 1    Q    (BY MR. ABRAMS) This is from page 16 of the incident

 2   report.  It says that heavy, black, turbulent smoke conditions

 3   were noted throughout the entire structure, correct?

 4    A    Yes.  Now, now -- excuse me.  Can you --

 5    Q    That was just a yes or no.  We've got to get through a

 6   trial.  Your counsel can ask you questions if there's things

 7   to follow up.  But that was the right answer.

 8              It also states that there was heavy black smoke or

 9   soot on the alpha and bravo sides of the structure, correct?

10    A    Correct.

11    Q    And so you have -- and you had smoke on the Charlie side

12   of the structure, correct?

13    A    Yes.

14    Q    So three of the four sides, correct?

15    A    Yes.

16    Q    And you understand that the scene of the fire was kept

17   under control of local and federal law enforcement agencies

18   for at least a month, correct?

19    A    No, not at all.  In fact, we have people back in the

20   building as early as the 2nd of October.

21    Q    Okay.  Let's pull up -- you want to read your report,

22   page --

23    A    Can I finish, please?

24              The footprint of the fire -- the footprint of

25   building 6 may very well have been held for some time, but the
```

690

phases 1 through 4 and 5, no. People were in them.

Q On October 23.

Your report says, The scene of the fire was kept under control of local and federal law enforcement agencies for at least a month. Is that not true?

A No, that's not true.

Q Okay. Your point is that 6 was kept under control. Residents eventually got back in in October 23 of 2018, correct?

A Right. But people were in the building, maintenance people, fire investigators, and others were in the building early October.

Q And the residents don't get in until October 23, correct?

A That I think is correct, yes.

Q One thing that I neglected to mention when we were talking about the body cam footage. What we see from the police department body cam footage is that lights are on, AC is working, correct?

A At that time, absolutely.

Q And you don't know -- you believe at some time it may have stopped working, but you don't know when?

A I can't give you a timestamp on that.

Q All right. Let's look at slide 6 from your report.

Okay. You created this diagram or your folks

```
 1   created this diagram, correct?

 2   A    Yes.

 3   Q    And if you look at -- when we talked about alpha, bravo,

 4   and Charlie with some smoke coming out of it, that's A, B, and

 5   C on this chart, correct?

 6   A    Correct.

 7   Q    All right.  You would also agree that the heat of the

 8   fire was so intense that it caused issues for fire personnel

 9   that were attempting to establish a blitz nozzle on the

10   Charlie side of the building, correct?

11   A    Yes.

12   Q    And buildings 1 through 4, just to orient ourselves and

13   give us some kind of idea of how far apart these things are,

14   they're about 119 feet from building 6, correct?

15   A    I'd have to look at a diagram to give you the distance.

16   Q    I can give you your report.  I'm referring to page 25.

17   A    Thank you.  Yes.

18   Q    Does that sound right, 119 feet?

19   A    I think -- I'd like to direct you to figure 15.

20   Q    I'm getting my copy out.

21   A    It's hard for me to see.

22   Q    Okay.

23   A    Over a hundred feet I think is a fair representation.

24   Q    Okay.  Very good.

25             You agree that there was thermal damage that
                              692
```

1    impacted the exterior of phase 5, correct?

2    A    Absolutely.

3    Q    And that PVC foam core vent stacks on phase 5 roof were

4    thermally degraded by the fire, correct?

5    A    The one -- the face of those closest to the fire, yes.

6    Q    Okay.

7    A    Totally.

8    Q    And let's look at slide 7.  That's the Charlie side

9    facing phase 5, correct?  I'm sorry.  That's the Charlie side

10   of phase 5 facing phase 6?

11   A    Based upon my diagram, yes.

12   Q    Okay.  That's correct?

13   A    That is the Charlie side.

14   Q    And you agree that that's fire damage, right?

15   A    That's thermal damage.

16   Q    Okay.

17   A    That's not direct flame impingement.  The body of fire

18   is not on there, but the radiant heat is.

19   Q    Let me put up another one.  That's damage from a fire,

20   correct?

21   A    Yes.

22   Q    Let me put it another way.  Let's go to slide 8, please.

23   This is -- and I think counsel may have shown you this.  This

24   is a still of the Birmingham Fire Department training their

25   hoses, and that's -- that's shooting a hose towards phase 5,

693

```
 1   correct?

 2   A    No.

 3   Q    I'm talking about the one in the middle, not the one up

 4   on the crane.

 5   A    Look at the angle of the nozzle relative to the

 6   driveway.  It's certainly spraying in the alleyway, but it's

 7   not spraying at 5.

 8   Q    Okay.  It's more pointing towards 5 than 6, correct?

 9   Can we agree on that?

10   A    Sure.

11   Q    Okay.  Let's look at slide 29, if you will.

12        MR. ABRAMS:  Actually you can skip that.  Let's go

13   to slide 10.

14   Q    (BY MR. ABRAMS) This is what we saw before.

15        Now, let's look at slide 11, please.  This is a

16   picture you looked at.

17        This is a photograph you took, correct?

18   A    No.  The Birmingham Fire Department took this.

19   Q    Okay.  I thought you testified that you took this?

20   A    No, I did not.

21   Q    Okay.

22        MR. ABRAMS:  Can we go to Irmiter slide 13?

23   Q    (BY MR. ABRAMS) While we're doing this, Dr. Schroeder,

24   you would agree that the windows within phase 5 were found

25   open during -- immediately after the fire, a number of them,
```

<center>694</center>

```
 1   correct?

 2   A    You mean not in the fire exposed area?

 3   Q    In phase 5 --

 4   A    Not on the south wall?

 5   Q    Why don't we do this.  Let's look at this.  This is from

 6   phase 5, correct?

 7   A    Yes.

 8   Q    That's damage as a result of the fire, correct?

 9   A    Totally.

10         MR. ABRAMS:  Go to the next slide, please.

11   Q    (BY MR. ABRAMS) This is phase 5.  That's damage as a

12   result of the fire, correct?

13   A    Radiant heat, yes.

14   Q    Okay.  But damage as a result of the fire, right?

15   A    Yes.

16   Q    Okay.  And the windows are impacted, correct, on 5?

17   A    Yes.  The vinyl melted.  Everything came out.

18   Q    All right.  Next slide.

19         All right.  That's inside of phase 5, correct?

20   A    Yes.

21   Q    And it shows damage as a result of the fire?

22   A    It does.

23   Q    Okay.  Next one.

24   A    Yeah.  You're looking towards -- you're looking towards

25   building 6 there.
```

695

```
 1    Q    Okay.

 2    A    As is this one too.

 3    Q    Phase 5?

 4    A    Uh-huh.

 5    Q    It will go a lot quicker if I just ask you some

 6  questions.

 7    A    Okay.

 8    Q    We've got to get this jury out of here at some point.

 9         This is slide 16.  This is phase 5, correct?

10    A    Yes.

11    Q    It shows damage to the windows as a result of the fire,

12  correct?

13    A    You can see the vinyl melting, yes.

14    Q    And you agree that hot gasses, smoke, or other

15  combustion products, I believe you testified about this, could

16  have entered phase 5 through these open bypasses, correct?

17    A    That the smoke could certainly get in there later on,

18  yes.

19    Q    Let's talk a little bit about --

20         MR. ABRAMS:  You can leave that up there.

21    Q    (BY MR. ABRAMS) Dr. Schroeder, you're not a

22  meteorologist, correct?

23    A    I'm not.

24    Q    Okay.  You've never been one, correct?

25    A    Correct.
```
696

```
 1   Q    Okay.  On page 14 of your report, you state that the

 2   mixing height on the date of the fire was forecast to be 4,800

 3   feet above ground level, correct?

 4   A    Yes.

 5   Q    You didn't compute the actual mixing -- the mixing

 6   height level the day of the fire, correct?

 7   A    No.  This information is coming from the National

 8   Weather Service, the fire weather data bank, and looking at

 9   the forecast for the Birmingham area on those days.

10   Q    And you're not aware that the weather data from the

11   National Weather Service at the time of the fire states that

12   the cloud cover was only 800 feet above ground level, correct?

13   A    Looking at the photographs, I would agree with that.

14   Q    All right.  Let's talk about brands or -- I'll call them

15   brands because that's the term that you prefer.

16        You concluded that the TPO roofing on phase 5 was

17   thermally pockmarked by burning brands and embers, correct?

18   A    Yes.

19   Q    And the embers and brands from the phase 6 fire

20   physically landed and damaged the phase 5 roof?

21   A    No question.

22   Q    Okay.  And we've heard testimony earlier that there were

23   actually hundreds of pockmarks on phase 5.  Hundreds, if not

24   thousands.  But you were not there to inspect the roof until

25   two-plus years later, correct?
```
697

1    A    I'm sorry.  Hundreds, if not thousands?

2    Q    Correct.

3    A    Somebody testified to that?

4    Q    Yeah.  And you weren't there, Dr. Schroeder.  You were

5    not there on that roof until it was repaired, correct?

6    A    Correct.

7    Q    All right.  And when you went out -- did you actually go

8    up on the roof?

9    A    Of course I did.

10   Q    Okay.  And you couldn't even -- by the time you saw it,

11   you couldn't tell where it had been patched, correct?

12   A    On building 5, that is correct.

13   Q    And on buildings 1 through 4, the magnitude of this

14   roof, it's about a 4-acre roof, correct?

15   A    That seems a little strong in the acreage, but it's a

16   big roof.

17   Q    Well, did you measure it?

18   A    I didn't run that calculation.

19   Q    Okay.  So you don't know?  You don't know how big -- how

20   many square foot is the roof on 1 through 4?

21   A    Just sitting up here without my diagrams, I can't tell

22   you.  I don't have that committed to memory.

23   Q    All right.  Let's -- well, you're not an expert in

24   construction defects, correct?

25   A    Correct.

                           698

```
 1    Q    You're not a certified building code inspector, correct?
 2    A    Correct.
 3    Q    You don't have any professional experience in
 4   construction or the roofing industry, correct?
 5    A    I have certainly overseen a number of flat roof projects
 6   for my own properties.
 7    Q    Right.  Your only first-hand experience in construction
 8   methods and applications is simply being an overseer on
 9   personal or family-related construction projects?  That's what
10   you put in your report, correct?
11    A    True.  But I've also had training and education in the
12   same areas as well, both in undergraduate as well as graduate
13   programs.
14    Q    You haven't overseen or managed a day-to-day
15   construction project on a residential building, correct?
16    A    I have.
17    Q    For your family, your personal --
18    A    Yes.
19    Q    Other than that, you haven't done that?
20    A    No, not my job.
21    Q    Let's look at --
22         MR. ABRAMS:  Can you put up Irmiter slide 36.
23    Q    (BY MR. ABRAMS) Now, this is -- there's been testimony
24   earlier about that this shows some radiant heat damage to the
25   zip wall here?
```
                                 699

```
 1   A     To the zip tape, yes.

 2   Q     Right.  And you take issue with that, correct?  Or no?

 3   A     No.  That's what we're seeing here.

 4   Q     Okay.  That that's fire damage to the -- that's fire

 5   damage to the zip wall?

 6   A     Heat-related damage to the zip wall, yes.

 7   Q     Great.  Okay.

 8         MR. ABRAMS:  Can you put up slide 15.

 9   Q     (BY MR. ABRAMS) All right.  Dr. Schroeder, you know what

10   we're looking at here?  This is a picture of the south

11   exposure of the Metropolitan where the roofs on phases 2 and 4

12   meet at the parking garage?

13   A     Seems right, yes.

14   Q     You agree that this shows smoke staining, correct?

15   A     No.

16   Q     What do you think this is?

17   A     Organics.

18   Q     Okay.  On a two-year-old building?

19   A     Sure.

20   Q     Okay.  Did you test it?

21   A     No.

22   Q     No, okay.

23         MR. ABRAMS:  Let's look at slide 16.

24   Q     (BY MR. ABRAMS) All right.  You would agree that this

25   picture shows smoke staining on the upper roof above phase 2?
```

<center>700</center>

```
 1   A    No, not at all.

 2   Q    Okay.  You think this is organics also, right?

 3   A    Organics related to the roof, yes.

 4   Q    And you didn't test?

 5   A    No.

 6   Q    Okay.  All right.

 7          MR. ABRAMS:  If we could go to slide 11.

 8          Strike that.  Let's move on.

 9   Q    (BY MR. ABRAMS) Now, we talked a lot about the way that

10   the Metropolitan was built, what the plans show, and the way

11   it was actually built, right?  You testified about that on

12   direct, correct?

13   A    When it came to smoke detectors, yes.

14   Q    But I'm going to ask you about several things.  You --

15   well, let's go one through one.

16          Your report states that the Metropolitan

17   specifications indicated that smoke detectors were to be

18   installed in the HVAC system, correct?

19   A    Correct.

20   Q    And you concluded that that would have halted the spread

21   of smoke by HVAC blowers, correct?

22   A    If they had picked -- if it had picked it up, yes.

23   Q    Since you've written your report, you've discovered that

24   that's not accurate, correct?

25   A    That is correct.
```

701

```
 1   Q    Okay.  Because you were basing your report on the plans,

 2   not actually how it was built, correct?

 3   A    I would agree with that.

 4   Q    Okay.  And also you were not aware that those systems

 5   were --

 6           MR. ABRAMS:  Well, let's go to slide 17.

 7   Q    (BY MR. ABRAMS) Actually here on this, you indicate --

 8   this shows smoke damage, right?

 9   A    That's from my file, yeah.  It says, See smoke puff.

10   Q    You had put into your report that --

11   A    Actually hold on.  My report, figure 13 is not this

12   report.

13   Q    Right.  I was -- I wasn't saying this is from your

14   report.

15   A    Oh, I'm sorry.  Then that's not my description.

16   Q    No.  I said it's not your description.  I didn't say it

17   was your description.

18   A    I'm sorry.  No, that is not my description.

19   Q    Right.  But you would agree?

20   A    Excuse me?  I would agree?  I would agree that

21   somebody's described it as see puff smoke grille, not

22   Schroeder.

23   Q    Right.  Because -- do you know if this area was tested

24   for soot and char?

25   A    I think it was.  And none was found.
                              702
```

```
 1    Q    Is that what your testimony is?

 2    A    That's my belief.

 3    Q    Okay.  And did you -- but you didn't test it yourself,

 4   correct?

 5    A    No.

 6    Q    All right.  That's not -- that's not the area of your

 7   expertise, correct?

 8    A    Sampling.  I've done a lot of fire, soot sampling over

 9   the decades.  But I do not do the analysis.

10    Q    Okay.  And you're not a microscopist?

11    A    No, I'm not.

12    Q    You didn't do any sampling here, correct?

13    A    No.

14         THE COURT:  Let's take a lunch break and resume a

15   little after 12.  We'll stand in recess.

16              (A recess was taken.)

17   (The following proceedings were had in the presence of the

18   jury:)

19   CROSS-EXAMINATION (continued) BY MR. ABRAMS:

20    Q    Mr. Schroeder, picking up where we left off -- not where

21   we left off, just a loose end.

22         You were at the Metropolitan once or twice?

23    A    Twice.

24    Q    In the times that you were at the Metropolitan, AC was

25   on in 1 through 4?
```
                              703

```
 1   A    I couldn't tell you.  I don't know.

 2   Q    It was inhabited, correct?  What I mean by AC -- let me

 3   be more precise.  HVAC was on, right?

 4   A    I'm going to have to presume it is.  People were working

 5   in the building.

 6   Q    And it was inhabited?  1 through 4 was not inhabited?

 7   A    No.

 8   Q    Right.  I'm sorry.  I forgot that.

 9        By the time you went -- I apologize.

10        By the time you went to the Metropolitan, it had

11   already been in the process of being remediated.  The walls

12   had come out and so on, correct?

13   A    They had taken the Sheetrock off.  They had removed

14   insulation, yes.

15   Q    Okay.  I apologize.  I forgot about that too.

16        So you were not at the Metropolitan between October

17   23rd, 2019 -- I'm sorry.  October 23rd, 2018 and April 2019,

18   correct?

19   A    That's correct.  I was not, not there.

20   Q    Right, okay.  Right.  So by the time you got there and

21   investigated, it's possible the HVAC wasn't operating just

22   because people weren't living in 1 through 4 when you went

23   to -- when you went to investigate, correct?

24   A    That's correct.

25   Q    Okay.  Have you seen this picture before?
```

<div align="center">704</div>

```
 1   A    I have.  I've seen a couple of pictures of this before.

 2   Q    Okay.  From -- and you know this is unit 438, correct?

 3   A    Yes.

 4   Q    You know what building that is, what phase?

 5   A    It's got to be -- 438 would put it in 4.

 6   Q    Phase 4?

 7   A    Yes.

 8   Q    In the back?

 9   A    Yeah.

10   Q    And have you seen the results of the testing from that?

11   A    No.  I haven't looked at it.

12   Q    All right.  Let's go back.  When we left, we were

13   talking about the HVAC units and the fire alarms.

14   A    Yes.

15   Q    Okay.  And you had indicated that at the time you wrote

16   the report, you thought that they were interconnected and

17   there would be a shutoff, but then you learned that that

18   wasn't the case?

19   A    Correct.

20   Q    The way they're actually built.

21   A    Yes.

22   Q    And you understand that the way it was built passed

23   code; it was approved by the city of Birmingham?

24   A    They at least gave a temporary certificate of occupancy

25   for the doughnut building, yes.
```

705

```
 1   Q    Okay.

 2   A    The complex had not gotten its final certificate of

 3   occupancy.

 4   Q    But you -- do you understand the 2009 International

 5   Mechanical Code, Section 606.1 on this?

 6   A    You're asking me to give you a chapter and verse?  I

 7   don't have that in my head.  If you have it, we can talk about

 8   it.

 9   Q    That's fair.  But that's not your area of expertise,

10   building codes?

11   A    Oh, I have been formally trained on building codes,

12   absolutely.

13   Q    Okay.

14   A    Totally.

15   Q    All right.  So then maybe you are familiar.

16        So do you know that the way that the system was

17   built with not the interlocking change off -- between the fire

18   alarm and the HVAC met the 2009 International Building --

19   International Mechanical Code?

20   A    Apparently it passed Birmingham's approval because they

21   gave it a temporary certificate of occupancy.

22   Q    Okay.  So Birmingham did approve it, but you don't know,

23   sitting here today, if that's compliant with the 2009

24   International Mechanical Code?

25   A    Can I see if I cited it?
```
                            706

```
1   Q     Yeah.  You can refer to your report any time you want.

2   A     Okay.  Bear with me a moment, please.

3   Q     Take your time.

4   A     I don't see that I've cited it.  If I have, I'm not

5   finding it.

6   Q     That's fine.  Mr. -- I'm sorry.  Dr. Schroeder, my

7   question was, you don't know -- and I'm not expecting you to

8   know it, and I wasn't saying that it was in your report.

9           But my question simply is, is the way that it was

10  built, that aspect of the way the Metropolitan was built, do

11  you know if that complied with the 2009 code?

12  A     Sitting here today, I can't tell you that.

13  Q     Okay.  Switching subjects.

14          At the time you wrote your report, you were not

15  aware that the HVAC filters in place at the time of the fire

16  consisted of fiberglass non-pleated filters with a MERV rating

17  of 4, correct?

18  A     Could you say the last part again?  Fiberglass filters

19  with --

20  Q     A MERV rating of 4.  Do you know what MERV is, M-E-R-V?

21  A     I can guess, but I'm not going to guess.  The filtration

22  factor was not the best.  It's not like HEPA.

23  Q     Okay.  And -- but, again, I don't want to get in an area

24  where you're not comfortable with, it's not your expertise.

25  You don't know what MERV stands for?
```

1    A    I don't.

2    Q    And am I correct that at the time, you didn't -- well,

3    at the time you wrote your report, you weren't aware of --

4    well, I'll tell you what MERV is.  MERV is the minimum

5    efficiency rating value.  Does that ring a bell?

6    A    That sounds right.

7    Q    And at the time you wrote your report, you didn't know

8    what the MERV rating was for the fiberglass non-pleated

9    filters, correct?

10   A    I did not address it in my report, but I believe that

11   Mr. Irmiter did address it in his.

12   Q    Okay.  But that's not something that you were aware of

13   in your conclusions -- in drawing your conclusions?

14   A    It's nothing that I wrote about.

15   Q    Okay.  All right.  When you -- again, when you inspected

16   the units at the Metropolitan in October of 2020, many had

17   already been rebuilt and -- correct?

18   A    Oh, my gosh.  When I was there, the building was just

19   being completely torn apart.  Yeah, there was nobody living in

20   that building when I was there.

21   Q    All right.  And some of it was being rebuilt at the time

22   you saw it in October of 2020, correct?

23   A    A lot of the exterior envelope within the courtyard had

24   rotted out, yeah.  There was extensive work going on there.

25   Q    Right.  And the interiors too, correct?

                              708

```
 1   A    They had boned them, yes.

 2   Q    Okay.  And, again, you didn't have the ability to see

 3   the as-built construction of the Metropolitan at the time of

 4   the fire, correct?

 5   A    Frankly, none of us would have seen that unless we were

 6   on the job site on a daily basis.

 7   Q    Right.  Or shortly after the fire, correct?

 8   A    No, no.  That's not correct.  We would have seen -- if

 9   you and I had been there on the 2nd of October 2018 and walked

10   through, we would have seen the conditions that we could see.

11   Q    All right.  No, my question was, you could -- you didn't

12   have the ability to do that?

13   A    No, I did not.

14   Q    Right.  Okay.  And you couldn't tell whether there were

15   missing fire stops in buildings 1 through 4, correct?

16   A    Oh, no.  Buildings 1 through 4, when it came to fire

17   separation walls, they were there.  If you're talking about

18   blocking, fire blocking in stub walls, yeah.  I noticed that

19   post-fire in the tall stub walls, they were putting fire

20   blocking in.  It's a stiffener as well as keeping fire

21   movement vertically within the stub wall chamber.

22   Q    But you weren't able to visibly inspect whether there

23   were unit separations between the floors, correct?

24   A    If there were unit separations between the floors?

25   Q    Between the floors and the hallways.
```

```
 1    A    Oh, my God.  They were there, absolutely.

 2    Q    Okay.  And you're basing that on some photos that you

 3   saw, right?

 4    A    I'm basing that on the plans, the photos -- hold on --

 5   the city of Birmingham, and what I saw, physically saw on site

 6   when I was there.

 7    Q    Okay.  So let's take them one by one.  Plans are just

 8   plans; they're not as-builts, correct?  Correct?

 9    A    Sure.

10    Q    You're going to have something on a plan, but it doesn't

11   reflect the way it's actually built, correct?

12    A    There are details that don't get captured, yes.

13    Q    And when you were there in two-plus years after the

14   fire, it would have been in the process of being rebuilt,

15   correct, 1 through 4?

16    A    Yes.  The focus was on the exterior; but, yes, it was

17   being built.

18    Q    Let me ask you about insulation.  At the time you wrote

19   your report, you were not aware about the way the insulation

20   assemblies had been placed in the Metropolitan, correct?

21    A    No.  I wouldn't say that at all.

22    Q    Did you actually see it with your own eyes?

23    A    Yeah.  I saw insulation with my own eyes.

24    Q    Shortly after the time of the fire or --

25    A    No, I was there.
```

                        710

```
1   Q    Or two years later?

2   A    When I was there.

3   Q    Two years later?

4   A    Yep.

5   Q    Do you know if there was any changes to the insulation

6   within the two years between the fire and when you were there?

7   A    Sure.  If we look at the photographs taken after the

8   fire, and there were over 6,000 taken by BCCM, you can see

9   where they've gone in when I got there and they'd already

10  removed the insulation.  In fact, they had gone in and sprayed

11  Kilz on a lot of the walls as well.

12  Q    Okay.  So you were able only to physically with your own

13  eyes see the insulation, touch it two-plus years after the

14  fire, correct?

15  A    Again, I didn't -- I'm sorry.  I didn't hear the first

16  part of the question.

17  Q    You were only able to see with your own eyes, touch it

18  two-plus years after the fire, correct?

19  A    That's when I was in the building, but there were plenty

20  of people documenting before I got in the building.

21  Q    Right, right.  Including one of them is Mr. Irmiter,

22  correct, who was in there?

23  A    Sure.

24  Q    All right.  Let's switch subjects now.

25          The -- let's talk about the water in phase 5.
```
711

```
 1              MR. ABRAMS:  And if we could go, please, to slide
 2    25, Melissa.
 3              THE WITNESS:  Can you direct me to a page?
 4    Q    (BY MR. ABRAMS) You should have it right on your screen.
 5    This is not necessarily from your report.
 6    A    Okay.
 7    Q    I didn't cross-reference it to your report, but I know
 8    you've looked at many photographs that are not in your report,
 9    correct?
10    A    Uh-huh.
11    Q    So, Mr. Schroeder, do you recognize that this is a
12    photograph of phase 5 in the day or days after the fire?
13    A    Yeah.  This photograph was likely taken on the 2nd of
14    October.
15    Q    Okay.
16    A    2018.
17    Q    Couple days after the fire?
18    A    Yes.
19    Q    All right.  And we see moisture on the floor there?
20    A    Yep.
21    Q    Okay.
22              MR. ABRAMS:  If you'd go to the next slide, Melissa.
23    Q    (BY MR. ABRAMS) Do you recognize this photograph?
24    A    I do.
25    Q    All right.  This is from the Birmingham Fire Department,
                              712
```

```
 1   correct?
 2    A    Yes.
 3    Q    And you think this is taken same time period, five days
 4   after the fire?
 5    A    If not sooner.
 6    Q    Okay.
 7    A    It might be taken on the day of the fire actually.
 8    Q    But the one before was not?
 9    A    No.
10    Q    Okay.  You know that one was taken five days after?
11    A    Yeah, the 2nd.
12    Q    The 2nd.  This one was either taken the day after the
13   fire or soon thereafter?
14    A    I think it was taken the day of the fire.  That's when
15   the crews -- the investigators were going through on their
16   initial.
17    Q    Okay.  And we see water in phase 5, correct?
18    A    Yes.
19         MR. ABRAMS:  If you go to the next slide.
20    Q    (BY MR. ABRAMS) All right.  Do you recognize this photo?
21    A    This was taken on the 2nd.
22    Q    The 2nd of October?
23    A    Yeah.
24    Q    Birmingham Fire Department?
25    A    No.  Veritas.
```
713

```
 1   Q   Veritas.  Okay.  And we see water on the floor --

 2   A   We do.

 3   Q   -- in this photograph, correct?

 4   A   Yes.

 5   Q   And just to be clear, you don't dispute that there's

 6   water from firefighting efforts in phase 5 after the fire,

 7   correct?

 8   A   No.  I would expect to find some water in there, yes.

 9   Q   All right.  And you are not -- you're not an expert in

10   OSB board and how long it's supposed to last and when it

11   deteriorates, correct?

12   A   I've certainly not reviewed research from that question

13   for this case, that's correct.

14   Q   Or in general.  That's not an area of your expertise?

15   A   You know, when it comes to material science, yes, that

16   can be an area of my expertise, but I haven't -- I haven't

17   looked into it for this case.

18   Q   Okay.  What's OSB stand for?

19   A   Oriented strand board.

20   Q   And how long is oriented strand board supposed to last

21   before it deteriorates if it's exposed to water typically?

22   A   Can't give you a hard time on that.  It depends upon --

23   in one case, the volume of water, the duration of exposure,

24   whether there's ponding.

25   Q   Okay.
```

714

```
 1   A     There's a lot of factors that come into it, just more

 2   than being sprayed with water.

 3   Q     Okay.  And where are we looking at in phase 5 here?

 4   A     This would be -- if we had a map -- I was talking this

 5   morning about the cutout in the eve.  This is in that -- I

 6   hate to use the term "courtyard area," but I think that's the

 7   best description in phase 5.

 8   Q     We used courtyard a couple of times, but I think we know

 9   what you're saying.

10   A     Okay.

11         MR. ABRAMS:  I'll pass the witness.

12         MR. ELY:  Brief redirect, Your Honor.

13         THE COURT:  Okay.

14         MR. ELY:  Let me pull up Plaintiff's Exhibit 1, page

15   16, please.

16   REDIRECT EXAMINATION BY MR. ELY:

17   Q     I'll start with something else, Dr. Schroeder, while

18   we're pulling that up.

19         There was the question to you about the cloud cover

20   on the night of the fire.

21   A     Correct.

22   Q     I believe the discussion was 800 feet.  You tended to

23   agree with that.

24         Can you elaborate and tell us how that may or may

25   not have impacted your analysis of the fire dynamics of that
```

<div align="center">715</div>

```
 1   fire?
 2   A    Sure.  And I think of this as a pilot.  If a cloud
 3   depth -- so that the ceiling from the ground is 800 feet and
 4   the depth of the clouds is 500.  So now we're at 1,300 feet
 5   above ground.
 6            The power of this plume, the energy, the heat is
 7   going to blast right through that cloud depth.  And if we were
 8   flying along, we would literally see above the clouds this
 9   plume finding its way up.  We'd see it.
10   Q    Okay.  So just so I'm clear, the clouds didn't serve as
11   some sort of ceiling?
12   A    No.
13   Q    Okay.
14   A    No.
15   Q    And one thing, you used a word that I want to make sure
16   I understand.  When you were showing some outside pictures of
17   the roof and darkened areas, you used the term "organics"?
18   A    Yes.
19   Q    What's that mean for the rest of us?
20   A    It's stuff that we have in the air as a result of
21   vegetation and pollution, and that's what I call organics.
22   This is not a smoke deposit.
23   Q    Okay.  So I want to look at Plaintiff's Exhibit 1.  I
24   believe this was up when Mr. Abrams was talking to you, and
25   you had some additional things you wanted to say.
```
716

```
 1            MR. ELY:  Can you go to page 16 of this, please.

 2            And the narrative text section, could you blow that

 3   up.  Down below.  Right here.  Thank you.

 4   Q    (BY MR. ELY) I believe this is what you were reviewing

 5   with Mr. Abrams.  Maybe it wasn't?

 6   A    No.

 7   Q    Let me back up.

 8   A    I had asked him to show the previous page just so I

 9   could understand where the narrative was coming from.

10            MR. ELY:  Let's go back one page.

11   A    Okay.  And it was down here that I was asking him about

12   and it's -- the narrative name is Q22.  That's quint 22.  So

13   they are describing what they encountered upon arrival, and

14   that's what our discussion was about.

15   Q    (BY MR. ELY) Was there anything you wanted to add about

16   that?

17   A    No.  I just wanted you to know the source.

18            MR. ELY:  Thank you, Dr. Schroeder.

19            MR. ABRAMS:  Nothing further, Your Honor.

20            THE COURT:  You can step down.

21            THE WITNESS:  Thank you.

22            MR. ELY:  Defendant calls Chris Spicer, Your Honor.

23   RUSSELL CHRISTOPHER SPICER, being duly sworn by the courtroom

24   deputy, testified:

25   DIRECT EXAMINATION BY MR. ELY:
                           717
```

```
1   Q   Could you state your name for the record, please.

2   A   Russell Christopher Spicer.

3   Q   Mr. Spicer, where do you reside?

4   A   St. Simons Island, Georgia.

5   Q   Okay.  Can you tell me where you're currently employed?

6   A   I'm self-employed.

7   Q   And what is your profession?

8   A   I am a certified industrial hygienist.

9   Q   Okay.  And by "certified," what do you mean by that?

10  A   That's a designation attributed by the American Board of

11  Industrial Hygiene for a person who has demonstrated

12  proficiency in the field of industrial hygiene, which is the

13  recognition, evaluation, and control of occupational and

14  environmental hazards.

15  Q   And to become certified as an industrial hygienist, can

16  you walk us through kind of the process you had to go through

17  to do that?

18  A   To become a certified industrial hygienist, one must

19  have at least an undergraduate degree in engineering, science,

20  chemistry, physics, or public health or related field, five

21  years of experience in -- under the direct observation and

22  control of a certified industrial hygienist.

23          At that point, one may apply to the board for

24  acceptance to take the examination.  As part of that

25  application, there must be a sign-off from the supervising
```
718

```
 1    industrial hygienist.  Then upon acceptance or completion of

 2    the examination, one is designated ACIH.

 3    Q    When did you become a certified industrial hygienist?

 4    A    1989.

 5    Q    Okay.  And you have maintained that certification

 6    continuously since then?

 7    A    Yes, sir.

 8    Q    And presently have it?

 9    A    Yes.

10    Q    So let me back up.  And can you just tell us briefly

11    your educational background?

12    A    I have a -- as I said, an undergraduate degree in

13    biology from the University of Delaware and a master's in

14    environmental studies from Rowan University.

15    Q    And do you presently hold any specific certifications?

16    A    Yes.

17    Q    Okay.  Tell me about those certifications you hold now.

18    A    In addition to the CIH, I'm also a certified safety

19    professional, CSP, which is a designation given by the Board

20    of Certified Safety Professionals or BCSP.  I also have

21    several subspeciality certifications given by other

22    organizations, which fall under the general practice of

23    industrial hygiene.

24          I'm currently a certified smoke and fire damage

25    consultant.  That's given by the American Council of
```

719

1    Accredited Certification, ACAC.

2    Q    Do you presently serve on any professional committees?

3    A    I do.

4    Q    Tell me about that.

5    A    I currently serve as a member of -- on the subcommittee

6    for a wildfire evaluation standard being promulgated by the

7    Institute of Inspection, Cleaning, and Restoration

8    Certification or IICRC.  And that standard is currently

9    designated as S760.

10   Q    So tell me, what is the IICRC?  What do they do?

11   A    IICRC is the umbrella organization for the restoration

12   industry.  That would be people who evaluate and then address

13   cleanup in buildings that have sustained water damage, fire

14   damage, or other catastrophic events similar to that.

15   Q    And so am I correct that you're serving on a committee

16   that is in the process of developing a standard writing 7S60

17   with the IICRC?

18   A    That is correct.

19   Q    And that is for what?

20   A    This subcommittee that I serve on is essentially set up

21   to establish standards for inspection, evaluation, and

22   sampling for post-fire assessment.

23   Q    Okay.  How many folks are on that committee?

24   A    Approximately 12 to 15 are on that subcommittee.  Then

25   there's another subcommittee, which is on the restoration

                              720

```
 1   side.

 2   Q     Okay.  So I believe you mentioned that you are

 3   self-employed?

 4   A     Yes, sir.

 5   Q     How long have you been self-employed?

 6   A     Approximately a year.

 7   Q     And you're still working as an industrial hygienist?

 8   A     Correct.

 9   Q     Okay.  How long have you been actively working as an

10   industrial hygienist?

11   A     Since 1982, which would be 41 years, I guess.

12   Q     Okay.  So if you could, could you just please inform us

13   a little bit -- we've heard the terms "industrial hygienist"

14   and "industrial hygiene" thrown around a lot in this trial.

15   Can you kind of explain to us what that field is, what it

16   comprises?

17   A     Yes.  It's a -- it's the practical application of

18   various scientific disciplines through, again, the

19   recognition, evaluation, and control of hazards, occupational

20   and environmental hazards.  The -- perhaps to give a better

21   feel for that would be to point to some of the sub-areas that

22   are tested for the CIH examination.

23           So there are chemical hazards, noise hazards,

24   environmental controls, biological hazards, community

25   stressors such as hazardous waste.
```
<div align="center">721</div>

```
 1              In my particular area, I've concentrated on pretty
 2    much the hazards involved in construction and also hazards
 3    that occur after certain, again, catastrophic events, which in
 4    my particular case I've done a lot of work in the asbestos
 5    removal industry, asbestos assessment industry, water damage
 6    and mold and fire and smoke.
 7    Q    Okay.  So you've been -- and you've been practicing in
 8    the field of industrial hygiene now for 41 years continuously?
 9    A    Yes, sir.
10    Q    And before you became self-employed, were you employed
11    at Gallagher Bassett?
12    A    I was.
13    Q    Company called Gallagher Bassett.  What does Gallagher
14    Bassett do?
15    A    It was actually Gallagher Bassett Technical Services.
16    We were a subsidiary of Gallagher Bassett, which is an
17    insurance broker, large insurance, international insurance
18    broker.  We were the technical industrial hygiene
19    environmental arm of that company.
20              I served as the director of industrial hygiene for
21    the three years that we were with Gallagher Bassett.  Prior to
22    that, I was a partner in an environmental consulting firm that
23    was incorporated into Gallagher Bassett.
24    Q    And how many people did you have working under you at
25    Gallagher Bassett when you left?
```
722

1    A    I served as the technical lead in the company.  So

2    essentially everyone; but generally there were about 25

3    technical people that I had some control over.

4    Q    Okay.  So let's talk about this case.

5         Tell me when you were initially contacted by

6    Travelers and what you were asked to do.

7    A    Shortly after the fire in 2018, which would have been in

8    early 2019, I was contacted to evaluate the post-fire

9    conditions at the Metropolitan Apartment complex in

10   Birmingham, Alabama.

11   Q    Well, specifically with regard to the post-fire

12   conditions, were you given any sort of information about what

13   the claims were?

14   A    Yes.

15   Q    Tell me about that.

16   A    I was given a report to review, which was an assessment

17   of that facility with regards to water damage, and more

18   specifically, smoke and fire damage as a result of the fire

19   that was exterior to the general complex.

20   Q    Okay.  So what was your -- what was your understanding

21   of the extent of the claimed damage from soot and char?

22   A    The -- as per the report that I reviewed, there was the

23   allegation that there was widespread smoke and -- smoke damage

24   and water damage throughout these apartments, which the

25   recommendation was that a lot of demolition was necessary to

                                723

1    effectively address.

2    Q    Okay.  So does -- do you know what day you came out to

3    the facility the first time?

4    A    Not specifically.  I think it was May of 2019.

5    Q    June 13th ring a bell?

6    A    Yes.

7    Q    Okay.  So you had received an initial report from the

8    plaintiff, Maxus, about their assessment, their -- FBS's

9    assessment of soot and char damage from the phase 6 fire in

10   the other areas of the Metropolitan before you arrived?

11   A    That is correct.

12   Q    And do you recall having an understanding of how this

13   was supposed to have happened; meaning, the soot and char

14   infiltration into the other areas?

15   A    Yes.

16   Q    Tell me about that, please.

17   A    The complex was composed of a series of buildings that

18   were -- what they call phases 1 through 5, was contiguous in

19   basically a horseshoe shape.  Then separate from those five

20   phases, there was a building 6, which was not really within

21   the same building envelope.  It was connected by a walkway.

22            Building 6 sustained a significant fire.  I believe

23   it was arson.  But it burned to the ground so that the smoke

24   and -- that was emitted from building 6 destruction allegedly

25   impacted the remainder of the buildings in that complex.

                                724

```
 1   Q    Do you recall, was there a mechanism for infiltration

 2   given in that initial report or mechanisms?

 3   A    Yes.  The mechanism was that there was, for lack of a

 4   better term, a vortex; in other words, a plume of smoke and

 5   fire debris that was emitted into the atmosphere and then

 6   surrounded the buildings so that these buildings were

 7   reportedly enveloped in smoke.  And then the smoke was -- had

 8   infiltrated through the exterior, what we call the building

 9   envelope of the remainder of the complex.

10   Q    Okay.  So in anticipation of your visit on June the

11   13th, what did you do to prepare?

12   A    I read the report and formed in my mind kind of -- not

13   an assumption, but what I expected to see as a result of this.

14   I went to the facility, anticipating that I would be

15   attempting in some way to assess the extent of damage, smoke

16   damage in that facility.

17   Q    Okay.  So you arrive on the site on June the 13th.  Do

18   you remember who was there with you?

19   A    Not specifically.  I remember there were some

20   individuals from JSL.

21   Q    Okay.  JSL being the building expert for Travelers?

22   A    Yes.  I believe one of the individuals was a fellow --

23   professional by the name of Tom Sumner.  I believe he was

24   there.

25   Q    Okay.  So take us through -- let's start in the doughnut
```

725

1  building, and take us through kind of what you did in there,

2  what your inspection entailed in that -- and at the time you

3  were there, it was finished space, correct?

4  A    Yes.

5  Q    And there were tenants living in there?

6  A    In some, yes.

7  Q    So take us through what you did in the doughnut building

8  in terms of your inspection that day.

9  A    Well, the first thing I did when I arrived at the site

10  was I looked at the general environmental surroundings.

11  Because in these circumstances when an assessment for smoke

12  damage is necessary, sometimes there may be testing involved.

13  And in this particular case, there was.  It had been reported

14  back from the FBS report.

15        So that the first thing I did was actually look at

16  the surroundings to see what other potential confounding

17  sources may exist in that area with regards to soot and char,

18  which are the main constituents of smoke that we look for in

19  post-fire evaluation, because that may contribute to the

20  background, so that we want to make sure that we put any

21  testing that is conducted into the proper context.

22        But after I had an assessment of the -- assessment

23  of the general conditions, then we did a visual inspection,

24  walk-through of the entire facility, which starting in -- I

25  believe in the occupied spaces, the doughnut, what we call the

726

1    doughnut building, phases 1 through 4.  And we -- but we also

2    looked at 5 and also looked in the -- again, visual

3    walk-through inspection of the -- some of the common areas as

4    well as the roof on building 5.

5    Q    Okay.  And you mentioned the word "background." I want

6    to go back to that.  If you could, give us an explanation of

7    what you mean by that.

8    A    The main constituents or combustion residual that we

9    look for in a post-fire assessment are what we call char and

10    soot.  Char are basically irregular fragments that sometimes

11    under the microscope, they have some of the same

12    characteristics of the fuel.  For example, if it's a wildfire,

13    there may be some indications of leaf structure or something

14    in char.

15         And then the other constituent is soot, which is a

16    very fine black powder which is produced as a result of

17    combustion in essentially any process, any combustion process

18    that we have in the industrialized world.  So they have

19    stacks, smokestacks, automobile exhaust, backyard fires,

20    barbecues, even areas from wood fire and fireplaces.  So it

21    all emits some degree of those combustion particulates into

22    the general atmosphere, and then they will settle.  And it

23    varies across the country as far as how much of that is there.

24    Q    So is background -- in your world, is background

25    combustion byproducts from all these different sources that we

<center>727</center>

```
 1   live with every day?

 2   A    Yes.

 3   Q    And so as part of what you're doing, you're trying to

 4   figure out what background sources may be there, the normal,

 5   everyday combustion sources, versus whether it's related to a

 6   fire?

 7   A    In a context of possibly having to do testing or

 8   evaluating any testing that may have been done, that's

 9   correct.

10   Q    You mentioned that you made an assessment of the

11   environment around Metropolitan.  Tell me about that.

12   A    Well, I also did some, you know, for lack of a better

13   term, Google or internet research on what were the industrial

14   operations in that area, in the Birmingham area historically

15   and currently.  So I got a feel for, again, what the general

16   emissions would have been as a general environmental pollutant

17   in that area.

18   Q    Okay.  And just as kind of a matter of principle, the

19   Metropolitan is located in an urban area, correct?

20   A    It is in the approximate -- I believe the approximate

21   middle of Birmingham, Alabama, that's correct.

22   Q    And with respect to these background combustion

23   byproducts, are they more prevalent in urban areas than they

24   are, say, outside of town?

25   A    Yeah.  That's generally accepted, yes, sir.  And
```
728

1  Birmingham has historically been called the Pittsburg of the

2  south.  Birmingham has a long history of steel production and

3  heavy industry in that area.  And I believe there's a coke

4  foundry even in some -- within a short distance.

5  Q    Okay.

6  A    Maybe a few miles.

7  Q    Okay.  So take us through the inspection.  How many

8  units did you go in?

9  A    I looked at 31 units, 31 residential units in addition

10  to the space in phase 5, which was not complete at the time,

11  and the common areas and the roof area.

12  Q    Okay.  So with respect to the -- and I'll call it the

13  doughnut building, phases 1 through 4, the finished space.

14  With respect to the units that you went through, tell me --

15  first of all, tell me what you're looking for.

16  A    Well, the units that we looked at were -- I looked at

17  the FBS report and tried to concentrate, as access would

18  permit us, on the areas that they had either done testing or

19  had reported on.  So we -- I centered the 31 units that we

20  evaluated based on that guidance, so to speak.

21       And when these circumstances occur in a post-fire

22  situation, typically we're looking for visual surface impact.

23  I think we all, as a common experience, would recognize that.

24  For example, above a candle if we hold a flat surface, there

25  would be a black deposition on that surface.

729

```
 1             So it's very similar to that.  You would see soot

 2   and/or other fine particulate on various horizontal surfaces,

 3   under doors, within closets, on top of window ledges.  So when

 4   we do it in an inspection like this, we try to visualize what

 5   would have been the pathways into this space, and then look

 6   for the visual signs that that had occurred.

 7             And in addition to that, depending on a number of

 8   factors, could be the location, could be the relative

 9   humidity, could be location and time since the fire.  There

10   may or may not be that characteristic smoke or acrid odor, I

11   think, that we're all familiar with when something is burnt.

12   Q    So is it correct that the first thing you were looking

13   for was using your sight and smell?

14   A    Correct.  And that is consistent with all the current

15   guidelines out there in this field.

16   Q    And it's your opinion that that's the industry standard?

17   A    Correct.  That's the primary evaluative tool, that's

18   correct.

19   Q    So -- and you mentioned that you looked -- so let's walk

20   through the apartments.  And you mentioned you're looking for

21   points of entry, correct?

22   A    Correct.  Under doors or over doors, around diffusers or

23   what we -- vents, air vents.  Sometimes you'll see black trail

24   or black sooting around that.  It would be airflow patterns.

25   Around the windows, because that's -- typically windows,
```

<div align="center">730</div>

1    although they are supposed to be airtight, seldom are.

2          So there may be -- again, in this case the alleged

3    route of entry was through the perimeter.  So around windows,

4    below windows, on the top ledges, on the window ledges

5    themselves or in the window frames would be a logical place to

6    look, which I did.

7    Q    Okay.  And so based on the information you had before

8    you arrived, what were you expecting to find in these

9    individual units?

10   A    I was expecting to see an area within the building or

11   units that showed a definite soot discoloration or blackening

12   or some indication that there had been entry of smoke into

13   that space.  And perhaps as I walked through the facility,

14   maybe it would degrade or I wouldn't see as much.

15         Again, these kinds of situations, it's usually

16   pretty obvious when there's been smoke or a fire impact other

17   than physical damage, which I think we all recognize the

18   charring and so on.  But as you get further away, when there

19   are concerns about smoke infiltration in occupied spaces,

20   there will be signs that that has occurred.

21   Q    Okay.  And those signs are in the form of what?

22   A    Again, visual and smell.

23   Q    Are they -- I mean, smoke leave a trail?

24   A    I'm sorry?

25   Q    Does smoke leave a trail?

                              731

```
 1   A    It may or may not, depending on how it comes in.  I
 2   mean, there may be large areas that are -- have a black
 3   sooting.  There may be what we call ghosting where there may
 4   have been some furniture or some item in the space, and then
 5   the smoke tends to -- because of the thermal and electrostatic
 6   forces, it tends to ghost or shadow around that.
 7          It all depends.  There would be obvious indications
 8   based on, again, your -- the theories or the presumptions we
 9   have about what were the sources, where the fire was, how --
10   you know, how hot was it, and where the routes of entry were
11   likely to have been.
12   Q    In addition to the individual things that you mentioned
13   that you expect to see the evidence of smoke infiltration, in
14   terms of the scope and the frequency, what were you expecting
15   when you went?
16   A    I was expecting to see some very obvious signs of smoke,
17   at least in some areas of the particularly occupied space in 1
18   through 4.
19   Q    And based on your inspection of 31 units, you looked at
20   the corridors also?
21   A    We did.  As we -- that was part of it.  As we obviously
22   walked from one area to the other as these spaces became
23   available to us and, you know, conducted inspections while --
24   during that process as well.
25   Q    Is there carpet in this building?
```

1    A    I don't -- there was carpeting, I think, in the main

2    conference room that we, I think, gathered in in the morning.

3    I think that was the only place that I recall.  The rest of it

4    I don't believe had carpeting.

5    Q    Okay.  So based on your inspection of the 31 units in

6    the doughnut building, tell us what you found.

7    A    I didn't see any indications -- I didn't detect any odor

8    at all.  And this is, again, detailed in my report.  And I did

9    not see any indications, you know, of what I would have

10   attributed to smoke infiltration from an event.

11   Q    Okay.  Now, the phases 4 and 5, those phases were in a

12   different stage of construction when you were there in June of

13   '19, correct?

14   A    Correct.  Phase 6 is essentially a separate building.

15   It's not within the same envelope of the rest of the complex,

16   so that it's almost like an exterior point source as opposed

17   to an indoor fire.

18   Q    Okay.  So my question back to you is, what were the

19   stages of construction of phases 4 and 5?

20   A    I don't remember specifically.  I know that the entire

21   facility was in various stages of construction.  Some areas

22   were completed; some were not.  I remember looking in two

23   units that were occupied, and I remember looking at my notes

24   that were -- again, there were various areas of completion of

25   construction throughout the complex.

733

```
 1    Q    So do you remember that phase 5 was in a framed-in

 2   stage?

 3    A    Yes.  Phase 5 was not framed in.  I'm sorry.  It had

 4   framing.  It was not -- the walls were not completed.

 5    Q    All right.  So tell me in these unfinished spaces where

 6   the walls were not in, tell me what your observations were of

 7   those areas.

 8    A    That would be 5, phase 5?

 9    Q    Yeah, phase 5.  Phase 5 is closer to the fire; is that

10   correct?

11    A    Phase 5 was immediately -- well, not immediately, but in

12   proximity to the building that burned, phase 6.

13         And on the wall area that was immediately adjacent

14   to 6 or where 6 was at the time, there was evidence of water

15   intrusion.  There was black and darkening on that wall on

16   various members.  I had some difficulty differentiating

17   whether it was water -- it looked like most of it was water

18   damage.

19         Obviously soot is dark and black; so it may be a

20   mixture there.  But that was the only area that I really saw

21   any significant impact.  The rest of it was just pretty much

22   of an open construction area.

23    Q    And, again, within phase 5, which was closer to the

24   fire, based on what you understand the claims were, were you

25   surprised at what you saw?
```
                                  734

```
 1   A    Relative to the FBS report, certainly.

 2   Q    Okay.  So at some point after your initial inspection --

 3   how long did the initial inspection take, do you think?

 4   A    I was there several hours.

 5   Q    Okay.

 6   A    Between the units and looking at the roof.

 7   Q    Okay.  So did you go on all four floors, all the phases?

 8   A    Eventually I did.  I don't recall that I did that day,

 9   but I know I had a second site visit where I looked at

10   pretty -- because we did some testing.  We did testing on all

11   levels.

12   Q    Did you go on the roof?

13   A    On the first inspection, yes, sir.

14   Q    What were you looking for on the roof?

15   A    Just for my own edification, just some sort of

16   indication of the severity of the fire and the impact on the

17   building.  I'm not an expert in that area, but I thought it

18   would be good to look at.

19   Q    Okay.  So after you concluded your initial

20   investigation, at some point you gave to Travelers your

21   preliminary impressions?

22   A    Yes, sir, I did.

23   Q    Tell me about what those were.

24   A    Prior to my report?

25   Q    Tell me what they were in the August 2nd report.
```

735

Case 4:20-cv-00095-FJG   Document 245   Filed 09/05/23   Page 124 of 224

```
 1    A    I didn't see any impact.  There was no indication of

 2   impact that I could discern from my inspection in -- outside

 3   of that small area in building -- phase 5, which I had

 4   previously indicated.  The rest of the facility, I did not see

 5   any impact from smoke.  There was no evidence, based on the

 6   protocols that we follow in this industry, that there was an

 7   impact in those spaces.

 8    Q    Okay.  And also as part of that report, did you evaluate

 9   the FBS findings for Travelers?

10    A    I did.

11    Q    And you had some criticisms of FBS's analysis, correct?

12    A    I did, yes, sir.

13    Q    Tell us what those were.

14    A    The primary consideration was that I felt FBS, for lack

15   of a better term, reduced their evaluation to strictly an

16   environmental testing exercise.  The testing in this field is

17   not exact or very precise.  There are no absolute standards.

18   The data that is reported theoretically from the same sample

19   by five different laboratories could be very different.

20        There is no standard metric by which the impact is

21   assessed.  For example, we'll see numbers, for example,

22   3-percent char or 5-percent char in a sample.  That number is

23   highly variable.  Again, that's not standard in the industry

24   because some laboratories will also report actual counts of

25   soot and char versus percent.  Percent is really a relative
                              736
```

1    standard.  It's not an absolute number.

2            So the numbers and the really science behind it is

3    not real precise.  This is not to be confused with like a

4    medical test for cholesterol or something where you can pretty

5    much get the same number regardless of, you know, who you go

6    to or have it analyzed.  It's going to be -- fall within a

7    very tight range and cholesterol is specifically identified.

8    It's not the case here.

9            As a result of that, the primary criterion, again,

10   as stated in parallel industry documents, for example, mold

11   and fungi, but also for fire.  For example, the AIHA Wildfire

12   Guide, which was published in 2018, specifically state that

13   primary evaluation tool is visual inspection, and any testing

14   that is done should be done very judiciously, very carefully,

15   and it is only a secondary or confirmatory type exercise to

16   be -- again, there's no absolute test, no black-and-white test

17   that can say this is a problem or is not a problem at this

18   level.

19   Q    So in that context, what was specifically your criticism

20   of FBS and what they had done?

21   A    I didn't see anything in there.  Of course, this was

22   confirmed through my visual inspection.  I didn't see

23   anything, any sound visual inspection or assessment of

24   conditions.  It was just a bunch of data that was produced

25   with laboratory data that was generated in one of the many

                                    737

1   ways that we see in this industry.  Again, so it's not

2   standardized, and it was not consistently reported.

3   Q    Okay.  So after you provided Travelers with your August

4   2nd findings, you were asked to go out and conduct additional

5   sampling, correct?

6   A    I was.

7   Q    Okay.  And so walk me through the process of how you

8   arrive at a sampling protocol that -- I believe that sampling

9   took place on September 30th, 2019.  Does that ring a bell?

10  A    Yes.

11  Q    Okay.  So walk me through how you came up with that

12  protocol.  How does one do that?

13  A    Very carefully.  The first thing I did was try to

14  establish a hypothesis as to what I was trying to determine.

15  This was a little bit -- this is different from a standard

16  post-fire assessment because in general what happens is we

17  want to look at -- try to get an idea of the extent of alleged

18  smoke contamination.

19          In this particular case, this was a fire that did

20  not -- this was a hybrid fire.  So the guidelines that we have

21  out there are either for wildfire or for other circumstances.

22  This was a hybrid fire.  It was an external fire but a

23  structural fire.  So structural materials were the primary

24  fuel, but it wasn't within the same envelope as the rest of

25  the building.

738

1    So consequently, the dynamics of how the smoke moves

2    as a result of that and then -- which dictates where you're

3    going to sample and what you're going to look for is not -- is

4    kind of a different animal.  So I had to look at it that way

5    and say, All right.  What am I really trying to identify?

6            Based on the FBS's assertion that there was soot and

7    char essentially in every cavity, every space throughout and

8    in every building cavity, I then contacted a laboratory and

9    explained the situation, and we came up with a sampling and an

10   analytical protocol to test that assumption.

11   Q    To make sure that I'm clear, what you were doing was

12   looking for external infiltration into the wall cavities?

13   That's what you were testing?

14   A    As -- exactly as per -- and as is indicated in the FBS

15   report.  That was the assertion.  That was the assumption, so

16   that's what I wanted to test.  That's correct.

17           Again, I want to point out that the assertion in the

18   FBS report was that the framing, the wood framing, which is

19   the wooden studs and also the wooden sheathing, which is what

20   we call OSB or oriented strand board, needed to be exposed.

21   So the walls, the interior walls needed to be removed and the

22   framing of the building exposed so it could be cleaned and

23   treated.

24           So from that assumption, you know, I deduced that

25   the hypothesis is really looking at essentially soot, char on

739

1  the framing.  In this case, the most logical place would be in

2  the exterior wall cavities based on the hypothesis or based on

3  the presumptions from the FBS report.

4  Q    And in your role as an industrial hygienist, coming up

5  with a sampling location plan based upon a loss, that's part

6  of what you're trained to do and have been doing for 40 years;

7  is that correct?

8  A    Yes, sir.

9  Q    So let's take a look at Defendant's Exhibit 56 if we

10  could.  I want to briefly run through the sampling locations

11  that you chose.

12       While we're doing that, can you tell us -- the

13  laboratory I think you mentioned that you used was a company

14  called R.J. Lee?

15  A    R.J. Lee, correct.

16  Q    Are they an accredited laboratory?

17  A    Yeah.  Rich Lee is very well-known.  He's been in the

18  industry for as long as I -- for well over 40 years.  They are

19  well known as a materials laboratory, and so I contacted them.

20  I'd used them in the past.

21       MR. ELY:  Defendant's Exhibit 156.  Let's go to page

22  2.

23  Q    (BY MR. ELY) So briefly, Mr. Spicer, I just want to run

24  through this quickly.  Tell me what you're trying to do here

25  with the selection of these four sample locations on the first

                              740

1    floor.

2    A     Yes.  And in the -- figuring out the sampling locations,

3    I had to -- again, within -- you know, there were certain

4    budgetary restraints as well because this type of testing is

5    very expensive.  It's not the same as standard kind of

6    post-fire evaluation.  This is more of a research type of

7    effort.

8          So I had essentially 20 samples to work with, I

9    figured.  And within that constraint, looked at the locations

10   horizontally as well as vertically.  So I wanted to get a

11   representation on all levels as well as what I thought would

12   be the most likely routes of entry through the exterior,

13   again, based on the assumptions or the indications from the

14   FBS report.

15         So in this case here, this is the first floor sample

16   locations.  This is in close proximity to phase 6.  Phase 6

17   was the structure that burned.

18   Q     Okay.  You mentioned budgetary constraints.  Let me back

19   up and ask this question.  With regard to the testing, you

20   provided a proposal to Travelers?

21   A     I did.

22   Q     Did you get any pushback on costs?

23   A     No.

24   Q     So there were no budgetary restraints put on you by

25   Travelers?

                              741

```
 1   A    Absolutely not.  I was trying to just be reasonable.

 2   What could I learn with something without conducting a 7th

 3   grade science experiment.

 4   Q    Okay.  So these are the locations you chose on the first

 5   floor.  You're sampling inside the wall cavities, correct?

 6   A    Correct.

 7   Q    Okay.  Let's go to the next page, please.

 8            So we see more of them.  Can you tell me why you're

 9   in phase 5 sampling?

10   A    Again, phase 5, this is the second floor.  I had to make

11   some conclusions as to where I -- this idea of a smoke plume

12   and elevation.

13            So on the second floor, I looked at phase 5 and

14   phase 3.  Phase 5 is 17 and 18.  So that's immediately

15   adjacent to phase 6, which was the initial source of the

16   combustion.

17            So if 17 and 18 would represent theoretically more

18   impact than -- or a different impact than other areas, perhaps

19   more testing.

20   Q    Let's go to the next page, please.

21            Again, other sampling locations still in phase 5.

22   In phase 5, the wall cavities were not closed, were they?

23   A    That's correct.

24   Q    Okay.  Let's look at the next page, please.

25            So these would be your sampling locations.  Tell me
                              742
```

1  with regard to specifically how you sampled.  We've heard

2  mentions of tape lifts.  We've heard mentions of wipe samples.

3  We've heard mentions of SEM tabs.

4         Can you tell me what you selected and how you

5  selected your sampling means?

6   A    I did that in conference with the laboratory people, and

7  we came up with -- since we wanted to do what's called

8  transmission electron microscopy in this particular case, then

9  that requires wipe sampling.  So we did some wipe sampling at

10  each location.

11        In addition to that, we did the traditional, what's

12  called tape lift sampling, which is, I think by its

13  description, it's basically a sticky tape or a sticky material

14  that is -- in this particular case, on a prepared glass slide

15  and has contact with the surface, and you submit that.

16        And then there was a third sample, which we called

17  an SEM.  That stands for scanning electron microscopy stub.

18  And that was just a provisional sample that was collected in

19  the event that the wipe samples were not descriptive for us.

20   Q    Mr. Spicer, I want to ask you a couple of questions.

21  Have you ever in your 41 years sampled in a way to skew

22  results one way or the other to satisfy a client?

23   A    No, sir.

24   Q    Did you do that for Travelers here?

25   A    No, sir.

743

1    Q    Did you -- when you opened those wall cavities, did you

2    or anybody in your employ wipe the surface clean, discard the

3    cleaning material, and then sample afterward?

4    A    No, sir.

5    Q    Explain to us, if you would, how the -- the step-by-step

6    process.  Did you sample with the wipes first?

7    A    In most cases that is my recollection, yes.

8    Q    And what were the size of the wipes?

9    A    The wipe sample is -- again, I want to clarify this.

10   It's a wipe sample media.  The sampling technique was not

11   exactly as we would -- I didn't exactly directly wipe the

12   surface.  The wipe sample media was placed onto the surface,

13   and we tried to tap it or pat it so that it would contact as

14   much of the surface as possible.

15          The reason for that is there is -- we didn't want to

16   smear any material, any carbon material that may be in there.

17   So we then did that and then pulled it off.

18          It's not a -- it's wipe sample media.  It's not

19   really a wipe sampling technique.  It's more closely related

20   to a tape lift, what we call a tape lift.  You can't call it

21   that here because it's not clear tape.  It's a hybrid sort of

22   thing.

23          At any rate, we did that.  It's 4 inches by 4

24   inches.  It has a wetness to it, an isopropyl alcohol that's

25   tapped onto the surface.  We pull that off.  That is then

                                744

1    folded and then placed into a cuvette.  It's a little

         2    container with a top on it that's labeled, documented on site,

         3    and then placed aside for transport.

         4            MR. ELY:  Can you pull up Plaintiff's Exhibit 16,

         5    photo log 13, page 311, please.

         6    Q    (BY MR. ELY) Is this -- Mr. Spicer, this is, as you can

         7    see at the top, it's a Forensic Building Science, Inc.

         8    photograph.

         9            When you were sampling on September the 30th, were

        10    there employees of FBS with you at that time?

        11    A    They were in proximity, yes.  In some cases they were

        12    close by to take photographs; in other cases they were not.

        13    But they were on site the day we were there, that's correct.

        14    Q    Okay.  And so what we see in figure 77, is this you?

        15    A    That is correct.

        16    Q    And it looks as though the -- a piece of Sheetrock has

        17    been cut out?

        18    A    Correct.

        19    Q    Insulation has been pulled out into the room.  And then

        20    in figure 78, is that an example of the wipe samples you all

        21    were conducting?

        22    A    That is correct.

        23    Q    And why were you sampling the back of a cavity?

        24    A    Again, this was in a wall cavity; so this to us

        25    represented the most likely location of infiltration -- or the

                                        745

```
 1   result of infiltration since, again, as indicated to us from

 2   FBS, they had asserted that the smoke plume from the

 3   destruction of building 6 had entered into the exterior wall

 4   cavity or through the exterior of the building.

 5            So in my mind, the most likely place to find any

 6   indications from the testing procedure would be at the

 7   locations as perimeter as we could reasonably get in the

 8   building.

 9   Q    Okay.  And describe for me, if you would, Mr. Spicer,

10   how the insulation impacts the migration of combustion

11   byproducts from the exterior.  Would it prevent it from moving

12   into the front of the wall cavity?

13   A    I don't think -- basically what happens, and, again, it

14   gets to the difference in the types of the fire.  Were this a

15   classical structural fire where there was heavy smoke filling

16   up the inside and perhaps penetrating from the interior space,

17   then in that particular case, the fiberglass may act as a

18   filter or a way of preventing impact onto the structural

19   surface behind it.

20   Q    If this had been an interior fire, interior phase of the

21   doughnut building, which increases the pressure and the heat

22   and all that, would you have sampled in different locations

23   perhaps?

24   A    Yes.

25   Q    Where would you have sampled?
```

746

```
 1   A     Perhaps at -- again, at areas more representative of the

 2   interior space.  For example, on the back side of perhaps the

 3   removed coupon or underneath.  We could have removed wall

 4   cover -- outlet covers.  They can be sampled from the inside.

 5   It would depend.

 6            As part of this -- again, part of what we did here,

 7   and I want to emphasize this as part of the testing, this

 8   was -- I mean, we did testing, that's true.  But we also

 9   looked at -- there was a visual inspection involved with this.

10   So when the fiberglass was removed, we did a visual inspection

11   of the space as well as the back side of the coupon that was

12   removed.

13   Q    What were the results of your visual observations of the

14   wall cavities once you had gotten inside of them?

15   A     In addition to the visual and olfactory, smell, there

16   was no indication to me that there was an impact from smoke.

17   Q    So let's take a look at Defendant's 33, page 39.

18            Hold up.  Sorry.  One more question here.

19            With respect to the cutting of the Sheetrock, is

20   there any way to sample the back of a wall, a closed-in wall

21   cavity other than cut through the Sheetrock?

22   A     Not to my knowledge.

23   Q    And so there's been -- you've heard criticisms of you in

24   this case with regard to the samples that you took that

25   included Sheetrock dust was generated from the saws, correct?
```

747

```
 1   You remember seeing that?

 2    A    Correct.

 3    Q    Tell me what precautions you took to prevent just that

 4   kind of contamination.

 5    A    Well, the -- first place, the -- there is some gypsum

 6   board dust that is generated from the process that can be seen

 7   on the floor here.  The fact that there was the fiberglass

 8   batt immediately underneath the gypsum board, most of the dust

 9   that we could see was collected or, you know, deposited either

10   on the floor or on that batt.

11          So, you know, in my mind that batt served as a

12   pretty good way of preventing any kind of gross contamination

13   into that space.  And then -- or into the wall cavity that

14   would have affected the sampling.

15          Then we took some -- I took some precaution in

16   trying to extract that fiberglass batt in a way that wouldn't

17   generate a lot of dust.

18          Now, that being said, I also want to point out that

19   the TEM analysis that's done is done on what we call the

20   aciniform particles.  So whether there is dust there or not is

21   really irrelevant to the analysis that's done on -- I guess

22   we'll talk about that later -- the actual aciniform particles

23   that may be in that space.

24          So, you know, it's not -- the contamination is a

25   concern if we were in a strict tape lift situation.  We did
```

748

1    tape lifts as well, but we also had the TEM as a backup, and

2    then the SEM if we had to go to that.

3    Q    So the TEM, the media you used for the TEM analysis,

4    just so I'm clear, is this wipe that we see in figure 78?

5    A    That is correct.

6    Q    Okay.  And so is there any other way to get a sample for

7    TEM analysis other than using some kind of wipe media?

8    A    The wipe is what was recommended by the laboratory.

9    There is a -- there are reports of some individuals trying to

10   do TEM analysis on tape, but it's not very successful and it's

11   not -- wasn't recommended by the laboratory.  So that's a --

12   Q    Let's pull up Defendant's Exhibit 33, page 39, please.

13        So as an example, tell me what I'm looking at here.

14   A    The top panel is the travel container or cuvette that's

15   used.  Once the wipe material is collected, it is folded and

16   inserted into this container.  It's labeled and then prepared

17   for transport, stored and prepared for transport.

18   Q    Is it your testimony that every wipe sample that you

19   took at the Metropolitan on September the 30th, 2019, was

20   placed directly into one of these vials, sent to R.J. Lee, and

21   examined?

22   A    Correct.

23   Q    You didn't discard any on the floor?  You didn't put any

24   in the garbage can?

25   A    No.

                              749

```
1    Q    All of them made it to R.J. Lee and were sampled?

2    A    Exactly.

3    Q    So let's back back out.

4         Tell me what the bottom photograph is of.

5    A    This is the container that has the tape sample.  The

6    tape sample, again, was provided, as it shows here, by R.J.

7    Lee.  There are other ways to collect tape samples.  This is

8    what they preferred; so we used the media that they sent us.

9         It's basically a flexible slide that has an adhesive

10   to it, and that's -- it's taken from the container.  The

11   adhesive side is contacted with a surface, not the same

12   surface that we did the wipe sample on, but another surface

13   close by.  And then that's put into this container, again,

14   labeled, documented, and we took photographs obviously.  This

15   is the laboratory photograph, but we photographed on site as

16   well.  And sent to the laboratory.

17   Q    And so inside the wall cavity, you're taking a -- you're

18   using a wipe sample in one area, taking --

19   A    Modified procedure, right.

20   Q    Putting it in the vial?

21   A    Correct.

22   Q    Then you're going back in with a tape sample.  You're

23   going into a different location in the wall cavity than what

24   you just sampled with the TEM?

25   A    Yeah.  Not on the same surface, correct.
```

750

Case 4:20-cv-00095-FJG   Document 245   Filed 09/05/23   Page 139 of 224

```
1    Q    Okay.  Let's go to Defendant's Exhibit 33, page --

2    A    We also conducted a test, a stub as well on each

3    location.  It's not shown here because it wasn't --

4    Q    Okay.  Those SEMs, those were never analyzed?

5    A    That's correct.

6    Q    Why is that?

7    A    Based on what the laboratory indicated to us, they said

8    they -- the TEM analysis was satisfactory to them.  They felt

9    that it was representative of what we had sampled and was not

10   necessary to conduct the SEM.  The TEM also is a little bit

11   more powerful, has other capabilities that the SEM doesn't.

12   So that was, you know, unnecessary.

13        MR. ELY:  All right.  Let's go to page 83 of this

14   same exhibit, please.  Actually can you go to page 75?  I'm

15   sorry.  Got the wrong numbers written down.

16   Q    (BY MR. ELY) We've been talking about the wipe sample

17   and the TEM analysis.  Is this an example of what you're

18   talking about?

19   A    Yes.  This is what arrived at the laboratory.

20   Q    Okay.  And the material on the sample looks like R.J.

21   Lee.  Is R.J. Lee the company that cuts those pieces out?

22   A    Yes.  We don't do that.  That's done strictly by the

23   laboratory.

24   Q    Okay.  So go to page 83.

25        And is this -- tell me what I'm looking at here.
```

                                  751

```
 1    A    This is the -- on the left is the transmission electron
 2   microscopy image.  Light microscopy is only able to, for lack
 3   of a better term, magnify to about 400.  That's what the
 4   traditional counting and assessment is done, at about 400 with
 5   the light microscope.
 6          The transmission electron microscope is able to
 7   magnify up to 100,000 depending on the needs.  So it's much
 8   more powerful, can resolve things much more readily and at a
 9   higher magnification, for lack of a better term.
10    Q    Is the TEM analysis able to differentiate between the
11   particular chemicals or elemental makeups of the particles?
12    A    Yes.  That is shown to the right.  There is a capability
13   where there is a -- this is what's called EDS or electron
14   diffraction spectroscopy.
15          And the -- essentially there's an electron beam
16   that's shot down into a target, and then the elements that
17   make up the target scatter x-rays and other types of energy in
18   a certain pattern as picked up by a detector.  And that's
19   shown on the graph here.
20    Q    Okay.  So tell us what the general results of the PLM
21   and the TEM analysis from R.J. Lee were.
22    A    The light microscopy of the 20 samples, they found --
23   they didn't see anything by light microscopy that was
24   aciniform.  That is to say what we see here, kind of this
25   grape-like structure in the chain, which is characteristic of
```

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

1    soot and char -- or soot and carbon black, they didn't see any

2    of that by light microscopy.

3            Under the TEM, they did see some semblance of that

4    as we see here.

5            But of those 20 samples, none of those fit the

6    definition of soot as defined in the current standard, the

7    6602, which is an ASTM international standard.

8    Q    So why not?

9    A    Because of the way -- the shape of the individual

10   particles.  Even though they are somewhat grape-like, you can

11   see that they -- they're not real distinct.  The connection is

12   also -- the way that they attach to each other and the

13   difference in size is also a way that they differentiate or

14   they assess whether it really fits the classic definition of

15   soot as defined -- or aciniform soot as defined in the 6602.

16   Q    Okay.  And in addition to the PLM analysis and the TEM

17   analysis, you did one other level of analysis also, correct?

18   A    Yes, we did.

19   Q    What's that called?

20   A    Well, on the -- we had a -- what's called a fractal

21   analysis on the TEM images, which basically is a way of

22   looking at the texture of each one of these individual

23   particles, and that is -- that is called a fractal index.  And

24   what that does, that's a technique well-known in air pollution

25   science.  But it basically is characteristic of the type and

                                753

1 the fuel source of that particular particle that they see.

2 Q    What are you looking at?  Are you looking at -- what

3 about the particle are you looking and comparing?

4 A    The -- we're looking at basically the surface structure

5 relative to the total volume of the particle, and that's done

6 through a very complicated computer analysis program.

7          MR. ELY:  Can we go to page 134.

8 Q    (BY MR. ELY) Is this what you're talking about of a

9 fractal analysis?

10 A    The fractal analysis is actually a number that comes

11 out, but this is the image that is used to generate that

12 fractal analysis.

13 Q    Okay.

14          MR. ELY:  Can you go to page 7.

15 Q    (BY MR. ELY) So tell me what I'm looking at here,

16 Mr. Spicer, in terms of this fractal dimensions table.  It

17 looks like you have it divided between phase 5 and phases 1

18 through 4.

19          MR. ELY:  Chris, if you can take the next page and

20 split it.

21 Q    (BY MR. ELY) Tell me what I'm looking at with this

22 table.

23 A    The table is a summary of the fractal dimension data

24 that was collected.  And the samples, 15 through 20, which are

25 the top half of the table, represent fractal dimensions

754

1    generated from data in phase 5.  And then -- correct.

2          And then the remainder of the table are the fractal

3    dimensions generated from the samples collected throughout

4    phases 1 through 4.  Phase 5 and phases 1 through 4 were set

5    up as basically two comparators.  1 and 4 were combined.  So

6    we compared the fractal dimension of the particles in phase 5

7    or picked up in phase 5 versus the fractal dimension of the

8    particles in phases 1 through 4.

9          What I do want to -- I want to go back a little bit

10   to the TEM analysis from R.J. Lee.  Their light microscopy did

11   not find any -- as I said, any classic aciniform.  That would

12   be this grape-like structure that's used for -- as a

13   characteristic of soot.  However, they did in the TEM.  They

14   did find aciniform particles that were suggestive of other

15   combustion sources.

16         When I say "other combustion sources," the classic

17   definition in D6602 is predominantly carbon and maybe a little

18   bit of oxygen.  That's the way that standard is set up to look

19   for carbon black and soot.

20         In this particular -- there were combustion-related

21   particles that were found.  So what we -- again, by doing

22   this, we were able to do a comparison between those aciniform

23   combustion particulates suggested from the TEM analysis in

24   comparison by the fractal dimensions.

25   Q    Okay.  So -- why are you comparing phase 5 to 1 through

                                755

```
 1   4?
 2    A     Based on the sampling plan, I went in with the
 3   assumption that phase 5 would be -- because that was closest
 4   to the building that burned, phase 5 in my mind likely would
 5   be -- if it showed anything related to impact from the fire,
 6   would be the most likely to show that; and, therefore, I set
 7   up phase 5 as a comparison against which to look at the other
 8   phases 1 through 4.
 9    Q     What did you determine?
10    A     There is a significant difference.  The aciniform
11   particulates, the combustion particulates are not basically --
12   as we say, statistically not from the same population.  They
13   appear to be from this, from two different sources.
14    Q     What conclusion were you able to draw from that?
15    A     Well, again, that's -- that is another bit of
16   information in this whole process between visual inspection
17   and all the other testing and all the other things we do that
18   strongly indicate that there was not a source from 5 that went
19   over into the other areas of the building.
20    Q     Okay.  So based upon your education, experience of over
21   40 years in practicing industrial hygiene, based upon your
22   review of the site, sampling, and the test interpretation
23   results, interpretation you've done, are you able to say to a
24   reasonable degree of scientific certainty whether you were
25   able to find evidence of aciniform soot or char from the phase
```
756

```
 1   6 fire in the other areas of the Metropolitan?

 2    A    I came to a reasonable scientific conclusion that there

 3   was not impact from the fire area 5 over to the doughnut

 4   portion of the building.

 5    Q    And overall, was there any impact across the

 6   Metropolitan that you were able to find from the phase 6 fire?

 7    A    No.

 8              MR. ELY:  Thank you, Mr. Spicer.

 9              MR. ABRAMS:  May I, Your Honor, or are you --

10              THE COURT:  I'll let you know when I'm ready.

11   CROSS-EXAMINATION BY MR. ABRAMS:

12    Q    Good afternoon, Mr. Spicer.

13    A    Good afternoon.

14    Q    You mentioned -- we were talking about your

15   qualifications, your background.  You mentioned your work at

16   IIRIC, correct?

17    A    It's IICRC, but that's okay.  It happens all the time.

18    Q    I can never get it right.  IICRC.

19              And one of your colleagues on the committee that you

20   were working on is Mr. Dan Baxter, correct?

21    A    Correct.

22    Q    And you consult with Mr. Baxter on a regular basis,

23   correct?

24    A    With -- in regards to that committee, absolutely.

25    Q    Yeah.  And you have respect for Mr. Baxter's background
```

<div align="center">757</div>

1    and qualifications?

2    A    I do.

3    Q    Okay.  So you first visited the Metropolitan on June

4    13th, 2019, correct?

5    A    Correct.

6    Q    And when you visited, the HVAC was working, air

7    conditioning on?

8    A    At the time, the HVAC is -- the HVAC -- that's the air

9    conditioning.  I'm sorry.  Heating, ventilation, and air

10   conditioning was on in some of the units.  My recollection was

11   that the HVAC that I was looking at were the individual units

12   in -- that service the individual apartment units that I

13   looked at, my recollection was some of those were on and some

14   of those were not.

15   Q    Okay.  And you understand that between the time of the

16   fire and the time that you went to -- had your first visit,

17   there had been some repair and painting and such of the

18   Metropolitan, correct?

19   A    There was, as indicated in the FBS report and as well as

20   when I was there, there was ongoing construction activity as

21   well.

22   Q    Okay.  And you generated a report -- it's actually -- it

23   looks like the same report, but there's like three little

24   word -- it's not very consequential.

25          You generated a report on July 31st, 2019, for
                              758

```
 1   Travelers and another one on August 2nd; is that right?

 2    A    I would have to see that.

 3    Q    I'm going to hand you -- I'm going to put in front of

 4   you the reports that I'm going to ask you about.

 5    A    Okay.  Yes.  Apparently, yes.  There was two reports

 6   within a few days.

 7    Q    And just so the record's clear, there is a report on

 8   July 31st, 2019, that's Plaintiff's Exhibit 237, and one on

 9   August 2nd, 2019, Plaintiff's Exhibit 24, correct?

10    A    Yes.

11    Q    Okay.  And, again, they're almost identical.  There's I

12   think just -- do you remember there was a change of just a

13   couple of words?  I'm not suggesting they're consequential at

14   all, but do you remember that?

15    A    I don't specifically, but it doesn't surprise me, you

16   know, that it may have happened.

17    Q    Okay.  And this report, I know counsel mentioned the

18   word "preliminary." I know you did another report, but this

19   is -- what's here, let's just use Plaintiff's Exhibit 24, the

20   later one, August 2nd, 2019.  It does indicate it's a

21   preliminary report, correct?

22    A    No.  You know, I could do a word search, but I don't see

23   the word "preliminary."

24    Q    It's not a draft, correct?

25    A    I don't believe so.
                              759
```

1    Q    Okay.  You actually -- my point is you actually sent

2    this to Travelers, correct?

3    A    I believe so.

4    Q    All right.  And you believe that you would have sent

5    this to Travelers on or about August 2nd, 2019?

6    A    I believe so, sure.

7    Q    Okay.  And in that report, you reach some conclusions.

8    And essentially if I could distill it down, you concluded that

9    there was no analytical support for fire residual

10   contamination at the Metropolitan in phases 1 through 4,

11   correct?

12   A    That would be -- I believe if you -- right now without

13   looking at it specifically, I believe that was based on the

14   review of the FBS report, and I questioned the analytical

15   protocols in that.  And, therefore, because of those

16   questions, I said the analytical support is not strong.  I

17   think that's what I said.

18   Q    Okay.  And that was based upon your visit to the

19   Metropolitan in June, correct?

20   A    That conclusion would have been based upon my assessment

21   of the FBS report and certainly reinforced by my inspection.

22   Q    Okay.

23   A    Or my inspection was consistent with that.

24   Q    And you did not believe, as part of your conclusion in

25   your written report on August 2nd, that there was support for

                              760

1    FBS's conclusions calling for extensive interior demolition

 2    and cleaning of the Metropolitan, correct?

 3    A    I'm sorry.  Could you repeat that?

 4    Q    Yeah.  Your conclusion in your August 2nd report to

 5    Travelers was, is you didn't think that there was support in

 6    FBS's conclusions that were calling for an extensive interior

 7    demolition and cleaning at the Metropolitan, correct?

 8    A    Correct.

 9    Q    Now, I want to ask you about a few other things in your

10    report.  You state here, and I think you touched on it in your

11    testimony on direct, is that due to the lack of standardized

12    testing, there is no fixed numerical concentration of soot or

13    char that can consistently be described as denoting

14    contamination or damage, correct?

15    A    That's correct.

16    Q    In other words, if you were to define damage, different

17    people have different views of what damage is, correct?

18    A    Well, and that is -- I was making, I believe, a specific

19    reference to laboratory data which can be easily taken out of

20    context.  That's why I made that statement.  The fact that,

21    you know, a 5-percent char or 5-percent soot with some

22    individuals might be considered problematic, and other people

23    it would -- it may not be, and it's -- there's no standard for

24    that.  So damage is -- in this realm is very difficult to

25    attach to a specific analytical value.

                              761

```
 1   Q    So there are no fixed numerical concentrations of soot

 2   or char that there is uniform agreement as to what constitutes

 3   damage?

 4   A    Right.  In any given circumstance, that's correct.

 5   Q    And, likewise, by extension, there are no health-based

 6   standards or exposure limits to the levels of soot or char for

 7   fire residual on surfaces, correct?

 8   A    Certainly.  And when we talk about exposure, now we're

 9   slipping into a whole other area because --

10   Q    Mr. Spicer, I'm reading directly from your report.  Do

11   you agree that by extension, there are no health-based

12   standards or exposure limits, i.e. levels of soot and char for

13   fire residual --

14   A    Correct.  In that context, correct.  I apologize.

15   Q    And you agree that fire residuals can contain a wide

16   range of organic compounds and inorganic compounds, some of

17   which are carcinogens, correct?

18   A    Certainly.

19   Q    And carcinogens are materials that can cause cancer in

20   humans, correct?

21   A    That is correct.

22   Q    Okay.  And exposure to humans can be through -- of these

23   carcinogens can be through inhalation of dust, absorption

24   through the skin, and/or inadvertent ingestion or resulting

25   from inadequate washing after a contact with these
```

<center>762</center>

Case 4:20-cv-00095-FJG   Document 245   Filed 09/05/23   Page 151 of 224

1   contaminated surfaces, correct?

2    A    That is correct.

3    Q    That's why when you have personnel that are exposed to

4   certain surfaces or in the air, you know, you wear coveralls

5   and gloves and respirators and such?

6    A    I think I explained that.  And, therefore, particularly

7   for the remediation, people who are doing direct contact

8   with -- who are cleaning up restores who are -- have obvious

9   contact with material that's blackened or charred in that

10  circumstance, that's correct.

11   Q    So just to get our timing again correct, you visit in

12  June 13th, 2019; you write a report and send it to Travelers

13  on August 2nd, 2019; and then you come back and do testing, do

14  sampling for testing on September 30th, 2019, correct?

15   A    That timeframe seems correct, yes.

16   Q    Is -- was there any reason for the delay between your

17  report in August -- well, your first visit in June of 2019 and

18  then not sampling until September 30th, 2019?  Do you remember

19  why there was that time difference?

20   A    I can remember one of the reasons why.

21   Q    Yes?

22   A    Because my first advice to Travelers was there is no

23  need to do any testing for this, and I spent considerable

24  amount of time explaining to them what I had done in a very

25  brief format here today with regards to the limitations and

                              763

1   the ease by which generating a lot of data can oftentimes

        2   result in confusion and lack of clarity.

        3           So before I -- in that whole process of discussing

        4   this with Travelers, I made a point of explaining to them what

        5   the advantages and disadvantages were.  That took some period

        6   of time.

        7   Q   So you had -- so it sounds like there was -- again, June

        8   13th, you go and do your initial investigation, you write your

        9   report.  That gets done.  Six weeks later, August 2nd, 2019.

       10   And then you have a series of discussions with Travelers about

       11   whether to do additional testing, which ultimately results in

       12   your visit on September 30th, 2019, correct?

       13   A   Correct.

       14   Q   All right.  So let's talk about Birmingham, and you --

       15   your report doesn't cite any source of information about what

       16   background levels of soot and char are for Birmingham,

       17   Alabama, correct?  Or in this particular part of the city,

       18   correct?  I didn't see it.

       19   A   That's because there's no specific references.  They

       20   give a metric for that, as I indicated before.  The whole

       21   field of even assigning a metric or, for lack of a better

       22   term, number that people can kind of grasp is the question of

       23   how that's done is not standardized out there.  Or we can say

       24   that, and I think I put references in there, that Birmingham

       25   is known to be at least in the air pollution field to have

                                    764

```
 1   generated a fair amount of airborne particulate from

 2   combustion sources.

 3   Q    And that's because historically Birmingham in the past

 4   was a steel manufacturing city, correct?

 5   A    And it still is today with regards to -- I believe there

 6   have been -- I believe it's on the list of -- generated by the

 7   EPA with regards to pollution from particulates.  I think I

 8   referenced that in there.

 9   Q    But that's not in your report, is it?  It's in front of

10   you.

11   A    Okay.

12   Q    Both of them are.  Well, all three of them are.

13   A    I know one of my reports has it.  It may not be this

14   one, but I do recall a --

15   Q    Well, you -- I'm sorry.  I didn't mean to cut you off.

16            Mr. Spicer, just to be clear, I think you say it,

17   but you don't cite any source of information regarding the

18   background levels of soot and char in Birmingham, correct?

19   A    I don't necessarily agree with that.  I believe that I

20   had.

21            Well, I'll agree to disagree on that at this point

22   so we can move on, but I usually --

23   Q    If you can locate it, that's fine.

24   A    Thank you.

25   Q    What we can agree on is you didn't perform any testing
```

<center>765</center>

1   or background levels in the city of Birmingham during your

2   investigation, correct?

3    A    Certainly not.

4    Q    Okay.  All right.  You mentioned that you took -- when

5   you got there for your next visit on September 30th, 2019, you

6   took some samples.  You said you took samples from 20 places,

7   right?

8    A    Correct.

9    Q    And you mentioned that part of the reason why you took

10  20 samples were budgetary concerns?  You mentioned budgetary.

11   A    I mean, I wanted to -- it wasn't a constraint, but I

12  certainly -- as I said, I didn't want to propose something

13  like 50 samples that would take two weeks to complete.

14         Again, in any situation such as this, one of the

15  first things that, you know, we like to consider is, okay, how

16  much sampling am I going to conduct, and what are the

17  locations that would be -- give me the most information.

18         So, you know, that comes into play.  You figure out

19  how many samples.

20   Q    Right.  So you -- but one of your concerns was

21  budgetary.  I'm trying to get an understanding.  Is it the

22  cost of your folks' time in taking the samples, or is it the

23  cost -- the budgetary concern, the cost of the lab analyzing

24  the sample or both?

25   A    It would be both, and I -- to be quite honest with you,

                              766

1   when I had this first discussion with Travelers, I was a

2   little embarrassed because it was going to be a little higher

3   than I had hoped it was.  It turned out to be a fair amount of

4   money.

5   Q    To do the 20 samples, when you say a fair amount of

6   money, can you give us an idea of what we're talking about?

7   A    The total project cost to my recollection -- to answer

8   your question previously about this, you know, it involves the

9   laboratory analysis and the transport and the travel down to

10  do it and the analytical -- the writing of the -- the report

11  writing.  Beginning to end, including the analysis, I believe

12  the total project was around $70,000.

13  Q    Okay.  But to take -- like if you added a sample, like

14  is there an amount per sample that it would cost you?  Can you

15  get it down to that?  Your 70,000 includes your first visit,

16  correct?

17  A    No.

18  Q    This is just the second visit --

19  A    Exactly.

20  Q    Okay.  And so do you have an idea of what it cost per

21  sample to -- for your folks' time to take it and for the lab

22  to charge you to analyze it?

23  A    Well, I don't -- you could divide 20 into 70,000 and

24  come up with a very, very crude unit cost, which includes

25  travel and all of the things that generate the report.  So I

                                767

1    guess you could do it that way, but --

2    Q    Okay.  So it would be somewhat less than that because

3    you have certain fixed costs, correct?

4    A    Sure, sure.

5    Q    All right.  The -- you chose -- if I'm correct, you

6    chose the places to sample, correct?

7    A    Well, I chose them, but they were not chosen randomly.

8    They were generated by a report.

9    Q    No, I understand that.  I'm just asking if you chose the

10   locations to sample.

11   A    Yes.

12   Q    Okay.  And you knew at the time that you sampled on

13   September 30th, 2019, you knew where FBS had sampled

14   previously, correct?

15   A    I had their previous report.  I don't recall that I used

16   their previous sampling as an influence on where I sampled.

17   Q    Well, I know that.  But I'm just -- I know that for a

18   fact.  But I'm just getting out the fact -- I just want to --

19   I think you've just confirmed it -- is you chose to sample in

20   different places than FBS sampled, correct?

21   A    Yeah.  My choice was driven on their hypothesis with

22   regards to the pathway into the building.

23   Q    And I'm correct that you did not sample behind or

24   alongside wall outlets, electrical outlets, correct?

25   A    Not immediately adjacent, correct.

                              768

```
 1   Q    Okay.  And you didn't sample alongside switch plates,

 2  correct?

 3   A    Not immediately adjacent, no.

 4   Q    Or through recessed can lights, correct?

 5   A    I'm sorry.  Could you repeat that?

 6   Q    Yeah.  Through recessed can lights?

 7   A    Ceiling, like recessed ceiling?

 8   Q    Yeah.

 9   A    No, I don't recall we did.

10   Q    Or through drop ceiling plenums?

11   A    Correct.

12   Q    Or you didn't sample elevator shafts, correct?

13   A    Correct.

14   Q    You didn't sample -- well, you didn't take any bulk

15  samples of insulation, correct?

16   A    That's correct.

17   Q    All right.  When you did take -- we've seen some photos

18  of this.  When you did take the samples behind the wall, it

19  looks like you cut a 16-inch by 16-inch square into the gypsum

20  board of the wall; is that right?

21   A    I did not cut that.  That was done by a facility

22  representative who was there at that time, but at our

23  direction, we said this seems to be a place where we would

24  like this cut.

25   Q    I didn't mean to say that you actually took out the saw
```

769

```
 1   and did it, but you told the folks with the saw where to cut
 2   it?
 3    A    Correct.
 4    Q    And again -- let's look at slide 9.
 5              THE COURT:  Mr. Abrams, why don't we take a break
 6   here.
 7              MR. ABRAMS:  Okay.
 8              THE COURT:  We'll resume at 2:15.  I'll ask the
 9   members of the jury, remember the admonition of the court.  Do
10   not discuss the case at this time or any time before
11   submission of the case to you.
12              Thank you.
13                   (A recess was taken.)
14              (The following proceedings were had in the presence
15   of the jury:)
16   CROSS-EXAMINATION (continued) BY MR. ABRAMS:
17    Q    Mr. Spicer, switching subjects, there's been talk about
18   ASTM, the ASTM standard, standard 6602.
19    A    That's correct.
20    Q    You're familiar with that, correct?
21    A    Yes, sir, I am.
22    Q    And I just want to clear up a couple things.  That
23   standard is a standard that's used to identify carbon black,
24   correct?
25    A    It's designed for that purpose, that's correct.
```
                                 770

1   Q    All right.  It's not designed to determine the

2   deposition patterns of soot, correct?

3   A    That's correct, yes.

4   Q    Okay.  In other words, there's nothing in the ASTM 6602

5   standard where it says it should be used to identify soot from

6   structural fires, correct?

7   A    That's correct.

8   Q    All right.  Switching subjects, the -- let's talk about

9   the methodology in wipe sampling.  I'm correct, and I think

10  you sort of alluded to this, that the science in this area is

11  evolving, correct?

12  A    To put it politely, yes, sir.

13  Q    What do you mean by that?  It's evolving at a radical

14  degree?

15  A    Correct.

16  Q    Correct?

17  A    Yes.

18  Q    In other words -- and it's actually been evolving even

19  since this work was done on the sampling that was done back in

20  2019, correct?

21  A    There are certain aspects of -- particularly the

22  sampling analysis portion of it which are evolving, that's

23  correct.  The basic premise behind the evaluation based on

24  visual inspection and understanding what went on and getting

25  as much information as possible as the primary criterion by

                            771

1  which to judge -- that's still in place.

2  Q    Okay.  Understood.  But, again, what one would have

3  recommended doing back in 2019 as far as sampling may be

4  different than one would recommend doing today, just three

5  short years later?

6  A    Well, as a general rule, that's true.  I don't know if

7  that's particularly in this particular situation, but I would

8  say as a general rule, that's certainly possible.

9  Q    Okay.  And we'll get into the specifics.

10          So let's talk about wipe sampling.  So it's my

11  understanding what was done back in 2019 for wipe sampling or

12  what you all did was you took a 4 by 4 inch of Texwipe fabric

13  media that's premoistened with 70 percent isopropyl alcohol,

14  correct?

15  A    Correct.  That's the way it comes from the laboratory,

16  correct.

17  Q    And then you sampled each location with a sticky tape,

18  correct?

19  A    Correct.

20          MR. ABRAMS:  In fact, can we throw up slide 121.

21  Q    (BY MR. ABRAMS) Okay.  So, Mr. Spicer, these are photos

22  of your team's work in sampling.  Can you just show on the

23  left side, what are we seeing there?

24  A    That's the Texwipe, 4 by 4 Texwipe.  That's the trade

25  name.

772

```
 1    Q    And then on the right?

 2    A    That is the SEM stub.

 3         MR. ABRAMS:  Okay.  You can take that off.

 4    Q    (BY MR. ABRAMS) So once the samples were taken, they're

 5    sent to R.J. Lee, correct?

 6    A    Correct.

 7    Q    And just to have -- you don't do the tests at R.J. Lee,

 8    correct?

 9    A    No, that's correct.

10    Q    Are you a microscopist?

11    A    I am not.

12    Q    You wouldn't be qualified to do the testing, are you?

13    A    No, absolutely not.

14    Q    And you didn't go to the lab to look at how they were

15    doing it, correct?

16    A    No, sir, I did not.

17    Q    All right.  So just a little bit more about the science

18    of how wipe samples are analyzed.  So this is a TEM analysis,

19    correct, that we're talking about, right?

20    A    That is correct.

21    Q    Again, tell us what TEM is, just to refresh us.

22    A    Transmission electron microscopy.

23    Q    Okay.  And so under a TEM analysis, the wipe samples

24    have to be placed in 20 milliliters of filtered acetone,

25    correct?
```

773

```
 1   A    There is a procedure that is used to manage the samples.
 2   Q    Right.  That's what I'm going to go through here.
 3        But that's what R.J. Lee did here, right?
 4   A    I would have to go back and look at that, but there is
 5   an extraction process that goes on.
 6   Q    Do you have Exhibit 238 in front of you?
 7   A    I do not.  I have 237.
 8   Q    So you don't have to take my word for it, look at
 9   appendix 3, page 27.
10   A    I'm sorry.  Did you give me a page?
11   Q    Yes, appendix 3, page 27.  I think there's two copies
12   there.  Don't get confused.
13   A    That was appendix C, you said?
14   Q    Yeah.  No.  I'm sorry.  Appendix 3.
15   A    I apologize.  I'm having some difficulty locating it.
16   This is in the R.J. Lee section?
17   Q    It should be, yeah.  Appendix 3, page 27.  If you
18   need -- you want me to --
19   A    Yes, sir.  Please, if you would.
20   Q    All right.  Why don't we do this:  I'm going to have
21   someone else do it so we don't waste everybody's time.  Then
22   we'll come right back.
23        Okay.  So, Mr. Spicer, you understand that typically
24   the way labs do this, and we're going to look at the specific
25   reference, is you put -- normally it's put into acetone,
```
774

```
 1   correct?

 2   A    I don't -- I can't tell you exactly.  I believe that's

 3   correct, yeah.  I know there's some solvent that's involved.

 4   Q    Some solvent, okay.  And then you have to create some

 5   particle suspension by agitating each sample for a number of

 6   minutes, correct?

 7   A    Correct.

 8   Q    And so it's -- you use sort of this ultrasonic bath to

 9   break up the aggregates and particles, correct?

10   A    It's a sonication, what's called sonication.

11   Q    So I'm correct?

12   A    Yes.  And it's used to dislodge the particles from the

13   sample media.

14   Q    And so by doing that, it changes and alters the particle

15   size distribution, correct?

16   A    Repeat that question.

17   Q    Yeah.  When you do this, when you do this ultrasonic

18   bath and you shake it up for ten minutes, it changes or alters

19   the particle size distribution?

20   A    Well, it may, depending on what particles you're talking

21   about.  If it's agglomerated soot, maybe, maybe not.

22   Q    Okay.  But it's possible by doing that, it could alter

23   agglomerate soot, correct?

24   A    It may.

25   Q    And that's one of the reasons why there's -- before we
```

<center>775</center>

1    go further, does that indicate the samples that were placed in

2    the acetone?

3    A    Yes, correct.

4    Q    Okay.  Forgot what I was asking you.

5         The reason that -- well, you said that it may

6    disrupt the formation of soot when you go through this

7    ultrasonic bath and the agitation, correct?

8    A    Correct.

9    Q    That's one of the reasons that wipe sampling has become

10   disfavored for this type of analysis, correct?

11   A    No.

12   Q    It's not one of the reasons?

13   A    No.

14   Q    Okay.

15   A    But this -- we were not doing a standard post-fire

16   analysis.  This was a -- we were doing a -- testing a specific

17   hypothesis, location, alleged location of smoke and soot.  So

18   the TEM is applicable for this particular application.  It's

19   not -- as I indicated before, this is a specialty type of

20   exercise.  It was not a standard soot, char, and ash

21   evaluation.

22   Q    So a standard soot, char evaluation is trying to

23   determine amount and source of soot, correct?

24   A    That is -- that is done by -- there's a couple of

25   factors involved with that.  There are three things that are

                                  776

1  being looked at.  One is obviously location.  It's done with
2  tape sampling generally --
3  Q    To interrupt you, my question is when you said a
4  standard, when you're doing a standard review, isn't the
5  purpose of a standard review or what you're trying to get at
6  is amount of soot and char and source; is that right?
7  A    The source is deduced.  It's not a direct indication.
8  You have to deduce that from the indication you get from the
9  sampling analysis.
10  Q    And what I mean by "source" is whether it came from a
11  structure fire or not from a structure fire?
12  A    There are -- yeah, there are clues with regards to
13  source, whether it's a structure.  That's correct.  What the
14  source was, that's correct.
15  Q    Okay.  And that's what you call standard, right?  Those
16  are a standard testing protocol?
17  A    The standard testing protocol is one, tape sampling,
18  light microscopy.  And by that, there is the -- as you had
19  indicated, trying to get some clues as to the sort based on
20  the depositional pattern in the sample.
21  Q    Okay.  Completely agree.
22          So -- and that is the standard of the science now;
23  that if you were trying to determine whether it comes from a
24  structure fire and amounts, you use the combination of -- the
25  best method, as far as you're concerned and what the standards

                                777

1  are in science, is tape sampling versus light microscopy,
2  correct?
3   A    For that particular purpose, that's correct.
4   Q    Okay.  Because -- and the reason for that is because
5  wipe sampling and TEM analysis aren't the ideal method to
6  determine the difference between background soot infiltration
7  and the soot condensation patterns that are normally
8  associated with a fire event such as what happened in the
9  Metropolitan?
10  A    Not necessarily.  If we're looking -- we used -- in this
11  particular case, we used the TEM to get a better indication of
12  the type of particles that were present and then to do an
13  analysis of the surface characteristics by which to determine
14  sources in that case.
15          In our particular case, we identified, for example,
16  the sources by the fractal analysis were characteristic of
17  diesel soot.  I think that's pointed out in my report.  So it
18  depends on what purpose we're talking; what the context and
19  the purpose of the particular investigation is.
20  Q    But if the context of the investigation was to determine
21  whether the soot and char was present from a structure fire,
22  the best method to do that is tape analysis using light
23  microscopy, correct?
24  A    Please repeat that.
25  Q    Yeah.  If the goal of your testing is to determine
                              778

1    whether the soot or char came from a structure fire, the best

2    way to do that is from -- is light microscopy using tape

3    samples, correct?

4    A    For a general building assessment, depending on what

5    you're looking for, the light microscopy tape sampling gives

6    you the most information, biggest bang for your buck, so to

7    speak, for what you're doing.

8    Q    Right.  When I say what you're looking for, you're

9    looking for whether there's the presence of soot and char from

10   a structure fire?  And in that case, the best method would be

11   to use tape sampling using light microscopy, correct?  That's

12   the standard in the industry right now, correct?

13   A    Within the context of the general building assessment,

14   yes.

15   Q    Okay.  Just to give us an understanding of like the

16   magnitude of what we're looking at here, the -- and I know

17   you're not a microscopist; so if you don't know this, let me

18   know and I'll move on.

19        Do you understand or can you describe the maximum

20   size of the particle that can be analyzed in a TEM?

21   A    The maximum size?

22   Q    Yeah.

23   A    Not off the top of my head.  We're talking about micron.

24   So we're talking about a thousandth of a millimeter or one

25   25-thousandth of an inch.  We're talking about very small.

779

1  Q    Super, super small.  In other words, like if I were to

2  think of your wipe sample, is it fair to say that what the

3  microscopist is looking at is one 300-thousandth of that wipe

4  sample?

5  A    Right.  He's looking at a small section of it.

6  Q    Right.  That's what I'm talking about.

7  A    Yeah.  He's looking at a very small section of the

8  sample, that's correct.

9  Q    Okay.  All right.  A little bit more about this because,

10  again, we talked about ASTM, and the purpose is to look for

11  carbon black.

12          Carbon black, am I correct, is manufactured at more

13  than 2,400 degrees Fahrenheit?

14  A    Carbon black is a -- I don't know the exact temperature,

15  but it's -- it's a controlled material.  It's an industrial

16  material that is generated for various commercial purposes.

17  So it has a really specific temperature, and it ends up being

18  produced with very specific surface characteristics and size

19  characteristics and agglomeration or chain connections that

20  all can be evaluated in the TEM.  That's why the TEM is used.

21  Q    So -- but -- okay.  I know you may not know exactly the

22  temperature the carbon black is manufactured.  Fair enough.

23          But you know that carbon black is manufactured at a

24  higher degree than soot is generated?

25  A    I don't know exactly, but it doesn't surprise me.  I'll

780

1    take your word for that.  I don't know the exact differential.

        2    Q    Do you know the temperature in which a TEM electron beam

        3    is used to collect the image of a sample?

        4    A    Hot, hot is all I can tell you.

        5    Q    I'm going to start with the microscopist questions.

        6         All right.  Just quickly on the R.J. Lee -- I want

        7    to do this quickly.

        8         On the R.J. Lee results, even doing the wipe samples

        9    and the TEM, they found aciniform -- they did find aciniform

       10    material, correct?

       11    A    Correct.

       12    Q    And --

       13    A    In 16 of 20 samples.

       14    Q    You knew the question I was going to ask you.  They

       15    found it in 16 -- perfect.  You're saving time.  They found it

       16    in 16 of the 20 samples.

       17         Let's switch subjects.  One of the things that you

       18    noted in the fractal analysis and as part of your report, that

       19    they saw the presence of calcium, right?

       20    A    Correct.

       21    Q    Okay.  And you have some opinions about that.  But

       22    you'll agree that calcium is also an element in gypsum board

       23    and Sheetrock dust, correct?

       24    A    Correct.

       25    Q    And the gypsum board is -- when you had to cut open, you

                                        781

```
 1   asked someone else to cut it open in order to take your test,

 2   correct?

 3   A    Correct.

 4   Q    Your samples?

 5   A    Correct.

 6          MR. ABRAMS:  Can you throw up real quick 117, 118

 7   that we did before.

 8   Q    (BY MR. ABRAMS) While we're getting that ready,

 9   Mr. Spicer, you agree that calcium is also found in PVC pipe?

10   A    That what is?

11   Q    Calcium.

12   A    That one I don't know.  PVC is primarily -- chlorine is

13   one of the ones we look for as a result of combustion of PVC

14   pipe.

15   Q    You don't know if calcium is in it?

16   A    I don't know.

17   Q    Electrical wiring?

18   A    Electrical wiring, a lot of times there's hydrocarbons

19   and chlorine, but, again, it's a PVC covering.

20   Q    Vinyl windows?

21   A    It would be the same.

22   Q    Hardie board's got calcium in it?

23   A    That I would expect.

24   Q    Okay.  And this is a picture -- to the right, this is a

25   picture of your sampling, correct?
```

<div align="center">782</div>

```
 1    A    At this location, that's correct.

 2    Q    Right.

 3    A    Appears to be.

 4    Q    It's not every sample.  It's just a picture of one

 5    sample?

 6    A    Right.

 7    Q    Go to the next one.

 8         Same thing, a picture of what you're sampling?

 9    A    Correct.

10    Q    We also talked where you mentioned about the fractal

11    analysis?

12    A    Yes.

13    Q    Okay.  And that found presence of calcium also, correct?

14    A    No.  Fractal analysis is an evaluation of the surface

15    characteristics of the aciniform carbon particles.  It has

16    nothing to do with calcium.

17    Q    I'm sorry.  I got confused.  All right.

18         But the fractal analysis, the same thing -- you're

19    using the same wipe sample material in order to look at it?

20    A    Yes, of course.

21    Q    So, in other words, it's gone through the agitation,

22    it's gone through the heating and so on?

23    A    Correct.

24         MR. ABRAMS:  Thank you, Mr. Spicer.

25    REDIRECT EXAMINATION BY MR. ELY:
```

                              783

1    Q    Chris, I believe you mentioned earlier that in your

2    inspection of phase 1 through 4 building, you were looking in

3    cabinets and you were looking in closets, correct?

4    A    Yes.

5    Q    Why specifically were you looking in there?

6    A    Because, again, smoke -- I think we all from our own

7    common experience understand that smoke is airborne, so it can

8    get into these spaces.  And since there's no ventilation, for

9    example, within a closet, it may linger there and so it will

10   settle.  You may get odors as a result.  Again, that's a

11   typical place that one would look in an inspection of this

12   nature.

13   Q    And like cabinets, no HVAC vent in a cabinet?

14   A    I'm sorry?

15   Q    No HVAC vent in a cabinet?

16   A    No.

17   Q    Last question.  With respect to your sampling that you

18   did on September the 30th of 2019, had you been provided

19   reports, sampling reports from EMSL or MicroVision prior to

20   those -- prior to your trip to the Metropolitan?

21   A    I'm trying to -- you know, it's been four years.  I've

22   seen those reports.  I can't remember exactly if I saw them

23   before or after as I sit here today.

24   Q    And additional reports, is that something that would be

25   helpful in your analysis -- would have been helpful in your

                                784

```
 1   analysis in September?
 2    A    Sure.  It would have factored into my whole assessment,
 3   sure.
 4           MR. ELY:  That's all I have.  Thank you.
 5           MR. ABRAMS:  No further questions, Your Honor.
 6           THE COURT:  Thank you.  You may step down.
 7           MR. ELY:  Your Honor, defendant calls Stephen Brian.
 8   STEPHEN BRYAN, being duly sworn by the courtroom deputy,
 9   testified:
10   DIRECT EXAMINATION BY MR. ELY:
11    Q    Can you state your name for the record, please.
12    A    Stephen Bryan.
13    Q    Mr. Bryan, where do you live?
14    A    Redding, Pennsylvania.
15    Q    Where are you currently employed?
16    A    Travelers Insurance.
17    Q    What is your job at Travelers?
18    A    I'm an executive general adjustor.  I oversee, in our
19   commercial lines major case unit.  So I oversee five general
20   adjustors that handle the major case commercial claims that
21   come into Travelers.
22    Q    Okay.  You mentioned the major case unit.  You're
23   talking about commercial claims.  I want to start with the
24   major case unit.  Tell me what major case unit -- explain that
25   to us.
```
                              785

1   A    So you have varying levels of claim.  They start from a

2   couple hundred dollars up to multimillion dollar claims.  So

3   major case is -- starts -- at the time of this loss, it

4   started around $100,000 that claims above that amount would

5   get referred to major case because those are adjustors that

6   have more experience.  And now the threshold for major case is

7   roughly $250,000 --

8   Q    Okay.

9   A    -- and above.

10  Q    And so you've been an executive general adjustor in the

11  major case unit for how long?

12  A    Roughly seven years.

13  Q    Okay.  So it takes us back to around 2016.  So for 2016,

14  you've -- you've managed around five general adjustors.  Does

15  that number vary from time to time?

16  A    No.  It's been five consistently in my seven years.

17  Q    Okay.  Before you became an executive general adjustor,

18  what did you do at Travelers?

19  A    I was a general adjustor for roughly five years prior to

20  that.

21  Q    So basically working in the same role as the folks you

22  supervise?

23  A    Yes.

24  Q    And that was also in the major case unit?

25  A    Yes.

786

1   Q    And so you've been in the major case unit with Travelers

2   for the last 12 years?

3   A    Yes.

4   Q    And the types of claims that come into the major case

5   unit, are they commercial property claims?

6   A    Yes.  They're all commercial property.  So they range

7   from manufacturing to restaurants to apartment buildings, new

8   construction, historical buildings; I mean, anything that's

9   commercial.

10  Q    Okay.  And so in your role as an executive general

11  adjustor, do you handle claims directly still?

12  A    Yes, I do.

13  Q    Okay.  So let me back up.

14       Before you went into the major case unit, were you

15  employed with Travelers?

16  A    Yes.  I graduated college in 2003 and started with

17  Travelers that same year.  So I've been with Travelers for 20

18  years now.

19  Q    Okay.  So what did you do between 2003 and when you came

20  into the major case unit?

21  A    I've been in the property division the entire time

22  handling property claims.  So I started out handling -- as an

23  outside claim rep, handling the smaller losses that you have

24  at your house; you know, dishwasher leak, a house fire, damage

25  to the roof from storms.

787

1    Then I was promoted to a technical specialist that
2    handled claims -- same type of claims, but $25,000 and above.
3    I was a property field trainer after that where I taught
4    estimating to newer adjustors and did on-site training for our
5    adjustors.
6    Then I was a unit manager where I handled anywhere
7    between six to eight outside technical specialists.  That was
8    in the Virginia area about five years, and then I went into
9    major case after that.
10   Q    Okay.  I want to talk a little bit -- shift from your
11   background into the policy itself.
12        MR. ELY:  So can we pull up Defendant's Exhibit 1.
13   Let's go to the second page, start with.
14   Q    (BY MR. ELY) So, Mr. Bryan, this is a page that
15   identifies the name of insured, and it's got policy period.
16   Who is the -- who was the named insured on the policy
17   originally?
18   A    Bomasada Birmingham Nationwide LLC.
19   Q    Okay.  What is the policy period?
20   A    It is from March 31st, 2018, until September 30th, 2018.
21   Q    So the policy ended three days after this fire?
22   A    Yes.
23   Q    And Maxus is not mentioned here as a named insured.  But
24   there's not an issue as to whether Maxus is insured under the
25   policy, is there?

                                788

```
 1   A    Not as we sit here today.  But initially it was an issue
 2   that we had to resolve, you know, from the time we received
 3   the claim.
 4   Q    Okay.  At the time you received the claim, had anyone
 5   alerted Travelers to the fact that Maxus had purchased the
 6   property?
 7   A    I believe it may have been notified to underwriting per
 8   the agent, but we had no indication prior to the fire that
 9   Maxus had bought the property.  Once we got the claim, we were
10   informed by Bomasada that Maxus had purchased the property on
11   August 30th.
12   Q    Okay.  So time of the fire, Maxus had been insured under
13   the policy for about 28 days?
14   A    Yes.
15   Q    And that was one of the issues you all dealt with early
16   in the claim and you ultimately resolved, and it's not an
17   issue today and hasn't been an issue since?
18   A    Correct.
19   Q    So what kind of policy is this?  I think we've heard the
20   term -- I used the term "builders risk."  Is this a builders
21   risk policy?
22   A    Yes.  This is a builders risk policy.  It's something
23   that companies purchase when they're building a structure.
24   Q    Okay.  So it covers the property while it's under
25   construction, correct?
```

                                   789

```
 1   A     Yes.

 2   Q     And is the coverage limited to the construction that has

 3   taken place?

 4   A     Yes.  The coverage has a limit of -- this policy

 5   specifically has a specific limit of $35 million, but at the

 6   time -- we must determine what the level of completion is for

 7   the construction because that's what we would pay for when the

 8   loss occurred, is where they were at at the time of the loss.

 9   Q     Okay.  So things that were to be done are not covered

10   under the builders risk policy?

11   A     No.  Because those costs had not been incurred at that

12   time yet.

13   Q     So let's go to page 22, please, Section A1 on the left.

14          So this -- tell us what this is.

15   A     This is stating that we'll pay for direct physical loss

16   or damage to covered property resulting from a covered cause

17   of loss.  Then it states then that the covered property is the

18   property that they own and are liable for and for which the

19   value is included in the estimated total project value shown

20   on the declarations page, which is prior to this.

21   Q     Okay.

22          MR. ELY:  Can you zoom back out and put 23 on the

23   split screen for me.  Page 23.

24   Q     (BY MR. ELY) So you mentioned the covered cause of loss

25   in section 3 on the second page here?
```

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

```
 1    A    Yes.

 2    Q    Covered cause of loss means risks of direct physical

 3    loss unless the loss is excluded in section B, exclusions,

 4    correct?

 5    A    Yes.

 6    Q    So some people refer to this as an all-risk policy.  Is

 7    that how you refer to it?

 8    A    Yes.  It's -- loss is covered unless it's specifically

 9    excluded.

10    Q    So with respect to that, in terms of an all-risk policy,

11    the fact that it's called an all-risk policy, does that mean

12    that there doesn't have to be a direct physical loss or damage

13    to property?

14    A    Well, sure, for -- so risk of direct physical loss means

15    that there has to be damage that occurs within the active

16    policy period, which we had a loss here within the active

17    policy period.

18          Then you need direct physical damage due to that

19    loss for there to trigger coverage.

20    Q    Okay.

21          MR. ELY:  Can we go to page 37, please, section 10,

22    please.

23    Q    (BY MR. ELY) You mentioned the policy period.  We

24    covered loss or damage commencing with the inception date of

25    the policy period shown in the declarations and ending when
```

<center>791</center>

any one of the following first occur:  Policy expires or is

canceled.

So by virtue of that in this case, any damage that

occurs to the Metropolitan after September the 30th of 2018

when the policy expired is not covered under the policy?

MR. ABRAMS:  Your Honor, can we approach?

(Counsel approached the bench and the following proceedings

were had:)

MR. ABRAMS:  Your Honor, what I think is happening

here is this witness is being elicited testimony as to the

implication of what the policy means.  That's for you to

decide.  And I think that's -- I think that's what's going on

here.

If he's going to talk about what's proximate cause

or not, that's subject to the motion that they filed on Monday

and what we filed something else on.

MR. ELY:  That's fine, Your Honor.  I can move on.

(The proceedings returned to open court.)

MR. ELY:  Can we go to page 18, please.  Go to

general conditions, section A.

Q    (BY MR. ELY) Mr. Bryan, can you read this -- just read

the general condition A1 through 4, if you would, please.

A    Concealment, misrepresentation, or fraud.  This coverage

part is void in any case of fraud, intentional concealment, or

misrepresentation of a material fact by you or any other

792

Case 4:20-cv-00095-FJG   Document 245   Filed 09/05/23   Page 181 of 224

1  insured at any time concerning:  This coverage part; the

2  covered property; your interest in the covered property; or a

3  claim under this coverage part.

4  Q    Thank you.

5           MR. ELY:  Can we go to page 17, please.  Go to

6  section 4 at the bottom, please.

7  Q    (BY MR. ELY) Mr. Bryan, can you please read this

8  provision?

9  A    Take all reasonable steps to protect the covered

10 property from further damage, and keep a record of your

11 expenses necessary to protect the covered property for

12 consideration in the settlement of the claim.  This will not

13 increase the limit of insurance.  However, we will not pay for

14 any subsequent loss or damage resulting from a cause of loss

15 that is not a covered cause of loss.

16 Q    Thank you.

17          So I want to shift gears now from the policy, and I

18 want to talk about the payments that Travelers has made under

19 the policy.  But I want -- the first part of that is I want to

20 talk about how Travelers makes its payments.

21          You've been here, and you've heard the testimony

22 that Travelers did not provide any explanations for its

23 payments, and I want to go through that with you.

24          MR. ELY:  If we could go to Plaintiff's Exhibit 760,

25 please, full screen.

                        793

```
 1              Can you go to the next page, please.
 2    Q     (BY MR. ELY) Okay.  Mr. Bryan, can you tell me what this
 3    is, Mr. Bryan?
 4    A     This is an email sent by the general adjustor handling
 5    claim, Greg Bynum, to Jason Johns and Stuart Fred on
 6    Wednesday, March 13th, informing them that a payment has been
 7    made, and it has the settlement letter attached, statement of
 8    loss attached, and the detailed repair estimate for phases 1
 9    through 5 that was completed in Xactimate.
10    Q     Xactimate is a term that's been used before in this
11    trial.  Can you kind of tell all of us what Xactimate is and
12    what it does?
13    A     So Xactimate is an estimating software that's used by
14    insurance companies and remediation companies and contractors
15    across the world.  They update their price list monthly; so
16    they take information from -- that they have people that
17    gather, and they update the prices monthly.
18              So this is an estimating system that a lot of people
19    use that -- you know, it has pricing, labor rates up to date
20    monthly.
21    Q     So, Mr. Bryan, take a look at the date, Wednesday, March
22    13th, 2019.  Is this the first Xactimate payment that
23    Travelers had made on the fire damage?
24    A     Yes.  Well, December 5th we advanced a million dollars.
25    We didn't have all the information to complete our repair
```

794

estimate.  That takes time.  So we advanced a million dollars.

As we got the information in from the insured, we compiled our Xactimate estimate.  And based on all the information we had to date as of March 13th, we produced an Xactimate estimate, and this would be the initial payment in excess of the initial million dollars paid based on the Xactimate.

Q    And I want to back up to the initial advance, the million dollar advance.  Tell me how -- was an explanation as to what that million dollars was for provided to Maxus and Bomasada?

A    Yes.  There was an on-site meeting on December 3rd in a conference room in the doughnut building that Maxus, Bomasada, attorneys were -- they were all present.  We had our consultants there.  Greg was there from Travelers.

From my understanding, the insured was requesting a $5 million request.  At that time they discussed it, and they determined that a million dollars would be sufficient at that time to do the initial cleanup, any emergency repairs so they could get going.

Q    Okay.  And so that was all explained at that meeting?

A    Yes.  From my understanding, yes.

Q    Okay.  We've already -- who is Greg Bynum?

A    He's the general adjustor that works under me that handled this claim directly.

795

```
 1   Q    Okay.  Who's Jason Johns?

 2   A    Jason Johns is the attorney that represented Bomasada.

 3   Q    And who is Stuart Fred?

 4   A    Stuart Fred is -- from my understanding, he's the

 5   president of Bomasada.

 6   Q    And at this point in time, was Bomasada acting as point

 7   on this claim for Maxus, based on your understanding?

 8   A    Yes.  In the first part of the claim, we communicated

 9   directly with Bomasada and Jason Johns.

10   Q    Okay.

11        MR. ELY:  Can you go to the next page, please, and

12   then -- yeah, blow that up for me.

13   Q    (BY MR. ELY) So what's this document?

14   A    So this is our statement of loss.  This is where we

15   summarize our amounts that we have verified or estimated.  So

16   this is clearly laying out that it says building repairs per

17   Travelers' Xactimate estimate for phases 1 through 5.  We

18   estimated roughly $580,000 in repairs, and then for -- per our

19   Travelers' Xactimate estimate for phase 6, we estimated

20   roughly $2.9 million for repairs.

21   Q    And so is the statement of loss, is this something that

22   is provided with every payment?

23   A    Yes.  Every payment we provide a statement of loss.  We

24   provide a settlement letter.  And whenever we generate an

25   Xactimate repair estimate, we provide that as well.
```
796

1    Q    Okay.

2         MR. ELY:  Can you go to the next page, please.

3    Q    (BY MR. ELY) So the -- I'm not going to -- certainly not

4    going to go through the Xactimate estimate, but I want to

5    provide some sort of an example.

6         The Xactimate estimates in this case, every time a

7    payment was made, a Xactimate estimate was provided showing

8    the detail, correct?

9    A    If it was related to an update in our Xactimate

10   estimate, yes, we would have provided an Xactimate estimate.

11   Q    So the level of detail provides -- is this an example of

12   the level of detail provided in Xactimate estimate?

13   A    Excuse me?

14   Q    Is this an example of the level of detail provided

15   through an Xactimate estimate?

16   A    Yes.  So it -- you know, this estimate, it will -- it

17   starts on the first floor, or it starts on the top floor,

18   depending on the preference of the consultant.  Some start

19   from the top down, bottom up.  They'll go through each level.

20   They'll list out every room.  So in every room for the phase 5

21   estimate, you'll see that it's affected.  You'll see a line

22   item that says what we're doing in each of those rooms.

23         So here we're thermal fogging and sealing the stud

24   wall.

25   Q    Okay.  And this Xactimate estimate is an example of what

                              797

1    would have been provided on a room-by-room basis with any

2    updated payments made by Travelers through this claim?

3    A    Yes.  This was provided with our initial March 15th

4    payment.

5    Q    So with respect throughout this claim, that's the

6    documentation Travelers had provided?

7    A    Yes.

8    Q    Okay.  Let's go to Defendant's 31, please.

9            That's all right.  We'll come back to it.

10           So I want to shift gears, Mr. Bryan, and I want to

11   talk about -- move through some of the aspects of the claim.

12   I want to start with the first section of the claim.  The loss

13   occurred on September 27th, 2018.

14           Can you tell me what coverage issues -- what, if

15   any, coverage issues arose almost immediately?

16   A    Right.  So the first thing we do when we get a loss in,

17   we review the policy.  So builders risk policy, we see them,

18   but we don't see them as much as, you know, some of our other

19   policies.  So any policy we're going to review from front to

20   back.

21           So here, like we pointed out earlier, this is an

22   all-risk policy.  We know you had a fire.  It's a covered

23   cause of loss, but we continue to go through the policy and we

24   look.  Well, on this policy, they had a protective safeguards

25   endorsement.

                              798

1    What that endorsement entails is it says during the

2  construction progress, you have to meet the requirements that

3  are checked on this endorsement.  And two of the requirements

4  that were checked on that endorsement that directly related to

5  a fire event was a security guard that monitored the loss site

6  and also essentially monitored alarm -- an intruder alarm

7  system.

8  Q    I apologize.  I'm skipping around a little bit.  Tell us

9  what this is with regard to payments, what we're looking at as

10  Defendant's Exhibit 31.

11  A    All right.  So this is a statement of loss generated on

12  October 29th, 2021.  So this would have been one of our final

13  payments prior to being here.

14    So this clearly lays out what we paid for for phases

15  1 through 4 based on our Xactimate repair estimate.  We paid

16  $37,000 and change.  For phase 5, based on our Travelers'

17  Xactimate estimate, we paid a little over one million dollars

18  for phase 5.

19    For phase 6, based on our Xactimate estimate, we

20  paid a little over 5 million.

21    Extra expenses, which we don't have the tab here,

22  but we would have another tab down here that we had on the

23  statement of loss that would summarize the extra expenses in

24  the amount of $39,000, which included lawyer invoices,

25  invoices for the engineer inspections, for the hygienist

799

1    inspections.

2          So that -- and then we paid for a mobile mini

3    container.  If you remember in some of the pictures they were

4    pointing out, there was a container on the east side of phase

5    6 in that alley that was damaged.  And then we also paid for

6    damage found to the construction trailer.

7    Q    Okay.

8          MR. ELY:  Can you shift the page a little bit down,

9    Chris.

10   Q    (BY MR. ELY) We've got a second section down here for

11   business interruption.  Does that explain what's been paid for

12   the lost rents?

13   A    Right.  So it states we've paid a little over $415,000

14   for rental income as calculated by Travelers, and we -- just

15   like the schedules you saw from Ms. Pienta, we had an internal

16   accountant in our claim accounting services department.  Her

17   name was Jackie Sasser.  She prepared a schedule of the same

18   nature that we shared with our insured when we issued the

19   payments for the loss of rents.

20         Soft costs, which -- insurance premiums, it clearly

21   states there.  That's for a portion of insurance premium with

22   the applicable 30-day waiting period applied.  I know we

23   talked about it briefly, but since it came up here, for the

24   soft costs and loss of rental income piece, if the loss

25   occurred on 9/27 and they immediately started incurring loss

                              800

1   of rents, we wouldn't pay for those loss of rents until 30

2   days expired.

3   Q    Okay.

4   A    And then the other ones were soft cost payments directly

5   related to costs submitted by Bomasada.  And then we paid

6   claim data expenses which were for the costs that Maxus

7   incurred for Michelle Pienta to prepare their loss-of-rents

8   claim.

9   Q    Okay.  So from this statement of loss, can you tell us

10  how much has been paid for -- to Maxus for building damage?

11  A    Yes.  $6.1 million.

12  Q    Okay.  Is that that 6.1 -- is that 6,168,425.69 number?

13  A    Yes.

14  Q    With respect to the lost rents that's been paid to

15  Maxus, that's not that total 865 because some of that went to

16  Bomasada for soft costs.  What's the figure for the Maxus --

17  the amount that's been paid to Maxus for lost rents?

18  A    415,379.92.

19       MR. ELY:  Chris, if you could pull Defendant's

20  Exhibit 1 again.  I believe it's page 70.

21  Q    (BY MR. ELY) So before we talked about the statement of

22  loss, we were talking about the protective safeguards

23  endorsement.  Is this what was in the policy at the time of

24  loss, the protected safeguards endorsement that was in there

25  at the time of loss?

                          801

```
 1    A    Yes.

 2    Q    Explain to us in simple terms how this works, what

 3    you're looking at.

 4    A    Okay.  So this is -- it states protective safeguards.

 5    It pretty much says that these items have to be in place at

 6    the time of the loss for the applicable causes of loss, which

 7    are summarized right here.

 8         So as you can see, this was a fire.  So theft and

 9    vandalism, we determined wouldn't apply to this loss.  It was

10    fire.

11         So as it was a fire, this endorsement requires that

12    a private security guard service is retained monitoring the

13    loss site.  And then also that there's essentially monitored

14    electronic intruder alert system that's installed that helps

15    prevent -- that could possibly help prevent the fire.  So it

16    says if a fire happens, both of these items have to be in

17    place at the time of the loss.

18    Q    So loss occurs September the 27th, 2018.  Tell me

19    when -- did you make a visit to the site after the loss?

20    A    Yes.  So once we got the claim, Greg called -- you know,

21    I see when claims are assigned.  So I try to reach out to my

22    guys and help as much as possible.  We review stuff together;

23    so we were reviewing the policy.

24         We determined these protective safeguards.  So we

25    met on site on October 3rd in the construction trailer with
```

<div align="center">802</div>

1    Bomasada.  J.S. Held was there with us, our construction

2    consultant that we retained prior to that meeting to help move

3    the claim along as well.  And the agent McGriff was there as

4    well to meet with us.

5    Q    And in that meeting, did the issue -- the questions

6    about the protective safeguards that were in place at the time

7    of the loss come up?

8    A    Yes.  Well, I don't know if they asked about it, but we

9    wanted to make sure that they were aware of them because we

10   knew that these were items that had to be in place at the time

11   of the loss.  So we wanted to make sure that they were aware

12   of that.

13            So at that time we told them, Look, we're going to

14   request information to verify that this stuff was in place.

15   We informed them that while we investigate, we're going to

16   issue a reservation of rights letter that's pretty much saying

17   that we reserve our rights to deny or accept any part of this

18   claim now or any time in the future until we complete our

19   investigation.

20            So we discussed that, and they understood, and they

21   were going to start working on getting us the information.

22   Q    Did you make any request for information from Bomasada

23   at that October the 3rd meeting?

24   A    Yes.  Unofficially we told them what we needed.  We

25   said, Look, if you had -- you had a security guard service in

                          803

1   place -- we later found out it was Signal 88 -- we need to
    2   make sure that they are in place.
    3          And especially after Maxus bought the property, we
    4   wanted to ensure that that service continued from the time
    5   they purchased it until the time of the fire.
    6          We told them we needed proof that a
    7   centrally-monitored intruder alert system was present as well.
    8   Q    Did you learn anything about the centrally-monitored
    9   intruder alert system at the time of the meeting?
   10   A    Yeah.  The Bomasada representative, which was Doug
   11   Altenbern, he made the statement that there wasn't full power
   12   to the site.  There was temporary power, and he was not aware
   13   that there was an alert system installed.
   14   Q    So given that information, did that raise a coverage
   15   issue potentially?
   16   A    Yes.  I mean, this clearly states that these two items
   17   have to be in place at the time of loss, and they're both
   18   marked.  So if they weren't, it could possibly affect coverage
   19   moving forward.
   20   Q    In addition to the coverage issue with regard to the
   21   protective safeguards endorsement that was raised at the
   22   October the 3rd meeting, did you talk to Bomasada about what
   23   information you needed to begin adjusting the physical loss of
   24   the claim?
   25   A    Yes.  Like I said, J.S. Held was there.  They're our
                                804

1    construction expert.  So we hire them to help us move that

2    portion of the claim along in a timely manner.

3              I mean, myself and my general adjustors, we have

4    claim handling background.  We have -- some of us have

5    construction background, but that's not all we deal with.  We

6    deal with the whole range of the claim.

7              So we hire construction experts that have that

8    expertise in that specific area.  That's why we bring them

9    out.

10             So during that meeting, J.S. Held was reviewing what

11   plans were in the trailer with the Bomasada representative,

12   and they were giving them a rough list of what we would need

13   moving forward so we could ensure while our coverage

14   investigation was ongoing that we're going to start getting

15   all the information for -- to determine the state of the

16   building, at what stage of completion it was in at the time of

17   the loss.

18             So once we completed our coverage investigation, no

19   matter what the outcome was, we were ready to move on to the

20   next part of the loss if necessary.

21   Q    Okay.  So even though the coverage issue had been

22   raised, did Travelers move the claim forward on the adjustment

23   piece?

24   A    Yes.  We always move forward with the adjustment piece

25   until a coverage -- until a coverage determination is made.

                                    805

1   Q    Okay.  And do you know when J.S. Held first visited the

2   site to evaluate the loss and begin the work on estimating the

3   damage?

4   A    Right.  So when we were out on October 3rd, the scene

5   was still being held by the ATF because we knew it was arson.

6   It was reported as arson.

7        We did have a representative from Travelers that was

8   out inside the buildings walking around.  It was our cause and

9   origin investigator.  Because they are investigating the cause

10  of loss and they kind of do that hand in hand with the local

11  fire department and they were doing that with the ATF, they

12  are allowed into phases 1 through 4, 5.  They walked the

13  entire site.

14       We were not allowed.  So we walked the perimeter

15  with J.S. Held.  We got a lay of the damages.  Phase 6 was on

16  the ground.  We had some obvious damages to phase 5.

17       So we informed Bomasada at that time, let us know

18  when ATF clears the site.  October 4th, ATF cleared the site

19  to where J.S. Held -- we could inspect phase -- we could get

20  into phase 5 and the other phases.  So J.S. Held was out there

21  on October 8th through the 10th.

22  Q    Okay.

23       MR. ELY:  Can we pull up Defendant's Exhibit 6,

24  please.

25  Q    (BY MR. ELY) This is a letter dated October the 5th,

                              806

1    2018.  Can you kind of just generally tell us -- state what
2    this is?
3    A    This is a reservation of rights letter, as I informed
4    you, we discussed during our meeting in the construction
5    trailer on October 3rd.  This just tells them, if you look at
6    the second paragraph here, that we're investigating this loss
7    for fire damage at the loss location subject to a complete
8    reservation of all our rights under the policy, including the
9    right to deny coverage for all or part of your loss should it
10   be determined the policy does not afford coverage.
11         There's other language in that that as we complete
12   our investigation, we're reserving our rights.
13   Q    Take a --
14         MR. ELY:  If you can blow up the first paragraph,
15   please.
16   Q    (BY MR. ELY) And here's where we're -- here's where
17   there's mention -- we talked about the question about the sale
18   of the property that was ultimately resolved -- no question
19   about Maxus' status as an insured -- and the protective
20   safeguard endorsement, correct?
21   A    Correct.
22   Q    So as of October the 5th, those are the two things from
23   a coverage side that you all were trying to deal with?
24   A    Yes.  Those were the only two things that we saw as
25   being an issue in regards to verifying coverage at that time,

                                807

1    was Maxus bought the property on August 30th.  Nowhere on the

2    policy was Maxus' name.  So we needed documentation to verify

3    the sale of the property, the transaction, the details of

4    that.

5              And then the second thing, as we went into a lot of

6    detail already, was the protective safeguards that were

7    requirements that were in place, which was the security guard

8    and the alarm system.

9    Q    Okay.  So with respect to the adjustment of the building

10   claim, were there requests for information that went to

11   Bomasada around this same time?

12   A    Yeah.  Well, if you go to the second page of this, I

13   believe there was -- there's a request for information there

14   at the bottom that goes on to the second page.  We lay out

15   exactly what we need.

16             Again, this is just summarizing what we need for the

17   sale of the property and to verify the protective safeguards

18   were in place.  And then also in follow-up to our meeting on

19   October 3rd, our initial request for information was sent out

20   on October 10th to our insured, and that was a much more

21   extensive list of all the construction documents that we

22   needed.

23   Q    What are you needing the construction documents for?

24   A    Well, they change sometimes from job to job, depending

25   on the type of construction and that.  But for this one, we

                                  808

1    needed a construction contract, the subcontracts, the schedule

2    for the project.  We needed the pay apps.  We needed the lien

3    waivers.  We needed photos.  We needed daily logs.  We needed

4    inspection reports.

5              I mean, there's a lot that's kept on a job of this

6    size that tracks the amount of work that is done day in, day

7    out to support, you know, the amount of work that was done;

8    and more importantly, that you submit to your finance company

9    for them to release money as you move along in the progress.

10   Q    So why were those documents important?  What were

11   they -- what were you trying to figure out from those

12   documents?

13   A    Those were going to help us determine what state -- what

14   level of completion phase 6 was in.  Because it was on the

15   ground, there is no way we could tell.

16             Now, based on our initial inspection on October 3rd,

17   we were informed that phase 5 and phase 6 were of similar

18   completion status.  So when we were able to get into phase 5,

19   we made notes that -- of everything that was in phase 5

20   because we were informed that phase 5 and phase 6 were pretty

21   close in the amount of completion at that time.

22             So that's where we started, but we needed all this

23   documentation to further verify the amount of work that was

24   done on phase 6 prior to the loss.

25   Q    So at some point, the issue of the protective safeguards

                                 809

```
 1   endorsement was resolved; was it not?

 2   A    Yes, it was.

 3   Q    Tell us how that happened.

 4   A    So we continued -- we got information from the insured

 5   through Jason Johns, Bomasada attorney.  So we did eventually

 6   confirm in the beginning of August -- I mean, in the beginning

 7   of November that there was no centrally-monitored alert system

 8   installed.

 9        We had verified that Security 88 was, in fact, in

10   place, and they were monitoring the job in the off-site hours,

11   you know, from the time it closes until the next morning.

12   There was no centrally-monitored alert system.

13        Well, first I believe it was November 7th, an agent

14   from McGriff reached out to underwriting and provided a letter

15   from their -- from the last renewal that showed that the

16   protective safeguards, they both didn't have to be in place.

17   It was "or."  It was the security guard or the

18   centrally-monitored alert system.

19   Q    Let me stop you right there.  Who's McGriff?

20   A    They're the broker for Bomasada.

21   Q    Okay.  So they were the company that Bomasada used to

22   purchase the policy back in March?

23   A    Correct.

24   Q    Okay.

25              MR. ELY:  So, Chris, if we could go to Exhibit 1,
                      810
```

1    pages 87, 88.

2    Q    (BY MR. ELY) So Mr. Bryan, can you tell us what we're

3    looking at here?  Looks like it's an endorsement of the policy

4    with the issue date of 12/6/18?

5    A    Right.  So this would say that -- so once we got that

6    information, again, I'm not in underwriting, so I'm just

7    telling you what they share with me.  That they got the

8    information, they reviewed it, verified that it was, in fact,

9    something that was provided to Bomasada and their agent at the

10   time of the last renewal.  They took that information.  They

11   reformed the policy.

12          So part of the reformation is they updated this

13   protective safeguards endorsement that was specifically

14   affected by this, and they took off the checkmark on the alert

15   system.  So all they had to have in place at the time of fire

16   for a loss caused by fire was the security guard service.

17   Q    So this was an endorsement that was added to the policy

18   in December of 2018 as a result of the -- the "or" information

19   you had received from the agent?

20   A    Right.  This whole process started November 7th when it

21   was received.  It takes several weeks.  So eventually when

22   this reformation went through, it was put into effect on

23   12/6/18.

24          MR. ELY:  Can we pull up Plaintiff's Exhibit 259,

25   please.

                              811

```
 1   Q    (BY MR. ELY) Okay.  So letter dated November 29th, 2018.
 2   Can you tell us -- go ahead and read the letter, please.
 3   A    Dear Mr. Johns:  This letter is in follow-up to a
 4   conversation you had with claim manager Stephen Bryan on
 5   Wednesday, November 28th, confirming Travelers' investigation
 6   has been completed and coverage is being provided for this
 7   loss.
 8          This letter is to confirm coverage as being provided
 9   in full for this loss per the applicable policy conditions.
10   We look forward to meeting with you and the insured on Monday,
11   December 3rd, 2018, to begin working toward a resolution of
12   this claim.
13   Q    So I believe you mentioned November 7th as the date that
14   you got the information about the protective safeguards
15   endorsement, correct?
16   A    Yes.
17   Q    Okay.  So can you explain what's gone on in the last
18   basically three weeks, what took three weeks for this letter
19   to go out to confirm coverage?
20   A    Again, I'm not in underwriting, so I can't comment as
21   to, you know, why things take a certain period of time.  But
22   we know that underwriting was supplied that information.  They
23   were reviewing it, and they were working on a reformation.
24          So we got word on -- it was either, you know,
25   November 27th or 28th.  I don't remember when I got it.  As
                                  812
```

```
 1    soon as I got it, I reached out to Jason Johns because

 2    that's -- all communication was going through him at that

 3    time.

 4            I know they were anxious to get a decision on the

 5    coverage and let him know that, hey, we sorted out the issues

 6    with the protective safeguards, and we're providing coverage

 7    for this loss.

 8    Q    Okay.  So you've seen testimony about an Alabama

 9    Department of Insurance complaint that was filed right around

10    this time.

11    A    Yes.

12    Q    Correct?  Remember seeing that?

13    A    Yes.

14    Q    Did the Alabama Department of Insurance complaint have

15    anything to do with this letter?

16    A    No.  We had already gotten the information on November

17    7th from the insured, and we were already in the process of

18    waiting for underwriting to complete the reformation so we

19    could share with our insured that coverage was going to be

20    provided.

21    Q    You mentioned the word "reformation."  What's that mean?

22    A    That means they're going to reform the policy.  So

23    they're going to make a change to it; that the first

24    protective safeguards endorsement had those two requirements

25    on it, but based on information they received now, there's
```
                               813

```
 1   only one requirement.  So they're going to reform the policy
 2   to reflect that change.
 3   Q    And until that policy is reformed, are you in a position
 4   to communicate anything about the change in coverage?
 5   A    No.  From my understanding, it goes through different
 6   levels of review and underwriting.  We have to make sure that
 7   everyone on that side is in agreement.  So until they come
 8   back to us and confirm that this change is being made, we
 9   can't make a coverage decision.
10   Q    So I want to -- now that -- am I correct that both the
11   coverage issues, the question of Maxus has been insured and
12   the protective safeguard endorsement have both been resolved
13   in Maxus' and Bomasada's favor, correct?
14   A    Correct.
15   Q    As of November the 29th, 2018.
16        So I want to shift gears into the actual movement on
17   the claim.
18        What's the next thing that happened in the claim
19   after November the 29th?
20   A    So there was a site meeting in the doughnut building on
21   Monday, December 3rd with Travelers.  I was not there.  Greg
22   Bynum was there.  J.S. Held was there.  Bomasada and Maxus
23   were both there with their attorneys.
24   Q    What was discussed at the time?  I think you mentioned
25   the advance earlier.  Was an advance discussed then?
```
814

Case 4:20-cv-00095-FJG   Document 245   Filed 09/05/23   Page 203 of 224

1   A    Right.  They discussed an advance on it now that we

2   had -- we determined coverage was available, we could now

3   issue some money to them.  So, again, there was some

4   discussion on the amount of advance.  It eventually was landed

5   on a million dollars would be sufficient to get them going.

6             They also discussed what was needed for the loss.

7   So we had already sent out an RFI on October 10th, but that

8   same RFI was provided as a hard copy at this meeting.  So they

9   discussed the level of completion and why we needed to

10  determine that based on the applicable coverage per the

11  builders risk policy.

12  Q    So just as a point of clarification, what is an RFI?

13  A    Oh, I apologize.  It's a request for information.

14  Q    So October the 10th, we -- you had sent a request for

15  information to Bomasada for construction documents, correct?

16  A    Yes.  That was our initial request on October 10th.

17  Q    So we're fast forwarding to a meeting on December the

18  3rd.  Had Bomasada provided any construction documents in

19  response to that request for information by December the 3rd?

20  A    Not to my knowledge, no.

21  Q    Okay.  And were the outstanding requests for information

22  discussed at the December 3rd meeting?

23  A    Yes.  A copy of that request for information was

24  physically provided to everyone in attendance.  They discussed

25  why it was necessary.  From -- after that meeting in talking

                                815

```
 1    to Greg, my understanding was that Stuart Fred of Bomasada
 2    wasn't in agreement that all that documentation was required.
 3            Greg explained that per the policy and the coverage
 4    provided in this builders risk, we had to determine the level
 5    of completion of that -- of the construction to determine what
 6    was in there at the place of time.  Since it burned down to
 7    the ground, we needed that information.
 8            So explained that, and they discussed why everything
 9    was needed to -- for us to adjust the loss accurately.
10    Q    Okay.  And so did the question of environmental
11    investigation come up at the meeting?
12    A    Yes.  From my understanding, Bomasada brought up that
13    they wanted to bring out ATC, which is an environmental
14    company, to test phase -- to test for combustion byproduct and
15    water.  They ultimately ended up testing phase 5, and they
16    also wanted them to test debris of phase 6 to determine if
17    there was any asbestos in it.
18            And they also wanted to bring out an engineer to
19    test the slab of phase 6, the concrete, to determine if that
20    had to be replaced as a result of the fire.
21    Q    Who was the company ultimately that Bomasada had come
22    out and do the testing in phase 5?
23    A    ATC.
24    Q    Okay.  Do you know when that inspection occurred?
25    A    It was mid December.
                              816
```

1    Q    Okay.  And did someone from J.S. Held accompany ATC on

         2    the inspection?

         3    A    Yes.  So it was agreed that ATC would do the testing.

         4    We were fine with that.  Bomasada was retaining them.  We said

         5    since we had J. S. Held involved, they had -- they're a big

         6    company.  They have IHs, industrial hygienists, in their

         7    company.

         8         So we said, Look, we're going to have them tag

         9    along, just review everything, work with ATC to make sure that

        10    everything is on board, everything is done correct so we make

        11    sure we all get the correct information moving forward.

        12    Q    Okay.  Do you know when you got the ATC report?

        13    A    It was mid January, I think --

        14         MR. ELY:  Plaintiff's 244, let's pull that up.

        15    First page.

        16    A    So January 15th.

        17    Q    (BY MR. ELY) Okay.  So we're now in January 15th, 2019.

        18    We've got an ATC report.  What else is going on in the claim

        19    in terms of are you -- are estimates being prepared; is the

        20    loss being quantified; what's happening?

        21    A    Yes.  J.S. Held was out there on October 8th to the

        22    10th.  They did a complete takeoff of the damages on phase 5

        23    and some minor damages on the exterior of phase 4 that were

        24    identified.  So they were working on the estimates, but there

        25    was only so much we could do until we started receiving the

                                        817

1    requested information from Bomasada in regards to phase 6.

2    Q    So we're here now on January 15th of 2019, six weeks

3    later after the meeting in December.  Had Bomasada provided

4    any information in response to the October 10th request for

5    information?

6    A    I believe they supplied some documents here and there

7    because we had sent out two additional RFI requests in

8    January.  And every time on that RFI request when we would

9    update it, we would have a column of what we received and what

10   we were still waiting on.

11          So I believe we sent out two additional copies in

12   January updated.  So we -- I believe we had received some

13   information, but not near the amount that we needed to do a

14   full evaluation of what level of completion phase 6 was in at

15   the time.

16   Q    Okay.

17          MR. ELY:  Let's pull up Defendant's Exhibit 9.

18   Let's go to the -- let's go to the first paragraph, please.

19   Q    (BY MR. ELY) So we're at January the 29th of 2019 at

20   this point.  Based on -- strike that.

21          Was Travelers still waiting on documentation from

22   Bomasada, construction documentation from Bomasada, to assist

23   it with quantifying the loss?

24   A    Yes.

25   Q    Was this an ongoing problem from the very beginning

                                  818

```
 1    after the loss?
 2     A    Yes.  Like I stated earlier, the counsel for Bomasada
 3    had some reservations about all of the documents we were
 4    requesting from the beginning, and this is an email received
 5    on January 29th, 2019, from Stuart Fred that's informing us
 6    that he's still -- they're still working on getting the
 7    documentation for us.
 8     Q    Okay.
 9          MR. ELY:  Let's go to the second paragraph, please.
10     Q    (BY MR. ELY) So first sentence -- can you read the
11    first -- I don't even really know if these are sentences.
12          As you know, one million dollar advancement was made
13    towards repairs.  That's the advance you were talking about
14    on -- that was made in December, correct?
15     A    Correct.
16     Q    Now, this brings up a point.  Can you explain to us what
17    an advance is?
18     A    So when we go out to a loss and, you know, we're
19    handling large losses, whether it's from a quarter million
20    to -- you know, I think, you know, some of the biggest are
21    hundreds of millions.  That's a lot of money for anyone.
22          So when we get out to a loss, we determine, all
23    right, what's the potential here for the total size of loss,
24    if -- you know, just looking at it roughly.
25          Then we talk to the insured.  We determine what are
```
<div align="center">819</div>

```
 1   your immediate needs?  So then that's when we determine an

 2   advance.  So that advance payment puts funds into their bank

 3   so they can address the emergency repairs, any remediation

 4   that's needed.  It could deal with payroll if that's -- you

 5   know, it could deal with a lot of different stuff.

 6   Q    Okay.  In this particular email, Stuart Fred was with

 7   Bomasada, and Bomasada was conducting the demolition and

 8   cleanup, correct?

 9   A    Correct.

10   Q    So second sentence:  I previously confirmed with you and

11   still am of the opinion we are good with this amount given

12   where we are as to known damage attributed to the fire.

13   A    Right.  So he's saying, Look, you gave me a million

14   dollars.  I don't need any more money at this time.

15   Q    Okay.

16         MR. ELY:  Let's go to the third paragraph.

17   Q    (BY MR. ELY) And can you read this paragraph, please?

18   A    Greg, we honestly have been more challenged here as to

19   demonstrating work in place as compared to our draws, given

20   the way our draws and budgets were set up with the lender.

21   They don't, for purposes of isolating phase 6, match up to

22   show accurately what work has been done.

23         I have attached a schedule for work complete, which

24   is a hybrid of our draw request.  This is what we can opine to

25   as work in place as of the fire.  You have been provided photo
```

```
 1    logs as well as daily reports and aerials.  Obviously we need
 2    to agree on the percent of work in place as of the date of the
 3    loss.
 4          The items that will be subject to clarifying are not
 5    that difficult but will require further discussion.  I might
 6    suggest, with your permission, I have a call with Troy Wilson
 7    as to establishing a protocol to move the process forward and
 8    discuss his suggestions on how to get there.
 9    Q    So tell us what's going on and what all that means.
10    A    Stuart Fred from Bomasada is saying we cannot -- we're
11    having trouble documenting what level of completion we were at
12    at the time of the loss.  And what he's saying here is all the
13    phases 1 through 5 for the -- you know, for the initial
14    project value, which was roughly $35 million, it's all lumped
15    together as one.  They didn't break out phase 6.
16          So he's saying based on the pay apps and what they
17    paid, it doesn't accurately reflect the amount of work that
18    was actually done in phase 6.
19    Q    Okay.
20    A    One comment was this was the first time that he ever
21    supplied us with a percent complete for phase 6.  This was one
22    sheet that was broken out with percentages by trade.  And in
23    reviewing it, summarizing that specific percent complete
24    provided by him represented that phase 6 was roughly 54
25    percent complete at that time.
                                821
```

```
 1    Q    Okay.  And so as of this day on January 29th, 2019, the

 2   documents we're talking about, documentation we're talking

 3   about, that's -- those were the topics of information

 4   requested in the request for information back in October of

 5   2018, correct?

 6    A    Correct.

 7    Q    Okay.  So when did Bomasada finally provide responses to

 8   the October 10th request for information with documents that

 9   assisted in actually determining what was in phase 6 at the

10   time of the loss?

11    A    So February 5th was the first real substantial

12   documentation we received.  We received pay app 34 and 35,

13   which 35 was the last pay app that was reviewed prior to the

14   fire.  That was on August 20th of '18.

15            He provided photos, some daily logs, and he also

16   provided a percent complete again, which was what, roughly

17   five, six days later.  Now the percent complete that he's

18   claiming in phase 6 was 62 percent.

19    Q    Okay.  So one of the things that he mentions in this

20   highlighted photograph or the highlighted part of the letter

21   says they don't, for purposes of isolating phase 6, match up

22   to show accurately what work has been done.

23            Was one of the problems that -- with the Bomasada

24   documentation is that they didn't split out what work was --

25   what payments were being made for what phases?
```

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

```
 1   A    Right.  Yeah.  We did not see what payments were being

 2   made for each phase.  It was just pay apps were submitted,

 3   subcontractor pay apps were submitted, and it was just for

 4   work that they were doing related to all phases.

 5            So they didn't break out exactly for what phase it

 6   was for.

 7   Q    And you used the word "pay apps," and I know we've been

 8   over it before.  But what information are you getting from a

 9   pay application or pay app?

10   A    A pay app is going to show the amount of money that's

11   being requested for that time period, and it's also going to

12   show the level of completion based on each trade for the whole

13   project.

14   Q    Okay.  And so during this time period, it wasn't like

15   Travelers was not trying to come up with Xactimate estimate of

16   the damage, correct, even though it wasn't getting information

17   from Bomasada?

18   A    I said earlier we were trying to.  During that December

19   3rd meeting, it was agreed upon with all parties that

20   Xactimate would be utilized to estimate that loss.  Like I

21   said, Stuart Fred had expressed concerns about how the

22   information would be tracked and provided.  And as you can see

23   from here, he was still having issues trying to show the level

24   of completion.

25            So we were trying -- we had completed as much as
```

```
 1   possible at this point, but we could not finalize it until we
 2   received the information that we requested or at least the
 3   majority of it.
 4   Q    Well, is it also true that there was some communication
 5   about that phase 5 was in a similar state as phase 6?  Because
 6   the problem with phase 6 it burned to the ground and you
 7   couldn't tell what was in it, right?
 8   A    Right.  So as I stated earlier, it was stated during our
 9   initial inspection on October 3rd in the construction trailer
10   with the Bomasada representative that was on site daily that
11   phase 5 and phase 6 were about at the same level of
12   completion.
13          So based on the initial walk-through by J.S. Held on
14   October 8th through the 10th, they had completed the Xactimate
15   estimate based on phase 5 as far as they could.  But there was
16   still information we needed to finalize that estimate.
17   Q    Okay.  And so when did you finally receive the
18   information from Bomasada?  I believe you said -- was it
19   February 5th?
20   A    February 5th we received the information that I just
21   went over, and then February 20th, we received another large
22   dump of information that received the initial -- it was the
23   initial construction contract, more subcontracts, pay apps,
24   daily -- well, no more pay apps.  I apologize.  Daily logs,
25   photos, schedules.  So we received a lot more then.
```

824

```
 1          Based on the information we received then, J. S.
 2   Held worked on finalizing the estimate as good as they could
 3   based on the information provided to date.
 4   Q    So, Steve, with respect to -- you were able to finally
 5   make a payment on March the 13th, 2019, correct?
 6   A    Correct.
 7   Q    And this is -- and you provided an Xactimate estimate
 8   for the basis for the payment, correct?
 9   A    Correct.
10   Q    And, again, this is an example of the detail that was
11   provided at the time?
12   A    Yes.  This goes through in tremendous amount of detail
13   by area, by room.  If you zoom back out, I mean, you can --
14          MR. ELY:  Flip through the pages for me, three or
15   four pages.
16   A    Right.  This has to be over a hundred pages.
17   Q    (BY MR. ELY) All right.
18   A    So --
19          MR. ELY:  Go to the end of it, Chris, and we'll see
20   how long it is.  No, don't go through that.
21   Q    (BY MR. ELY) So payment was made on March the 13th of
22   2019, 164-page estimate, correct?
23   A    Correct.
24   Q    A payment was also made on phases 1 through 5 as well.
25   Xactimate provided for that as well?
```

<div align="center">825</div>

```
 1    A    Correct.

 2    Q    Okay.  So let's fast forward to Defendant's Exhibit 14.

 3    May 1st of 2019.

 4         Tell me what you recall about this letter.

 5    A    Well, this was a letter from David Johnson from Maxus

 6    that's making us aware that there is evidence of smoke and

 7    soot damage in phases -- well, it says in the buildings that

 8    survived the fire.  Based on the ATC inspection, we already

 9    knew there was some issues with that in phase 5.  So it was

10    making us aware of additional soot, char issue that they're

11    finding in phases 1 through 4.

12         And then also he's letting us know that there's

13    extensive water damage to the subfloor in phase 5 building

14    that he's saying will require replacement.

15    Q    Okay.

16         MR. ELY:  Let's go to Defendant's Exhibit 10.  We're

17    getting into these lawyer letters that we've referenced

18    before.  Next page, please.  Next page, please.  Third

19    paragraph.

20    Q    (BY MR. ELY) So at this point, Steve, May 13th of 2019,

21    Travelers' communications and responses to Mr. Johnson's

22    letter are coming through counsel, correct?

23    A    Correct.

24    Q    Okay.  And in this letter, take a look at it and tell me

25    what Travelers was doing in terms of the new soot and char
                                826
```

1   claims that were made in the May 1 letter?

     2    A    So we're acknowledging that the May 1st letter has

     3   identified possible issues with soot and char in other

     4   buildings, and they've employed a company to perform testing.

     5   So that's where we asked them to help move along the

     6   investigation of these issues.  We asked that we be allowed to

     7   inspect at the same time as their expert.

     8            I mean, at this time they've identified -- they've

     9   informed us they've hired a company.  They haven't let us know

    10   who, but we're saying, look, to help the investigation move

    11   along in the process, you know, let us know when you're going

    12   out there, and we'll get it -- we'll have our expert.  We'll

    13   go out there and we'll do it together.

    14    Q    Okay.

    15            MR. ELY:  Back out of that, please.  Go to the

    16   fourth paragraph, please.

    17    Q    (BY MR. ELY) And this dates to the water damage issues

    18   that were raised in the May 1 letter.  Is this Travelers'

    19   response to those at that time -- to those claims at that

    20   time?

    21    A    Yes.  Because in Mr. Johnson's letter, he states there's

    22   extensive water damage to the flooring in phase 5.  We ask

    23   that they forward any documentation relating to the evaluation

    24   of that damage or documents that are relevant to it so we can

    25   determine how we're going to handle that.

                                  827

```
 1   Q    So let's go to Defendant's Exhibit 15, third paragraph,
 2   please.  Letter from Mr. Abrams to me.
 3           Have you seen this letter, Steve?
 4   A    Yes.
 5   Q    Okay.  So tell me what response Travelers received from
 6   Maxus to its request to accompany industrial hygienists or a
 7   testing company, whoever it may be, out to the site?
 8   A    Right.  So that request was made on May 13th.  Now, on
 9   May 28th, we're being informed that the Howarth Group was
10   retained, and also an environmental hygienist has been engaged
11   to determine the extent of the environmental issues.
12           There again, they're not named.  They've already
13   inspected the property.  And later we find out that actually
14   that hygienist, who turns out to be FBS and Tom Irmiter, they
15   were actually -- they actually ended up inspecting the loss
16   again on June 30th, two days after this letter.
17   Q    You mean May 30th?
18   A    Yeah, I mean May 30th.
19           MR. ELY:  Let's go to Plaintiff's Exhibit 307.
20   Judge, I know we're bumping up.  You can stop me whenever you
21   want.
22           THE COURT:  How far along are you?
23           MR. ELY:  I've got a little ways to go, I'm afraid.
24   But I can stop at any point you want me to.
25           THE COURT:  Sounds like you're asking for help here.
                                828
```

```
 1            MR. ELY:  No, sir, I'm not.  No, sir, I'm not.

 2            THE COURT:  Well, I planned to break for the day

 3   around 4:15 or so.

 4            MR. ELY:  Okay.  I'll keep going.

 5            THE COURT:  Well, it's up to you.

 6            MR. ELY:  Yes, sir.

 7   Q    (BY MR. ELY) So, Steve, you remember seeing this letter

 8   from me to Mr. Abrams on June 6th?

 9   A    Yes.

10            MR. ELY:  Second paragraph, please.

11   Q    (BY MR. ELY) So in this letter, we've got -- and

12   Mr. Spicer has been retained.  Who at Travelers retained

13   Mr. Spicer?

14   A    Greg Bynum.

15   Q    Okay.  Had you ever worked with Mr. Spicer before?

16   A    No.

17   Q    Had Greg?

18   A    No.

19   Q    And in this letter, Travelers invites Maxus' experts to

20   accompany Mr. Spicer on any inspection -- or the inspection on

21   June 13th, correct?

22   A    Correct.

23   Q    Okay.  So let's go to Plaintiff's Exhibit 311.  This is

24   my letter to Mr. Abrams on June the 12th that has been

25   referenced earlier in the trial, and I want to start -- take a
```

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

1  look at the whole letter.

 2          So let's look at the second paragraph.  This is in

 3  response to request for input on potential tenant eviction.

 4  Do you remember that?

 5          Let's go to the second paragraph, please.

 6          Okay.  So the date of this letter, June the 12th,

 7  Chris Spicer is coming out the next day on June the 13th,

 8  2019.  Can you read that letter for us, please, or that

 9  paragraph?

10  A    First, Travelers' investigation into the claim is

11  ongoing, and it has scheduled an inspection of the premises by

12  an industrial hygienist tomorrow, June 13th, 2019.  Once the

13  industrial hygienist has inspected the premises, he will need

14  an opportunity to analyze the information he obtains in the

15  inspection, review, and analyze Mr. Irmiter's report and

16  recommendations and perform his own evaluation.

17  Q    Next paragraph, please.  Read that paragraph for us.

18  A    Until such time as the industrial hygienist has

19  completed his evaluation and Travelers has an opportunity to

20  consider that information, Travelers is not able to set forth

21  its position regarding what coverage may or may not be

22  available for relocation of the residents.

23  Q    Okay.  Next paragraph that's been highlighted before a

24  couple of times.

25  A    Second, please note that Travelers' review of any

                               830

```
 1    industrial hygiene opinions offered by Mr. Irmiter and whether

 2    any relocation or evacuation of the residents is reasonable or

 3    necessary will be undertaken for the sole purpose of

 4    determining whether any costs associated therewith would

 5    qualify for coverage under the terms of the above-referenced

 6    policy.  Travelers has not undertaken and will not undertake

 7    any technical, feasibility, safety, or other review of the

 8    report or opinions of Mr. Irmiter.  Therefore, Travelers

 9    cannot and does not take a position regarding the alleged

10    necessity of instructing the residents to vacate the premises.

11    Q    Next paragraph, please.

12    A    Travelers continues to reserve its rights during the

13    course of the investigation, including but not limited to

14    regarding coverage issues related to any costs associated with

15    relocation.

16    Q    So with respect to the request for guidance on whether

17    to evict the tenants, which is essentially how it's been

18    characterized, in your experience, is that something that

19    Travelers as an insurance company ever does?

20    A    No.

21    Q    And with respect to Travelers' role in this entire

22    process, can you explain to us how Travelers views its role

23    with regard to this -- in this particular context with this

24    property loss and what it was -- what role it played?

25    A    We're there to apply coverage per the policy conditions.
```

831

| 1 | Then once we do that, we're there to estimate the damages on

| 2 | making the -- putting the insured back to where they were at

| 3 | the time of the loss.

| 4 | So we're evaluating any damages, any losses

| 5 | resulting from that. We're working on estimating those,

| 6 | working with sometimes their contractor to come to an agreed

| 7 | repair cost. Here we are trying to get information to

| 8 | determine the cost to put them back at the time of the loss.

| 9 | And where necessary, if we're not sure if there's

| 10 | damage or not, in this situation we might hire an expert to

| 11 | help us evaluate the --

| 12 | Q    Okay.  Let's go to Defendant's Exhibit 16.

| 13 | So 6/12/2019 was my letter to Mr. Abrams that we

| 14 | just read.  We heard Mr. Spicer earlier today.  He's out on

| 15 | June the 13th, 2019.  And you remember seeing a copy of this

| 16 | letter?

| 17 | A    Yes.

| 18 | Q    And the date of that letter?

| 19 | A    June 14th, 2019.

| 20 | Q    Okay.  So you were here for Mr. Spicer's testimony

| 21 | earlier today, and Mr. Spicer generated a report on or

| 22 | around -- I think Mr. Abrams introduced it July 31st, August

| 23 | 1st, August 2nd timeframe.  And explain why that report of

| 24 | Mr. Spicer was not provided to Maxus in that August timeframe?

| 25 | A    Well, we retained Mr. Spicer because of the FBS report

832

1  that we received in June.  And if you recall, that FBS report

2  laid out that there was soot and char throughout phases 1

3  through 4 that required remediation and also stated that there

4  was extensive damage to phase 5; that his opinion was the

5  building should be torn down and rebuilt.

6       So up until this point, we had no indication from

7  anyone from multiple site visits, discussions with the

8  insured, that there were any issues in phases 1 through 4.  I

9  mean, they continued to rent right up until the time that this

10  letter was sent.

11       So there was clearly a disconnect between the scope

12  of damages from when we were last out there.  So we retained

13  Chris Spicer, and we let the insured know is, look, our expert

14  has to come out and take a look at it to verify if we're going

15  to be -- if we're in agreement with the opinions provided by

16  Tom Irmiter in his FBS report.

17  Q    Okay.

18       THE COURT:  Would counsel approach the bench?

19       MR. ELY:  Yes, sir.

20       (Counsel approached the bench and the following

21  proceedings were had:)

22       THE COURT:  Who do you have next?

23       MR. ELY:  Who do I have after him today?

24       THE COURT:  No.

25       MR. ELY:  Tomorrow I have an expert witness who will
                              833

```
 1   not be as long as today.  I have two fact witnesses who will
 2   not be nearly as long.  They will -- that's who I have left.
 3   I have one witness left, one expert witness that will be on
 4   Wednesday.
 5              MR. ABRAMS:  So who is who?
 6              MR. ELY:  Batterman, Stakely, and Brad Stiles
 7   tomorrow.  And then Mulder on Wednesday.
 8              MR. ABRAMS:  Then we have three rebuttal witnesses
 9   on Wednesday.
10              THE COURT:  Are you going to be able to get that
11   done?
12              MR. ABRAMS:  I think so.  It will be tight.
13              MR. ELY:  Mike's experts, I will just say from a
14   cross standpoint, I don't think they're going to be extensive
15   unless they opine new information.
16              I don't think those are going to be extensive
17   cross-examinations.  The ones we've bitten off today were the
18   biggest.  I've got one -- my engineer expert on Wednesday.
19   He'll take a little bit, but I'm going to plan to try to get
20   him up and down as quickly as I can.
21              THE COURT:  How much longer do we have with him?
22              MR. ELY:  20 minutes, 15, 20 minutes.
23              THE COURT:  Why don't we finish him tomorrow.  The
24   jury is getting tired.
25              (The proceedings returned to open court.)
                              834
```

```
 1              THE COURT:  Are you ready to go home?  The
 2    expressions tell me that.  I want to make sure I'm reading you
 3    right.
 4              We're going to stop for the day and start fresh in
 5    the morning.  We're still on schedule as far as I can tell.
 6              Again, I'll ask that you not discuss this case among
 7    yourselves or with others as per the instructions.
 8              Any questions?
 9              Have a good evening.  See you back at 8:30 tomorrow.
10                   (Court adjourned.)
11              REPORTER'S CERTIFICATE
12
13              I certify that the foregoing pages are a correct
14    transcript from the record of proceedings in the
15    above-entitled matter.
16
17    _____        _____
         Date                /s/Gayle M. Wambolt
18                           GAYLE M. WAMBOLT, CRR, RMR
                             United States Court Reporter
19
20
21
22
23
24
25
                              835
```