<pre>
 1              IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF MISSOURI
 2                      WESTERN DIVISION

 3   MAXUS METROPOLITAN, LLC,          )
                                       )
 4                    Plaintiff,       )  No. 20-cv-00095-FJG
               vs.                     )
 5                                     )
     TRAVELERS PROPERTY CASUALTY       )  August 1, 2023
 6   COMPANY OF AMERICA,               )
                      Defendant.       )
 7

 8            ..............................
            TRANSCRIPT OF JURY TRIAL - VOLUME 6 OF 8
 9     BEFORE THE HONORABLE FERNANDO J. GAITAN, JR.
            UNITED STATES DISTRICT COURT JUDGE
10

11     Proceedings recorded by electronic stenography
               Transcript produced by computer
12

13                      APPEARANCES

14   For the Plaintiff:      MR. MICHAEL J. ABRAMS
                             MS. ALANA McMULLIN
15                           MS. KIMBERLY K. WINTER
                             Lathrop GPM LLP
16                           2345 Grand Avenue, Suite 2200
                             Kansas City, Missouri 64108
17
     For the Defendant:      MR. BRENEN G. ELY
18                           MS. LAUREN A. WIGGINS
                             Ely & Isenberg, LLC
19                           3500 Blue Lake Drive, Suite 345
                             Birmingham, Alabama 35243
20
                             MR. DANIEL EDWARD HAMANN
21                           Deacy & Deacy, LLP
                             9233 Ward Parkway, Suite 370
22                           Kansas City, Missouri 64114

23            Gayle M. Wambolt, RMR, CRR
              U.S. Court Reporter, Room 7552
24        Charles Evans Whittaker Courthouse
               400 East Ninth Street
25        Kansas City, MO 64106 (816) 512-5641
                          836
</pre>

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

```
 1                          INDEX
                          JURY TRIAL
 2                      AUGUST 1, 2023

 3                    CHRONOLOGICAL INDEX

 4    PLAINTIFF'S WITNESSES:

 5                              DIR   CROSS   RDIR   RCRS

 6    STEPHEN BRYAN           838    852    876    879

 7    STUART BATTERMAN        881    907    918    920

 8    KRISTIN STAKELY         921    929    931

 9    WILLIAM BRADLEY STILES  932    944    946    946

10    EVENT                                        PAGE

11    Proceedings in Courtroom                      947

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                            837
```

Case 4:20-cv-00095-FJG   Document 246   Filed 09/05/23   Page 2 of 117

1

2 (The following proceedings were had in the presence of the

3 jury:)

4 STEPHEN BRYAN, previously being sworn, resumed the stand:

5 DIRECT EXAMINATION (continued) BY MR. ELY:

6 Q    Mr. Bryan, I believe when we left off yesterday in terms

7 of the time period of the claim, we had been through the June

8 2nd, 13th, and 14th time period, June 14th, the day of the

9 tenant eviction.  I think when I left off yesterday, I had

10 asked you a question with regard to Mr. Spicer's late July,

11 August report to Travelers.  I believe my question to you was

12 can you explain why that report was not provided to Maxus at

13 that time?

14 A    It wasn't complete.  We wanted to make sure that we were

15 as thorough as possible.  As Mr. Spicer stated yesterday, he

16 recommended to us that he didn't feel testing was necessary

17 because of his initial site inspection.  He didn't see it.  He

18 didn't smell it.  We had a report from FBS that had testing

19 included; so we felt it was necessary for Spicer to perform

20 testing and to analyze those results.

21 Q    So -- and you've heard -- we've heard the testimony of

22 Eugenia Mirica from EMSL and also Denise Weidler from

23 MicroVision, two lab technicians who performed reports for

24 FBS.  Do you remember that testimony?

25 A    Yes.

838

```
 1   Q    And as you heard that testimony, at the time Chris
 2   Spicer issued his report to Travelers on August the 2nd, was
 3   Travelers aware that those two lab reports had been issued,
 4   one from EMSL and MicroVision -- another from MicroVision?
 5   A    No.  At that time we had only received the FBS report,
 6   which included the findings of Carlson, the test results that
 7   was provided to them.  We were not aware that FBS had also
 8   took additional testing in May, and they received test results
 9   in mid June from EMSL and MicroVision.  EMSL, we eventually
10   got those results on November 14th; and MicroVision, those
11   results were never provided to us.  We received those results
12   eventually in litigation.
13          MR. ELY:  Let's pull up Defendant's Exhibit 17,
14   please.  Go to the third paragraph, if you would, please.
15   Q    (BY MR. ELY) Now, Mr. Bryan, you've seen a copy of this
16   letter, correct?  Again, this is a communication going back
17   and forth between myself and Mr. Abrams during this period of
18   time.  You've seen this letter before; have you not?
19   A    Yes.
20   Q    And does this -- well, with respect to this, can you
21   tell from this letter how Travelers learned that additional
22   sampling had been done by FBS in May -- late May?
23   A    Yes.  There was an examination under oath taken of the
24   Bomasada representative Stuart Fred sometime in August.  And
25   during that deposition, he revealed that additional testing
```

```
 1   was done by FBS.

 2   Q    So Travelers learned of the additional -- the additional

 3   sampling done by FBS from Bomasada?

 4   A    Correct.  We learned from Bomasada through the

 5   examination under an oath.  We never found that out from FBS

 6   or Maxus.

 7   Q    And this letter was a request to Maxus to provide

 8   information relating to that sampling, correct?

 9   A    Yeah.  This is the first of several letters requesting

10   that additional testing results.

11   Q    Okay.  I won't go through each of the letters.  But

12   between -- you mentioned November the 13th of 2019.  Is it

13   your testimony that between September 12th of 2019 and

14   November the 13th of 2019, Travelers made multiple requests

15   for the information related to the FBS May 30 testing?

16   A    Yes.

17   Q    Okay.

18        MR. ELY:  Can we pull up Plaintiff's Exhibit 11,

19   please.  So please go to page 8.  I don't believe that's the

20   right one.

21   Q    (BY MR. ELY) So on November the 13th, do you have a

22   recollection of when -- or what information was provided to

23   Travelers with regard to this second round of sampling?

24   A    Yeah.  It was a supplemental report from FBS summarizing

25   the MicroVision -- the EMSL testing results.
```

840

1    Q    Okay.  And the EMSL report was provided with that,
2    correct?
3    A    Correct.
4    Q    And do you recall the date of the EMSL report?
5    A    I believe it was June 14th or June 21st.
6    Q    Okay.
7    A    You know, one, EMSL and MicroVision were both received
8    in June; so one was received on June 14th, I believe, and one
9    was received around June 21st.
10   Q    Did Travelers receive any explanation on November the
11   13th as to why that EMSL report had not been forwarded for
12   nearly five months?
13   A    No.
14   Q    And we talked -- you heard the testimony of Mr. Spicer
15   yesterday that Mr. Spicer came out on June the 13th to make
16   his initial walk-through.  He was asked to go back out to do
17   additional sampling.  He did so on September the 30th of 2019.
18            Prior to his visit to the site on September the
19   13th, 2019, had Travelers been provided either the EMSL or the
20   MicroVision sampling reports?
21   A    No.  And as he testified yesterday, he said that any
22   additional testing results would have been beneficial in his
23   investigation.
24   Q    Well, from Travelers' standpoint, would that have been
25   important to you in the claim to ever see those results?

                              841

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

Case 4:20-cv-00095-FJG  Document 246  Filed 09/05/23  Page 6 of 117

```
1    A    Sure.  It was relevant to the damages that were being
2    claimed by Maxus.  So, you know, those test results
3    specifically spoke to the additional damages in phases 1
4    through 4 being claimed by Maxus.
5    Q    Do you recall in that November the 13th report from
6    Mr. Irmiter at FBS, was there any mention of a second report
7    from MicroVision?
8    A    No.
9    Q    At any point during the claim prior to litigation, was
10   Travelers ever told by anyone at Maxus they had an additional
11   report it had received from MicroVision?
12   A    No.
13   Q    Okay.  Now, with respect to -- I want to back up.
14        You heard the testimony of Alex Stehl --
15   A    Yes.
16   Q    -- from Maxus?
17        And you heard the testimony regarding sampling that
18   was done earlier in the claim back around April 11th and 12th
19   by a company out of Helena, Alabama, called SELC.  Do you
20   remember that testimony?
21   A    Yes.
22   Q    Same questions with respect to the investigation of the
23   soot and char claim.  At any point in -- during the pendency
24   of the claim, did Maxus advise Travelers that it had retained
25   another testing company, particularly SELC, to come out and
```
                                    842

```
 1   conduct sampling on April 11th and 12th of 2019?

 2    A    No.  First notification that we ever received in regards

 3   to the soot and char was on May 1st from David Johnson

 4   indicating there could be an issue.  Then a letter from

 5   counsel stating that they had retained an IH, and eventually

 6   we were informed that FBS was out and taking samples.

 7            That was the first indication that we had that

 8   anyone ever was out on site to take samples.

 9    Q    Okay.

10            MR. ELY:  Can we pull up Plaintiff's Exhibit 369,

11   please.  Next page, please.

12    Q    (BY MR. ELY) Do you recall this email from me to

13   Mr. Abrams?  You might not have seen the email, but do you

14   remember the events?

15    A    Yeah.  I don't recall the email, but I know this is when

16   we provided the Spicer -- finalized Spicer report to Maxus.

17    Q    So December the 16th of 2019, the final Spicer report is

18   provided to Maxus, correct?

19    A    Yes.

20    Q    And at the time that report was issued, Travelers

21   didn't -- was not aware of the sampling performed by SELC in

22   April of 2019 or the test results from the MicroVision report

23   from the sampling FBS had done May 30th?

24    A    No.

25    Q    Okay.
```

843

1          MR. ELY:  Can you pull up Defendant's Exhibit 14,

2    please.  Highlight the fourth paragraph, please.

3    Q    (BY MR. ELY) Now, Defendant's Exhibit 14 is the May 1,

4    2019, letter from David Johnson, correct?

5    A    Yes.

6    Q    Do you remember that letter?

7    A    Yes.

8    Q    Okay.  We are making you aware of this information so

9    that you can take immediate steps to engage your own appraiser

10   and experts to inspect and evaluate the damages to the

11   remaining buildings.  We will, of course, immediately copy you

12   with any valuations and expert reports we obtain, but we want

13   to strongly request that you not wait until then to engage

14   your experts to start your own investigation into these

15   damages, as the window of opportunity will close quickly when

16   construction and restoration move immediately back into full

17   gear.

18          Based on the information you have now with regard to

19   SELC and the MicroVision report, did Maxus follow through --

20   in your opinion follow through with its promise to provide

21   Travelers with all of the information relating to sampling and

22   testing it was doing at the Metropolitan?

23   A    No.  And as Mr. Spicer stated yesterday, any sampling

24   testing results that would have been done would have helped

25   assist in his assessment, and it could have possibly, you

                              844

1    know, sped up his final determination.

2    Q    From a claims perspective, Mr. Bryan, is it important

3    for you to get all of the information from your insureds?

4    A    Yes.

5    Q    And would this information have been important in part

6    of Travelers' adjustment of the claim, of the soot and char

7    claim?

8    A    Yes.

9    Q    And what would Travelers have done with the information?

10   Would it have provided it to its expert?

11   A    Yes.  We would have provided it to our industrial

12   hygienist for his expert evaluation of it.

13   Q    Okay.  And in making the decision on the soot and char

14   claim, did Travelers rely on Mr. Spicer's expert opinion in

15   doing so?

16   A    Yes.

17   Q    And shortly after the December 16th email, do you recall

18   that litigation was initiated in this case?

19   A    Yeah.  We were -- litigation was filed on December 19th.

20   Q    Okay.  And still the SELC information, the identity of

21   SELC had not been disclosed, much less the samples, correct?

22   A    Correct.

23   Q    And nor had the identity of MicroVision or its lab

24   report been disclosed?

25   A    Correct.

845

1    Q    So I want to move past the litigation that started in

2    December of 2019 and shift gears into -- quickly into January

3    20th of 2020.  Travelers made a supplemental payment, I

4    believe, on January 20th, 2020; is that correct?

5    A    Yes.  It was roughly $1.8 million.

6         MR. ELY:  Can we go to Defendant's 31, please, and

7    hit the second tab, the spreadsheet.  Hit the payments tab at

8    the bottom, please.

9    Q    (BY MR. ELY) So, Mr. Bryan, tell me what I'm looking at

10   here.

11   A    This is a tab within our statement of loss that

12   summarizes all the payments made to date on this claim.

13   Q    Okay.  So can you point to the line --

14        MR. ELY:  Go up a little bit, Chris, please.

15   Q    (BY MR. ELY) Can you point to the line that represents

16   the supplemental payment made on phases 5 and 6 in January of

17   2020?

18   A    It would be this one straight across.

19   Q    Okay.  So payment of $1,879,385.45 is made on, I

20   believe, January 20th, 2020?

21   A    Yes.

22   Q    This is after the litigation had started, correct?

23   A    Correct.

24   Q    Did -- is it a fair statement to say that you and

25   Mr. Bynum continued to adjust this loss throughout litigation?

846

```
 1   A    Yes.

 2   Q    So this payment was made on January 20th of 2020.

 3        With respect to phase 5, can you tell us what

 4   specific supplemental damage payment was being made for phase

 5   5?  Not the amount, but what was being paid for?

 6   A    There is additional -- it was the additional subfloor

 7   replacement and additional ductwork replacement.

 8   Q    Okay.  So why was the ductwork being replaced?

 9   A    Due to all the subfloor having being replaced, we had to

10   manipulate that to get to the subfloor.

11   Q    So on January 20th of 2020, Travelers paid for

12   replacement of the entire subfloor in the phase 5 building,

13   correct?

14   A    Yes.

15   Q    And additional HVAC removal in order to get that work

16   done?

17   A    Yes.

18   Q    And did Travelers make a supplemental payment yet again

19   in July of 2020?

20   A    Yes.

21   Q    And can you point to the line of that, please?

22   A    (Witness complied.)

23   Q    So do you have a recollection of what that cost was for,

24   that $138,399.40 was for?

25   A    Yeah.  Maxus had come back and said to replace all the
```

847

```
 1   subfloor, they had to manipulate all the fire suppression
 2   lines as well.
 3   Q    So this is -- these are additional costs associated with
 4   the complete subfloor removal?
 5   A    Correct.
 6   Q    So Travelers paid for the entire subfloor to be removed,
 7   HVAC to be removed so it could be done, and sprinkler removal
 8   and reset so that work could be done, correct?
 9   A    Correct.
10   Q    And at the time Travelers made these payments on
11   January -- in January of 2020 and, again, in July of 2020
12   after litigation had started, was Travelers aware of the April
13   10th sprinkler line rupture that was referenced in Mr. Stehl's
14   testimony?
15   A    No.
16   Q    Had Maxus provided any notice whatsoever to Travelers
17   that that sprinkler line rupture had taken place in the phase
18   5 building April 10th, 2019?
19   A    No.
20   Q    And just as -- to refresh, the policy expired on
21   September the 30th of 2018, correct?
22   A    Correct.
23   Q    So Travelers made those payments not knowing there had
24   been a -- there had been a sprinkler rupture in phase 5 that
25   had put water on all four floors?
```
848

1    A    Correct.

      2    Q    Would that have made a difference in the claim

      3  evaluation of this additional water damage?

      4    A    Sure it would have.  I recall when Greg, the general

      5  adjustor, went out with EDT in June of '19 or July of '19,

      6  that they -- after the additional water damage was claimed,

      7  they saw additional water damage.  We talked about it.  We

      8  were surprised that that much additional water damage was

      9  manifested itself, you know, six to nine months after the

     10  loss.

     11         We weren't aware of any other cause that would have

     12  caused that.  Maybe ACT was out there, evaluated, did moisture

     13  mapping.  We replaced what they recommended at the time.

     14         Based on the additional damage we saw and ultimately

     15  some additional reports that we received, we eventually agreed

     16  to replace all the subfloor.  We had no reason to believe that

     17  it was not as a result of the firefighting efforts.

     18    Q    And in April -- you heard Mr. Irmiter's testimony, April

     19  the 24th of 2019, was it Travelers' understanding that the

     20  entire subfloor in the phase 5 didn't need to be replaced?

     21    A    Correct.

     22    Q    At some point by January of 2020, that, in fact, was the

     23  case?

     24    A    Right.  If I remember closely, it was around 3,000

     25  square feet that we replaced based on the recommendation of

                                  849

```
 1   ATC.

 2   Q    Okay.

 3        MR. ELY:  Can we go to Defendant's Exhibit 14 one

 4   more time, please.  Go to the last paragraph, please.

 5   Q    (BY MR. ELY) Can you read that for us?  Again, this is

 6   from David Johnson's letter of May 1, 2019.

 7   A    There is also extensive water damage to the flooring in

 8   the phase 5 building that we believe will require replacement

 9   of most of the flooring in place at the time of the fire.

10   This is a frustrating move backwards for us, but one that

11   cannot be prevented, unfortunately.

12   Q    So Travelers' payments in January of 2020 and July of

13   2020 were in direct response to that supplemental water damage

14   claim articulated in the May 1 letter?

15   A    Correct.

16   Q    And nowhere in that May 1 letter does it mention the

17   sprinkler line rupture that had been discussed earlier in this

18   case?

19   A    No.  This whole letter is referring to damage directly

20   caused by the fire.

21   Q    And at no time did anyone at Maxus ever, first, tell

22   Travelers about the -- prior to the payment, tell Travelers

23   about the sprinkler line rupture and the extent of damage?

24   A    No.

25   Q    And the incident reports that we saw earlier in the
                                850
```

```
 1   trial, those were never provided to Travelers prior to that
 2   payment, were they?
 3   A    No.
 4   Q    And the video that we saw was not provided to Travelers
 5   prior to that payment?
 6   A    No.
 7   Q    Okay.  So finally, Mr. Bryan, you recall that in the
 8   February, March timeframe of 2020, again, four months after --
 9   or three or four months after litigation had started, there
10   was a claim for water damage to the phase 1 through 4 roof.
11   You recall that?
12   A    Yes.
13   Q    Tell me what Travelers did with respect to the
14   investigation of that water -- that water damage claim from
15   damage to the roof.
16   A    We had EDT go out and take a look at the phase 1 through
17   4 building.
18          MR. ELY:  Can we pull Defendant's Exhibit 1, page 2,
19   please.
20   Q    (BY MR. ELY) So, Mr. Bryan, will you read Section 4A, B,
21   C, and D?
22   A    We will not pay for loss or damage caused by or
23   resulting from faulty, inadequate, or defective planning,
24   design -- planning, zoning, development, surveying, siding,
25   design, specifications, workmanship, repair, construction,
                              851
```

```
 1   renovation, remodeling, grading, or compaction, materials used
 2   in repair, construction, renovation, remodeling, grading, or
 3   compaction or maintenance.
 4   Q    And did Mr. Mulder issue an opinion to Travelers in
 5   terms of his investigation of that water damage claim?
 6   A    Yes.
 7   Q    And what was his opinion?
 8   A    In summary, if I recall correctly, he identified issues
 9   with the installation of the phase 1 through 4 roof.  Greatest
10   issue was there was no IsoBoard underneath the TPO membrane
11   that was required by the 2009 codes.  Instead that TPO roof
12   was laid directly on the OSB decking.
13          And there was some siding installation issues and
14   some issues with the stucco that required further destructive
15   testing.  And I believe that would be -- I'm sure I didn't
16   capture everything, but those were the major --
17   Q    Did Travelers rely on Mr. Mulder's opinion in making its
18   determination of coverage with regard to the water damage
19   claims, phase 1 through 4?
20   A    Yes.
21          MR. ELY:  Pass the witness, Your Honor.
22   CROSS-EXAMINATION BY MR. ABRAMS:
23   Q    Good morning.
24   A    Morning.
25   Q    First, let's clear something up that was talked about or
```
852

mentioned earlier about Maxus not being the original insured,
but an additional insured.  Do you remember talking about
that?

A    Yes.

Q    Just so we're clear, that doesn't mean that Maxus is any
kind of lesser insured, correct?

A    No.  There's some additional loss payee language in the
policy that says they have coverage under the policy up to
their financial interests.

Q    Okay.  So we don't get any less coverage than the
original insured under the terms of the --

A    No.  The same policy provisions, conditions apply.

Q    All right.  Let's talk about time.  Once again,
Travelers had received notice of the fire the day it happened,
September 27th, 2018, correct?

A    Yes, sir.

Q    All right.  And by November 20th, 2018, almost two
months, Travelers had neither accepted coverage or made any
payments on the claim, correct?

A    Correct.

Q    And it wasn't until December 2018 that -- I'm sorry.  It
wasn't until November 29, 2018, nine days after the Alabama
Department of Insurance complaint, that Travelers finally
accepted coverage, correct?

A    Yes.  Based on information received November 7th from
                              853

```
 1   the agent, we had already started the process of having the
 2   policy reformed.
 3   Q    All right.  Let me ask you about that.  This is this
 4   protected safeguards issue, right?
 5   A    Correct.
 6   Q    Okay.  And what you're saying is, if I've got this
 7   right, is that there was an error in the policy, correct?  The
 8   policy didn't reflect what the policy -- what actually should
 9   be, correct?
10   A    I do not know how underwriting determined if it was an
11   error, if that should have been there or not.  They just --
12   they took that information from the agent and agreed to make a
13   reformation on the policy.
14   Q    What you said yesterday was that -- first of all,
15   underwriting is Travelers, right?
16   A    Correct.
17   Q    Okay.  It's not -- it's just a different department that
18   you work in?
19   A    Yeah.  I don't -- but I have no -- I have no idea what
20   their inner workings are, what they do.  They don't keep me in
21   the loop on all that.
22   Q    Right.  I just want to make it clear because when we
23   talk about underwriting, underwriting is part of Travelers?
24   A    Correct.
25   Q    Okay.  And what you said yesterday was that underwriting
```

854

1    received a letter from the broker saying policy is wrong; you

2    need to fix the policy, correct?

3    A    I think he pointed out a letter that was included

4    prior -- in a prior renewal that had some different language.

5    Q    Okay.  But you weren't waiting on anything from Maxus,

6    right?  This was -- this was a letter from the broker that

7    said this is what should be in the policy for protected

8    safeguards, correct?

9          Well, and to be fair, you're really not part of the

10   underwriting department, so you really don't know, do you?

11   A    Well, we were waiting on documentation from the insured.

12   We were waiting on documentation in regards to the security

13   guard service and the sale of the property to Maxus.

14   Q    Okay.  But you didn't need -- what we determined, what

15   you said yesterday was, is under the protective safeguards

16   endorsement, you didn't need both, correct?  You needed one or

17   the other?

18   A    Correct.  Yeah, after May -- after receiving the

19   information on November 7th, that's what was determined.

20   Q    Okay.  And it took the broker telling your underwriting

21   department, hey, you got the policy wrong, correct?  That's

22   your understanding?

23   A    I don't know if he stated it was wrong.  He just

24   indicated that there was a letter out there.

25   Q    That the policy should have been different?

1    A    That stated, yes, that there was an either/or on the two

2    protected safeguards indicated for fire.

3    Q    Okay.  Travelers agreed to and paid Bomasada to hire ATC

4    to do some combustion byproduct testing on phase 5 in the

5    spring of 2019, correct?

6    A    Well, they were out there in December of '18.

7    Q    Okay.  But at some point, Travelers actually agreed and

8    paid to remediate combustion byproducts on phase 5, correct?

9    A    Yes.  We paid -- based on the ATC report, we paid to

10   repair some fire -- damage from fire and ultimately remediate

11   some of the soot and char found in phase 5.

12   Q    Okay.  So Travelers recognized, but at least with

13   respect to phase 5, under this policy that soot and char

14   remediation was covered under the policy, correct?  It

15   wouldn't have paid for it on phase 5 if they didn't think it

16   was covered, right?

17   A    Right.  Well, we don't -- we don't pay for soot and char

18   remediation if there's no additional damage.  So there was

19   damage caused to phase 5.  We paid to fix that, which was the

20   exterior, replace some windows.  It was open to it.  So, yes,

21   ultimately we determined that part of that process was to

22   remediate some of the soot and char that entered phase 5.

23   Q    And Travelers paid for it?

24   A    Correct.

25   Q    It recognized -- and you -- Travelers wouldn't have paid

                            856

```
 1    for soot and char remediation in phase 5 if it didn't think it
 2    was owed under the policy, fair?
 3    A    Correct.
 4    Q    Okay.
 5         MR. ABRAMS:  Melissa, let's go down the outline.
 6    Q    (BY MR. ABRAMS) And counsel had just showed this to you
 7    before.  If you look at Exhibit 301.
 8         While Melissa is getting that up, I know you've seen
 9    this before.  So this is not going to be news but just to
10    orient ourselves.
11         May 1, 2019, you received a letter -- actually
12    Mr. Bynum receives a letter from Mr. Johnson saying, Hey, we
13    believe we've got a soot and char problem, correct?
14    A    Correct.
15    Q    And by the way, so you are Mr. Bynum's -- or were
16    Mr. Bynum's supervisor?
17    A    Yes.
18    Q    Are you still his supervisor?
19    A    Yes.
20    Q    Okay.  So you receive that letter May 1, 2019, and then
21    on June 7, 2019, you receive the FBS report, correct?
22    A    Correct.
23    Q    All right.  And, again, I say "you," Travelers.  It
24    really came to Mr. Bynum, correct?
25    A    Yes, sir.
```

857

1    Q    Again, on June 11, 2019, Maxus wrote to Travelers

2    requesting input for the remediation issues that were outlined

3    in the FBS report, correct?

4    A    It sounds right.  There was a lot of communications

5    going back and forth at that time.

6    Q    Okay.

7         MR. ABRAMS:  So are you able to pull up Exhibit 311?

8    Q    (BY MR. ABRAMS) Maybe we can do it without it because I

9    think you're familiar with these documents.  If you need to

10   see it, we'll do it.  We're trying to get it put up.

11        The next day, June 12th, Mr. Ely writes a letter,

12   June 12th, 2019.  And as part of that letter, we've read this

13   sentence a couple of times.  It says, Travelers has not

14   undertaken and will not undertake any technical, safety, or

15   other review of the report or opinions of Mr. Irmiter.

16        You remember that?

17   A    Yes.

18   Q    Okay.  By the way, isn't that exactly what Travelers has

19   done here throughout this trial?

20   A    Well, I can't speak for Mr. Ely, but I know that we

21   received that FBS report on June 7th of '19.  And if we pull

22   that up, what, I think it was in excess of 70, 80 something

23   pages.  So in order for us to review it, we're not going to be

24   able to review it and fully -- you know, review all the

25   information in a week.

                              858

```
 1            So, you know, we're always going to request more
 2    time.
 3    Q    No.  I understand that.  I understand that, Mr. Bryan,
 4    but that's not what the letter from Travelers says.  The
 5    letter says Travelers has not undertaken and will not
 6    undertake any technical, safety, or other review of the report
 7    or opinions of Mr. Irmiter, right?
 8    A    Well, yeah.  Travelers -- we had retained an expert, so
 9    we're not going to comment on technical stuff.  We're not
10    going to -- we never comment on safety.
11    Q    No, no.  That's -- I'm going to get to that.  That's the
12    next question.
13            What I'm getting at is Travelers says that it has
14    not undertaken and will not undertake any technical, safety,
15    or other review of the report or opinions of Mr. Irmiter.  But
16    isn't that what you've done in this trial?  Isn't what you've
17    done is to review and undertake the technical, safety, or
18    other review of the reports of Mr. Irmiter?  Fair?
19    A    Travelers has not.  Chris Spicer has on behalf of
20    Travelers, yes.
21    Q    Is that what you're -- you think that's what you're
22    saying in this letter, is Travelers is not going to do it, but
23    Travelers could hire someone else to do it?  Is that what was
24    meant by that letter?
25    A    I didn't write that letter so I can't tell you.  I can't
```
                                859

```
 1   speculate as to what was meant in that letter.
 2    Q    Well, you speculated about a bunch of letters that you
 3   didn't write before.  This is -- but you would agree with me
 4   that this is on behalf of Travelers, correct?  This is what
 5   it's telling its insured?
 6    A    Yes.
 7    Q    Okay.  And, sir, are you saying that when it says
 8   Travelers will not undertake any technical, safety, or other
 9   review of the report or opinions of Mr. Irmiter, that you were
10   saying, well, it's Travelers internally won't do it, but we
11   may hire someone else to do it?  Is that what was meant by
12   this?  Is that --
13    A    Again, I didn't write it.
14    Q    Okay.  So you don't know?  DO you think this was wrong?
15    A    No.
16    Q    You think this is correct?
17    A    (Witness nodded head.)
18    Q    Okay.  Would you agree with me that the experts that
19   Travelers has hired and who have testified in this courtroom
20   this week and last week were under -- did undertake technical,
21   safety, and other review of the reports or opinions of
22   Mr. Irmiter?  Will you agree with me on that?
23    A    That our experts did?
24    Q    Right.  On your behalf.
25    A    Yes.
                              860
```

```
 1   Q    Okay.  All right.  Let's move on.

 2              We know -- we heard from Mr. Spicer yesterday.  And

 3   he did his investigation, and you received by August 2nd

 4   Mr. Spicer's report, correct?

 5   A    Correct.

 6   Q    And when I say "you," it came to Mr. Bynum, but he

 7   shared it with you?

 8   A    I mean, if you want to get official, there was a lot of

 9   communication going through Mr. Ely, not Mr. Bynum.  So you're

10   right, it was either to Mr. Bynum or to Mr. Ely.

11   Q    Okay.  Because it's addressed to Mr. Bynum, but that's

12   your -- he's your report?

13   A    Correct.

14   Q    Okay.  So August 2nd, Travelers knew, correct, that its

15   expert disagreed with the findings of the FBS report, correct?

16   A    Yes.

17   Q    All right.  And you said something, and I wrote it down.

18   You said that the report was preliminary, correct?

19   A    Yes.

20   Q    The report does not say it's preliminary, correct?

21   A    Correct.

22   Q    In fact, I asked Mr. Spicer, Was the August 2nd report

23   preliminary yesterday.  And he said no, correct?

24   A    Correct.

25   Q    Okay.  Let's see if we can do this.  Mr. Bryan, if you
                              861
```

```
 1   need the documents in front of you, please let me know.
 2            But you're aware that between when people were moved
 3   out of the Metropolitan in June of 2019, Maxus continued to
 4   write letters to Travelers requesting information regarding
 5   what its experts had -- the conclusions they had come to,
 6   correct?
 7    A    Correct.
 8    Q    And, in fact, there was a letter that we saw before,
 9   Plaintiff's Exhibit 339, on September 18th asking for
10   Travelers' position on the soot and char remediation?  Do you
11   remember that?
12    A    That's a letter from you?
13    Q    Well, let's get it out.  Yes.
14    A    There's a lot of them.
15    Q    I know.  I'm taxing your memory while we try to get the
16   screen working.  Right?  So I'm correct, this is the September
17   18th, 2019, letter asking for a position?
18    A    Yes, sir.
19    Q    And, again, on October 2nd, you remember there was
20   another letter asking for Travelers' position on soot and
21   char?
22    A    Yeah.  I remember there was multiple letters going back
23   and forth, you requesting our position and Mr. Ely responding
24   saying we were going to have our expert inspect.
25    Q    Okay.  And then on -- and you understand that on October
                                  862
```

```
 1   9, 2019, that Maxus hired a contractor to remediate the -- and
 2   sign a contract with the contractor to remediate phases 1
 3   through 4?
 4   A    Yes.  Yeah, that would be BCCM.
 5   Q    Okay.  And, again, it wasn't until December 16, 2019,
 6   that Travelers shares the August 2nd report by Mr. Spicer,
 7   correct?
 8   A    Correct.  Once he got all his testing done and --
 9   Q    But what -- the report that was shared was the August
10   2nd report and a second report, correct?  It was both?
11   A    I believe he incorporated his initial August 2nd report
12   into the report that evaluated the testing completed on
13   September 30th.
14   Q    But you sent us both reports.  You sent us August 2nd
15   and the later report, correct?
16   A    From what I remember, it was one whole report that
17   Spicer provided.
18   Q    Okay.
19        MR. ABRAMS:  Okay.  Can we pull that up?
20        Your Honor, we're having a problem getting things
21   pulled out.
22        Your Honor, I apologize.  It's going to take ten
23   minutes.  We're going to have to switch laptops.
24        THE COURT:  Don't you have a hard copy?
25        MR. ABRAMS:  Yeah.  We can do that.
                            863
```

```
 1              All right.  We're going to find it for you.  We'll
 2   come back to it.  I don't want to waste too much time.
 3   Q    (BY MR. ABRAMS) I'll show you the email.  You don't
 4   remember whether -- based on the August 2nd report and his
 5   second report or it was just one report together?
 6   A    Yeah.  I just recall that there was a report, and then
 7   the testing was after, where he commented on the testing.
 8   Q    All right.  We'll refresh your recollection in a minute.
 9              Plaintiff's Exhibit 369.
10              Mr. Bryan, does it refresh your recollection that
11   what was sent to Maxus was Mr. Spicer's August 2nd, 2019,
12   report and his December 11 report?
13   A    Yeah.  It has -- it has a link containing two
14   attachments.  So --
15   Q    So he sent both, right?
16   A    Correct.  He sent two attachments.
17   Q    Right.  The August 2nd report and the December 11th
18   report, correct?
19   A    Well, it says December 11th assessment of combustion
20   product impact.  So as I said, one was the initial report, and
21   the other was the additional information in regards to the
22   testing that he performed.
23   Q    I understand your point.  There were two different
24   reports.  They sent both reports, the August 2nd report and
25   the December 11th report.  Are you saying the December 11th is
                              864
```

```
 1   not a report; it's an assessment?

 2   A    You're going to have to clarify that with Spicer.  I'm

 3   just telling you when we reviewed -- when we got this, he

 4   said, Here you go.  Here's my report, and here's also the

 5   assessment of the testing that was completed.

 6   Q    Okay.  I'm trying -- I'm really just asking a simple

 7   question.

 8            On December 16, 2019, when we received the

 9   information from Mr. Spicer, it was two different things,

10   right?  It was, one, Mr. Spicer's August 2nd, 2019, report;

11   and number two, his December 11th, 2019, report, fair?

12   A    Yeah, you're correct.  It appears that there are two

13   items here.  It's saying there's two items.  How it was

14   captured in the Dropbox links, I have no idea; but, yes, it's

15   broken out by No. 1 and No. 2.

16   Q    Okay.  And so when this was sent December 16, 2019, this

17   was after Maxus had already started tearing out and replacing,

18   remediating 1 through 4.  We saw the pictures of that.  You

19   saw all the garbage bags and so on, correct?

20   A    Yes.

21   Q    All right.  Do you have any idea why Mr. Bynum didn't

22   send the August 2nd report when it was received?

23   A    As Mr. Spicer testified yesterday, he submitted that

24   report.  We had a conversation with him.  We determined that

25   additional testing would be done.
```

865

```
 1              Until that additional testing was done, we felt our
 2      review wasn't complete, it wasn't thorough.  We were going to
 3      wait until everything was done to send the report.
 4      Q    Well, that's what Travelers thought, right?  But
 5      Mr. Spicer said it wasn't a preliminary report, correct?
 6      A    He did say it did not say preliminary on the report.
 7      Q    And -- but do you have any idea why Mr. Bynum didn't
 8      pick up the phone and call Maxus and say, Our expert disagrees
 9      with yours, hold off.  We're going to do additional testing.
10              But do you have any idea why Mr. Bynum didn't pick
11      up the phone and call my client?
12      A    Again, we discussed internally.  We felt the report
13      wasn't complete without the results of the testing.
14      Q    But was it -- would it have done any harm to Travelers
15      or anyone to -- for Mr. Bynum to pick up the phone and say,
16      Listen, we got this report, this August 2nd, 2019, report,
17      from Mr. Spicer.  We have some disagreements about the
18      condition of the property.  It's important for you to know
19      we're asking for it?
20              What would the harm have been in doing that?
21      A    If the test results would have came back totally
22      different and we would have said we weren't in agreement what
23      it was doing -- so we didn't want to jump to a conclusion that
24      was preliminary.  We wanted to make sure that we had all the
25      information available before we shared any results.
```
866

```
 1   Q    But what would the harm have been for Mr. Bynum simply
 2   to say, We got a report from Mr. Spicer, he has a disagreement
 3   with your experts?
 4          What would the harm have been in doing that?
 5   A    Travelers' position is we do not share incomplete
 6   reports.
 7   Q    Okay.  But this wasn't an incomplete report, was it?
 8   A    Based on our conversation with Mr. Spicer, there was
 9   testing that was available to be completed; therefore, we had
10   to go out, take tests and get those test results.
11   Q    So are you saying, Mr. Bryan, that it is Travelers'
12   policy that when an insured is asking about an expert's
13   opinion before it moves people out, before it signs a contract
14   with a -- with a remediator, before it starts ripping up the
15   building, your policy is don't tell the insureds that the
16   expert's opinion is that he has a differing opinion than the
17   insured's opinion?  Is that your testimony?
18   A    This is the first situation of this nature that I've
19   ever encountered; so I can't comment what -- I've never
20   encountered this --
21   Q    That's fine.
22   A    -- prior.
23   Q    I appreciate that.  So, Mr. Bryan, if you had to do it
24   again, would you have told Mr. Bynum to say, Listen, pick up
25   the phone, call your insured and say we've got a report from
```
867

1  our expert that disagrees with yours.  You need to know that.

2        Do you think you should have done that?

3  A    No.  We determined that there was testing still to be

4  done and reviewed, and we waited until all that was completed.

5  Q    All right.  I'll move on.

6        All right.  You were asked about some policy

7  provisions on the Travelers' policy.  And this is a policy

8  that Travelers wrote, correct?

9  A    Yes.

10 Q    The insured doesn't write the policy.  It comes from

11 Travelers.

12 A    I don't know if Travelers writes the policy yet.  I

13 don't -- I don't know who writes the policies.  These forms

14 are similar across all insurance companies.  So Travelers

15 provided the policy.

16 Q    Right.  They may have paid someone to write it for them,

17 right?

18 A    I don't get -- I don't know who writes it.

19 Q    Okay.  But you know that the insured doesn't write it,

20 correct?

21 A    Correct.

22 Q    All right.  You were asked about direct physical loss,

23 the policy provision that says direct physical loss of or

24 damage to covered property, correct?

25 A    Correct.

                              868

```
 1   Q    All right.  And that's what the policy covers, right,
 2   direct physical loss of or damage to covered property,
 3   correct?
 4   A    Correct.
 5   Q    And there's no definition in the policy of the term
 6   "direct physical loss," is there?
 7   A    I'd have to look at the policy.  But from my
 8   recollection, no, there's -- I don't believe that's in the
 9   definitions defining direct physical damage.  We can agree on
10   that.
11   Q    Okay.  I would show you the policy, but --
12   A    No.  That's fine.  We can --
13   Q    Okay.  The policy doesn't say the property must be
14   uninhabitable to suffer direct physical loss, correct?
15   A    Correct.
16   Q    And the policy doesn't state that the damage to the
17   property must render it unhealthy to be considered direct
18   physical loss, correct?
19   A    Correct.
20   Q    All right.  Let's -- we know, just to reorient
21   ourselves, that Travelers agreed that it would pay to rebuild
22   phases 5 and 6 of the Metropolitan to get to -- get them to
23   their prefire condition stage of completion, correct?
24   A    Correct.
25   Q    All right.
```

869

```
 1              MR. ABRAMS:  Can we put side by side slide 128 that
 2   we used for Irmiter with the Travelers' payments?
 3   Q    (BY MR. ABRAMS) All right.  Mr. Bryan, what we're
 4   looking at here is the column -- the middle column is the
 5   amounts that Maxus claims that it paid to rebuild 1 through 4,
 6   5 and 6, correct?
 7   A    Correct.
 8   Q    Okay.  And the column on the right is what Travelers has
 9   represented it has paid to Maxus to rebuild 1 through 4, 5,
10   and 6, correct?
11   A    Correct.
12   Q    So let's take these one by one.  On 6, Maxus states that
13   it cost them $6,218,703.24 to rebuild phase 6 from -- rebuild
14   phase 6, correct?
15   A    Correct.
16   Q    And it's true that Travelers has paid $5,052,463.41,
17   correct?
18   A    Correct.
19   Q    All right.  What hasn't Travelers paid for?
20   A    I don't --
21   Q    Well, we went through all of the pay apps.  Remember,
22   Mr. Irmiter was here.  We went through every single pay app,
23   every single check, every single bill adding up to the $6.2
24   million.
25              What is Travelers not paying for on phase 6?
                                  870
```

```
 1   A    Okay.  So if you recall after my last deposition, right

 2   before that deposition, you got -- Maxus had provided

 3   thousands of documents that supported the amount incurred.

 4            After that deposition, I personally went through

 5   those thousands of pages of invoices, of incurred invoices for

 6   phase 6, 6.2 million.

 7            Provided a detailed spreadsheet to -- I believe it

 8   was provided to you and Maxus.  I'm not sure if it was

 9   provided -- something that we put together that I verified

10   that based on those invoices, only $4.688 million roughly were

11   actually related to phase 6, and that had documentation that

12   could support the incurred costs.

13   Q    I don't have it.  Sitting here today, though, we're in a

14   trial.  You know what we're claiming.  We're claiming $6.2

15   million.  Can you tell us what -- and you've only paid $5

16   million.  And you're the only witness from Travelers,

17   Mr. Bryan.  You're the only person who can testify about this.

18   We went through and went line by line of what we paid.

19            Can you tell us which of that -- of that $6.2

20   million Travelers is not paying?

21   A    I can tell you based on the documentation we received,

22   based on the originals back in February of '19, the Howarth

23   estimate received in July of '19, the additional information

24   received from the principals' meeting of November 14th of '19,

25   the additional documentation received after that, we
```

871

1    calculated $5 million to repair phase 6 at the time of the

2    loss.

3           We received document -- I went through all these

4    invoices that were incurred for the rebuild, determined that

5    we could only verify $4.688 million were directly related to

6    the fire rebuild of phase 6 and that we could document that

7    those items were there at the time of the loss.

8    Q    And did you write a letter to your insured saying, No,

9    we're disagreeing with you on this million two?

10   A    It was in litigation at that time, so there's no

11   requirements that we communicate during litigation.  But I --

12   me personally, all communication was going between yourself

13   and Travelers' lawyers.  So I did not personally send a

14   communication.

15   Q    All right.  Let's try to figure it out this way.  I

16   think what you said is, is Travelers calculated its $5 million

17   based on Xactimate, correct?

18   A    And based on the documentation we received from Bomasada

19   to support the level of completion at the time of the fire.

20   Q    Xactimate is a resource that you use to estimate how

21   much it will cost to rebuild something, correct?

22   A    Yes.

23   Q    All right.  But it's an estimate, right?

24   A    Yes.  It's an estimate.

25   Q    And there's nowhere in the policy does it mention that

                            872

1  the parties have to follow Xactimate, correct?

2   A    No.

3   Q    Okay.  Wouldn't you agree with me that the best

4  indication of the true cost to rebuild is what was actually

5  paid to rebuild versus what an estimate is to rebuild,

6  correct?

7   A    I would agree.

8   Q    Okay.  And I don't want to belabor the point.  You can't

9  do it, you can't do it.

10          But sitting here today, can you tell us -- because

11  we went through pay app by pay app, check by check, bill by

12  bill.  Can you tell us sitting here today what 1.2 -- well,

13  less than 1.2 million on phase 6 Travelers is not paying and

14  why?

15   A    I can't tell you specifically what it was.  But like I

16  said, I went through all those invoices, these incurred

17  invoices, and was only able to verify $4.688 million that we

18  could verify --

19   Q    All right.

20   A    -- incurred.

21   Q    But just to be clear, in preparation for your trial that

22  we knew we were going to be here, you can't, sitting here

23  today, tell us which pay apps you're not paying and which you

24  are paying for phase 6, correct?

25   A    Correct, no.

                        873

```
 1   Q     Okay.  Let's go to phase 5.

 2          Phase 5, Maxus paid claims -- and is submitting its

 3   claim for $3,647,113.39, correct?

 4   A     Correct.

 5   Q     And Travelers has paid -- what it's represented to the

 6   court and to us, that it's paid for phase 5 $1,018,778.81,

 7   correct?

 8   A     Correct.

 9   Q     And I don't want to belabor the point again because I

10   think the answer is going to be the same.  But you can't,

11   sitting here today, tell us which pay applications, which

12   change orders, which contracts Travelers is paying and not

13   paying for phase 5, correct?

14   A     No, not specifically.  We've reviewed everything, and we

15   feel that our 1.18 accurately reflects the damages directly

16   related to the fire.

17   Q     Sitting here today, you can't specifically differentiate

18   for us what you paid and what you didn't pay?

19   A     You can bring up my Xactimate, the Xactimate estimate,

20   and it will specifically lay out exactly what we paid for.

21   Q     Well, the Xactimate is just an estimate of what you

22   expect the cost would be, right?  Right?

23   A     Correct.

24   Q     Okay.  It's not what was actually paid, right,

25   Mr. Bryan?
```
874

```
 1   A    I don't understand that question.  It does reflect what
 2   we actually paid.
 3   Q    Oh, I'm sorry.  What Travelers paid, but not what the
 4   actual costs were?
 5   A    It does not -- no, it does not reflect what was actually
 6   incurred, being claimed.
 7   Q    Okay.  Well, I think -- well, 1 through 4 may be easier,
 8   right?
 9   A    Yes.
10   Q    Okay.  Maxus paid $1,653,539.60 to rebuild 1 through 4
11   without remediation.
12        The $37,101.30, do you know what that's for that
13   Travelers paid?
14   A    We replaced, I believe, five windows.  We paid to clean
15   and paint one side of phase 3.
16   Q    Okay.  So that's easier.  You're not paying for any of
17   the rest that's claimed that Mr. Irmiter went through?
18   A    Yes.  It's a difference in scope, yes, sir.
19   Q    That one is a little easier.
20        And for remediation, Maxus -- I'm sorry.  Aside from
21   phase 5, which Travelers paid for, Travelers is not paying for
22   any remediation of 1 through 4, correct?
23   A    Correct.
24   Q    Okay.  One little, small thing.  We've heard about
25   sprinkler breaks and so on.
```
875

```
 1            You heard the testimony the sprinkler break was
 2   cleaned up, correct, shortly afterwards?
 3   A    I did, yes.
 4   Q    You weren't present at the time of the sprinkler break,
 5   correct?
 6   A    No, sir.
 7   Q    In fact, you didn't know about it, right?
 8   A    No, sir.
 9   Q    But -- okay.  And you -- well, let's just -- we'll leave
10   it at that.
11            MR. ABRAMS:  Pass the witness.
12            MR. ELY:  Brief redirect.
13            Can we pull up Plaintiff's Exhibit 310.
14   REDIRECT EXAMINATION BY MR. ELY:
15   Q    Mr. Bryan, Mr. Abrams was asking you questions about the
16   technical review language in my June 12th, 2019, letter.  The
17   June 12th, 2019, letter was written in response to a June
18   11th, 2019, letter -- do you remember that -- from
19   Mr. Abrams?
20   A    Yes.
21   Q    And have you seen this letter before?
22   A    Yes, I have.
23   Q    Okay.  Can you take a look at this letter and tell us
24   what is the specific question being asked by Maxus to
25   Travelers here?
                              876
```

1    A    I believe it's imperative that we hear from you

2    immediately if you have any objection or do not see the

3    necessity of proceeding in that manner, and I believe that's

4    in reference to evacuating the tenants.

5    Q    So the question being -- you recall the question that

6    was asked to Travelers is -- from Maxus is, Are you -- is it

7    okay if we evacuate our tenants?

8    A    Correct.

9    Q    And so the language that is in my June 12th letter about

10   technical feasibility and evaluation, was that in response to

11   that specific question and whether Maxus should evict its

12   tenants?

13   A    I believe so.

14   Q    Okay.

15           MR. ELY:  Can we go to Plaintiff's Exhibit 342,

16   please.

17   Q    (BY MR. ELY) So this is dated September the 30th of

18   2019, and I believe Mr. Abrams mentioned the October 8th

19   contract with BCCM, which it entered into that contract for

20   remediation of phases 1 through 4, correct?

21   A    Correct.

22   Q    Is that your recollection?

23   A    Yes.

24   Q    So on September the 30th of 2019, that was the same date

25   Chris Spicer came to the Metropolitan to sample, correct?

877

```
 1    A    Yes.

 2    Q    And take a look at that second paragraph.

 3    A    Pretty much saying we won't have an answer on what our

 4  position is on the damages until we get our expert report.

 5    Q    Okay.  So as of September the 30th, 2019, which was a

 6  week before the October 8th contract with BCCM, Travelers is

 7  advising Maxus that, number one, Mr. Spicer has been out to

 8  sample, which Maxus knew already; and secondly, that it

 9  wouldn't be able to comment on remediation, the necessity of

10  remediation until it got those results back, correct?

11    A    Correct.

12    Q    Finally, Mr. Bryan, you mentioned the spreadsheet that

13  you did, I believe, in the 2021 timeframe with regard to phase

14  6?

15    A    Yes.

16    Q    That was based on the as-built documentation provided by

17  Maxus, correct?

18    A    Correct.

19    Q    I believe you placed the value of the rebuild as

20  incurred that you could verify was, A, in the building at the

21  time of the loss; therefore, related to the fire at, what, a

22  $4.6 million number?

23    A    Roughly, yes.

24    Q    And how much did Travelers pay back in -- how much has

25  Travelers paid on phase 6?
```

878

```
 1    A    A little over $5 million.

 2    Q    So based on the documentation you reviewed in 2021 that

 3   you received from Maxus, the number -- the as-built number

 4   actually worked out to be less than what the Travelers'

 5   Xactimate number that it paid off of?

 6    A    Correct.

 7          MR. ELY:  Thank you.

 8          Nothing further, Your Honor.

 9   RECROSS-EXAMINATION BY MR. ABRAMS:

10    Q    Just so we've got this correct, Mr. Bryan.  This

11   analysis that you did that we don't have in front of us right

12   now was based on Xactimate, correct?

13    A    No.

14    Q    The -- wait a minute.  I'm talking about for phase 6,

15   the rebuild.  The basis for what you used was Xactimate, what

16   the -- what the estimate would be for the rebuild, correct?

17    A    Correct.  But we didn't put what we were able to verify

18   was present at the time of the loss.  So it wasn't just

19   Xactimate.  We took all the documentation that was provided by

20   Bomasada to verify what we would put in the estimate.

21    Q    By the time it was actually built, we've now submitted

22   to you bills, costs, change orders that equal the $6.2

23   million, correct?

24    A    Correct.

25    Q    You've seen that?  And sitting here today, you can't
                              879
```

```
1   tell us of those $6.2 million, what you haven't paid for, what

2   the difference is, right?

3   A    Not specifically, no.

4   Q    Okay.

5         MR. ABRAMS:  Melissa, can you -- if we could go to

6   Plaintiff's Exhibit 255.  This is the insurance policy.

7   Q    (BY MR. ABRAMS) Mr. Ely was asking you about faulty

8   workmanship, and I want to read the -- have you read the rest

9   of the provision.

10        MR. ABRAMS:  If we could go to page 31 of 82.

11  Q    (BY MR. ABRAMS) Because there's an important exception

12  to the faulty workmanship exclusion, correct?  By the way,

13  let's define our terms.  I'll strike that.

14        What's an exception to an exclusion?  Only insurance

15  folks would know this.

16  A    I don't know what you mean by "exception to an

17  exclusion."  Yeah, there is additional language after this

18  that --

19  Q    Okay.  Have you never heard the term "an exception to an

20  exclusion"?

21  A    No, I've never used that term.

22  Q    All right.  And it says here that -- so if a covered

23  loss is caused by faulty workmanship, that is covered -- well,

24  read what we have here for this provision.  Do you see --

25  A    You want me to re-read what I read before or just below?
```
                                  880

```
 1    Q    No.  The part below.

 2    A    You'll have to --

 3    Q    You're right.  We've got to move it up a little bit.  An

 4    excluded cause of loss.

 5    A    So part of any property on or off the job at the

 6    described -- in the declarations.  If an excluded cause of

 7    loss listed in paragraph 4A through 4D above results in a

 8    covered cause of loss, we will pay for the resulting loss or

 9    damage caused by that covered cause of loss, but we will not

10    pay for any cost of correcting or making good the fault,

11    inadequacy, or defect itself, including any cost incurred to

12    tear down, tear out, repair, or replace any part of any of the

13    property to correct the fault, inadequacy, or defect, or any

14    resulting loss or damage to the property that has the fault,

15    inadequacy, or defect until the fault, inadequacy, or defect

16    is corrected.

17    Q    Okay.

18              MR. ABRAMS:  I'll leave it at that.  I will not ask

19    you to interpret the policy.  Thank you.

20              MR. ELY:  Nothing further, Your Honor.

21              THE COURT:  Thank you.

22              THE WITNESS:  Thank you.

23    STUART BATTERMAN, being duly sworn by the courtroom deputy,

24    testified:

25    DIRECT EXAMINATION BY MR. ELY:
```

881

```
 1   Q    Good morning.  Can you state your name for the record.

 2   A    Stuart Batterman.

 3   Q    Where do you reside?

 4   A    I live in Michigan.

 5   Q    What's your current -- are you employed?

 6   A    Yes, I am.

 7   Q    Tell us where you're employed and what you do.

 8   A    Yeah.  I'm a professor at the University of Michigan.

 9   My home department is the school of public health,

10   environmental health sciences.  I have appointments in civil

11   and environmental engineering and also as professor of global

12   public health.

13   Q    Okay.  And at the University of Michigan, do you also

14   teach?

15   A    Yes, I do.

16   Q    Tell us generally.  You teach undergraduate, you teach

17   graduate level classes; what do you teach?

18   A    I teach primarily grad students and also in continuing

19   ed as well.

20   Q    Okay.  And generally speaking, what are the -- what is

21   the general subject matter of the classes you teach?

22   A    Yeah.  So I teach a number of courses on environmental

23   impact assessment, indoor air, ambient air quality, pollution

24   and health and research efforts.

25   Q    Okay.  So if you could, Dr. Batterman, give us a little
```

882

1  bit of your educational background, please.

2   A    Sure.  I have a Bachelor's of Environmental Science from

3  Rutgers State University of New Jersey and a master's and

4  Ph.D. from Massachusetts Institute of Technology.

5   Q    And what is -- what are the master's and Ph.D. degrees

6  from MIT?

7   A    In civil and environmental engineering.

8   Q    Okay.  And at the University of Michigan, in addition to

9  the classes that you teach, do you also conduct research?

10  A    Yes, I do.

11  Q    Can you tell us some of the subject matters -- the

12  subject matter areas that you conduct research?

13  A    Right.  So research occupies probably the bulk of my

14  time actually.  I have in any particular point in time, a

15  number of different research studies.  Most of them are

16  dealing with the health effects of air pollutants or other

17  type of pollutants and understanding how people come in

18  contact with toxic agents and what the effects are.

19        I have studied things from asthma to brain health.

20  It's been very diverse.

21  Q    Okay.  So when were you contacted in this case?

22  A    My memory for dates is probably 2020, I think.

23  Q    Okay.  What were you generally asked to do?

24  A    I was asked to review the evidence related to the fire

25  at the Metropolitan, to look at the possibility of adverse or

                          883

```
 1   health effects or risks to health.

 2   Q    Okay.  So in doing that, can you kind of walk us through

 3   your -- the initial things you considered in making that

 4   assessment?

 5   A    Sure.  You know, I tried to get a big picture to

 6   understand what was happening with respect to the fire, the

 7   possibility of smoke intrusion on the adjacent buildings,

 8   residues that might have been left in place, the potential for

 9   human exposure or direct contact either by breathing or

10   ingestion or some other, what we call, pathway, which can

11   bring toxics into the body and cause an adverse health effect,

12   and then try to understand what is the overall likelihood that

13   there was an adverse risk to individuals in the apartments

14   there.

15   Q    Okay.  And I meant to ask you this:  How long have you

16   been at the University of Michigan?

17   A    Since 1989, which makes it 34 years.

18   Q    Okay.  So as part of what you do there in addition to

19   your teaching and your research, do you also -- have you also

20   had experience conducting indoor air quality assessments?

21   A    Yeah.  So many years ago when we thought about air

22   pollution, we thought primarily about outdoor air pollutants.

23   I had the honor of working with a number of pioneers in the

24   indoor air field.  So early in the 2000s or actually in the

25   '90s, a lot of my research migrated to the indoor
```

                                884

1   environments.

2   Q    Okay.  And so you're coming at these assessments from a

3   health perspective; is that fair?

4   A    That's fair.

5   Q    Okay.  So with respect to the different kinds of

6   exposure, did you -- you have a -- you had different kinds of

7   exposure that you're evaluating when you look at the

8   Metropolitan and determine whether there's been any health

9   impact from this fire?

10  A    Hypothetically, yes.  I mean, there was no actual

11  exposure assessment; so it's -- there's no direct evidence

12  related to exposure other than potentially indicating that

13  maybe the air samples might relate to what people breathe.

14          But the air samples were not in the breathing zones,

15  so it's not really an exposure assessment per se.

16  Q    So let me back up.  You said there was no health

17  assessment made.  Is that -- tell us how that works into your

18  evaluation of what went on with the investigation process.

19  A    So to understand a health assessment in a case like

20  this, we are looking for a couple of things.  We're looking

21  for the presence of something that is toxic or other stress.

22          In this case, it's just a toxic chemical residue

23  that might be left as a result of char or soot or ash

24  potentially containing hazardous chemicals; chemicals that we

25  know are hazardous based on epidemiology and toxicology.

                                885

1           The second step would be to try to quantify the

2       levels of toxins that were -- would be present so we have an

3       estimate of what is a source term.

4           A third step would be to look at the potential

5       pathways by which people could become exposed to these things.

6       You can have chemicals in close proximity which have no

7       potential for a completed pathway to bring them into my nose

8       or respiratory system or gut or somehow otherwise get into

9       contact with the human body.

10          And then we would want to understand what is the

11      exposure potential, how many people live there, how long are

12      they in the place, and so forth.  And then we'd like to

13      understand what is the toxicity, so then we can start putting

14      together the idea that someone is exposed to something and

15      then how toxic it is.

16          And at the end of all this process, we come up with

17      an estimate as to whether there's a reasonable likelihood of

18      there being an adverse effect.

19          This is a risk paradigm which has been developed by

20      National Academy of Sciences, and it has been used for, gosh,

21      40 years now, 30 years.

22      Q    Okay.  So what you're looking for in -- is it -- you're

23      looking for the toxin levels and whether there is an actual

24      potential impact on humans to summarize it?

25      A    Okay.

                                886

```
 1   Q    My summary, not yours.

 2            So with respect to that, the -- you're in the area

 3   of public health.  Can you explain to us how you make those

 4   assessments of whether there's a risk of an adverse health

 5   effect; meaning, is that something that -- you're in the area

 6   of public health, and you're looking to protect.  And tell us

 7   how that works and how you evaluate that at the end of the

 8   day.

 9   A    Sure.  There are many factors that influence an

10   individual's exposure and susceptibility.  And to handle this,

11   we take a very protective stance.  So we take reasonable worst

12   case or what you might think of as hypotheticals where someone

13   is doing everything wrong.  Okay.

14            And we want to ensure that the possibility of an

15   adverse outcome is very minimal, and so we develop standards.

16   We try to enforce them.  We try to get regulatory agencies to

17   recognize these.  And so this has resulted in standards from

18   EPA and other agencies that are designed to keep levels of

19   contaminants low.

20   Q    And so in your field, is it a fair statement to say that

21   you are looking at this from a very conservative way and

22   trying to err on the side of caution with regard to public

23   health?

24   A    Absolutely.  So we recognize that agents that are in

25   everyday use may pose some hazards.  We want to eliminate
```
887

1    those.  So we have things like the Stockholm Convention which

2    essentially banned chemicals.  We have air quality standards

3    and many other guidelines.  Some of them are irrelevant to

4    this case as well.

5    Q    Okay.  So am I understand to this -- I have a five-step

6    process of identifying a chemical, levels of toxins, pathways,

7    exposure potential and finally toxicity.  None of that was

8    done at the Metropolitan that you're aware of?

9    A    Certainly that five-steps process was not done.  There

10   were preliminary analyses to try to understand the

11   distribution of soot and char and ash throughout the space,

12   but that's about it.  But that's not a quantitative

13   assessment.

14   Q    Okay.  So it's your opinion that in order to assess a

15   health or safety risk, this additional -- these additional

16   steps have to be taken with toxicity, chemicals, all of those

17   things?

18   A    Right.  At this point there's no evidence that indicates

19   that there's a risk.  What's been said about the case is what

20   I would characterize as a phantom risk, something that's make

21   believe.

22   Q    Okay.  So let's talk about what was done at the

23   Metropolitan first of all.  In looking at this -- in looking

24   at this fire and whether it could have had even an impact on

25   the Metropolitan -- other areas of the Metropolitan, tell us

                                888

1    what you did initially.

2    A    Well, initially I reviewed the evidence that you

3    provided, which included a number of walk-throughs,

4    assessments, visual, some exploratory sampling, some follow-up

5    sampling, and video evidence of the fire.

6            I looked at the prevailing winds, the meteorology.

7    I looked at the evidence that was collected.  I plotted.  I

8    tried to assemble a database of all the sampling that had been

9    taken so I could understand the significance of the residues

10   that were found and where they were found.

11           I looked at the literature with respect to

12   composition of fires and some of the PAHs that had been --

13   these are chemicals, polycyclic aromatic hydrocarbons that

14   were claimed to cause cancer and so forth.

15           I put together very simplified screen level analysis

16   and wrote this up in the report and the supplement to the

17   report.

18   Q    Okay.  Well, let's talk about the fire, the first step

19   that you talked about, which is tell me what you observed

20   based on your review of videos, review of the weather data,

21   what you observed in terms of potential impact on the doughnut

22   building.

23   A    On the doughnut --

24   Q    The doughnut building, the finished spaces.

25   A    Right.  So, of course, I wasn't there, and I'm basing my

                              889

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

Case 4:20-cv-00095-FJG   Document 246   Filed 09/05/23   Page 54 of 117

opinion on what others have written and, you know, the
assessment of the distance between the doughnut building and
the fire, which was, I believe, 120 feet or so and the
prevailing winds and the photographic and video data, which
essentially indicated that the fire burned very rapidly.  The
plume was affected or lofted upwards.  And the ceiling height
at that time was about 800 feet, dropping a little bit through
the early hours of the morning.  So the plume would have
largely risen and then spread downwind.

Winds were very, very light.  So there wasn't a lot
of turbulence in or pressure in the adjacent doughnut building
to spread the fire and the plume and the particulates.  And
these are what we call small particles that would include soot
and char and ash into that doughnut building.

Q    So with regard to -- you mentioned the prevailing winds.
You're not a meteorologist?

A    No, I'm not.  But I am an atmospheric dispersion
modeler.  At the urban scale, I've done hundreds of studies
looking at the dispersion of plumes from all types of sources,
including fires.

Q    And in this particular case, what did -- data did you
access to take a look at the prevailing winds?

A    I looked at the nearby airport, Birmingham airport,
approximately 4 to 5 miles away.  I used a service on the web
that makes it easy to pull up other datasets.  I identified a

890

1  few other sites, pulled up the data from there, and got hourly

2  observations from these different sites.

3  Q    And you've received some criticism in this case for how

4  you've calculated the winds in the databases that you have

5  accessed.  The wind data that you have in your reports and in

6  your opinions, did -- were those based upon generally-accepted

7  databases in your industry?

8  A    Well, the data you want for modeling is clear; you'd

9  like to get local data.  We don't have any on-site data.  So

10 we're using the airport data, which is generally considered to

11 be representative for region, mainly because airport data is

12 collected typically at 10 meters height in a big grassy field,

13 and you don't have local obstructions that would cause wind

14 shifts in direction.

15       Speeds at airports are sometimes different.

16 Directions are sometimes different.  I like to look at other

17 sites because it helps to confirm whether or not the data is

18 representative.  This is a big issue in dispersion modeling or

19 meteorological analysis.

20 Q    That's what you did in this case?

21 A    Yes.

22 Q    You mentioned dispersion modeling.  Is that what you

23 said?

24 A    Right.

25 Q    Tell us what that is.

                              891

```
 1   A    Sure.  So we are all experienced to air pollution from

 2   local sources like traffic, industry, trains, ships, and train

 3   dust, all types of things.

 4              In the urban scale, we use a number of dispersion

 5   models to try to understand what are the exposures that people

 6   experience.  And so agencies like, you know, U.S.

 7   Environmental Protection Agency has lots of scales of models,

 8   and urban scale models is something that we've been doing a

 9   lot of in the last, oh, I don't know, 10 or 20 years, looking

10   at impacts of these types of sources.

11   Q    And that takes into consideration the buildings and all

12   of the contours of an urban area?

13   A    Right.  And, in fact, we often use meteorological data

14   combined with many other data sources to get wind fields that

15   represent the curvature of the winds around different sources

16   and so forth.  So it's not -- it's a model product actually,

17   not just a single meteorological station.

18   Q    And that can happen in an urban environment.  You can

19   have winds heading around the corner in different directions

20   than, say, the airport?

21   A    Sure.

22   Q    So with respect to what you looked at, the weather data

23   that you looked at and the video of the fire you looked at,

24   can you tell us what your conclusions were about the wind and

25   the airflow on the night of the fire in relation to the
```

892

1  doughnut building?

2  A    Sure.  Shortly after the fire started through the next

3  few hours during the intense phase, winds were light or very

4  light.  We call -- when there's no specific wind direction

5  that's very clear or below a couple miles per hour, we call

6  this a calm, and winds fell into this calm, light to very

7  light condition for that first phase of the fire.

8  Q    Okay.  And what about the rest of the fire through the

9  next couple hours?

10  A    Yeah.  Winds picked up a little bit but would still be

11  considered light.

12  Q    So in your opinion, you mentioned pressure, winds and

13  pressure.  So in your opinion, am I correct that the lightness

14  or the calmness of the winds did not create some sort of

15  pressure gradient against the doughnut building?

16  A    No.  And, in fact, winds move for a couple of reasons or

17  we have winds for a couple of reasons.  We have high pressure

18  systems.  We have low pressure systems.  We have areas that

19  are heated or cooled, and hot air will rise and so forth.  And

20  that's important in the case of a fire because obviously it's

21  a big source of heat, and air is going to rise and ascend, as

22  I mentioned.

23  Q    And from a -- you mentioned the pressure gradient.  Why

24  is the pressure gradient important or something you're

25  considering?

893

1    A     Sure.  So air in a building like this, for example,

        2   comes into the space due to pressure differences.  You have

        3   either fans or something like that which draw air in.  This is

        4   due to a pressure difference.

        5             A fire -- well, a wind will exert a pressure on the

        6   side of the building, allow air to come in through open

        7   windows and doors, of course, but also through tiny, little

        8   cracks that might be present.  So that is one of the major

        9   forces in determining the air change in a space.  The air

       10   change is the rate at which the air is replaced in that space.

       11    Q     And is -- there's something in your report.  You

       12   mentioned the word "penetration."?

       13    A     Correct.

       14    Q     Can you tell us the significance of that?

       15    A     Sure.  So what we look at is the air change rate, but

       16   then we're also concerned with, say, pollutants like particles

       17   moving indoors.  And we have -- instead of calling it

       18   infiltration or airflow rate, we have a particle penetration

       19   rate.  And that particle penetration rate is lower than the

       20   air change rate because particles tend to get stuck in little

       21   cracks and crevices and don't move through quite as easily as

       22   the air molecules themselves.

       23    Q     So in terms of -- in terms of assessing a health risk

       24   from a fire and potential soot and char in a building, the

       25   penetration rate is the key thing you're looking for?

                                      894

```
1    A    That is correct.

2    Q    And the penetration rate is going to be less than the

3    air infiltration rate?

4    A    That's correct.

5    Q    And so am I correct that the reason you're looking at

6    the wind and the potential pressure differential is to look

7    for a mechanism for that penetration?

8    A    That's correct.

9    Q    And what did you find at the Metropolitan about the

10   mechanism for penetration into --

11   A    Well, there's been no objective assessment of

12   penetration or from -- to my understanding, even air change

13   rates at the space.  We do this very routinely.  There's a

14   number of standard methods for doing that; so that wasn't

15   established.

16           However, the exterior boundary of the building, the

17   facade of the building would limit airflow through into the

18   space, as would the prevailing winds at the time as well,

19   which were not directed against the space.  In fact, quite the

20   opposite.

21           Air would rush into the fire to fill the need to

22   replace the air that had just ascended, and so that would tend

23   to suck air out of those spaces.

24   Q    Based on the information that you reviewed, was there

25   any mechanism for penetration of the soot and char combustion
```

895

```
 1   byproducts from the phase 6 fire into the doughnut building?
 2    A    On the evidence that I saw, nothing that suggested
 3   significant intrusion or penetration of fire products into
 4   that space.
 5    Q    Okay.  And so you mentioned earlier the preliminary
 6   data.  There was some -- there was sampling done.  You called
 7   it preliminary.
 8         So did you do an analysis of -- once you looked at
 9   the fire itself, did you also do an analysis of the data
10   that's been collected prior to the remediation and testing
11   date?
12    A    Yes.
13    Q    Tell us about that.
14    A    Well, there was several waves of investigations using a
15   variety of different types of techniques.  These included bulk
16   samples, a couple of those, but most of the samples that were
17   collected were air-o-cell samples.  These are what I consider
18   small volume air samples on a little filter, and they included
19   tape lift samples.
20    Q    Okay.
21         MR. ELY:  Can we pull up Defendant's Exhibit 169,
22   please.
23    Q    (BY MR. ELY) So, Dr. Batterman, you recognize -- it's
24   page 2.  I'm sorry.
25         Do you recognize this table?
```
896

```
 1   A     Yes.

 2   Q     Is that something you prepared?

 3   A     Yes.

 4   Q     Can you tell us what you gleaned from this table?

 5   A     Sure.  That is reflecting the wipe samples that -- you

 6   know, I'm reading the caption here -- collected by FBS and

 7   analyzed by EMSL lab in New Jersey.  My screen's gone blank.

 8   Q     Yeah.  We got it back.

 9   A     Okay.  Thank you.

10         And EMSL did a screen-level analysis, and they

11   looked for, as can be seen lower in the table, a variety of

12   things.  They looked for combustion byproducts.  This is the

13   most relevant thing to the case.  But they also looked for

14   other stuff that is typically found in these types of samples.

15         This analysis shows for -- I believe there were 20

16   samples here, and 18 of them had -- blank again.  Thank you --

17   either nondetects, which means they found nothing, or levels

18   that were reported as less than 1 percent of material

19   indicated as anything that could be considered fire related.

20         Two of the samples had some char.  That included the

21   phase 4 truss and a unit 115 -- screen keeps blanking on me.

22   Sorry about that -- which had 40 percent of material that

23   could be identified by this analysis as char.

24   Q     What was your takeaway from these results?

25   A     Yeah.  So very little, very -- and these samples were
```

897

1   collected in locations that were presumed to have higher

2   levels of fire-related byproducts.  Two of 20 showed anything

3   definitive.  Loadings weren't excessively high even on these.

4   There was no ash or soot, just some char particle floated

5   down, and a couple made its way into the visual field of the

6   analyst.  There were a number of particles in these cases, but

7   90 percent of the samples showed nothing.

8   Q    So with respect to the soot samples, was there any soot

9   detected in any of the 20 samples?

10  A    No.  The lab indicated nondetected.  So they didn't even

11  find trace levels.

12  Q    How does this impact your assessment of the health risks

13  at the Metropolitan at this point?

14  A    Well, this is indicating that in the spaces that were

15  sampled, which again were believed to be ones which could

16  accumulate fire residues, very light accumulation or no

17  accumulation in most of the building.  And two of the 20

18  samples showed some accumulation.

19  Q    Okay.  And as part of your analysis, you also looked at

20  the data collected by Mr. Carlson.

21       MR. ELY:  Can we look at Plaintiff's Exhibit 15?  Go

22  to page 107, please.  Thank you.  And could you split screen

23  with page 114.

24  Q    (BY MR. ELY) So, Dr. Batterman, these -- you remember

25  reviewing the pre-remediation data from Mr. Carlson?

                              898

```
 1   A    Yes.

 2   Q    Okay.  So down here on the -- on the right screen is a

 3   scale, I guess, for lack of a better term.  Do you see that?

 4   A    Yes.

 5   Q    So based on the scale Mr. Carlson provided, did you --

 6   based on your review of his data, did -- can you tell us what

 7   you determined?

 8   A    Yeah, sure.  So I looked at all of Mr. Carlson's data

 9   and tried to interpret it.  There were problems because there

10   were many issues with the description of the data collection

11   procedure, the records that were available, and so forth.

12        Nonetheless, I took it verbatim, tried to identify

13   samples that were -- and where the samples were collected and

14   tabulated everything in a large workbook.  So this is just a

15   beginning of some of the data that he collected on this date,

16   May 8th and 9th, and this essentially are the results that

17   were provided by Mr. Carlson.

18   Q    So in looking at potential health risk from soot and

19   char penetration, what kind of results would you be looking

20   for from Mr. Carlson's data using his scale?

21   A    Well, the analysis that he provided would be considered

22   a screening analysis.  It's kind of is there potential for

23   fire-related residues based on the optical microscopy that was

24   done with these samples?  And I believe these samples -- yes,

25   all the samples in here are collected on a little device
                                899
```

1    called an air-o-cell.

2             So these are particles that were trapped on a

3    filter.  And you could think of a vacuum cleaner, for example,

4    and you're sucking air into a little filter, and then you are

5    pulling out the filter later and counting particles.

6             And these samples were largely collected in both the

7    ambient air, air in a space like this, as well as in spaces

8    that -- like doorframes or trusses or things like this that

9    folks would typically not have access to.

10            Anyway, he has indicated that he found some char,

11   some soot in cases, and carbon black, another type of soot,

12   and mold with -- in a number of these different samples.

13   Q    Okay.

14            MR. ELY:  Can we go to page 108 on the left side,

15   please.  Leave the right the same.  And then 109 and then 110.

16   Q    (BY MR. ELY) So, Dr. Batterman, you see beginning on

17   page 110, you also did bulk and tease tape samples, correct?

18   A    Yes.

19   Q    So is there any -- in terms of the analysis of the

20   numbers, is there any difference in your mind in relation to

21   his scale between the air-o-cell and bulk tease tape?

22   A    Yes.  In fact, if we just constrain or restrict our

23   analysis to the air-o-cell, the air samples, these use

24   different sample volumes, and he essentially pulled 30 liters

25   in some cases, 75 liters in other cases; and I believe in some

                              900

1    cases, it wasn't specified.  And the scale adjustment that he

2    used did not appear to adjust for the difference in volumes.

3            This makes it very challenging to interpret.  I can

4    pull in a very large volume of air and find particles and get

5    a higher count and even though everything else might be the

6    same as the smaller volume of air.

7            Also there was no sampling in a controlled case,

8    which is actually very important, and so I don't know why he

9    found these particles unless this material was disturbed

10   unless they arose from other sources.  We would not expect for

11   a fire that took place, what, in September 27th to leave

12   particles airborne until May 8th or 9th.  And so these

13   particles don't remain suspended for more than perhaps a few

14   days at most.  And so even at that level, they would be

15   falling out of the air or sticking onto surfaces.

16           So the reason these airborne particles are there is

17   speculative, but it could be material was disturbed and the

18   particles on a surface were entrained.  Everybody's familiar

19   with vacuuming or following a street sweeper or something like

20   that and seeing dust behind it.  Or they were outdoors in

21   ambient air, which is certainly possible, and -- which is

22   definitely possible.

23           And we do have some air monitoring in Birmingham,

24   and I can talk about that.  But the particle levels out there

25   certainly contain soot and so forth.  And so I can't, without

                                 901

more information, identify the source of these particles, but it's not likely to be the fire unless material was disturbed. This applies to the airborne samples.

THE COURT: Let's take a break.

MR. ELY: Absolutely.

THE COURT: About 15 minutes or so. I ask that you not discuss the case among yourselves or with others. Take about a 15-minute break.

(A recess was taken.)

(The following proceedings were had in the presence of the jury:)

DIRECT EXAMINATION (continued) BY MR. ELY:

Q   Dr. Batterman, we were talking about the sample results, testing results that you had reviewed as part of your work in this file.

Based on your review of the many samples, was there anything in there in terms of frequency or concentration, soot and char, that indicated a potential health risk at the Metropolitan from the phase 6 fire?

A   No, not directly. What was performed was a screening analysis designed to identify, I think, the potential of finding char, soot, black carbon, and so forth, and nothing directly related to a quantification of the chemicals that might pose a health risk.

Q   Okay. So moving from the sampling data, you made

902

```
 1    observations from photographs and whatnot of the conditions of
 2    the Metropolitan after the fire, correct?
 3    A    Yes.
 4    Q    The internal spaces?
 5    A    Yes.
 6    Q    Did you have some -- did -- strike that.
 7         With respect to a potential health risk, tell us
 8    what you would expect to see in terms of visual condition of
 9    the internal spaces, interior spaces of the Metropolitan.
10    A    That would pose a health risk?
11    Q    Yes, sir.
12    A    Yeah.  I would expect to see heavy staining,
13    discoloration, accumulation of residues easily visible to the
14    eye on a variety of surfaces distributed throughout the space.
15    Q    And did you see any of that?
16    A    Very little of that.
17    Q    So with respect to the -- moving from the living areas
18    into the interstitial spaces, part of the claims in this case
19    is that the interstitial spaces have soot and char from the
20    phase 6 fire.  You understand that?
21    A    Yes.
22    Q    Tell us how the location of the soot and char impacts
23    your analysis of health risks.
24    A    Sure.  So the approach here taken is that this is an
25    external fire to structures 1 to 3, the doughnut building, and
                              903
```

1   4 and 5, I guess, and the smoke would need to move in, cross

                2   the building boundary one way or another and enter the living

                3   spaces for it to pose a health risk.

                4             The other part of the presumption is that the smoke

                5   and other fire residues would make it only partly into that

                6   space and end up residing in interstitial -- what we're

                7   calling, interstitial spaces, which are wall cavities, for

                8   example, or chases where pipes run or potentially heating and

                9   ventilating and air conditioning ductwork and plenums.

               10             So the theory here is that heavy residues

               11   accumulated in either those interstitial spaces or in the

               12   living compartment where people are, and the sampling didn't

               13   indicate any of that.

               14   Q    Okay.  Is the location in the interstitial space, the

               15   fact that it's located in the wall cavities, does that impact

               16   your assessment of potential health risk?

               17   A    It does.  If you do find accumulation in interstitial

               18   space, the next step of the process is to see if there's a

               19   pathway by which that toxin or contaminant can come out and

               20   actually expose people.  And when I mean expose people, I'm

               21   talking about you inhaling a particle or a vapor or ingesting

               22   the same that would then accumulate in your body and

               23   potentially or possibly cause an adverse health effect.

               24             So a product or a toxin or a pollutant which is in

               25   interstitial space does not have that pathway completed.  You

                                            904

1   are not breathing the air in that interstitial space directly.

2   Some of it potentially can diffuse out very slowly.  Possibly

3   you won't have direct contact with that.  So it very much

4   impacts that exposure or pathway analysis that I'm talking

5   about.

6   Q    Okay.  And so you mentioned very early on when we

7   started talking about what kind of air quality assessment

8   would need to take place in order to ascertain whether there

9   is a health risk as a result of the fire.

10          Can you walk us through exactly what that would

11  entail?

12  A    Sure.  And we're talking in particular about the

13  Metropolitan case where a fire took place half a year or more

14  before the assessment.  At that point, as I indicated earlier,

15  I would not find airborne particles.  Those have long gone.

16  They've settled onto surfaces possibly in the living space,

17  possibly in the interstitial space, which is the theory here.

18          The assessment to understand the potential for a

19  health risk would be, first, to see if there is anything

20  present.  This can be done by bulk sampling in an interstitial

21  space, in a heating duct, in a living space, wherever you

22  think there might be material to see if there is anything

23  there, and that helps us because it would identify what are

24  the toxins of concern, whether they're benzoapyrene, for

25  example, which is one of the chemicals that the theory here

                            905

advanced by Metropolitan is claiming is a health risk, a

carcinogen.

So if it's present in a bulk sample or a wipe

sample, then there is a possibility that I can find it in an

air sample. And the air sample is designed to be reflective

of what people would breathe.

So following this bulk analysis, if I do find some

materials there, then my next step would be to undertake air

sampling in representative spaces or even worst-case spaces in

the structure, looking for things like these PAHs or this

benzoapyrene, for example.

I would want to collect samples that I believe are

representative, and these would typically be long-term

samples; take a couple of days to collect these samples.

Q    Okay.  So what you're looking for, as I understand it,

you're looking for the actual chemicals that can harm someone?

A    That's right.

Q    Okay.  So based upon the information that you've

reviewed in the case from how the fire behaved, the winds,

penetration potential, the sampling that you reviewed, if you

were to conduct that kind of sampling, what would you have

expected to find?

A    I would expect not to find anything reflective of a

fire, but more of general environmental sources that

contribute these kinds of cases.  I'm talking about air

906

1   sampling here now.

 2   Q    Okay.  And is it your opinion that based on the

 3   information you reviewed, there is no evidence that you can

 4   point to that would lead you to believe that there is a

 5   potential for -- a potential risk to the tenants as a result

 6   of the fire?

 7   A    No.  There's no evidence indicating a risk from

 8   fire-related residue.

 9   Q    Okay.

10        MR. ELY:  Pass the witness.

11   CROSS-EXAMINATION BY MR. ABRAMS:

12   Q    Mr. Batterman, good morning.  My name is Mike Abrams.

13   A    Nice to meet you.

14   Q    Nice to meet you.

15        Just to confirm, you were not present on the night

16   of the fire, correct?

17   A    That's correct.

18   Q    You have no reason to disagree with the statements from

19   the Birmingham Fire Department regarding the severity of the

20   fire or anything that's in the fire reports, correct?

21   A    No.

22   Q    You agree that combustion byproducts such as soot, ash,

23   char can cause severe health effects, correct?

24   A    Yes.

25   Q    And just so we have it clear, we've been talking about

                              907

```
 1   health effects.  Does your expertise extend to the effects of
 2   soot, char, and ash have on building materials such as copper
 3   or wires and things like that?
 4   A    To an extent, yes.
 5   Q    But that's not part of your report, correct?
 6   A    That's not part of my report.
 7   Q    So because the -- back to the health effects.  Because
 8   soot, char, and ash can contain toxic components such as lead,
 9   arsenic, PAH, pesticides, dioxans, and cresols, correct?
10   A    Yes.
11   Q    In fact, soot, char, and ash can contain chemicals that
12   are considered carcinogenic, cancer causing, correct?
13   A    Yes.
14   Q    By the way, just so we define our terms, PAH, that's
15   polycyclic aromatic hydrocarbons, correct?
16   A    Correct.
17   Q    And you agree that PAHs are toxic to humans and are thus
18   a health concern?
19   A    Yeah, generally speaking.  I mean, we focus on 16
20   different PAHs in the commonly-accepted analytical approaches.
21   There are many more than that.  And of those 16, six of them
22   are considered carcinogenic or possibly carcinogenic.
23   Q    And you agree that PAHs can remain on a building surface
24   after being deposited as combustion residues after a fire in
25   theory?
```
                                908

```
 1    A    Yes.

 2    Q    Okay.

 3    A    Well, they are part of the combustion residue.

 4    Q    Right.  So am I correct?

 5    A    Yes.

 6    Q    Okay.  And the major health concern related to PAHs is

 7  chronic exposure that can increase someone's risk of cancer,

 8  correct?

 9    A    Yes.

10    Q    And at least -- you mentioned there's all kinds of

11  different PAHs, but at least two of the PAHs are probable

12  human carcinogens and four others are possible carcinogens,

13  correct?

14    A    Right.

15    Q    Some of the cancer effects of these PAHs include tumors

16  in the stomach, liver, or auditory canals, correct?

17    A    Yes.

18    Q    And so your report also mentions benzopyrene?

19    A    Benzoapyrene.

20    Q    Benzoapyrene?

21    A    Yes.

22    Q    Okay.  And benzoapyrene also can cause noncancerous

23  effects, health effects, correct?

24    A    Yes.

25    Q    Such as developmental or immunological or reproductive
```

909

```
1    effects, correct?

2     A    Yes.

3     Q    And you would agree that individuals may be exposed to

4    combustion residues that could be cancerous if these residues

5    or components of them make their way into occupied living

6    spaces and are inhaled, correct?

7     A    Yes.

8     Q    We talked about your review of Carlson's work and EMSL's

9    work.  And just if you remember, EMSL's work were wipe

10   samples, correct?

11    A    Yes.

12    Q    And Carlson's work, what you -- you talked about air

13   samples, but he also took tape lifts, correct?

14    A    Correct.

15    Q    And you would agree with me that particulate emissions

16   from a fire may enter hidden spaces of the building such as

17   wall cavities, correct?

18    A    Yes.

19    Q    And this can happen as a result of normal air exchange,

20   air infiltration, and pollutant penetration, correct?

21    A    Yes.

22    Q    And these particulates can cause -- well, they can cause

23   exposure -- well, strike that.  We already talked about that.

24          You would agree with me that contaminants can also

25   settle and deposit on building surfaces, both exposed surfaces
```
                                    910

1   and hidden surfaces, in the building cavities during or after

2   a fire, correct?

3   A    Yes.

4   Q    And you would agree with me that particulates may also

5   penetrate the building envelope or the HVAC system or be

6   absorbed in porous materials like filters, insulation, or

7   foam, correct?

8   A    Yes.

9   Q    You would agree with me that emissions can off gas from

10  where they have settled, deposited, or absorbed, correct?

11  A    Some of the emissions can.

12  Q    Okay.  And we're talking about soot, char, ash, correct?

13  A    Yes.

14  Q    And we -- briefly, just for those of us who don't know,

15  off gas; tell us what that is.

16  A    Sure.  Off gas is kind of like evaporation.  So, you

17  know, you spill water and it evaporates.  So like in this

18  case, we're talking about something which is a solid doing the

19  same sort of thing, off gassing a vapor.

20  Q    Okay.

21  A    But it can also move into a liquid form as well.  But of

22  concern here is the vapor.

23  Q    And you had mentioned about particles becoming

24  disturbed.  You would agree with me that settled or deposited

25  contaminants can also become disturbed by vibration, movement,

                                  911

```
 1   sweeping, or high-velocity airflow and entrained into the air,
 2   correct?
 3   A    Yes.
 4   Q    And this could include construction or remediation
 5   activities, correct?
 6   A    Potentially.
 7   Q    Depends on what they are?
 8   A    It depends on many factors, yes.  I mean, as I
 9   mentioned, a demolition, for example, where material is torn
10   out would potentially liberate, entrain some of these
11   particles.
12   Q    So that would include, if you're cutting wallboard,
13   moving wallboard around and such?
14   A    That was contaminated, yes.
15   Q    Yeah.  All right.  Let's talk about the meteorological
16   data.  First of all, I can't remember.  When were you first at
17   the Metropolitan?
18   A    I have not visited the site.
19   Q    Okay.  I'm sorry.  You never went to the Metropolitan?
20   A    I have not.
21   Q    Okay.  And I think you said you're not a meteorologist,
22   correct, but you've done some weather work?
23   A    I've done hundreds of applications of dispersion
24   modeling, which is driven by meteorological processes.  I'm
25   very familiar with meteorological data.
```
                                912

```
 1   Q    Okay.  But you're familiar with the data, but you're
 2   not -- I'm correct, you're not a meteorologist yourself?
 3   A    No.
 4   Q    In your report, you use some meteorological data from
 5   the Birmingham and Bessemer, Alabama, airports, correct?
 6   A    Yes.
 7        MR. ABRAMS:  Can we put up slide 7.
 8   Q    (BY MR. ABRAMS) So this is figure 3 from page 13 of your
 9   report, and this is the map showing the locations of the two
10   airports and the Metropolitan, correct?
11   A    Yes.
12   Q    Okay.  And the Birmingham airport is 5.5 miles northeast
13   of the Metropolitan approximately?
14   A    Approximately.
15   Q    And the --
16   A    Well, the -- technically the geographic coordinates of
17   the weather station are that distance.
18   Q    Right.  And that's what your report is focusing on?
19   A    Right.  The airport --
20   Q    5.5 from your report?
21   A    The airport is a little bit closer.
22   Q    I see.  Right.  So to be precise, the weather station
23   that you're using the data from, from the Birmingham airport,
24   is 5.5 miles away?
25   A    Based on the coordinates I have for it, yes.
```
913

```
 1   Q    Right.  Because your point is you didn't actually go out

 2   there, but based on the data that you were able to -- you've

 3   Googled on or Google Maps, you determined it's 5.5 miles.  I'm

 4   not arguing with you about it.

 5   A    Okay.

 6   Q    I'm just getting it in the record.

 7        But 5.5 miles, right?

 8   A    Approximately, yes.

 9   Q    And the Bessemer airport is 15.9 miles south, southwest

10   of the Metropolitan, correct?

11   A    Yes.

12   Q    All right.

13        MR. ABRAMS:  Can we put up slide 8.

14   Q    (BY MR. ABRAMS) So this is just a satellite image of

15   Google Earth of the three locations between the Birmingham

16   airport and the Bessemer airport and the Metropolitan.

17        You would agree that the topography or the physical

18   environment immediately surrounding the airports is different

19   than that of the Metropolitan, correct?

20   A    Sure.

21   Q    The Metropolitan is in a more developed commercial area,

22   correct, that's surrounded by other buildings?

23   A    It's in an urban area, yes.

24   Q    And the airports are not surrounded by commercial

25   buildings, correct?
                              914
```

```
 1   A    No.

 2   Q    And you would agree with me that the physical

 3   environment surrounding a property can affect wind flow near

 4   that property, correct?

 5   A    Sure.

 6   Q    And it can affect wind direction?

 7   A    Yes.

 8   Q    I think you've referred to that.  Okay.

 9        And because the Metropolitan is a commercial area,

10   your report concludes that sheltering effects from nearby

11   buildings tends to reduce wind speed from the measurements in

12   the airport, correct?

13   A    Generally does, yes.

14   Q    But you would agree with me that wind speeds can

15   actually increase between buildings, right?

16   A    Sure.  There can be a channeling effect, for example.

17   Q    Anytime anyone's walking through a big building, you can

18   have that -- you can understand that phenomena where wind

19   speeds can increase between buildings?

20   A    Sure.

21   Q    Okay.  You did not -- tell me if I'm incorrect about

22   this.  In your report, you don't indicate that you ever took

23   wind speed readings from around the property at the time -- at

24   a time and then compared them to the wind readings at the

25   Birmingham airport and the Bessemer airport to prove that they
```

915

```
 1   were representative of the normal conditions, correct?

 2   A    No.  I haven't been to the site, and I'm not quite sure

 3   what normal conditions are.

 4   Q    Okay.  Well, you didn't -- you didn't direct anyone to

 5   take a wind reading at the Metropolitan and have two other

 6   people take wind readings at Bessemer airport and Birmingham

 7   airport at the same time?

 8   A    No.  There was no need.

 9   Q    What's that?

10   A    There was no need.

11   Q    Okay.  But you didn't do that?

12   A    No.

13   Q    Okay.  All right.  Let's talk about -- well, a little

14   bit more about Birmingham.

15        You mentioned just very briefly in your direct

16   testimony a study about the environment of Birmingham,

17   Alabama, right?

18   A    Yes.

19   Q    Okay.  And that's -- that was -- and you cited it in

20   your report.  I read it.  That was data that was collected

21   back in 2005 and 2006, correct?

22   A    I believe so.

23   Q    Okay.  It was published a few years later, correct?

24   A    Yes.

25   Q    Okay.  So more than a decade before the fire.  And that
```

                                  916

```
 1   study chose a couple of locations near industrial facilities,
 2   correct?
 3   A    I believe so.
 4   Q    Okay.
 5   A    I think they had four locations.
 6   Q    Yeah, four or five.  I don't remember.  But they were
 7   near industrial locations?
 8   A    Yes.
 9   Q    All right.  Let's talk about infiltration.  You do
10   agree, based on your report, that smoke or other fire-related
11   particulates can enter a building by crossing through the
12   building envelope such as zip sheathing through either a
13   mechanical air change -- exchange, open windows, doors, and
14   gaps and leaks in the envelope, correct?
15   A    Yes.
16   Q    And infiltration of fire-related particles can also
17   occur where there's a pressure difference across the building
18   envelope, correct?
19   A    Correct.
20   Q    And that pressure difference can occur from either winds
21   or HVAC systems operating, correct?
22   A    Yes.
23   Q    And is it your understanding that the HVAC system was
24   operating on the night of the fire, correct?
25   A    I believe it was.
```
917

```
 1   Q    All right.  And when assessing the ability of
 2   fire-related particles to enter the building envelope, you
 3   agree that it would be important to know how the Metropolitan
 4   was actually built and what the building envelope actually
 5   looked like?
 6   A    Yes.
 7   Q    Okay.  And since you didn't -- you weren't there
 8   physically in person, you relied on blueprints, correct?
 9   A    I relied primarily on observations and blueprints and
10   the other experts, yes.
11   Q    Okay.
12        MR. ABRAMS:  No further questions.
13        MR. ELY:  Briefly, Your Honor.
14        MR. ABRAMS:  Thank you.
15   REDIRECT EXAMINATION BY MR. ELY:
16   Q    Dr. Batterman, Mr. Abrams was talking with you about the
17   potentially cancerous effects of some of these chemicals, the
18   PAHs and the -- I can't pronounce it -- benzo --
19   A    Benzoapyrene.
20   Q    The benzo chemical.
21        Have you done an assessment here of what kind of
22   volume of soot and char from the phase 6 fire it would take to
23   create that kind of carcinogenic long-term cancer risk?
24   A    Yes, I did.
25   Q    Can you tell us about that?
```
918

1    A    Sure.  I was very interested in this because we look at

2    a lot of chemicals routinely, and we try to understand what

3    their impacts or potential impacts are on health.

4            And so what I did was take what you characterized

5    earlier as a protective stance or a conservative stance, kind

6    of a worst-case scenario analysis.  And what I found was for

7    the soot and char and ash containing levels that we expect to

8    see of these carcinogenic compounds, higher levels that we

9    would expect to see under scenarios that were worst case, a

10   person staying in the apartment 24/7, 365 for ten years, never

11   leaving; for air change rates that were reflective of the

12   ventilation that we would expect for the worst chemical of the

13   PAHs that were identified for the higher end of the toxic

14   compound that is found in fire-related materials, I did some

15   calculations that showed you'd have to have ounces to pounds

16   of soot deposited in the space for a person to get that kind

17   of exposure that would lead to a tumor.

18   Q    Okay.  And based on your review of all of the evidence

19   that was provided to you, did you see any indication that soot

20   and char levels were even remotely close to that level in the

21   Metropolitan?

22   A    No.  That would be like painting walls with soot and

23   char, and there's nothing like that.  There's traces in cases,

24   but not the kind of deposition that could lead to off gassing

25   or contact that would confer a health risk like that.

                            919

```
 1              MR. ELY:  Thank you.

 2              MR. ABRAMS:  One quick recross, Your Honor.

 3    RECROSS-EXAMINATION BY MR. ABRAMS:

 4     Q    Dr. Batterman, on this topic, you recognize like when

 5    you read Mr. Carlson's data, he took -- he took data from 72

 6    locations, correct?

 7     A    At least, yes.

 8     Q    What's that?

 9     A    Yes.

10     Q    Well, 72 locations before remediation, correct?

11     A    Yes.

12     Q    He took more samples as testing to make sure the

13    remediation worked, correct?

14     A    Yes.

15     Q    Is that what you were getting at?

16     A    Yes.

17     Q    Okay.  Right.  So at the time of the remediation, there

18    were 72 samples.  And there were other samples taken at the

19    Metropolitan, but there wasn't a sample taken from every wall

20    cavity, every room, every air duct, correct?

21     A    Of course.

22              MR. ABRAMS:  Thank you, Dr. Batterman.  I apologize.

23    I called you Mr. Batterman.  Dr. Batterman.

24              THE WITNESS:  No worries.

25              MR. ELY:  Nothing further, Your Honor.
                              920
```

```
 1              THE COURT:  Thank you.  The witness may step down.

 2    KRISTIN STAKELY, being duly sworn by the courtroom deputy,

 3    testified:

 4    DIRECT EXAMINATION BY MS. WIGGINS:

 5    Q    Please state your name for the court.

 6    A    Kristin Stakely.  I go by Kristy.

 7    Q    Ms. Stakely, how old are you?

 8    A    28.

 9    Q    And where do you reside?

10    A    I'm in Birmingham, Alabama.

11    Q    When did you move to Birmingham, Alabama?

12    A    In September of 2018.

13    Q    Where did you move to when you moved to Birmingham,

14    Alabama?

15    A    The Metropolitan Apartments.

16    Q    And do you remember what unit you lived in at the

17    Metropolitan Apartments?

18    A    I believe it was 418.

19              MS. WIGGINS:  Can we have Defendant's Exhibit 185,

20    please.

21    Q    (BY MS. WIGGINS) Ms. Stakely, on the screen in front of

22    you to the left is Defendant's 185, which is a map of the

23    Metropolitan.

24              Now, can you describe -- can you point to where your

25    unit is on this map?
                              921
```

```
 1   A    Yes.  It's at the bottom, I believe.

 2   Q    Well, first, let me ask you, which of those buildings is

 3   it in?

 4   A    It's the one on the left.

 5   Q    Is it the one that's shaped with the hole in the middle

 6   of it?

 7   A    I'm sorry.  It's hard for me to see.

 8   Q    I know those numbers are small to read.

 9   A    Yes.  It's the one with the hole in the middle, and it's

10   the one at the bottom of that.

11   Q    So your unit is in this building?

12   A    Yes, that's correct.

13   Q    Okay.  And what month did you tell us you moved into the

14   Metropolitan, Ms. Stakely?

15   A    I believe it was September 5th.

16   Q    Of what year?

17   A    2018.

18   Q    Were there other people living at the Metropolitan when

19   you moved into it?

20   A    Just a couple.

21   Q    Now, did you have any problems with your unit when you

22   first moved in?

23   A    Yes.  Technically I was supposed to move into another

24   unit; but when I arrived, they didn't have that one ready.  So

25   I ended up then re-signing, I believe, for that particular
```

922

```
 1    unit.  So my original one that I was supposed to move into
 2    wasn't ready at all.
 3    Q    So you moved into a different unit?
 4    A    Correct.
 5    Q    And that unit you moved into was unit 418?
 6    A    That's correct.
 7    Q    Okay.  So we've heard a lot of testimony in this case
 8    about a fire that occurred on September -- the very early
 9    morning hours of September the 27th, 2018.  Were you at home
10    that night?
11    A    I was.
12    Q    And were there any major life events going on for you
13    around that time?
14    A    Yes.  I was taking the final part of my CPA three days
15    later, and I had started my first, you know, big job that
16    Monday.
17    Q    Can you tell me what the CPA is?
18    A    It's the certified public accounting exam, and there's
19    four parts.  Each part is about three to four hours of the
20    test.  So I was taking my last one.
21           MR. ABRAMS:  Your Honor, may we approach?
22           (Counsel approached the bench and the following
23    proceedings were had:)
24           MR. ABRAMS:  What's the relevance here?
25           MS. WIGGINS:  She's a witness to the fire, and this
                                   923
```

```
 1    is what's happening in her life at the time of the fire.
 2              MR. ABRAMS:  That doesn't matter.
 3              THE COURT:  What's happening in her life doesn't
 4    matter.  She can be a witness to the fire.
 5         (The proceedings returned to open court.)
 6    Q    (BY MS. WIGGINS) Ms. Stakely, when did you first become
 7    aware there was a fire in the Metropolitan on September the
 8    27th, 2018?
 9    A    That morning.  I think it was about 12 a.m. when a
10    police was banging on my door.
11    Q    What did the officer tell you?
12    A    She told me that there was a fire in the building next
13    door and that I needed to get out immediately.
14    Q    Now, before the officer told you that, did you have any
15    idea that there was a fire going on?
16    A    I had no idea.
17    Q    So what did you do next?
18    A    I asked if I had time to put clothes on and get out, and
19    so I left.
20    Q    Did the officer tell you, you had to time to put on
21    clothes before you left?
22    A    Yes, she did.
23    Q    So while you were getting dressed and leaving the
24    building, did you hear any alarms going off?
25    A    There were no alarms going off.
```

924

```
 1   Q   Do you know if the fire alarms ever sounded?

 2   A   They did, yes.

 3   Q   How do you know that?

 4   A   Well, I remember I had asked the property manager.  I

 5   was like, Why did the fire alarms not go off?  Why did we not

 6   know?  Then she explained to me that they didn't, like, pull

 7   the fire alarms or anything because they wanted to make sure

 8   that everybody got out the door that was, like, the safe exit.

 9   And then she said then the fire department or one of the

10   police officers ended up pulling the alarm just to make sure

11   everybody had left.

12   Q   So once you exited the building, where did you go?

13   A   I stood on the side of the road.  That's it.  And I

14   watched it burn down.  And then that night, I ended up getting

15   a hotel room.

16   Q   Now, from where you were standing on the side of the

17   road, could you see the fire?

18   A   Yes.

19   Q   And could you see the building that you lived in?

20   A   Yes.

21   Q   Do you recall at any point whether the lights went off

22   in the building that you lived in?

23   A   I don't remember when, but I believe that they did.

24   Q   Okay.  Now, you said you eventually went to a hotel?

25   A   Yes.
```
925

```
 1    Q    How long did you stand on the street and watch the fire
 2   before you went to the hotel?
 3    A    The whole time, I think, until maybe like 4:45 a.m.
 4   Finally got in contact with my parents, and my dad was like --
 5           THE COURT:  Counsel approach the bench, please.
 6           (Counsel approached the bench and the following
 7   proceedings were had:)
 8           THE COURT:  I'm failing to see the relevance of this
 9   testimony.
10           MS. WIGGINS:  Well, she has personal knowledge of
11   the fire, and the fire is the mechanism that plaintiff claims
12   is how the contamination --
13           THE COURT:  What's her knowledge about -- knowledge
14   of the fire?
15           MS. WIGGINS:  Her observations of the fire.  We can
16   move on.
17           THE COURT:  Objection sustained.
18        (The proceedings returned to open court.)
19    Q    (BY MS. WIGGINS) Ms. Stakely, you were not allowed to
20   return to your apartment for a period of time immediately
21   following the fire, correct?
22    A    Yes.
23    Q    And there's been testimony that residents were allowed
24   back into the Metropolitan sometime in mid to late October,
25   around October 20th, 2018.  Does that sound accurate to you?
                              926
```

```
 1   A    That does.
 2   Q    And did you move back into the Metropolitan at that
 3   time?
 4   A    I did.
 5   Q    Did you move back into the same apartment?
 6   A    Yes.
 7   Q    When you moved back into unit 418, did you see dark
 8   staining anywhere in your apartment?
 9   A    No.
10   Q    Did you see it on the countertops?
11   A    No.
12   Q    Did you see it in the cabinets?
13   A    No.
14   Q    Did you see it on the white walls?
15   A    No.
16   Q    Did you see it on the air conditioning vents?
17   A    No.
18   Q    Did you see it in the hallways?
19   A    No.
20   Q    Did you see it in the lobby area?
21   A    I did not.
22   Q    Did your apartment smell like smoke?
23   A    It didn't.
24   Q    Now, after you returned to the Metropolitan in October
25   of 2018, how much longer did you live at the Metropolitan?
                              927
```

```
 1   A      I lived there until July of 2019.  I mean, June of 2019.
 2          MS. WIGGINS:  Can we show Defendant's Exhibit 16,
 3   please.
 4   Q      (BY MS. WIGGINGS) Ms. Stakely, do you recognize
 5   Defendant's Exhibit 16?
 6   A      I do.
 7   Q      What is Defendant's Exhibit 16?
 8   A      It's an eviction notice.  I received it via email.  I
 9   was not in the country.  I was in Europe, and I -- yeah, it's
10   the eviction letter.
11   Q      Ms. Stakely, can you read about three-fourths of the way
12   down on that same paragraph where there is some highlighting.
13   On what date does it say your belongings can remain in the
14   apartment till?
15   A      Looks like our belongings could remain in the apartment
16   until July 8th.
17   Q      Were you able to get your belongings out of the
18   apartment before July 8th?
19   A      No.
20          MR. ABRAMS:  Your Honor, can I approach?
21          (Counsel approached the bench and the following
22   proceedings were had:)
23          MR. ABRAMS:  Objection, relevance.  What are we
24   talking about?
25          THE COURT:  So far I see none.
                            928
```

```
 1              MS. WIGGINS:  Your Honor, they're claiming lost

 2      rents.  This is -- she's a fact witness.

 3              THE COURT:  This has already been testified to.

 4              MR. ELY:  Judge, can she testify to her observations

 5      of the building for the time period that she was living there?

 6              MR. ABRAMS:  She already did.

 7              THE COURT:  She's already testified to that.

 8              MR. ELY:  Okay.

 9              THE COURT:  Yeah.  What else?

10              MR. ELY:  We'll finish.

11          (The proceedings returned to open court.)

12      Q    (BY MS. WIGGINS) Ms. Stakely, when you were immediately

13      evicted from the Metropolitan, where did --

14              THE COURT:  I think we're through with this witness

15      unless you have some cross.

16              MR. ABRAMS:  I do, Your Honor.

17      CROSS-EXAMINATION BY MR. ABRAMS:

18      Q    Ms. Stakely, good morning.  Just briefly, you were a

19      plaintiff in a lawsuit that was filed against Maxus

20      Metropolitan, correct?

21      A    That's correct.

22      Q    It's the -- you're one of the -- well, you were a

23      plaintiff.  It wasn't a class action, but there were a number

24      of plaintiffs.  You were one of them, correct?

25      A    Yes.
```

                                929

```
 1   Q    And one of the allegations that you made -- and I have a
 2   copy here if you don't have it memorized.  This is a copy of
 3   the petition that you filed in that case, correct?
 4   A    Yes.
 5   Q    And if you turn to paragraph 52, one of the things you
 6   allege is that Maxus knew or should have known, with the
 7   exercise of reasonable diligence, that the fire effects to
 8   phases 1 through 3 was extensive with such damage including
 9   the entry of soot and other toxins into the air circulation,
10   heating and cooling systems at the Metropolitan, correct?
11   A    Yes.  So --
12   Q    And --
13   A    I mean, I was told that.
14   Q    Well, that's what you've alleged in this lawsuit, right?
15   A    I mean, that's what we were told in our eviction; that
16   it was unhealthy to live here because of those reasons.
17   Q    Right.  But you also -- you allege that you were subject
18   to these dangers, correct?
19   A    That is what I was told.
20   Q    Right.  And you filed a lawsuit about it, right?
21   A    I mean, to get rent money back that I was owed, yes.
22   Q    Well, it was more than rent money, right?  Let's go one
23   more.
24            In paragraph 53, you allege many of these toxins
25   from the fire entered the existing living spaces because of
                            930
```

```
 1   failures on behalf of Bomasada and Maxus in operating the
 2   Metropolitan, correct?
 3   A    Once again, that is what I was told.
 4   Q    But you allege that unhealthy toxins entered living
 5   spaces, correct?
 6   A    Right.  I didn't perform any testing over it, but it was
 7   what I was told by the people that I trusted to provide myself
 8   a safe living space.
 9   Q    Right.  And I'm not suggesting you did the testing, but
10   you had a lawyer who was representing you, correct?
11   A    Yes.
12   Q    And this case resulted in a settlement, correct?
13   A    We settled it.
14   Q    Yeah.  You received -- I'm not going to ask you the
15   amount unless you want to say, but you received a monetary
16   settlement for this case, correct?
17   A    I did.
18   Q    Okay.
19        MR. ABRAMS:  No further questions.
20        MS. WIGGINS:  Briefly, Your Honor.
21   REDIRECT EXAMINATION BY MS. WIGGINS:
22   Q    Ms. Stakely, you just confirmed that you were
23   represented by an attorney in your lawsuit against Maxus,
24   correct?
25   A    That's correct.
```
931

```
 1   Q    Were you contacted within the last week by an attorney
 2   at the Lathrop firm regarding that settlement?
 3   A    I was.
 4   Q    Is that Lathrop attorney in this courtroom right now?
 5   A    Yes.
 6            MR. ABRAMS:  Your Honor, can we approach?
 7            MS. WIGGINS:  We're done, Your Honor.
 8            THE COURT:  Yes, you are.
 9            The witness can step down.
10   WILLIAM BRADLEY STILES, being duly sworn by the courtroom
11   deputy, testified:
12   DIRECT EXAMINATION BY MR. ELY:
13   Q    Could you please state your name for the record.
14   A    My full name is William Bradley Stiles.
15   Q    Mr. Stiles, where do you reside?
16   A    Currently Hoover, Alabama.
17   Q    Are you currently employed?
18   A    Yes, I am.
19   Q    With what company?
20   A    Safety Environmental Laboratories and Consulting
21   Incorporated.
22   Q    Where are they located?
23   A    Pelham, Alabama.
24   Q    What is the business of Safety -- I'm going to call you
25   guys SELC; is that okay?
```
                              932

```
1    A    Absolutely.

2    Q    What is SELC's business?

3    A    We are an environmental consulting firm who also has

4    accredited laboratory services.

5    Q    Okay.  And so take me through, if you would, please,

6    kind of the gamut of what you do.

7    A    Sure.  Most of what I do is field inspections.  So we go

8    around and survey buildings for environmental hazards such as

9    mold, asbestos, lead paint.  Those are the big three.

10   Q    And if you would, please, tell us your educational

11   background.

12   A    Sure.  I have a Master's Degree in Environmental Science

13   Management and Public Administration from Jacksonville State

14   University.

15   Q    Okay.  And currently what is your title at SELC?

16   A    I'm the director of operations.

17   Q    Okay.  How long have you been in that position as

18   director of operations?

19   A    Since 2012.

20   Q    Okay.  Do you have any certifications?

21   A    I have several certifications in asbestos and indoor

22   environmental consulting.

23   Q    Okay.  So -- and let me back up.

24        Prior to 2012, when you became director of

25   operations at SELC, were you also working at SELC?  Where were
                                 933
```

```
 1   you working?

 2    A    Also at SELC.

 3    Q    How long have you been at SELC total?

 4    A    Since 2007; so 16 years in September.

 5    Q    So your first four years there, what did you do?

 6    A    I was an environmental technician for the first year,

 7   and then I became a project manager after that, and again was

 8   promoted to director in 2012.

 9    Q    As an environmental technician, what did you do?

10    A    Go out and actually do field inspection work.

11    Q    Okay.  Did you conduct sampling?

12    A    Yes.

13    Q    Have you received any training in your sampling -- in

14   sampling collection methods, tape lift samples, wipe samples,

15   that kind of thing?

16    A    Yes.

17    Q    Tell me about that, if you would, please.

18    A    Most of the training that I received was hands-on

19   training or on-the-job training from superiors who are

20   collectively certified industrial hygienists.

21    Q    Okay.

22         MR. ELY:  Can we put up Defendant's Exhibit 11,

23   please.

24    Q    (BY MR. ELY) Okay.  Mr. Stiles, have you seen this

25   email, this exchange of emails before?
```
                                934

```
 1   A    Yes, I have.

 2   Q    Tell me what I'm looking at.

 3   A    This is email correspondence between myself and Alex

 4   Stehl with Maxus.

 5   Q    Okay.  Let's go to the last page of it so you can see

 6   it.  It looks like it's working bottom up.  Okay.  One more

 7   up.  Thank you.

 8        So this email looks like it's going up as we get new

 9   emails.  So this is the first email in the chain.

10        If you could take a look at that, who's Cary Case?

11   A    I'm honestly not sure.  I was -- I don't believe I ever

12   talked to Cary.

13   Q    So take a look at that email and see if you can explain

14   to me who first contacted you about work at the Metropolitan?

15   A    Alex Stehl.

16   Q    Okay.  Alex contacted you first?

17   A    I believe so, yes.

18   Q    Okay.

19   A    Via phone call.

20   Q    Okay.  So Tuesday, April 9th, you're contacted.  Was it

21   a call out of the blue?

22   A    Yes.

23   Q    You'd never met Cary Case or Alex Stehl before?

24   A    No, I had not.

25   Q    Had you been to the Metropolitan before?
```
935

```
 1   A    Not before this specific instance, no.

 2   Q    And so walk me through what you were requested to do at

 3   the Metropolitan by Mr. Stehl and/or Mr. Case.

 4   A    I was requested to go in and do a visual inspection to

 5   determine impact to the structure by the previous fire.

 6   Q    Okay.  And in this email, it looks like there's some

 7   specific directions as to where they want you to sample; is

 8   that fair?

 9   A    Yes, that is correct.

10   Q    Okay.  So is this a representation of what you -- the

11   limited amount of information you had before you went out

12   there?

13   A    Yes.

14   Q    Okay.  And so with respect to the timing of this, was

15   there any -- I see in that -- the first paragraph, We would

16   like to set a limit not to exceed $6,500 and have findings to

17   us by Friday, April 19th, 2019.

18        Do you remember that?

19   A    Yes, sir, I do.

20   Q    So there was a request that you have a report to them by

21   Friday, April 19th, 2019, correct?

22   A    Yes.

23   Q    At the time, did you understand where the fire had been?

24   And what I mean by that is it was a fire external to these

25   other spaces or internal?
```

                                    936

```
 1   A     External to the spaces in -- referenced in the email.

 2   Q     Okay.  And so prior to this particular job, had you had

 3   experience on fire sites before?

 4   A     I have.

 5   Q     Tell me in what context.

 6   A     Most of what my experience was based on --

 7             MR. ABRAMS:  May we approach?

 8             (Counsel approached the bench and the following

 9   proceedings were had:)

10             MR. ABRAMS:  Your Honor, this is a fact witness.

11   This is not an expert.  I think it's fine to get into

12   qualifications, but for him to -- he can't render -- he can

13   talk about what he did and what the results were, but he

14   shouldn't be rendering any opinions beyond that.  So he's --

15             MR. ELY:  That's okay.  That's fair.  I'm not trying

16   to render some opinion that's not been disclosed here.  I'm

17   just -- I want his observations of the facility when he went

18   out there, and that's what I'm kind of driving at because he

19   has some experience in that.

20             MR. ABRAMS:  Just to be clear, when you say he is

21   not disclosed, he's not an expert.

22             MR. ELY:  No, he's not an expert.  Not offering for

23   the purpose of --

24             THE COURT:  You're asking about his observations, is

25   that what you said?
```

937

```
 1              MR. ELY:  Yes, sir.  What I'm trying to establish

 2    that he's been on a fire site.

 3              THE COURT:  What else are you trying to establish?

 4              MR. ELY:  I'm trying to establish that he did the

 5    inspections and he did the sampling and what the conditions in

 6    the property were and what his communications with Maxus were

 7    about the results and when he was terminated.

 8              MR. ABRAMS:  Your Honor, that's totally fair game.

 9              MR. ELY:  I'll try to stay in that narrow area.

10         (The proceedings returned to open court.)

11    Q    (BY MR. ELY) Back to my question, Mr. Stiles.  You had

12    been on fire sites before?

13    A    I have.

14    Q    Tell me in what context.

15    A    Mostly asbestos inspections due to renovation or

16    demolition regulations.

17    Q    Okay.  So when you got to the Metropolitan -- this is an

18    April 9th email.  Do you recall when you arrived at the

19    Metropolitan to start sampling?

20    A    It was a day or two later.  I don't remember -- or

21    excuse me.  It was the week before that obviously.  I believe

22    it was the 15th and the 16th.

23    Q    Okay.

24              MR. ELY:  Let's back up a little.  Go to the first

25    page, please.
                            938
```

```
 1    Q    (BY MR. ELY) So take a look down at the bottom there.
 2   Does this refresh your recollection, Mr. Stiles?
 3    A    Yes.  It appears we began work on April 11th.
 4    Q    Okay.  And so when you went out to take your samples,
 5   where did you start?
 6    A    We started in what is referred to as the doughnut
 7   building, and we were directed into apartments located on the
 8   east side of that building closest to where the fire was.
 9    Q    Okay.  And do you know how long you all spent out there
10   conducting sampling?
11    A    Approximately two days.
12    Q    Okay.  So when you arrived at the site, what were your
13   observations of the doughnut -- the condition of the doughnut
14   building?
15    A    The doughnut building appeared to be very clean.
16    Q    Okay.  And when you -- before you arrived, what did you
17   expect to see based on your -- based on what had been related
18   to you about what you were investigating?
19    A    No one really told me the conditions; so I didn't really
20   have much of an expectation.  But when I arrived, I
21   immediately expected those units that I was inspecting to be
22   occupied soon.
23    Q    Okay.
24    A    Based on their condition -- based on my visual
25   observation.
```

939

```
1   Q    Okay.  Were you able to observe any physical signs of
2   smoke damage, soot deposition, anything of that nature?
3   A    Not in the doughnut building at all, no.
4   Q    Did you -- was there any smell that you were -- could
5   tell from the --
6   A    I do not recall any odors or visual evidence of soot or
7   fire particles.
8   Q    Okay.  And walk me through, if you would, just please
9   your inspections of the individual units when you were -- and
10  I suspect you were looking around the units and taking the
11  samples in the units?
12  A    Correct.  So the initial visual inspection would be of
13  the entire apartment.  Typically when I do an inspection, I do
14  it the same way every time so that I can keep up with my own
15  pace and location within the structure.  So I would start in a
16  clockwise fashion and work my way around from room to room.
17            So in these specific apartments, there were
18  kitchens, bedrooms, bathrooms, and what is -- you know, could
19  be referred to as a utility closet that contained the water
20  heater and the HVAC system.
21  Q    Were there particular areas that you were targeting for
22  sampling in the apartment -- in individual apartments?
23  A    Really it was just based on the visual inspection.  You
24  know, the standard for inspection says look for fire and soot
25  particles or things that could resemble fire and soot
```

940

1  particles.  So those were the intended targets of our
2  sampling.  We never actually found anything that looked like
3  that.
4  Q    Okay.  So not finding any targets, did you -- were there
5  any areas that you decided to target secondarily?
6  A    Typically, that would be, you know, surfaces that may or
7  may not have been cleaned before we were there.
8  Q    Okay.  So you sampled in the doughnut building on day
9  one; and day two, you worked around to the other areas of
10 phase 4 and then into phase 5.  And those were in a different
11 condition, were they not?
12 A    Yes, they were unfinished.
13 Q    Okay.  And you observed phase 5 on April -- was it April
14 12th, I guess?  If you started on April 11th, it would be
15 April 12th?
16 A    Yes.  It would have been the 12th, yes.
17 Q    What were your observations of the condition of the
18 phase 5 building at that time?
19 A    Considering that it was an active construction site, it
20 was fairly clean.  There was obviously evidence of some water
21 intrusion issues and things like that.  Again, no real
22 evidence that I could see of fire or soot particle deposition
23 on the surfaces.
24 Q    Okay.  So how many samples did you collect at the
25 Metropolitan that day?

                           941

```
 1   A     I believe it was --

 2   Q     Those two days, I'm sorry.

 3   A     I believe it was 97 combined.

 4   Q     Now, and these were all tape lift samples, correct?

 5   A     Yes, that's correct.

 6   Q     And so you sample on the 11th and the 12th, and then I'm

 7   assuming took the samples back to your laboratory?

 8   A     That is correct.

 9   Q     And what -- tell us what you -- how you had the samples

10   analyzed.

11   A     So SELC operates an accredited PLM lab for asbestos, and

12   the microscope used for asbestos analysis can be the same

13   microscope that is typically used for fire and soot particle

14   analysis.

15            So once I filled out the chain of custody form,

16   turned those samples in, our PLM analyst began the analysis in

17   house.

18   Q     Who was that person?

19   A     His name is Talieson Partridge.

20   Q     Okay.  And had Mr. Partridge, did he have experience

21   reviewing combustion byproducts through a PLM analysis?

22   A     Yes.

23   Q     And was this -- was this the first -- was this the first

24   combustion byproduct sampling that you all had done at SELC?

25   A     In-house, correct, yes.
                        942
```

```
1   Q    Okay.  You had done it before?

2   A    Yes.

3   Q    But the microscopic analysis, you just weren't doing

4   that analysis in house?

5   A    Correct.  We were typically sending that to a

6   third-party laboratory.

7   Q    Such as?

8   A    EMSL is probably the most recognizable.

9   Q    Okay.  So in this instance, you had Mr. Taliesen?

10  A    Yes.  Just call him Tal, T-a-l.

11  Q    You had Tal.  You were going to leave this in-house and

12  let Tal do the microscopy on it?

13  A    Correct.

14  Q    So you bring the 97 samples back to your office in

15  Pelham.  Tell me what happens next.

16  A    So once Tal started the analysis, he was kind of keeping

17  me up to date in realtime.  You know, we were kind of

18  organizing our response back to our client so that, you know,

19  we could meet the April 19th deadline.

20  Q    Okay.  So were you getting -- let me back up.

21         After you take the samples, return to your lab at

22  Pelham, and start the analysis on -- I guess it's Monday, the

23  15th probably?

24  A    That's correct.

25  Q    Did you have any communications with Mr. Stehl or
                         943
```

```
 1   Mr. Case about what you were doing early in the week of the
 2   15th?
 3    A    I don't believe it was on Monday.  I believe on Tuesday
 4   I made a phone call and kind of gave them a verbal of the
 5   results.
 6    Q    Had Tal been through all of the results -- all -- sorry.
 7   All of the tape samples at least preliminarily when you made
 8   that call?
 9    A    Yes.
10    Q    And in that call, what did -- what did you tell Maxus or
11   Alex Stehl?
12    A    We really didn't find anything.
13    Q    Okay.  And what was Alex's response to you?
14    A    Okay.  Stop what you're doing and don't publish the
15   report.
16    Q    Did he give you any reason why?
17    A    No, he did not.
18    Q    And his termination of your services was in that very
19   phone call --
20    A    Yes.
21    Q    -- when you related the results?
22    A    Yes, it was.
23    Q    Okay.
24         MR. ELY:  Nothing further, Mr. Stiles.
25   CROSS-EXAMINATION BY MR. ABRAMS:
                              944
```

```
 1    Q    Mr. Stiles, good morning.

 2    A    Yes, sir.

 3    Q    My name is Mike Abrams.

 4         Just a few questions for you.  When you went to the

 5    Metropolitan to do the sampling, HVAC was working in 1 through

 6    3?

 7    A    It was in the doughnut building.

 8    Q    That's -- 1 through 3 is --

 9    A    That's 1 through 3?  Then, yes, yes.  The apartments

10    that I looked at, everything seemed to be normal.

11    Q    And I'm correct, you didn't test behind walls, correct?

12    A    Did not remove any finishing materials to do tests, no,

13    I did not.

14    Q    And you said that you also the next -- that day or the

15    next day, April 12th, 2019, you did some sampling at phase 5

16    that was not finished, correct?

17    A    It was actually 4 and 5.

18    Q    4 and 5, right.

19    A    Yes, sir.

20    Q    Right.  And focusing on 5, you said you saw some water

21    intrusion, correct?

22    A    I believe so, yes.  The day that I was there, the day

23    before, there was a sprinkler head burst.

24    Q    Yeah.  But it wasn't like floods of water?

25    A    Only in one location.
```
945

```
 1   Q    Okay.  Just -- and it was in the process of being
 2   cleaned?
 3   A    Correct.  There was actually subfloor removed and areas
 4   that were not accessible in that hallway because of that.
 5   Q    The subfloors had already been removed?
 6   A    Correct.
 7   Q    Okay.  Am I correct that you said that for SELC this was
 8   the first time that your lab was assigned to test for
 9   combustion byproducts?
10   A    To analyze the samples, correct.
11   Q    Okay.
12           MR. ABRAMS:  Nothing else.  Thank you, Mr. Stiles.
13           THE WITNESS:  Yes, sir.
14           MR. ELY:  Briefly, Your Honor.
15   REDIRECT EXAMINATION BY MR. ELY:
16   Q    In terms of the locations, Mr. Stiles, that you looked
17   at in the individual apartments, those individual apartments
18   had individual HVAC units in them, correct?
19   A    Yes, sir, that's correct.
20   Q    Did you sample in the HVAC units?
21   A    Yes, sir, I did.
22   Q    Did you do that on every apartment?
23   A    I believe so, yes.
24           MR. ELY:  Nothing further.
25   RECROSS-EXAMINATION BY MR. ABRAMS:
                              946
```

```
 1   Q    Mr. Stiles, just to be clear though, even though you
 2   sampled the HVAC, you didn't sample behind walls, correct?
 3   A    That is correct.
 4   Q    All right.  And, Mr. Stiles, is there anything wrong
 5   with a client not wanting there to be two people who are
 6   investigating, sampling, and perhaps going with an outfit that
 7   had more experience in terms of sampling combustion
 8   byproducts?
 9   A    I would say no.
10            MR. ABRAMS:  Thank you, sir.
11            MR. ELY:  Nothing further, Your Honor.
12            THE COURT:  Thank you.
13            THE WITNESS:  Yes, sir.  Thank you.
14            MR. ELY:  Your Honor, may we approach?
15            (Counsel approached the bench and the following
16   proceedings were had:)
17            MR. ELY:  We are at a break point.  I have one
18   witness who is on her way.  Mike has additional witnesses
19   coming, I understand, in rebuttal.  You have a witness you're
20   trying to take out of time?
21            MR. ABRAMS:  Yeah, but we may not.  Given what we
22   have, we may not use him.  So we have three rebuttal
23   witnesses.  That's all that's left.
24            THE COURT:  You're saying you have a witness that's
25   on a plane?  What do I take that to mean?
                           947
```

```
 1              MR. ELY:  He's not here, Your Honor.

 2              THE COURT:  When will he be here?

 3              MR. ELY:  He'll be here in the morning.

 4              THE COURT:  We don't have another witness today?

 5              MR. ELY:  Not today, Your Honor.  I anticipated that

 6   we would -- as I mentioned, we would finish with our evidence

 7   on Wednesday morning, and this has just gone faster than we

 8   expected.

 9              THE COURT:  Who do you have for me today?

10              MR. ABRAMS:  Well, we have our three witnesses, but

11   they were scheduled to go tomorrow.  They'll all be ready.  I

12   don't -- I think they're coming in tonight because they --

13   they're gone -- they're going tomorrow.

14              THE COURT:  How did we get in this mess?  You know,

15   I don't care, but the jury, they have to be frustrated with

16   all this.

17              So I'm going to -- I fully expected to be submitting

18   this case on Thursday.

19              MR. ELY:  We will be, Your Honor.

20              MR. ABRAMS:  I mean, how long do you think you need

21   with -- you have Mulder tomorrow?

22              MR. ELY:  Yes, sir.

23              MR. ABRAMS:  How long do you think you need?  Can we

24   talk this over?  How long do you think you need with Mulder?

25              THE COURT:  Let's do this.  You're going to talk.
                               948
```

```
 1   Should we let the jury go?

 2          MR. ABRAMS:  Let the jury go.

 3      (The proceedings returned to open court.)

 4          THE COURT:  We're at a position in this trial where

 5   we have witnesses who are not here yet.  I'm going to let you

 6   go for the rest of the day.  I need to talk to the attorneys

 7   about things.

 8          It is my expectation that we will be submitting this

 9   case to you on Thursday morning, and so that's still within

10   the timeframe that I had -- I think I represented to you early

11   on.

12          So we're -- this happens in trials all the time, and

13   it's better that we spend some time discussing some things so

14   that we can get moving smoother.  I hope you will accept my

15   apology for bringing you down here for half a day; but in the

16   long run, the case is going to move smoother.

17          So have a good afternoon.  Thank you.

18          Remember my instruction, my admonitions, please.

19          (The following proceedings were had out of the

20   presence of the jury:)

21          THE COURT:  Anything?

22          MR. ABRAMS:  Your Honor, my understanding is that

23   defense has one witness left.  We have three rebuttal

24   witnesses because we're going to make a decision not to use --

25          THE COURT:  You have one witness.  How much time do
```
                                    949

```
 1    you think that witness will take?

 2              MR. ELY:  An hour in the morning.

 3              THE COURT:  And your rebuttal?

 4              MR. ABRAMS:  Three rebuttal.  We'll try to make them

 5    as short as possible and get done by Wednesday.  I think that

 6    that's definitely doable.

 7              THE COURT:  I'm asking for more specific.  So if

 8    you've got an hour, how long are you going to take?

 9              MR. ABRAMS:  Oh, on cross?

10              THE COURT:  That too, but how long will your three

11    take?

12              MR. ABRAMS:  I think the first two, we think with --

13              MS. McMULLIN:  I think less than an hour.

14              MR. ABRAMS:  The last one, Mr. Baxter, may go a

15    little longer.  He may be an hour, hour and a half.

16              THE COURT:  So we're talking little over morning

17    with the testimony, correct?

18              MR. ABRAMS:  Correct.

19              MR. ELY:  Well --

20              MR. ABRAMS:  Definitely into the afternoon, Your

21    Honor.

22              THE COURT:  From what you're telling me, I'm

23    thinking one o'clock, two o'clock because we need to spend

24    some time talking about instructions too.  That sound like a

25    fair representation of what tomorrow will look like?
```

                                   950

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

```
 1            MR. ELY:  I anticipate -- your Honor, with regard to
 2    their two expert witnesses, they're not going to be long on
 3    direct, and they're certainly not going to be long on cross.
 4    Mr. Baxter may take a little bit longer.  So I would think
 5    maybe if it takes Mike an hour to an hour and a half on
 6    direct, probably 45 minutes or an hour on cross.
 7            Mr. Mulder on my end will probably take an hour on
 8    direct.  So I can't speak to the cross, but that's kind of the
 9    math that I'm doing.
10            THE COURT:  Tomorrow I'll probably be letting the
11    jury go around two or three.  That sound right?
12            MR. ABRAMS:  Yes.
13            MR. ELY:  That sounds right.
14            MR. ABRAMS:  And talk about instructions in the
15    afternoon and then argue Thursday morning?
16            THE COURT:  Yes.  That sound right?
17            MR. ELY:  Yes, Your Honor.
18            MR. ABRAMS:  Yes.
19            THE COURT:  I want it in blood.
20            MR. ELY:  All right.  Thank you.
21            Do we have the Zoom set in the morning?
22            Rule 50 motion, can we do that in the morning?
23            THE COURT:  Yes.
24            MR. ELY:  Great.  Thank you.
25            THE COURT:  Anything else, gentlemen?  Otherwise,
                                 951
```

```
 1    I'm out.  Is there going to be any reading of deposition

 2    testimony?  You don't intend to read any deposition testimony?

 3              MR. ABRAMS:  Oh, we don't.

 4              MR. ELY:  Yeah.  I think we have one.  I don't know

 5    for sure.  I forgot.  That will take no longer than 30

 6    minutes.

 7              THE COURT:  You have your allotted time.  You've got

 8    to squeeze it into that.

 9              MR. ELY:  Yes, sir.

10                  (Court adjourned.)

11                  REPORTER'S CERTIFICATE

12

13              I certify that the foregoing pages are a correct

14    transcript from the record of proceedings in the

15    above-entitled matter.

16

17    _____      _____
          Date                  /s/Gayle M. Wambolt
18                            GAYLE M. WAMBOLT, CRR, RMR
                              United States Court Reporter
19

20

21

22

23

24

25
                        952
```