<pre>
 1              IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF MISSOURI
 2                      WESTERN DIVISION

 3   MAXUS METROPOLITAN, LLC,        )
                                     )
 4                   Plaintiff,      ) No. 20-cv-00095-FJG
                vs.                  )
 5                                   )
     TRAVELERS PROPERTY CASUALTY     ) August 2, 2023
 6   COMPANY OF AMERICA,             )
                     Defendant.      )
 7

 8              ............................
           TRANSCRIPT OF JURY TRIAL - VOLUME 7 OF 8
 9      BEFORE THE HONORABLE FERNANDO J. GAITAN, JR.
            UNITED STATES DISTRICT COURT JUDGE
10

11      Proceedings recorded by electronic stenography
               Transcript produced by computer
12

13                      APPEARANCES

14   For the Plaintiff:      MR. MICHAEL J. ABRAMS
                             MS. ALANA McMULLIN
15                           MS. KIMBERLY K. WINTER
                             Lathrop GPM LLP
16                           2345 Grand Avenue, Suite 2200
                             Kansas City, Missouri 64108
17
     For the Defendant:      MR. BRENEN G. ELY
18                           MS. LAUREN A. WIGGINS
                             Ely & Isenberg, LLC
19                           3500 Blue Lake Drive, Suite 345
                             Birmingham, Alabama 35243
20
                             MR. DANIEL EDWARD HAMANN
21                           Deacy & Deacy, LLP
                             9233 Ward Parkway, Suite 370
22                           Kansas City, Missouri 64114

23            Gayle M. Wambolt, RMR, CRR
              U.S. Court Reporter, Room 7552
24         Charles Evans Whittaker Courthouse
                 400 East Ninth Street
25         Kansas City, MO 64106 (816) 512-5641
                          953
</pre>

```
 1                           INDEX
                           JURY TRIAL
 2                        AUGUST 2, 2023

 3   EVENT                                           PAGE

 4   Proceedings in Courtroom                         955

 5                     CHRONOLOGICAL INDEX

 6   DEFENDANT'S WITNESSES:

 7                          DIR  CROSS  RDIR  RCRS

 8   KURT MULDER              962  1000

 9   PLAINTIFF'S REBUTTAL WITNESSES:

10   ROCCO CALACI            1015 1034   1047

11   ADAM FARNHAM            1049 1074   1082

12   DANIEL BAXTER           1083 1121   1136

13

14

15

16

17

18

19

20

21

22

23

24

25
                            954
```

```
 1              WEDNESDAY, AUGUST 2, 2023

 2              (The following proceedings were had out of the

 3   presence of the jury:)

 4              THE COURT:  Good morning.  I guess my first order of

 5   business, defendant has a motion to present to the court.

 6              MR. ELY:  Yes.  Mr. Ackerman is going to handle the

 7   Rule 50 motion.

 8              THE COURT:  Okay.

 9              MR. ACKERMAN:  Good morning, Your Honor.  I hope you

10   have the outline forming the basis for our Rule 50 motion

11   which we've also filed this morning in writing.

12              I'll be happy to outline briefly orally the basis

13   for our Rule 50(a) motion which we've also submitted this

14   morning in writing.

15              So the first argument that we make is that under the

16   policy's concealment provision, which states that the policy

17   coverage is void in case of any fraud, intentional

18   concealment, or misrepresentation of material fact by new or

19   any other insured at any time concerning a claim under the

20   relevant part of the policy, that coverage is void in this

21   case.

22              We believe the evidence presented at trial is

23   undisputed that Maxus intentionally concealed material

24   information from Travelers regarding both the combustion

25   byproducts, test results that were not provided and were
                              955
```

concealed and told not to be put into a report, as was

testified yesterday, and also the sprinkler break in April of

2019, which was not disclosed in the May 1st, 2019, letter

that we've seen a number of times in the course of the trial.

This -- and we have several arguments in addition

that are alternative arguments for partial judgment as a

matter of law.

So the second piece of our motion relates to the

claim for the remediation of the combustion byproducts, the

approximately $15.6 million claim, that is essentially the

heart of the plaintiff's case.  And we have two arguments that

we make for judgment as a matter of law on that claim.

So the first argument is that Maxus has not

established direct physical loss of or damage to property

under Eighth Circuit law because the only evidence that's

presented of combustion byproducts in phases 1 through 4 that

allegedly warrant the remediation that was done is that they

were present at a microscopic level.  So it's clear no one has

testified that they saw any combustion byproducts visually

other than these couple of photos of an HVAC diffuser, and

that does not rise to the level of direct physical loss.

It's clearly something that could simply be wiped

off, and Mr. Irmiter testified it was wiped off before he had

tested it, and thus there's no test results as to what that

substance was at all.  It never was confirmed as to whether it

956

1   was combustion byproduct or not.

2          And then, second, the alternative piece of our

3   argument on that issue is that the jury cannot reasonably

4   conclude on the evidence presented that it was necessary to do

5   the remediation, the $15.6 million remediation that was done,

6   and that's because there's been no expert testimony that that

7   remediation was necessary; that was, the combustion byproducts

8   were identified allegedly by microscopy.  But even if you

9   assume that to be true, no one with any scientific knowledge

10  or experience has testified that you have to do this type of

11  remediation because of the presence of the combustion

12  byproducts.

13         The only testimony on that issue was by Mr. Irmiter

14  as essentially a fact witness.  He's not qualified as an

15  expert on that issue, has no scientific background at all.

16         And then our next argument relates to the water

17  infiltration into phases 1 through 4 from the ember holes.

18  Our argument on that point is that the water infiltration was

19  not -- did not occur during the policy period.  The plaintiff

20  has not introduced evidence that can demonstrate that that

21  water infiltration occurred during the policy period.

22         So this policy expired on September 30th of 2018,

23  and there's no evidence that the water infiltration occurred

24  due to problems with the roof from the fire during the period

25  before the policy expired.

                              957

1    There's testimony that those holes allegedly were
2    found and the water damage underneath was found many months
3    later, and there's been no evidence that no -- that there was
4    rainfall during those -- the periods right after the fire that
5    would have caused this damage.  There's no testimony to that
6    effect.
7        The -- we also believe there's insufficient evidence
8    to support the business income and rental value claim with
9    respect to phases 1 through 4.  That's essentially for the
10   same reasons that I've articulated based on the evidence
11   presented.
12       The reason for the business income loss was the
13   eviction of the tenants, and that was for the purpose of doing
14   the remediation project.  So essentially if there's no
15   coverage for the remediation project for the reasons I've
16   articulated and the ones that we've included in our brief,
17   then there's also no evidence sufficient for the jury to find
18   business income and rental value losses based on that -- based
19   on the need to evict tenants allegedly for the remediation
20   project.
21       And then, finally, we believe there's insufficient
22   evidence to support Maxus' vexatious refusal claim.  Based on
23   the evidence presented, Travelers had reasonable grounds for
24   its position, and there were bona fide disputes during --
25   concerning coverage and the amount of loss.

958

1          There's obviously a lot of facts that go to that,

          2    but Maxus' central claim here is the microscopic presence of

          3    these combustion byproducts.  We've heard a lot of testimony

          4    about how really that was a novel claim, it's not something

          5    that we'd seen before.

          6          Scientists have said there's no real standard for

          7    what constitutes a microscopic presence of those combustion

          8    byproducts, and Travelers had reasonable grounds to dispute

          9    that claim, which is really the vast majority of this case.

         10          Travelers also was entitled to investigate the

         11    faulty construction.  We've heard Mr. Irmiter testify about

         12    how this was one of the top ten worst buildings he's ever

         13    seen.  Travelers was entitled reasonably to investigate that

         14    and, therefore, did not act vexatiously in doing so.

         15          We've also -- as indicated earlier, there's plenty

         16    of evidence that Maxus withheld information from Travelers

         17    during the course of its investigation, including the test

         18    results and the sprinkler leakage.

         19          And for that reason and the other ones we

         20    articulated in our brief, the jury cannot reasonably conclude

         21    that Travelers acted vexatiously and without any reasonable

         22    cause in this case.

         23          THE COURT:  Response?

         24          MR. ABRAMS:  Your Honor, would you like a brief

         25    reply?

                                    959

```
 1            THE COURT:  Yes.

 2            MR. ABRAMS:  Again, I'm using the phone just because

 3     we saw this motion just a few minutes ago, but I'll go

 4     briefly.

 5            On the concealment issue, the evidence yesterday

 6     from SELC was on the sprinkler break.  He was there.  They

 7     cleaned it up the next day.  Didn't cause damage.  This is a

 8     mountain out of a molehill.  The evidence is that there was a

 9     sprinkler break, didn't cause the damage, and it was cleaned

10     up.  No reason to report.

11            One of the best evidence is from the guy who was

12     there the next day who said, Yeah, I saw a little water spot

13     the next day, and it was cleaned up.

14            On the direct physical loss, Your Honor, Travelers

15     paid for the remediation of soot in phase 5.  There's no

16     question -- and they've admitted that that is a -- it can be a

17     covered loss under the policy.  What they're saying is, Well,

18     it was too small, and it didn't result in damage to phases 1

19     through 4.  We disagree.

20            We think that there's plenty of evidence that that's

21     not the case.  And under the definition and the law in the

22     state of Missouri, that's damage to property.

23            On this notion that, okay, well, the damage didn't

24     occur during the policy period because there's some water

25     damage to the roof on 1 through 4.  If the ember holes are
```
960

```
1    caused by the fire, rain comes in and damage results
2    afterwards, that is classic proximate cause that's covered.
3            On business interruption, frankly, we just disagree
4    with counsel, and Michelle Pienta's testimony speaks for that.
5    It's not only 1 through 4, but it's also 5 through 6 where we
6    have lost rents.  We had very detailed testimony on that.
7            Finally on vexatious refusal, Your Honor, we think
8    there is plenty of evidence in the way that Travelers has
9    behaved in this manner, the way that they've handled their
10   claim, that there's enough evidence to submit to the jury on
11   vexatious refusal.
12           THE COURT:  Okay.  I'm going to take the matter
13   under advisement.  We'll proceed.
14           I think Patricia gave you rough drafts of the
15   instructions.  I want you guys, when we have a break, to take
16   a look at that.  And I've got a potential problem that may
17   require me to be away this afternoon.  I'm trying to resolve
18   it now.  But even if it comes to pass, you know, we'll still
19   have an opportunity to get preliminary discussions on the
20   instructions either directly with me or with Patricia because
21   she and I spent a lot of time talking about it.
22           In the worst-case scenario, we'll meet in the
23   morning at eight o'clock to finalize the instructions and
24   submit as planned.
25           MR. ELY:  Okay.
                                961
```

```
 1              THE COURT:  This is all worst-case scenario.

 2              MR. ABRAMS:  Your Honor, I missed the beginning of

 3    it.  You said that you may have a problem late in the

 4    afternoon, and we may have to do the final jury instructions

 5    in the morning?

 6              THE COURT:  Yes.  What I hoped is that once you guys

 7    go through instructions, we'll be in a position to make it

 8    brief in the morning.

 9              (The following proceedings were had in the presence

10    of the jury:)

11    KURT D. MULDER, being duly sworn by the courtroom deputy,

12    testified:

13    DIRECT EXAMINATION BY MR. ELY:

14    Q    Could you state your name for the record, please?

15    A    Kurt D. Mulder.

16    Q    Mr. Mulder, where do you reside?

17    A    Birmingham, Alabama.

18    Q    Are you currently employed?

19    A    Yes.

20    Q    With who?

21    A    Engineering Design and Testing Corporation.

22    Q    How long have you been with Engineering Design and

23    Testing Corporation?  Is it okay if I say EDT?

24    A    Yes.  That's actually what we call it.

25              Been with them ten years.
```

962

1    Q    Okay.  And what is your job with EDT?

2    A    I am the district office manager, engineering manager

3    and structural forensic engineer.

4    Q    Okay.  And are you a licensed engineer?

5    A    Yes.

6    Q    In how many states?

7    A    Five, I believe.

8    Q    Now, prior to coming to EDT, what was your work

9    experience?

10   A    Prior to that, I was a land developer, general

11   contractor, home builder; did that for ten years prior to EDT.

12   Before that, I was a design engineer, worked in commercial,

13   residential projects and such as that.  And then prior to

14   that, I was -- basically my college, high school years, I was

15   a carpenter and working at framing houses and such.

16   Q    Okay.  When you mentioned you were a home builder, did

17   that also include the construction of apartments?

18   A    Yes, yes.  We did multi-family and commercial as well.

19   I was the general contractor.

20   Q    Okay.  So walk us through, if you would, your

21   educational background, please.

22   A    Well, of course, I graduated high school, and then I

23   attended the University of Tennessee where I received a degree

24   in civil engineering.

25   Q    Okay.  What year was that?

963

1    A    I graduated in 1995.

2    Q    Okay.  So do you hold any particular certifications that

3    are applicable here?

4    A    No.  I mean, at one point in time, I did have a -- I was

5    a certified fire and explosive investigator, but I let that --

6    I wasn't really using it, per se; so I let that certification

7    go.

8    Q    Okay.  So let's talk about this claim specifically.

9    When were you -- around the time when you were first contacted

10   by Travelers to start working on this claim?

11   A    I believe that was July of 2019 or slightly before that.

12   Q    Can you tell us what you were asked to do?

13   A    I was asked to evaluate the structure of phase 5 of the

14   Metropolitan due to an adjacent fire as well as some of the

15   siding in the proximity of the fire of the Metropolitan.

16   Q    And did you inspect phase 5 at some point pursuant to

17   those requests?

18   A    Yes, I did.

19   Q    Do you remember the date of that?

20   A    The exact date, no, but I believe it was July 2019.

21   Q    Okay.  So July 9th, does that ring a bell?

22   A    Yes.

23   Q    Okay.  So you showed up at the Metropolitan on July 9th,

24   2019.  The scope of your inspection was limited to phase 5; is

25   that correct?

                                964

1    A    Correct.

    2    Q    Okay.  When you got to the Metropolitan, who did you

    3  meet?

    4    A    Oh, shoot.  I don't remember exactly whose name it was.

    5  I'm sorry.

    6    Q    Fair enough.  Was it a representative of Maxus or

    7  Bomasada or whom?

    8    A    I believe it was a representative of Bomasada.

    9    Q    Okay.  So let's talk about -- let's walk through your

   10  inspection.

   11         MR. ELY:  If we could pull up Defendant's Exhibit

   12  188, page 35.

   13    Q    (BY MR. ELY) So describe for us, generally speaking,

   14  what you observed about the state of the construction of phase

   15  5 on July 9th, 2019.

   16    A    Well, the building was in a dried-in condition when I

   17  was examining it, which meant that it was closed in from the

   18  weather.  But it was in just a framed condition.  It did not

   19  have any interior finishes yet or insulation.

   20         The state, as you can see here, there had been some

   21  portions of the flooring, which had been removed.  And an

   22  investigation of what I was tasked with, I found that portions

   23  of the OSB, which were still present, were damaged due to

   24  moisture intrusion.

   25    Q    Okay.

                                965

```
 1          MR. ELY:  Can we go to page 38, please.

 2    Q    (BY MR. ELY) Tell me what we're looking at here, please.

 3    A    Right here, this is what normally would be -- this is

 4    the plumbing which would be under, I believe, the kitchen

 5    sink.  So you have two different shades of OSB, what's going

 6    on here.

 7          The darker gray portion, which is around the

 8    plumbing, I would assume they didn't want to remove due to the

 9    plumbing.  So they left it in place.  That's the original OSB.

10    And it is surrounded by new OSB, which has been placed.  And

11    then you also have a section there at the top, which is the

12    OSB is missing.

13    Q    Okay.  So is this representative of kind of the stage of

14    repairs on the interior subfloor at the time you were there?

15    A    In the upper portion of the building, yes.

16    Q    So just in -- and just for clarification, these are

17    photographs you took at your inspection, correct?

18    A    Correct.

19    Q    Okay.  So walk me through what you were looking at at

20    the Metropolitan -- at the phase 5 of the Metropolitan at the

21    time.  Did you take a look first at the wood framing?

22    A    Yes.  They basically took me to phase 5 and let me go on

23    my own recognizance.  And so basically I went through the

24    entirety of phase 5, started at the top examining -- looking

25    up first, starting at the roof, and the structure there, and
```

966

```
 1   then examining the wall structure down to the floor structure,
 2   and then continued down through all the different floor levels
 3   of the phase 5.
 4   Q    Okay.  With regard to the framing, did you find anything
 5   that you could equate to damage from the fire to the interior
 6   framing?
 7   A    Well, on interior framing, you're looking for obviously
 8   pyrolysis, which is when the wood heats up and sap actually
 9   starts to come out of the wood.  And that actually shows you
10   that there's a weakening of the wood due to heat exposure.
11         That, you're looking for charring and similar
12   byproducts of a fire, which neither of those things did I see.
13   Q    Okay.  And so once you've taken a look at the framing,
14   let's talk about your inspection of the subfloor if we can,
15   please.
16         Tell me what you observed of the subfloor.
17         MR. ELY:  Can we pull up page 111 and split it with
18   Defendant's Exhibit 185.
19   Q    (BY MR. ELY) Okay.  So tell me what we're looking at on
20   the left, please, Mr. Mulder, with regard to the subfloor.
21   A    What you're seeing here is one of the rooms that had
22   been replaced with the OSB in the flooring.  You can see again
23   where the kitchen plumbing was.  Here, that you can see
24   there's old OSB surrounded by new OSB as well as a division
25   point here where you have new OSB versus old OSB.
```

967

```
 1              The old OSB tended to be swollen and have -- be kind

 2    of raised, rough texture, which indicated that it had

 3    experienced moisture exposure that affected the wood.

 4              MR. ELY:  Can we go to page 191, please, on the

 5    left.

 6    Q    (BY MR. ELY) Is that an example of what you're talking

 7    about with the old damaged subfloor?

 8    A    Exactly.  So what you're seeing here is you can see the

 9    joints of the sheathing boards, that the swelling has caused

10    them to raise up and become pronounced, especially right here.

11    You can see where the corner of the board has really become

12    pronounced.  As well as on the left, you can really see the

13    texture of the board, which it's -- that's -- both are

14    indications that those boards were exposed to high levels of

15    moisture.

16    Q    Okay.  So -- on July 9th, 2019, what was your

17    understanding of the source of water in phase 5?

18    A    The understanding during that examination was it was

19    exposed to water during firefighting activities from phase 6.

20    Q    Okay.  And were you able to identify -- so let me back

21    up.

22              So with respect to what you saw out there, you saw

23    various stages of the subfloor.  We saw the open space that

24    looked like some had been removed but not replaced?

25    A    Correct.
```

968

```
 1   Q    Correct?
 2        We saw some other areas where removal had taken
 3   place and replacement had been completed, correct?
 4   A    Correct.
 5   Q    And then we saw some other areas where neither had taken
 6   place that were still damaged?
 7   A    Which is what's shown, yes.
 8   Q    And so were you able to make a determination of the
 9   areas of damage of the subfloor in that July 9th, 2019,
10   inspection?
11   A    Yes, I was.  Can we actually zoom in on the map on the
12   right just to phase 5 so we can actually just see that?  Is
13   that possible?
14        MR. ELY:  Yeah.  Go to the top right corner.  The
15   top right quadrant would be -- there you go.  Great.
16   A    Yeah.  Okay.  So looking at that, you see obviously it's
17   kind of a C shape.  You have a courtyard in the middle.
18   Starting at about just below the center of the C shape, you
19   see a 453353.  During my examination you could tell that the
20   OSB flooring had been damaged pretty much from the 53
21   apartments coming up front to the bottom portion of the
22   picture, which I refer to as the front.  When I say front
23   left, right, back, I'm referring from looking at phase 6
24   towards the building, phase 5.
25        So most of the 57s, I believe the flooring was --
                              969
```

1   had been removed and wasn't present.  So it wasn't really as

2   part of saying that was damaged.  So I did identify that

3   through the 53, 54, 55, and 56, the OSB flooring was damaged

4   and should be remediated.

5   Q    Okay.  So in addition to looking at the framing, looking

6   at the subfloor -- I understand you made an inspection of the

7   siding and the windows at the time, right?

8   A    Correct.

9   Q    Was it your -- were you aware as to the stage of repairs

10  that had taken place since the fire in phase 5 when you

11  conducted that inspection on July 9th?

12  A    I was not informed of any repairs having being conducted

13  at the facility.

14  Q    Okay.  So your observation that there was no damage to

15  the siding and no damage to the windows, you now know that the

16  repairs had already been made?

17  A    Yes.  I know that now.

18  Q    So putting that aside, the last thing you looked at, I

19  believe, was some water intrusion in the courtyard area of

20  phase 5; is that correct?

21  A    It's not the last thing I looked at.  I looked at the

22  roof on phase 5 as well when I was there.

23  Q    All right.  So what did you observe from the roof on

24  phase 5 when you walked in?

25  A    It was pretty nice.  It was not damaged.

                                    970

1    Q    You've come to learn since then that what you were

2    looking at was the newly-replaced roof?

3    A    Correct.  I did not know at that time that that was new

4    roofing.

5    Q    So with regard to the additional water that you found --

6         MR. ELY:  Can we go to page 201 on the left side,

7    please.  Zoom back out of that map.

8    Q    (BY MR. ELY) So while he's pulling that up, can you tell

9    us -- just kind of describe what you were -- describe what you

10   learned about the additional water that you found in phase 5,

11   water damage you found in phase 5.

12   A    Okay.  So looking at the -- again, the C shape, you have

13   the -- what I would consider the front wall of the courtyard

14   or the bottom of the courtyard if you're looking at the

15   picture.

16        I determined that looking -- you can see on the

17   picture on the left that there was long-term water intrusion

18   occurring in the back wall.  You can tell by the amount of

19   staining there that that was long term, as well as the fact

20   that if you see there as well on the bottom that it was still

21   wet.  So that was an active area of water intrusion at that

22   time.

23        It started at the top floor and continued down in

24   the same area of the wall all the way down through the floors,

25   indicating that it was starting at the top and occurring all

                              971

1   the way down.

2          Once I saw that it was there, I examined it at the

3   exterior to try to determine what was causing or -- or why the

4   water was intruding at that location.

5   Q    Okay.  Can you point to the map as to where this -- on

6   the -- where this photograph is generally?

7   A    Right there.

8   Q    Okay.

9          MR. ELY:  So can we go to page 199, please.

10  Q    (BY MR. ELY) And describe for us what you -- I think you

11  just mentioned you went outside to take a look at the stucco

12  and see the source of the water.  Tell us about that.

13  A    Correct.  I went out on the balconies located right

14  here.  You can see them on the map.  I went out on the balcony

15  and looked back at the building to try to determine what could

16  be the possible source.  And when I looked, you could see that

17  there was an intersection of siding and stucco at that

18  location.

19  Q    Okay.

20         MR. ELY:  Go to page 200, please.

21  A    You can also see -- so, one, you have the intersection

22  of the stucco and the siding as well as a parapet wall

23  intersection with the roof where there's a gutter in it.  This

24  aligned perfectly with where the water intrusion was in the

25  inside, indicating that this was where the water was

                              972

1    intruding.

2          As you can see here, there's not -- there's not any

3    obvious damage to what you're looking at.  The stucco is

4    intact, the siding's intact, gutter's intact indicating that

5    the possible -- the most likely source of this was a

6    construction defect within that intersection.

7          MR. ELY:  Can we go to page 192, please.

8    Q    (BY MR. ELY) Is this another photo in that same area?

9    A    Yes, it is.

10   Q    Okay.

11         MR. ELY:  Go to 194, please.

12   A    Same wall.  You can see through the window that you can

13   see the opposite wall of the building of phase 5 that -- I

14   would say I guess the top portion of the C.

15         So, again, you're looking at that wall.  That water

16   is coming down through that area, and it's moving along the

17   bottom of the wall.

18   Q    (BY MR. ELY) Okay.  So with respect to the water that

19   you saw in the courtyard, if you can circle that again for me,

20   Mr. Mulder, what area that was.

21   A    (Witness complied.)

22   Q    Were you able to determine whether that water had any

23   relation to the phase 6 fire?

24   A    Yes.  Considering phase 6 is on the opposite side of the

25   building and it's -- there's -- no fire damage was apparent at

                              973

1  that area, the fact that it was still wet, showing that it was

2  an ongoing situation, the amount of biological growth and

3  water that you had there had been long and ongoing.

4          The firefighter activities would have been on the

5  other side of the building, not inside the courtyard, facing

6  away from the building.  So along with that, I made the

7  determination it was most likely a construction defect.

8  Q    So at some point, you became aware that there had been a

9  sprinkler line break in phase 5, correct?

10 A    Correct.

11 Q    And you didn't learn that until when?

12 A    I believe after the publication of my report, and I

13 think about a year later.  I think that would have been March

14 of 2020.

15          MR. ELY:  Can we go to Defendant's Exhibit 25, page

16 1, please.

17 Q    (BY MR. ELY) So tell me what -- when you -- tell me what

18 you reviewed with regard to the sprinkler line break in phase

19 5.  You issued a supplemental opinion later?

20 A    Correct.

21 Q    I'm trying to go through the basis of that.

22 A    Well, I reviewed letters between Maxus -- and like here

23 is an example of one -- which was discussing the sprinkler

24 break, I believe immediately, and that that happened during

25 remediation of the floor from the original damage.

                                 974

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

```
 1              So I reviewed the multiple letters or emails, some

 2     event logs that I believe were the maintenance people that

 3     were -- or construction people that were doing the remediation

 4     of the actual break itself.

 5              I reviewed videos and photographs of the facility

 6     after the break and during the actual water intrusion.  And I

 7     believe there was some other material that I reviewed, but

 8     it's not coming right to mind at this second.

 9     Q    All right.

10              MR. ELY:  Let's go to page 5, please.

11     Q    (BY MR. ELY) I think you mentioned this, Mr. Mulder.

12              MR. ELY:  Go back to page 4 so we can have some

13     context, please, Chris.  Page 3, please.

14     Q    (BY MR. ELY) So is this something you reviewed in terms

15     of your supplemental opinion?

16     A    Yes, it was one of the things I believe I reviewed.

17              MR. ELY:  Can we go to page 5 now, Chris.

18     Q    (BY MR. ELY) And you understood that to be an incident

19     report from Maxus about the waterline break?

20     A    Yes.

21     Q    And you reviewed the described incident in detail

22     section?

23     A    Yes, I did.

24     Q    So --

25              MR. ELY:  Chris, go to page 6, please, and zoom in
```
                                        975

1  on the photographs, if you would.

2  Q    (BY MR. ELY) Are these the photographs you were

3  referencing earlier that you reviewed?

4  A    I believe so, yes.

5  Q    And so after reviewing this information, after learning

6  about the sprinkler line break, tell me what -- how you

7  changed your opinion about the cause of the subfloor damage in

8  phase 5.

9  A    Well, there was an original ATC report, I believe, that

10  I reviewed as part of this that actually identified what the

11  damage was from the original firefighting activities, compared

12  that to what I had found and concluded as water damage and

13  based on that, minused off what the ATC damage was to mine and

14  determined that was a damage which occurred from these -- this

15  incident.

16  Q    And is it true that when you changed your opinion on the

17  cause, were you aware that the -- that Travelers had paid for

18  the entire subfloor to be replaced?

19  A    Yes, I was, because they went off of my report, which

20  stated they should replace the entirety of it, yes.

21  Q    Okay.  And with respect to how this water -- sprinkler

22  line rupture was remedied, what did you learn about how it was

23  remedied?

24  A    One, that they punched holes in the floor and let it run

25  through, and that was pretty much it.  They didn't bring in

                              976

condensers to pull the water out of the air.  They didn't have
fans blowing on it, both of which are pretty standard for
drying out a system.  They basically closed up the facility
and left it as is.

Q    Okay.  And did that factor into your opinion or your --
to the change in your opinion that damage to the subfloor had
been caused by the sprinkler line break?

A    It did, due to the fact that that moisture remained on
the floor.  Also -- and OSB is treated with a certain amount
of water resistance.  During construction, you're going to get
rain.  It's going to get wet; so it does have -- it is treated
for some moisture resistance.

        Part of the problem here is you did have large
portions of it where it had been cut due to the fact of doing
the remediation, you cut the boards to size, they're cutting
boards, removing it.  The treatment is only on the exterior of
the board.

        As soon as you cut any type of wood that's treated,
the cut end is not treated.  So now you have multiple areas in
this part of the facility where you have exposed wood which is
not treated where the water is going to be running over the
edge and such as that and getting into the boards.

Q    Okay.  So we mentioned your July inspection.  At some
point, you were called back out to the Metropolitan to do
additional work, correct?

                              977

```
1    A    Correct.

2    Q    Was that in the timeframe of March 2020ish?

3    A    I believe so, yes.

4    Q    So tell me about what you were tasked with doing at that

5    time.

6    A    At that time, that is when I believe FBS had been

7    brought in and was at the facility.  So I was tasked to go out

8    and meet with FBS and assess what their reports of damage

9    were.

10   Q    Okay.  And so you mentioned earlier in your July 9th,

11   2019, inspection, you were basically left alone to inspect

12   phase 5, correct?

13   A    Correct.

14   Q    Was that the case in the March inspection with --

15   A    No.  That was a guided tour with Mr. Franklin Martin.

16   Q    Okay.  And what -- was Mr. Martin pointing to areas of

17   damage that they were claiming was fire damage?

18   A    Correct.  And from firefighting activities.

19   Q    Okay.  And so you -- as part of that, did you go back

20   into phase 5?

21   A    Yes, we did.

22   Q    Okay.  And what was described to you by Mr. Martin --

23   what was his claim at that time?

24   A    His claim was that, one, firefighting activities had

25   ended up spraying water through the flashings and such of the
                              978
```

1  facility coming in, intruding in, as well as embers burning

2  the roof, causing holes and resulting in water intrusion.

3          MR. ELY:  Can we go to page 571, please.

4  A    As well that the facility had been engulfed in the smoke

5  cloud, resulting in high levels of temperature, damaging

6  portions of the materials in the facility.

7  Q    (BY MR. ELY) So let's just focus on phase 5 a minute,

8  remove phase 1 through 4.  I know this is an odd photograph.

9  It's forcing me to have to turn my head.

10          What are we looking at here?  This is a photograph

11  you took in March of 2020?

12  A    Yes.  This is actually sideways.  So the left of the

13  photograph is actually the top of the photograph.  So you're

14  looking at the floor above, which actually I believe is the

15  roof structure in this instance.

16          And if you look here, this is actually an ongoing

17  leak.  This is where they put plastic to hang below it to try

18  to catch the water, which was coming through the roof at that

19  point in time.

20          MR. ELY:  And page 572, please.

21  A    That's below it, and you can see where they put a bucket

22  as well below it to catch water.

23  Q    (BY MR. ELY) So your observations in phase 5 in March of

24  2020, you observed active water leaks through the roof?

25  A    Yes, I did.

                              979

1   Q    And March 3rd, 2020, was this the old roof from the

2   fire, or was this a new roof?

3   A    Actually even when I showed up to this meeting, they had

4   not informed us yet that the roofing had been replaced.  It

5   was with my discussions with Mr. O'Neil with J.S. Held was

6   present at the same exact on-site, that he informed me that

7   this was a new roof at that point in time.

8   Q    Okay.  So you observed active water leaks in the

9   phase -- the new roof of phase 5 --

10  A    Correct.

11  Q    -- on March -- in March of 2020, correct?

12  A    Correct.

13  Q    Second thing, did you revisit the area of the

14  construction defect around the courtyard also?

15  A    As in travel outside, walk around outside?

16  Q    Did you walk back through those same water-damaged areas

17  you identified in July?

18  A    Most of them, yes.

19  Q    Had any of those been remediated?

20  A    No.

21  Q    Okay.  And the subfloor, what was the state of the

22  subfloor at the time you walked through?

23  A    Same condition it was in my original examination, except

24  there was areas of active water leaks that were -- it was wet

25  and causing further damage.

                          980

```
 1   Q   Okay.  So based on your inspection of phase 5 in March

 2   of 2020, nothing had been done to change its condition or

 3   remediate any of those issues since your visit on July 9th,

 4   2019?

 5   A   Correct.  Nothing had been done.

 6   Q   Okay.  So let's move over to phase -- the doughnut

 7   building.  I want to know the -- and we'll go to --

 8          MR. ELY:  Please, page 305.

 9   Q   (BY MR. ELY) So, if you would, Mr. Mulder, can you tell

10   us the first thing that was pointed out to you in the doughnut

11   building by Mr. Martin as fire-related damage?

12   A   I don't know if it was the first thing, but it was one

13   of the things.  This is actually the stucco portions of the

14   exterior of the building.  Mr. Martin stated that the smoke

15   cloud had enveloped the facility causing high temperatures,

16   which he reported damaged the siding and used these cracks as

17   an example.

18   Q   Okay.  Were you able to make a determination as to

19   whether -- is this an example of what he was showing you?

20   A   Yes.

21   Q   And were you able to make a determination as to whether

22   these cracks were related to the fire or something else?

23   A   Yes, I was.  Heat expansion in stucco, I mean,

24   there's -- the material is actually getting bare.  So, I mean,

25   it's expanding.  That material has to go somewhere.  It
```
                              981

```
 1    just -- so it pushes in upon itself.  And at some point within

 2    the stucco that's maybe weaker than another, it's going to

 3    tent up and separate from the substrate.  And then after it

 4    tents up, that material is no longer attached.  Portions can

 5    fall off, chip off, which is called spawling.

 6            I didn't see that here.  What I saw here was kind of

 7    straight line cracks or circular cracks, which are indicative

 8    of contraction.  So stucco, when it cures, it shrinks, and

 9    that can -- you can see up at the top and bottom, there are

10    controlled cracks there which are meant to actually try to

11    alleviate that, hide it.

12            But in this instance here, you can see that it

13    actually happened in the middle of the board as the board --

14    the top separated away from the bottom, and you get cracks.

15    Q    Are these cracks something that's typical in a stucco

16    facade on a facility?

17    A    One that's improperly installed, yes.

18    Q    So it's your opinion that what you were looking at were

19    construction defects related to the stucco?

20    A    Correct.

21            MR. ELY:  Let's go to page 375.

22    Q    (BY MR. ELY) Did Mr. Martin also raise issues with the

23    hardie board siding on the building -- on the doughnut

24    building?

25    A    Yes, he did.  At that time he still reported that it was
```
982

1    damaged from the fire.  And, again, Mr. O'Neil informed me

2    that that had been replaced prior to our on-site at that time.

3    Q    Okay.

4          MR. ELY:  Page 378, please.

5    Q    (BY MR. ELY) Can you tell me what I'm looking at here?

6    A    This is one of the locations of siding where you're

7    looking up, and you can see that -- so this is a vertical line

8    of butt joints.  So it's where two pieces of siding meet

9    laterally.  They're supposed to be separated.  But what you're

10   supposed to have behind that is actually a piece of flashing.

11         So you can actually see the top of the underlying

12   board, which you're not supposed to be able to see.  It was

13   actually supposed to be a piece of metal that comes down and

14   covers that.  That -- so when it rains, water doesn't come

15   down and get through the butt joint.

16         What you're also seeing is the siding is curling off

17   of the building, which is indicative of moisture intrusion in

18   the siding and uneven drying, resulting in the siding curling

19   as well as improper fastening.

20   Q    So did you determine -- I guess my question is, was any

21   of this siding heat damage from the fire?

22   A    No, it was not.

23   Q    What did you determine was the cause of the damage?

24   A    Improper installation.

25   Q    Let's go to page 317.
                        983

```
 1              So it was also pointed out to you, as I understand,
 2     that there was a claim that there was ember damage to the
 3     phase 1 through 4 roof that was causing water intrusion.  Is
 4     that -- am I correct about that?
 5     A    That is what Franklin Martin was telling me at that
 6     time, yes.
 7     Q    Okay.  And so is this an example of what was pointed out
 8     to you?
 9     A    He wasn't really so much pointing stuff out as kind of
10     making broad statements.  This is one area that I saw.  And so
11     since he's making these statements, I'm -- that's what I'm
12     looking for.
13     Q    Okay.
14     A    This being black in nature, I was like, Oh, makes sense
15     to me that this might be what he's talking about, except this
16     is material sitting on top of the roof.  This is not more
17     burns.  This is not holes through the roofing.  This is the
18     material sitting on top of the roof.
19              You can actually see as well up here on top -- it's
20     not drawing.
21     Q    I've got a photograph.
22              MR. ELY:  Please go to page 319, and we'll zoom in
23     on that.
24     A    All right.  This is the wall above it.  So first you can
25     see on the top, there's actually where someone has actually
                                984
```

1    punctured the roofing on the parapet wall.  You can also see

2    that there's a lateral scrape leading up to that.  So that is

3    not material falling down on it.  That is someone carrying

4    something along it and abrading the roof.

5         Below that, you actually see where liquid has fallen

6    on the roof as well, resulting in some of the little black

7    globules again right there on the wall.  This is indicative of

8    someone actually spilling something on the roof.

9         So if you go back to the previous photo, this is

10   after they spilled it on the wall.  So they walked back across

11   the roof spilling whatever it is they were carrying.

12        If you have a smoke cloud that's dropping debris on

13   a roof, it's going to be random and widespread across the

14   roof.  It's not going to be in a straight line going across

15   the roof.  That is indicative of human traffic, foot traffic,

16   someone carrying something and dropping it on the roof.

17   Q    Okay.

18        MR. ELY:  Can we go to 329, please.

19   Q    (BY MR. ELY) Tell me what this is, Mr. Mulder.

20   A    This is an area where I observed that there was a

21   globule on the roof.  I actually took the globule off and kept

22   it.  And you can see here that this was an area that, okay,

23   this looks like it might be burn damage.  Well, I think we're

24   all familiar with how a cigarette burns, so to speak.  A

25   cigarette is an ember, right?

                                985

So if you go ahead and place that on anything, it's
going to start burning at the center and burn outwards because
that's the hottest point of the ember.  Okay.  It's not going
to -- in this instance, you can see it's clean in the center.
That's where the globule was.  The actual damage to the
roofing surface was outside of the globule.

          So why is the center protected?  Because that's
where the material was.  So some materials are -- caulks and
sealants and such are not -- caulks and sealants.

          So the center part, which is undamaged, was
protected by the caulk that was sitting on top of it.  If it
was burning, you would expect that to be where the damage was.

          In this instance, what you're getting is a reaction
between the caulk and the roofing and oxygen.  So that's
allowing the chemical reaction, which is resulting in a burn
around the globule, outside of it.  So that is not indicative
of a burn mark.  That's indicative of a chemical reaction.

Q    And did you -- you said you took that -- you took the
globule that was there?

A    Yes.  That's from phases -- I don't know exactly which
one, if it was phase 1 through 4.

Q    Did you have that globule tested to see what it was?

A    Yes, I did, along with some globules from phase 5 off
the new roof.

Q    Did you do that testing yourself?

                              986

```
 1   A    Our office did.  But the materials engineer, Richard

 2   Edwards, in our office did the testing.

 3   Q    What did you determine this particular globule was?

 4   A    A caulk sealant type material.

 5   Q    Okay.  So did you also walk the entire roof and take

 6   photographs to get the general condition of it?

 7   A    Yes, I did.

 8   Q    Okay.

 9        MR. ELY:  Can we go to page 282 with split screen

10   with 185, Defendant's 185, please.

11   Q    (BY MR. ELY) So this photograph on the left, did you

12   take that photograph in March of 2020?

13   A    Yes, I did.

14   Q    Can you tell us what area of the roof this is depicting

15   of the doughnut building?

16   A    That would be looking that way.

17   Q    Okay.

18        MR. ELY:  Let's go to 283, please.

19   Q    (BY MR. ELY) Tell us where you're standing here.  So

20   this is looking across the doughnut building?

21   A    Yes.  That is looking diagonally across, over top of the

22   pool.

23   Q    Okay.

24        MR. ELY:  Let's go to page 286 on the left, please.

25   Q    (BY MR. ELY) And is this the eastern side of the
```
987

```
 1   doughnut building?

 2   A     Yes.

 3   Q     Okay.  Can you point to where that is?

 4   A     (Witness complied.)

 5   Q     Okay.  Is that the side that you understood was closest

 6   to the phase 6 fire?

 7   A     Correct.

 8         MR. ELY:  Can we go to page 390, please.  Actually

 9   let's go to 415.  Let me back up.  Let's go to 390.  I'm

10   sorry.

11   Q     (BY MR. ELY) Can you describe for us -- you see these

12   black marks here?

13   A     Yes.

14   Q     Can you describe for us what you observed those to be?

15   A     Those are scrape marks of something being drug across

16   the roof and scraping the roofing.

17   Q     And while you were walking the doughnut building roof,

18   did you also -- did you observe mechanical damage such as that

19   throughout the roof?

20   A     Yes, I did.

21   Q     Okay.

22         MR. ELY:  So let's go to 415, please.

23   Q     (BY MR. ELY) Can you show us on the map the area that's

24   depicted here?

25   A     That is actually over top of the stairwell that leads up
```
                                  988

1  and down through the facility.

2  Q    Okay.  And then the last photograph.

3         MR. ELY:  Go to 405, please.

4  Q    (BY MR. ELY) Can you show us where this -- is this, I

5  guess, astro turf?

6  A    Yeah.  It's kind of a lounge area they have up on the

7  roof that you can see here's like a firepit and had some astro

8  turf, plastic grass.  It's actually depicted right here on the

9  drawing, but that is up on the roof.  And I believe it's in

10 this area.

11 Q    Okay.  And what was the purpose of taking this

12 photograph?

13 A    Well, there's a large section of plastic grass on the

14 roof of an area that was reported to have been engulfed in a

15 high-heat cloud resulting in damage to the roofing and stucco

16 and such as that.

17        This is -- there's no damage to this.  There's no

18 indication of a hot material falling on it.  There's no

19 melting.  There's no darkening of the material.  There was

20 nothing.  It was pristine.

21 Q    Did you inquire as to whether this was the original turf

22 that had been in place at the time of the fire?

23 A    Yes, I did.

24 Q    What were you told?

25 A    It's the original turf.

                        989

```
 1   Q    Okay.  So were you able to identify -- based on your
 2   view of the roof, were you able to identify anything you could
 3   term as ember damage to the roof?
 4   A    No, I could not.  I was looking for burn-through.  I'm
 5   looking for actual holes in the roofing, which Mr. Martin was
 6   giving us a tour this whole time.  He did not identify.  I did
 7   not see it.  He didn't take us to a location, say, Right here
 8   is the damage I'm talking about.  It was just broad strokes,
 9   There's ember damage to this roofing everywhere.
10   Q    Did you see patches on that roof?
11   A    Yes.  There were some patches.  But you're going to have
12   patches in roofing.  That's just -- it's damaged during
13   construction.  There's all sorts of things that can happen to
14   it.
15   Q    Did anybody at FBS point out to you that the patches
16   were representative of ember damages?
17   A    No, they did not.  And if that would have been the case,
18   I would have expected them to have taken me to a spot, said,
19   Here's where we repaired the roof.  And at that point, we did
20   have a roofer with us.  We were taking test cuts and getting
21   into the roof.  At that point, we would have been able to test
22   that location.
23   Q    So you also, as I understand it, examined the roof from
24   a construction standpoint?
25   A    Correct.  Not in heavy depth, but I did.
```

990

1    Q    Let's go to page 438 and tell me what we're seeing

2    there, if you can explain it.

3    A    This is actually over top of that stairway, which

4    actually I think I mismarked it earlier.  It's actually at the

5    top left of the building, that area.  This is actually an area

6    where water was actually shown to us inside the facility

7    coming into a stairwell.  I believe we might have pictures of

8    it later.

9         So we -- I definitely wanted to get in the roofing

10   at this location to see what was going on.  Why was there

11   water during our examination present?

12        So we -- as you can see here, we actually took a

13   portion, cut it back.  And I asked for them to do it at a

14   location where there was a lap so I could see what the

15   fastener condition was.

16        You can see here as soon as we cut it back, it was

17   roofing -- a thermoplastic roofing on top of the roof decking

18   or the OSB board.  It lacked a cover board and it lacked

19   insulation.

20   Q    So when you say "it lacked insulation," what would you

21   -- what did you expect to see under this TPO membrane?

22   A    I expected to see insulation sheathing.  So it's going

23   to be -- one, it's -- like I mentioned earlier, materials are

24   not always compatible.  So as soon as you cut back roofing

25   such as a thermoplastic membrane, you expect to see a cover

                          991

```
 1    board, which keeps it separated from what would be below that,

 2    which is insulation sheathing or IsoBoard, which is not

 3    necessarily compatible with the roofing.  So you want to keep

 4    them separate because they will actually react with each

 5    other.

 6            So I expected to see that here.  Most roofing

 7    manufacturers require it for their warranty.  It's also very

 8    important in controlling conditions within the facility.

 9    Q    Okay.

10            MR. ELY:  Let's go to 439, another -- I think this

11    is a better -- further picture of when you peeled it back.

12    And then let's go to 441, please.

13    Q    (BY MR. ELY) Can you tell us, Mr. Mulder, the same

14    location, what are these black marks?

15    A    What you're seeing here is you can see that there's

16    black staining of where the majority of the board, which is

17    indicative of long-term water intrusion into the area.  But

18    also fasteners react with the water when they're exposed to it

19    and start to corrode.  So that corrosion kind of starts to

20    leach out into the wood.  So those black stains are actually

21    the locations of where the fasteners are.

22    Q    Okay.  I think we mentioned mechanical damage earlier.

23    Let's just go to an example of that.

24            MR. ELY:  Page 395, please.

25    Q    (BY MR. ELY) Tell us what we're looking at here, please.
```

992

```
 1    A    Right there that's an expansion joint in the phase 1
 2   through 4 area, and what you're seeing there is where
 3   something was drug across the expansion joint damaging the
 4   roofing.
 5    Q    And so with regard to this -- the lack of insulation
 6   that we saw, is that a code violation?
 7    A    To drag something across the roof or --
 8    Q    No.  I'm sorry.  With the lack of insulation?
 9    A    Yes.  The Modern Energy Code requires that you have
10   insulation in that area.
11    Q    Okay.
12    A    Which is part of the International Building Code, and it
13   was adopted by the city of Birmingham, which is where this is
14   located.
15         MR. ELY:  So let's go to page 447.
16    Q    (BY MR. ELY) Am I -- am I correct in understanding that
17   FBS also took you into the interior of the doughnut building
18   and identified specific areas of water intrusion it was
19   claiming was related to the fire?
20    A    Into select units and portions of the first floor.  They
21   did take us in, yes.
22    Q    What am I looking at here on the left?
23    A    This is actually again a sideways photo.  You would have
24   the floor on the left, and this is framing below a window.  I
25   believe this was unit 407, which is located -- I can't read
```

993

```
1   the numbers on the screen.

2   Q    I believe it's in the inset over there to the left.

3   A    Oh, that's right.  It's in one of these.  Yes, it's

4   right here, which is away from the building where the fire

5   occurred.

6   Q    Okay.  Is that -- that's over the lobby?

7   A    Yes, that's it.  It was located over here facing -- this

8   window is outside.  So this is facing this direction.

9   Q    Okay.

10  A    Facing away from the fire.  And this was actually, as

11  you can see, I have a moisture meter where I've tested this.

12  It was actually wet at the time I was testing it.

13  Q    Okay.

14       MR. ELY:  Can we go to 459, please.

15  Q    (BY MR. ELY) This is another area that was pointed out

16  to you?

17  A    Yes.  This was unit -- I can't remember the exact

18  number, but this is actually facing the parking garage.  So

19  it's in that -- facing that direction.  Again, we're facing

20  the outside.

21       This is more water intrusion adjacent to a window

22  that was active at the time it was tested.  It was wet.

23  Q    So a number of these areas were pointed out by FBS.

24  Were you able to determine the source of the moisture?

25  A    Due to the fact that I'm facing away from the facility
```

994

```
 1   and facing the parking garage, which was, I think, maybe 10

 2   feet away from the building, it was just common sense.  There

 3   was no firefighting activities in these locations.  So we have

 4   since learned from review of the fire department logs that,

 5   no, there was not firefighting activities in these locations.

 6           So at that point in time, this was most likely

 7   construction defect, which I believe after the fact and even

 8   publication of this report, that there was determined multiple

 9   construction defects were resulting in water intrusion at the

10   facility.

11           MR. ELY:  Can we go to page 462.

12   Q    (BY MR. ELY) And I believe you mentioned when you were

13   looking at the roof pictures, that there was a stairwell

14   underneath that was actively leaking.  Is this the picture of

15   that stairwell?

16   A    Correct, it is.  As you can see, there's actually

17   standing water in this stairwell, and to my memory, it had not

18   rained that day.

19   Q    Okay.  Can you show us on the map where that was?

20   A    (Witness complied.)

21   Q    So in addition to the individual units and the

22   stairwell, did FBS also take you into the lobby area?

23   A    Yes, they did.

24           MR. ELY:  Let's go to page 463, please.

25   Q    (BY MR. ELY) Tell me what your observations were in the
```

995

1   lobby area.  Is that Mr. Martin there on the left?

    2   A    I believe it is, yes, there, and a couple other

    3   individuals.

    4         This is actually the lobby facing the pool house.

    5   This isn't the front lobby facing the exterior.  So that would

    6   be the inner courtyard here and facing, I'll say, that wall.

    7   Q    Okay.  So what are we looking at here?

    8   A    You're looking at a wall that's been experiencing

    9   long-term moisture exposure.  You have a lot of dark staining.

   10   It's throughout the wall.  It's not focalized necessarily at

   11   one point.  So this is something where moisture has gotten

   12   inside and has permeated through the wall and causing the wood

   13   to exist in a moistened condition.

   14   Q    Okay.

   15         MR. ELY:  Let's go to page 466, please.

   16   Q    (BY MR. ELY) It's another picture of that area?

   17   A    Yes, it is.

   18         MR. ELY:  And 469, please.

   19   Q    (BY MR. ELY) This in the same area?

   20   A    This is, but this is a location where you actually do

   21   have it focalized in one area where you can see it's running

   22   in a vertical row coming down, and it's actually really

   23   accumulated there at the bottom.  It's also very, very dark

   24   staining.  So it's just -- that's indicative of something

   25   that's been occurring for a long time.

                                    996

1    Q    Okay.  So, finally, did FBS also point you to some

2    ground water issues?

3    A    Some issues that were occurring at the bottom of the

4    wall, yes.

5         MR. ELY:  Can we go to page 507, please.

6    Q    (BY MR. ELY) Can you show us on the map where this is?

7    A    (Witness complied.)

8    Q    Can you tell -- tell us what you're looking at.

9    A    Right there, that is an exterior walk within what I

10   believe we're referring to as the foyer.  It's inset into the

11   building.  You can see there that there's a pattern of tile

12   that was used within the foyer area and a brick paver-type

13   situation to the front of that.

14        That there is the entrance to the building, and this

15   is an exterior wall of the foyer, which is located right there

16   on that side.  You can also see here you have heavy

17   corrosion-colored staining coming down from a low wing wall

18   that protrudes from the corners of the pool area.

19        Below that you can see cracking of the material

20   finishes running laterally along the corner as well as heavy

21   brown-colored staining on the ceiling of the foyer.

22   Q    Okay.

23        MR. ELY:  Can we go to 510, please.

24   A    Couple more things I want to talk about here, is you

25   have areas of sediment that have accumulated on the floor of

                              997

1   the foyer.

2          This is the area within the exterior that hold

3   water.  I believe the original architectural plans for this

4   building stated that it was the 2009 International Building

5   Code that this building falls under.  According to the 2009,

6   I'll call it the IBC, the ground surface adjacent to a

7   foundation should slope within 10 feet, should be 5 percent.

8          If it's an impervious surface, which is what we have

9   here, it's a minimum of 2 percent.  So as you can tell, if

10  it's holding water, it's not sloped like it's required to be

11  by the International Building Code.  The main purpose of that

12  requirement is to keep water away from the building.

13  Q    Okay.  Why is that important?  We're talking about the

14  bottom floor here on the grade.  Why are we talking about the

15  grading issues?

16  A    Due to the fact that they're reporting this as damage

17  from firefighting activities and the fire -- the moisture

18  intrusion that occurred in these areas.  Where I was -- that

19  was what I was given as the reason why it happened.  So, okay,

20  let's look at it, and let's look at the data.  Let's look at

21  what happened here.

22          And almost immediately started finding construction

23  issues, which lead to moisture intrusion, which it's --

24  there's no reason why in a courtyard, I mean, did they

25  helicopter into here and fight the fire?  Did they run through
                                     998

1    the building and drag their hoses through the building?  That
2    was not reported.  It wasn't in the fire department report.

3         I was told there were firefighting activities within
4    this courtyard.  Okay.  Well, how did the water get in then?
5    Because buildings are constructed or should be constructed to
6    prevent water from entering them, such as during a rain event,
7    which comes from the top down.

8         So in order for them to have fought this fire in
9    this location, it would have to have been from the trucks from
10   the top down.  In that instance, you're seeing water just like
11   you would during a rain event.  Why would water have entered
12   into this location then?

13        So now I had to find a reason why.  Well, this is
14   what I found.  I found multiple construction defects within
15   the facility that were leading to water intrusion.

16   Q    Okay.

17        MR. ELY:  If you could go to page 501 real quick,
18   please.

19   Q    (BY MR. ELY) Is this related to the area we were just
20   talking about?

21   A    Yes, it is.  You can kind of see the angle of the wall
22   there that you saw at the exterior of the foyer where the
23   corners are.  This is where the water is coming in at the
24   bottom of the wall and starting to seep up and wick up through
25   the wall.  You can see it's darker on the bottom and it's

                              999

1    actually wet.  And then you see this bottom portions of the
2    studs are wet or at least stained, and then you can see where
3    it dissipates away to nothing.  This is indicative of water
4    coming from the top and working its way up.
5    Q    So to sum up with regard to the March 2020 inspection
6    from areas pointed out to you in phase 5, areas on the roof of
7    the doughnut building, the area on the interior apartments and
8    the areas in the lobby and then the ground areas, were you
9    able to determine the causes of those water intrusions?
10   A    The vast majority of them, yes.
11   Q    Okay.  Were any of them related to the fire in your
12   opinion?
13   A    No.
14   Q    Were they related to construction defects or faulty
15   installation?
16   A    Yes.
17        MR. ELY:  Thank you.  I'll pass the witness.
18   CROSS-EXAMINATION BY MR. ABRAMS:
19   Q    Good morning, Mr. Mulder.  I'm going to give you
20   Defendant's Exhibits 38 and 40, hard copies.  These are your
21   reports because you may need to refer to them, okay?
22   A    Okay.
23   Q    All right.  Mr. Mulder, I want to start with -- you
24   don't know what Maxus -- the fire-related damages that Maxus
25   is claiming here in this litigation, correct?  You haven't
                                1000

```
1   seen the exhibits and what Maxus is claiming is fire-related
2   damage in this litigation?
3   A    Beyond the material that I was given to write my reports
4   and to review and such as that.  So I have reviewed some of
5   the damages, yes.
6   Q    No, no, no.  Different question.  My question is, is you
7   are not aware of what Maxus is claiming is fire-related damage
8   in this litigation, correct, what they've submitted?  You
9   haven't seen that evidence, correct?
10  A    I haven't seen what has been brought forth in this court
11  case from the witnesses beyond what was given prior to court.
12  Q    Back in 2020, right.
13       So are you aware that the pictures that you just
14  were shown by counsel about water and construction defects,
15  that Maxus isn't claiming those amounts in this litigation?
16  You're not aware of that, right?
17  A    I guess not.
18  Q    Okay.  All right.  Let's do this chronologically.
19       Your first visit -- remind us when your first visit
20  was to the Metropolitan.
21  A    July of 2019.
22  Q    July of 2019.  Okay.  And you were told at that point
23  that a portion of the phase 5 -- portion of the phase 5
24  roofing adjacent to phase 6 had been damaged by falling and
25  burning embers during the fire, correct?
                           1001
```

```
 1    A    Correct.

 2    Q    And you were also told that a majority of the portion of

 3    the roofing that was damaged by the fire had been replaced

 4    prior to your first visit, correct?

 5    A    No, not prior to.  I was informed of that after my

 6    second examination of the facility during the on-site.

 7    Q    Let me make sure I got this right.  Didn't Mr. -- you

 8    can look at page 6 of your first report.

 9         Didn't Mr. O'Neil tell you that a majority of the

10    front portion of the roofing damaged by the fire in phase 5

11    had been replaced prior to your examination of the facility?

12    A    All right.  Let's go to background.  Sorry.

13    Q    I'm referring to the November 6th, 2020, report.

14    A    That's July.  November.  So I want to see in my report

15    where I actually detail that.

16         Please note paragraph 3, background information of

17    the report that you're speaking of, of the June 26th report.

18    It's page 5.  Second examination of the facility was conducted

19    by EDT on March 3rd, 2020, and a third on May 22nd.  Second

20    examination, you'll notice Mr. Taylor O'Neil was present.  He

21    was not present in my first one.

22         He informed me at the second examination, as I

23    stated earlier, that's when the roofing had been replaced

24    prior to my first examination.

25    Q    Okay.  So it -- we've got it correct, though, that the
                              1002
```

```
 1   roof that you saw when you inspected 5 was not the same roof

 2   that existed at the time of the fire, correct?

 3   A    That is correct, yes.

 4   Q    So -- and you were told by Travelers' adjustor,

 5   Mr. Gregory Bynum, that embers from the fire landed on the

 6   roof on building 5 burning holes into the roofing, correct?

 7   A    Correct.

 8   Q    And he told you that water applied -- this is the

 9   Travelers' adjustor, Mr. Bynum, who's not here, he told you

10   that the water applied to the roof during the firefighting

11   activities intruded through the burn holes, correct?

12   A    That is what he told me, yes.

13   Q    And he also told you that it flooded a portion of the

14   interior of building 5, correct?

15   A    Correct.

16   Q    And based on those statements, your report concludes

17   that building 5 was inundated with water from hoses by the

18   fire department during the firefighting activities to prevent

19   building 5 from catching fire.  That was your report, correct?

20   A    Because that was what I was informed of at that time,

21   yes.

22   Q    That was your report, okay.  And your report concluded,

23   and I'm quoting you, Therefore, the inundation of the

24   structure of building 5 with water in combination with the

25   reported holes burnt in the roofing embers, that a large
```
1003

1   amount of water would be expected to have intruded into the

2   interior of building 5, correct?

3   A    Correct.

4   Q    And you also state in that report -- well, you talked

5   about the OSB flooring there, correct?

6   A    I believe so, yes.

7   Q    Yeah.  And you say that when OSB is exposed to a large

8   amount of water where the sheathing is inundated and stays wet

9   for a period of time, the OSB sheathing can swell, cup, and

10  start to lose cohesion between the compressed woodchips, which

11  make up the sheathing, correct?

12  A    Correct.

13  Q    And you understood that after the phase fire -- I'm

14  sorry.  After the fire, there was a time where ATF had control

15  of the building and people couldn't get into the building?

16  A    At that point in time when writing my report, was I

17  aware of that?  I have since -- recently actually found that

18  out.  I did not know of that back in the day.

19  Q    Okay.  You ultimately concluded in your report that the

20  observed damage to the OSB floor decking at the front portion

21  of building 5 in apartments 253 through 256, 353 to 356, 453

22  to 456 was caused by water inundation of the OSB floor decking

23  and resulted from firefighting activities, correct?

24  A    I believe that is the conclusion if you're reading my

25  report, yes.

                            1004

```
 1    Q    So those were the conclusions you made when you first

 2    went to the Metropolitan, correct?

 3    A    Yes.

 4    Q    All right.  Now, you also mention the -- an ATC report,

 5    a moisture mapping report, right?

 6    A    Yes.

 7    Q    Okay.  And tell us who ATC is.

 8    A    They're the company that originally came in at the

 9    behest of Travelers, I believe, to determine the extent of the

10    moisture damage within phase 5.

11    Q    And ATC is a reputable firm?

12    A    As far as I know, yes.

13    Q    And they inspected phase 5 building in December of 2018,

14    correct?

15    A    I believe so.  I know it was before my examination.

16    Q    In fact, it was seven months before you got there,

17    right?

18    A    Right.  Prior to the water main being cut.

19    Q    Yeah.  It was five months before the water main break,

20    right?

21    A    Correct.

22    Q    And ATC -- you've reviewed the report, right?

23    A    I have.  I've not like -- within the recent timeframe,

24    but when I did my report, yes, I did.

25    Q    But you remember that ATC moisture mapped the facility
```

1005

```
 1   using visual examination and a moisture meter and
 2   thermography, correct?
 3    A    Correct.
 4    Q    And we've heard this before, but just to remind us
 5   what -- what's thermography mean?
 6    A    That's where you're looking for temperature
 7   differentials and determine if there's anomalies within the
 8   material you're looking at.
 9    Q    And you knew that that's part of the moisture testing
10   process?
11    A    Yes.
12    Q    Okay.  And the ATC report concluded that extensive water
13   intrusion and microbial growth was on floors 1 through 4 of --
14   this is phase 5.  And the photos and the moisture mapping
15   showed that water intrusion on the ceilings, walls, floors
16   throughout the building, correct?
17    A    Yes.
18    Q    And I have -- that's slide 3 that's right in front of
19   you.  That's what they concluded, and that was seven months
20   before you got there, right?
21    A    Yes.
22    Q    Okay.  Now, you are now aware that before you examined
23   the Metropolitan in July of 2019, that repairs were made to
24   fire-damaged portions of the facility, correct?
25    A    Water intrusion portions of the facility as well as
                              1006
```

```
 1  damage to the exterior -- the exterior from the fire, yes.

 2   Q    Right.  So, for example, the damaged siding and windows

 3  at the southern elevation of phase 5 and the eastern

 4  elevations of phase 1 through 3 had been removed and replaced

 5  with new material before your inspection, correct?

 6   A    I believe, yes, on the south side.  I don't know if the

 7  east side had been replaced.

 8   Q    Do you want to look at your November 6, 2020, report,

 9  page 6?

10   A    Then, yes, it was.

11   Q    Okay.  So the observations made in your first report

12  that --

13        MR. ABRAMS:  Can I switch you to Irmiter slides?

14  Let's start at 13.

15   Q    (BY MR. ABRAMS) All right.  So this is -- we're looking

16  at phase 5, right?

17   A    Yes.

18   Q    Okay.  But when you got there, this had all been

19  repaired, correct?

20   A    Correct.

21        MR. ABRAMS:  Go to the next slide.

22   Q    (BY MR. ABRAMS) Can we agree that that's fire damage?

23   A    Yes.

24   Q    Okay.  This slide -- by the time you got there, this had

25  been repaired, correct?
```
                           1007

```
 1   A    Correct.

 2   Q    And we can agree that's fire damage?

 3   A    Yes.

 4        MR. ABRAMS:  Can we go to the next slide?

 5   Q    (BY MR. ABRAMS) Same question.  Windows are out.  This

 6   has been repaired.  The windows --

 7   A    Well, in this picture, the windows had been replaced,

 8   yes.  I can't -- there was not anything done to the wood

 9   framing or anything.

10   Q    Right.  I'm referring to the windows.

11   A    Yes.

12   Q    Okay.  Because you put in your report, in your July

13   26th, 2019, report, you noted a lack of melted siding or burn

14   marks in those areas, but you didn't realize they had already

15   been replaced?

16   A    I was figuring it, but I didn't have any -- beyond the

17   fact that they looked new, any indication that they had been

18   replaced.

19   Q    Okay.

20        MR. ABRAMS:  Melissa, can you put up Irmiter 36.

21   Q    (BY MR. ABRAMS) This is -- this is a picture of -- well,

22   do you agree that this is a picture of fire damage to the

23   sheathing on phase 5?

24   A    It does appear to be melted tape.

25   Q    Okay.  And that's consistent -- and when you were there,
                              1008
```

```
 1   did you see this type of fire damage to the sheathing on 5?

 2   A    The sheathing was not exposed when I was there.

 3   Q    Okay.  So you didn't get to see this part?

 4   A    No.

 5   Q    All right.  You didn't conduct any destructive testing,

 6   correct?

 7   A    Correct.

 8   Q    All right.  You talk about the stucco.  Are you aware

 9   that Maxus is not claiming any damage to the fire -- stucco

10   damage as a result of the fire?

11   A    They were then.  What they're doing now, I'm not aware.

12   Q    You say "were then."  What you're saying is FBS, someone

13   from FBS, someone named Frank said, Okay, we think that this

14   is fire damage, right?

15   A    They didn't say "think."  They said, This is fire

16   damage.

17   Q    But you don't know whether Maxus is claiming that today?

18   A    I would say no.

19   Q    Okay.  And the -- and also you pointed out like the butt

20   ends problem on the siding.  Do you remember that?  You were

21   asked about that by counsel?

22   A    Yeah.

23   Q    You don't know if Maxus is claiming that, correct?

24   A    No.

25   Q    All right.  And you pointed out a bunch of what you saw
```
1009

```
 1   was active wet damage as a result of construction defects,
 2   right?
 3    A    Yes.
 4    Q    Okay.  And it's -- let's talk about that.  It's really
 5   important for you when you're analyzing this, if you're seeing
 6   something that's actually wet, that tells you that there is a
 7   current problem, right?
 8    A    Correct.
 9    Q    If it was dry, that would indicate something else,
10   right?
11    A    That there was not a problem there.
12    Q    Right.  Or, well, let me be more specific.  Good point.
13           If it was dry and rotted out, right, and damaged,
14   that would tell you that there was an initial problem that had
15   been corrected, right?
16    A    Not necessarily.  That means there was an initial
17   problem, not necessarily corrected.
18    Q    Okay.  But if you would know -- you would agree with me
19   that -- in fact, all the stuff that you saw that was wet
20   indicates a current problem, right?
21    A    Correct.
22    Q    And a construction defect problem?
23    A    Correct.
24    Q    But you're not aware if Maxus is claiming any funds --
25   any monies for any of that in this litigation, correct?
                            1010
```

```
 1    A    Correct.

 2    Q    All right.  Let's talk about the sprinkler break.

 3         Have you ever spoken to Brad Stiles?  He testified

 4    here yesterday.

 5    A    I don't believe so.

 6    Q    Okay.  Mr. Stiles, he works for a company called SELC.

 7    Travelers brought him in all the way from Alabama.

 8         He was actually at phase 5 the day after the fire.

 9    And would it surprise you that Mr. Stiles said that they were

10    in the process of cleaning up phase 5, and there was just a

11    little bit of water on phase 5 after the sprinkler break?

12    Would that surprise you?

13    A    I guess not.

14    Q    And you had some testimony about -- that someone said,

15    contrary to what Mr. Stiles said, that there was no -- no one

16    was cleaning up phase 5 after the sprinkler break, right?

17    A    I didn't say no one was cleaning it up.  I don't believe

18    I testified to that.

19    Q    Okay.  I misheard you.  I apologize.  I thought you said

20    that it was -- the water was just left to stand and that no

21    one was --

22    A    I said the water was left to stand.  I didn't say no one

23    was cleaning it up.

24    Q    That's not in your report, is it?

25    A    I don't think it is.
```
                              1011

```
 1    Q    No.  Also you mentioned punch holes to drain water.

 2    A    Yes.

 3    Q    Remember that?

 4    A    Yes.

 5    Q    If the floorboard had already been rotted and needed to

 6    be removed anyways, is there any problem with punching a hole

 7    in the floorboard in order to drain water?

 8    A    If that portion was damaged.  But there were portions

 9    that weren't, according to the ATC report, and differences in

10    mine.

11    Q    Okay.  But the -- but would you agree with me that in

12    order to drain water if it's going to be replaced anyways, to

13    punch a hole in it is fine, right?

14    A    I would say yes.

15    Q    Okay.  All right.  You had this testimony about the

16    globules on the roof, right, and --

17    A    Correct.

18    Q    You tested them, sampled them.  These are all -- just so

19    we've got our timeframe, this is -- these are all globules

20    found after the roofs have been replaced, correct, and

21    repaired?

22    A    Incorrect.  One of the globules was from phase 4 prior

23    to that roof being replaced.

24    Q    I'm saying repaired.  You said you saw patching,

25    correct?
                              1012
```

```
1    A    I did say, yes, there was probably some patching in the
2    roof, yes.
3    Q    Are you aware if Maxus is claiming in this litigation
4    that those globules represent portions of the roof that
5    need -- that were damaged as a result of embers?
6    A    I guess -- Maxus' claim, no.
7             MR. ABRAMS:  Nothing further, Your Honor.
8             MR. ELY:  No redirect, Your Honor.
9             THE COURT:  Thank you, sir.
10            THE WITNESS:  Thank you, Your Honor.
11            (Counsel approached the bench and the following
12   proceedings were had:)
13            MR. ELY:  Judge, we're not reading any depositions;
14   so Mike is going to move into the rebuttal portion of his
15   case.  To the extent necessary, we renew our Rule 50 motion
16   that's already pending before Your Honor.
17            THE COURT:  Okay.  Consider it renewed.
18            MR. ELY:  Thank you.
19            MR. ABRAMS:  We're ready, Your Honor, if you're
20   ready.
21            THE COURT:  How long is it?
22            MR. ABRAMS:  He'll be -- I'm not doing it.  My
23   colleague is doing it.  I think probably 30, 40 minutes.  We
24   said about an hour.
25            THE COURT:  Why don't we take a short recess.
                              1013
```

```
 1              MR. ELY:  Yes, sir.
 2          (The proceedings returned to open court.)
 3              THE COURT:  We've got a witness who's going to take
 4    30, 40 minutes.  So I think we'll take a brief recess now, 10
 5    or 15 minutes, and then we'll resume.  You're excused for the
 6    recess with my admonitions not repeated again.
 7              (The following proceedings were had out of the
 8    presence of the jury:)
 9              THE COURT:  You had two or three?
10              MR. ABRAMS:  Three.  Two live, one video.
11              THE COURT:  And that's it?
12              MR. ELY:  Yes, sir.
13              THE COURT:  All right.
14              MR. ABRAMS:  I think we're in good shape.
15              THE COURT:  I do too.  Good deal.
16              MR. ELY:  Thank you.
17                  (A recess was taken.)
18              (The following proceedings were had in the presence
19    of the jury:)
20              THE COURT:  Can I speak with counsel for just a
21    moment?
22              (Counsel approached the bench and the following
23    proceedings were had:)
24              THE COURT:  The issue has been resolved.  So back on
25    the normal schedule.  Once we get through today, we've got a
                              1014
```

```
 1   lot of things to talk about.  I won't waste your time now.

 2          MR. ELY:  Very good.

 3          MR. ABRAMS:  Thank you.

 4        (The proceedings returned to open court.)

 5   ROCCO CALACI, being duly sworn by the courtroom deputy,

 6   testified:

 7   DIRECT EXAMINATION BY MS. McMULLIN:

 8   Q    Good morning.

 9   A    Good morning.

10   Q    Can you please introduce yourself to the jury.

11   A    Hi.  My name is Rocco Calaci.

12   Q    And what do you do, Mr. Calaci?

13   A    I'm a meteorologist.

14   Q    And what is a meteorologist?

15   A    A person who deals with weather elements, forecasting,

16   observing, reporting.

17   Q    And where do you work?

18   A    Fort Walton Beach, Florida.

19   Q    Do you work for a specific company?

20   A    Yes, mine.

21   Q    What's it called?

22   A    LRC Services.

23   Q    What do you do at LRC Services?

24   A    I do site-specific forecasting.  That means for an exact

25   point.  I do site-specific observing.  I do data research.  I
```
1015

```
 1   do general weather consulting, and I do forensic meteorology.
 2   Q    And what is forensic meteorology?
 3   A    It's basically a reconstruction of weather events after
 4   the fact.
 5   Q    Tell us a little bit about your educational background.
 6   A    I have a bachelor's degree from Eastern Illinois
 7   University.  I have a master's degree from Troy State
 8   University.  I've completed multiple meteorology schools
 9   through the Department of Defense.  I've given many, many
10   seminars across the country on meteorology, things like that.
11   Q    You mentioned your classes or courses at the department
12   of defense.  What were those in?
13   A    They were all in meteorology, things like -- we would
14   have things like atmospheric physics, cloud physics,
15   trigonometry, precalculus, tropical meteorology, satellite
16   meteorology.  Pick a subject and put meteorology after it, and
17   I probably took it.
18   Q    How long have you been working in the field of
19   meteorology?
20   A    For 54 years.  I'm an old guy.
21   Q    Well, tell us a little bit about that.  Where did you
22   get your start?
23   A    I got my start in the United States Air Force.  I was in
24   the Air Force for 20 years as a meteorologist.  And four of
25   those years, I was an instructor of meteorology for the
                            1016
```

1 Department of Defense.

2  Q    And what did you do after that?

3  A    Well, the Air Force then sent me to other locations.

4 But once I retired, I worked on the development of what we

5 call NEXRAD.  You know, on TV and you look at the weather

6 portion of it, you see that nice colorful radar with all the

7 different colors?  That's called -- that's a Doppler radar or

8 NEXRAD, as we call it, and I assisted in the development of

9 that.

10  Q    And where else have you worked as a meteorologist?

11  A    All over the world.  All over the United States.

12  Q    You mentioned this, and I want to mention it because I

13 think it's pretty cool.

14        Have you worked for the White House.

15  A    I did for four years.

16  Q    What were you doing there?

17  A    I provided daily weather support and weather forecast to

18 the White House for things like, you know, possible events at

19 the White House or when the helicopter had to land or take off

20 from the White House.  I even did the weather forecast for the

21 2004 presidential inauguration.

22  Q    Do you have any certifications or licenses in

23 meteorology?

24  A    I was federally certified as a meteorologist from 1968

25 to 2007, and then I had a certification from the Norwegian
                              1017

1    Institute of Meteorology from 2010 to 2012.  And then I was

2    certified for site-specific severe weather forecasting from

3    2015 to 2017.

4    Q    What do you have to do to keep up those certifications

5    and licenses?

6    A    Too much.  First, after graduation from school, then

7    you -- like when I was in the military, for example, you would

8    graduate from your school, your course that was very long.

9    And then you would have to have eight weeks of what they

10   called on-the-job training.  After the eight weeks, you have

11   to take a 100-question test, closed book, and they give you

12   three hours.  And you had to get 85 to pass.

13          Then you had to do this every six months to maintain

14   your certification; you know, keeping up with education,

15   things that are happening.  So I did that from 1968 to 2007

16   every six months.

17   Q    So how did you get involved in this case?

18   A    I was contacted by Mr. Mike Abrams.  It would be

19   December of 2020.

20   Q    And what did he ask you to do?

21   A    He asked me to basically collect and look at the weather

22   data that occurred on the date of the fire, September 27th,

23   2018, and to look at the weather data included in the two

24   reports of a Dr. Batterman and a Dr. Schroeder.

25   Q    And how many times in your 54 years of experience have

                                  1018

```
 1   you done an analysis like this?

 2    A    Thousands.

 3    Q    Now, why is it important for a meteorologist or a

 4   forensic meteorologist to look at weather data in an analysis

 5   like this instead of, say, just relying on the data itself?

 6    A    You have to understand the source of the data, the

 7   reliability of the data, and the applicability of the data at

 8   the site-specific location.  For example, here, you know, the

 9   Metropolitan was 4 miles away from the airport.  Well, that's

10   a big distance, and weather could be vastly different at

11   times.

12          During this time, there was cloud cover, and

13   temperature was 72, dew point was 71.  So that told me the

14   cloud cover would be very dense and thick because of the high

15   relative humidity.  And, again, because -- when you take data

16   from an airport, it's a wide-open space, so the winds can blow

17   unobstructed.

18          But when you're in a city and you're surrounded by

19   buildings, the winds can do a variable number of things.  So

20   you have to understand the difference and understand how to

21   apply the data.

22    Q    And you mentioned reliable data.  How do you know or

23   what did you review in this case that was reliable data?

24    A    The only data that I considered to be reliable comes

25   from the National Weather Service; because other agencies,
```

1019

| | |
|---|---|
| 1 | they don't go through quality control or verification |
| 2 | processes listed by the National Weather Service. We don't |
| 3 | know what type of equipment is used by other agencies. We |
| 4 | don't know if they are up to the standards. There's a wide |
| 5 | variety where data from the National Weather Service has to |
| 6 | meet specific standards and regulations. |
| 7 | Q    What happens if you use unreliable data? |
| 8 | A    If you use unreliable data, there's a good probability |
| 9 | that you may have an inaccurate conclusion. |
| 10 | Q    Now, we'll go over each one of these in more detail, but |
| 11 | what are the conclusions that you came to in this case about |
| 12 | the meteorological conditions at the time of the fire? |
| 13 | A    I believe there was a low overcast. I believe the |
| 14 | temperatures, and I think the winds coming from the airport |
| 15 | were at the airport. They don't necessarily reflect what |
| 16 | occurred at the Metropolitan during the fire. |
| 17 | Q    And what did that cause you to conclude about |
| 18 | Dr. Batterman and Dr. Schroeder's reliance on that data? |
| 19 | A    That it may have been misinterpreted and that it may be |
| 20 | misleading. |
| 21 | Q    Did you also visit the property? I forgot to ask you |
| 22 | this. |
| 23 | A    I did. |
| 24 | Q    When was that? |
| 25 | A    Excuse me. January 3rd, 4th, and 5th of 2021. |

1020

```
1   Q    We'll get back to that.

2           Now, based on the data you reviewed and you

3   mentioned a little bit earlier about the temperature and the

4   cloud cover, but what was the weather like on September 27th,

5   2018, at the time of the fire based on your assessment?

6   A    Again, overcast skies, low overcast, probably around 800

7   feet as in the airport.  The winds would be very light and

8   variable in the conditions at the Metropolitan.  And, again,

9   because of dew point and temperature closeness, I would expect

10  the clouds that were overhead to be very thick and very dense.

11  Q    You said something.  You said light variable winds.

12  What does that really mean?

13  A    It means the wind speeds are less than 5 miles an hour,

14  and the direction can change at any second.  Federal

15  regulations state that if you have wind speeds of 5 -- of more

16  than 5 miles an hour, you have to have a specific wind

17  direction.  But when they're light and variable, like under 5

18  miles an hour, they expected winds to change direction all the

19  time.

20          MS. McMULLIN:  Can you go to slide 2.

21  Q    (BY MS. McMULLIN) Mr. Calaci, I'm going to show you a

22  figure from your report, figure -- or page 4.  What are we

23  looking at here?

24  A    That's what we call a surface weather analysis from the

25  National Weather Service, and it shows a stationary front
```

1021

|     | running along the East Coast through the Southeast, through |
| --- | --- |
| 1   | running along the East Coast through the Southeast, through |
| 2   | northern Alabama, out to the Gulf and out to the Southwest. |
| 3   | Q    And what day is this for? |
| 4   | A    This is for September 27th, 2018, at one o'clock in the |
| 5   | morning. |
| 6   | Q    And that's at the time of the fire, right? |
| 7   | A    Correct. |
| 8   | Q    What does this tell us about the weather conditions in |
| 9   | Birmingham, Alabama, and at the Metropolitan at the time of |
| 10  | the fire? |
| 11  | A    I just said that you would probably have low overcast |
| 12  | skies and light and variable winds. |
| 13  | MS. McMULLIN:  Can we go to slide 3. |
| 14  | Q    (BY MS. McMULLIN) Now, this is a figure from |
| 15  | Dr. Batterman's report or a part of a figure.  But does this |
| 16  | map of the Metropolitan show the different phases of the |
| 17  | Metropolitan with the correct orientation of north, south, |
| 18  | east, west? |
| 19  | A    It does. |
| 20  | Q    Okay.  Did you review videos of the fire event from |
| 21  | September 27th, 2018, during your assessment? |
| 22  | A    I did. |
| 23  | Q    Let's take a look at some. |
| 24  | MS. McMULLIN:  Can you move to 4.  That was really |
| 25  | quick.  Can we go back to the beginning? |

1022

```
 1    Q    (BY MS. McMULLIN) What were we seeing in this video?
 2    A    Well, you're seeing the fire raging on the morning of
 3  September 27th.
 4    Q    And where is the smoke going toward, if you can tell us
 5  from this video?
 6    A    That I couldn't tell from this video.
 7    Q    Do you know what's on the left here, whether that's
 8  phase 1 -- phases 1 through 3 on the left here at the picture?
 9    A    I don't know because I don't know where the camera was
10  located.
11    Q    Okay.
12         MS. McMULLIN:  Let's go to the next slide.
13    Q    (BY MS. McMULLIN) Let's take a look at this video.  Now,
14  this has been called the security footage video, I think,
15  throughout the trial.  It was taken from across the street of
16  the Metropolitan.  Have you seen this video before?
17    A    Yes.  Four long, boring hours.
18    Q    We are not going to show all four long, boring hours.
19  But can you tell me what the timestamp is or what the stamp on
20  top of the video says?
21    A    It was taken at 13 -- 12:13 a.m. on the 27th of
22  September 2018.
23         MS. McMULLIN:  All right.  Can you play it?
24    Q    (BY MS. McMULLIN) Just tell us what we're seeing here.
25    A    You're seeing it from across the street at the southern
```

                              1023

1  side of the building, and you can just see the smoke going in

2  different directions.  Like part of it's going to the east.

3  As I was watching it, I would see part of it going to the

4  north.  I would see part of it going to the west, which just

5  showed me and confirmed to me the light and variable winds.

6  Q    And are you able to tell where this is?  Can you see the

7  buildings in the background?

8  A    At the moment, no.

9  Q    Okay.

10         MS. McMULLIN:  Can we go to the next video.

11  Q    (BY MS. McMULLIN) And what's the timestamp on this

12  video?

13  A    This is 2:04 a.m. on the 27th of September 2018.

14  Q    So a little less than two hours after the last clip we

15  just played?

16  A    Correct.

17  Q    Let's play it.  Then can you tell us what we're seeing

18  here?

19  A    Well, now you're seeing the smoke drifting to the west

20  and away -- you know, winds would be light and variable, again

21  coming out of the east and drifting towards the west and then

22  up.

23  Q    So is this consistent with your conclusion that the

24  winds shifted direction throughout the time of the fire?

25  A    Yes.

                              1024

```
 1   Q    Okay.  And if we go back to the map on slide 7.  Okay.

 2            Is it fair to say the wind was not going away from

 3   the Metropolitan north, east, south the entire time?

 4   A    That would be correct.

 5   Q    Now, if we go to slide 8.

 6            This is another figure from your report, page 1.

 7   What does this photograph tell us?

 8   A    Basically what I wanted to do, because the Metropolitan

 9   is surrounded by different buildings and streets, I wanted to

10   show what would be the main orientation of any wind.  Wind

11   coming from the north would most likely come out of the

12   northeast, and then -- excuse me, northwest.  Winds out of the

13   south would have more of a southwesterly component because

14   they're all funneling between the buildings around the

15   Metropolitan.

16   Q    Does this also show the topography of the area

17   surrounding the Metropolitan?

18   A    Yes.  It shows that it's surrounded by buildings, you

19   know, in an urban setup or situation.

20            MS. McMULLIN:  If we can go to the next slide.

21   Q    (BY MS. McMULLIN) Does this better show the topography

22   of the Birmingham airport, the Bessemer airport, and the

23   Metropolitan?

24   A    Yes.  Again, it looks like, you know, airports are wide

25   open.  Again, federal regulations state at airports you have
```

1025

1    to have so many feet around weather equipment, so you'd have

2    an unobstructed flow.  Whereas, in a city setting, you've got

3    all these different buildings that cause the winds to deflect

4    and move in different directions.

5    Q    Is that the only effect that the difference in

6    topography can have without obstructions and in a commercial

7    area is just the wind direction?

8    A    It can also affect the wind speeds.  Sometimes it can

9    decrease the wind speeds, and sometimes it can actually

10   increase the wind speeds based upon how the buildings are

11   oriented.

12   Q    Now, on Monday, we heard from Dr. Robert Schroeder.  And

13   you reviewed his report in connection with your assessment in

14   this case, right?

15   A    I did.

16   Q    Okay.  On Monday he testified about the mixing height at

17   the time of the fire that he forecasted.  Can you tell us what

18   that is?

19   A    Mixing height is a fancy term we use so that -- so when

20   the temperature reaches a certain value, it causes turbulent

21   mixing of the winds in the lower levels; let's say, below a

22   thousand feet.

23          And on that day, Dr. Schroeder had a forecast of the

24   mixing level at 4,800 feet, but he never said what it was used

25   for, why it was useful, why he needed that.  And he never --
                                 1026

```
 1   from reading his report, didn't place any information on was
 2   the mixing level verified, did it actually occur.  And because
 3   a fire was so early in the morning, we had very dense cloud
 4   cover, you wouldn't get the necessary surface heating for the
 5   temperature to go up to a specific level and create a mixing
 6   height.
 7   Q    Let's talk about that a little bit.  You said earlier
 8   that the cloud cover at the time of the fire was confirmed to
 9   have been about 800 feet; is that right?
10   A    Correct.
11   Q    Okay.  And what does that mean for your analysis of the
12   fire?  What does the cloud cover have to do with any of it?
13   A    Well, the lower the cloud cover, including the density
14   of the cloud cover, it acts like a cap on the smoke.  Again,
15   federal regulations state that when meteorologists observe
16   smoke layers, we have to report it.  And we also have to
17   report things like the layer, the cloud layer, the -- where
18   the smoke is going, which direction.
19          So knowing where the cloud layer was at 800 feet,
20   that would act like a cap.  So as the smoke would go up and
21   out, it would hit that cloud layer, and then it can go in any
22   direction.
23   Q    Switching topics, one of your other conclusions in this
24   case is that Dr. Schroeder and Dr. Batterman's data that they
25   relied on from the Birmingham, Bessemer airports was
```

1027

```
 1    inaccurate, flawed, or misinterpreted.  Can you explain what
 2    you mean?
 3    A    Well, first, again, as I stated earlier, you've got to
 4    understand that the weather at the airport and the weather at
 5    the Metropolitan, you know, don't always have to be the same.
 6    It's kind of like, you know, if you -- if your house was
 7    burglarized and the detectives come before they -- come and
 8    get the evidence, instead of coming to your house, they went
 9    to a location 4 miles away.
10            You know, you're not going to get the correct
11    information.  You have to know what happened at the
12    Metropolitan.
13    Q    And what sources of information did Dr. Batterman and
14    Dr. Schroeder use in their fire analysis?
15    A    They used data, one, from the Birmingham airport 4 miles
16    away and then from the Bessemer airport 16 miles away.
17    Q    And what were the sources of that data?
18    A    The National Center for Environmental Information, which
19    is same as the National Weather Service, and the Weather
20    Underground.
21    Q    And what is Weather Underground?
22    A    It's a website that allows -- it collects a lot of
23    weather data, but they collect it from various sources.  They
24    have a network.
25            A lot of people are weather geeks.  I'm a weather
                              1028
```

```
 1   geek.  And they put up weather stations in their backyards,
 2   you know, to look at the weather.  I have one myself.  So what
 3   they do is they allow you to put up your weather station,
 4   connect it to the internet so that all the data that shows up
 5   on your weather station goes out to the internet.
 6           The problem with that is we don't know what type of
 7   equipment.  We don't know if it's been standardized or
 8   calibrated.  We don't know if it's in conjunction or in
 9   accordance with federal regulations.
10           I can tell you from personal experience, my weather
11   station doesn't meet any federal regulations, you know, but I
12   don't -- I'm not connected to the internet.  So I'm the only
13   one who knows what happens.
14           But anyway, you can have these irregularities in the
15   weather -- in the data in the Weather Underground, and I've
16   seen it happen multiple times.  So you have to, again, know
17   the data source and know the reliability of the data.
18   Q   Can you give us an example of one time that you found
19   that Weather Underground source of data was completely
20   inaccurate or unreliable?
21   A   About seven years ago, I get contacted by a friend of
22   mine who's doing data analysis, and he says there's something
23   going on in Las Vegas.  He pulled up a weather report from the
24   Weather Underground that showed that there was a station in
25   Las Vegas, north Las Vegas, that hit 99 miles an hour every
```
1029

Saturday afternoon.

Well, first thing I know, there's no weather that works on a schedule. So I knew it couldn't be weather. So the Weather Underground allows you to actually pinpoint where that data comes from, and I knew the house number and the street of where this data came from.

So I had a good friend of mine who lived in Las Vegas go out to the house. He introduced himself, explained why he was there, and he said, Can you explain why your weather station is reporting 99 miles an hour every Saturday afternoon?

From what I was told, the gentleman, the owner of the house laughed and said that every Saturday afternoon, he took his leaf blower and cleared off his driveway of dirt and dust. And every Saturday afternoon, he put the leaf blower up against his weather station because he liked to see the little cups go around. That reported 99 mile-an-hour wind every Saturday afternoon.

Q    If we can go to the next slide. Let's look at a little bit of the data Dr. Batterman relied on. What is this chart?

A    This is the information from Dr. Batterman's report and -- on the left or in the middle and on the right are the actual wind measurements from those times from the Birmingham airport.

Q    Okay. There's a lot of numbers on here. So can you

                                    1030

```
 1   just explain to us, for example, on the first line, what are

 2   we seeing?  What does all this mean?

 3    A    On the left side, it says 0053.  That's government or

 4   military talk of 12:53 in the morning.  Dr. Batterman said

 5   that there was no direction, but the winds were 3.4 miles per

 6   hour.  Whereas, the information from the Birmingham airport

 7   said the winds were basically from the southeast at 1 mile per

 8   hour.

 9    Q    Did you find multiple examples of these inaccuracies

10   between Dr. Batterman's data and the National Weather Service

11   data throughout his report?

12    A    I did.  And what struck me is that Dr. Batterman had

13   wind information in decimal -- using decimals like four-tenths

14   of a mile an hour.  That doesn't occur.  Again, federal

15   regulations state that you've got to have only whole numbers.

16           So like, you know, 5 miles an hour, 6 miles an hour;

17   no 1.7.  So that told me that -- I don't know where

18   Dr. Batterman's 3.4 came from.

19    Q    And did you find any times in Dr. Batterman's report

20   where he lists out all of the hours throughout the fire and

21   the weather data for those hours that it matched with your

22   understanding what the National Weather Service said the data

23   was?

24    A    No.

25           MS. McMULLIN:  We can go to the next slide.
                            1031
```

```
 1   Q    (BY MS. McMULLIN) Is this the chart from Dr. Batterman's
 2   report?
 3   A    It is.
 4   Q    Okay.  Is this just the example of the 3.4 that you saw
 5   where it doesn't match up with the other data that he has here
 6   as well as your own that you went and reviewed?
 7   A    Correct.  For example, if you go down to the line and
 8   read 1:53 a.m., if you go over to the wind speed, they're
 9   saying -- he says it was calm.  But at Birmingham airport,
10   well, at 1:53, he has nothing.
11        Again, the 3.4, if you look down, you go see 3.4,
12   4.7, those aren't reportable values.  So I don't know where he
13   got that data.
14   Q    And on the right, we see Bessemer airport in the top
15   right.  Now, you mentioned that he relied on that airport data
16   as well.  What's wrong with that?
17   A    It's 16 miles away.  I mean, you might want to know what
18   the weather was 16 miles away if you had an approaching storm.
19   But under these conditions, Bessemer airport data is
20   irrelevant.
21   Q    And if we look at the column where it actually says wind
22   direction, where you see the calm, calm, and you see south,
23   southeast quite a few times, is that what Dr. Batterman
24   reported for a couple of hours during the fire?
25   A    He -- well, he was mostly saying they were south,
                              1032
```

```
 1   southeast, but then he was reporting calm.  And you could see
 2   at the airport, it was south, southeast at 3 miles an hour;
 3   south, southeast at 5 miles an hour.  And then you turn around
 4   and -- but now he's saying 160 degrees, which is totally
 5   different, and 3.4 miles an hour.
 6   Q    Let me ask you this:  South, southeast, if that's
 7   reported there, is that where the wind is coming from or going
 8   to?
 9   A    That's where the wind is coming from.
10   Q    Even if that was correct, if it was coming from the
11   south, southeast, what direction would that put the smoke at
12   the time of the fire?
13   A    It would basically making it go this way.
14   Q    And is that consistent with what you saw on the videos
15   just a couple of minutes ago?
16   A    I saw the fire -- the smoke going in every direction.
17   Q    And you mentioned the site inspection at the
18   Metropolitan.  Tell us about that.
19   A    I need to know how the subject property, the
20   Metropolitan, how the winds react there versus the airport.
21   So I went out and did a site inspection, myself and my
22   assistant.  We stood at opposing sides of the building around
23   the block like, for example, here, here, or here and here.
24   And what we would do is we'd take simultaneous wind
25   measurements every minute to see what was happening.
```
                              1033

```
 1              And then I compared them to the same time from the
 2       Birmingham airport.  At no time did the winds from my site
 3       inspection match the winds from the Birmingham airport, and
 4       they even had different directions.
 5              Now, I wasn't trying to reconstruct what happened
 6       the day of the fire, the morning of the fire.  I was just
 7       trying to show that, again, what happens at the airport does
 8       not necessarily reflect what's happening at the Metropolitan.
 9   Q    And are you aware if Dr. Batterman or Dr. Schroeder took
10       any site inspections or measurements at the Metropolitan for
11       their analysis?
12   A    I don't know that.
13   Q    And from the data you reviewed and the videos of the
14       fire that you looked at and your own site inspection, were you
15       able to tell whether the variable wind directions at the time
16       and day of the fire were forcing the smoke in one direction or
17       in every direction?
18   A    Well, you could see on the video, they were going in
19       different directions.
20              MS. McMULLIN:  That's all I have.
21   CROSS-EXAMINATION BY MR. ELY:
22   Q    Good morning.
23   A    Good morning.
24   Q    How are you?
25   A    I'm fine, thank you.
                                     1034
```

```
 1   Q    I'm Brenen Ely.  I'm a lawyer at Ely & Isenberg in

 2   Birmingham, Alabama.  It's nice to meet you.

 3   A    Nice to meet you, Mr. Ely.

 4   Q    So couple questions.  First of all, I want to start

 5   with --

 6            MR. ELY:  Can we go to Plaintiff's Exhibit 147, page

 7   12, please.

 8   Q    (BY MR. ELY) Do I pronounce your name Mr. Calaci?

 9   A    Calaci, yes.

10   Q    Thank you.

11            So, Mr. Calaci, with respect to the wind speeds at

12   the -- I just want to talk about the wind speeds at the

13   Birmingham airport during the duration of the fire.  Did you

14   make a study of that weather service data?

15   A    Excuse me?

16   Q    Did you make a study of that weather service data, the

17   National Weather Service?

18   A    Yes.

19   Q    Can you tell us -- and you understand the fire started

20   around midnight?

21   A    Correct.

22   Q    So can you tell us, is the -- what we're looking at on

23   page 12, the right column, KBHM.  What's KBHM stand for?

24   A    That's the identifier for the Birmingham airport.

25   Q    Okay.  And so the column I'm looking at on the right is
```

1035

```
 1   what the Birmingham airport reading was at these different

 2   times the night of the fire?

 3   A    Correct.

 4   Q    And for us civilians, that's 12:53 a.m., 1:53 a.m., 2:53

 5   a.m., 4:35 a.m., and 5:53 a.m., correct?

 6   A    Correct.

 7   Q    So do you have any data that you've looked at that shows

 8   any wind speeds any higher than 1, 3, 3, 2, and 3 during that

 9   five-hour period?

10   A    There were some, yes.

11   Q    What is -- what data did you look at, and tell me those

12   speeds.  I need to understand what your research revealed was

13   the Birmingham airport data.

14   A    The Birmingham airport wind equipment records the wind

15   speeds every one minute.  So I downloaded the one-minute data

16   from the Birmingham airport.  So I had 60 wind observations

17   every hour.  And then I matched up the times with

18   Dr. Batterman and reported exactly what happened at that

19   specific time because I had the whole day's worth of

20   one-minute wind speeds.

21   Q    Okay.  So the table on the right is coming from your

22   research?

23   A    Correct.

24   Q    Okay.  In that period of time, was there any period of

25   time that the wind speeds were higher than 3 miles an hour?
                               1036
```

```
1    A    Yes.

2    Q    Tell me about that.  Tell me about those times and what

3    the speeds were.

4    A    I don't have the exact times, but there were times of 5

5    miles an hour, 7 miles an hour, some as high as 17 miles an

6    hour in the mid morning hours.

7    Q    In the mid morning, that would be --

8    A    Ten o'clock.

9    Q    Okay.  The next day?

10   A    The same day, 10 o'clock in the morning.

11   Q    Ten hours after the fire started?

12   A    Correct.

13   Q    Okay.  And I believe that you mentioned that you went to

14   the site in January of 2020?

15   A    2021.

16   Q    2021.  Tell me what you did out there.

17   A    Well, first, I walked around the building.  I just

18   wanted to get myself oriented to what was -- the building was

19   shaped like.  And then I actually tried to talk to some people

20   if they were there for the fire.  I talked to two individuals.

21   Neither one was there during the fire; so they couldn't give

22   me any useful information.

23        And then I went and we started setting up our -- you

24   could say our wind readings.  As I said, myself and my

25   assistant, we stood at opposing sides of the building, took
```

```
 1   one-minute wind readings to see how they were from one side of

 2   the building to the other.  And we recorded those and marked

 3   them down so we could see the wind direction, how the wind

 4   direction acted.

 5          And then I compared it to those exact same times

 6   from the Birmingham airport and found out that what was

 7   reported at the Birmingham airport was different from what I

 8   was actually measuring at the Metropolitan.

 9   Q    Okay.

10          MR. ELY:  Let's take a look at page 20, please, same

11   document.

12   Q    (BY MR. ELY) So as I understand your opinion that you

13   gave in this case, there were two aspects that you were

14   looking for.  Number one, you're looking at wind speed?

15   A    Correct.

16   Q    And the second one, you're looking for direction?

17   A    Correct.

18   Q    And if I'm correct in what you did, you were standing on

19   the ground?

20   A    Correct.

21   Q    And were holding a pole up in the air?

22   A    No.  I had a handheld.  So it was about maybe 7, 7 and a

23   half feet off the ground.

24   Q    So you had a handheld anemometer?

25   A    Yes, I did.
                              1038
```

```
1    Q    And your associate did also?

2    A    Correct.

3    Q    So, you know, 8 feet off the ground, 9 feet?

4    A    She was shorter.  She'd be down closer to 6 feet.

5    Q    Okay.  Fair enough.

6         What did you discover about the speed readings you

7    got standing on the ground at the Metropolitan holding up the

8    anemometer compared to the Birmingham airport?

9    A    They were lower.  Because as you get lower to the

10   ground, wind speeds start to decrease; whereas, the winds at

11   the airport are taken 33 feet off the ground so that I would

12   expect a difference.

13        But at the same time, what struck me mostly was,

14   again, was the direction, the variability of the directions.

15   Q    Sure.  Let's talk about speed for just a minute.  Stay

16   on one thing.

17   A    Sure.

18   Q    Did you determine a percentage of drop in the wind speed

19   from the Birmingham airport readings to what you got at the

20   Metropolitan?

21   A    Based upon the wind speeds at the Birmingham airport,

22   there was no -- the wind speeds would have been about what I

23   got; about, you know, between 1 to 2 miles an hour.

24   Q    Well, so explain to me -- here's what I'm looking at on

25   page 20 of this -- this is your report?
```

1039

```
 1            So am I to understand the -- let's go from column to

 2   column.  The left column there where it says .1, that's the

 3   time you're making your readings at the Metropolitan, correct?

 4   A     That was at point one, yes.

 5   Q     Yes.  Okay.  So you're standing there with an anemometer

 6   at 10:51?

 7   A     Correct.

 8   Q     And you're reporting a wind direction of southeast?

 9   A     Correct.

10   Q     At 1.6 miles an hour?

11   A     Correct.

12   Q     Let's look at the next one at 10:53, southeast 1.7.

13   A     Correct.

14   Q     What were you seeing at the Birmingham airport in terms

15   of the speed?

16   A     It was 5 miles an hour.

17   Q     Okay.  So significantly less where you were standing

18   than what it was reading at the Birmingham airport?

19   A     Correct.

20   Q     Okay.  And that's to be expected, right?

21   A     It is.

22   Q     So I want to go down to 11:53.  Same thing, anemometer.

23   It got a little faster at the Metropolitan; got 3.4.  But

24   what's the speed at the Birmingham airport?

25   A     8 miles an hour.
                              1040
```

1   Q    Okay.  So less than half?

2   A    Correct.

3   Q    Okay.  So if the wind speed the night of the fire was

4   between 3 to 5 miles an hour during that five-hour period we

5   just discussed, what would you expect the wind speed to be at

6   the Metropolitan at the same time?

7   A    Light and variable.

8   Q    1 and a half miles an hour?

9   A    1 and a half to 3 miles an hour.

10  Q    Your data here shows that it's reduced by less than half

11  each time.

12  A    On that data point.  What you can't -- what's the word

13  I'm looking for?  You can't reject the fact that Dr. Batterman

14  took the weather at the airport at 33 feet in the air and then

15  try to use it.  Now, if Dr. Batterman had taken -- if there

16  were wind recordings taken during the fire, that would be a

17  more objective comparison because then you could see what was

18  actually happening to what was happening at the airport.  But

19  you wouldn't need the airport data because then you would have

20  realtime observations there.

21  Q    Sure.

22  A    But in this case, trying to take data from 4 miles away

23  and then bringing it over to the -- bringing it over to the

24  Metropolitan, like I said, you could have -- we've all been to

25  areas where it's raining in one spot and not in the other,

                              1041

```
 1   things like that.
 2            So, again, trying to use the data from the airport
 3   to project what was happening at the Metropolitan would be --
 4   would lead you to an incorrect assumption.
 5   Q    Okay.  Back to my question.  The night of the fire, did
 6   you have an opinion whether the wind speeds on the ground next
 7   to the Metropolitan would be less than what was being read at
 8   the Birmingham airport?
 9   A    I would think that they would be less because they were
10   getting closer to the ground, but they would still be light
11   and variable.
12   Q    So what we're talking about is if we've got 3 miles an
13   hour at the Birmingham airport, and based on your data and
14   your research and your experiment out there, standing there at
15   the same height, 10 feet the night of the fire, we're looking
16   at a wind speed that is substantially less than even 3 miles
17   an hour, correct?
18   A    We don't know because we don't have realtime
19   observations, but my conclusion would be that they would still
20   be light and variable.
21   Q    And light and variable is less than 5?
22   A    Less than 5, and the wind direction changing rapidly.
23   Q    Okay.  And so along those same lines, you said that -- I
24   believe you just told me that you're not willing to make that
25   extrapolation from your data, from the Birmingham airport as
                              1042
```

```
 1   to what the wind speed was at the time -- the night of the

 2   fire, correct?

 3    A    Oh, I said that I agreed with you that the winds would

 4   probably be less than what was reported, but they would still

 5   be considered light and variable.

 6    Q    Understand.  So would you also agree with me that the

 7   best evidence of the airflow the night of the fire would be

 8   actual realtime video?

 9    A    Not having realtime observations, I would say the video

10   would be a very good indicator.

11    Q    Okay.  Now, I want to talk about direction for a minute.

12   You mentioned that the direction -- you noticed the direction

13   variation between the airport and the Metropolitan, correct?

14    A    Correct.

15    Q    And you attribute that to the fact -- I mean, we're

16   talking about buildings, right?

17    A    Correct.

18    Q    And things go around buildings, and the Birmingham

19   airport is a 30-foot pole?

20    A    33 feet, yes.

21    Q    33 feet.  33-foot pole in the middle of an airfield,

22   correct?

23    A    Correct.

24    Q    So it's a straight shot.  So would you agree with me

25   that the lighter the wind, the less the impact on smoke?
```

1043

```
 1    A    Not at all.  Not at all.

 2    Q    You won't agree with me that a 10-mile-an-hour wind has

 3  a greater impact than a 1-mile-an-hour wind?

 4    A    Oh, on that subject, on that, yes.

 5    Q    Yes.  I'm sorry.  That was a bad question.  Okay.

 6         So you mentioned in your report that the wind speeds

 7  were very low, were lower where you were standing as compared

 8  to the Birmingham airport, and you agree you were -- you were

 9  10 feet high, right?

10    A    Like I said, maybe 7 and a half.

11    Q    7 and a half.  Okay.  I'm making you pretty tall.

12    A    You're making me pretty tall.

13    Q    Did you go to the top of the Metropolitan and make any

14  wind measurements?

15    A    Excuse me?

16    Q    Did you go to the top floor or the roof and take any

17  wind measurements up there?

18    A    Oh, I don't do roofs; so the answer would be no.

19    Q    So if you went to the roof, can you tell me based on

20  your experience, what would -- would the speeds be more

21  similar to perhaps the Birmingham airport?

22    A    I don't know because, again, this is -- it's situational

23  depending on when you did it.  When I went up there, I tried

24  to simulate the same weather situation; meaning, higher

25  pressure, more stable atmosphere.  If you went up there when a
                           1044
```

```
 1    storm was approaching, you could have an entirely different
 2    situation.
 3    Q    Well, sure.  And I'm not -- so if you go to the top of
 4    the Metropolitan, are you going to get the same directional
 5    variations you're going to get on the ground if you're above
 6    the buildings?
 7    A    You may, yes.
 8    Q    Is it going to be -- is it going to be a different -- is
 9    the directions of the airflow -- are the directions of the
10    airflow and the air currents going to be different at the top
11    of the building versus on the ground?
12    A    As I said, they could be, yes.
13    Q    Okay.  So I want to discuss this real briefly with you.
14    You mentioned cloud cover.  We've got a ceiling of 800 feet --
15    A    Correct.
16    Q    -- the night of the fire, correct?
17         You mentioned that you -- you believe that it was a
18    thick cloud layer?
19    A    Correct.
20    Q    How thick?
21    A    Based upon the data and based upon 54 years of
22    experience, I would say at least two to three hundred feet
23    thick.
24    Q    But what data did you look at to come up with that
25    calculation?
                          1045
```

1    A    One, I looked at the temperature dew point at the

2    airport; and, two, the -- I looked at the observations that

3    told me the thickness of the layers.

4    Q    Okay.  Did you do that calculation and put it in your

5    report?

6    A    I didn't see a reason why.  I would just -- what's

7    interesting is the fact that you have the cloud cover, dense.

8    And based on all my observations for smoke layers, I've always

9    seen smoke going up if it's a low overcast, hitting the

10   ceiling and then starting to spread out over different

11   directions.

12   Q    In this particular instance, you're not stating an

13   opinion about how the plume behaved in relation to the cloud

14   cover, are you?

15   A    No.

16   Q    Okay.  So you've not done any studies on how the

17   plume -- a hot plume reacts with a cloud -- with cloud cover,

18   are you?

19   A    I am not.

20   Q    Okay.  With respect to the night of the fire, when you

21   looked at the video, made observations, have you done any

22   studies regarding any airflow patterns that were occurring in

23   or around the Metropolitan the night of the fire?

24   A    I did not because we don't have any realtime observation

25   data.

                              1046

```
 1   Q    Okay.  Is it possible that airflow patterns created by a
 2   fire or a burning fire could negate any sort of weather data?
 3   Meaning, if you have a light prevailing wind, that may have no
 4   impact on what's going on at the time of the fire, the airflow
 5   around the fire?
 6   A    The little that I know about fire science is that
 7   sometimes fires can create their own little weather patterns.
 8   Q    Okay.  But you're not opining on that in this case?
 9   A    I am not.
10        MR. ELY:  Nothing further, Mr. Calaci.  Thank you
11   very much.
12        MS. McMULLIN:  Just a few questions, Your Honor.
13   REDIRECT EXAMINATION BY MS. McMULLIN:
14   Q    Mr. Calaci, why can't you or anyone else tell us what
15   the wind speed and the direction of the wind was at the day
16   and time of the fire?
17   A    There was no weather equipment there to record it.
18   Q    And you mentioned light variable winds.  That means what
19   for the smoke at the time of the fire?
20   A    That means that it's going to shift.  It's going to
21   move.  As you can see in the video, I could tell when I was
22   watching it, again, that long four-hour video, lots of time I
23   could see the smoke moving away from the security camera.  I
24   could see it moving to the right of the security camera.  I
25   could see it moving to the left of the security camera.
                            1047
```

```
 1              Only one time when the firemen threw water on a
 2    flame in the corner did I see it billow up towards the
 3    security camera.  But, otherwise, it was either going to the
 4    right away from the camera or to the left of the camera.
 5    Q    And what type of wind speed is required for this type of
 6    fire event for the smoke to just simply go in one direction
 7    the entire time?
 8    A    It would probably need consistent, I would say, 10 miles
 9    an hour.
10    Q    And you didn't see that here?
11    A    No.  There was nothing.  It didn't occur.
12    Q    Mr. Ely asked you about your site inspection, that you
13    didn't go on the roof.  I know you don't like roofs.
14              Do you know if anyone from Travelers ever did any
15    type of wind direction analysis at the Metropolitan, let alone
16    on the roof?
17    A    I'm unaware of any.
18              MS. McMULLIN:  That's it.  Thank you.
19              MR. ELY:  Nothing further, Your Honor.
20              THE COURT:  Thank you.
21              THE WITNESS:  May I step down?
22              THE COURT:  You may.
23              THE WITNESS:  Thank you.
24              MR. ABRAMS:  Your Honor, you ready for the next
25    witness?
                              1048
```

```
1   ADAM FARNHAM, being duly sworn by the courtroom deputy,

2   testified:

3   DIRECT EXAMINATION BY MS. MCMULLIN:

4   Q    Good morning.

5   A    Good morning.

6   Q    Can you introduce yourself to the jury?

7   A    Yes.  Ladies and gentlemen, I'm Adam Farnham, fire

8   protection engineer.

9   Q    And you said you're a fire protection engineer.  What

10  does that mean?

11  A    Basically I have a master's degree from the University

12  of Maryland, and I've been working in the area of fire

13  protection systems, design, and analysis and the fire growth

14  and smoke growth and transport and things like that since

15  about 1989, something like that.  It's sort of a subset of

16  mechanical engineering that deals specifically with fire and

17  fire safety systems.

18  Q    And where do you currently work?

19  A    For Envista Forensics.

20  Q    What does Envista Forensics do?

21  A    We handle a bunch of analyses basically for law firms,

22  insurance carriers, and private parties.

23  Q    What do you do at Envista Forensics?

24  A    I look for -- well, I do analyses on things that break

25  primarily involving mostly fire protection systems and how
```

1049

```
 1    they relate to the built environment and people in it, in the
 2    environment.
 3    Q    What's your title?
 4    A    I apologize.  I'm probably rushing here.
 5         I am a regional technical leader.  I'm in charge of
 6    the western region engineers, everything from basically Denver
 7    west, mechanical, electrical engineers.  And also in charge of
 8    the fire protection division, if you will.  There's only two
 9    of us in the division; so it's a pretty small operation at
10    this company.
11         But I handle mostly -- I do assignments and quality
12    control for the larger group of guys and gals, but I also will
13    take on casework involving fire protection systems and things
14    like that.
15    Q    You mentioned earlier, I heard failure analysis.  What
16    does that mean?
17    A    Basically things that break.  We have -- gosh, it's
18    amazing really what breaks out there.  A lot of analyses of
19    piping failures that involves like the sprinkler system over
20    our head.  If a pipe failed in that due to a freeze or really
21    anything, then they would ask me -- a lot of cases they would
22    have me out to find out, well, who looked at it, when they
23    should have looked at it, what they should have done and why
24    it ultimately failed.
25         So it's basically dealing with mechanical systems
```
1050

1  that fail.

2  Q    And your expertise is in fire protection systems, right?

3  A    Correct, yes.

4  Q    Now, you mentioned your master's degree, but tell us all

5  about your educational background.

6  A    Okay.  It started a long time ago.  I have an

7  undergraduate from Virginia Tech in Blacksburg, Virginia,

8  about nineteen eighty -- maybe I shouldn't talk about that.

9  Pretty old.

10        And then I got a graduate degree in fire protection

11  engineering from the University of Maryland in '99.  And since

12  then, I also have, what, a certified safety professional

13  designation.  I'm a registered fire protection engineer in a

14  number of states, most of the western states.

15        What else do I do?  I wear a lot of hats at the

16  company; so it's hard to break it down.  I'm also really bad

17  about speaking about myself.

18        I have a lot of recurrent education that I'm

19  required to do to keep up on all that.  So there's a lot of

20  points involved with that.

21        Oh, I'm also a certified fire investigator and

22  certified fire and explosion investigator.  And those are two

23  separate designations from two different bodies.  I'm on the

24  board in the Northwest Fire Investigators Group.  And nobody

25  else wanted it, so they gave me the treasurer position.
                            1051

1  Q   To keep up with these types of certifications,
2  especially the fire investigator one, what are you having to
3  do?
4  A   Yeah.  Most fire investigator designations require
5  recurrent training.  It's about 40 hours worth of training
6  every five years.  The PE designations are very similar in
7  terms that you have to have a number of points for whatever
8  jurisdiction you're in.  They have very specific requirements
9  usually for recurring education and things like ethics and
10  various different types of casework to make sure that you're
11  following the laws and rules that are established.
12  Q   And you said PE.  I don't know if anybody knows what
13  that means.  Can you explain what that is?
14  A   Yes.  Yeah.  That's professional engineering
15  designation.
16  Q   And you have a license as a professional engineer?
17  A   Yes.  So basically that guarantees that I don't just say
18  that I can do fire protection engineering, but I'm actually --
19  you need to get five years of experience.  It's kind of like a
20  trade position, I guess, in a way.  You need five years of
21  experience and need to work for people that are willing to
22  sign off on that experience.
23        Then you have two tests; one, a generic test in
24  matters of engineering; and then a second test in your area of
25  specialty.  I had to pass all that.

1052

```
 1    Q    You mentioned you worked at Envista Forensics.  What did

 2   you do before you worked there?

 3    A    Many different things, but similar.  I started off back

 4   in the day as an insurance authority having jurisdiction

 5   working for industrial risk insurers.  It's kind of like a

 6   fire marshal position where I would do analysis of buildings

 7   and structures and make sure they met codes and standards

 8   relating to fire protection and building construction.

 9            From there I went -- what have I done?  I've been

10   doing this for, gosh, 40 years.

11            I worked for a forensic firm in the '90s out of

12   Annapolis, Maryland, and that was my first foray into

13   forensics.  It was very interesting because I like to figure

14   out why things break, and it just suited me really well.

15            My wife at the time said she wanted to move to

16   Washington state.  So we moved across the country.  Then I got

17   a job in Washington working for a design firm where I was the

18   head of the fire protection department where we basically

19   integrated different types of system, like smoke control and

20   sprinkler systems and high expansion foam, things like that,

21   into buildings.

22            And then from there I went back into forensics,

23   worked for a company called GT Engineering out of Redmond for,

24   gosh, many years.  Stayed there way too long, and then got an

25   offer from -- well, Exponent made me an offer after that, and
```

1053

```
 1   I was there for a few years.  Then I worked for -- sounds like
 2   I've had a lot of jobs.
 3          Let's see.  I worked for -- oh, EFI Global.  And
 4   Envista, where I currently work, they were after me the whole
 5   time, and I kept saying, No, I'm fine, no, I'm fine.  Then
 6   they finally made an offer, and I was like, Hold on a minute,
 7   I've got to talk to my wife.  They finally made me an offer
 8   that I couldn't refuse, and so here I am.  And I've been here
 9   a little over two years.
10   Q    Where is Envista Forensics located?
11   A    We're nationwide, but the office I work out of is in
12   Redmond, Washington.
13   Q    You mentioned an insurance company.  Have you actually
14   worked for Travelers Insurance Company as an expert before?
15   A    Yes.
16   Q    Now, how did you become involved in this case?
17   A    They called and asked if -- because on our website, we
18   have a big marketing presence, and our website has a
19   description of things that we can do, and they were looking
20   for someone who could do an analysis of fire growth and smoke
21   transport.
22   Q    And by "they," you mean Maxus, not Travelers, right?
23   A    Yes.
24   Q    And what did they ask you to specifically do in this
25   case?
```
1054

```
 1    A    Specifically, I was to rebut the report written by

 2   Dr. Schroeder and to also look at the fire dynamics involved

 3   with this particular fire.

 4    Q    Okay.  And I think we've heard the term "fire dynamics"

 5   a couple of times.  Can you explain to us what that really

 6   means?

 7    A    Basically all fires start off small, and then they grow.

 8   And it's the science of dealing with how the fire grows, the

 9   heat release rate involved, and what it's -- what the fire is

10   burning, and then where the products of combustion go.

11         It has to do with fire growth and smoke transport.

12   In fire protection, we use it to determine how to handle the

13   products combustion within the building and also how to

14   construct -- how to recommend buildings be constructed to make

15   them fire resistant, fire hardened.  And also for

16   extinguishing systems like the sprinklers in here, if things

17   go wrong, then we can put the fire out hopefully.

18    Q    And in your about 30 years of fire protection

19   experience, how many times have you done an analysis like

20   this?

21    A    Several hundred.

22    Q    You mentioned that you looked at Dr. Schroeder's report.

23   What other materials did you review for your assessment?

24    A    I listed them in my report.  I basically reviewed some

25   videos.
```

1055

```
 1    Q    Handing you Exhibit -- Plaintiff's Exhibit 780.  Can you

 2    tell us what that is?

 3    A    Yes.  This is my rebuttal report dated January 15th,

 4    2021.

 5    Q    If you need to refer to that at any time while we're

 6    talking through things, just let me know.

 7    A    Okay.  I'll just look here.  A bunch of documents.

 8    Basically report of Dr. Schroeder, Environmental Analysis

 9    Associate's report, report of Stuart Batterman.  I have about

10    20 things:  Birmingham police video, YouTube videos, NFPH

11    Association, Standard No. 9 -- sorry.  Guide to Fire and

12    Explosion Investigations, Dougal Drysdale, it's an

13    introduction to fire dynamics, Fire Protection Engineering,

14    Fifth Edition, drawings, et cetera.

15    Q    So is it fair to say that you looked at the expert

16    reports, videos, photos, and some standards?

17    A    Yes.

18    Q    Now, after reviewing all those materials and when you're

19    working on your analysis, what conclusions did you come to?

20    A    Basically that Dr. Schroeder was not wrong.  I liked his

21    analysis actually of the fire growth up until the point where

22    it reached maximum heat release rate, and then from -- he

23    seemed to just stop at that point.  So that was -- that was

24    one of my primary findings.  I list other things in there as

25    well.
```
                                1056

```
 1    Q    Did you come to --

 2    A    Sorry.  Go ahead.

 3    Q    Did you come to any conclusions about the thermal or

 4   heat damage as well from the fire?

 5    A    Well, just that there wasn't really enough information

 6   to make a thorough conclusion.  There is thermal damage in the

 7   photographs, but I don't know how deep into the structure that

 8   goes based upon just the surface photographs.

 9    Q    And we'll get to that a little bit later.

10         MS. McMULLIN:  Can we go to slide 2.

11    Q    (BY MS. McMULLIN) So before we talk about this case and

12   the fire that happened on September 27th, 2018, I want to ask

13   you about a figure from your report.  It's on page 7 if you

14   want to look at it there.

15    A    Okay.  Here it is.

16    Q    What are we looking at here?

17    A    This is the heat release -- black and white.

18   Engineering textbooks are really dull.  I apologize.  It's

19   basically the idealized heat release rate of a fire.  This is

20   common for all fires.  It's time versus -- HRR is heat release

21   rate, and basically -- can I stand and point?  Is that okay?

22         MS. McMULLIN:  Sure.  Absolutely.

23         Your Honor, is it all right if he gets up?

24         THE COURT:  You can also mark on the screen.

25    Q    (BY MS. McMULLIN) You can mark on the screen.  I forgot
                                 1057
```

1    to tell you.

2    A    We have basically low heat release rate in the

3    beginning.  Oh, that is so cool.  Sorry.  Simple things in

4    life are very important to me.

5              But, anyway, you have a low heat release rate at the

6    ignition phase, and then gradually the heat release rate will

7    ramp up, depending on what it is like.  If you have a

8    fuel-induced fire, it's usually very quick relative to time.

9              Then you have the growth phase where the fire gets

10   pretty big.  As we say, nothing burns as a solid.  So the fire

11   has to give something back to boil off volatiles that then

12   combust in the presence of oxygen in the air.  So the growth

13   will be indicative of how much heat is being given off.

14             And then it eventually becomes fully developed.  In

15   this phase it depends on how much mass you have and how much

16   surface area you have.  Like if you light a candle, say, your

17   ignition would be very low, very quick, and then your heat

18   release rate would be pretty flat over time, versus something

19   like, oh, I don't -- like this building, for instance, it

20   went -- it was mostly sticks that weren't really protected.

21   The structural material is dry enough to burn quite well.

22             So anyway it would -- it would have a much faster

23   growth rate, kind of like what is shown on the drawing.  And

24   then after you get to the fully-developed phase, you have less

25   and less mass.  It's constantly getting rid of the mass by

                                 1058

burning it and turning it into products combustion.  Then you
have this gradual decay.  And the decay function is similar to
growth function in terms of time and depending on how much
fuel is there and all that.

The decay usually lasts really longer than ignition
growth up to the fully developed phase because things would
gradually fall apart.  Kind of like a campfire, it gradually
just falls apart, and it will still be burning for a long time
after the big fire.

Q    So for those of us who are not fire science experts,
this is the growth stages of a fire?

A    Well, it's the whole thing, from the ignition growth,
fully developed, and then decay on the back side.

Q    Would this happen in every single fire that occurs?

A    Yes.

Q    Did this happen at the Metropolitan?

A    Yes.

Q    Okay.  Now, you mentioned earlier, and I think it might
help to have this figure up, that Dr. Schroeder, your critique
of him is that he stopped at some point, his analysis, and he
didn't go fully through the phases of the fire.  Can you show
us what you mean?

A    Right about there.  So all of this, he covered all of
this really well, and then he just didn't talk about that part
after reaching fully-developed phase.

1059

```
 1    Q    Okay.  Now, on Monday we actually heard from

 2    Dr. Schroeder, and he testified extensively about some videos

 3    of the fire event, including a security video and some others.

 4              MS. McMULLIN:  Can we go to slide 3.

 5    Q    (BY MS. McMULLIN) I'm going to show you a -- this is the

 6    YouTube video of the fire.  Have you seen this before?

 7    A    Yes.

 8    Q    All right.  Let's take a look at it.  Can you explain to

 9    us what we're seeing here?

10    A    It looks like a shot from about a block away, and it

11    looks like building 6 that's fully engulfed.  That is -- I

12    hate to say a good-looking fire, but it's a good-looking fire.

13    My wife always teases me I'd make a good arsonist, but I can't

14    stand to impact people that way.

15              Basically you have a flame height that's about --

16    and I can't tell from this video exactly, but there's some

17    other -- there we go.  Yeah.  Flame height is -- it's about

18    twice the size of the building, and it's about a four-story or

19    five-story building, and the flames are twice that high.  So

20    it's well over a hundred feet of flame.

21              Then it's casting off all these flying brands and

22    things that are just going everywhere in the plume.  And

23    that's characteristic of a fully-developed fire.

24    Q    You mentioned this a little bit earlier, but the person

25    taking this video, about how far away was that person?
```
                              1060
```

```
 1    A    About a block away.

 2    Q    And these are the embers that he's seeing directly

 3   above; is that right?

 4    A    Yes.

 5    Q    What is this amount of burning embers, or we've heard

 6   them called brands as well, what does that mean about the

 7   potential for damage at the Metropolitan complex itself since

 8   this is a block away?

 9    A    It's basically wafting this stuff everywhere.  It's got

10   a lot of energy, and it's just throwing everything up in the

11   air in every which direction.  So you're going to have flying

12   brands.  They'll burn until the mass in them burns out, and it

13   varies in time depending on what it is that's being thrown up

14   there.  But the more fire, basically the higher things are

15   cast into the sky and then the larger chunks that you get.  So

16   it's a significant damage potential.

17    Q    You mentioned this earlier, but I just want to be clear

18   for the jury.  What stage of the fire is this in?

19    A    Fully developed.

20         MS. McMULLIN:  If we go to the next slide, please.

21    Q    (BY MS. McMULLIN) I don't think we actually need to play

22   the clip, but this is a still from that same video a little

23   bit further on.  What can you tell us about the fire's

24   magnitude in this image?

25    A    Oh, it's huge.  That's probably enough power to power
                                1061
```

```
1   that town for a few minutes being released all at one time
2   there.  It's just -- it's amazing.
3            I -- there are ways to estimate that.  I would need
4   to get a clearer picture of exactly how many megawatts of
5   energy that is.  But it's a lot of energy.
6   Q    Can you orient us as to which building is phase 5 there?
7   A    Phase 5, it looks like it's in -- oh, I can draw on
8   this, that's right.  There.
9   Q    And it's also the one next to it to the right a little
10  bit?
11  A    Yeah.  This whole thing here.
12  Q    I'm sorry, to the left.  If you can't tell us from this,
13  it's totally fine.
14  A    Yeah, yeah.  I know.  I'm sorry.  It's taken just far
15  enough away.  I keep getting confused because I can see the
16  alcove area on building 6, and it looks like that.  Everything
17  past the fire is building 6, but it's actually building 5.
18  Q    From this still image, you can see that the plume and
19  the flame are well above the phase 5 roof; is that right?
20  A    Yes.  It's about twice the height of the former
21  structure.
22  Q    On Monday, Dr. Schroeder also testified there was no
23  spread of the fire into the other phases of the Metropolitan.
24  Do you agree with that?
25  A    In my report I point out that there was no evidence of
                              1062
```

```
 1   open flaming combustion in other areas of the complex.  But I
 2   don't have any information on pyrolysis.  And in order to burn
 3   things, as I said, you need to heat materials until they boil
 4   off volatiles, and then it's the volatiles in the air that end
 5   up burning.
 6           So what you have is if you have materials in the
 7   adjacent building that are exposed to heat, the fire will
 8   generally loft 70 percent of its energy straight up in the
 9   plume, and 30 percent of it is radiant heat.  This is just
10   kind of a ballpark average.  So you've got 30 percent of the
11   radiant heat hitting the other building, and it's boiling off
12   volatiles off that building.  It was never taken apart, so I
13   don't know.  But there likely is damage to the substructure.
14   I think there's some photos that are probably coming up in a
15   bit.
16   Q    Dr. Schroeder went through a couple of photos, and I
17   think we're going to bring some up as well.
18           He concluded that the photos didn't show any signs
19   as far as char damage to the other Metropolitan buildings.
20   Have you seen photographs that contradict that?
21   A    Yes.  I -- again, it would require me to take the
22   building apart to determine the extent of the damage, but what
23   we're seeing is char damage on the surface.  It's likely also
24   damage to the structures underneath.
25   Q    Have you seen this before?
                              1063
```

```
 1    A    Yes.

 2    Q    Is this in your report?

 3    A    Yes.

 4    Q    What are we looking at?

 5    A    See the damaged siding on the south elevation of

 6    building 5.  I don't know if it's hardie plank.  It's a type

 7    of material that as it loses mass, it starts to buckle, and

 8    you can see cracks in it, and it's buckled up.

 9              It's basically part of the wall on the building, and

10    it's been just subject to a tremendous amount of heat.

11    Q    So this is damage from the fire, right?

12    A    Yes.

13              MS. McMULLIN:  We can go to the next one.

14    Q    (BY MS. McMULLIN) This is also from your report.  What

15    are we seeing here?

16    A    Damaged siding on the south elevation of building 5.

17    This is broken windows, melted window frames, tortured siding,

18    I guess you would say.  Again, a lot of thermal impact to this

19    building.

20    Q    Is this what you would have expected to see after that

21    video of the fire on the building right next door?

22    A    Yes.

23    Q    Okay.

24              MS. McMULLIN:  We can go to the next one.

25    Q    (BY MS. McMULLIN) Have you seen this photo before?
                             1064
```

```
 1    A    Yes.

 2    Q    What is it showing us?

 3    A    You've got partially melted window frames in the

 4    windows, and you have basically the sticks in building 5.  The

 5    structural elements are still there, but -- and this is what

 6    I'm saying.  I can't really determine the depth or the nature

 7    of how badly damaged it is, but it's likely damaged because

 8    the exterior is so badly damaged that you probably have damage

 9    to the sheathing on the inside of the exterior as well.

10              MS. McMULLIN:  If we can go to the next photo.

11    Q    (BY MS. McMULLIN) Is this similar damage from the fire

12    that you've seen?

13    A    Yes.

14    Q    What do we see on those windows?  Is that melting off?

15    A    Yes.

16    Q    That would be from the fire, right?

17    A    Yes.  These windows are not rated for fire exposure at

18    all; so they tend to break.  The glass will expand when it

19    gets bound up, and it doesn't like that and will break.  And

20    the window frames tend to melt.

21    Q    Let me ask you this:  Would all of the potential damage,

22    the thermal effects from the fire, be visible right after the

23    fire from these photographs?

24    A    Well, yes.  What would be visible like on the exterior

25    you could see that, but you need to take that apart to see
```

1065

```
 1    what's underneath to see if there's damage to that as well.
 2              Again, if the substrate gets heated to a certain
 3    degree, then you'll have partial pyrolization.  You won't have
 4    open flaming combustion necessarily; but if you had oxygen
 5    present, it probably would have burst into flame.  But it
 6    can't do that because it's covered over, and it doesn't have
 7    the ability for oxygen to get to it.  But it's still damaged.
 8    Q    You mentioned that a couple times.  You have to
 9    essentially take the exterior off to see what was underneath
10    to see if there was further damage; is that right?
11    A    Yes.
12    Q    If Maxus had done that once they started remediating the
13    property and they found thermal heat damage, would that be
14    consistent with your opinion?
15    A    Yes.
16              MS. McMULLIN:  Can you go to the next slide.
17    Q    (BY MS. McMULLIN) What are we looking at here?
18    A    Let's see.  This is zipwall tape on sheathing melted by
19    fire.  So this is some damaged sticky tape or zipwall.
20    Q    If this was found underneath the sheathing on phase 5
21    awhile after the fire, would that be consistent with your
22    conclusion that thermal damage could have occurred underneath
23    the exterior sheathing?
24    A    Yes.
25    Q    Now, have you also looked at photographs from the
                              1066
```

```
 1    reports that you reviewed in this case showing there's smoke

 2    or soot damage to the Metropolitan?

 3    A    Yes.

 4    Q    Go to the next slide.  What are we looking at here?

 5    A    This is the wall of the parking garage showing

 6    essentially soot staining.  It's early -- it's visually

 7    consistent with soot staining, and I'm -- I'm hypothesizing.

 8    At least I can't rule it out, given the age of the garage,

 9    which at this point was not very old, that it's probably not

10    biological growth from diesel soot or something like that.

11    The air quality is probably pretty good in that area.  But

12    this has what is consistent with residual smoke damage.

13    Q    So if Dr. Schroeder said this was organics, what's your

14    opinion on that?

15    A    Well, residual smoke damage is organic.  So he's not

16    wrong.  It's just a different source.

17    Q    But your conclusion is this is probably from the fire?

18    A    Yes.

19         MS. McMULLIN:  If we can go to the next slide.

20    Q    (BY MS. McMULLIN) Figure 10, what are we looking at

21    here?

22    A    The same sort of thing.  This is roofing siding that

23    has, you know, striations or marking consistent with soot

24    damage.

25    Q    Okay.
```

                              1067

```
 1              MS. McMULLIN:  I think there might be one more.

 2   Q    (BY MS. McMULLIN) What are we looking at here, figure

 3   64?

 4   A    It says on here obvious smoke accumulation on partition

 5   wall.  I see this a lot when we do fire investigations.  We'll

 6   go into a building.  You work from your outside in.  And

 7   anywhere you have something that's cooler than the area that's

 8   catching on fire, you'll see things like this, where you have

 9   agglomeration and basically smoke coagulating on anything

10   cooler than the area where it started.

11              So this is consistent with smoke accumulation on

12   that.  It looks like the back side of wall sheathing or

13   something.

14   Q    So this is an interior wall, right?

15   A    Yes.  That's what it appears to be.

16   Q    You didn't write any of these descriptions on the

17   figures, right?

18   A    No.

19   Q    But this is consistent with your conclusion that there

20   could be smoke and soot, visible smoke and soot damage?

21   A    Yes.

22   Q    Now, Dr. Schroeder also testified, and we've talked

23   about what fire dynamics is, but he testified about the

24   airflow that occurred during the fire.

25              He said that there would have been -- the plume
                              1068
```

1  would have been drawing air through phase 5 into the phase 6

2  fire.  Do you agree with that?

3  A    Yes.

4  Q    Why?

5  A    Because he's doing his analysis up to the peak heat

6  release, and basically when the fire is fully developed, it's

7  going to be drawing air in at a tremendous rate.  So it's

8  going to be getting it from wherever it can.

9          Basically when you have the plume going up and out

10  from being heated, you have to have air coming in to make up

11  the difference.  And the air is going to be rushing through

12  pretty much any opening or any open area that it finds to do

13  that.  And that's when it's at peak heat release.

14          As it gradually dampens down, your plume will

15  collapse, not in terms of -- like the plume goes up and then

16  it falls down.  It just -- it starts wafting less and less

17  high because it has less and less energy in it.  And then at

18  that point, you really don't have any air rushing.  Things are

19  kind of wafting around.  They're not really rushing at that

20  point.  I think we probably have some photos of that too.

21  Q    And just because we are, again, not fire science

22  experts, to me, Dr. Schroeder's conclusion was that, you know,

23  at the active phase of the fire, the smoke would do this.

24  A    Yeah.

25  Q    Go straight up and straight out and wouldn't touch kind

1069

of the buildings next door.  Is that accurate?

A    Yes.

Q    Is that what would happen the entire time of the fire?

A    No.  That's what I'm saying.  Once you get in the later stages of the fire, then you're going to still have products of combustion being evolved, but they're going to hang around. It's kind of like -- this town is known for barbecue, as I understand it.  So when you smell your neighbor's barbecue, that's because the plume is not going up.  There's not much energy in the Hibachi or whatever, and the smell is hanging around.  That's a good one.  That's a good thing.  This is not.

Q    So do you have any analogy that we can use -- is it like a fog machine?

A    Yeah.

Q    What does the smoke do once it's on the ground at this decay stage?

A    It doesn't have a lot of energy in it, so it tends to hang around and basically get into everything that's around.

Q    And if we just heard from our meteorologist that the winds were light and variable at the time of the fire, what would that mean for the smoke?

A    The smoke would tend to waft in various different directions, and I -- from the size of that fire and the residual char and combustion that you had towards the end of

1070

1   the fire, you'd probably have a several block radius where you

2   have just smoke hanging around.

3   Q    And how long about does the decay phase last?

4   A    Again, it depends.  In this case, I think the fire

5   department left at two in the afternoon the following -- or

6   the same day.  So I think they had most of the flame and

7   combustion knocked down at, I don't know, early hours of the

8   morning.  So, you know, it lasted a good nine hours, 12 hours.

9        It probably went on past that point as well because

10  the fire department typically leaves.  They don't want to have

11  the manpower stationed there in case they have other incidents

12  to go to, but you'll still have hot spots that develop and

13  things like that.

14  Q    Okay.

15       MS. McMULLIN:  If we can take a look at the next

16  slide.  We can go to the next one.  As much as I love the

17  formulas, I think we're going to show the videos.

18  Q    (BY MS. McMULLIN) Have you seen this video before?  This

19  is the security cam footage from across the street at the

20  Metropolitan.

21  A    Yes.

22  Q    What does the timestamp up there say?

23  A    13:59.  So it's 13 minutes after midnight, according to

24  that stamp.

25  Q    Okay.  In general, just what are we seeing here?

                            1071

```
 1    A    Fire department using aerial apparatus to put water on

 2  burning building.  Looks like there's a pumper to the right.

 3  You've got police in front.  This looks like it's a little bit

 4  after peak heat release or -- either before or after.  I can't

 5  see the structure, which is why it's giving me trouble.

 6    Q    And you can't see it because why?

 7    A    Oh, the -- well, flames and smoke.

 8    Q    Right.

 9         MS. McMULLIN:  We can go to the next slide.

10    Q    (BY MS. McMULLIN) This is a later part of that same

11  security video, right?

12    A    Yes.

13    Q    What's the timestamp say?

14    A    2:04.

15    Q    So this is hours after what we just saw?

16    A    Yes.

17         MS. McMULLIN:  Okay.  If you can play that.

18    A    What we have here is it looks like we have fire

19  department apparatus on the right with a ladder up putting

20  water on the fire, and the fire is -- the smoke in this is

21  kind of a whitish color, which means they're being pretty

22  effective in terms of when you get a lot of steam in addition

23  to smoke, products combustion.  And you're kind of -- you're

24  past peak heat release, and here the smoke is starting to just

25  go everywhere, which is indicative of decay phase.
```

                              1072

```
 1          What I noticed about this was, again, winds are
 2    light and variable, but also you can't see the whole -- all
 3    the smoke because it's at night.  And you've got a lot of
 4    illumination in the foreground and some on the parking deck,
 5    but you can't really see -- it's -- you can't see where the
 6    smoke is ultimately going, but it's hanging around basically.
 7    Q    And if we can look right down the middle where that car
 8    is in the back, that's the courtyard between phase 6 and
 9    phases 1 through 3, right?
10    A    Yes.
11    Q    In your review of this security camera footage, did you
12    see smoke pooling in that area?
13    A    Yes.  It's kind of wafting through that area now.
14          MS. McMULLIN:  Go to the next slide.  If we can fast
15    forward to about 18 seconds.
16    Q    (BY MS. McMULLIN) Is this exactly what we just talked
17    about?
18    A    Yes.  But it's earlier in the fire progression from --
19    at least according to the way this video is shot and the clips
20    that they're using.  So you still have smoke hanging around.
21    It's not all being lofted.  And this may -- may have to do
22    with firefighting in one particular area of the burning
23    structure is not putting out quite as much heat as another
24    area at that point in time.  And then your smoke will bank
25    down.
                         1073
```

```
 1    Q    And is this in that same area we just looked at in
 2    between building 6 that's burning to the ground and phases 1
 3    through 3?
 4    A    Yes.
 5    Q    And this is consistent with your conclusion that the
 6    pooling of the smoke, even before the decay stage of the fire,
 7    would have gone everywhere?
 8    A    Yes.
 9    Q    Okay.
10    CROSS-EXAMINATION BY MR. ELY:
11    Q    Hello, Mr. Farnham.  How are you?
12    A    Hello.  Good.  Thank you.
13    Q    I'm Brenen Ely.  I'm a lawyer at Ely & Isenberg in
14    Birmingham.  Couple questions.
15         Have you ever visited the site?
16    A    No.
17    Q    Okay.  You mentioned the decay phase, and I think the
18    question that was posed to you is how long does the decay
19    phase last.  I want to make sure I understand exactly what
20    your answer to that question is.
21         So can you kind of go back to the decay phase, tell
22    me when -- what kind of period of time we're looking at when
23    your -- I believe it's your opinion that during the decay
24    phase, the smoke will be more present at the lower levels
25    around the Metropolitan.  Is that a fair statement of what
```

1074

```
 1    you're saying?

 2    A    Yes.

 3    Q    Can you tell me how long that lasts?

 4    A    Not exactly, but I was bracketing it at probably twice

 5    as long as the initial growth phase.

 6    Q    Okay.  How long was the initial growth phase generally

 7    speaking?

 8    A    Well, for a fire like this, I think the fire department

 9    arrived to a fully-developed fire at about roughly an hour and

10    a half after it likely started.  I think there was a passerby

11    seen in that area.  So at least three hours, probably longer.

12    Q    So if the fire department arrived, say, at 12:45, you're

13    talking about 3:45 in the morning, maybe 4:30 in the morning?

14    A    I don't think they had the fire out until about four.

15    It would be basically up -- well, up to that point and then

16    after that point, you still have smoldering combustion

17    occurring even after the fire is technically -- the flame and

18    combustion is out, but it's still going to be producing smoke.

19    Q    Okay.  And I want to -- and what I'll do is I'll

20    point -- could we point to your opinion.

21            MR. ELY:  Pull up Plaintiff's Exhibit 780, please,

22    and maybe it will be more fair if I show you the part of your

23    opinion.  Let's go to page 15, please.

24    Q    (BY MR. ELY) So what I'm really asking questions about,

25    Mr. Farnham, is this paragraph that starts with Schroeder.
```

                              1075

1      Schroeder offered no calculations, experimentation,
2   or observations to support a reported lack of smoke staining
3   in the phase 5 building.
4      But what I'm really asking about is:  The lack of
5   protection to openings on the south side of the building would
6   have resulted in smoke entry after the plume had collapsed.
7   Similarly, smoke would have entered the other phases of the
8   complex and adjacent complexes with the opening and closing of
9   exterior doors and windows and other similar building envelope
10  effects.
11     So my question is really to the last sentence.  How
12  long is that period of time when what you've opined could take
13  place could have taken place?
14  A    I don't know exactly.  I would need better information
15  on the timestamps and observations from the site.  But it was,
16  you know, several hours at least.
17  Q    Okay.  So you haven't done that kind of analysis to
18  determine when -- how long this period of time you're talking
19  about in this last sentence would have lasted?
20  A    Not specifically, no.
21  Q    Okay.  And you say it would have lasted several hours.
22  Several hours from what point?
23  A    After the fire was fully extinguished.
24  Q    Okay.  So do you have any information with respect to
25  whether any doors were opened or closed on the exterior at any
                                1076

```
 1    part of the Metropolitan during this period of time you're
 2    talking about?
 3    A    No.  But what I'm saying here is that you have the smoke
 4    hanging around, and if you had anything coming or going, any
 5    differential pressure, anything would have moved the products
 6    and combustion in that direction.
 7    Q    You mentioned differential pressure.  That's something
 8    new.  What are you talking about there?
 9    A    All buildings have what's called a neutral axis which
10    depends -- the location of the neutral axis depends on how hot
11    or cold the building is relative to the exterior air around
12    it.
13         So what I'm saying is you have -- if someone opens a
14    door to go out or come in, if there is an exhaust vent, you
15    also have permeability of the -- oh, what's it called?  The
16    barrier on the exterior of the building.  All these things
17    will be affected by the smoke in the air.
18    Q    But you haven't done any study as to determine any --
19    whether any of those things happened or anything about the
20    building, have you?
21    A    No.
22    Q    Okay.  And do you have information as to, number one,
23    when the tenants were evacuated from the doughnut building?
24    A    The doughnut building?  I saw the police video.  I'm not
25    sure if they were in the doughnut building evacuating people.
```

1077

```
1    Q    Okay.  So you don't have any information as to when all

2    the people were out of the doughnut building or when they

3    might have gone back in?

4    A    No.

5    Q    Okay.  And do you have any information with respect to

6    when the power may or may not have gone off in the phase 1

7    through 4 building?

8    A    No.

9    Q    Okay.  And when you're speaking of exterior doors and

10   windows here, what area of the doughnut building are you

11   talking about?

12   A    The area that would be -- well, really, there's so much

13   smoke after this fire, it could be any of them on any side,

14   depending on which way the smoke is wafting at that point in

15   time.

16   Q    Okay.  Would the primary exposure be the eastern face

17   that's closest to the fire?

18   A    Logically, yes.

19   Q    Okay.  Do you know how many windows are on the eastern

20   face?

21   A    No.

22   Q    Not done any study of that?

23   A    No.

24   Q    Have you reviewed any -- have you seen any photographs,

25   videos, or other data that shows the Metropolitan between six
```

1078

```
 1    in the morning and two in the afternoon the next day?

 2    A    I don't think I have, no.

 3    Q    Okay.

 4    A    There are photographs afterwards, but it looks like

 5    they're taken a long time after the event.

 6    Q    So you weren't asked to do any sort of study of where

 7    the -- what smoke was in the vicinity during this decay and

 8    post-decay phase, correct?

 9    A    Correct.

10    Q    And so what you're testifying to here today is based

11    upon just your assumption?

12    A    It's based on the fire dynamics in the typical fire.

13    This fire in specific, in terms of the amount of mass, it was

14    a large building.  It burned very well and thoroughly.  So I

15    don't -- I'm not sure I follow you with respect --

16    Q    It was a bad question.  I'm sorry.

17              So regarding this period of time of post-decay.

18    Let's call it decay, post-decay?

19    A    Okay.

20    Q    I understand you haven't seen any video, you haven't

21    reviewed any photographs that definitively can show what was

22    going on with any smoke that may have been in that vicinity

23    during that time.  Is that a fair statement?

24    A    Yes.

25    Q    Okay.  So any opinion you render about the smoke's
```

<div align="center">1079</div>

```
 1   presence in that area during that period of time is not based

 2   upon any factual evidence you've received?

 3    A    It's based on fire dynamics essentially.  Not

 4   specifically -- I would really welcome receiving that

 5   information.  That would be great.  You know, it would be nice

 6   to further benchmark what I'm saying, but I'm just speaking

 7   generally in terms of what you have in terms of products

 8   combustion and fire growth and decay.

 9    Q    No one gave you that information prior to rendering this

10   opinion?

11    A    No.

12    Q    Now, you mentioned there were some photographs that were

13   shown to you and --

14          MR. ELY:  Can we pull up Plaintiff's Exhibit 8, page

15   32, figure 41.

16    Q    (BY MR. ELY) I believe we looked at these photographs.

17   At least figure 26 was shown to you.  Do you have any idea

18   where that photograph is located on the building?

19    A    No.

20    Q    Have you done any study of thermal damage to the other

21   areas of the Metropolitan as a result of this fire?

22    A    No.

23    Q    You reviewed Dr. Schroeder's report, correct?

24    A    Yes.

25    Q    And I think you testified you were retained to
                              1080
```

```
 1   specifically respond to that?

 2   A     Yes.

 3   Q     Do you know Dr. Schroeder at all?

 4   A     I've worked against him for many years.  I don't know

 5   him personally.

 6   Q     Okay.  And did you see a section of his report that

 7   dealt with pyrolization and the heat impact of the fire?

 8   A     I don't have it memorized, but I recall.

 9   Q     I don't expect you to have it memorized.  That's fair

10   enough.

11         Did you have any disagreement with his assessment of

12   the heat impact from the fire?

13   A     I would have to have a look at what he --

14   Q     And if he didn't render an opinion on that, that's fine.

15   I just want to understand specifically.

16   A     No.  I was looking specifically at his fire dynamics.

17   Q     So in terms of the heat impact of the fire, you're not

18   rendering any opinion one way or the other as to the actual

19   effects?

20   A     No.

21   Q     And you've not done any studies on that?

22   A     No.

23   Q     And you've not been asked to do that?

24   A     No.

25   Q     So other than being shown these photographs today,
```

1081

```
 1  you've not been asked to do that prior?

 2   A    That's correct.

 3          MR. ELY:  Thank you, Mr. Farnham.  I don't have

 4  anything further.

 5          MS. McMULLIN:  I just have one question, Your Honor.

 6  REDIRECT EXAMINATION BY MS. McMULLIN:

 7   Q    Mr. Farnham, you were just asked, and I think Mr. Ely

 8  might have said that your opinion was based on an assumption,

 9  and you said it was based on fire dynamics.  Did you also

10  review the actual realtime footage of the fire from the videos

11  that you looked at?

12   A    Yes.  I reviewed all the video data that I had.

13          MS. McMULLIN:  Thank you.

14          MR. ELY:  Nothing further, Your Honor.

15          THE COURT:  Thank you.  You may step down.

16          THE WITNESS:  Thank you.

17          (Counsel approached the bench and the following

18  proceedings were had:)

19          MR. ABRAMS:  The last witness is the witness that

20  appears remotely.  He's ready, but I don't know if we -- it

21  will take awhile.

22          THE COURT:  You say it won't take long?

23          MR. ABRAMS:  No, no.  It will take awhile.  I'm

24  saying he's ready.

25          THE COURT:  Okay.  What I'm going to do is give them
```
                              1082

```
 1    a break and do that.

 2          (The proceedings returned to open court.)

 3              THE COURT:  You recall yesterday I told you that

 4    we'd likely break early today.  We have one other witness, and

 5    he may be an hour or so; so I'm thinking we may go ahead and

 6    break, take a 30-minute lunch break, come back, finish up with

 7    that witness, and I'll let you go today.

 8              Sound good?

 9              All right.  Let's stand in recess for lunch.

10                  (A recess was taken.)

11              (The following proceedings were had out of the

12    presence of the jury:)

13              THE COURT:  So what's going on in here?

14              MR. ABRAMS:  I think we're ready.

15              (The following proceedings were had in the presence

16    of the jury:)

17              MR. ABRAMS:  Proceed?  Thank you, Your Honor.

18    DANIEL BAXTER, appearing by videoconference and being duly

19    sworn by the courtroom deputy, testified:

20    DIRECT EXAMINATION BY MR. ABRAMS:

21     Q    Please state your name for the record.

22              Mr. Baxter, can you hear me?

23     A    Yeah.  It's a little low.  I have my volume turned all

24    the way up.

25     Q    Please state your name for the record.
```
                                1083

```
 1   A    Name is Daniel Martin Baxter.

 2   Q    Mr. Baxter, where are you today?

 3   A    I'm in San Diego, California, in my home office.

 4   Q    And can you tell us briefly why you're not in Kansas

 5   City today?

 6   A    Yes.  On the way back from Michigan a little over a week

 7   ago, I had a medical emergency and vertigo in my ears, and

 8   I've been advised by my doctor not to fly or travel.

 9   Q    Okay.  Mr. Baxter, what do you do for a living?

10   A    I'm an environmental scientist, and I currently am

11   president and owner of Environmental Analysis Associates, a

12   microscopy testing laboratory.

13   Q    All right.  Before we -- can we refer to your company as

14   EAA?

15   A    Yes.

16   Q    Okay.  Before we get to EAA, tell us about your

17   background.  Start with your educational background for us.

18   A    I received a Bachelor of Arts in physical science with

19   an emphasis in sedimentology and radiation physics.  That was

20   back in 1975 from San Diego State University.

21   Q    And tell us what EAA does.

22   A    Environmental Analysis has been in business for various

23   forms actually going back into the 1990s.  It currently is a

24   particle analysis, materials analysis laboratory using our

25   expertise in optical and electron microscopy.
```
                                    1084

```
 1    Q    Tell us about your professional background as an

 2    environmental scientist.

 3    A    All right.  My professional background goes all the way

 4    back to 1976.  It actually goes further than that as a

 5    volunteer working on Scripps Research vessels, but my first

 6    formal employment was with the Los Angeles Police Department

 7    criminalistics laboratory.  I started as a staff research

 8    associate, actually was board certified, and did a lot of

 9    materials analysis while at the laboratory.

10    Q    And then from there?

11    A    From there, I received a permanent position as a staff

12    research associate at Scripps Institution of Oceanography

13    doing sedimentology and paleoecology work on core sections,

14    including the collection of samples and the analysis by

15    optical and electron microscopy.

16    Q    Okay.  And we've heard the term "microscopist"

17    throughout this trial.  Are you a microscopist?

18    A    Yes.

19    Q    How does one become a microscopist?

20    A    There really isn't formal training for that.  You get

21    training, mentoring in a number of organizations.

22         I did at the police department, also while working

23    as a volunteer at Scripps back in the early '70s, and then my

24    expertise was further enhanced at the Los Angeles Police

25    Department where I would handle cases dealing with physical
```

                                  1085

1 evidence from shoes, hairs, fibers, soil.  That experience

2 also then translated.  And, of course, it's based on my

3 background in what's called micropaleontology, which is the

4 study of micro fossils, fossil, pollen, organisms, and that is

5 what I did at Scripps Institution of Oceanography back in

6 1978.

7         I actually skipped one employment.  I also worked at

8 Spin Physics developing magnetic particles for Eastman Kodak

9 to look in high-speed tape.

10        But back to the oceanography, again, that is

11 primarily micropaleontology.

12        From there, I actually was hired as a chemist at

13 Science Applications International Corporation from 1980 to

14 1985.  There I used those same skills to look at particles.  I

15 actually helped and was on one of the select panels that

16 developed the PLM bulk analysis method for asbestos as well as

17 the TEM, the transmission electron microscopy, method for the

18 US EPA at that point in time.

19        I actually received a citation from the head of --

20 and director of the EPA at that time for actually helping

21 develop that method.

22        As a part of that experience there, I also did a lot

23 of field and laboratory work for science application for a lot

24 of government agencies, including the Nuclear Regulatory

25 Commission, the Defense Nuclear Agency, EPA, the California

<div align="center">1086</div>

1    Department of Health Services, and a lot of these projects
                2    were specifically looking at the application of electron
                3    microscopy and optical microscopy to environmental particle
                4    analysis.
                5    Q    Okay.  And if you would, Mr. Baxter, briefly tell us
                6    your experience with regard to being a microscopist as it
                7    relates to combustion byproducts.
                8    A    Well, this actually goes back to the 1980s, but the
                9    primary work there was on asbestos and other environmental
               10    particles.
               11          But in the '90s, we actually developed methods for
               12    looking at combustion particles.  And then going forward to
               13    the mid 2000s, we started to specialize in the analysis of
               14    combustion particles and be able to do what we call
               15    differential or assemblage analysis, which is the ability to
               16    differentiate char, charcoal, and combustion particles from
               17    different points of origin or sources.
               18          That work going forward resulted -- if we skip
               19    forward even further, taking that experience, in 2015, I
               20    worked on the AIHA wildfire task force to develop methods, and
               21    that resulted inevitably in me being a primary author of the
               22    2018 Wildfire Technical Guide, which is the standard in the
               23    industry right now.  That was published in 2018.
               24    Q    All right.  Let me -- let me pause you there,
               25    Mr. Baxter.  We'll come to that in a second.
                                          1087

Case 4:20-cv-00095-FJG   Document 247   Filed 09/05/23   Page 135 of 187

1    Tell us -- before we get there, tell us about your
        2   committee work with regard to soot and char analysis.
        3   A    Well, that committee was -- obviously the wildfire task
        4   force in 2017 developed, as I said, the AIHA field guide.  I'm
        5   also currently one of the primary authors and developed the
        6   IICRC, which is a restoration group.  And there is a -- under
        7   review right now, a standard that is going to be published on
        8   wildfire assessment and analysis, and I'm heavily involved
        9   with that committee.
       10   Q    Okay.  Do you own any patents relating to the testing or
       11   sampling of particulate material?
       12   A    Yes, I do.  In 1993, I filed the patent for what is now
       13   the air-o-cell, which is the most widely-used slide impaction
       14   device in the world.
       15   Q    Have you published any articles, professional articles
       16   relating to microscopy or combustion byproduct testing?  When
       17   I say "published," have you authored?
       18   A    Yes.  Again, I'm listed as, because my name starts with
       19   B, the primary author on the Wildfire Guide.  Like I said, the
       20   wildfire task force.  I've also published articles and given
       21   technical papers and presentations to the AIHA and to other
       22   organizations on the appropriate use of microscopy and fire
       23   combustion analysis.
       24   Q    So when you say by the way that the wildfire impact or
       25   the wildfire guide, right?  You mentioned that?
                                   1088

1    A    Yes.

2    Q    Okay.  Does wildfires just mean fires out in the

3    wilderness, or does it mean something else?

4    A    No.  It actually deals with fires and then looking at

5    the wildfire/urban interface.  So it actually can translate.

6    Even though the document is entitled on wildfire, it also

7    involves structure fires as a part of that.  And the methods

8    are very similar you would use for microscopy analysis between

9    a wildfire or a structure fire.

10   Q    Mr. Baxter, if you had to estimate the amount of times

11   that you personally as a microscopist analyzed samples for

12   soot and char, what would you estimate those to be?  How many

13   times?

14   A    Over the last 15, 20 years, I've easily analyzed over

15   100,000 samples, specifically for structure and wildfire.

16   Well over 100,000.

17   Q    Mr. Baxter, what was your role in this case?  What did

18   you do?

19   A    I was hired to look at the laboratory data from both

20   parties.  We call them both sides of this case.  Samples

21   collected by Mr. Chris Spicer, also Neil Carlson.  And then

22   look at how the sample collection and the methods were applied

23   by all parties in this case.

24        That is an area of my expertise because of the

25   history I have with how sampling methods work and how they

1089

```
1    interface with appropriate methods.

2    Q    Mr. Baxter, after reviewing Travelers' reports and

3    industry standards relating to combustion byproducts and

4    Mr. Carlson's report, did you come to any conclusions?

5    A    Yes.  On Mr. Carlson's data, there is evidence he used

6    the primary method, which is optical microscopy, in

7    combination of tape sampling we can get -- in the art world,

8    they call it provenance.  What we're really talking about is

9    to be able to not only look at the particles, but also get an

10   idea of what the cause and origin or the source might be.

11              In regards to the data that was analyzed by --

12              MR. ABRAMS:  Mr. Baxter, can you hold on one second?

13   We need to approach.

14              (Counsel approached the bench and the following

15   proceedings were had:)

16              MR. ELY:  I want to make sure that we're not getting

17   into an area that is -- Mr. Baxter is not -- is not rendering

18   an opinion in this case.  It's specifically limited in his

19   opinions, meaning he's not going to testify about the extent

20   of any contamination in the Metropolitan.  I want to make sure

21   that we're not about to venture into the area before -- an

22   area that he has limited himself and there's no expert opinion

23   on that.  If he is going to look at the slide, look at the

24   Neil Carlson slides and talk about the specifics of the slides

25   and what is on the slides, that's fine.  But if he goes past
```
<center>1090</center>

```
 1    that into an analysis of the extent of any contamination, I
 2    want my objection on the record because he has not opined on
 3    that.
 4              MR. ABRAMS:  I don't think so.  What he's -- what's
 5    in his report is exactly what you said, is that Carlson's work
 6    shows that the -- that the samples were from a combustion
 7    byproduct from a structure fire.
 8              MR. ELY:  To your point you made earlier in the
 9    first day, Your Honor, are we talking about what's on the
10    slide or are we talking about what's in the Metropolitan?  As
11    long as he's not going any further than what's on that slide,
12    we're fine.  I just don't want to get into that.
13              MR. ABRAMS:  He didn't go to the Metropolitan.  He's
14    looking at what's on the slide.
15              MR. ELY:  Thank you.
16         (The proceedings returned to open court.)
17    Q    (BY MR. ABRAMS) I forgot where we were.  I apologize.
18    We were in the middle.
19              Mr. Carlson -- Mr. Baxter, do you remember what
20    question I just asked you?
21    A    You were asking about what was my scope of the
22    engagement with this project.
23    Q    Oh, and your -- the conclusions that you reached.
24              Let's -- and we can get into them in specifics.
25    Let's do that.  First of all, I want to authenticate your
                              1091
```

```
 1   reports.
 2           We sent you and you should have Plaintiff's Exhibit
 3   28 and 784.  Those are your -- those are your reports that you
 4   rendered in this -- written reports that you rendered in this
 5   case, correct?
 6   A    Correct.
 7   Q    All right.  Let's start with Maxus' sampling, and that's
 8   the sampling that you -- review was from Carlson, correct?
 9   A    Correct.
10   Q    Now, in reviewing Mr. Carlson's report, what did
11   Mr. Carlson conclude regarding whether fire-related
12   particulates were present at the Metropolitan?
13           MR. ELY:  Your Honor --
14   A    He concluded that there are some of those samples --
15           MR. ABRAMS:  Wait.  Mr. Baxter, hold on one moment.
16           (Counsel approached the bench and the following
17   proceedings were had:)
18           MR. ELY:  Your Honor, Mr. Carlson has not concluded
19   anything about whether there's contamination at the
20   Metropolitan.  That's what we're trying to stay away from
21   here.  If -- as to what is on those slides, what Mr. Carlson
22   concluded, he can answer that question.  But the question was,
23   as I recall it, what did Mr. Carlson conclude about combustion
24   byproducts at the Metropolitan.
25           MR. ABRAMS:  Your Honor, I don't see the
                                1092
```

```
 1   distinction.  He took samples --
 2            THE COURT:  There is a distinction, and you can
 3   argue that in argument.
 4            MR. ABRAMS:  Okay.  I think I'm missing it.
 5            THE COURT:  He's going to be able to testify -- as I
 6   understand it, he's going to be able to testify to the
 7   contents of the slide.
 8            MR. ELY:  Correct.
 9            MR. ABRAMS:  We're going to do that.
10            THE COURT:  Then the next step is where did the
11   slides come from.
12            MR. ABRAMS:  Fine.
13            MR. ELY:  Okay.
14        (The proceedings returned to open court.)
15    Q    (BY MR. ABRAMS) Mr. Baxter, you reviewed Mr. Carlson's
16   slides from his analysis?
17    A    I reviewed the photographs that he has taken from that
18   project.
19    Q    And that -- when you say "photographs," those are the
20   micrographs?
21    A    Yes.
22    Q    Okay.  And tell us again what a micrograph is.
23    A    A micrograph is a -- in this case a digital image that
24   is collected from the microscope slide at the magnification of
25   the microscope.
```
                              1093

1   Q     And they are -- there are different types of sampling

2   that were done by Mr. Carlson, correct?

3   A     Correct.

4   Q     And what types of sampling were those?

5   A     There was some air sampling with the air-o-cell, and

6   then there was also a tape lift sample.  There are two

7   different kinds of sample.  One is representing the air.  The

8   other is representing what would be on the surface --

9   Q     And were --

10  A     -- of the substrate.

11  Q     Were there some bulk samples?

12  A     Yes.

13  Q     And is there a benefit of analyzing different types of

14  samples when you're analyzing a site?

15  A     Well, an air-o-cell is going to tell you what is in

16  the -- what is airborne and quantitatively what is there, and

17  as the particle actually exists.  That's a big difference.

18  With air-o-cells and tape lift samples, you're seeing what the

19  original structure is, and that's important to not only get

20  concentration numbers; in other words, relatively how much is

21  there, but also to, again, to look at what is the provenance

22  or the cause.  And origin can be also derived from its

23  association with other particles in that sample.

24  Q     So --

25  A     Both of those samples --

                              1094

1  Q    Go ahead.

2  A    -- preserve the spatial integrity.  That is a really

3  important concept that is being able to decide which fire --

4  what type of fire it may be from.

5  Q    Okay.  And you mentioned that Mr. Carlson used optical

6  microscopy, correct?

7  A    Correct.

8  Q    All right.  Is there a benefit in your opinion of using

9  optical microscopy to analyze samples like this?

10  A    Yes.  Optical microscopy is actually the standard

11  method.  The only -- we use light waves in optical microscopy.

12  It's what human eyes see, color, texture, and it's important

13  to have those properties.  Visually that is the only way we

14  can actually get an idea of what might be burned or might be

15  unburned.  And that's a big difference between electron

16  microscopy.  You cannot do that with electron microscopy.

17  Q    All right.  We're going to get back to electron

18  microscopy in a bit.  I want to still focus on optical

19  microscopy.

20        I want you to look at what we sent you, Slide No. 2,

21  and we're going to put it up on the screen here, and the jury

22  is going to have to do a little bit of watching a tennis match

23  here between you and what's on the screen.

24        Bear with us for a second, Mr. Baxter.  We're going

25  to get that put up.

                              1095

```
 1              Okay.  Mr. Baxter, tell us what we're looking at in

 2   Slide No. 2.

 3   A    Okay.  I actually don't have it on the screen.

 4   Q    It's not going to be on the screen.  You're going to

 5   have to refer to the hard copy.  The jury is looking at it on

 6   the screen.  We had some technical issues at the court here.

 7   A    So which exhibit is it again?

 8   Q    This is the slide.  So it's figure 6, the mix -- the

 9   micrograph from N.G. Carlson's report, No. 14, page 115.  It's

10   slide 2.

11              Yeah, it's Plaintiff's Exhibit -- so it's -- it's in

12   your report also.

13   A    Okay.  So is this -- I want to make sure I've got this.

14   What you have sent me is Exhibit 35.  I want to make sure

15   we're operating from the same --

16   Q    No, no.  It's the slides.  It's No. 2, which is a

17   portion of your report.  When I say "slides," from the

18   PowerPoint.

19   A    So am I looking at my Exhibit PL784?

20   Q    It's part of -- yes.  It's part of Plaintiff's Exhibit

21   784.  It's figure 6.

22   A    Okay.

23   Q    You with me?  And we've called them out from the

24   PowerPoint.

25   A    The page I'm looking at is 8 of 25 of my rebuttal
```

1096

```
1    report, and that is -- on that page, there's figure 4, figure

2    5, figure 6, and 7; is that correct?

3    Q    What we have is figure 6.  What do we see there?

4    A    You're seeing on this photo -- again, it looks like

5    we're looking at a mixed soot cluster that's identified by

6    Carlson.  Keep in mind, he is looking through the microscope.

7    He would have more resolution than what it will appear on the

8    page in the photograph.  He's seeing a mixed soot cluster.

9    Q    That's your opinion?

10   A    Yes.

11   Q    Okay.  So do you have the slides in front of you?  Do

12   you have the PowerPoint in front of you in hard copy,

13   Mr. Baxter?

14   A    Let me --

15   Q    The first page says "Testimony of D. Baxter"?

16   A    You're looking at figure 6?

17   Q    Right.

18   A    Yes.  Okay.  I'm sorry.  I want to make sure we're

19   clear.  The PowerPoint says "Testimony of D. Baxter."  It

20   doesn't say PowerPoint on it.

21   Q    Right, yes, exactly.  So you go to the next slide,

22   please.

23   A    Okay.  So figure 6 is a mixture that you'd expect to see

24   of soot that looks like a little mixture of char also.  These

25   particles are fairly large.
                                1097
```

```
 1    Q    Okay.  A mixture of soot and char?

 2              All right.  And let's go to slide 4, figure 7.

 3              Mr. Baxter, what do we see here?

 4    A    This is a classical example of what structure fire soot

 5    would actually look like.  This is different than what would

 6    be from manmade sources, outdoor or diesel.  It actually has a

 7    long chain of the structure, which is consistent with it being

 8    from a nearby source.

 9    Q    Okay.  And the nearby source, what kind of nearby

10    source?  You said --

11    A    It would have to be either a structure fire or a

12    structure fire close by that would be consistent with this

13    photo.

14    Q    Let's go to Slide No. 5.  This is from Mr. Carlson's

15    report, and that's his conclusion regarding -- in looking at

16    the slide you just looked at.  Do you agree or disagree with

17    Mr. Carlson's conclusions here of the soot and char analysis?

18    A    Okay.  So what am I -- in other words, are we looking at

19    the next page after this photograph?

20    Q    Yeah, slide 5 where it says 65, phase 4, top of AC unit

21    in N-S hallway.  Do you see that?

22    A    Yeah.  He's showing this as a visual area estimate of

23    char being 1 to 3 and soot like 15 to 20 percent.

24    Q    And -- 15 to 20 percent soot, 1 to 3 char.  You have any

25    reason to disagree with that conclusion?
                           1098
```

```
1    A    No.  Obviously he's provided one photograph from there,
2  and it would have to be an analysis of that slide, which is
3  what he did.  So I can't say one way or another the actual
4  quantification on it.  That would be something that he would
5  have analyzed looking at multiple fields.
6    Q    But your conclusion is, is that the slide, figure 7, is
7  consistent with soot and char from a structure fire nearby?
8    A    Yes, it would be.  That's the most consistent source.
9  It would not be like a bus down at the corner downtown or
10 outside.  You wouldn't see that large of a structure or that
11 smearing on that structure.
12   Q    I missed one word.  It wouldn't be like a what?
13   A    This is not like it just came in from a bus stop.
14   Q    Oh, a bus stop.
15   A    Okay.  Or, you know, an exhaust source or a background
16 soot from automobiles.  That is inconsistent with that.
17   Q    Let's look at slide 6.  It will be figure 8 on the
18 PowerPoint.  What are we looking at here, Mr. Baxter?
19   A    Again, looking through the microscope, there are
20 classical pieces of char in this photograph up in the upper --
21 the upper left-hand to mid corner.  There are also numerous
22 pollen that look like they may have been singed or burned in
23 this sample.  So this is -- this photograph itself is
24 consistent with -- seems like mixed sources again.
25   Q    Okay.  And singed pollen, that could be -- is that from
```
                                  1099

```
 1   a burning tree?

 2    A    It could be.  Again, I'd have to look more closely at

 3   the actual slide this is a photograph of, but that caught my

 4   eye right away.  You have a number of charred particles

 5   besides the actual -- those very angular dark char pieces in

 6   this slide.

 7    Q    Are -- the char that you're seeing on figure 8, is that

 8   consistent with a structure fire from nearby?

 9    A    Yes.  Or the infiltration of other vegetative sources

10   from outside in addition to a structure fire.  So it looks

11   like a mixed source fire to me.

12    Q    So it's both.  It's both.  You've got char from the

13   structure fire nearby, and you said you've got some burned

14   pollen?

15    A    That's what it appears in the photograph.

16    Q    Okay.  Let's go to --

17    A    Again, as a microscopist, I would always like to look at

18   the slide, but -- itself because you get better resolution.

19   But I think if Neil came to this conclusion, if Dr. Carlson

20   came to this conclusion, I would concur.

21    Q    Okay.  You can tell just looking at this that this is

22   char; is that right?

23    A    Oh, yes, yes.

24    Q    Let's look at -- if you go to slide 8.

25              Mr. Baxter, I'm looking at figure 9 in your
                              1100
```

PowerPoint deck.  What are we looking at here?

A    You're looking at another microscope field that has a

lot of angular char particles in it.  Again, those are

consistent with mostly vegetative -- vegetative or a wood

source.  It could be either -- they're both vegetative, but

one might be from lumber.  Another might be from burning

material outside.

Q    And the char that you're looking -- that you're seeing

here, is that consistent with a structure fire nearby?

A    Yes, it could be.  It's consistent with -- again, I

would look at this as what other sources might have caused

this, but it's consistent with a nearby source, yes.

Q    And a nearby source being a structure fire?

A    A structure fire that would involve wood or a cellulose

source, yes.

Q    When you say "cellulose source," what does that mean?

A    Well, cellulose is a more general term that would

include wood, leaves, twigs, bark.  So, you know, the twigs

and bark would be coming from an outdoor or nearby source,

whereas the char from lumber would be from the wood, and wood

is all cellulose.

You know, we have a lot of cellulose materials.  You

have synthetic cellulose also which would be paper fragments

or something else.  And, again, you'd have to look more

closely at the samples to see if they're mixed with other

1101

```
 1   cellulose.
 2           But cellulose is a term that we generally use for
 3   materials that are made from plants.
 4   Q    Okay.  And are you seeing here char from a structure
 5   fire nearby?
 6   A    It could be a structure fire.  Again, it looks like it's
 7   a mixed source because we have pollen and everything else.
 8   You have a mixed source, and it could be a structure fire
 9   nearby, yes.
10   Q    Yeah.  Because you have different -- you're saying
11   because there's different things in here.  So -- is that
12   right?
13   A    Yes.
14   Q    So some of it's from --
15   A    That's a number of reasons that you need to preserve
16   this, is what's surrounding it; what are the other particles
17   it's associated with.
18   Q    So, in other words, if you -- if there were trees that
19   were burned, you could be seeing that here?
20   A    Yes.  You could -- and that's what we're doing.  We're
21   seeing a mixed pollen source with a char source, and that
22   would indicate that there are -- there's a flowering plant or
23   residual from that or a flowering tree or something.
24   Basically that is indicative of a plant-based fire.
25   Q    So you have two sources here that you're seeing?
```
                                1102

```
 1    A    Yes.

 2    Q    So let's talk about the sampling that Travelers

 3    conducted at the Metropolitan, okay?

 4         You reviewed Travelers' sampling and -- done by

 5    Mr. Spicer and the sampling analysis from R.J. Lee; is that

 6    correct?

 7    A    Yes.

 8    Q    Okay.  After reviewing Travelers' reports relating to

 9    that September 30, 2019, sampling of the Metropolitan, what

10    did you conclude?

11    A    Well, actually it's important to read their report

12    that -- in their own reports, they state that there is no way

13    to use -- or that there is not a standard method using optical

14    microscopy for doing this.  And that report is in 2019.  They

15    totally ignored number one, the Wildfire Technical Guide that

16    specifies optical microscopy as a primary method.

17         They have used -- so let me break it down.  There

18    are several types of sampling they've done.  They have done

19    tape lift sampling, and then they have done wipe sampling.

20    The tape lift sampling, they tried to follow the ASTMD6602

21    method, which only uses optical microscopy as a screening

22    method, and that's all they did with it.

23         So their tape lift samples and their optical

24    literally doesn't go any further than just looking for

25    aggregate material and not really an analysis.  I didn't see
                                1103
```

```
 1    in any of their reports an actual -- in this industry what we
 2    call a certificate of analysis for any of the optical
 3    analysis.  It looks like they just made some observations
 4    before going to the TEM analysis and intended to use that
 5    method as their primary method.
 6    Q    Let's come back, Mr. Baxter.  Let's circle back to that.
 7    Let's first talk about the sampling method that Travelers
 8    used, okay?
 9    A    Yes.
10    Q    What are your opinions with regards to how Travelers
11    sampled the Metropolitan?
12    A    Well, like I said, the tape lift samples, they did
13    collect them.  They were not used as any part of the primary
14    analysis.
15              So they relied primarily on wipe sampling, which is
16    not a primary method.  If they would have read the AIHA
17    Technical Guide, they would have seen a lot of information
18    that said the wipe sampling doesn't preserve the provenance.
19              And as I indicated earlier, that's important to
20    being able to figure out the source of the fire.  As a matter
21    of fact, they have ignored Section 7.3.2 in the actual ASTM
22    method that says if you need to look at the spatial integrity,
23    you need to use tape lift sampling and base the analysis on
24    that.
25              So what they did do was they used wipe sampling, and
                                    1104
```

1  then they used subsamples of that wipe, placed the cut samples

2  of that wipe sample -- and this is actually -- this is

3  actually important to understanding how much data you can get.

4          So what they did is they made 5 to 6 transfers.

5  They took a wipe sample.  They cut a sample of that.  They put

6  it in a test tube.  They put acetone in that wipe to try to

7  extract off the soot, and that is the primary method if we're

8  interested in carbon black.

9          The problem is we're dissolving the soot particles

10 we're looking for.  So what they did is put it in acetone.

11 They put it in an ultrasonic bath.  That's what you use to

12 clean jewelry with to get the carbon and all the stuff off of

13 it.

14         So what they basically did was then destroy the size

15 distribution of the particles that were in there, and then

16 they took basically an eye dropper and evaporated that

17 material directly onto what is called a TEM grid.  It is

18 literally known -- it is an actual screen.  It's a copper

19 screen that is coated with carbon.  It's only 3 millimeters.

20 If you look at a piece of paper in front of you, it's the size

21 of an O on the paper.

22         So we go from this large white sample to something

23 that is no larger than a dot on a piece of paper.  Then they

24 evaporate that onto that piece of paper or onto that grid.

25 That goes into a transmission electron microscope.  By the

                              1105

```
 1   time it gets to the electron microscope, they diluted what

 2   they've wiped on that sample almost 20,000 fold.  So you're

 3   looking at literally a tiny amount of what was there.

 4             Now, if we are looking for what the ASTM method was

 5   intended for, for carbon black, and trying to differentiate

 6   both samples of that from something else, that works fine.

 7   But for trying to see what is soot on the sample, not carbon

 8   black, you basically destroy it.

 9             So the method they used basically eliminates what

10   we're looking for in the diagnostic information we could use

11   to differentiate whether it came from a wildfire, whether it

12   was actually soot from a structure fire.  They're left with

13   the residue that they haven't burned away already.

14   Q    Okay.  And so is that why wipe method -- wipe sampling

15   is not the recommended method to test for combustion

16   byproducts from a structure fire?

17   A    Yes.  We're not interested -- the method being used

18   works well for carbon black, which is elemental carbon.

19   Actually what we've done -- and that's before -- remember,

20   we're talking about before what the electron microscope does

21   to it because that's a whole other issue.  Not only have we

22   had one 20,000th of a dilution going in there, the electron

23   microscope itself in that analysis is the second part of the

24   problem.

25   Q    And the second part of the problem is that it burns the
```
<center>1106</center>

```
 1    char or soot?

 2     A    I think a good way to look at this is an analogy.

 3    Anybody who has an oven and wants to put it in self-cleaning

 4    mode, okay?  My wife usually does that.  So the guys may not

 5    understand this.  But what you do in a self-cleaning mode of

 6    an oven is that you basically turn it up very high to clean

 7    the oven.  Okay.  So what do you get rid of?

 8              You get rid of the organic carbon, which is the soot

 9    from a lone, uncontrolled temperature fire, okay; like a

10    structure fire, like a wildfire.

11              So what happens is you heat it to over 500 degrees,

12    and then you open your oven, and it looks a lot cleaner, and

13    it's actually easy to clean off what's there.  Why?  Because

14    what's left is elemental carbon.  That's all that's there.

15    But it is totally different, looks different than what you

16    started with.

17     Q    So would it surprise you if someone used wipe sampling

18    to test for a structure fire and not find any soot or char?

19     A    Actually if you were asking me to choose a method to use

20    so I didn't find it, the method that has been employed here is

21    the method that I would use.

22     Q    Okay.

23     A    And there is one more analogy here that I think is

24    really important so people understand.  A transmission

25    electron microscope in its simplest form is no different than
                                 1107
```

a light bulb.  Think about it for a minute.  An incandescent
light bulb has a filament in it.  You apply 120 volts and it
glows.  That's how we get light.

            But it also generates electrons.  So if you think
about it, if you take a light bulb and extend it out into a
long cylinder, it's in a vacuum.  That's what an electron
microscope is.  And then you turn the microscope on, you heat
it, and you heat the sample in a vacuum, you'd also get rid of
material.

            Anyone who has changed a light bulb knows that if
you turn it off and try to unscrew it, right away you're going
to burn your hand.  And that's 120 volts.

            What is kind of astonishing in this report, if the
photos, micrographs are correct from the R.J. Lee analysis,
think about it for a minute.  You go from 120 volts, this TEM
light bulb, which is what it is, they actually apply 200,000
volts to that filament instead of 120.

            So what you've done is you heat the sample.  The
electron beam heats the sample and burns away what you're
looking for.  What you're left with is carbon black or
elemental carbon.  It's changed.  It's different material.

            Most fires, a structure fire or wildfire are like
50-percent organic carbon, which has carbon and oxygen.  It's
the kind of stuff we see as resonance material.

            Carbon black, what's left over, is nothing more than
                              1108

```
 1    a powder, and it is totally different in what it appears.  And
 2    if we have organic carbon in the sample, and that's what we're
 3    looking for, and in the fire analysis, that is what we're
 4    looking for.  He just burned it away.
 5            So what you're left with are the charred residues of
 6    heating that sample to probably 500 degrees or more with an
 7    electron beam.
 8    Q    All right.  Let's -- to that point, let's go --
 9            MR. ABRAMS:  Melissa, if you go to slide 11.
10    Q    (BY MR. ABRAMS) Mr. Baxter, if you look at what's in
11    your PowerPoint package as No. 11, and tell us what we're
12    looking at here.  This is from Travelers' R.J. Lee report,
13    correct?
14    A    Correct.
15    Q    And what are we seeing here?
16    A    We're seeing an image.  If we look at the top image to
17    the left, and I'm assuming we're looking at what says W1, unit
18    115 is the top of the page?
19    Q    Correct.
20    A    You're looking at the left of an electron --
21    transmission electron micrograph that has been taken at 80,000
22    magnifications.  You can barely read it.  The jury will not be
23    able to read it on the screen, but the first picture at the
24    bottom in the black, you'll actually see it says 200KV.
25    That's 200,000 volts.  That's what the TEM was running at.
```
                                 1109

```
 1            So that is the photo of what the little, tiny

 2    residual structures look like.  That grape-like structure is

 3    what people use determines aciniform, and so what you're

 4    looking at is the residue that's there.

 5            Throughout this report, Mr. Spicer and the R.J. Lee

 6    report insists that these are carbon particles that are left

 7    over.  They've misinterpreted their data, which is to the

 8    right.

 9    Q    And tell us how they've misinterpreted the data.

10    A    Well, first off, these particles that we're looking at

11    are not aciniform soot particles at all.

12    Q    What are they?

13    A    They think they are, okay.  And you can tell that from

14    the graph next to it.  And, you know, it's -- I went through

15    all their spectra.

16            So the jury understands what this is when you put an

17    electron beam on the sample, you actually generate coming back

18    off the sample x-rays, and these x-rays have a different

19    energy.  And so what we can tell is depending upon their

20    energy, which if you look at these graphs, what you go is from

21    low energy on the left to high energy on the right.

22            The axis shows you one, two, three, four, five, up

23    to ten.  That is actually the energy coming back.  And each

24    element in the periodic table, the chemistry is what we're

25    talking about, has its own energy where we will identify it.
```
                                1110

1    If you look at the peaks -- so what we have is the

2  C, an O, which is carbon oxygen.  Then we have some smaller

3  peaks which are -- we've got aluminum, silicone.  The big

4  peaks there, the S is for sulfur and the C is for calcium.

5    This spectrum is a dead ringer for calcium sulfate

6  or gypsum dust.

7  Q    Okay.

8  A    So what we're looking at in this sample is not carbon,

9  ash, and soot.  We're looking at calcium sulfate.  As I told

10  you earlier, they basically put the sample in acetone and then

11  evaporate it onto the grid.  We're looking at the

12  crystallization structure.  It's just like if water dries,

13  you'll see a light residue.  That's exactly what we're seeing

14  in the photos on the left, but the photo on the right tells

15  them all we're looking at is the evaporated structure, calcium

16  sulfate.

17  Q    Okay.  You said --

18  A    Drywall dust.

19  Q    I'm sorry.  You said what we're looking at is gypsum

20  dust.  Can you explain --

21  A    Yes.

22  Q    What is gypsum dust and where --

23  A    It's the composition of the drywall.  And in a wall

24  cavity -- actually if you pull up -- there are some pictures

25  that show --

                         1111

```
 1   Q    Yeah.  Let's go to the next slide, slide 12.

 2             This is from R.J. Lee's sampling.  Do you understand

 3   that?

 4   A    Yes.

 5   Q    And Mr. Spicer's sampling.  What are we seeing in these

 6   pictures?

 7   A    In order to get to the wall cavity, they used a saw to

 8   cut out a piece of the drywall to access the wall cavity.  And

 9   you can see that there is -- in figure 29, there's insulation

10   behind there, but what you do see all over the floor, it's

11   pretty messy, is you generate a lot of drywall dust, and you

12   can actually see it's even coloring his shoe in this

13   photograph.

14             So what you've done in collecting a wipe sample

15   inside this wall cavity is you're collecting probably more

16   drywall dust than anything.

17   Q    And is that what you're seeing in Slide No. 11 with the

18   chemical analysis that was done?

19   A    Yes.

20   Q    Let's go to the next slide, No. 13.  Tell us what we're

21   seeing here.

22   A    Again, I'm looking at W2, unit 119?

23   Q    Correct.  This is from R.J. Lee's report, correct?

24   A    That's correct.  So we're actually seeing another

25   example of the exact same thing.  If you look, you will see
```
1112

```
 1   those calcium and sulfur piece, the S and the CA.  That is the
 2   atomic designation on how we differentiate each element.
 3           So we're also seeing carbon and oxygen.  We may have
 4   some carbon coating on the sample of the drywall dust itself;
 5   but, again, the actual substrate that they have is actually
 6   what's called a formed bar and then a carbon coating.  So the
 7   carbon is not just a function of what might be coating the
 8   drywall particles, but also the substrate.
 9   Q    Okay.  And is --
10   A    So, again, it's calcium.  They haven't recognized
11   they're looking at calcium sulfate.  They're looking at
12   drywall dust.
13   Q    Okay.  Let's go to the next slide.  This is from unit
14   121, W3.  Is this the same thing?
15   A    Yes, it is.
16   Q    So what they're looking at is drywall dust?
17   A    Yes.  Now, there may actually -- I'm seeing some other
18   elements in here; the potassium and magnesium, which would be
19   indicated.  And, again, it's going to be hard to see.  An MG
20   is for magnesium, and sodium, and then K is for potassium.
21   It's right next to that calcium peak.
22           But, again, we have -- the major peaks in this
23   sample, the major part of this is gypsum dust.
24   Q    Let's go to the next --
25   A    By the way, what's important, I think, in my own report,
```
                                 1113

1    I showed pictures of what happens when you evaporate drywall

2    dust and you get this hexagonal structure; the same thing when

3    you evaporate it.

4    Q    Let's go --

5    A    W4 is what you're looking at now; is that correct?

6    Q    Yeah, W4, 122.  Just briefly, are we seeing the same

7    thing here?  This is from R.J. Lee.  Are we seeing them

8    capturing gypsum dust?

9    A    Yes.

10   Q    Next one, W5, unit 227.  Are we seeing the same thing?

11   A    Yes.  There may be a little of silicone or other clay or

12   something in there, but it's still primarily gypsum dust.

13   Q    All right.  Let's look at the next one, unit 330, W6.

14   Are we seeing the same thing?

15   A    Yes.

16   Q    One last one, W7, unit 306.  Are we seeing the same

17   thing?

18   A    No.  We're actually seeing in this one that you can now

19   see -- this is probably a soot -- this is a soot cluster,

20   okay?  Because look at the carbon peak.  And there still is a

21   little calcium and sulfur in this, but I would agree this one

22   is probably a soot particle.

23   Q    Okay.  So this is one where R.J. Lee actually found some

24   soot?

25   A    Correct.

                              1114

```
 1    Q    Okay.

 2            MR. ABRAMS:  By the way, can we go back to slide 12,

 3    Melissa.

 4    Q    (BY MR. ABRAMS) This is the photograph you were looking

 5    at, Mr. Baxter, cutting out the wallboard.

 6            Is there a way to do the sampling that -- I know

 7    you're not supposed to do wipe sampling, but is there a way to

 8    test behind the wall where that doesn't create all this dust?

 9    A    There are saws you can use.  No matter what, even if you

10    hadn't cut that, you would have the drywall dust in the wall

11    cavity from the original construction.  But the answer is

12    there's no way to totally eliminate it.  But this looks like

13    the procedure that was used was overly aggressive.

14            You could have used a really thin blade.  This looks

15    like they used like a saw, and that would generate a lot of

16    drywall dust.  So a large essentially razor blade.  They make

17    these large cutting blades where you can minimize the amount

18    of drywall dust.  It doesn't appear that was used at all here.

19    Q    And can you get behind -- can you test in between walls

20    going on the side of wall sockets?

21    A    Yeah.  Actually in these photographs --

22    Q    When I say "wall sockets," I meant electric sockets.

23    A    Yes.  That brings up a whole other issue, and that is

24    how you select these samples.  Your analysis or results are

25    only going to be as good as your sampling preserves the
```
<div align="center">1115</div>

1    sample, what you're looking for.

2          So there is a wall plate, as you can see in both

3    figure 14 and 29.

4          If you're trying to get an idea of what would have

5    migrated from the inside of that unit into the wall, the first

6    place if I was doing the sample, I would have done is to

7    remove the plate on the electrical outlet and sample on the

8    back side; because if it's going to get in anywhere, it's not

9    going to get in where he cut the sample in figure 29.

10          It would be where that wall outlet is, and that's

11   the first place I would have tested.

12   Q    Do you have any other criticisms of R.J. Lee of where

13   they sampled?

14   A    The only other issue, because there is mixed partition

15   walls and exterior walls, is that there are a lot of the

16   locations where they actually pulled the insulation out.  If

17   we're looking at figure 29, what they actually did, there's

18   probably a photo showing them doing that.  Do we want to go to

19   one of those photos where they actually poke the insulation?

20   Q    You can describe -- we'll see if we can pull it up, but

21   you can describe.

22   A    Okay.  What they basically did was to try to get to what

23   is called the oriented strand board or OSB.  It's what they

24   use a lot in construction instead of plywood now.

25          What they did was to pull the insulation out and
                              1116

```
 1    then go to the back side and take samples off of the board
 2    that is on the exterior side of that wall cavity just on the
 3    other side of the fiberglass insulation.  Okay.  And those
 4    samples, that would be the last place that I would actually
 5    sample if I'm trying to find how far the soot penetrated into
 6    a wall.
 7    Q    And why is that?  Why would that be the last place you
 8    would sample if you were trying to determine whether there
 9    were combustion byproducts present in the Metropolitan as a
10    result of a nearby structure fire?
11    A    A little bit of this is chemistry and physics.  So what
12    happens is that when you have a warm plume from a fire that is
13    either generated in the building or from coming to a close
14    source, everybody has seen it on a water glass, okay?
15    Moisture will condense on a glass with ice cubes in it because
16    the physics and chemistry of gasses, which a lot of gas and
17    fumes, which a lot of wildfire structure fire contain
18    initially, will condense on the first cooler object they can
19    run into.
20           So I'd do testing on the fiberglass itself first.
21    That's like a cool sponge that would collect the condensing
22    residues, and it also acts like a filter before it could ever
23    get to that exterior wall.
24    Q    Did you see anything in the R.J. Lee report where they
25    tested the fiberglass?
                             1117
```

```
 1   A    No, I did not.

 2   Q    Okay.  I want to go to one last topic, Mr. Baxter.  This

 3   is the topic of fractal analysis, okay?

 4        And we heard testimony from Mr. Spicer that in

 5   addition to the TEM analysis from R.J. Lee, they -- there was

 6   some fractal analysis or a report from an outfit called PH2.

 7   Did you review that?

 8   A    Yes, I did.

 9   Q    Can you briefly describe for the jury what is a fractal

10   analysis?

11   A    In simplest forms, fractal analysis determines the

12   roughness or the edges in the perimeter of the -- the ratio of

13   the longest dimension in a particle to the perimeter that it

14   has to go around to complete a full circle.  So there is a

15   ratio.

16        Another way to look at it -- I'm from California.

17   So as I look at it, one way to look at it, if you were to draw

18   a straight line from San Francisco to, say, San Diego, and

19   that would be the length of the dimension you're going to use,

20   and then you were to draw a line following the exact coastline

21   that it would take to get from San Francisco to San Diego,

22   that would be part of the fractal analysis.

23        Obviously a straight line is the shortest distance,

24   and the fractal is how torturous that coastline is.  You'd

25   probably find that it's -- depending upon what unit of
                              1118
```

1    measurement, if you're going to go foot by foot or mile by

        2    mile, it could be 10, 20 times longer than the distance.

        3           So all that is, is a ratio of the perimeter to the

        4    distance.  So it's a measure.  And it makes some basic

        5    assumptions, which are invalid when we're looking at the

        6    analysis we've already described.

        7    Q    Let me get to the point.  What Mr. Spicer testified was,

        8    is that based on the fractal analysis, he concluded that the

        9    soot and char found in phase 5 was different than the soot

       10    found in phases 1 through 4 and that they came from different

       11    sources, okay?  Do you agree with that?

       12    A    Absolutely not.

       13    Q    And why do you absolutely not agree with that?

       14    A    Because, number one, we're not looking at the soot, as

       15    we described previously.  We're looking at drywall dust.

       16    That's the first thing.

       17           So we --

       18    Q    In other words, before you get to the second thing.  I

       19    just want to make sure I understand.

       20           The first thing is, is because they've destroyed the

       21    soot sample; is that what you're saying?

       22    A    Yes.  They're only analyzing what wasn't removed from

       23    the sample, and all that's left is drywall dust and a little

       24    bit of carbon.

       25    Q    Okay.  And what's your second reason?
                                    1119

```
 1   A    Well, that is part of the second reason is that, first
 2   off, we're not dealing with a material as found.  By the way,
 3   fractal analysis is used throughout the industry in looking at
 4   comparing diesel emission sources, a change in diesel
 5   emission, atmospheric particles, and most of these are assumed
 6   to be elemental carbon and to look at the decay.
 7            And they're looking at actual samples that haven't
 8   been -- that haven't been distorted or have been prepared side
 9   by side.  As I said, to use fractal analysis on what's
10   remaining in the sample is only looking at those that are
11   elemental at best, if not the drywall.
12            And totally doing that comparison ignores what was
13   removed from the sample that I think the parties that
14   Mr. Havics and Mr. Spicer are actually unaware of what happens
15   when you try to prepare these.  And the difference between
16   using that D6602 analysis is literally designed to look at
17   resilient carbon particles, and it doesn't apply to these more
18   long temperature soot materials that are generated from
19   plastics and low temperature resins from wood or woody
20   materials.
21   Q    So finally, Mr. Baxter, if Mr. Spicer concluded, based
22   on fractal analysis, that the shapes of what was found for
23   soot in phase 5 are different than 1 through 4, so then we
24   would know that the soot in 1 through 4 was not the same type
25   of soot that was found in No. 5 -- in phase 5, would you agree
```
                                     1120

```
 1   or disagree?

 2    A    You can't even do that comparison because of what we

 3   have discussed.  The shape and the fractal -- there is one

 4   other important thing that I forgot.

 5           When we evaporate materials, which is what happened,

 6   if we look at their own method, they would take one drop at a

 7   time, put it on the grid, allow it to evaporate, then put

 8   another drop with more material up to ten times.  They're

 9   overlapping the debris they're adding to the sample.  They've

10   destroyed the spatial integrity, and fractal analysis is based

11   on spatial integrity.  So they've artificially created a

12   scenario they're trying to compare that isn't even related to

13   soot.

14           MR. ABRAMS:  Your Honor, I'll pass the witness.

15           THE COURT:  You sure?

16           MR. ABRAMS:  You want me to keep going?

17           You're going to get college credit for this, Your

18   Honor.

19   CROSS-EXAMINATION BY MR. ELY:

20    Q    Mr. Baxter, good afternoon.  How are you?

21    A    I'm doing good.  It's earlier for me than you.

22    Q    Yes, sir, it is.  I'm Brenen Ely.  I'm a lawyer from

23   Birmingham, Alabama.  I represent Travelers.  It's nice to

24   meet you finally.

25    A    Yes.
                              1121
```

```
 1   Q   So I want to try to go in order here and be -- and move

 2   this along as quickly as I can.

 3          So I do want to talk to you a little bit about the

 4   state of the science currently in the industry, okay?

 5   A   Yes.

 6   Q   Is it a fair statement to say that there is a healthy

 7   debate in the science -- in your industry right now as to what

 8   the proper sampling, analytical methods are for these kinds of

 9   soot and char issues?

10   A   Yes.  It's probably more than a healthy debate.  I think

11   you underestimate it.

12   Q   I was trying to be kind.

13          So -- and I want to make sure we're clear on this.

14   Is that science evolving?

15   A   Science is always evolving, and that is -- that is part

16   of the issue, is that every investigator or laboratory gets

17   trapped in that evolving science.  The answer is yes.

18   Q   So -- and this was -- Mr. Spicer was out at the

19   Metropolitan in September, the fall of 2019, nearly four years

20   ago.  You remember that?

21   A   Correct.

22   Q   So is it possible -- to some extent, what was understood

23   in 2019 may not be the case now in 2023?

24   A   That is correct, and there's still -- the knowledge base

25   is based on whether people do a peer review of research and
```
                                 1122

1   keep up with that research.  As I said, 2018, the Wildfire

2   Guide was published.  It went through 24 experts, two years of

3   peer review from a lot of laboratory experts.  And I would say

4   in fairness, there are a lot of people in 2019 that actually

5   weren't actually aware of what the standard in the industry

6   was, and they're relying on older methods.

7   Q    Okay.  Mr. Abrams mentioned that you are currently on

8   the subcommittee for the IIRC?  I can't get the acronym right.

9   I'll let you do that.

10  A    It's IICRC.

11  Q    Thank you.

12  A    The answer is yes.

13  Q    Are you the chair of that subcommittee?

14  A    No, I'm not.

15  Q    Okay.  Is Mr. Spicer on that committee with you?

16  A    Yes, he is.  Chris and I are good colleagues and

17  friends.  We spend a lot of time talking about methods, yes.

18  Q    In fact, you all used to work together back in the old

19  days, didn't you?

20  A    Oh, yes, going back to the 1980s with asbestos, yes, we

21  did.  We were part of parent companies, yes.

22  Q    So Mr. Baxter, since you've known Mr. Spicer all these

23  years, do you have an opinion as to his integrity and his

24  character as a scientist?

25  A    I have great respect for him, yes.

1123

1    Q    Okay.  And you just happen to disagree with what he did

2    in this case?

3    A    Yes.  He would probably, after spending a lot of time on

4    these committees, realize that if we were going to do this

5    again today, we would probably use the advanced and evolving

6    methods, yes.

7    Q    So in 2019 was the TEM analysis, the tape lifts, the

8    wipe samples, all the stuff you talked about, I'm going to try

9    not to go back through all those details, but was that at

10   least an acceptable practice in the industry, whether you

11   agreed with it or not?

12   A    Well, in 2018 -- going back to 2015 even, there was a

13   lot of debate.  In 2018, in April, the guide was published.

14   And since that time going forward, it's kind of been

15   recognized as the standard in the industry.

16            Of course, there's a lot of disagreement over it.

17   Q    Sure.  But are you stating an opinion that Mr. Spicer

18   wasn't following an industry standard when he went out to

19   sample the Metropolitan?

20   A    He was relying on information, which is really common,

21   from the laboratory is the best way to go out and do this, and

22   he was following that.

23   Q    Was that typical in the industry at the time?

24   A    Yes.

25   Q    Is that still typical in the industry to some degree?

                                1124

```
 1    A    We have a lot of people that are fighting the science.

 2   That is what happens.  But the science is pretty staunch in

 3   what is appropriate to try to determine and differentiate

 4   fires.  The idea of using optical microscopy in 2019, there's

 5   a large body of work and a lot of people who accepted that as

 6   the consensus, and there are those that didn't.

 7    Q    And so the AIHA guide was published in 2018, correct?

 8    A    Correct.

 9    Q    And so some of the criticism that you had, I heard from

10   Mr. Abrams, was Mr. Spicer's -- let me back up and ask you

11   this question.

12         I read in your reports, there was some debate over

13   the primary combustion byproduct you would be looking for from

14   this kind of structure fire.  Do you have an opinion on that?

15    A    Well, I have an opinion on structure fires in general.

16   There are all kinds of materials.  And depending upon what

17   burns precisely, will generate a different -- what we call an

18   assemblage within those particles.  I think it's important,

19   because the word "assemblage" is coming up all the time, did

20   come up.  That's a grouping of particles found together that

21   help determine a source, and that varies from fire to fire.

22         And unless you go real in depth, the differentiation

23   and determining whether you have various sources is based on

24   that assemblage, okay?  And, you know, having a mixed source

25   with the looking -- where I've looked at these photographs, it
```

                              1125

```
 1   appears consistent with a mixed source, as I said.

 2   Q    Okay.  Let me -- I'm going to read you something from

 3   your report.  Do you have your report handy there physically?

 4   A    Yes, I do.

 5   Q    And what I'm looking at is the October report, which is

 6   Plaintiff's Exhibit 28.  You may not have the exhibit number.

 7          I'll read you the passage.  We don't need to put

 8   it -- you don't need to find it.  I'll just read it and see if

 9   you agree with me.

10   A    All right.

11   Q    In your report on page 16 in the second paragraph, it

12   states:  In structure fires, including the Metropolitan

13   building, in parentheses, the most common and primary fire

14   generator residue found depositing on building surfaces is the

15   aciniform soot from the melting and combustion of organic

16   finishes, plastics, and synthetic materials.

17          Char particles are also present from combustion of

18   cellulosic and other carbonaceous materials.  However, these

19   are not the particles that typically infiltrate and are found

20   on wall cavity surfaces as a direct result of smoke from an

21   indoor structure fire.

22          You recognize that?

23   A    Yes.

24   Q    So am I correct that it has been your opinion throughout

25   this case that the primary combustion byproduct that we're
```
                                   1126

1    looking for from this fire is soot?

2    A    That's correct.

3    Q    Okay.  And you mentioned something -- Mr. Baxter, you

4    issued a report during the claim back on May the 5th of 2020.

5    Do you remember issuing that report?

6    A    Yes.

7    Q    And in that report -- and I can read you the sentence,

8    but I'll just ask you the question instead.

9         Do you recall referring to this -- making the

10   assumption that this fire was interior to the Metropolitan

11   phase 1 through 4 building?

12   A    Yes.

13   Q    And where did you get that information?

14   A    That was relayed by Mr. Irmiter.  And following that,

15   he'd indicated that it was more of a nearby source after we

16   had additional conversations.

17   Q    So you now know that the fire at issue was not, in fact,

18   inside the doughnut building; rather, it was in a different

19   building to the exterior?

20   A    That's correct.

21   Q    Okay.  And so with respect to your commentary with

22   regard to Mr. Spicer and his selection of the locations, you

23   mentioned that the -- is it -- are you operating under the

24   assumption that the migration of the soot from the fire is

25   working from the interior spaces into the wall cavities?

                                1127

```
 1   A    That is one possibility.  I also understand that there

 2   is not blocking on some of these ceilings; so it actually

 3   could be coming in from the top and then translating through

 4   holes drilled in the stud, from stud bay to stud bay.

 5   Q    Okay.  Do you understand that there's a -- there is a

 6   suggestion that soot from the fire could have migrated in from

 7   the exterior envelope?

 8   A    Yes.  But that still doesn't change my opinion on the

 9   location of the sampling that was actually conducted by

10   Mr. Spicer.

11   Q    Okay.  I'm going to go to your report again on page 15

12   from October, and I'm going to go to paragraph 4 there and ask

13   you to take a look at that if you would.  You have that with

14   you?

15   A    Is that Exhibit PL784, the one you're referring to?

16   Q    Well, the PL784 -- I'm not sure what you have.  Mine

17   is --

18   A    Is that -- I guess is that my December report?

19   Q    What I've got is Plaintiff's Exhibit 28, which is your

20   October report in this case.  If you don't have it, I can just

21   read it to move things along.

22   A    Yeah.  Go ahead and read it.

23   Q    If you trust me to read it, I'll just go ahead and do

24   that.

25   A    Okay.
                              1128
```

1   Q    Paragraph 4:  Based on the sampled locations given in

2   the GBTS -- now, GBTS is Mr. Spicer, correct?

3   A    Correct.

4   Q    Given in the GBTS report shown in appendix 2, quote,

5   photographs of sampled locations, unquote, the locations with

6   the highest potential fire residue deposition and

7   contamination are the fiberglass wall insulation facing the

8   interior of each room or the interior drywall, and not on the

9   OSB, oriented strand board, on the exterior perimeter wall

10  where GBTS collected both their wipe and tape lift samples.

11  These exterior wall cavity wall locations would be

12  representative only if the smoke came into the wall cavity

13  through the exterior penetrations of the building envelope.

14          So the question back to you, Mr. Baxter is, if

15  you're testing to determine if there's been exterior

16  infiltration or penetration from the outside of the building,

17  does that sentence, that last sentence I read to you, are you

18  in agreement that the back of a wall cavity is the appropriate

19  place to test?

20  A    No.  Because where those -- I looked at all the

21  locations where they'd been, and they are still at the base

22  of -- down at the base of the wall.  It's not going to migrate

23  through the exterior envelope of the building and through the

24  OSB board.  You wouldn't be testing that.

25          If it's coming through through other penetrations,

                              1129

1    through attic or soffit spaces, you would be -- you wouldn't

2    be testing in those locations.  Those would be different

3    testing locations.  It doesn't change the actual opinion of

4    mine on whether that sampling location was appropriate or not.

5    Q    So that last sentence, that exterior wall cavity

6    locations would be representative only if the smoke came into

7    the wall cavity through exterior penetrations of the building

8    envelope, you no longer believe that to be true?

9    A    No.  I'm saying that is the only place it would work is

10   if you actually have a penetration.  You have a pipe or you

11   have some other way of it coming through the OSB to that

12   interface between the fiberglass and the outside wall.  That

13   would -- it would be the appropriate location if I was

14   sampling right next to where there's an exterior pipe or

15   conduit or penetration.  I would do the exact same thing.

16             If it was from outside, then I would be looking at

17   that conduit that penetrates right through to the exterior

18   side of that wall cavity.  That would be the only time it

19   would be appropriate to sample in some of those locations

20   where Spicer has sampled.  But you've got to show me there's a

21   penetration from the outside where he sampled it to make that

22   a valid location.

23   Q    Okay.  Mr. Baxter, are you aware -- do you know whether

24   all 20 samples were taken within finished wall cavities?

25   A    No.  Some of those, I've been made aware of that later

1130

1 in looking at photographs, are partition walls.  So some of
2 your locations are not exterior walls.  They're interior
3 partition walls.
4  Q    Have you -- are you aware that five of the samples were
5 taken in spaces that were unfinished with no Sheetrock or
6 insulation?
7  A    I'm going to have to see the photos.  Again, the
8 interpretation of each area and exactly what happens, I'm the
9 laboratory and evaluating the laboratory results.  Those
10 locations are literally the expertise of Mr. Irmiter and
11 Mr. Spicer.
12  Q    Okay.  And I understand that, Mr. Baxter.  But you also
13 understand you have -- you just testified that you were
14 critical of the locations that Mr. Spicer chose.  So if you're
15 now deferring to Mr. Irmiter and Mr. Spicer, that's fine.  I
16 just need to understand that.
17  A    No, no.  I am still -- I'm still critical.  The correct
18 locations would be near actual penetrations.  Whether it came
19 from the interior or the exterior, you'd be sampling near
20 those penetrations where the soot would originally condense.
21  Q    If you were sampling in unfinished spaces, would you
22 agree that it's -- that the appropriate sampling location
23 could be on an exterior wall?
24  A    It could be, depending on the situation, yes.
25  Q    Great.  Thank you.
                            1131

1          So I want to shift gears quickly to your criticisms

         2   of the sampling methods that Mr. Spicer used, and I believe

         3   with -- I want to be specific, specifically talking about the

         4   wipe sampling and the TEM analysis.  Okay?

         5   A    Yes.

         6   Q    You with me?

         7   A    Yes.

         8   Q    So I understood your testimony to basically say that

         9   you -- it's one of the worst testing methods you could have

        10   possibly chosen.  Is that a fair representation?

        11   A    It's unknowingly, because a lot of the field people

        12   don't know it, but that is the wrong way to collect the sample

        13   for the task at hand.

        14   Q    Is it --

        15   A    It is the specified method for carbon black, ASTM D6602.

        16   You referred to the controversy.  The controversy in this

        17   industry is that there are a lot of individuals who do not

        18   understand that that method within the method says you

        19   can't -- you shouldn't be using it for uncontrolled fires.

        20   Q    So, Mr. Baxter, as I understood your testimony, one of

        21   the criticisms that you have in the use of the TEM method is

        22   how hard it is on the aciniform soot particle; is that right?

        23   A    That's correct.  You have a method that's designed to

        24   cram a larger -- break down a larger sample and put it onto a

        25   3 millimeter grid so you can use the TEM, okay?  And it's the

                                        1132

```
 1    inappropriate instrument.

 2    Q    So is a wipe sample also inappropriate media?

 3    A    Not for carbon black.

 4    Q    Okay.  Well, we're talking about soot.  And your

 5    testimony is that use of a wipe media and TEM analysis was

 6    inappropriate; it was wrong?

 7    A    Yes.

 8    Q    So --

 9    A    For the purpose of deciding is it from a fire event.

10    Q    So I've got to ask this question.  Mr. Baxter, the AIHA

11    guideline has an entire section on wipes?

12    A    Yes, it does.

13    Q    Okay.

14    A    And it's been carefully written.

15    Q    It's been terribly written, is that what you said?

16    A    Carefully written.

17    Q    Oh, carefully written.  I'm sorry.

18    A    It defines on pages 7 through 10, the advantages and

19    limitations of each method.  And if you read carefully and

20    look at the entire method after all those advantages and

21    limitations, it says based on that, the consensus and primary

22    method is to use tape lift sampling to preserve the spatial

23    integrity, and to use optical microscopy as the primary

24    method.  Whether it's for soot, for char, for all the

25    indicator particles that we haven't talked about here and
```

<div align="center">1133</div>

1  would just confuse things, optical microscopy is the primary

2  method.

3  Q    You also -- you also -- I believe your testimony was

4  that the electron microscope, use of the electron microscope

5  also is damaging to the aciniform soot?

6  A    If it is primarily organic carbon, you can heat the

7  sample to almost 500 degrees if you're not careful, whether

8  it's scanning electron microscopy or transmission.

9         In a vacuum, what you do is the materials that have

10  condensed, the organics that have the odors, that have all the

11  problems that we associate with it will actually burn away

12  when you start going to temperatures of about 200 or 300

13  degrees in the vacuum chamber.  Remember, water boils at like

14  200.  But in an atmosphere if you remove it and put it in

15  space, which is like the chamber of a TEM, it will evaporate

16  at room temperature.

17         So the problem is you see this happen all the time.

18  In the tens of thousands of TEM analysis that I have

19  personally done for asbestos and environmental particles, you

20  will see these things burn away as you put the beam on them.

21  But when we're doing asbestos analysis, nobody thought

22  anything about it because we were looking for asbestos.

23  Q    And does the AIHA Wildfire Guide also mention electron

24  microscopy analysis as being -- as -- that may be warranted

25  and helpful in determining the presence or absence of fine

1134

```
1   nonvolatile combustion soot?

2    A     That's correct.  And you just hit on the point.

3   Nonvolatile.

4    Q     Okay.  So --

5    A     Carefully written.  Like I said, the problem is it's in

6   a vacuum, and using a 200,000 volt electron beam is going to

7   make anything that is semi-volatile disappear.

8    Q     Okay.  Mr. --

9              THE COURT:  Let me interrupt, Counsel, for a moment.

10             MR. ELY:  I have one question.  Can I finish?  Go

11  ahead.

12             (Counsel approached the bench and the following

13  proceedings were had:)

14             THE COURT:  I was going to see if you would be much

15  longer, we're going to break.

16             MR. ELY:  I've got one question left.

17             MR. ABRAMS:  So far I don't have anything.

18             MR. ELY:  I'll finish.

19        (The proceedings returned to open court.)

20             MR. ELY:  It may be two or three, but it will be

21  brief, I promise.

22   Q     (BY MR. ELY) Mr. Baxter, we're going to try to get you

23  gone.

24             Last question, are you in the process -- is the AIHA

25  Technical Guide in the process of being revised?
```

                            1135

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

```
 1   A    Yes.  Well, it is version 2.  It's supposed to start in
 2   September.  Actually I made sure Chris Spicer is a part of
 3   that.
 4   Q    I appreciate that.  And I will say this, Mr. Baxter, I
 5   am glad to see you.  I'm glad you were able to testify for all
 6   of us here, and I hope you get to feeling better.  Thank you.
 7             THE WITNESS:  Thank you.
 8             MR. ABRAMS:  One quick question, Your Honor?
 9             MR. ELY:  You said none.
10             MR. ABRAMS:  You asked such a good question.
11   REDIRECT EXAMINATION BY MR. ABRAMS:
12   Q    Mr. Baxter, you were just asked by counsel about the
13   revisions to the guide.  Is there any contemplation of
14   revising what you stated about wipe samples in the new
15   revision?
16   A    No.  As a matter of fact, talking with approximately 15
17   of those original contributors, we actually are under the --
18   we actually felt that there were some things that were an
19   accommodation with advance in science that we would have let
20   in that actually became loopholes for people to continue to
21   use the wipe sampling.  We're actually envisioning and
22   expanding the group of people to actually harden those things
23   to make sure people understand where wipe sampling is and is
24   not useful.
25             MR. ABRAMS:  Thank you.  Nothing further, Your
                                   1136
```

Honor.

MR. ELY:  Nothing further.

THE COURT:  All right.  I think that we've completed the evidence in this case.  As I said earlier, I was going to let you go.  It's a little later than I thought it would be. I feel compelled to read this instruction to you at this time. I'm not going to read it all.

During this recess, that is, between today and tomorrow when the case will be submitted to you, you're not to discuss the case among yourselves or with anyone else, including your family and friends.  Do not allow anyone to discuss the case with you or within your hearing.  Do not discuss also means do not email, send text messages, blogs, you know, engage in any other form of written or oral electronic communication, as I instructed you earlier.

You must decide this case only from the evidence received by the court here in the courtroom and the instructions on the law that I will give you later.  Do not read any newspaper or other written accounts, watch any TV, television accounts, radio account, or listen to any other streamed internet or radio program on the subject of this trial.

Do not conduct any internet research or consult with any other sources about this case, the people involved in the case, the general subject matter of the law.  You must keep

1137

```
1    your mind open and free of outside information.  Only in this

2    way will you be able to decide the case fairly based solely on

3    the evidence received here in court and my instructions on the

4    law.

5            If you decide this case on anything else, you will

6    have done an injustice.  It is very important that you follow

7    these instructions.

8            I'm going to recess for the day and ask that you

9    report again tomorrow at 8:30, and we'll begin submitting the

10   case to you.

11           Any questions?

12           Thank you for your time and your patience.

13           (The following proceedings were had out of the

14   presence of the jury:)

15           THE COURT:  Why don't you take a few minutes and

16   take a deep breath somewhere besides in here, and then I'll

17   ask you gather with Patricia and Hope and look at these

18   instructions.  And then we'll come together again.

19                   (Court adjourned.)

20

21

22

23

24

25                         1138
```

```
1                    REPORTER'S CERTIFICATE

2

3          I certify that the foregoing pages are a correct

4   transcript from the record of proceedings in the

5   above-entitled matter.

6

7   _____        _____

8      Date                 /s/Gayle M. Wambolt
                             GAYLE M. WAMBOLT, CRR, RMR
9                            United States Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```