3    MAXUS METROPOLITAN, LLC,          )
                                       )
4                    Plaintiff,        ) No. 20-cv-00095-FJG
               vs.                     )
5                                      )
     TRAVELERS PROPERTY CASUALTY       ) August 3, 2023
6    COMPANY OF AMERICA,               )
                     Defendant.        )
7

8          ..............................
         TRANSCRIPT OF JURY TRIAL - VOLUME 8 OF 8
9     BEFORE THE HONORABLE FERNANDO J. GAITAN, JR.
           UNITED STATES DISTRICT COURT JUDGE
10

11     Proceedings recorded by electronic stenography
              Transcript produced by computer
12

13                    APPEARANCES

14   For the Plaintiff:       MR. MICHAEL J. ABRAMS
                              MS. ALANA McMULLIN
15                            MS. KIMBERLY K. WINTER
                              Lathrop GPM LLP
16                            2345 Grand Avenue, Suite 2200
                              Kansas City, Missouri 64108
17

     For the Defendant:       MR. BRENEN G. ELY
18                            MS. LAUREN A. WIGGINS
                              Ely & Isenberg, LLC
19                            3500 Blue Lake Drive, Suite 345
                              Birmingham, Alabama 35243
20

                              MR. DANIEL EDWARD HAMANN
21                            Deacy & Deacy, LLP
                              9233 Ward Parkway, Suite 370
22                            Kansas City, Missouri 64114

23          Gayle M. Wambolt, RMR, CRR
           U.S. Court Reporter, Room 7552
24       Charles Evans Whittaker Courthouse
              400 East Ninth Street
25      Kansas City, MO 64106 (816) 512-5641
                         1139

Case 4:20-cv-00095-FJG   Document 248   Filed 09/05/23   Page 1 of 73

```
1                          INDEX
                         JURY TRIAL
2                      AUGUST 3, 2023

3    EVENT                                    PAGE
```

```
4    Instruction Conference                   1141

5    Instructions Read                        1155

6    Plaintiff's Opening Argument             1155

7    Defendant's Closing Argument             1174

8    Plaintiff's Closing Argument             1194

9    Questions by the Jury                    1201

10   Jury Verdict                             1208
```

```
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                            1140
```

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

```
 1              THURSDAY, AUGUST 3, 2023
 2   (The following proceedings were had out of the presence of the
 3   jury:)
 4              THE COURT:  Since it was such a tight fit in my
 5   conference room, I thought we'd do this out here, and what
 6   might be the best format is for counsel to come up with --
 7   what I plan to do is you have the instructions that I'm going
 8   to be looking at.  I'm going to be -- you don't have them?
 9              MR. ELY:  We do.
10              THE COURT:  Okay.  What I'm going to do is go
11   through them one by one, allow you to make your objections,
12   and tender any alternative instruction you would like me to
13   consider and move through it that way.  If you want to do it
14   from your seats, that's okay too.  I'll leave it up to you,
15   but it's time to get on with the show here.
16              Okay.  I'm going to start with Instruction No. 9.
17              Any objections here?  Who's going to be handling
18   this?
19              MR. ELY:  Mr. Ackerman.
20              MR. ACKERMAN:  I'll speak for the defendant.
21              MR. ABRAMS:  And Ms. Winter will.
22              MR. ACKERMAN:  We have no objection to Instruction
23   No. 9.
24              THE COURT:  No. 10?
25              MS. WINTER:  No objection.
                             1141
```

```
 1          MR. ACKERMAN:  No objection.

 2          THE COURT:  Don't be bashful now.  Speak up.

 3          11?

 4          MS. WINTER:  No objection.

 5          MR. ACKERMAN:  No objection.

 6          THE COURT:  12?

 7          MS. WINTER:  No objection.

 8          MR. ACKERMAN:  No objection.

 9          THE COURT:  13?

10          MS. WINTER:  No objection.

11          MR. ACKERMAN:  No objection.

12          THE COURT:  14?

13          MS. WINTER:  No objection.

14          MR. ACKERMAN:  No objection.

15          THE COURT:  15?

16          MS. WINTER:  No objection.

17          MR. ACKERMAN:  No objection.

18          THE COURT:  16?

19          MS. WINTER:  No objection.

20          MR. ACKERMAN:  No objection.

21          THE COURT:  17?

22          MS. WINTER:  No objection.

23          MR. ACKERMAN:  Travelers objects to Instruction No.

24  15 as too general for this case.

25          THE COURT:  I'm on 17 now.
                            1142
```

```
 1           MR. ACKERMAN:  Sorry.  17.  I meant to say 17.

 2           As too general for this case; that any damages

 3   awarded must be consistent with all applicable provisions of

 4   the insurance policy; and that the jury cannot award more than

 5   policy limits.

 6           I'll note that our proposed instruction relevant to

 7   this is at ECF Document 165 at page 9.

 8           THE COURT:  Overruled.

 9           18.  Or 19, I guess --

10           MS. WINTER:  No, you're on 18.

11           MR. ACKERMAN:  Travelers objects to Instruction No.

12   18 as inconsistent with recent Eighth Circuit authority that

13   we cited, the *Homestead Medical Center* case.  The instruction

14   should say that there must be a physical effect on property.

15   That a substance that can be eliminated by routine cleaning

16   does not constitute direct physical loss or damage to property

17   and that a danger to human health is not sufficient.

18           Our proposal on this was at ECF Document 208.

19           THE COURT:  Overruled.

20           19?

21           MS. WINTER:  We do have an objection, Your Honor.

22   The last part of this instruction that starts "such damages

23   include rebuilding," these are very specific line items after

24   that.  It says the state of construction at the time of fire,

25   any water damage in phases 1 through 4, water damage in phase
```

Gayle M. Wambolt, CCR No. 462
Registered Merit Reporter

5, and exterior damages to phases 1 through 5.  No one in this
case, not us, not Travelers, broke down the damages in this
way, and the policy doesn't require that you break down the
damages this way.

So our total damages, the jury would have no way to
determine what's water damage in phase 5, phase 1 through 4.
So it doesn't make sense, and we're requiring the jury to do
something that they're not going to be able to do because no
one has broken it down.

This also relates to form A.  The verdict form A is
similar in that --

THE COURT:  What number is that?

MS. WINTER:  Verdict form A comes -- it's on page
17.

THE COURT:  Okay.

MS. WINTER:  It's sort of nonsensical because this
is not how anyone broke down the damages, and we only split up
our damages between the rebuilding and the soot remediation
because Travelers was denying coverage for the soot
remediation, and we were trying to make it easier.  But
there's -- it's really not water damage.  No one discussed
specific water damage.  It's fire damage.  And the policy does
not require us to break it down this way, which is why we
didn't, with just a total.

THE COURT:  I guess I'm doing nonsensical today.
1144

```
 1    Overruled.

 2            Next.  20?

 3            MR. ACKERMAN:  Travelers objects to Instruction No.

 4    20.  We believe it should say that there must be direct

 5    physical loss, other damage to property caused by a covered

 6    cause of loss; that any damage to be covered must occur during

 7    the policy period, and also because there's no reference to

 8    the faulty workmanship exclusion.  We had a proposal which was

 9    ECF Document 173 at page 10.

10            THE COURT:  I wish I heard half of that.

11            Overruled.

12            21.

13            MS. WINTER:  We do have an objection to 21, Your

14    Honor.  In the first -- or, sorry, the second paragraph that

15    starts, "First, plaintiff failed to take all reasonable

16    steps," there needs to be some specific water damage amounts

17    included because there's -- again, there's no way for the jury

18    to determine exactly what damages were -- we failed to

19    mitigate because there's been no evidence presented on this by

20    Travelers whatsoever.

21            THE COURT:  Overruled.

22            22?

23            MS. WINTER:  We have an objection on 22 as well.

24    The paragraph that starts, "First, plaintiff or any other

25    insured intentionally concealed or misrepresented."
```

                              1145

Case 4:20-cv-00095-FJG   Document 248   Filed 09/05/23   Page 7 of 73

```
 1              Part of the problem is the way it's worded.  It says
 2    "combustion byproduct testing results or the sprinkler leak, a
 3    material fact concerning the claim."
 4              There is a requirement that concealment be a
 5    material fact, but this -- that's something for the jury to
 6    determine.  And this reads as if the combustion byproduct
 7    testing results and sprinkler leaks are necessarily a material
 8    fact.
 9              And where it says, "The defendant was thereby
10    prejudiced," I think we need to explain or it would be helpful
11    to explain to the jury what prejudice means.  And here that
12    means that Travelers would have changed their position in some
13    way.  So had they known about the sprinkler leak, had they
14    known about this other testing, which by the way, they argue
15    actually supports their denial.
16              So there's no evidence that Travelers would have
17    changed its position had they had this information, and that's
18    what you have to have for it to be material and for defendant
19    to have been prejudiced by this.
20              So I'm afraid it's going to confuse the jury.
21              MR. ACKERMAN:  And, Your Honor, we have an objection
22    to Instruction No. 22 that relates to the part that states,
23    "Second, the defendant was thereby prejudiced."  We believe
24    that's not required by applicable law; that there is only a
25    materiality requirement.
                                1146
```

```
 1            The case that is cited at the bottom, the American
 2  Modern Home Insurance Company v. Thomas case actually cites
 3  another Eighth Circuit case holding -- stating that the
 4  holding of the other case is that there is, quote, no
 5  requirement that the insurer was prejudiced by
 6  misrepresentation of proof of loss, end quote, and it holds
 7  that reliance is not required.
 8            So we believe that there is no prejudice requirement
 9  and that part of it should be stricken, but the remainder of
10  the instruction is -- we are comfortable with.
11            MS. WINTER:  Your Honor, if I may make one comment?
12            THE COURT:  Give me a moment.
13            MS. WINTER:  I was just going to say, after the last
14  paragraph on here "misrepresentation is material," there is
15  further discussion in the Thomas case, which we do believe
16  requires prejudice.  But there is further discussion in the
17  Thomas case after this language that says what this means is
18  the insurance company would have either charged a different
19  premium, or they would have accepted or rejected coverage.
20            There's absolutely no evidence here that Travelers
21  would have done something different.  The sprinkler leak is
22  not a part of our claim.  It's immaterial.  The combustion
23  byproduct testing results that they're talking about, they've
24  had them for I don't know how long, and they've never changed
25  their opinion.  In fact, they believe -- we disagree, but they
```

1147

believe that those test results actually support their denial.

              So there's absolutely no way that this is material
      or that they were prejudiced.

              THE COURT:  Overruled.

              Verdict form A.

              MS. WINTER:  Yes, Your Honor.  As I mentioned
      earlier, we believe that the bottom part of this form is going
      to confuse the jury because we have not broken our damages up
      this way.

              If we could just add a -- there's not a total damage
      amount listed.  It's really not -- it's not water damage in 5.
      It's not water damage in phases 1 through 4.  It's really
      damage from the fire.

              We didn't break down exterior damages to phases 1
      through 5 because that's not what the policy requires, and
      there's no total damage.

              THE COURT:  You said there was no evidence of water
      damage?

              MS. WINTER:  No.  I'm saying we don't have to break
      down the damages by those -- and there's no -- Travelers has
      not presented any evidence as to what amounts they disagree
      with as far as water damage goes or -- it's all fire damage.
      There's no water damage claim.

              THE COURT:  Overruled.

              Next?
                                1148

```
 1          MR. ACKERMAN:  Instruction No. 23, Your Honor, we
 2   object to the use of the word "presence" in this instruction.
 3   We believe under the case law, mere presence of a combustion
 4   byproduct would not be sufficient to constitute direct
 5   physical loss over damage to property.  It would need to have
 6   a physical effect on property such as the reasons I previously
 7   stated.  Our alternative was at document 173 at page 15.
 8          THE COURT:  Overruled.
 9          Next?
10          MR. ACKERMAN:  Instruction 24, we object to the use
11   of the word "present" and "presence" essentially for the same
12   reasons that I stated with respect to Instruction No. 23.
13          THE COURT:  Same ruling.
14          No. 25?
15          MS. WINTER:  This is the same as the prior
16   instruction that we objected to about misrepresentation and
17   defendant having to show that they're prejudiced by having
18   changed their coverage position, which they have not.  We're
19   concerned that it's misleading to the jury because it appears
20   to state the combustion byproduct testing results or the
21   sprinkler leak are material facts, and that's something for
22   the jury to determine in that second paragraph.
23          It's the same objection as before.
24          MR. ACKERMAN:  And we object to Instruction No. 25
25   to the extent it contains a prejudice requirement for the same
```

1149

```
 1    reasons I stated with respect to Instruction No. 22.

 2              THE COURT:  Overruled.

 3              Verdict form B?

 4              MS. WINTER:  No objection.

 5              MR. ACKERMAN:  No objection.

 6              THE COURT:  Instruction 26?

 7              MS. WINTER:  No objection.

 8              MR. ACKERMAN:  No objection.

 9              THE COURT:  Instruction 27?

10              MS. WINTER:  No objection.

11              MR. ACKERMAN:  We object to Instruction No. 27

12    because there's no reference to the policy's causation

13    requirement.  Also the policy has other specific requirements

14    through the business interruption coverage, including a period

15    of restoration that's not explained in this instruction.  Our

16    proposal was at ECF document 208 at page 4.

17              THE COURT:  No objection?

18              MS. WINTER:  No objection.

19              THE COURT:  Overruled.

20              28?

21              MS. WINTER:  Same objections as before, Your Honor.

22    This is the same instruction regarding misrepresentation of a

23    material fact and the fact that Travelers has not shown any

24    prejudice.  And we're concerned with the wording of the second

25    paragraph because it appears to say that combustion byproduct
```

1150

```
 1   testing results or the sprinkler leak, misrepresentation of

 2   those is a material fact.  And that's something that the jury

 3   should decide.  And there's been no evidence presented that

 4   Travelers actually would have changed their position had they

 5   known about these things earlier, which is what's required to

 6   show prejudice and material fact.

 7            MR. ACKERMAN:  Travelers objects to Instruction No.

 8   28 to the extent it contains a prejudice requirement for the

 9   same reasons as stated regarding Instruction No. 22.

10            THE COURT:  Overruled.

11            Verdict form C?

12            MS. WINTER:  No objection.

13            MR. ACKERMAN:  No objection.

14            THE COURT:  Instruction 29?

15            MS. WINTER:  No objection.

16            MR. ACKERMAN:  No objection.

17            THE COURT:  Instruction 30?

18            MS. WINTER:  No objection.

19            MR. ACKERMAN:  No objection.

20            THE COURT:  Verdict form D?

21            MS. WINTER:  No objection.

22            MR. ACKERMAN:  No objection.

23            THE COURT:  Is that it?

24            MS. WINTER:  Yes.

25            MR. ACKERMAN:  Your Honor, I also wanted to state
                                1151
```

```
 1   our objections to the court's failure to give several
 2   instructions.
 3           One is the failure to give any instruction on faulty
 4   workmanship exclusion.  We believe there's fairly extensive
 5   evidence of that in this case.  Our proposal on that exclusion
 6   was ECF document 165 at pages 5 and 6.
 7           Secondly, we object to the court's failure to give
 8   any instruction regarding the policy's requirement that the
 9   loss must have occurred during the policy period that expired
10   on September 30th of 2018.  There's extensive evidence in the
11   record of damage that occurred after that date.  Our proposal
12   on that was at ECF document 208 at page 3.
13           And then, third, we object to the court's failure to
14   give any instruction on the burdens of proof under insurance
15   policy.  Our proposal on that was ECF document 165 at page 4.
16           THE COURT:  Objection noted.
17           Anything from plaintiff?
18           Okay.  I guess I can officially overrule or deny the
19   request for the Rule 50 motion that was filed by defendants.
20           I did talk about allowing the jury to take notes
21   during oral arguments.  Were there any objections to that?
22           MR. ABRAMS:  No, Your Honor.
23           MR. ELY:  No, sir, Your Honor.
24           THE COURT:  Okay.  Where are we, Christy, on the
25   exhibits?
```

1152

```
 1              THE COURTROOM DEPUTY:  Copies of the list that I
 2    have were handed to counsel yesterday.  At the end of the day,
 3    they both had conferred that the list was accurate.  Still
 4    waiting to hear back as to whether or not they were going to
 5    stipulate to the admission of the majority of those or if they
 6    need to move to admit them.
 7              MR. ABRAMS:  That's correct, Your Honor.
 8              THE COURT:  We're good?
 9              MR. ELY:  Yes, sir.
10              THE COURT:  Okay.
11              That brings me to another question.  My guess is
12    that the jurors are going to want to look at exhibits.  And my
13    thought is since a lot of these exhibits were introduced via
14    technology, that we bring them back into the courtroom and let
15    them look at it that way rather than shipping technology back
16    to them.
17              Any objection?
18              MR. ABRAMS:  No, Your Honor.  You talking about
19    videos or --
20              THE COURT:  Yes.  I'm talking about exhibits that
21    have been displayed that way.
22              MR. ABRAMS:  That's fine, Your Honor.  We'll have to
23    work with the court about getting it to them, but that's -- we
24    have no objection to that.
25              THE COURT:  Well, the point I'm making is that --
                              1153
```

```
 1    I'm just assuming, based upon years of seeing this happen,
 2    that they're going to want to look at something.  I may be
 3    wrong.  But if they do, I'm saying rather than sending
 4    anything back to them, let them come back, let it be displayed
 5    because it's going to be in -- a few of them, not one or two,
 6    my guess is.
 7              If it's one or two, then you have a hard copy.  If
 8    it's a bunch of them, then it might be easier to have them
 9    come back and do that.
10              MR. ABRAMS:  I understand, Your Honor.  I misheard
11    you.  I don't have an objection to that.
12              MR. ELY:  If we can hand them hard copies, I'd
13    prefer to do that; but if not, there's too many of them, Your
14    Honor, and that's the way the court wants to handle it, that's
15    fine.
16              THE COURT:  Okay.  We'll discuss it when it comes
17    up.  I just wanted to let you know what my thoughts were on
18    that.
19              MR. ELY:  Okay.
20              THE COURT:  Anything else?
21              MR. ELY:  Not from us, Your Honor.
22              MR. ABRAMS:  No, Your Honor.
23              THE COURT:  Okay.  So we'll be bringing the jury in
24    the next five or ten minutes or so, and we'll start with
25    closing statements.
```

                              1154

```
 1              MR. ABRAMS:  Very good.  Thank you, Your Honor.

 2              MR. ELY:  Thank you.

 3              THE COURT:  Let Christy know how you want your time

 4    utilized, or at least the plaintiff.  Thank you.

 5                     (A recess was taken.)

 6                     (The following proceedings were had in the presence

 7    of the jury:)

 8              THE COURT:  We've got the evidence now.  We're going

 9    to go through instructions again, and my able assistant will

10    be reading the instructions because I can't -- I'm not able to

11    do that, as you may have noticed throughout this process.

12    Then the attorneys will have an opportunity to make closing

13    arguments.

14              I think you have notebooks.  You can make notes if

15    that's valuable to you.  If you don't feel you need to, don't

16    feel like you have to.

17                     (Instructions read.)

18              MR. ABRAMS:  Thank you, Your Honor.

19              Thank you, members of the jury panel.  Thank you for

20    your attention, your patience, and your service.  Thank you to

21    the court and to the marshals for all the help that they've

22    given us through the week, and thank you to Mr. Ely and his

23    team.  It's always appreciated to have a skilled opponent and

24    courteous lawyers.

25              So I want to start with where I started at our
                                      1155
```

1    opening statement a few days ago.  I said that this was an
        2    insurance coverage dispute, and this was a breach of contract
        3    matter.  And in thinking about this last night, it struck me
        4    that it's important to recognize where we are and what we're
        5    doing.

        6            The contracts are a critical part of the foundation
        7    of our society, of our economy, and contracts make certain
        8    that parties treat each other fairly; that they fulfill their
        9    obligations.  It's one of -- and one of the great things of
       10    our democracy is -- and what really makes -- one of the things
       11    that makes our nation great is that if someone does not
       12    fulfill their obligations under a contract, you can come to
       13    court, you can have this dispute decided by a jury of your
       14    peers, and that's what you are here for.  And this case is
       15    soon going to be handed to you.

       16            Travelers and Maxus entered into a written
       17    agreement, an all-risk contract for insurance.  Travelers had
       18    an obligation to pay claims if there was a covered loss, and
       19    the evidence has shown that Travelers has not fulfilled its
       20    obligation.

       21            So you have four claims that you're going to decide,
       22    and I'm going to take you one through four, and I think it's
       23    in the order of the claim forms.

       24            First the cost to rebuild and repair the
       25    Metropolitan for damages due to the fire.  We know, and you've

                                      1156

1  heard over and over again, phase 6 burned to the ground.

                            2  Phase 5 was severely damaged.  Its sides were burned, windows

                            3  melted.  You saw those pictures over and over again.

                            4  Thousands of ember holes.

                            5           By the way, one witness says, Thousands, really?  If

                            6  you don't believe it, go look for yourself at ATC report,

                            7  Plaintiff's Exhibit 244, page 4.

                            8           So we know that that happened.

                            9           Melissa, will you put up the chart for damages?

                           10           All right.  This is a chart that you have seen

                           11  before.  Maxus -- this is the amounts of money that Maxus paid

                           12  out of its pocket.  During trial, Tom Irmiter and Ryan Snyder

                           13  methodically went contract by contract, change order by change

                           14  order, pay application by pay application.

                           15           Melissa, will you show just an example of that.

                           16           Tom Irmiter spent an entire day, which I'm sure you

                           17  remember, going through line by line what Maxus paid for and

                           18  what it is seeking from Travelers.

                           19           Maxus got competitive bids.  It managed the

                           20  construction process.  Alex Stehl and Tom Irmiter testified

                           21  that if a subcontractor didn't do quality work, they sent the

                           22  pay application back and they said redo it.  We're not going

                           23  to pay for it.  Show us that it's justified.  And we went line

                           24  by line.

                           25           And I want to -- I want to talk about one thing
                                                        1157

```
 1   because I think it's going to come up with what Mr. Ely says,
 2   and you heard a lot about it.  There were construction defects
 3   at this project.  Bomasada was not a good contractor.  We
 4   freely admit that.  We recognize that.  We came forward with
 5   that.
 6           And part of why Mr. Irmiter took all day to go line
 7   by line by line was that he painstakingly made sure that we
 8   weren't seeking anything that was a construction defect.
 9   Nothing in these amounts that we're claiming is a construction
10   defect.  That's our responsibility.  And we've paid $14
11   million to correct those construction defects, but that's not
12   what's being sought here today.
13           So Irmiter and Ryan Stehl -- I'm sorry -- and Ryan
14   Snyder go pay application by pay application, change order by
15   change order showing you all those things.  We knew -- so what
16   this chart is showing that is on phase 6, Maxus paid to
17   rebuild and remediate phase 6 -- and this does not include
18   soot.  That's different -- $6,218,000.  On phase 5,
19   $3,647,000.  Phase 1 through 4, $1.6 million.
20           We knew the amount that Travelers paid us.  $37,000
21   for 1 through 4; 1 million for 1 through 5; 5 million for
22   phase 6.  We knew that there was a -- we knew that we paid and
23   we were claiming damage as a result of the fire of $11.5
24   million.  Travelers had only paid us $6.1 million, which
25   leaves a difference of $5.3 million.
```

1158

```
 1            We knew that, and Travelers admitted, yes, that's

 2   what we paid and didn't contest that's what Maxus -- that's

 3   what Travelers paid and didn't contest what Maxus paid.  What

 4   we didn't know and what we thought we would find out in this

 5   trial is why hasn't Travelers paid us for the $5.3 million?

 6   Which change order, which pay application do they dispute?

 7            And one of -- well, there was one witness who

 8   testified from Travelers, only one, and that was Mr. Bryan,

 9   who's been here this entire time.  He is the insurance

10   adjustor's supervisor.

11            And Mr. Bryan's testimony was perhaps the most

12   remarkable and surprising thing that happened in this trial.

13   He took the stand.  I put this chart in front of him, and I

14   said:  Okay, Mr. Bryan.  Do you agree that this is the amount

15   that you paid us from Travelers; this is the amount you --

16   that we paid to remediate the Metropolitan?  Please tell us

17   which pay applications -- you've been sitting here in court,

18   you've received all this information before trial.

19            Which pay applications, which change orders, which

20   contracts are you not paying?

21            And his response was, I can't do that.

22            Well, how do you know that what Travelers paid is

23   correct?

24            Well, I looked at it a while ago.

25            Well, can't you tell the jury what you paid for and
                                1159
```

```
 1    what you didn't pay or why you didn't pay for it?

 2              No.

 3              Members of the jury, that's what a trial is for.

 4    Travelers is supposed to come here and say:  Okay, we disagree

 5    with this payout.  You paid too much.  It wasn't reasonable.

 6    Go line by line like we did.

 7              Instead, nothing.

 8              What we heard from Mr. Bryan was:  Well, I did a --

 9    I did an Xactimate estimate at some point, and this is what I

10    thought it was a few years ago.

11              Xactimate is Travelers' tool to estimate.  Xactimate

12    is not in the policy.  It's an estimate.  We are not to take

13    it as gospel.  What we've put up is the actual dollars that we

14    have paid.

15              When we talk about vexatious refusal -- I want to

16    come back to this, because they have given no reasonable

17    excuse as to what they haven't paid for and why.  And it's,

18    frankly, shocking, and I don't use that word lightly.

19              That is why you have a trial.  That is why you're

20    sitting here.  That's why we put Tom Irmiter on for a day.

21    That's why we had Ryan Stehl go line by line by line.  In

22    response, we get nothing.

23              We get:  I did an estimate awhile ago, and we don't

24    think that we owe any more.

25              By the way, the policy doesn't say, Well, Travelers,
                                   1160
```

1  you're only obligated to pay what you estimate.  No.  You're

2  obligated to pay what actual damages occurred.  An estimate

3  means nothing.  It's a good tool when you're trying to figure

4  out how much things are going to cost, but it's not gospel.

5          So let's go to Claim No. 2, and this is for our lost

6  rent.  A similar thing happened.  This is the lost rental

7  income.

8          So one type of damages you heard about from our

9  expert Michelle Pienta is loss of business income or business

10  interruption loss.  That's because we weren't able to -- we

11  lost rents because we weren't able to rent them because of the

12  fire.

13          And, remember, this coverage has a separate $5.1

14  million policy limit.  That's in addition to the $35 million

15  policy limit.

16          Now, you also heard from Ms. Pienta.  And Ms. Pienta

17  went painstakingly through apartment unit by apartment unit to

18  determine when each would have been available to rent had the

19  fire not occurred.

20          And then she applied a 30-day waiting period that's

21  per the terms of the policy to -- for each unit's calculation,

22  and she based the calculation on the rent Maxus would have

23  received.  And she deducted any rent that Maxus actually

24  received to determine the total damages.

25          And by her calculations, by the way, Maxus would

1161

have exceeded the policy limit, the $5 million by June of
2020.

Remarkably, there was no testimony from Travelers
about this.  There was not -- they didn't hire an accountant.
Mr. Bryan, the adjustor, did not say anything about this,
about criticizing Ms. Pienta's calculations.  Do we get
something wrong?  Do we have an apartment unit that shouldn't
be in there?  Nothing.

And we thought -- we knew we had submitted this
claim to Travelers.  They knew we were claiming $4.2 million
for lost rents.  We assumed that when we got to trial, we
would have a debate about this.  We would hear from them why
haven't you paid for it?  Why do you disagree with
Ms. Pienta's calculation and what the right calculation is.

Instead there is no evidence.  There is no testimony
from Travelers to dispute this point.

And I suspect Mr. Ely may get up here and try to
offer some calculations on rebuttal or lost rent calculations.
That's not evidence.  It's too late for this.  They could have
hired an expert.  They could have put up Mr. Bryan to talk
about these calculations are wrong.  That's the way you do it
in a trial, but it's not -- you don't do that during argument.

And the evidence will be that Maxus rebuilt as
quickly as possible using its own funds during -- and this
was -- remind you during complications of COVID in order to

1162

get its business back up and running.

You may hear it took awhile to get the phase 5 going. We said that. And the reason why is that we were debating whether to tear the whole thing down. We had to hire an engineer. We had to figure out does it make more sense to repair it or build it back? We have to take into consideration there was a new building code. All of those things happened.

But, again, no evidence from anyone at Travelers who said, No, no, no. You guys should have had this rebuilt instead of 2020, it should have been in 2019. Nothing.

And I'm going to remind you about this when we talk about vexatious refusal.

All right. The third claim. This is for soot and char. This is what Maxus paid to repair soot and char at the Metropolitan. $17.1 million.

There's no disagreement about how much Maxus paid. So what's the dispute? Travelers contends that the soot and char found in phases 1 through 4 didn't come from the fire; and that even if there was soot and char, it didn't result in damage to the Metropolitan. So let's take them one by one.

How do we know that it's more likely than not that the soot and char came from the fire? First of all, you're allowed to trust your own eyes. You've seen the video. Smoke is billowing everywhere. You saw physical evidence of the

1163

1   soot on the walls from vents.

2          Tom Irmiter testified that you could smell it once

3   the HVAC was turned off.  The only meteorologist to testify in

4   this case, Mr. Calaci, yesterday, the gentleman who testified

5   yesterday, said that the video confirms that -- confirms what

6   the weather data is, is that there were variable winds, and

7   the smoke was going everywhere.

8          Adam Farnham testified yesterday, the fire dynamics

9   expert, that smoke was everywhere, especially as the fire

10  entered its second stage.  And you heard testimony about

11  pathways of entry of the smoke into the building.  You heard

12  testimony from Mr. Irmiter, who inspected the property.  He

13  was down there 18 times.  He knew the Metropolitan like the

14  back of his hand.

15         He described pathways.  The outside vents, the lack

16  of blocking, that the HVAC could have been pathways for the

17  soot to enter the Metropolitan and get behind walls and into

18  vents and into the air conditioning system, and not to mention

19  open doors and windows.

20         Travelers' experts admitted that when they reviewed

21  the pathways to the Metropolitan, they made a mistake.  They

22  were looking at blueprints instead of as-built drawings.

23         So let's go to the second argument.  Well, on top of

24  that, combustion byproducts, as we know, you heard from

25  probably more microscopists than you're ever going to hear

                                  1164

1  from again in your life, that soot and char are not always

2  visible to the naked eye.  It's small.

3        We had four microscopists come and testify, much to

4  your, I'm sure, chagrin.  But Ms. Mirica, Ms. Weidler,

5  Mr. Carlson, Mr. Baxter.

6        They each used different microscopists' analysis.

7  One used light microscopy, some used TEM, some used SEM.

8  There were different methods of sampling.  Some were

9  air-o-cell, some were tape lifts, some were bulk samples, some

10 were wipe samples.  They examined different samples at

11 different times, sometimes after it was painted.  But they all

12 come to the same conclusion, that the soot and char from a

13 nearby structure fire was in phases 1 through 4 of the

14 Metropolitan, and that the samples viewed were not from some

15 mesquite barbecue restaurant a couple blocks away; that these

16 had the hallmarks of a structure fire.

17        Dan Baxter, who you heard from yesterday who was by

18 video, one of the leading microscopists in the country on soot

19 and char.  He said that the best methodology that was used was

20 from Neil Carlson because you need to use light microscopy to

21 see soot and char from a structure fire.

22        Mr. Baxter, Mr. Dan Baxter confirmed Mr. Carlson's

23 conclusions; that the samples were consistent with a structure

24 fire nearby.  Not a big leap because we knew that -- we know

25 that there was a massive structure fire just 119 feet away

                              1165

from phases 1 through 3.  Not a big leap at all.

If you remember what Mr. Carlson testified to and Mr. Baxter testified, of the 72 samples that Mr. Carlson took, 70 out of the 72 tested positive for soot and char in significant amounts.

Travelers had one expert, Mr. Spicer, who's not a microscopist, and he's a gentleman, and he testified very candidly.  I asked him:  Okay.  Has the science here changed?  Would you do it differently?  He agreed that the preferred method to determine the existence of soot and char from a structural fire is from light microscopy from a tape lift.  That's not what he did.

I'm sure what he did back then he thought was the right thing to do.  I'm not challenging him as a professional or as a gentleman.  I'm sure he probably thought it was the right thing to do.

But what Mr. Dan Baxter told you yesterday was when you do a wipe sample and you put it under a TEM microscope, it destroys the soot.  So you're not going to find soot.

So what he did, and he was -- he was kind to admit it, is that the preferred method sitting here today -- and, again, I'm not saying he knew it back in 2019 or he should have known it back in 2019.  What I'm saying is he now knows that the science is if you want to find soot from a structure fire, you use a light microscope, and you do it with tape

1166

```
 1    samples just like Mr. Carlson did.

 2            That's why what Mr. Carlson -- Mr. Carlson's reports

 3    and his conclusions are the most persuasive here.

 4            By the way, Travelers' sampling by Mr. Spicer was

 5    just on 20 different spots, and Mr. Baxter was very critical

 6    about the way that he did it.  He was cutting through walls.

 7    There's calcium all over the place.

 8            If you remember, there was some testimony that said,

 9    hey, we did this fractal analysis, and the soot and char from

10    1 through 5 is different than that from -- I'm sorry.  The

11    soot from 5 is different from 1 through 3, so it must have

12    come from different places.  And Mr. Baxter says, No, what

13    you're looking at here is -- first of all, everything's been

14    destroyed, and what you're looking at is a bunch of gypsum

15    dust.  And that's what happens when you test that way.

16            The only microscopist who came who didn't issue a

17    report that we saw was Mr. Stiles.  His testimony was very

18    brief.  He was from Birmingham.  This was the fellow who was

19    hired, and then when we -- and we fired him because -- before

20    he issued a report.  And that's because we didn't -- we hired

21    somebody else.

22            I asked him, okay -- and this was the first time

23    that he had ever done -- if you remember, he said it was the

24    first time I ever tested for soot and char.  And I asked him:

25    Okay.  Is there anything unusual about the fact that a client
                              1167
```

```
1   would want someone who has done this tens of thousands of

2   times instead of someone who's just done it for the first

3   time?  He said, No, that's understandable.

4           Travelers' next argument is that the soot and char

5   got into phases -- that got into phases 1 through 4 didn't

6   cause direct physical loss to the building.  What's going to

7   be very important for you to go back and look at -- and you're

8   going to have all the instructions with you.  But if you go

9   back to Instruction No. 18.

10          And I know you just -- they were read to you, but

11  you're going to have the -- you're going to have them in front

12  of you.  But Instruction 18 says what's direct physical loss

13  or damage to the policy -- under the policy?  It means that

14  the property has suffered some physicality to the loss or

15  damage to the property.  A physical alteration.

16          All you need to show is that the property was

17  altered.  You don't have to show that it was uninhabitable.

18          But how do we know that this is direct physical

19  loss?  How do we know that it's been altered?  We know that

20  one of the best pieces of evidence is Travelers' actions

21  themselves.  When soot and char was found on phase 5, they

22  paid for it under the policy.  And I even asked Mr. Bryan:

23  Would Travelers have paid for the removal of soot and char if

24  it wasn't covered; it wasn't physical damage to the property?

25  He said no.
```

                              1168

So we know that soot and char can cause damage to a
property.  It can alter a property.  They wouldn't have paid
for it if not.

          However, it -- I will -- we don't have to prove
this, but it certainly was evidence that came out.  I want to
remind you that it is undisputed that soot and char can pose a
danger to humans.  Travelers' own experts testified -- I went
through it with them -- that combustion byproducts can cause
cancer and all kinds of other bodily harms, and there's no
nationally-recognized standard for how much of the combustion
byproducts are safe.

          It's not like a fire in your fireplace unless you
were building -- unless you are burning a bunch of plastic and
treated wood with chemicals and things like that.  And the
problem is not limited to humans.  You heard testimony that
soot and char can damage wiring.  It allows copper to start
touching that can cause arcing and fire.  It corrodes copper
plumbing and other metals in the HVAC system.

          This building was contaminated, and it simply needed
to be cleaned up.  It was not -- it was not enough to spray
some Lysol on it, paint over it and call it good.  And you
heard from Mr. Johnson that when he heard -- Mr. Dave Johnson,
the owner of Maxus, that when he heard about this, when he was
given the report, he said:  Listen, I have no choice.  I have
to make this right for my residents, and that's the $17.1

                           1169

```
 1   million.

 2         Okay.  The final claim, vexatious refusal.  So if

 3   you determine that Travelers acted unreasonably in failing to

 4   pay Maxus' claim, you have the ability to award an additional

 5   10 percent in damages and allow Maxus to earn a reasonable

 6   attorney fee.  You'll be happy to know that attorney -- the

 7   reasonableness of the attorneys' fees is decided by Judge

 8   Gaitan and not by you.

 9         THE COURTROOM DEPUTY:  Five minutes.

10         MR. ABRAMS:  All right.  Thank you.

11         All right.  Let's go -- Mr. Ely in his opening

12   statement said, Pay attention to the dates.  Dates are very

13   important.  I could not agree any more.

14         So, Melissa, let's go through this timeline.

15         All right.  Here's the important dates.  Some of

16   these may be seared into your mind already.  Maxus bought the

17   property August 31, 2018.  Fire occurs less than a month

18   later, September 27th, 2018.  On October 23, 2018, tenants are

19   finally allowed back into the Metropolitan.

20         On November 20th, 2018, we are not getting any

21   recognition from Travelers that the claim is going to be

22   covered.  We had to file an Alabama Department of Insurance

23   complaint.  They say, well, our underwriting department had

24   the wrong policy and that's why it took us so long, but we had

25   to file it.
```

                              1170

```
 1              Finally, on November 29th, Travelers confirms full
 2       coverage under the policy, and we start receiving -- we
 3       received an initial check to get going.
 4              Then fast forward to 2019.  FBS comes on site.
 5       There's already been some remediation of phase 5.  They see
 6       there's soot and char.  FBS says, Hey, you know what, you may
 7       have a problem in 1 through 4.  We better check it out.
 8              They go, and we tell -- Dave Johnson writes a letter
 9       to Travelers on May 1st, 2019, says, Hey, we may have a
10       problem with 1 through 4 when it comes to soot and char.
11       We're letting you know this.  That's May 1, 2019.
12              A week later, FBS comes out.  They start testing for
13       the soot and char on May 8th and 9th.
14              On June 15th -- I'm sorry.  On June 5th, FBS issues
15       its report to Maxus, and our worst fears are confirmed; that
16       there's soot and char in 1 through 4.
17              And we send the report to -- we send the FBS report
18       to Travelers right away, June 7th, 2019, saying, Hey, we've
19       got a problem.  Can you please look at this?  Give us your
20       impression.  This is going to be expensive to remediate.  We
21       don't know how much, but we want you to weigh in.  June 7th,
22       2019.
23              June 11, we send another letter because we hadn't
24       heard from them saying, Travelers, we need you to react to
25       this.  We're considering removing tenants from the
                                    1171
```

Metropolitan, some of whom have just moved in.  This is going

2   to be an expensive remediation.  Please respond.

3          We finally get a response.  We finally get a

4   response from Travelers, and you've heard this over and over

5   again.  And Travelers said that it has not undertaken and will

6   not undertake any technical, feasibility, safety, or other

7   review of this report of Mr. Irmiter.  Will not.  By the way,

8   that is what they've done throughout this trial.

9          Now, Mr. Bryan says, Well, it says -- it says

10  Travelers will not undertake any safety review, but that

11  doesn't mean we can't hire some consultant to do it for us.

12  Come on.

13         Let's go to the next one.

14         We make the hard decision June 14th, 2019.  We tell

15  residents they have to vacate.

16         On August 2nd, unbeknownst to us, Chris Spicer

17  issues his report to Travelers.  We don't know about this.  He

18  issues the report saying, Hey, we think FBS got it wrong.  We

19  don't think that there's an issue.  We don't think people need

20  to be moved out.  We don't think you need to be remediated.

21  August 2nd, 2019, we don't know about this.

22         On September 18, 2019, we are still asking for

23  Travelers' position.  We're asking for it because we know it's

24  expensive, and we're coming out of pocket for all these costs

25  to remediate.  That's September 18, 2019.

On October 2nd, we send another letter to Travelers saying, Please, tell us what you're thinking. Meanwhile, all this time, they're sitting on a report that says we disagree with FBS's opinion without telling us.

We sign a contract on -- a very expensive contract on October 9, 2019, to remediate 1 through 4. And we start tearing apart, as efficiently and economically as possible, the Metropolitan from October through December. This is a picture. If you remember, we showed these pictures of tearing out the walls, cleaning, the HEPA vac'ing. That's from November 21st, 2019.

Still no word from Travelers. We've spent millions on remediation.

Finally, on December 16th, 2019, we receive a letter with the August 2nd and December 11 reports.

THE COURTROOM DEPUTY: Time.

MR. ABRAMS: I'm going to go over, and I'll be quick. I'm going to go over, and I'll use some of my time.

We finally get it. And we finally get it, and we file suit later.

I asked Mr. Bryan: Why didn't Mr. Bynum just pick up the phone, call us during these months, tell us there was an issue? And he said: Well, we don't do that. You know, and the report was preliminary, even though the expert Spicer says it wasn't preliminary.

1173

1       And even if you don't want to give the report, why

2   don't you just pick up the phone and call us and say, Hey,

3   there's an issue?  Well, we just don't do it.

4       No excuse.  That is inexcusable.  That is vexatious.

5   Dave Johnson says, Listen, all you had to do is pick up the

6   phone and call us.  We could have talked about this.  But

7   instead they do nothing while we spent millions and millions

8   of dollars.

9       And I asked Mr. Bryan:  If you had to do it again,

10  would you do it the same way?  Did Mr. Bynum -- was he right

11  in doing it?  Yep, we would have done it the same way.

12      That's inexcusable, and that's why we need vexatious

13  refusal.

14      I haven't covered some other things that are

15  important.  I'm going to try to cover them when I can get back

16  up here and finish my time.

17      Thank you.

18      MR. ELY:  Good morning.  You made it.

19  Congratulations.

20      I want to echo what Mike just said about, first of

21  all, all of your attention and your patience with us.  There's

22  logistics that go in to trying this case, getting witnesses

23  together, and you've been very patient.  We're very

24  appreciative of that.

25      I do want to thank Mike and his firm and his group.

                        1174

1   They've been great to work with, and it makes this whole

 2   process work easier.  Judge Gaitan has been fantastic and the

 3   entire staff.  I do want to thank everybody as well.

 4           I want to -- we have notepads today; so I'm going to

 5   try to go in order to make it a little bit easier to take some

 6   notes, and I'm going to try to hit the things -- there's some

 7   things I want to clear up from what Mike just said.

 8           I want to start at the very beginning and go back as

 9   well to the opening statement.  We talked about facts and

10   evidence in the opening statement, I believe.  I asked you to

11   look at the facts and the evidence.  You've got it all now.

12   You've probably got more than you ever wanted now.

13           So here we are, and now it's time for you to make a

14   decision on what you've seen, what you've heard, and you've

15   seen a lot.  So I want to kind of go back.  I'm not going to

16   rehash all of it, fortunately for you, but I do kind of want

17   to summarize, hit the bullet points and talk about what we

18   think has been proven, and what, more importantly, we think

19   has not been proven.

20           So let's start first with the soot and char claims.

21   The -- one of the things that Mr. Abram said was that the four

22   microscopists established that combustion byproducts from the

23   phase 6 fire were in the Metropolitan.

24           I did not hear a single microscopist or any expert

25   from Maxus say to a reasonable degree of -- or -- in any way

                              1175

that the phase 6 fire had contaminated the doughnut building,
the other areas of the Metropolitan with soot.

If you heard it, great.  I didn't hear it.

What I heard from Ms. Mirica was a microscopist
looks at a slide.  What a microscopist -- I promise, I'll
never say that word again -- a microscopist can say is what
they're seeing on the slide.

No one has taken what was seen on the slide and put
it in the Metropolitan and established that it was
contaminated to the point it had to be remediated in excess of
$17 million.  Not one person has said that period, much less a
person who has said it to a reasonable degree of scientific
certainty.  It's not there.

The evidence is not there.  As a result of that,
right off the bat, this claim fails.

What we did hear was Mr. Carlson.  Mr. Carlson talked
about his sampling results.  And you heard -- you heard Maxus'
position.  70 of 72 showed combustion byproducts.  As much as
you have heard this week about microscopists, I think
everybody on -- everybody sitting in that box knows there's a
whole lot more to it than that.

When I was -- when I was talking to Mr. Carlson, we
went through his data.  We talked about what was -- how many
samples were -- detected no soot.  Remember, Dan Baxter sat
here yesterday and told us the primary combustion byproducts
1176

from a construction fire is soot.  That's what we're looking
for.

I talked to Mr. Carlson about that.  We talked about
the soot in his samples.  He said 19 of them, I believe,
either didn't find any or found them at levels that were --
they were not -- unremarkable, not even worth talking about.

Then I asked him a question.  I used his own scale
and said -- he's got that scale we showed that said 50 or
above, it's heavy impact from smoke.

How many of the 72 samples showed soot with heavy
impact of smoke above 50?  The answer:  Zero.

And then he offered one of -- I have to disagree
with Mike.  This was one of the more interesting things in the
trial to me.  He said, you know, if you take a sample next
to -- or in the area of someone's fireplace, you can easily
get readings over a 50.  Zero of the 72 samples Mr. Carlson
looked at had readings that were higher than what you find
around a fireplace at home.

That's what Maxus relied on.  That's the sole data
they have on June the 14th when they evicted the tenants from
the Metropolitan.

You'll remember Tom Irmiter had been out there on
May the 30th and had sent samples to two laboratories, EMSL.
You heard from both of them, EMSL and MicroVision.  Those lab
results were not back when he issued his opinion on June the

1177

1  6th.  They had not received them.  They were relying solely on

 2  the Carlson data.

 3          Also on October the 8th of 2019, when they entered

 4  into the contract for remediation with BCCM, they had not

 5  received a report from Mr. Irmiter on either of those lab

 6  reports.  They got that on November the 13th of 2019.

 7          So two decisions were made solely based upon what

 8  Neil Carlson found in his samples, and you heard what he said

 9  about his samples.  I'm not going to repeat.

10          The truth of the matter is at the end of the day,

11  the soot and char claims are a concern from a microscopy

12  standpoint.  No one has established any contamination from

13  soot from the phase 6 fire in the Metropolitan.  No one has

14  established it period, and no one has established it to a

15  reasonable degree of scientific certainty.

16          The second thing we looked at with regard to the

17  soot and char claims.  Let's not talk about microscopists ever

18  again.  Let's talk about the regular stuff.

19          What did you hear, what you see, what did you see in

20  this trial that showed you what you would expect to see for a

21  widespread soot contamination issue in an apartment building

22  that required $17.4 million worth of remediation?  Where are

23  the photographs?

24          You saw photographs of four vents -- five vents.

25  That's all we've seen in two weeks.  It's all we've seen.

                                    1178

1   What you've seen dozens of are pictures of those white walls
        2   the night of the fire, the week after the fire.  No smoke, no
        3   soot, no smoke trail.
        4           You heard experts testify, smoke leaves a trail.
        5   It's coming in around the doors.  It's going to leave a trail,
        6   especially on a white wall.  We didn't see any of that, none
        7   of it.
        8           Mr. Irmiter said he's reviewed over 10,000
        9   photographs.  Where are they?  They were not put into evidence
       10   in this trial.
       11           So you also heard from Mr. Johnson, frankly, about
       12   the condition of phase 1 through 4 after the fire.  He said no
       13   one knew anything was wrong.  There were no tenant complaints.
       14   There were no issues with smells of smoke.  Not hearing
       15   anything.  There's no request for smoke remediation in
       16   apartments that you heard about.  Nothing.
       17           In fact, business went along as usual from October
       18   when the tenants got back all the way to June 14th before they
       19   were evicted.  And you heard the testimony of Ryan Snyder.
       20   Maxus was actively leasing the doughnut building throughout
       21   that period of time.
       22           So what you've seen is the conditions.  You've seen
       23   the conditions of the property.  You've seen the photographs.
       24   And what's missing here, no testimony that soot contaminated
       25   the phase 1 through 4 building.  There's no photographic

                                    1179

1  evidence that anyone would expect to see from a soot

2  contamination -- soot contamination from a fire that would

3  require remediation to the tune of $17.4 million.  And you've

4  not heard any other evidence about the living conditions that

5  indicated that there was any kind of a problem.

6           As a result, the evidence before you is insufficient

7  to establish the soot and char claim.

8           So let's move to the water damage claim.  We've

9  heard testimony on water damage claims on phase 5.  What you

10  heard is that phase 5 was damaged by water the night of the

11  fire.  There was soot and char damage from the -- soot and

12  char contamination from the -- from the fire that night.

13           You heard the windows were melted out.  You've seen

14  the photographs.  The roof was hit with embers.  There's no

15  question about that.  The siding was damaged.  Travelers paid

16  for all that.

17           So what we're talking about in phase 5 is we're

18  talking about water damage.  You heard Mr. Irmiter say the

19  soot and char in phase 5, that's not an issue for me.

20  Travelers already paid for that.

21           So we're talking about the water damage in phase 5.

22  Understand this:  Mr. Irmiter also told you that when he went

23  in April 24th of 2019, phase 5 was dried in.  Windows were in,

24  siding was back on, and the roof was on the building.

25           It was not condition -- because it was in a framed

                              1180

condition.  So he went on April 24th of 2019, and he reviewed the property.

You heard the testimony of Kurt Mulder.  When Mr. Mulder visited the site on July the 19th, he found water damage.  He found active water leaks from a construction defect, and he found the subfloor had been damaged.  And later upon learning about the sprinkler leak, altered his opinion and has opined that the sprinkler -- the sprinkler break caused damage to phase 5.  You've seen the photos.  You've seen the reports.  You've seen the videos.  You decide whether there's damage there.

He also went back in March of 2020.  He identified -- you saw that thing -- the upside down photograph I showed you yesterday with the tarp.  He identified active roof leaks in 2020.  That's the new roof that was put on after the fire.  That's almost a year and a half after the Travelers' policy expired.

So phase 5 was exposed to three water sources from 2019 to 2020.  The sprinkler line break, which I'll let you decide on, the active roof leak that Mr. Mulder identified, and the active construction defect that he identified.

When I asked him yesterday:  When you went back on March 3rd of 2020, had any of that stuff been remediated from back when you were there in July?  And he said no.

That building sat there dried in with active water

1181

sources unconditioned for a year.  Those damages increased.

They got worse.  Mr. Abrams just talked about it.  You have to

decide the impact of that as to why that -- why that sat there

for a year.

        So with respect to the phase 1 through 4 water

damages, I think I told you in opening statement to expect a

lot of testimony about firefighting efforts.  You didn't hear

a lot about firefighting efforts because you heard Mr. Irmiter

on the stand decided it would change his opinion, an opinion

he's had for three years.  For three years, he's been saying

the fire hoses damaged the upper areas of the Metropolitan

courtyard.

        And right here at trial, you heard it, he said no

longer am I opining that it's the firefighting efforts.  It's

all about the embers.  It's all about the embers.  It's all

about the patches.

        You heard the testimony of Dr. Schroeder.  He did a

full study of the ember -- the brand dispersement across the

Metropolitan.  He looked at everything.  He looked at the fire

dynamics.  He looked could the smoke have made it in?

        He determined that there was no brand damage other

than in the section of phase 5 that you saw photographs of.

We pulled up photographs of phase 5 that looked terrible.  It

was ultimately replaced by Travelers.

        You also saw the photographs from ATC in December of
                                1182

1   '19 of the roof of the doughnut building.  Further, Mr. Mulder

2   was called back out in March 2020 to investigate this ember

3   damage claim.  He walked the entire property.  You saw his

4   photographs yesterday.  He even picked up one of the pieces

5   that he thought was a globule that was being talked about,

6   took it back to his lab, had it tested, and it was caulk.

7            Not to mention the fact that he also identified, and

8   we talked to Mr. Irmiter about this, the fact that the

9   manufacturer of the roof had been on that roof in February of

10  2019 within four months of the fire.  Further, Mr. Irmiter's

11  group had been on that same roof May the 8th of 2019, six

12  months after the fire, and nobody mentioned ember damage.

13  Nobody identified ember damage.

14           You've seen the photographs.  I'll let you make the

15  decision as to whether there was ever any ember damage on

16  phase 1 through 4 that led to the water damage.

17           Now, one of the things that Mr. Abrams talked about,

18  and it's been a theme of this trial, is that the construction

19  defect -- and there's a lot of construction defects.  The

20  construction defect, they're not claiming the construction

21  defect.

22           We sat here and heard Mr. Irmiter go through a lot

23  of testimony about all of the areas.  We even put photographs

24  up, and he was saying one-half of this is water damage,

25  one-half of this is construction defect, one-half of this is

                              1183

```
 1   fire damage.  And you heard Mr. Mulder.  Mr. Mulder went out
 2   there in March 2020.  FBS, Franklin Martin from FBS, same
 3   company as Mr. Irmiter, pointed out multiple areas of water
 4   damage that they were claiming was related to the fire.
 5           Mr. Mulder identified all of those as construction
 6   defect.  The claims for water damage that Mr. Irmiter has
 7   made, Mr. Mulder has countered and said those are construction
 8   defects.  The fact that Maxus has said it is a fire damage --
 9   fire-related damage doesn't mean they're not claiming things
10   that are construction defect in this case.  We just disagree
11   on that point.
12           So I want to touch on a couple of things that
13   Mr. Abrams talked about with respect to Travelers' position
14   with regard to these different claims.  Let's be clear.  Phase
15   1 through 4, Travelers has denied coverage because it
16   cannot -- it cannot equate the claimed soot and char
17   contamination.  There's no evidence that it's there.  Can't
18   equate that to the phase 6 fire.
19           It is also taking the same position with regard to
20   the water damage.  That water damage is related to
21   construction defect, not the phase 6 fire.  You all sat here
22   for two weeks and heard this back and forth, back and forth,
23   back and forth.  That's Travelers' position with regard to
24   both of the -- to the phase 1 through 4 claims.
25           Travelers' position with regard to phase 5, it has
                              1184
```

```
1    paid all of the fire-related damage.  Everything else is
2    related to either ongoing water events that occurred after the
3    policy period or related to construction defect.
4          So with respect to phase 6, they put up a million
5    dollar differential.  And I want to make sure that we're
6    talking about -- and you heard Mr. Bryan's testimony just like
7    I did.  I'll let you leave you -- I'm not going to argue about
8    the characterization of the testimony, but Mr. Bryan testified
9    -- to my recollection, he testified that upon receiving
10   as-built costs for phase 6 from Maxus during the litigation,
11   this is not before.  This is during the litigation in 2021.
12   After his deposition, he went page by page, reviewed every
13   single document that Maxus had identified as as-built cost for
14   phase 6 and concluded that the -- what he could verify as,
15   number one -- or not -- being in phase 6 at the time of the
16   fire, which is all the builders risk policy covers was $4.6
17   million.  It was not an Xactimate estimate that he prepared.
18         The Xactimate estimate was prepared earlier in the
19   case when we couldn't get information from Bomasada because
20   that's the best you can do when you don't have documentation.
21   What we're talking about is as-built costs in 2021.  It was
22   not Xactimate estimate.  It was an Excel spreadsheet that he
23   went through and identified each and every line item that
24   Maxus had provided, gave Travelers' position on that, totaled
25   it up, $4.6 million.  Travelers paid over $5 million for the
```
                                  1185

phase 6 damage.

Not only did he do that, he provided an explanation at each line item if there was insufficient documentation of what he would need to go back and evaluate that case -- or evaluate that claim. That's in the litigation. Travelers is still adjusting the claim and still communicating with Maxus about it.

So the accusation that he just referred to his Xactimate a couple of years ago, you heard the testimony. I'll leave those decisions to you.

With respect to the claims against -- the claims regarding -- the claims regarding the Chris Spicer report on August the 2nd, you heard Mr. Bryan's testimony. There's been argument that I may have characterized it as a preliminary report. It does not say preliminary on it. I didn't mean to mischaracterize anything.

What is true, though, is that for Travelers' purposes, it was preliminary. You heard Mr. Spicer's testimony. He didn't want to do additional testing. He tried to talk Travelers out of it because he didn't think it was necessary, and Travelers insisted on having him go do it.

The question was asked, and I thought a lot about this, Mr. Abrams asked the question of Mr. Bryan. He said, you know, Mr. Bryan, what would have been the harm? Pick up the phone, telling Maxus what you had found at that point?

1186

1    And Mr. Bryan said, It's not our position.

2    Travelers, as a company, does not provide incomplete expert

3    results to insureds until they are completed and it's

4    comfortable with the reliability of the conclusions.

5          If ever there were a case -- and he said, What harm

6    would come from doing that?  If ever there were a case that

7    showed what harm can come from a consultant sending out an

8    incomplete opinion based on part of the results, this is it.

9    FBS provided a report on June the 6th, 2019, to Maxus.  That

10   report concluded that there was widespread contamination in

11   phases 1 through 4.  That report was generated before Tom

12   Irmiter ever got the reports back from EMSL or MicroVision.

13         From that report, from that report, Maxus made two

14   decisions; evict the tenants, undertake a $17.4 million

15   remediation project.  A premature report with premature

16   conclusions without all the data.  That's the harm.  That's

17   exactly the harm.

18         And with regard to Mr. Irmiter, Mr. Irmiter -- we

19   went over his qualifications.  Mr. Irmiter does not have a

20   degree in any science.  He's a building code official.  He was

21   completely running this environmental -- this entire

22   environmental project.  He said to you -- I think he said he

23   was wearing -- he was running two projects at the same time,

24   wearing two hats.  He was running the construction defect

25   aspect and he was running the environmental project.

                              1187

```
 1          Mr. Irmiter has an English degree.  Now, I don't

 2    have a problem with English degrees.  I love English degrees,

 3    but not for this.  Not for this.

 4          And one has to wonder.  Mr. Abrams was talking about

 5    Brad Stiles.  You heard Mr. Stiles' qualifications.  He has a

 6    master's degree in environmental science.  You heard what SELC

 7    was doing.  They had a microscopist trained in their office

 8    who was trained in identifying combustion byproducts.  They

 9    went out there on April the 11th and 12th, took 97 samples,

10    more samples than any single testing company in this entire

11    case.  They took 97 samples.

12          Maxus was demanding, I want the report by April the

13    19th.  Within days of getting a report that was going to say

14    this place is clear, they were fired.  You have to answer the

15    question why that was.  You've heard the explanation.  You've

16    seen Mr. Stiles.

17          You have to ask -- and you heard him testify.  He

18    called Alex Stehl.  He told Alex Stehl, This is what the

19    results are going to show.  In that same conversation, he was

20    told you're fired, do not put it in writing.

21          You have to ask yourself why when they were days

22    away from getting a report that would have said the site is

23    clean, fires the testing company and tells them not to write

24    it down.  And then, then goes to hire Tom Irmiter to run the

25    entire environmental operation.  That's the question you have
```
1188

1    to answer on that aspect.

     2           Mike did say something I do agree with.  He said use

     3    your own eyes with regard to what the fire did.  You've seen

     4    enough video.  I'm with him.  Use your own eyes.  We don't

     5    need Rocco Calaci to tell us where the smoke's going.  You all

     6    can see the video.  You've seen the video.  You make your own

     7    conclusions.

     8           You've heard Dr. Schroeder's explanations of it.

     9    They're not rebutted.  In fact, Adam Farnham said, I kind of

    10    like Dr. Schroeder's opinion.

    11           You heard Adam Farnham's testimony yesterday, and he

    12    said smoke could have gotten all around the Metropolitan in

    13    this decay phase, and then I asked him, I said, Well, have you

    14    seen any photographs or videos of what the smoke actually did

    15    during that phase?  He said, You know, that would be really

    16    great to have it, but I haven't seen it.

    17           Dr. Schroeder -- you all heard -- you heard what

    18    Dr. Schroeder did.  You heard how many documents he's

    19    reviewed.  You heard how many frames of that video he looked

    20    at.  Weigh that evidence and make your decision on that.

    21           So with respect to the health issues, was there a

    22    health risk?  You heard Dr. Stuart Batterman.  Dr. Batterman

    23    has spent his entire life in the public health field.  You

    24    heard him say that we always -- we're conservative.  He tries

    25    to err on the side of caution helping people, making sure that

                                      1189

people are safe.  He assessed the fire.  He watched the fire.

He saw what it did to see if any of the smoke could have

gotten into the phase 1 through 4 building.  He looked at all

of the sampling data, all of it.  He looked at all of it

pre-remediation, post-remediation.

He looked at the same photographs you saw of the

interior and he made his assessment.  I asked him point blank,

Was there a health risk at the Metropolitan?  He said no.  And

the important thing that you have to understand is it's not

the soot and char necessarily that creates a health risk.

It's any chemicals that come from it.

No such analysis was made.  You heard him go through

the details, which are detailed, of what he would have to do

to come up with that sort of -- that sort of evaluation.  None

of that was done at the Metropolitan, and you heard him say in

his opinion to a reasonable degree of scientific certainty

there was absolutely no health risk at the Metropolitan from

any soot contamination from the phase 6 fire.

That testimony is unrebutted.  Maxus has not put a

single witness up to contest that.  In fact, the only person

who talked about actual safety issues and the health of the

tenants was Tom Irmiter, and he said what he was concerned

about was the safety of the tenants with respect to water

damage and mold and how that people might start getting sick

from the mold, not the soot and char.  Stuart Batterman's

1190

testimony is unrebutted in this case.  There were no health
risks from the phase 6 fire at the Metropolitan.

You heard back and forth about -- you heard comments
about vexatious refusal to pay.  You've seen an instruction on
that that was just read to you, and Mr. Abrams pointed to the
fact that Travelers didn't provide the August 2nd, 2019,
Spicer report and said that's vexatious and -- that's a
vexatious refusal.  Vexatious refusal requires Travelers to
deny a claim without a reasonable basis.

The fact that the report was not provided in the
middle of Travelers' investigation of the soot and char claim
is not a vexatious denial.  There was no denial of the claim
at that point.  In fact, that was what Travelers was trying to
-- the very thing Travelers was trying to figure out at the
time.

You've heard the testimony in this case.  Payments
were made on phase 6 based on what could be verified.
Payments were paid on phase 5 based on what the extent of the
water and soot damage and the other damage was.  And every
time that Travelers has been able to verify damages from the
fire, even into litigation, it has made payments.

Every time that there has been a dispute, there has
been a reasonable basis for that.  Travelers -- every part of
these claims, Travelers, where it needed it, Travelers relied
on experts to evaluate it for them.

1191

```
 1              You heard testimony about Mr. Spicer.  Mr. Spicer's
 2    a board certified industrial hygienist.  They can argue he was
 3    wrong, which they have.  You heard all of that discussion with
 4    Mr. Baxter.  But Travelers' reliance on Mr. Spicer was not
 5    unreasonable by any stretch of the imagination.  You met the
 6    man.  Travelers relied on Mr. Spicer to tell it whether there
 7    was impact from soot and char in the doughnut building.
 8              He gave an opinion.  He expressed that opinion, and
 9    Travelers used that opinion to make its coverage decision.
10              Same with the water damage claims.  You met
11    Mr. Mulder.  Mr. Mulder is a licensed engineer.  He was in
12    that place twice.  He made his evaluation.  He made his
13    reports as to whether the water damage was covered -- was
14    related to the fire.  Travelers relied on those expert
15    opinions and made its coverage decision.  There's nothing
16    about that that's unreasonable.
17              And with phase 6, as I mentioned, Travelers has made
18    a full evaluation as to the cost, determined it was $4.6
19    million is what they can verify, and no additional information
20    has been submitted.
21              Travelers adjusted this claim even into litigation,
22    even when all this was going on, and its actions in this case
23    have come nowhere close to the standard set forth in the jury
24    instruction.  But you be the judge of the evidence.  You be
25    the judge of how the evidence applies to the law on that
                                   1192
```

1    issue.

2              So what do we know about the construction defects

3    that were present?  You heard the testimony of Mr. Irmiter.

4    Mr. Irmiter said, you know -- I think he said -- it makes his

5    top ten -- I can't remember what -- it was one of the worst

6    ten buildings he's seen in 10,000.  The construction defects

7    were everywhere.  They quantified the damages.  You've seen

8    that.

9              Mr. Abrams told you they paid $14 million for

10   construction defect.  I've explained Travelers is contending

11   the additional damages are also construction defect that

12   they're claiming with regard to fire damage.

13             Mr. Irmiter even said that -- he even said that the

14   building was exhibiting characteristics of a building that was

15   20 years old.  It was only a year and a half old.  The

16   construction defects were everywhere in this place.

17             You've heard the testimony about the purchase of the

18   property.  You've heard it from Mr. Johnson.  The -- he even

19   admitted candidly that he wished that they would have done

20   more investigation into the condition of the property before

21   they purchased it as is on August 31st of 2018, and there was

22   a real push to get it done because the opportunity zone issues

23   and getting it purchased before the first tenants allows you

24   to get every single penny of the tax benefit is, I believe,

25   how Mr. Johnson characterized it.

                              1193

1    And that's what they did.  And it turns out they
 2  bought a really bad building.  There's no question about that.
 3  That's one thing that has certainly been established in the
 4  trial, and that's one thing Maxus is not trying to run away
 5  from.  It was a very bad building.
 6    So at the end of the day, that certainly has been
 7  proven.  So you have to ask the question now, having seen all
 8  the evidence.  You've seen all the videos.  You've seen all
 9  the photographs.  You've seen everything.  You've also seen
10  the email from Mr. Johnson to his bank.  I believe his
11  testimony was he sent the email to the bank.  He was trying to
12  convince the bank to give him a loan.
13    So at the end of all this, having seen all this
14  evidence, the question you have to ask is are we here -- and
15  this is a question that was asked in opening statement by
16  Mr. Abrams.  Why are we here?  You have to ask yourself the
17  question:  Are we here because the doughnut building is
18  contaminated with soot from the phase 6 fire that no one can
19  seem to confirm actually happened, or are we here for another
20  reason?  That's the decision you have to make.
21    I want to thank you for your time.  I want to thank
22  you for your attention, and I'm going to sit down now and let
23  Mr. Abrams finish so you can get to this case and get back to
24  your lives.
25    Thank you.
                              1194

1          MR. ABRAMS:  Thank you, Your Honor.  I'll be quick

         2    since I don't have much time.

         3          First, let's pay attention to what was not mentioned

         4    by Mr. Ely.  Not a single word about business interruption or

         5    lost rents.  I think that claim is admitted, and they've given

         6    no reason why they haven't paid it.  We've submitted it.

         7          That's vexatious refusal.  It's vexatious refusal to

         8    pay.  When they don't give you any indication why they're not

         9    paying, that's vexatious refusal.  Not a word about -- not a

        10    word during trial and not a word during closing about lost

        11    rents.

        12          I want to go to what Mr. Ely put up about

        13    Mr. Johnson.  Do you remember why -- what he said when he told

        14    his bank there would be money coming in on insurance?  What he

        15    said was, I've dealt with insurers, they want to pay you ten

        16    cents on the dollar, and I don't give up.  I fight.  That's

        17    what he said.

        18          Now, Instruction No. 18 is very important about soot

        19    and char, and it's really important to pay attention to.  All

        20    you have to show -- all we have to show is that the property

        21    suffered some physicality to the loss or damage of the

        22    property.  A physical alteration.  That's what we have to

        23    show.  I can't believe there's any debate that this property

        24    wasn't altered by the presence of soot and char.

        25          Neil Carlson, 70 out of 72, high -- and Mr. Ely was
                                    1195

very careful. He said, oh, well, he didn't find the high
concentrations of soot here. No, it's soot and char. In
sample after sample after sample all over the Metropolitan,
you find soot and char.

Construction defects, this was a bad building.
We've said it's a bad building. We paid for that mistake. We
paid $14 million for that mistake. We are not charging
Travelers or seeking Travelers to pay one penny of that. So
all the stuff about this other water damage and stuff that
Mr. Ely says, we're not seeking it.

Now, the argument about not giving us the Spicer
report in August and saying, Well, what's the harm in giving
it, you know, it's an incomplete report, they want to do
testing, even though Mr. Spicer says in his full report he
didn't want to do testing. Tell us. Even if you don't want
to show us the report, tell us. Hey, don't kick people out,
or actually people were already kicked out by then. Don't
start renting out the building, there's an issue here. Just
pick up the phone and tell us, and when -- that is not the way
an insurer should behave to an insured.

There is no excuse, and if it's Travelers' policy
not to do that, not to -- to treat their insureds that way,
that's vexatious refusal, and it needs to stop.

Okay. There wasn't much mentioned about the
sprinkler leak because I think that they've gone off of this.

1196

```
 1   The best testimony, the fact that Mr. Stiles came to testify
 2   -- remember, they were saying sprinkler leak that caused other
 3   damages at phase 5.
 4          The best evidence was Brad Stiles came here from
 5   Birmingham, Alabama.  I asked him, he happened to be there,
 6   thank God.  He was there the day after the sprinkler break.
 7   He was at the spot.  What did you see?  I saw some water on
 8   the floor, looked like it was being cleaned up, not a big
 9   deal.
10          That is just a -- that is just an excuse to draw
11   your attention away from the fact of what -- the way that
12   Travelers behaved.  The sprinkler leak here did not cause any
13   additional damage.
14          Okay.  I want to show you and put up the verdict
15   forms.  I think this is very important.  And while we're
16   getting that up, the testimony was that during the decay phase
17   of the fire, smoke spread everywhere.  Everyone agreed with
18   that.
19          You saw it with your own eyes in the video.  They
20   tried to stop the video at one hour.  We showed you the one
21   where it showed that smoke was going from 1 through 4.
22          Got the Elmo ready?
23          Okay.  So this is what you're going to have when you
24   go back to the jury room.
25                THE COURTROOM DEPUTY:  They need to focus it.
                                    1197
```

1    MR. ABRAMS:  I'm running out of my time.

2        Can I have a pause on my time?

3        THE COURTROOM DEPUTY:  I paused your time.  You have

4    five minutes and 52 seconds left.

5        MR. ABRAMS:  Beautiful.  Thank you.  Technology.

6        All right.  This is verdict form A.  This is on the

7    -- this is on the damage to the building that's not soot and

8    char.  So you're going to have to fill out this form.  If you

9    find -- and by the way, the -- the argument here is that

10   there's some magic spreadsheet that's out there that's not in

11   evidence that Travelers said, hey, we looked at this and we

12   don't think that we owe anymore.  That's not what you do in a

13   trial.

14       What you do in a trial is you say, okay, we've

15   submitted these claims, we disagree, and you go item by item

16   and you have a trial about it.  You don't say we did some

17   magic calculation that we're not going to show you, that we

18   never showed you, and just take it for our word.  That's not

19   the way insurance contracts work, and that's not the way

20   trials work.

21       So if you find for Maxus on the property damage, you

22   have to break it up into four different categories here.

23   First of all, you've got to circle Maxus, and then rebuild on

24   phase 6 to the state of construction that hasn't been paid,

25   and we've got it down to the penny.  But it's -- and you

1198

1  should write this down.  The number you should put there is

2  $1,666,239.  I'll ignore the cents.

3           Water damage in phase 5, we heard a lot about water

4  damage in phase 5 that came through.  It's only $126,000 that

5  has been submitted, but that's the water damage on phase 5.

6           The water damage on phases 1 through 4, the burn

7  holes, and then Mr. Irmiter said, well, we know that it's

8  water damage as a result of the fire because you have burn

9  holes.  The roof was fixed, and then it dried out.

10          We know if it's dry, it's fire damage.  If it's wet,

11  it's a construction defect.  That's $250,000.

12          The exterior damages to 1 through 4, the damages

13  through -- I'm sorry.  1 through 5 for the fire.  So other

14  than 6, not the water damage, is -- and please write this

15  down, $3,868,722.  We'll ignore the cents.  That's for form A

16  on the damage to property.

17          Verdict form B, this is on the combustion

18  byproducts.  So this is on soot.  Damages for remediating soot

19  on 1 through 4, $17,184,851.  That's the damage for

20  remediation of soot in phases 1 through 4.  That's verdict

21  form B.

22          Verdict form C, this is on the claim for lost rents.

23  I think this is conceded.  There is just -- there was no

24  testimony that contradicted Ms. Pienta's testimony, and there

25  was no argument from counsel.  The lost rents, because we were

                            1199

```
 1   shut down because of the fire, is $4,234,399.

 2             And then verdict form D, this is vexatious refusal.

 3   If you believe that Travelers did not act reasonably in

 4   failing to pay Maxus in the way that they behaved in this

 5   claim, the way this works is, it's an old statute, you circle

 6   Maxus.  And what's the penalty?  You take a -- you can get 20

 7   percent on the first $1,500.  It's an old statute.  And you

 8   put in 20 percent.

 9             And then you can put a penalty to be awarded on the

10   remainder, and you're limited to 10 percent.  And --

11             THE COURTROOM DEPUTY:  Two minutes.

12             MR. ABRAMS:  We suggest you put 10 percent.

13             On the bottom it says, Should Maxus be entitled to

14   an award of its reasonable attorneys' fees?  We suggest that

15   you say yes, and thank goodness for you if you say yes, it's

16   not your decision to make about reasonable attorneys' fees.

17   That goes to Judge Gaitan.

18             I'm at my time.  Thank you again for your attention

19   and service on this case.

20             THE COURT:  Okay.  You'll be given copies of the

21   instructions.  Do we have them yet?  We have copies of the

22   instructions.  You can take those back to the jury room, get

23   yourself a little break, and then go to work, and if you need

24   anything from me, send me a note.  Okay.

25             All right.  We'll stand in adjournment pending.
                          1200
```

```
 1                    (A recess was taken.)

 2   (The following proceedings were had out of the presence of the

 3   jury:)

 4              THE COURT:  I'm ready to get on the record over

 5   here.  In response to the jury's Question No. 1, which I have

 6   labeled A and B because they requested different information,

 7   A is Defendant's Exhibits 438 from June 2019 rent roll;

 8   Plaintiff's Exhibit 260, Travelers' claim summaries and claim

 9   notes.  Then let me state what the other request was.  Is

10   there an exhibit that shows exterior payments made broken down

11   by buildings 1 through 3, 4, and 5?

12              It sounds to me like they're asking for plaintiff's

13   request, but I'm going to send it back to them and say as

14   follows:  I am providing the exhibits specifically requested

15   of defendant -- I said defendant.  It should be defendant and

16   plaintiff.  And what I have labeled as A regarding the request

17   and what I have labeled B, I need to know if you are referring

18   to plaintiff or defendant's exhibits or both.

19              That will be what I send back to them plus these

20   exhibits.

21              MR. ELY:  Yes, sir.

22              THE COURT:  They're Exhibits 438 and 260.

23              Any questions?

24              MR. ELY:  No, sir.

25              MR. ABRAMS:  No.
                                 1201
```

```
 1              MR. ELY:  Thank you.
 2                   (A recess was taken.)
 3              (The following proceedings were had out of the
 4    presence of the jury:)
 5              THE COURT:  Okay.  For the record, I've received
 6    another request from the jury.  They want plaintiff's reports.
 7    I'm assuming they mean Exhibits 746, 776, and 781.  I've been
 8    told that I have these exhibits here.  I'll ask Christy to
 9    take them back.
10              Any objections?
11              MR. ABRAMS:  No objection, Your Honor.
12              MR. ELY:  No.
13                   (A recess was taken.)
14              (The following proceedings were had out of the
15    presence of the jury:)
16              MR. ABRAMS:  The backup they've asked for is in five
17    boxes.  We can send the five boxes, but that is what they've
18    asked for.
19              THE COURT:  Where do they say what they ask for?
20              MR. ABRAMS:  Is there an exhibit that shows exterior
21    payments made broken down by buildings 1 through --
22              THE COURT:  That was the initial question.
23              MR. ABRAMS:  Right.  Then they said both.  They
24    circled both.
25              THE COURT:  Oh, both.
                            1202
```

```
 1          MR. ABRAMS:  This is the summary.  The backup is
 2     those five that are -- they're all -- see, what's happening,
 3     Your Honor, they're going off the list and they don't realize
 4     that some of these documents were never talked about at trial.
 5     We probably -- we have to do it again, maybe we wouldn't have
 6     done that because there's hundreds of exhibits that were never
 7     introduced at trial.
 8          But I don't have any objection to them seeing this
 9     and seeing the backup.
10          THE COURT:  It's going to become unyielding if we
11     continue doing this.  Why don't we just say that there's five
12     boxes that back it up.  Do you want the five boxes in addition
13     to the summary?
14          MR. ABRAMS:  Okay.
15          THE COURT:  Let me see what this says.
16          MR. ABRAMS:  This is 792.  It comes with a letter,
17     but then it -- then it breaks it down.
18          THE COURT:  I think this is what they're looking
19     for.
20          MR. ELY:  Your Honor, we have these two, Defendant's
21     Exhibit 47 and Defendant's Exhibit 42.
22          MR. ABRAMS:  Can we just take a look at them?
23          THE COURT:  What is 47 and 42?
24          MR. ELY:  47 is --
25          THE COURT:  Part of the summaries?
                              1203
```

```
 1            MR. ELY:  These are the detail on what we've paid on
 2   the exterior.  This is -- it is Xactimate.
 3            MR. ABRAMS:  I don't think that's --
 4            MS. WINTER:  That's not what's been paid.
 5            THE COURT:  They're asking -- they're saying is
 6   there an exhibit that shows exterior payments made broken down
 7   by building 1 through 3 and 4 and 5?  So they're contemplating
 8   not volume but an exhibit.  But you're saying there is no
 9   exhibit?
10            MR. ELY:  There is an exhibit --
11            THE COURT:  You have an exhibit?
12            MR. ABRAMS:  Right.
13            THE COURT:  We're going to be literal, we may as
14   well be literal.
15            MR. ELY:  There is an exhibit that details the
16   payment statement of loss details.  It is not broken down by
17   exterior, interior, but it is broken down by different
18   buildings as to what's been paid.  Exhibit 31.
19            THE COURT:  This would -- you had a big stack.  That
20   one represents the backup to this?
21            MR. ELY:  Yes, sir.
22            THE COURT:  What I'm going to do is send -- what I'm
23   inclined to do is send the summaries and let them know that
24   there are backup boxes that have backup material.  If they'd
25   like to have that, they can request it.  I don't know if you
```
                                     1204

1    have something that's going to be as pinpoint as they're

 2    requesting.  That's the issue.

 3              MR. ABRAMS:  See, what we have is -- you've got

 4    payments to other folks in there.

 5              MR. ELY:  But for the buildings, we don't.  The

 6    building payments have been made.  The building payments are

 7    the first three lines.

 8              THE COURT:  Did you display this?

 9              MR. ELY:  No, we didn't.

10              THE COURT:  See, they don't know what they're asking

11    for.

12              MR. ABRAMS:  That's what we discussed.  That was the

13    problem.  We thought we'd save time and wind up putting in

14    hundreds of exhibits that were never utilized.  They're just

15    looking -- and they didn't have notes so they couldn't --

16              THE COURT:  What I'm going to do is send something

17    back to them that says we need more specificity in their

18    request because this request could --

19              MR. ABRAMS:  I'm sorry.  I didn't mean to interrupt

20    you, Your Honor, but we're okay with this because it matches.

21    That's yours.

22              THE COURT:  That's what I'm saying if you can't

23    agree upon that.  If you can agree upon it, I'll just send

24    back the two summaries and let them know there is -- if they

25    want more, they can ask for more.  Does that make sense?
                                  1205

```
 1            MR. ELY:  I want to say this:  This is an Excel

 2    spreadsheet, and it has a second tab for business interruption

 3    that should be attached to it but is not.  We're trying to

 4    print that out, but that's not what they've asked for.  This

 5    is not -- I want to say this is not the full statement of

 6    loss.  Exhibit 31 is missing the extra -- the business

 7    interruption page.

 8            MR. ABRAMS:  They didn't ask for it.

 9            MR. ELY:  I understand.  I'm letting everybody know

10    this is not an accurate -- there's another page to this

11    exhibit.

12            THE COURT:  What are you proposing?

13            MR. ELY:  I'm fine sending the exhibit back, Exhibit

14    31, back with the -- because this does have the requested

15    information from Exhibit 31.  I just wanted to be clear to

16    everybody there's another page we're trying to get.

17            THE COURT:  They would have to ask for more.

18            MR. ELY:  Correct.  We would supply it.  So Exhibit

19    31.

20            THE COURT:  What I've written down here is I'm

21    providing a summary.  There are five boxes of backup

22    information that supports the summary.  Do you want the five

23    boxes?  I think I'm going to have to change that now.  These

24    are the summaries.  There is backup material --

25            MR. ABRAMS:  From the plaintiffs.
                              1206
```

```
 1            THE COURT:  From the plaintiffs, and he's got
 2    something he said.
 3            MR. ELY:  Yes.  This is the backup that goes with
 4    it.  We would submit Exhibit 31.
 5            THE COURT:  And do you have backup for that?
 6            MR. ELY:  Right here.
 7            THE COURT:  Okay.  I don't think they want the
 8    backup.  They just want the short version, but that's what I'm
 9    going to say.  I'm just going to say backup material.
10            MR. ELY:  These are the other pages.  It's got the
11    statement of loss with the payment detail.  It's got payment
12    detail on the building.  This is the spreadsheet.
13            MR. ABRAMS:  I think it totals a different number.
14            THE COURT:  Here's what I'm going to do in the first
15    instance:  I'm providing summaries.  There are boxes of backup
16    information that support the summaries.  Do you want that
17    backup material as well?
18            MR. ABRAMS:  That's fine, Your Honor.
19            MR. ELY:  Yes, sir.  That's fine.
20            THE COURT:  Right now I'm just going to send the
21    summaries; so you can look at it and talk about it.  Make sure
22    I've got the right stuff here.
23            MR. ELY:  Yes, sir.
24            MR. ABRAMS:  Yes.
25                    (A recess was taken.)
                           1207
```

1  (The following proceedings were had in the presence of the

2  jury:)

3          THE COURT:  All right.  Ladies and gentlemen of the

4  jury, I understand you have reached your verdicts in this

5  case.

6          May I speak with counsel.

7          (Counsel approached the bench and the following

8  proceedings were had:)

9          THE COURT:  I just want to share it with you before

10  I read it.

11          MR. ABRAMS:  Yes, sir.

12        (The proceedings returned to open court.)

13          THE COURT:  I'm going to read the verdicts as

14  provided to me by the jury, and then I'll call on members of

15  the jury panel and ask if the verdicts that I've just read is

16  your personal verdict in this case, and I'll be calling on you

17  individually to get your response.

18          Verdict form A, on plaintiff Maxus Metropolitan

19  LLC's breach of contract claim against defendant Travelers

20  Property Casualty Company of America for direct physical loss

21  or damage to the Metropolitan caused by the fire for which

22  plaintiff has been -- has not been fully compensated excluding

23  any property damages caused by combustion byproducts as

24  submitted in Instruction 20, we find in favor of plaintiff,

25  and they have broken down the amounts as $1,666,239,

                              1208

```
 1   rebuilding phase 6 to a stage of construction at the time of
 2   the fire; $126,000 for water damage as in phase 5; $250,000,
 3   water damage in phases 1 through 4; and $3,868,772, exterior
 4   damage to phases 1 through 5.
 5            Verdict form B, on plaintiff Maxus Metropolitan
 6   LLC's breach of contract claim against defendant Travelers
 7   Property Casualty Company of America for direct physical loss
 8   or damage to the Metropolitan in the form of combustion
 9   byproducts caused by the September 27, 2018, fire, as
10   submitted in Instruction No. 24, we find in favor of Maxus
11   Metropolitan in the amount of $17,184,851.43.
12            Verdict form C, on plaintiff Maxus Metropolitan
13   LLC's breach of contract claim against defendant Travelers
14   Property Casualty Company of America for business interruption
15   to the Metropolitan caused by the September 27, 2018, fire as
16   submitted in Instruction No. 27, we find for plaintiff.
17   Damages in the amount of $4,234,399.
18            Verdict form D, on plaintiff Maxus Metropolitan's
19   claim against defendant Travelers, we, the jury, find in favor
20   of plaintiff and the interest percentage, the first blank is
21   20 percent and the second is 2 percent.
22            On the issue of attorneys' fees, the jury finds that
23   the plaintiff is entitled to attorneys' fees here.
24            As I call your name, I'll ask that you tell me if
25   the verdict forms that I've just read are your personal
```

1209

1  verdicts in this case.

2                    (Jury polled.)

3          THE COURT:  At this time the court will accept those

4  verdicts.  I thank you for your time and your patience.  This

5  was kind of a roller coaster ride getting to this point, and I

6  appreciate the fact that you indulged us with the time we

7  needed.

8          If there's nothing else, I will dismiss you as

9  members of this jury panel.  You may return to the jury room

10  to collect your personal belongings.  And you have their

11  phones.  You're not leaving without those.

12          All right.  Thank you.

13          (The following proceedings were had out of the

14  presence of the jury:)

15          THE COURT:  Anything further from counsel?

16          MR. ELY:  No.

17          MR. ABRAMS:  No, Your Honor.

18          THE COURT:  Okay.

19                    (Court adjourned.)

20

21

22

23

24

25
                               1210

1          REPORTER'S CERTIFICATE

2

3          I certify that the foregoing pages are a correct

4    transcript from the record of proceedings in the

5    above-entitled matter.

6

7    _____        _____
          Date                    /s/Gayle M. Wambolt
8                                GAYLE M. WAMBOLT, CRR, RMR
                                 United States Court Reporter
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                            1211